KOH
PDK/TAX: USAO 2020R00192

USDC- GREENBELT
'25 JAN 16 PM 4:20

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.** LKG25CRL6 |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | **(Tax Evasion, 26 U.S.C. § 7201; Aiding** |
| | * | **and Assisting the Preparation of False** |
| **Defendant.** | * | **and Fraudulent Tax Returns,** |
| | * | **26 U.S.C. § 7206(2); Willful Failure to** |
| | * | **Pay Taxes, 26 U.S.C. § 7203; False** |
| | * | **Statements, 18 U.S.C. § 1014; Aiding** |
| | * | **and Abetting, 18 U.S.C. § 2;** |
| | * | **Forfeiture, 18 U.S.C. § 982(a)(2),** |
| | * | **21 U.S.C. § 853(p))** |
| | * | |

\* \* \* \* \* \* \*

### INDICTMENT

The Grand Jury for the District of Maryland charges that:

### Introductory Allegations

At all times relevant to this Indictment:

1.     Defendant **THOMAS C. GOLDSTEIN** ("**GOLDSTEIN**") was a lawyer and a resident of Chevy Chase, Maryland, and, beginning in 2021, Washington, D.C.

2.     From at least 2016 until March 2023, **GOLDSTEIN** was the sole owner of Goldstein & Russell, P.C. ("G&R"), a boutique law firm in Bethesda, Maryland, specializing in appellate litigation, which included briefing and arguing cases before the United States Supreme Court. **GOLDSTEIN** and others at G&R often performed appellate and related litigation with, and on behalf of, various law firms—including a nationwide law firm specializing in representing plaintiffs in securities litigation ("Law Firm-1"), and a New York-based law firm specializing in representing plaintiffs in mass tort litigation ("Law Firm-2").

3.     Although certain senior attorneys at G&R other than **GOLDSTEIN** were nominally referred to as "partners," those attorneys were employees of G&R, and **GOLDSTEIN** was the 100% owner of the firm. As the sole owner of G&R, **GOLDSTEIN** oversaw and had final word on the operation and management of G&R, including the hiring and firing of attorneys and other employees, the firm's finances and bank accounts, compensation paid to employees, the firm's health insurance coverage, and the accounting, bookkeeping, and tax reporting performed for G&R.

4.     According to the structure that **GOLDSTEIN** created, maintained, and oversaw, G&R did not employ an in-house accountant or bookkeeper. Rather, limited record-keeping functions were carried out by G&R's "firm manager," who was typically a recent college graduate with no formal accounting or bookkeeping experience and whose responsibilities also included, among other things, picking up **GOLDSTEIN**'s dry cleaning, getting service performed on **GOLDSTEIN**'s motor vehicles, and coordinating maintenance and other work done on **GOLDSTEIN**'s residence. Beginning in 2020, G&R began using a third-party, Canada-based online bookkeeping software service, which was administered by the G&R firm manager.

5.     In or about 2013, **GOLDSTEIN** hired a new outside accounting firm located in Bethesda, Maryland ("the Accounting Firm"), to perform bookkeeping, accounting and tax-preparation services for G&R and **GOLDSTEIN** individually. The Accounting Firm continued to perform accounting and tax-preparation services for G&R until in or about 2024.

### GOLDSTEIN's Gambling Activities

6.     In addition to the legal work he performed at G&R, **GOLDSTEIN** was also an ultrahigh-stakes poker player, frequently playing in matches or series of matches in the United States and abroad involving stakes totaling millions, and even tens of millions, of dollars.

2

GOLDSTEIN's poker activities included both "ring games" (which typically involved five or more players) as well as "heads-up" matches (which were two-player matches).

7.    To finance his participation in certain heads-up matches, GOLDSTEIN frequently enlisted other poker players to stake, or "buy a piece of," GOLDSTEIN in those matches. Generally, such arrangements meant that the other poker players would receive an agreed-upon percentage of GOLDSTEIN's winnings if he won the match but pay that same percentage of GOLDSTEIN's losses if he lost. Pursuant to a well-established custom in the high-stakes poker community, when an individual "buys a piece of" a poker player and that poker player wins against his or her opponent, the winning poker player is not expected to pay that individual their piece of the winnings until the opponent pays what was lost.

8.    GOLDSTEIN also funded his poker activities by borrowing millions of dollars. In early 2014, GOLDSTEIN approached a California-based businessman for whom he had previously performed legal work through G&R, seeking to borrow $10 million to fund GOLDSTEIN's gambling activities. The businessman, a billionaire ("California Businessman-1") who owned and operated a series of companies with his wife, agreed to do so but required GOLDSTEIN to sign a promissory note memorializing the loan and GOLDSTEIN's obligation to repay. Accordingly, in or about February 2014, GOLDSTEIN signed a promissory note ("Note-1") that allowed GOLDSTEIN to borrow up to $10 million and obligated him to repay, with interest, the amounts advanced under Note-1.

9.    Between March 2014 and November 2016, GOLDSTEIN borrowed over $9.5 million on Note-1, most of which he lost in poker matches during that period. Although the terms of Note-1 had originally obligated GOLDSTEIN to repay the amounts advanced to him by December 2015, the note was repeatedly extended through a series of "allonges," which amended

the terms of the note and extended the payment deadlines. By January 2021, **GOLDSTEIN** owed over $9.89 million on Note-1, an amount that remained outstanding throughout all of 2021. By the end of 2022, **GOLDSTEIN** still owed more than $8.89 million on Note-1.

10.     To make and receive payments related to his gambling and certain other private activities between 2016 and 2022, **GOLDSTEIN** typically used a personal bank account ("the Gambling Account") over which he exercised exclusive control and authority, including the authority to effectuate transfers. The G&R firm managers did not have access to the Gambling Account. By contrast, **GOLDSTEIN** permitted the G&R firm managers to share authority with respect to the G&R bank accounts, as well as a different personal bank account for **GOLDSTEIN** and his wife, through which the G&R firm managers, as part of their official duties, paid certain of **GOLDSTEIN**'s personal bills.

## **GOLDSTEIN's Sham Employment Arrangements**

11.     Between 2016 and 2022, **GOLDSTEIN** was involved in, or pursued, intimate personal relationships with at least a dozen women, transferring hundreds of thousands of dollars to them from his financial accounts or joint bank accounts he set up with the women, and paying for travel and other expenses for many of them. **GOLDSTEIN** executed these financial transactions while he owed substantial amounts of money to the Internal Revenue Service ("IRS").

12.     To supplement or supplant payments he was making personally to three of the women, and to pursue an intimate relationship with a fourth woman, **GOLDSTEIN** caused the four women to be nominally "hired" as employees of G&R at various points during 2018. That arrangement, **GOLDSTEIN** explained to the women, allowed the women to be paid by G&R and obtain health insurance under G&R's policy, for which G&R paid their premiums.

4

13.     Although **GOLDSTEIN** caused the women to be listed and paid as "employees" of G&R during 2018 and covered under the G&R health insurance policy, the women performed little or no work for the firm and therefore did not qualify for health insurance under the terms of G&R's health insurance policy. Although one of the women performed no work for G&R, the firm, at **GOLDSTEIN**'s direction, paid her more than $4,000 in "salary" over approximately one month, and provided her G&R health insurance between 2018 and 2020, and paid the premiums for that coverage. **GOLDSTEIN** caused the full salary and insurance premium payments to these women—which added to or replaced his personal payments to them—to be deducted as G&R business expenses, thereby falsely reducing his taxable income.

**The Defendant's Tax Reporting, Tax Filing, and Tax Paying Obligations**

14.     The United States income tax system ("the U.S. system") imposed a tax on the income of individuals and corporations. The tax was imposed on taxable income, as defined, multiplied by a specified tax rate. The U.S. system allowed for a reduction of taxable income for business and non-business expenditures, known as deductions. To be allowable, deductions must have been both ordinary and necessary.

15.     The U.S. system was based on self-assessment, which means that U.S. taxpayers must declare and pay taxes without being told the amount that is due by the U.S. taxing authority, which is the IRS, a bureau of the U.S. Department of the Treasury ("U.S. Treasury").

16.     The U.S. system was also a pay-as-you-go system, which means that taxes must be withheld from wages to be paid over to the U.S. Treasury in the year in which income was earned (which was the case with most taxpayers), and/or be paid quarterly to the U.S. Treasury on an estimated basis, again during the year in which the income was earned ("tax year"). When tax returns were filed in the following year, any withholdings or estimated tax payments were applied

5

against what the taxpayer owed, resulting either in a refund or an amount that was due to the U.S. Treasury.

17.    The U.S. system relied on the honesty and integrity of taxpayers in fulfilling their tax-reporting and tax-paying obligations. Although the IRS audits some returns each year, as a practical matter, it could audit only a small fraction of taxpayer returns.

18.    Individual income tax returns were typically due on April 15 of the calendar year following the tax year. A taxpayer could request and receive an extension to file his or her return, which extended the due date of the return to October 15. Taxpayers were required to pay any taxes owed by April 15, regardless of whether they filed a return on that date. In other words, an extension to file a return did not entitle a taxpayer to delay paying taxes; rather, those taxes were still due on April 15 of the calendar year following the tax year.

19.    Form 1040, U.S. Individual Income Tax Return ("Form 1040"), was an IRS form that individual taxpayers used to file their annual income tax returns. Form 1040 contained sections that required taxpayers to disclose their income, deductions, and other items for the year in order to determine whether additional taxes were due and owing or whether the filer would receive a tax refund.

20.    The U.S. system required taxpayers to report *all* their income, whether earned or paid to the taxpayer inside or outside the United States. Winnings from wagering transactions, such as poker matches, constituted income under the U.S. system and had to be reported in full on Forms 1040. For non-professional gamblers, known as "casual" or "amateur" gamblers, such income had to be reported as "other income" on Form 1040. Losses from wagering transactions could be reported, but such losses were "allowed" as deductions only to the extent of the winnings from such transactions. In other words, gambling losses could be used to offset gambling winnings,

6

but only to the extent of the winnings; gambling losses that exceeded gambling winnings had no effect on taxable income and could not offset other income or be carried over to another tax year. When reporting gambling losses, casual gamblers had to report such losses on Schedule A to Form 1040, on the line for "other itemized deductions."

21.     Cryptocurrency was a type of virtual currency that typically utilized cryptography to secure transactions that were digitally recorded on an electronic distributed ledger, such as a blockchain. Units of cryptocurrency were generally referred to as coins or tokens. For the tax years 2020 and 2021, the U.S. system required taxpayers to report, on their Form 1040, whether, at any time during the tax year, the taxpayer received, sold, sent, exchanged, or otherwise acquired or disposed of any financial interest in any virtual currency. In those years, the U.S. system also required taxpayers to report, on their Form 1040, capital gains realized on the disposition of virtual currency.

22.     S Corporations like G&R were small business corporations and were considered "flow-through" entities that did not pay taxes in their own right. Instead, such corporations, which were required to file annual tax returns called Form 1120-S, U.S. Corporation Income Tax Return ("Form 1120S"), passed the corporate income, losses, deductions, and credits through to their shareholders for federal tax purposes. Shareholders of S Corporations reported the flow-through of income and losses and certain other items on their Forms 1040 and were assessed tax at their individual income tax rates.

23.     A Form 1099 was an IRS form that listed how much nonemployee compensation a taxpayer was paid during the tax year by a third party, such as a business or a person. Nonemployee compensation, generally above a threshold amount, that was required to be reported

on Form 1099 included dividends, interest, gambling winnings, pension distributions, and fee income.

### GOLDSTEIN's Scheme to Evade Taxes, File False and Fraudulent Tax Returns, and Fail to Pay Taxes When Due

24.    Between 2016 and 2022, **GOLDSTEIN** engaged in a scheme to evade the assessment of taxes, file false tax returns, and fail to pay his tax obligations when they were due. In furtherance of that scheme:

a.  **GOLDSTEIN** used over $1.1 million of G&R funds to pay personal debts in 2016, including gambling debts owed to poker players and payments due on Note-1, causing the filing of false Forms 1120S and 1040 and the evasion of a substantial amount of his 2016 income tax;

b.  **GOLDSTEIN** falsely understated his gambling winnings by more than $3.9 million on his 2016 Form 1040, causing the filing of a false Form 1040 and the evasion of a substantial amount of his 2016 income tax;

c.  In March 2018, **GOLDSTEIN** falsely told an IRS Revenue Officer seeking to collect his unpaid taxes for 2016 that his unpaid tax liability for that year was attributable to a legal case resulting in a large payment to **GOLDSTEIN** whereas, in truth, his liability was attributable principally to gambling income;

d.  **GOLDSTEIN** diverted $250,000 in legal fees due and owing to G&R from Law Firm-1 to his Gambling Account, causing the false understatement of G&R's corporate receipts and the evasion of a substantial amount of his 2017 income tax;

e.  **GOLDSTEIN** used $175,000 of G&R funds in 2017 to pay a personal gambling-related debt that he owed to Law Firm-2, causing the filing of false Forms 1120S and 1040 and the evasion of a substantial amount of his 2017 income tax;

8

f. **GOLDSTEIN** falsely omitted $200,000 in gambling winnings from his 2017 Form 1040 by directing a Nevada-based professional poker player ("Professional Gambler-1") to send winnings that he owed to **GOLDSTEIN** to Law Firm-2 in order to satisfy part of a personal gambling-related debt that **GOLDSTEIN** owed to Law Firm-2;

g. **GOLDSTEIN** falsely stated in an October 11, 2018, email to the Accounting Firm that he had "[n]o gambling winnings" in 2017, causing the preparation and filing of a 2017 Form 1040 that falsely omitted over $3.4 million in gambling winnings;

h. **GOLDSTEIN** falsely omitted from his 2017 Form 1040 over $210,000 in income from a 401K distribution;

i. **GOLDSTEIN** used G&R assets in 2018, in the form of a $125,000 legal fee due to G&R from Law Firm-2, to satisfy a $125,000 gambling-related debt owed personally by **GOLDSTEIN** to Law Firm-2, causing the filing of false Forms 1040 and 1120S and the evasion of a substantial amount of his 2018 income tax;

j. **GOLDSTEIN** used tens of thousands of dollars of G&R funds in 2018 to pay health insurance premiums and full salaries to women, despite the fact that the women were not entitled to insurance coverage and performed little or no work for G&R and the payments were actually personal in nature;

k. **GOLDSTEIN** falsely understated substantial amounts of gambling and other income on his 2018 Form 1040, resulting in the evasion of a substantial amount of his 2018 income tax;

9

l. **GOLDSTEIN** used $170,000 of G&R funds to pay a personal gambling debt in 2019, causing the filing of false Forms 1120S and 1040 and the evasion of a substantial amount of his 2019 income tax;

m. **GOLDSTEIN** falsely omitted from his Forms 1040 for the 2016, 2017, and 2018 tax years certain interest income received through the Gambling Account, the records for which **GOLDSTEIN** failed to provide to the Accounting Firm;

n. **GOLDSTEIN** falsely stated on his 2020 and 2021 Forms 1040 that he had not received, sold, sent, exchanged, or otherwise acquired or disposed of any financial interest in any virtual currency—despite the fact that he had engaged in dozens of cryptocurrency transactions totaling over $10 million over those two tax years;

o. **GOLDSTEIN** falsely omitted $500,000 in legal fee income from the 2021 G&R Form 1120S, resulting in the filing of a false Form 1040 and the evasion of a substantial amount of his 2021 income tax;

p. **GOLDSTEIN** willfully failed to pay his 2016, 2017, 2019, 2020, and 2021 taxes when due, despite spending millions of dollars on personal expenses, including luxury purchases and payments to and on behalf of women; and

q. **GOLDSTEIN**, throughout the relevant period, systematically and repeatedly failed to provide to the Accounting Firm, or to G&R's firm managers, records of his gambling wins and losses, despite the fact that **GOLDSTEIN** at times kept records of his gambling activity, and throughout the relevant period had access to such information, including Forms 1099 and bank records.

10

## Particulars of GOLDSTEIN's Tax Crimes

### Tax Year 2016

#### A. GOLDSTEIN's False and Fraudulent Underreporting of his Gambling Winnings

25.     Between in or around March 2016 and late December 2016, **GOLDSTEIN** engaged in a series of heads-up poker matches with three ultra-wealthy individuals—two located in Asia ("Foreign Gambler-1" and "Foreign Gambler-2") and one located in Beverly Hills, California ("California Businessman-2"). In preparation for these matches, **GOLDSTEIN** sought and obtained guidance and coaching from two professional poker players (Professional Gambler-1 and "Professional Gambler-2"), as well as others, to study the historical playing patterns and betting strategies of his three opponents and hone his strategy against them. As part of his preparation for the heads-up match with Foreign Gambler-1, **GOLDSTEIN** authored and discussed with Professional Gambler-1 and Professional Gambler-2 a 24-page memorandum detailing the strategy and tactics he had devised, based on Foreign Gambler-1's playing patterns, **GOLDSTEIN**'s past mistakes when playing him, information gathered from other poker players, and computer simulated practice. **GOLDSTEIN** also updated and revised the memo and created versions of the memo reflecting the changes made, to further improve his chances at winning against Foreign Gambler-1 in future poker matches.

26.     **GOLDSTEIN**'s series of poker matches against Foreign Gambler-1, which took place in or around September 2016 in Asia, resulted in **GOLDSTEIN** winning approximately 107 million Hong Kong Dollars, which were then worth approximately $13.8 million. Shortly after his final match against Foreign Gambler-1 on or about September 11, 2016, **GOLDSTEIN** sent a text to both Professional Gambler-1 and Professional Gambler-2, each of whom had "a piece" of **GOLDSTEIN** in one or more of the 2016 matches, stating that the gross winnings from the

11

matches against Foreign Gambler-1 were "107.2" million Hong Kong Dollars. **GOLDSTEIN** confirmed his winnings against Foreign Gambler-1 when, as part of his effort to set up his match against California Businessman-2, **GOLDSTEIN** sent a text in September 2016 to California Businessman-2 stating that he was "up 14 [million dollars]" against "the big [foreign] player" and that those winnings were "all available immediately" for poker matches with California Businessman-2.

27.    **GOLDSTEIN**'s series of poker matches against California Businessman-2 occurred in the Beverly Hills home of California Businessman-2 in November and December 2016. Those matches, some of which were attended by Professional Gambler-2, resulted in **GOLDSTEIN** winning $26,435,000, which California Businessman-2 sent to **GOLDSTEIN**'s Gambling Account in two wire transfers in November and December 2016, followed by a Form 1099 reflecting the payment to **GOLDSTEIN** of $26,435,000.

28.    **GOLDSTEIN**'s series of matches with Foreign Gambler-2 occurred in or around December 2016 in Asia and occasionally involved another foreign gambler. In heads-up matches against Foreign Gambler-2, **GOLDSTEIN** won approximately 69 million Hong Kong Dollars, which were then worth over $8.8 million. In confirming his winnings to Professional Gambler-2, who had a 2% "piece" of **GOLDSTEIN** in those matches with Foreign Gambler-2, **GOLDSTEIN** sent a text to Professional Gambler-2 stating that **GOLDSTEIN** would be paying him "2% of 69," which, according to **GOLDSTEIN**, equated to $178,000 based on the then-existing exchange rate. On December 23, 2016, **GOLDSTEIN** wired to Professional Gambler-2 that $178,000. That same day, **GOLDSTEIN** wire-transferred $403,000 to Professional Gambler-1, who had a 5% "piece" of **GOLDSTEIN** in **GOLDSTEIN**'s matches with Foreign Gambler-2.

29.    In a text sent to Professional Gambler-1 and Professional Gambler-2 on December 17, 2016, **GOLDSTEIN** calculated the "win rate" from his poker matches against the "3 targets"—Foreign Gambler-1, Foreign Gambler-2, and California Businessman-2—as follows: "Our average win rate [was] US$660k per hour over an extended period of 77 hours," which equated to gross winnings of $50,820,000. In formulating the win rate in other terms, **GOLDSTEIN** texted that "[o]ur average is +US4.63 per session" over "11 sessions," a formulation that equated to over $50,900,000.

30.    **GOLDSTEIN** failed to report any of his winnings from the poker matches against Foreign Gambler-1 and Foreign Gambler-2, as well as millions of dollars in gambling winnings from California Businessman-2, on his 2016 Form 1040. **GOLDSTEIN** also failed to report on that Form $100,000 in gambling winnings from a separate poker match with Professional Gambler-1 and $200,000 in gambling winnings from a poker match involving a California Entertainer.

B. **GOLDSTEIN's Use of G&R Funds to Satisfy his Personal Debts**

31.    In addition to the 2016 poker matches described above, **GOLDSTEIN** was involved in other heads-up and ring poker matches during 2016 in which he lost millions of dollars. To pay some of those gambling debts, **GOLDSTEIN** caused four wire transfers totaling $871,600 to be sent from the G&R bank account to the winners of those matches. **GOLDSTEIN** also caused wire transfers in the amounts of $200,000 and $100,000 to be sent from the G&R bank account to California Businessman-1 to pay down the amounts **GOLDSTEIN** owed on Note-1.

32.    When causing those four gambling debt payments and two promissory note payments totaling $1,171,600 to be sent from the G&R bank account, **GOLDSTEIN** failed to inform the G&R firm manager that the transfers were to satisfy his personal debts rather than those

of G&R, resulting in those transfers being falsely classified as "Legal Fee[]" expenses of G&R. Moreover, despite having been provided by the firm manager in late December 2016 with a written, year-end summary spreadsheet of transfers from the G&R bank account that classified the six payments as "Legal Fees" paid by G&R, **GOLDSTEIN** did not inform the firm manager or the Accounting Firm that those six payments were to satisfy **GOLDSTEIN**'s personal debts. Consequently, **GOLDSTEIN** caused the $1,171,600 in payments to be falsely classified and deducted, for tax reporting purposes, as G&R expenses.

33.    While failing to inform the G&R firm manager that the payments totaling $1,171,600 were personal transactions, in December 2016 through January 2017, **GOLDSTEIN** drafted a ledger listing some of his gambling transactions in the 2016 tax year. To draft the ledger, **GOLDSTEIN** requested information from the G&R firm manager in or around late December 2016 about certain categories of payments made from G&R business and personal accounts, without explaining that the categories focused on gambling-related payments. In or around January 2017, **GOLDSTEIN** emailed the ledger, which reflected information on the year-end summary spreadsheet, to an encrypted, Switzerland-based email account bearing his own name, and later emailed an updated version of the ledger to his own G&R email account in or around October 2017. But **GOLDSTEIN** never emailed or otherwise provided the ledger to G&R's firm manager or the Accounting Firm.

C.  **GOLDSTEIN's Failure to Report Income from Foreign Gambler-3**

34.    Foreign Gambler-3 was a Malaysian citizen, a G&R client, and an ultrahigh-stakes poker player who assisted **GOLDSTEIN** in connection with, among other things, **GOLDSTEIN**'s 2016 heads-up match against Foreign Gambler-1. Foreign Gambler-3 also had a relationship with

14

a financial institution in Montenegro, in Europe, where he and **GOLDSTEIN** each maintained one or more financial accounts.

35.    In October 2016, Foreign Gambler-3 paid **GOLDSTEIN** gambling winnings by transferring hundreds of thousands of dollars to a Montenegrin bank account held by **GOLDSTEIN. GOLDSTEIN** transferred the majority of the funds to a G&R bank account in the United States but kept approximately $125,000 at the financial institution in Montenegro. He subsequently used most of that $125,000 for personal purposes, including making a payment to Professional Gambler-2, the purchase of luxury goods, and other personal payments. However, **GOLDSTEIN** did not report this money to the firm manager or the Accounting Firm, causing it not to be reported as income for the 2016 tax year.

D.    **GOLDSTEIN's Tax Evasion and False Tax Reporting for the 2016 Tax Year**

36.    As a result of the conduct described in paragraphs 25 through 35, **GOLDSTEIN** caused the G&R Form 1120S for the 2016 tax year to falsely overstate the expenses of G&R by $1,171,600. In addition, **GOLDSTEIN** falsely reported on his 2016 Form 1040 that his gambling winnings were $13,687,050 whereas, in truth and fact and as he knew, his gambling winnings were more than $17,500,000. **GOLDSTEIN's** under-reporting of his gambling winnings resulted in **GOLDSTEIN** falsely reporting on his 2016 Form 1040 that his net gambling winnings for 2016 were $2,748,350 whereas, in truth and fact, his net gambling winnings for 2016 were more than $5,000,000. In addition, **GOLDSTEIN** failed to properly report the $125,000 received from Foreign Gambler-3 and failed to report interest income received from the Gambling Account—the records for which he failed to provide to the Accounting Firm. Consequently, **GOLDSTEIN** falsely under-reported his total income for 2016 and thereby evaded a substantial amount of the income tax due and owing by him to the IRS for 2016.

E. **GOLDSTEIN's Willful Failure to Pay his 2016 Tax Liability**

37.     **GOLDSTEIN** caused his 2016 Form 1040 to be filed with the IRS on or about October 16, 2017, pursuant to an extension filed in April 2017. That tax return showed an amount due and owing of $1,679,000. **GOLDSTEIN**, however, failed to pay those taxes on April 18, 2017, when they were due, and on October 16, 2017, when he filed his Form 1040 showing the $1,679,000 liability. Rather than pay any of his 2016 taxes between April and October 2017, **GOLDSTEIN** spent over $2 million on luxury items, gambling debts, and other personal payments. **GOLDSTEIN** specifically acknowledged his choice to spend money on gambling rather than pay his taxes when he wrote to a representative of California Businessman-1 in or around November 2016, "I was going to use [hundreds of thousands of dollars in available funds] to pay my personal 2016 taxes, but I'm just paying penalties instead. That's fine, and it's my problem."

38.     Because **GOLDSTEIN** had not voluntarily paid his 2016 tax liability by March 2018, the IRS began taking steps to collect that tax debt. To that end, an IRS Revenue Officer interviewed **GOLDSTEIN** and asked for the reason behind his unpaid liability for 2016. In response, on or about March 26, 2018, **GOLDSTEIN** falsely told the IRS Revenue Officer that his outstanding liability for 2016 was attributable to his receipt of a significant legal fee whereas, in truth and fact, his liability was due principally to his gambling income. In 2019, **GOLDSTEIN** entered into a payment agreement for his 2016 and 2017 taxes.

39.     **GOLDSTEIN** failed to completely pay his 2016 tax liability until 2021.

16

**Tax Year 2017**

### A. **GOLDSTEIN's** Fraudulent Funding of Heads-Up Poker Matches

40.     Between late 2016 and early February 2017, **GOLDSTEIN** engaged in a series of heads-up poker matches in Los Angeles against a California businessman who had made millions in the real estate market ("California Businessman-3"). In those matches, **GOLDSTEIN** suffered net losses of over $9.5 million dollars. Because no one had staked or bought a piece of him in the matches, **GOLDSTEIN** was responsible for paying his entire losses to California Businessman-3 after each losing match. To fund his continued participation in poker matches against California Businessman-3, **GOLDSTEIN** engineered two illicit and fraudulent schemes that were made possible by his ownership and control of G&R and its assets.

#### (i)     **GOLDSTEIN's** Diversion of the G&R Fee Paid by Law Firm-1

41.     In early February 2017, **GOLDSTEIN** engaged in a scheme to divert to his Gambling Account a $250,000 legal fee owed by Law Firm-1 to G&R in connection with G&R's Supreme Court briefing in a securities class-action case. To divert the fee, **GOLDSTEIN** exchanged a series of emails on or about February 1, 2017, with a named partner of Law Firm-1, culminating in an agreement that Law Firm-1 would pay $500,000 to G&R over the course of the various phases of the Supreme Court appellate process, including, at **GOLDSTEIN's** insistence, an initial $250,000 to be paid by Law Firm-1 "immediately."

42.     In providing wire instructions for that initial payment on February 1, 2017, **GOLDSTEIN** requested that Law Firm-1 send the funds to his Gambling Account, rather than to G&R's business bank account. Accordingly, Law Firm-1 wired to **GOLDSTEIN's** Gambling Account the $250,000 initial fee, $178,000 of which **GOLDSTEIN** transferred the following day to California Businessman-3 to satisfy a portion of **GOLDSTEIN's** poker debt. Although

GOLDSTEIN typically had the G&R firm manager prepare invoices when seeking payment of G&R fees from Law Firm-1, he did not do so with respect to the diverted $250,000 fee, and he did not tell anyone at G&R or the Accounting Firm that he had diverted the G&R fee to his Gambling Account, or that he had used it to satisfy a personal poker debt.

(ii)  **GOLDSTEIN's Use of G&R Funds to Satisfy Personal Gambling Debts**

43.    By the end of February 2017, GOLDSTEIN had experienced but not yet fully paid net losses of approximately $10 million to California Businessman-3. In early March 2017, GOLDSTEIN continued playing the series of heads-up poker matches with California Businessman-3. To help satisfy a $500,000 poker debt stemming from an early March 2017 match against California Businessman-3, GOLDSTEIN contacted Law Firm-2 and asked a named partner at the firm whether he was interested in "investing" in one of GOLDSTEIN's poker matches against California Businessman-3. In connection with his request, GOLDSTEIN sent an email to the Law Firm-2 partner on or about March 6, 2017, containing a link to an online gambling-related forum, which included a discussion thread in which certain poker aficionados had commented that California Businessman-3 was a poor poker player. When sending the email, GOLDSTEIN did not reveal to the Law Firm-2 partner that, over the preceding months, he had already lost approximately $10 million to California Businessman-3. In addition, GOLDSTEIN falsely implied that the $500,000 "investment" GOLDSTEIN was seeking was to fund a future match against California Businessman-3 rather than to pay an existing debt from a match GOLDSTEIN had already lost.

44.    After Law Firm-2 agreed to "invest" $500,000 in GOLDSTEIN's poker match, GOLDSTEIN directed Law Firm-2 on or about March 6, 2017, to wire the funds to an account held by California Businessman-3 in California Businessman-3's own name, which GOLDSTEIN

falsely claimed to a partner at Law Firm-2 was an account used by both him and California Businessman-3 to "post" their funds until the resolution of the match. In truth, neither **GOLDSTEIN** nor California Businessman-3 was required to "post" funds in advance of a given match. Instead, the funds that **GOLDSTEIN** had Law Firm-2 send to California Businessman-3 were to satisfy part of **GOLDSTEIN**'s previous poker losses to California Businessman-3.

45.     Although **GOLDSTEIN** won a small number of poker matches against California Businessman-3 between late 2016 to mid-2017—which resulted in **GOLDSTEIN** sending to Law Firm-2 three "investment return" payments totaling $91,000 from his personal bank account between March and August 2017—the overall result of the matches during that period was that **GOLDSTEIN** lost more than $16 million. Moreover, although the "investment return" payments sent by **GOLDSTEIN** initially led Law Firm-2 to tell **GOLDSTEIN** that he could continue to use the "invested" funds, by the Fall of 2017, Law Firm-2 demanded that **GOLDSTEIN** fully repay the $500,000 "investment."

46.     To partially satisfy his $500,000 personal debt to Law Firm-2, **GOLDSTEIN** caused the G&R firm manager to send, via wire transfer from a G&R business bank account, $175,000 of G&R's funds to Law Firm-2 on or about November 7, 2017. When directing that the $175,000 wire be sent, **GOLDSTEIN** did not disclose to the G&R firm manager that this transfer—which was between two law firms—was to satisfy **GOLDSTEIN**'s personal gambling-related debt and not a legal fee or other G&R business expense. To further satisfy part of his debt, on or about November 14, 2017, **GOLDSTEIN** caused Professional Gambler-1 to send to Law Firm-2 $200,000 that he owed to **GOLDSTEIN** personally as a result of a poker match that **GOLDSTEIN** had won. By the end of 2017, **GOLDSTEIN** still owed $125,000 to Law Firm-2 in connection with the gambling "investment."

B. **GOLDSTEIN's Tax Evasion and False Tax Reporting for the 2017 Tax Year**

47.     As a result of the conduct described in paragraphs 40 through 46, **GOLDSTEIN** caused the following false tax reporting on the Form 1120S for G&R for the 2017 tax year: (1) the false understatement of G&R's gross receipts by $250,000 due to **GOLDSTEIN's** diversion of the $250,000 payment from Law Firm-1 to his Gambling Account; and (2) a false overstatement by $175,000 of G&R's business expenses due to **GOLDSTEIN** causing the transfer of $175,000 from G&R to Law Firm-2 to pay a personal poker debt, and the categorization of that transfer as a G&R "legal fee expense." Meanwhile, **GOLDSTEIN's** 2017 Form 1040 falsely omitted $215,971 in pension-related income he received during 2017 and $263 of interest income earned by his Gambling Account, both of which he failed to disclose to the Accounting Firm. As a result of these falsities on **GOLDSTEIN's** 2017 Forms 1120S and 1040, **GOLDSTEIN** falsely understated, on his 2017 Form 1040, his total income, taxable income, and his tax due and owing. In addition, **GOLDSTEIN** caused his 2017 Form 1040 to falsely omit more than $3,250,000 in gambling income earned from matches involving California Businessman-3 and Professional Gambler-1 by falsely emailing the Accounting Firm that he had "[n]o gambling winnings" in tax year 2017.

48.     **GOLDSTEIN** caused the G&R 2017 Form 1120S to be filed on or about July 13, 2018. **GOLDSTEIN** caused his 2017 Form 1040 to be filed with the IRS on or about October 15, 2018, pursuant to an extension filed in April 2018. That return showed an amount due and owing of $1,037,595.

C. **GOLDSTEIN's Willful Failure to Pay his 2017 Tax Liability**

49.     Despite **GOLDSTEIN's** acknowledgement on his 2017 Form 1040 that he owed $1,037,595 in taxes for that year, he failed to pay those taxes on April 17, 2018, when they were due, and on October 15, 2018, when he filed his Form 1040. Rather than pay any of his 2017 taxes

between April and October 2018, **GOLDSTEIN** spent hundreds of thousands of dollars on luxury items, gambling debts, and other personal payments.

50.    **GOLDSTEIN** failed to completely pay his 2017 tax liability until 2021.

**Tax Year 2018**

    A. **GOLDSTEIN's Use of G&R Assets to Pay His Personal Gambling-Related Debt**

51.    By early 2018, **GOLDSTEIN** had still not paid Law Firm-2 the $125,000 that **GOLDSTEIN** owed personally as part of the repayment of Law Firm-2's $500,000 "investment" in **GOLDSTEIN's** 2017 poker matches with California Businessman-3. Pursuant to a series of e-mail exchanges between **GOLDSTEIN** and Law Firm-2, both recognized that **GOLDSTEIN** personally owed the firm $125,000, while Law Firm-2 separately owed G&R a $125,000 fee for certain legal services performed by G&R personnel, including **GOLDSTEIN**. Rather than engaging in a mutual exchange of payments pursuant to which **GOLDSTEIN** would personally pay Law Firm-2 the $125,000 he owed, while Law Firm-2 would transfer $125,000 to G&R, **GOLDSTEIN** reached an understanding with Law Firm-2 that the payment obligations would be offset, thus resulting in no exchange of payments. By reaching this understanding, **GOLDSTEIN** effectively used G&R's funds (the $125,000 fee owed to G&R) to satisfy his personal gambling-related debt to Law Firm-2.

52.    **GOLDSTEIN** failed to inform the G&R firm manager, his partners at G&R, and the Accounting Firm that he had reached this understanding with Law Firm-2 to offset G&R's right to collect its $125,000 fee in exchange for Law Firm-2 offsetting its right to collect the $125,000 owed to it by **GOLDSTEIN** personally.

21

B.  **GOLDSTEIN's Failure to Report Foreign Income and Income from Foreign Gambler-3**

53.    On or about September 25, 2018, Foreign Gambler-3 transferred approximately $1,013,000 to **GOLDSTEIN**'s Montenegrin bank account, which was income to **GOLDSTEIN**. **GOLDSTEIN** thereafter caused those funds to be transferred to a G&R firm bank account in the United States and to be falsely classified as a reduction to stockholder distributions in G&R's books, rather than as income.

54.    In October 2018, **GOLDSTEIN** traveled to Macau, where he collected approximately $1,000,000 in income from Foreign Gambler-3 or his associate. Soon after, **GOLDSTEIN** flew from Hong Kong to Dulles International Airport carrying a duffel bag containing approximately $968,000 in United States dollars. During an encounter with a United States Customs and Border Protection officer at the airport, **GOLDSTEIN** admitted that the cash represented gambling winnings. **GOLDSTEIN**, however, failed to report the $968,000 as income on his 2018 Form 1040. Moreover, in an interview with representatives of the IRS on or about October 14, 2020, **GOLDSTEIN** falsely stated that the funds brought back from Hong Kong represented a "loan"—but never produced any record documenting the purported loan or its terms.

C.  **GOLDSTEIN's Use of G&R Funds to Make Other Personal Payments**

55.    As noted, during the 2018 tax year, **GOLDSTEIN** caused G&R to list as employees four women with whom he was having or pursuing intimate personal relationships. Pursuant to **GOLDSTEIN**'s instructions, the women were paid salaries by G&R and provided health insurance under G&R's health insurance policy even though **GOLDSTEIN** knew that they were not eligible for that insurance and performed little or no work. As a result, **GOLDSTEIN** caused over $8,000 in G&R funds to be used to pay the four women's health care premiums and over

22

$31,000 in G&R funds to be paid to them as salaries. These payments by G&R replaced or added to personal payments **GOLDSTEIN** was making to the women.

D. **GOLDSTEIN's Tax Evasion and False Tax Reporting for the 2018 Tax Year**

56.    As a result of the conduct described in paragraphs 51 through 55, **GOLDSTEIN** caused the following false tax reporting on the 2018 G&R Form 1120S for the 2018 tax year:

    a.  the false understatement of G&R's gross receipts by approximately $1,125,000, based on **GOLDSTEIN's** diversion of approximately $1,000,000 paid to his Montenegrin bank account by Foreign Gambler-3 or his associate and **GOLDSTEIN's** surreptitious use of the $125,000 fee owed to G&R for legal work to satisfy his personal gambling-related debt to Law Firm-2; and

    b.  the false overstatement of G&R's expenses and deductions by approximately $40,000, as a result of **GOLDSTEIN's** use of G&R funds to pay for salaries and healthcare premiums for the women whom he placed on G&R's payroll, who were not bona fide employees and who did not qualify for G&R's health insurance.

57.    As a result of the conduct described in paragraphs 51 through 56, **GOLDSTEIN** also caused the following false tax reporting on his 2018 Form 1040 for the 2018 tax year:

    a.  the omission of approximately $1,000,000 in income received in cash from Foreign Gambler-3 or his associate; and

    b.  the omission of certain interest income he received through the Gambling Account, the records for which he failed to provide to the Accounting Firm.

58.    Based on the foregoing false tax reporting, **GOLDSTEIN** falsely understated on his Form 1040 his taxable income and tax due and owing, and thereby evaded a substantial amount of the income tax due and owing by him for 2018.

59.  . **GOLDSTEIN** caused the G&R 2018 Form 1120S to be filed with the IRS on or about April 2, 2019. **GOLDSTEIN** also caused his 2018 Form 1040 to be filed with the IRS on or about April 15, 2019.

E. **GOLDSTEIN's Execution of a Note Promising to Pay his $6 Million Gambling Debt to California Businessman-3**

. 60.     By mid-2018, **GOLDSTEIN** still owed California Businessman-3 approximately . $6 million in connection with their heads-up poker matches that ended in mid-2017. Because **GOLDSTEIN** was not making sufficient regular payments to reduce this outstanding poker debt, California Businessman-3 requested that **GOLDSTEIN** sign a note promising to pay down his $6 million debt on a regular schedule, with interest. After agreeing to do so, on or about August 22, 2018, **GOLDSTEIN** signed an unsecured promissory note dated August 21, 2018 ("Note-2"), promising to make monthly principal and interest payments totaling $30,000 from the date of the execution of the note through May 2030, and a balloon payment of $2.4 million in 2030.

61.     Pursuant to the terms of Note-2, **GOLDSTEIN** made certain payments between October 2018 and the end of 2021, at which time **GOLDSTEIN** still owed over $4.5 million on Note-2.

**Tax Year 2019**

A. **GOLDSTEIN's Use of G&R Funds to Pay his Personal Gambling Debt and Personal Expenses**

62.     During 2019, **GOLDSTEIN** was involved in a poker match involving a California Movie Producer ("the Producer"). In that match, **GOLDSTEIN** lost $170,000 to the Producer. To satisfy that poker debt, **GOLDSTEIN** caused a $170,000 wire transfer to be sent from the G&R bank account to the Producer.

63.   **GOLDSTEIN** did not tell the G&R firm manager or the Accounting Firm that the $170,000 payment to the Producer was to satisfy **GOLDSTEIN**'s personal debt and thus was not a business expense of G&R. By causing the payment to the Producer to be sent from the G&R bank account, **GOLDSTEIN** caused the payment to be falsely categorized as a "Legal Fee[]" on the G&R books rather than a payment to satisfy **GOLDSTEIN**'s personal gambling debt.

64.   In addition, during 2019, **GOLDSTEIN** caused G&R funds totaling approximately $6,000 to be used to pay for healthcare premiums for a woman with whom **GOLDSTEIN** continued an intimate relationship and to whom **GOLDSTEIN** continued to make personal payments but who performed no work for G&R and did not qualify for health insurance under the terms of G&R's health insurance policy.

B.   **GOLDSTEIN's Failure to Report Income Received from Foreign Gambler-3 and Other Gamblers**

65.   In or about February 2019, **GOLDSTEIN** represented Foreign Gambler-3 in connection with certain court proceedings in Macau. For that legal work, Foreign Gambler-3 caused approximately $235,000 to be sent to the G&R Montenegrin bank account. **GOLDSTEIN** told the G&R firm manager that he was expecting to receive "$235k" from Foreign Gambler-3 at the Montenegrin financial institution and wanted to wire it to a U.S. domestic G&R bank account—but did not tell the firm manager that the money was legal fee income. When the Montenegrin financial institution asked for documentation to support the wire, the firm manager asked **GOLDSTEIN** if they should document the transaction as a "capital contribution" from **GOLDSTEIN** to G&R. **GOLDSTEIN** said, "Yes," and the firm manager submitted a letter to that effect. After the financial institution explained that it could more easily transmit the money to a G&R firm bank account in the United States from the G&R Montenegrin bank account, **GOLDSTEIN** approved an invoice on G&R letterhead listing a $235,000 fee for "Legal Counsel"

25

provided to Foreign Gambler-3, which the firm manager then submitted to the financial institution. Notwithstanding the foregoing, **GOLDSTEIN** ensured that the approximately $235,000 transfer was not reported as legal fee income and later confirmed with the Accounting Firm that the funds had been classified as a reduction to shareholder distributions.

66.    In addition to the foregoing, **GOLDSTEIN** received approximately $359,000 in gambling income during 2019. **GOLDSTEIN**, however, failed to inform the Accounting Firm about his gambling income and gambling losses for the 2019 tax year.

C. **GOLDSTEIN's False Tax Reporting for the 2019 Tax Year**

67.    As a result of the conduct described in paragraphs 62 through 66, **GOLDSTEIN** caused the following false tax reporting for the 2019 tax year: the false overstatement, on the 2019 G&R Form 1120S, of G&R's expenses and deductions by $175,997, based on **GOLDSTEIN's** use of $170,000 in G&R funds to satisfy **GOLDSTEIN's** personal gambling debt to the Producer, and **GOLDSTEIN's** use of $5,997 to pay healthcare premiums for an intimate partner; the false understatement, on the 2019 G&R Form 1120S, of G&R's gross receipts by approximately $235,000, based on the failure to report as fee income the funds received from Foreign Gambler-3; the fraudulent omission, on **GOLDSTEIN's** 2019 Form 1040, of $359,000 in gambling income; and the false understatement, on **GOLDSTEIN's** 2019 Form 1040, of his total income and tax due and owing.

D.    **GOLDSTEIN's Willful Failure to Pay his 2019 Tax Liability**

68.    **GOLDSTEIN** caused his 2019 Form 1040 to be filed on October 15, 2020. Although **GOLDSTEIN** owed over $500,000 in taxes for 2019 at the time he filed his return, **GOLDSTEIN** failed to pay those taxes until April 29, 2021. Rather than paying his taxes on July 15, 2020, when they were due, or on October 15, 2020, when he filed his return,

GOLDSTEIN spent over $50,000 on luxury items and other personal payments between July and October 2020. Moreover, GOLDSTEIN paid over $550,000 for gambling debts during 2020.

**Tax Year 2020**

A. **GOLDSTEIN's Failure to Report Gambling Income and his use of G&R Funds to Pay Personal Expenses**

69.    During 2020, GOLDSTEIN received approximately $93,180 in gambling income, which he failed to report to the G&R firm manager or the Accounting Firm. In addition, during 2020, GOLDSTEIN caused approximately $1,800 in G&R funds to be used to pay healthcare premiums for a woman who performed no work for G&R and did not qualify for health insurance under the terms of G&R's health insurance policy.

B. **GOLDSTEIN's 2020 Cryptocurrency Transactions**

70.    During the tax year 2020, GOLDSTEIN maintained a United States-based cryptocurrency account. GOLDSTEIN used that cryptocurrency account during 2020 to engage in approximately 80 transactions involving the receipt, sale, sending, exchange, or acquisition of a financial interest in digital currency, with a total transaction volume of more than $1.5 million.

71.    GOLDSTEIN knew that he was required to report his cryptocurrency transactions on his Forms 1040 since at least March 2020, when G&R's then-firm manager reviewed with GOLDSTEIN a tax organizer (provided by the Accounting Firm), and specifically reviewed with GOLDSTEIN a question on the tax organizer concerning whether he had engaged in cryptocurrency transactions. Similarly, the Accounting Firm's retention letters in tax years 2019 and 2020 explicitly stated that cryptocurrency transactions needed to be reported on Forms 1040.

C. **GOLDSTEIN's False Tax Reporting for the 2020 Tax Year**

72.    As a result of the conduct described in paragraphs 69 through 71, GOLDSTEIN caused his 2020 Form 1040 to falsely omit $93,180 in gambling income, and falsely omitted

27

$1,800 in income by using G&R funds to pay the healthcare premiums for one of the women with whom he had an intimate relationship. In addition, despite conducting approximately 80 cryptocurrency transactions with a total transaction volume of over approximately $1.5 million during 2020, **GOLDSTEIN** falsely answered "no" on his 2020 Form 1040 to the question, "At any time during 2020, did you receive, sell, send, exchange, or otherwise acquire any financial interest in any virtual currency?"

D. **GOLDSTEIN's Willful Failure to Pay his 2020 Tax Liability**

73.     **GOLDSTEIN** caused his 2020 Form 1040 to be filed on or about October 15, 2021. Although **GOLDSTEIN** owed over $945,000 in taxes for 2020, he failed to pay that tax liability on May 17, 2021, when the taxes were due, and failed to make any estimated tax payments. **GOLDSTEIN** also failed to pay his tax liability when he filed his Form 1040 on or about October 15, 2021. Rather than paying his 2020 tax liability between May and October 2021, **GOLDSTEIN** spent over $500,000 on luxury items and other personal payments between those months. Moreover, **GOLDSTEIN** paid over $1,000,000 for gambling debts during 2021.

74.     **GOLDSTEIN** failed to pay his 2020 tax liability until December 2022.

**Tax Year 2021**

A. **GOLDSTEIN's Fraudulent Failure to Report $500,000 in Fee Income**

75.     On or about December 19, 2019, a Texas-based billionaire ("Texas Businessman") engaged in a heads-up poker match in Dallas, Texas, against a California-based actor ("the Actor"). The match had been set up by the Producer, who bought a 50% piece of the Actor in the match. In addition to his wagering with the Actor, the Texas Businessman also placed "side bets" with other poker players that he would prevail in his match against the Actor.

76.     The Actor won over $15.6 million in the December 2019 poker match with the Texas Businessman, but the Texas Businessman failed to timely pay the Actor and the side bettors—to whom the Texas Businessman separately owed hundreds of thousands of dollars on the side bets. The Texas Businessman's failure to pay the Actor continued into 2021, although in the interim the Texas Businessman proposed to the Actor and the side bettors a settlement of his poker debts that involved paying an amount significantly less than what was actually owed.

77.     In or about 2021, the Actor, who refused to agree to a reduction of the amount owed to him by the Texas Businessman, retained **GOLDSTEIN** and G&R to serve as his legal representative in his efforts to secure full payment of the poker debt owed to him by the Texas Businessman. In connection with his retention of **GOLDSTEIN**, the Actor and **GOLDSTEIN** exchanged a series of email and text communications regarding how much **GOLDSTEIN** and G&R would be paid, including a discussion of work that G&R had already spent on the matter. **GOLDSTEIN** and the Actor ultimately agreed that the Actor would pay **GOLDSTEIN** a contingency fee based on a percentage of the amount **GOLDSTEIN** and G&R succeeded in convincing the Texas Businessman to pay to the Actor above the amount previously proposed by the Texas Businessman.

78.     As a result of **GOLDSTEIN**'s legal efforts, including an email **GOLDSTEIN** sent from his G&R firm email address to the Texas Businessman's attorney in which **GOLDSTEIN** stated that the Actor would consider filing a lawsuit to obtain payment, the Texas Businessman agreed in mid-2021 to pay the Actor in full. Accordingly, on June 21, 2021, the Texas Businessman caused $7,815,000 to be wire transferred to the Actor—representing payment in full to the Actor, less the 50% piece owed to the Producer.

29

79.    Pursuant to his agreement with **GOLDSTEIN,** the Actor owed a fee of $500,000 to **GOLDSTEIN** and G&R. But rather than directing the Actor to transfer this fee income to the G&R bank account or otherwise to him, **GOLDSTEIN** directed the Actor to transfer the fee to California Businessman-3 to pay down part of the multi-million poker debt still owed to him by **GOLDSTEIN,** as memorialized in Note-2. Pursuant to **GOLDSTEIN's** directions, the Actor transferred to California Businessman-3 the $500,000 fee he owed to **GOLDSTEIN,** confirming in a text message sent to **GOLDSTEIN** on or about June 22, 2021, that the funds had been sent to "[California Businessman-3] to pay you obviously." Days later, an employee of California Businessman-3 emailed **GOLDSTEIN** that the $500,000 sent by the Actor had been applied to payments owed by **GOLDSTEIN** to California Businessman-3 on Note-2.

80.    **GOLDSTEIN** did not tell the G&R firm manager or the Accounting Firm that he had earned and had effectively been paid the $500,000 legal fee.

B.    **GOLDSTEIN's 2021 Cryptocurrency Transactions**

81.    During the tax year 2021, **GOLDSTEIN** maintained two cryptocurrency accounts, one in the United States and the other abroad. **GOLDSTEIN** used those cryptocurrency accounts during 2021 to engage in approximately 200 transactions—involving the receipt, sale, sending, exchange, or acquisition of a financial interest in digital currency—with a total transaction volume of more than $8 million.

C.    **GOLDSTEIN's Tax Evasion and False Tax Reporting for the 2021 Tax Year**

82.    As a result of the conduct described in paragraphs 75 through 81, **GOLDSTEIN** caused a Form 1120S for the 2021 tax year to be prepared for G&R that falsely understated G&R's gross receipts by $500,000. This resulted in a false understatement of the taxable income and tax

due and owing by **GOLDSTEIN** on his 2021 Form 1040, and **GOLDSTEIN** thereby evaded a substantial amount of the income tax due and owing by him to the IRS for 2021.

83.    In addition, despite conducting more than 200 cryptocurrency transactions with a total transaction volume of over $8 million during 2021, **GOLDSTEIN** falsely answered "no" on his 2021 Form 1040 to the question, "At any time during 2021, did you receive, sell, exchange, or otherwise dispose of any financial interest in any virtual currency?" Moreover, despite winning approximately $267,000 in poker matches during 2021, **GOLDSTEIN** falsely omitted from his 2021 Form 1040 the reporting of any gambling income.

D.  **GOLDSTEIN's Willful Failure to Pay his 2021 Tax Liability**

84.    **GOLDSTEIN** caused his 2021 Form 1040 to be filed with the IRS on or about October 17, 2022.

85.    Despite owing over $1,139,000 in tax for the 2021 tax year, **GOLDSTEIN** failed to pay that tax liability on April 18, 2022, when the taxes were due, and failed to make any estimated payments on that liability. Rather than make timely payment of his tax liability, **GOLDSTEIN** spent over $800,000 on luxury items and other personal payments between April and October 1, 2022. **GOLDSTEIN** ultimately paid his overdue taxes when he filed his overdue 2021 Form 1040 on or about October 17, 2022.

**GOLDSTEIN's False Statements to Mortgage Lenders**

A.  **GOLDSTEIN's Debts**

86.    In early 2021, **GOLDSTEIN** sought to move from his home in Chevy Chase, Maryland, and purchase a $2.65 million home in Washington, D.C. **GOLDSTEIN's** efforts to obtain financing for the purchase of the new home were hampered, however, by his unpaid federal tax liabilities of more than $1.3 million for the 2016 and 2017 tax years, which led the IRS to place

31

liens on his Chevy Chase residence. He also had unpaid state tax liabilities, which led the State of Maryland to place liens on that residence. Although **GOLDSTEIN** had entered into a payment agreement with the IRS in 2019 with respect to his 2016 and 2017 liabilities, those IRS liens remained in place to protect the IRS's ability to collect. As noted above, in addition to his tax debts for 2016 and 2017, by February 2021, **GOLDSTEIN** still owed over $500,000 in taxes for the 2019 tax year.

87.    In addition to his substantial tax debt, **GOLDSTEIN** also owed, throughout all of 2021, over $9.89 million on Note-1, payable to California Businessman-1, and over $4.5 million on Note-2, payable to California Businessman-3.

88.    **GOLDSTEIN** had acknowledged his substantial debts to California Businessman-1 and to California Businessman-3 in communications with them and their representatives, in 2021 payments on the debts, and in the debt instruments themselves. Moreover, **GOLDSTEIN** also acknowledged the existence of those debts in a July 2019 email communication to the legal representative of a woman who was threatening to sue **GOLDSTEIN**. In response to the legal representative's proposal that **GOLDSTEIN** pay a settlement to the woman to resolve her legal claim, **GOLDSTEIN** countered by stating that suing him would be "totally and utterly pointless" because he "owe[d] more than $16 million dollars privately" and also had "a massive tax lien."

B.    The First Savings Mortgage Corporation Loan Applications

89.    In late February and early March 2021, **GOLDSTEIN** and his wife submitted two joint applications to First Savings Mortgage Corporation ("FSM"), seeking to borrow funds to purchase the Washington, D.C. home. The first application, signed and submitted by **GOLDSTEIN** to FSM on or about February 24, 2021, sought $2,000,000 to put toward the purchase of the new home. The second application, signed and submitted by **GOLDSTEIN** on or

32

about March 1, 2021, sought $180,000 as a bridge loan, to cover certain costs in connection with the new home purchase.

90.    Both applications required **GOLDSTEIN** and his wife to provide detailed financial information, including listing all outstanding debts. Both applications also required **GOLDSTEIN** and his wife to answer, "YES" or "NO," to whether either was "delinquent or in default" on any "federal debt." Both applications required the applicants to represent that "[t]he information I have provided is true, accurate, and complete as of the date of this application." Both applications also required the applicants to agree to and acknowledge that "[a]ny intentional or negligent misrepresentation" of any information in the application may result in the imposition of "criminal penalties" "including, but not limited to, fine or imprisonment or both under the provisions" of federal law, including 18 U.S.C. §§ 1001 *et seq.*

91.    The application for the $2,000,000 loan contained a document entitled, "MORTGAGE FRAUD IS INVESTIGATED BY THE FBI," which explained, among other things, that "[i]t is illegal to make any false statement regarding income assets, [or] debt . . . in a loan and credit application for the purpose of influencing in any way the action of a financial institution." The document further advised that the "applicable Federal criminal statutes which may be charged in connection with Mortgage Fraud include" 18 U.S.C. § 1014, which makes it a crime to make a false statement on a loan application. **GOLDSTEIN** signed the mortgage fraud warning on or about February 24, 2021.

92.    Directly above **GOLDSTEIN**'s signature on both FSM applications was the following language: "I/We fully understand that" it is a federal crime "punishable by fine or imprisonment, or both, to knowingly make any false statements" on the applications "under the provisions of Title 18, United States Code."

33

93. '  Despite repeatedly affirming to FSM that he had disclosed all his liabilities and debts, **GOLDSTEIN** falsely omitted more than $15,500,000 that he owed in personal debts and federal taxes. On both applications, **GOLDSTEIN** falsely omitted his liabilities on Note-1 and Note-2, on which he then owed more than $15,000,000 in total. On both applications, **GOLDSTEIN** also falsely omitted his unpaid tax debt of over $512,000 for the 2019 tax year. In addition, **GOLDSTEIN** falsely answered "No" in response to the question whether he was delinquent on any federal debt.

94.     In mid-March 2021, after learning of the tax liens, FSM informed **GOLDSTEIN** that it would not lend to him.

C. Funds Borrowed from the Litigation Funder

95.     To lift the tax liens on his Chevy Chase residence and to obtain financing for the Washington, D.C., home purchase, **GOLDSTEIN** contacted a litigation funder ("the Funder") that had previously provided financing to G&R. Pursuant to a series of communications in mid-March 2021, **GOLDSTEIN**, acting through G&R, entered into two agreements with the Funder. Through these agreements, **GOLDSTEIN** effectively borrowed $1,600,000 and an additional $4,000,000 from the Funder, allowing him to purchase the new home and to pay off the personal tax liabilities that had resulted in the tax liens. As part of his agreements with the Funder, which were signed by **GOLDSTEIN** on or about March 29, 2021, and April 17, 2021, **GOLDSTEIN** caused G&R to pledge certain receivables potentially due in specified court cases and other legal matters. **GOLDSTEIN** also provided a personal guaranty to the Funder in connection with both agreements, agreeing to be personally responsible if the security recited in the agreements did not result in full repayment to the Funder. One of the agreements further required that **GOLDSTEIN**, as "the Guarantor," would, upon "obtaining a mortgage loan on the" new Washington, D.C.,

residence, "cause the proceeds of such mortgage loan to be applied to the repayment of" the Funder.

96.     After receiving the money from the Funder, **GOLDSTEIN** paid his outstanding tax liabilities for the 2016 and 2017 tax years, thereby lifting the tax liens, and purchased the Washington, D.C., home.

   D. The NFM Loan Application

97.     In or about July 2021, **GOLDSTEIN** and his wife submitted a joint application to mortgage lender NFM Lending ("NFM"), seeking to borrow $1,987,500 to partially repay the Funder. **GOLDSTEIN** caused that application to be submitted to NFM on or about July 11, 2021.

98.     The NFM application, like the FSM applications, required **GOLDSTEIN** and his wife to provide detailed financial information, including by listing "all liabilities." The NFM application also required **GOLDSTEIN** and his wife to answer, "YES" or "NO," to whether "you are currently delinquent or in default on a federal debt." In addition, the NFM application required **GOLDSTEIN** and his wife to answer, "YES" or "NO," to whether either was "a co-signer or guarantor on any debt or loan that is not disclosed on this application." **GOLDSTEIN** and his wife both answered "NO" to each question. The NFM application required them to represent that "[t]he information I have provided in this application is true, accurate, and complete as of the date I signed this application." Moreover, the application required **GOLDSTEIN** to "agree to" and "acknowledge" that "[a]ny intentional or negligent misrepresentation of information may result in the imposition of . . . criminal penalties on me including, but not limited to, fine or imprisonment or both under the provisions of Federal law (18 U.S.C. §§ 1001 *et seq.*)."

99.     After NFM agreed to make the loan to **GOLDSTEIN** and his wife, a closing on the loan occurred on or about September 29, 2021. At the closing, which both **GOLDSTEIN** and his

wife attended in Maryland, **GOLDSTEIN** signed the application that had been previously submitted to NFM, representing that "[t]he information I have provided in this application is true, accurate, and complete as of the date I signed this application." **GOLDSTEIN** also signed a document at the closing entitled "UNDISCLOSED DEBT ACKNOWLEDGEMENT." That document stated that intentionally lying on a mortgage application constituted federal bank fraud and mortgage fraud. The document required **GOLDSTEIN** to list "[a]ll additional debt obligations that are expected to exist at or around the time of this transaction closing[], not included in my loan application." In response to that requirement, **GOLDSTEIN** represented, by initialing and dating the document, that there were "no exceptions"—that is, there were no undisclosed debt obligations. Elsewhere on that document, **GOLDSTEIN** acknowledged and certified that he had "no other debt obligations that are expected to exist at or around the time of this transaction closing beyond what I (we) provided on my (our) loan application and what is provided on this document." Finally, **GOLDSTEIN** acknowledged and certified that he understood "that knowingly withholding debt obligation information is mortgage fraud, which is punishable by incarceration in federal prison."

100.    Despite repeatedly affirming to NFM that he had disclosed all his liabilities and debts, **GOLDSTEIN** falsely omitted more than $15,445,000 that he owed in personal debts and federal taxes, as well as his status as a guarantor on the Funder's loans totaling $5,600,000. In particular, **GOLDSTEIN** falsely omitted his liabilities on Note-1 and Note-2, on which he then owed an aggregate of more than $14,500,000. **GOLDSTEIN** also falsely omitted on the application his unpaid tax debt of over $945,000 for the 2020 tax year. Finally, **GOLDSTEIN** omitted from the application his status as a personal guarantor on the two financing agreements

36

between G&R and the Funder, which were in the amounts of $1,600,000 and $4,000,000, respectively.

### Statutory Allegations

### COUNT ONE
(Tax Evasion—2016 Tax Year)

The Grand Jury for the District of Maryland charges that:

1. Paragraphs 1 through 85 of this Indictment are incorporated here.

2. From in or about January 2016 through in or about March 2018, in the District of Maryland and elsewhere, the defendant,

### THOMAS C. GOLDSTEIN,

willfully attempted to evade and defeat the income tax due and owing by him to the United States of America, for the calendar year 2016, by committing and causing to be committed the following affirmative acts, among others:

(a) using funds and assets of G&R to pay personal gambling debts;

(b) providing false and incomplete information to the Accounting Firm;

(c) making false and misleading statements to an IRS Revenue Officer;

(d) using foreign individuals and foreign bank accounts to receive income;

(e) causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1120S for G&R; and

(f) causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1040 for himself and his wife.

26 U.S.C. § 7201
18 U.S.C. § 2

37

## COUNT TWO
### (Tax Evasion—2017 Tax Year)

The Grand Jury for the District of Maryland further charges that:

1.    Paragraphs 1 through 85 of this Indictment are incorporated here.

2.    From in or about January 2017 through on or about October 16, 2018, in the District of Maryland and elsewhere, the defendant,

### THOMAS C. GOLDSTEIN,

willfully attempted to evade and defeat the income tax due and owing by him to the United States of America, for the calendar year 2017, by committing and causing to be committed the following affirmative acts, among others:

(a)  using funds and assets of G&R to pay personal gambling debts;

(b)  diverting G&R fees to his personal bank account and using those diverted fees to pay personal gambling debts;

(c)  directing gambling winnings to be sent to pay an unrelated gambling-related debt;

(d)  causing false and incomplete information to be provided to the Accounting Firm;

(e)  causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1120S for G&R; and

(f)  causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1040 for himself and his wife.

26 U.S.C. § 7201
18 U.S.C. § 2

## COUNT THREE
### (Tax Evasion—2018 Tax Year)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 85 of this Indictment are incorporated here.

2.      From in or about January 2018 through on or about October 14, 2020, in the District of Maryland and elsewhere, the defendant,

### THOMAS C. GOLDSTEIN,

willfully attempted to evade and defeat the income tax due and owing by him to the United States of America, for the calendar year 2018, by committing and causing to be committed the following affirmative acts, among others:

(a) using funds and assets of G&R to pay personal gambling debts;

(b) using funds and assets of G&R to make personal payments, in the form of salaries and health insurance premiums, to women with whom he was having or pursuing intimate relations;

(c) diverting G&R fees to a third party to pay personal gambling debts;

(d) causing false and incomplete information to be provided to the Accounting Firm;

(e) causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1120S for G&R;

(f) causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1040 for himself and his wife; and

(g) making false statements to IRS representatives about the funds brought back from Hong Kong.

26 U.S.C. § 7201
18 U.S.C. § 2

39

## COUNT FOUR
### (Tax Evasion—2021 Tax Year)

The Grand Jury for the District of Maryland further charges that:

1.     Paragraphs 1 through 85 of this Indictment are incorporated here.

2.     From in or about January 2021 through on or about October 16, 2022, in the District of Maryland and elsewhere, the defendant,

### THOMAS C. GOLDSTEIN,

willfully attempted to evade and defeat the income tax due and owing by him to the United States of America, for the calendar year 2021, by committing and causing to be committed the following affirmative acts, among others:

(a) using funds and assets of G&R to be used to pay a personal gambling debt;

(b) diverting G&R fees to a third party to pay a personal gambling debt;

(c) causing false and incomplete information to be provided to the Accounting Firm;

(d) causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1120S for G&R; and

(e) causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1040 for himself and his wife.

26 U.S.C. § 7201
18 U.S.C. § 2

40

## COUNTS FIVE THROUGH FOURTEEN
### (Aiding and Assisting the Preparation of False and Fraudulent Tax Returns)

The Grand Jury for the District of Maryland further charges that:

1.    Paragraphs 1 through 85 of this Indictment are incorporated here.

2.    On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

### THOMAS C. GOLDSTEIN,

did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation under, and in connection with a matter arising under, the internal revenue laws, of returns, claims, and other documents, that is, the IRS Forms 1040 and 1120S and attached schedules set forth below, for the tax years set forth below, each of which returns, claims and other documents, as GOLDSTEIN then and there knew, were false and fraudulent as to one or more material matters, as set forth below:

| COUNT | TAXPAYER/ RETURN | TAX YEAR | FILING DATE (Approximate) | FALSE ITEMS |
|---|---|---|---|---|
| 5 | GOLDSTEIN Form 1040 | 2016 | 10/16/2017 | a) Line 17: S Corp Income from Schedule E of $1,331,962<br><br>b) Line 21: Other Income of $13,703,706<br><br>c) Line 22: Total Income of $15,408,857<br><br>d) Line 78: Amount Owed of $1,690,527 |

| COUNT | TAXPAYER/ RETURN | TAX YEAR | FILING DATE (Approximate) | FALSE ITEMS |
|---|---|---|---|---|
| 6 | G&R Form 1120S | 2016 | 09/15/17 | a) Line 19: Other Deductions of $4,637,374<br><br>b) Line 20: Total Deductions of $6,872,621 |
| 7 | GOLDSTEIN Form 1040 | 2017 | 10/15/2018 | a) Line 17: S Corp Income from Schedule E of $3,214,887<br><br>b) Line 21: Other Income of $0<br><br>c) Line 22: Total Income of $3,374,846<br><br>d) Line 78: Amount Owed of $1,037,595 |
| 8 | G&R Form 1120S | 2017 | 09/15/2018 | a) Line 1a: Gross Receipts and Sales of $7,258,225<br><br>b) Line 19: Other Deductions of $1,491,487<br><br>c) Line 20: Total Deductions of $3,948,019 |
| 9 | GOLDSTEIN Form 1040 | 2018 | 10/15/2019 | a) Schedule 1, Line 17: S Corp Income from Schedule E of $336,763<br><br>b) Schedule 1, Line 21: Other Income of $0<br><br>c) Line 6: Total Income of $527,879<br><br>d) Line 22: Amount Owed of $25,109 |

| COUNT | TAXPAYER/ RETURN | TAX YEAR | FILING DATE (Approximate) | FALSE ITEMS |
|---|---|---|---|---|
| 10 | G&R Form 1120S | 2018 | 04/15/2019 | a) Line 1a: Gross Receipts and Sales of $7,354,028<br><br>b) Line 8: Salaries and Wages of $3,040,706<br><br>c) Line 18: Employee Benefit Programs of $90,643<br><br>d) Line 19: Other Deductions of $3,231,942<br><br>e) Line 20: Total Deductions of $6,839,880 |
| 11 | GOLDSTEIN Form 1040 | 2019 | 10/15/2020 | a) Schedule 1, Line 5: S Corp Income from Schedule E of $1,973,681<br><br>b) Schedule 1, Line 8: Other Income of $12,400<br><br>c) Line 7a: Other Income from Schedule 1 of $2,011,519<br><br>d) Line 23: Amount Owed of $681,515 |
| 12 | G&R Form 1120S | 2019 | 09/15/2020 | a) Line 1a Gross Receipts and Sales of $6,828,938<br><br>b) Line 18 Employee Benefit Programs of $126,662<br><br>c) Line 19 Other Deductions of $928,755<br><br>d) Line 20: Total Deductions of $4,845,868 |

| COUNT | TAXPAYER/ RETURN | TAX YEAR | FILING DATE (Approximate) | FALSE ITEMS |
|---|---|---|---|---|
| 13 | **GOLDSTEIN** Form 1040 | 2020 | 10/15/2021 | a) Answer "No" to question whether, at any time during 2020, **GOLDSTEIN** had received, sold, sent, exchanged, or otherwise acquired any financial interest in any virtual currency<br><br>b) Schedule 1, Line 5: S Corp Income from Schedule E of $2,818,297<br><br>c) Schedule 1, Line 8: Other Income of $0<br><br>d) Line 9: Total Income of $2,976,261 |
| 14 | **GOLDSTEIN** Form 1040 | 2021 | 10/15/2022 | a) Answer "No" to question whether, at any time during 2021, **GOLDSTEIN** had received, sold, sent, exchanged, or otherwise disposed of any financial interest in any virtual currency<br><br>b) Schedule 1, Line 5: S Corp Income from Schedule E of $3,517,770<br><br>c) Schedule 1, Line 8b: Gambling Income of $0<br><br>d) Line 9: Total Income of $3,675,863<br><br>e) Line 37: Amount Owed of $1,139,488 |

26 U.S.C. § 7206(2)
18 U.S.C. § 2

## COUNTS FIFTEEN THROUGH NINETEEN
### (Willful Failure to Pay Taxes)

The Grand Jury for the District of Maryland further charges that:

1.    Paragraphs 1 through 85 of this Indictment are incorporated here.

2.    In the tax years set forth below, in the District of Maryland and elsewhere, the defendant,

### THOMAS C. GOLDSTEIN,

received taxable income of at least the amounts set forth below, on which taxable income there was owing to the United States of America an income tax of at least the amounts set forth below, which required **GOLDSTEIN** to pay, on or before the payment due dates set forth below, that income tax to the Internal Revenue Service. Well-knowing the foregoing, on or about the tax payment due dates set forth below, **GOLDSTEIN** did willfully fail to pay the income tax due, as follows:

| COUNT | TAX YEAR | TAXABLE INCOME (Reported on Tax Return) | APPROXIMATE TAX DUE | PAYMENT DUE DATE |
|---|---|---|---|---|
| 15 | 2016 | $4,350,019 | $1,690,527 | 04/18/2017 |
| 16 | 2017 | $2,707,866 | $1,037,595 | 04/17/2018 |
| 17 | 2019 | $2,004,734 | $512,522 | 07/15/2020 |
| 18 | 2020 | $2,941,485 | $947,137 | 05/17/2021 |
| 19 | 2021 | $3,675,863 | $1,139,488 | 04/18/2022 |

26 U.S.C. § 7203
18 U.S.C. § 2

45

## COUNT TWENTY
### (False Statement on Loan Application—First Savings Mortgage Application #1)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 100 of this Indictment are incorporated here.

2. On or about February 24, 2021, in the District of Maryland and elsewhere, the defendant,

### THOMAS C. GOLDSTEIN,

did knowingly make false statements and reports for the purpose of influencing in any way the action of First Savings Mortgage Corporation, a mortgage lending business as defined in 18 U.S.C. § 20, in connection with an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, and loan, in that, in connection with a loan application seeking $2,000,000, **GOLDSTEIN** (1) represented that the information he provided in the application was "true, accurate, and complete as of the date of this application," when, in truth and fact, **GOLDSTEIN** knew that the application had omitted liabilities totaling over $15,000,000, based on the amounts owed under Note-1 and Note-2, and omitted over $512,000 **GOLDSTEIN** then owed to the IRS for the 2019 tax year; and (2) answered "No" in response to the question whether **GOLDSTEIN** was "currently delinquent or in default on a federal debt," when, in truth and fact, **GOLDSTEIN** knew that he had an unpaid tax liability of over $512,000 for the 2019 tax year.

18 U.S.C. § 1014
18 U.S.C. § 2

## COUNT TWENTY-ONE
### (False Statement on Loan Application—First Savings Mortgage Application #2)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 100 of this Indictment are incorporated here.

2.      On or about March 1, 2021, in the District of Maryland and elsewhere, the defendant,

### THOMAS C. GOLDSTEIN,

did knowingly make false statements and reports for the purpose of influencing in any way the action of First Savings Mortgage Corporation, a mortgage lending business as defined in 18 U.S.C. § 20, in connection with an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, and loan, in that, in connection with a loan application seeking $180,000, **GOLDSTEIN** (1) represented that the information he provided in the application was "true, accurate, and complete as of the date of this application," when, in truth and fact, **GOLDSTEIN** knew that the application had omitted liabilities totaling over $15,000,000, based on the amounts owed under Note-1 and Note-2, and omitted over $512,000 **GOLDSTEIN** then owed to the IRS for the 2019 tax year; and (2) answered "No" in response to the question whether **GOLDSTEIN** was "currently delinquent or in default on a federal debt," when, in truth and fact, **GOLDSTEIN** knew that he had an unpaid tax liability of over $512,000 for the 2019 tax year.

18 U.S.C. § 1014
18 U.S.C. § 2

47

## COUNT TWENTY-TWO
### (False Statement on Loan Application—NFM Lending)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1 through 100 of this Indictment are incorporated here.

2.      On or about September 29, 2021, in the District of Maryland and elsewhere, the defendant,

### THOMAS C. GOLDSTEIN,

did knowingly make false statements and reports for the purpose of influencing in any way the action of NFM Lending, a mortgage lending business as defined in 18 U.S.C. § 20, in connection with an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, and loan, in that, in connection with a loan application seeking $180,000, GOLDSTEIN (1) represented that the information he provided in the application was "true, accurate, and complete as of the date of this application," when, in truth and fact, GOLDSTEIN knew that the application had omitted liabilities totaling over $14,500,000, based on the amounts owed under Note-1 and Note-1, and omitted over $945,000 GOLDSTEIN then owed to the IRS for the 2020 tax year; (2) answered "No" in response to the question whether GOLDSTEIN was "currently delinquent or in default on a federal debt," when, in truth and fact, GOLDSTEIN knew that he had an unpaid tax liability of over $945,000 for the 2020 tax year; and (3) answered "No" in response to the question whether GOLDSTEIN was "a co-signer or guarantor on any debt or loan that is not disclosed in this application," when, in truth and fact, GOLDSTEIN knew that he was a guarantor on the two financing agreements between G&R and the Funder, which were in the amounts of $1,600,000 and $4,000,000, respectively.

18 U.S.C. § 1014
18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.      Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 982(a)(2) and 21 U.S.C. § 853(p) in the event of the defendant's conviction under any of the offenses alleged in Counts Twenty through Twenty-Two of this Indictment.

### Bank Fraud Forfeiture

2.      Upon conviction of the offenses alleged in Counts Twenty through Twenty-Two of this Indictment, the defendant,

### THOMAS C. GOLDSTEIN,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2) any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

### Substitute Assets

3.      If, as a result of any act or omission of any defendant, any of the property described above as being subject to forfeiture:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third person;

c.      has been placed beyond the jurisdiction of the Court;

d.      has been substantially diminished in value; or,

e.      has been commingled with other property which cannot be subdivided without difficulty,

49

the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), shall

be entitled to forfeiture of substitute property up to the value of the forfeitable property described

above.

.

18 U.S.C. § 982(a)(2)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

Erek L. Barron /PDK

Erek L. Barron
United States Attorney

A TRUE BILL:

_____
Foreperson

Date: 1/16/2025

50