# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *   CRIMINAL NO. LKG-25-6 |
| | * |
| THOMAS C. GOLDSTEIN, | * |
| | * |
| Defendant | * |
| | * |

******

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO REVOKE DETENTION ORDER

The United States of America respectfully requests that the Court deny Defendant's Motion to Revoke Detention Order (45). There is clear and convincing evidence that Defendant violated his conditions of release and probable cause that Defendant committed a violation of 18 U.S.C. § 1001 by failing to disclose his interest in and transactions using undisclosed cryptocurrency accounts, based on (1) his use of those accounts; (2) the timing of the recent transfers; (3) Defendant's consistent and recent use of cryptocurrency, which he has not disclosed to Pretrial Services and hid from the IRS; (4) the vast sums of money Defendant has won in recent years being consistent with his access to and use of the funds; and (5) Defendant's similar evasive actions taken while he has known about this investigation. The newly produced evidence by Defendant raises more questions than answers, and confirms his connection to the cryptocurrency wallets. Defendant remains a flight risk, a financial danger to the community, and unlikely to abide by conditions of release. Accordingly, the Court should affirm Defendant's Order of Detention.

**ARGUMENT**

**I. Defendant Used the 935B and 54E3 Wallets**

As explained in the Government's *Ex Parte* Motion (ECF 35, 40), Defendant plainly funded the 935B and 54E3 wallets. For the 935B wallet, the chats between Defendant and the Fixer demonstrate Defendant's use of that wallet, which is further corroborated by Defendant's financial records and the transactions in the wallet. Specifically, on April 23, 2023, the Fixer messaged Defendant, " I am working on this deal for the Crypto transfer. He said he can do USDT or USDC. Would you mind sharing *your address* on where he would need to send each coin?" Exhibit 1 at 1 (emphasis added). Defendant responds, "*I* can definitely take $500K crypto. But I have to structure it as a purchase. Like I have to have a record of buying it from him [someone going to Dubai with the Fixer]. Or from you. I need to do that bc I'm going to send it to ▇ as his share of poker." *Id.* (emphasis added). While Defendant references using the cryptocurrency to pay ▇ for his share of poker, nowhere does Defendant state that the funds would be sent directly to ▇ and not to him. Indeed, minutes later, after the Fixer asked Defendant how he wanted to structure the transaction, Defendant states, "I would have him send it to a wallet of yours. Then do an invoice to sell it to me. I'll wire you and have you send the coins for *me*." *Id.* (emphasis added). The Fixer asked how he should send the cryptocurrency. Defendant responded, "it doesn't matter so long as your accounting is sound. A lot of people would just buy a cold wallet." *Id.* The Fixer confirms that he has "a ledger one." *Id.* Therefore, from the start of the transaction, Defendant indicated that he was going to purchase the cryptocurrency and have it sent to him, and that at least the Fixer's transfer would take place using a cold, *i.e.* unhosted wallet.

Defendant and the Fixer then proceeded with the plan. The Fixer sent Defendant the requested invoice. *See Id.* at 3; Exhibit 2 (invoice). Defendant then wired $500,000 to the Fixer.

*See* Exhibit 1 at 3–4; Exhibit 3 at 1 (Defendant's wire transfer records); Exhibit 4 (Defendant's bank account statement).  On May 1, 2023, the Fixer messages Defendant, "I have *your coin* in the wallet ready to go when you are." Ex. 1 at 4 (emphasis added).  On May 5, 2023, Defendant asks what kind of crypto it is.  *Id.* at 5. The Fixer responds that it is USDC and asks "which wallet to send to?" *Id.*  Defendant gives the address of the 935B wallet, confirms receipt of a test transfer, and then confirms receipt of the $500,000 that he purchased.

Defendant introduces new evidence not previously available to the Government regarding purportedly parallel messages on an encrypted platform, WhatsApp, between Defendant, an unidentified number, and an individual identified as "Tiger."  The name of the group chat is "poker player tom."  Defendant submits that because Tiger sent Defendant the 935B wallet address on behalf of the unidentified number and confirmed receipt of the funds, Defendant does not own the 935B wallet.  But this evidence simply shows that there may have been other people involved in the transaction.  Defendant regularly pooled gambling winnings and losses with others and had financial backers to support him during poker matches.  For example, as described in the Indictment, in 2016 Defendant worked with Professional Gambler-1 and Professional Gambler-2 in a series of poker matches against Foreign Gambler-1, Foreign Gambler-2 and California Businesman-2. ECF 1, 25-29.  At the end of the matches, Defendant texted Professional Gambler-1 and Professional Gambler-2 a calculation of their shared winnings that was over approximately $50 million.  *Id.*  Here too the fact that other people may also have had access to the 935B wallet does not mean that Defendant did not use the wallet.  He plainly did by transferring the $500,000 worth of cryptocurrency that he paid for to the wallet.  Moreover, it is also not unusual that Defendant may not have known the 43-digit wallet number off the top of his head and messaged with his cohorts to obtain it.

The same is true for the 54E3 wallet. The 54E3 wallet was first used when Professional Gambler-1 transferred Defendant $242,410 in USDT on June 6, 2023, to pay Defendant for a poker loss. *See* Exhibit 5 (Professional Gamber-1 subpoena response letter). In other words, Defendant specifically used the 54E3 wallet to obtain a poker payment from Professional Gambler-1, with no indication that Professional Gambler-1 was paying someone else.

Defendant argues that the newly produced text messages suggest that the payment was actually sent to an unidentified "Mr. T." In those texts, an unidentified number asks Defendant whether he wants to pay Mr. T for the debt due, and sends Defendant the 54E3 wallet number. As with the 935B wallet, there is nothing unusual about Defendant having shared access to a wallet for his poker winnings in which Defendant is depositing funds, or that Defendant would not know the wallet number off the top of his head for that wallet.

**II. The Recent Transactions Corroborate Defendant's Use of the Wallets**

The facts surrounding the recent transfers—which are at the core of the Court's detention Order—corroborate Defendant's use of the accounts. As discussed in the Government's *Ex Parte* motion, the 935B wallet was opened within two weeks of when Defendant stopped using his Coinbase account, which is also at a time Defendant knew he was under investigation. The 935B wallet was consistently used since that time with some transactions each month to December 21, 2024. Exhibit 6 at 1-4. The transactions stopped until February 4, 2025—six days after Defendant's initial appearance and the day prior to Defendant's *pro se* motion—then there was an incoming transfer of $8 million USDT transfer into the wallet followed by a $3 million transfer USDT out of the wallet. On February 6, 2025, at 11:41 PM EST—approximately *30 minutes* after the Government filed its motion to strike Defendant's *pro se* motion—approximately $3 million more of USDT was sent out of the wallet, leaving approximately $2 million in the wallet. This

4

timing strongly suggests that the transfer of these recent funds was done by or at the direction of Defendant, violating his conditions of release.

The evidence regarding Defendant's use of the 54E3 wallet is even more clear. As explained above, the 54E3 wallet was first used when a professional gambler, identified in the Indictment as Professional Gambler-1, transferred Defendant $242,410 in USDT on June 6, 2023, to pay Defendant for a poker loss. *See* Exhibit 5 (Professional Gamber-1 subpoena response letter). The 54E3 wallet was dormant until, on February 5, 2025, at 4:10 AM EST—the day Defendant filed his *pro se* motion—the wallet received an incoming transfer of $1,306.32 in USDT. *See* Exhibit 7. One minute later, at 4:11 AM EST, a transfer of $22,006.84 in USDT went out of the wallet. *Id.* In other words, there were no transactions using the wallet from the day that Professional Gambler-1 used the wallet to pay Defendant for a poker loss until there were two the day that Defendant filed his *pro se* motion to shed the bond on his Washington, D.C. residence—a period of *one year, seven months, and thirty days*. To call this a coincidence is an understatement. Rather, it corroborates that transfer of these recent funds was done by or at the direction of Defendant, violating his conditions of release.

### III. Defendant Has Consistently Used and Hid His Cryptocurrency

As detailed in the Indictment, Defendant bought, sold, and held millions of dollars' worth of cryptocurrency and willfully failed to report such activity to the IRS. More specifically, Defendant "falsely stated on his 2020 and 2021 Forms 1040 that he had not received, sold, sent, exchanged, or otherwise acquired or disposed of any financial interest in any virtual currency—despite the fact that he had engaged in dozens of cryptocurrency transactions totaling over $10 million over those two tax years." ECF 1 at 10. During the tax year 2020, Defendant "maintained a United States-based cryptocurrency account" through which he engaged "in approximately 80

transactions involving the receipt, sale, sending, exchange, or acquisition of [cryptocurrency], with a total transaction volume of more than $1.5 million." ECF 1 at 27. During the tax year 2022, Defendant "maintained two cryptocurrency accounts, one in the United States and the other abroad." ECF 1 at 30. Through those accounts, Defendant "engaged in approximately 200 transactions . . . with a total transaction value of more than $8 million." ECF 1 at 30.

Moreover, Defendant knew since at least March 2020 that he was obligated to report cryptocurrency transactions to the IRS because his law firm's "then-firm manager reviewed with [Defendant] a tax organizer" from his accounting firm that included "a question . . . concerning whether he had engaged in cryptocurrency transactions." ECF 30 at 27. "Similarly, the Accounting Firm's retention letters in tax years 2019 and 2020 explicitly stated that cryptocurrency transactions needed to be reported on Forms 1040." ECF 30 at 27.

More specifically, Defendant initially created a United States-based cryptocurrency account hosted at Coinbase in June 2020. But in February 2021, Defendant created an account at Binance.com, a foreign-based cryptocurrency platform that prohibited U.S. residents from maintaining accounts. To create and maintain that account, Defendant appears to have used a virtual private network ("VPN") to make his device's location appear to be abroad, in places like Milan, Italy, and Oslo, Norway. Exhibit 8 (access log). During 2021, Defendant received cryptocurrency worth approximately $972,000 through his overseas Binance.com account and transferred approximately $660,000 in cryptocurrency from it to his domestic Coinbase account. Defendant overwhelmingly stopped using both accounts by the end of 2021.

In 2022, Defendant shifted from wallets hosted at exchanges, namely Coinbase and Binance, to unhosted wallets not attributable through any exchange. For example, on April 8, 2022, Defendant transferred 4,100 USDT to ███████ a former romantic partner, from an

unhosted wallet, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ 34df ("34DF wallet").[1]  Exhibit 9. On May 11, 2022, Defendant transferred 3,000 USDT to ▓▓▓▓▓▓▓ from the same 34DF wallet.[2]  *Id.* That 34DF wallet's most recent transaction occurred in December 2022 and it still contains approximately $2,150 worth of cryptocurrency.  Defendant did not disclose this wallet to Pretrial Services or the Court.

In the past two years, Defendant has continued to fund and use unhosted wallets. For example, in July 2023, Defendant wired a total of $463,900 to the Fixer to purchase USDT cryptocurrency through three transactions for $106,500, $275,000, and $82,000 respectively, for which the Fixer invoiced Defendant. Exhibit 10.  On July 21, 2023, Defendant provided the wallet address ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ b351 ("B351 wallet") to the Fixer, who then conducted a test transfer of 100 USDT that day.[3]  *Id.*  On July 23, Defendant asked the Fixer if he had sent the remainder of the cryptocurrency and wrote, "If not, I have a new address." Defendant then provided the new address, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ 20524 ("0524 wallet").  *Id.*  The Fixer then transferred $378,726 in USDT to the 0524 wallet. On August 12, 2023, the 0524 wallet transferred 369,000 USDT to the B351 wallet that Defendant had initially suggested to the Fixer.  *Id.*; Exhibit 11.

On February 28, 2024, Defendant purchased a $13,500 luxury watch from ▓▓▓▓ ("the Watch Dealer"), by transferring 13,500 USDT from the B351 wallet to the Watch Dealer's wallet, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ea07e.  Exhibit 12; Exhibit 13.  Defendant

---

[1] The transaction hash is 0▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓2a1c.
[2] The transaction is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ f8e3.
[3] A minute after that transaction, Defendant texted the Fixer, "Waiting for ▓▓ to land," referencing his then-romantic partner. The Fixer later texted, "I sent the $100. Was waiting for you to receive confirmation from ▓▓." This suggests ▓▓▓▓▓ controlled the wallet or managed it on behalf of Defendant. However, as discussed below, Defendant's subsequent use of that to purchase watches for others strongly suggests that even if she managed the wallet, he had control over its use.

described the watch as a present for another romantic partner of his, ▌       ▐. On March 22, 2024, Defendant purchased $9,500 luxury watch from the Watch Dealer, sending 9,500 USDT from the B351 wallet to the Watch Dealer's same wallet. Exhibit 12; Exhibit 14. Defendant described the watch as a present for ▌       ▐, another romantic partner of his. The B351 wallet conducted transaction worth hundreds of thousands of dollars in May and June 2024. It currently contains almost $15,000 worth of cryptocurrency. Defendant did not disclose this wallet to Pretrial Services or the Court.

These transactions, spanning 2021 through 2024, demonstrate Defendant has routinely concealed his cryptocurrency activities by using an account based abroad and using unhosted, otherwise unattributable wallets to conduct hundreds of thousands of dollars in transactions. Beyond concealing his financial transactions, Defendant has also attempted to use cryptocurrency to influence a potential witness in response to the Government's investigation, as noted in the Government's initial request to detain him. Defendant knew about the Government's investigation since at least October 2020, when IRS-CI special agents visited the office of Defendant's law firm to interview him and request documents via a subpoena. Shortly after that visit, the Government understands that he offered things of value, including cryptocurrency, to a potential witness in the case who had intimate knowledge of his and his law firm's finances and income. The Government has collected as part of its investigation contemporaneous documents and sworn testimony concerning those offers, and the evidence suggests Defendant had no credible reason to make the offers other than to attempt to prevent the potential witness from assisting in the investigation, or ensure that the potential witness would not divulge the full truth about Defendant's conduct. The Government understands that the potential witness did not accept Defendant's offers of cryptocurrency in part because at the time Defendant owed substantial amounts of taxes to the IRS

and the potential witness believed that, if anything, Defendant should be using his cryptocurrency assets to satisfy his tax debts.

Except for the limited explanations in the Emergency Motion for a few specific cryptocurrency transactions, Defendant has not disclosed any cryptocurrency asset ownership or use to the Court or to Pretrial Services. The sections above make clear that Defendant has been an active user of cryptocurrency including as recently as last year. Not only did Defendant willfully fail to disclose his cryptocurrency use to the IRS, but he has also been almost entirely silent on such use when it comes to the Court and to Pretrial Services. Defendant has not sought to clarify whether his previously imposed conditions of release require disclosure and/or prior notice of cryptocurrency transactions (although they clearly do on their face) nor has Defendant disclosed any such use of cryptocurrency to be safe and to ensure that the Court and Pretrial Services have the tools necessary to monitor his financial activity and detect, among other things, possible attempts to pay potential witnesses or transfers indicative of an attempt to flee the District of Maryland. These were and remain serious concerns especially given Defendant's international ties and use of convoluted, multi-party cryptocurrency transactions.

### IV. The Amounts in the Unhosted Wallets are Consistent with the Poker and other Assets held recently by Goldstein

The Government understood Defendant to argue at the hearing before Judge Sullivan that his lack of ownership of the wallets is demonstrated by the fact that, had he truly owned the assets in the wallets, he would have used the funds to pay off the mortgage on his home. This argument is unpersuasive for one simple reason: Defendant undeniably had millions in assets *after* he secured that mortgage loan in September 2021 and he chose to use those assets for purposes other than to pay off his mortgage. And the amounts of those assets are consistent with the amounts contained in the cryptocurrency wallets at issue.

Defendant's post-mortgage assets included net poker winnings in 2022 of at least approximately $12 million, which Defendant initially disclosed to his accountant in late 2022 but, according to IRS records, ultimately failed to reveal to the IRS by failing to file a tax return for 2022. Exhibit 15 (███ email). Likewise, during both 2023 and 2024, Defendant won several millions of dollars in poker matches with a Texas Businessman, *see* Indictment ¶ 75, yet failed to report his gambling income—or any other income—by failing to file a tax return for 2023. Exhibit 16 (███ losses to Defendant). These failures to file served not only to hide or obscure Defendant's gambling income, it also allowed Defendant to hide the reporting of his involvement in cryptocurrency transactions—which Defendant is specifically accused of doing on his 2020 and 2021 tax returns. Indictment ¶¶ 70-72; 81, 83.

In addition to his substantial poker assets during 2022-24, Defendant also possessed a kilogram of gold bars, which he used, in part, fund his gambling activities rather than to pay off his mortgage. *See* Exhibit 17.

In sum, Defendant possessed millions of assets between mid-2021 and 2024. It therefore simply does not follow that Defendant's failure to pay off his mortgage was attributable to his lack of assets to do so.

### V. Defendant's Actions are Consistent with Evasive Steps while Under Investigation

Defendant's related argument that he made during the hearing trying to distance himself from the unhosted cryptocurrency accounts—that it would be the height of stupidity for Defendant to utilize those accounts where the Government became aware of those accounts during its investigation—is belied by Defendant's very actions in this case. In particular, Defendant repeatedly made false statements to mortgage lenders in 2021, long after the IRS's criminal investigation became known to him in 2020. Similarly, Defendant diverted $500,000 in income

during the 2021 tax year and evaded taxes on that income by filing a false tax return in 2022—again, long after he knew of the Government's investigation. What is more, after the IRS interviewed both Defendant and his firm manager in late 2020, which led the firm manager to announce her decision to leave, Defendant repeatedly offered to pay her significant amounts of money through cryptocurrency transfers. Therefore, the evidence indicates that Defendant has not been deterred by the Government's investigation.

## VI. Defendant's Motion Should Not Change the Court's Order

In many ways, Defendant's arguments (both in Court yesterday and in the Emergency Motion filed today) do not contest the reasons underlying the Court's order to detain him. Most notably, neither Defendant nor his counsel have denied that Defendant had a role in, and/or was aware of, the recent cryptocurrency transactions forming the basis of the Government's request for detention.

Further, Defendant's newly proffered evidence lacks sufficient information about the underlying transactions for the Court to conclude that Defendant currently has no control or access to the at-issue wallets. However, these are the exact types of details that are necessary to evaluate the credibility of counsel's arguments that the newly produced text messages warrant overturning the Court's initial ruling to detain him. That is especially true in the context of the evidence already presented by the Government establishing that Defendant has in fact used the at-issue cryptocurrency wallets in the past to conduct financial transactions, and at least implicitly represented to third parties that he had control of or access to the wallets. More broadly, the text messages newly produced by Defendant's counsel were excerpted from what are presumably longer conversations that may shed further light on or answer the necessary questions, but the Court and the Government have no way of knowing given the limited scope of what was provided.

11

In sum, although the newly produced text messages may call into question Defendant's formal ownership of the two at-issue cryptocurrency wallets, Defendant's and his counsel's arguments do not negate the core evidence indicating that Defendant failed to disclose cryptocurrency assets and activity to the Court and to Pretrial Services.

### VII. Defendant Remains a Flight Risk, Financial Danger to the Community, and Unlikely to Abide by Conditions of Release

Far from demonstrating that Defendant's connection with the cryptocurrency wallets shows he poses no risk of flight, the obscurity concerning the accounts and Defendant's undisputed involvement in transactions related to one or more of those wallets shows that he presents not only a risk of flight but also a risk of ongoing financial danger. As noted above, Defendant is accused of committing crimes even while aware of the Government's investigation. In addition, notwithstanding his receipt of millions in gambling income in 2022 and 2023, Defendant appears, according to IRS records, to have willfully failed to file tax returns for those years. Moreover, with respect to his cryptocurrency transactions, Defendant has engaged in myriad transactions that he not only failed to report to the IRS—as alleged in the Indictment—but are structured in such a way to obscure the parties to the transactions and purpose behind them.

In short, Defendant's labyrinthine financial transactions, his involvement with numerous foreign actors with significant assets, and his extensive and sophisticated foreign travel, including through the Fixer, show that he presents a real risk of flight. Finally, the fact that Defendant continues to flout the law by failing to timely file tax returns shows that Defendant has little respect for the law (and little interest in disclosing his crypto assets and income) and thus cannot be counted on to abide by conditions of release.

## **CONCLUSION**

For all the reasons stated above, the Government respectfully requests that the Court deny Defendant's motion to revoke detention order.

Respectfully submitted,

Erek L. Barron
United States Attorney
/s/
Patrick D. Kibbe
Assistant United States Attorney
District of Maryland

Stanley J. Okula, Jr.
Senior Litigation Counsel
Department of Justice—Tax Division

Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice—Tax Division