IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | CRIMINAL NO. LKG-25-6 |
| v. | * | |
| | * | |
| THOMAS C. GOLDSTEIN, | * | |
| | * | |
| Defendant. | * | |

********

## DEFENDANT THOMAS C. GOLDSTEIN'S REPLY IN SUPPORT OF EMERGENCY MOTION TO REVOKE ORDER OF DETENTION

To establish grounds to revoke a release order, the government must prove by clear and convincing evidence that the defendant has violated a condition of release. 18 U.S.C. § 3148(b)(1)(B).[1] Defendant Thomas Goldstein's emergency motion to revoke the *ex parte* detention order establishes that the government has no such evidence. The government's assertion that Mr. Goldstein used cryptocurrency wallets owned by him to engage in transactions since his arraignment is just wrong. The messages attached to Mr. Goldstein's motion plainly show that the wallets do not belong to him and that he had no connection whatsoever to the recent transactions in those wallets. The government's false claims (a consistent theme

---

[1]   Under 18 U.S.C. § 3148(b)(1)(A), a finding of probable cause that a defendant "has committed a Federal, State, or local crime while on release" is a separate basis for an order of revocation. But the Court's detention order, ECF No. 42—which is the order Mr. Goldstein is respectfully challenging here —did not rely on this subsection. In any event, Mr. Goldstein's motion (ECF No. 44) establishes that the government has not established probable cause. The only theory of criminal liability identified by the government is a violation of 18 U.S.C. § 1001 based on Mr. Goldstein's supposed failure to disclose his ownership of the cryptocurrency wallets at issue here. And as Mr. Goldstein's motion clearly establishes, there is no evidence to show that Mr. Goldstein owns those wallets.

1

throughout the course of this investigation) have resulted in his wrongful and needless incarceration.

The government's opposition—served nearly 40 minutes after the Court's deadline—offers no proof or persuasive argument to the contrary. Instead, it relies on sheer speculation and places unwarranted weight on allegations in the Indictment about past events that have nothing to do with Mr. Goldstein's compliance with release conditions. Those allegations were not enough to support Mr. Goldstein's detention at his initial appearance, and they are still not enough to support Mr. Goldstein's detention now. Remarkably, the government also does not dispute that its detention motion contained inaccurate allegations of criminal conduct and misleading characterizations of the evidence, concessions that should give the Court considerable pause in weighing the credibility of the government's arguments. Mr. Goldstein's motion should be granted, and he should be released from custody forthwith.

**a.** The government's motion to detain Mr. Goldstein relied entirely on a single proposition: that Mr. Goldstein *owned* the 935B and 54E3 cryptocurrency wallets that he failed to disclose to Pretrial Services and that he used to engage in large transactions since the Indictment was returned. *See, e.g.*, ECF No. 40, at 4, 6 (discussing Mr. Goldstein's "ownership" of one wallet and alleging that Mr. Goldstein "*has* . . . two cryptocurrency wallets that he has not disclosed" (emphasis added)). The messages cited in Mr. Goldstein's motion show the contrary, and the government recognizes as much. On the last page of its motion, the government begrudgingly acknowledges that "the newly produced text messages *may call into question* Defendant's formal ownership of the two at-issue cryptocurrency wallets." ECF No. 52, at 12 (emphasis added). However, the government says that this "do[es] not negate the core evidence indicating that Defendant failed to disclose cryptocurrency assets and activity to the Court and to

Pretrial Services." *Id.*  Of course, that is *exactly* what it does.  The only direct evidence the government has offered tying Mr. Goldstein to ownership and control of the wallets are the two 2023 transactions discussed in its detention motion, and the messages included at ECF No. 44-1 and 44-2 *concerning those very transactions* clearly show that Mr. Goldstein *does not own* the 935B and 54E3 wallets.  He had no obligation to disclose to Pretrial Services cryptocurrency wallets that do not belong to him.  And the government has not even attempted to demonstrate that Mr. Goldstein gave a false—let alone intentionally false—statement to Pretrial Services about wallets that he does not own.  For the avoidance of any doubt—and because the government appears not to understand the significance of the messages discussed in Mr. Goldstein's motion, *see* ECF No. 52, at 11—Mr. Goldstein firmly denies that he had any role in or was even aware of the recent transactions through these wallets that do not belong to him, and the government has no evidence whatsoever to the contrary.  The messages thus hollow out the government's so-called "core evidence."  ECF No. 52, at 12.

  **b.**  With its argument in shambles, the government retreats.  The government now says only that Mr. Goldstein "funded" or "used" the wallets years ago.  ECF No. 52, at 2.  This weak assertion provides no basis for detention.  The fact that Mr. Goldstein sent money to these wallets two years ago does not come anywhere close to establishing by clear and convincing evidence that Mr. Goldstein had anything to do with the transactions in these wallets in the last week.  The government also does not allege that Pretrial Services asked Mr. Goldstein to identify every cryptocurrency wallet owned by another person to which he transferred funds since 2023.

  To fill this gap, the government resorts to speculation.  The government now hypothesizes that Mr. Goldstein might have *shared* these wallets with others.  *Id.* at 3.  This guess is not remotely supported by the evidence.

With respect to the 935B wallet, the messages cited in Mr. Goldstein's motion show that on May 5, 2023, the date of the transaction relied upon by the government, an individual using the phone number ▮ wrote to another individual using the name " ▮ "tom need to wire USDC to me, please give him a address." ▮ then provides the full address of the 935B wallet. At Mr. Goldstein's request, ▮ then confirms receipt of the $100 test wire and the $500,000 wire. *See* ECF No. 44-1.

None of these messages is even remotely consistent with the government's speculation that Mr. Goldstein may have shared ownership of the 935B wallet with others or that he engaged in any recent transactions in this wallet. If Mr. Goldstein shared ownership of the wallet, then there would have been no need for the individual requesting the payment to instruct ▮ to "give" Mr. Goldstein "a address" to send the payment. The government further speculates that Mr. Goldstein "may not have known the 43-digit wallet number off the top of his head and messaged with his cohorts to obtain it," ECF No. 52, at 3, but *that is not what the messages say*. Mr. Goldstein does not ask ▮ or the other individual on the messages to remind him of the full address of the wallet. Rather, the other individual on the thread instructs ▮ to provide "a address" for Tom to send payment in the first instance. Moreover, if the government's supposition were correct, then *there would have been no need for Mr. Goldstein to ask* ▮ *to verify that the transfers went through* once ▮ sent Mr. Goldstein the full wallet address. It is the government's burden to establish a basis to revoke Mr. Goldstein's release by clear and convincing evidence. 18 U.S.C. § 3148(b)(1)(B); United States v. Mallory, 268 F. Supp. 3d 854, 865-66 (E.D. Va. 2017). This sort of unsupported guesswork does not come close to meeting that standard.

4

The same is true of the 54E3 wallet. The messages cited in Mr. Goldstein's motion show that on June 6, 2023, the date of the transaction relied upon by the government, Mr. Goldstein wrote to another individual, "I have $220k UDT. Can I please have an ERC address to sent it." The individual responds, "You want to send to ▮▮▮ to pay down the debt due, right?" The individual then provides Mr. Goldstein with the full address of the wallet. *See* ECF No. 44-2. Here again, Mr. Goldstein does not say that he forgot the address of a shared wallet. And if Mr. Goldstein owed money to an individual with whom he happened to share a cryptocurrency wallet, Mr. Goldstein would not have *asked for an ERC address to send the payment.* Instead, Mr. Goldstein would have written, "I am sending a $220k payment to our shared wallet."

  **c.** The government's arguments based on the timing of the transactions fare no better. The government says that the 935B wallet "was opened within two weeks of when Defendant stopped using his Coinbase account." ECF No. 52, at 4. But the government does not dispute (though it still refuses to acknowledge) that the transaction records from the Coinbase account show that, when he closed that account, Mr. Goldstein did *not* transfer the funds from the Coinbase account to the 935B wallet. The government notes that funds were moved into and out of the 935B wallet during the first week of February, but again neither disputes nor acknowledges that this was a regular pattern—money moving into and out of the account—over an extended period of time.

  The government also attempts to correlate certain transactions involving the 935B and 54E3 wallets with events in this litigation, suggesting that this shows Mr. Goldstein was responsible for those transactions. ECF No. 52, at 4-5. Overwrought italicization aside, those attempted correlations remain weak at best. For example, the government reads great import into the fact that the 935B wallet was sent funds "six days after Defendant's initial appearance," *id.* at

4), but does not explain why that is significant. Similarly, the government cites an incoming transfer of $1,306.32 and an outgoing transfer of $22,006.84 in the 54E3 wallet during the first week of February, but does not explain why Mr. Goldstein would bother transferring such small sums of money into and out of a cryptocurrency wallet on the day he filed his motion to modify conditions of release. This weak correlation between the timing of filings in this case and transactions through wallets that Mr. Goldstein clearly does not own falls far short of establishing by clear and convincing evidence that it is *Mr. Goldstein* who directed those transactions.

     **d.** In light of the sheer implausibility of the government's interpretation of the messages and the utter weakness of its evidence concerning the wallets, it is not surprising that the government devotes just two and a half pages to the wallets that were the centerpiece of its detention motion. Instead, the government spends the bulk of its reply discussing allegations about *other, inactive* cryptocurrency accounts that appear in the Indictment. The suggestion that these allegations justify Mr. Goldstein's detention by clear and convincing evidence is utterly belied by the fact that the government, which was obviously aware of the allegations in its own Indictment, did not arrest Mr. Goldstein when the Indictment was returned, waited nearly two weeks for Mr. Goldstein to make an initial voluntary appearance, and did not ask for his detention at that time. The government never attempts to explain how allegations in the Indictment that Mr. Goldstein used now-inactive cryptocurrency accounts between 2021 and 2024 establishes by clear and convincing evidence that he should be detained.

     The government also enters into a lengthy exposition of allegations regarding Mr. Goldstein's alleged use of unhosted cryptocurrency wallets *in general* (see ECF No. 52, at 6-8 and the exhibits cited therein). But such allegations do nothing to show that Mr. Goldstein

owned the two specific wallets identified as the basis of Mr. Goldstein's detention or that he engaged in recent transactions involving those specific wallets. The government's theory seems to be that because Mr. Goldstein may have used *some* unhosted wallets, this demonstrates that he controlled the 935B and 54E3 wallets. Obviously, one does not follow from the other.

The government's suggestion (at ECF No. 52, at 8) that Mr. Goldstein used cryptocurrency "to influence a potential witness in response to the Government investigation" is both weak and highly misleading. First, the government knew all this at the time of the Indictment, yet the government did not charge Mr. Goldstein with witness tampering. Nor did the government seek Mr. Goldstein's detention at his initial appearance (or even arrest him when the Indictment was returned) on this basis. Moreover, the government fails to mention that (to the defense's understanding) this "potential witness" was a firm employee who had given notice that they intended to depart the firm, and that Mr. Goldstein offered the "witness" cryptocurrency as an incentive to remain with the firm.

e.  Unable to muster any evidence to support its detention request, the government resorts to gibberish. The government says that Mr. Goldstein had an obligation to disclose his use of now-inactive cryptocurrency accounts between 2021 and 2024 to Pretrial Services "to be safe and to ensure that the Court and Pretrial Services have the tools necessary to monitor his financial activity and detect, among other things, possible attempts to pay potential witnesses or transfers indicative of an attempt to flee the District of Maryland." ECF No. 52, at 9. The government nowhere alleges that Pretrial Services requested this information and never attempts to identify the source of Mr. Goldstein's obligation to volunteer information about accounts he does not own. Nor does the government explain how Mr. Goldstein's purported failure to

disclose old cryptocurrency transactions "to be safe" could possibly justify his detention pending trial.

The government further contends that Mr. Goldstein should be detained pending trial because he has not provided sufficient information about the cryptocurrency transactions identified in the government's detention motion. ECF No. 52, at 11 ("Defendant's newly proffered evidence lacks sufficient information about the underlying transactions for the Court to conclude that Defendant currently has no control or access to the at-issue wallets."); *id.* ("[T]hese are the exact types of details that are necessary to evaluate the credibility of [defense] counsel's arguments that the newly produced text messages warrant overturning the Court's initial ruling to detain him."). But it is the government, not Mr. Goldstein, that bears the burden of proof on a detention motion. It is not Mr. Goldstein's obligation to provide "sufficient information about the underlying transactions." ECF No. 52, at 11.

**f.** Finally, the government does not dispute or even address Mr. Goldstein's contention that key pieces of evidence in the government's detention motion were highly misleading and in at least one case flatly inaccurate. The government's detention motion relied heavily on an in-person meeting with Pretrial Services *that never occurred*. The government's motion relied on testimony from a witness about Mr. Goldstein's use of a cryptocurrency wallet in 2022, but failed to mention that this witness provided the government with the address of that cryptocurrency wallet, and that address does not match either of the two wallets at issue. The government's motion relied on the fact that Mr. Goldstein "emptied" a Coinbase account around the time that the 935B wallet was opened, but failed to mention that records from the Coinbase account show that the funds from that account were *not* transferred to the 935B wallet. These

8

misleading and inaccurate characterizations of the evidence should give the Court serious pause when weighing the credibility of the government's arguments in its filings.

## CONCLUSION

The government has failed to show by clear and convincing evidence that Mr. Goldstein owns the two cryptocurrency wallets (the 935B and 54E3 wallets) that are the sole basis for the government's motion to revoke his release order, or that Mr. Goldstein engaged in the transactions with those wallets in recent days. Accordingly, Mr. Goldstein should be immediately released.

Dated: February 12, 2025

*/s/ Jonathan I. Kravis*
Jonathan I. Kravis (Maryland Bar No. 1706220008, motion for admission to the Bar of the U.S. District Court for the District of Maryland pending)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Jonathan.Kravis@mto.com


*/s/ Stephany Reaves*
Stephany Reaves (Bar No. 19658)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
(202) 220-1100
Stephany.Reaves@mto.com


*Attorneys for Defendant Thomas Goldstein*