# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | |
| | * | |
| **Defendant.** | * | |
| | ******** | |

# DEFENDANT THOMAS C. GOLDSTEIN'S
## MOTION TO INVALIDATE CERTAIN ORDERS SUSPENDING THE STATUTE OF LIMITATIONS

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................2

I.   THE MONTENEGRIN BANK AND TRANSFERS INVOLVING "FOREIGN GAMBLER 3." ..............................................................................................2

II.  THE SUSPENSION OF THE LIMITATIONS PERIOD UNDER SECTION 3292..........................................................................................................4

ARGUMENT ........................................................................................................5

I.   THE SUSPENSION APPLICATIONS DEPEND ON TWO SETS OF MATERIAL FALSEHOODS. ........................................................................7

    A.   The false representations about the 2016 "loan," Mr. Goldstein's failure to pay taxes, and the Malaysian payment ................................7

    B.   The false representations about Mr. Goldstein's disclosure of the Montenegrin accounts. ..................................................................10

II.  THE SUSPENSION APPLICATIONS RELY ON STILL MORE FALSEHOODS BY AGENT ACCARDI. ....................................................13

    A.   Agent Accardi knew that Mr. Goldstein did not hire employees who did no work. ........................................................................................14

    1.   Employee 1 ..................................................................................15

    2.   Employee 2 ..................................................................................17

    3.   Employee 3 ..................................................................................18

    4.   Employee 4 ..................................................................................20

    B.   Agent Accardi knew that Mr. Goldstein did not willfully evade taxes by redirecting income from his law firm to personal uses..........................22

    C.   Agent Accardi knew that Mr. Goldstein did not direct that personal expenses be treated as deductible business expenses. ..........................25

III. THE COURT SHOULD ORDER DISCLOSURE OF THE RELEVANT GRAND JURY MATERIALS BEFORE ANY EVIDENTIARY HEARING................26

CONCLUSION...................................................................................................30

## INTRODUCTION

Defendant Thomas Goldstein respectfully requests that this Court invalidate two orders suspending the statute of limitations with respect to certain alleged offenses arising from the 2016 tax year. *See* Ex. A (October 31, 2023 Order); Ex. B (May 7, 2024 Order).

Under 18 U.S.C. § 3292, a court may suspend the limitations period while the government seeks a foreign government's assistance in obtaining evidence that is located abroad. Because the court issues the suspension order *ex parte*, review is deferred until it is disclosed to the defense post-indictment. The court then may hold a contested evidentiary hearing. If the order is invalidated, the evidence is not suppressed; instead, the statute of limitations is not tolled.

Beginning with the earliest days of this investigation in 2020, the government was well informed of the facts relating to (1) Mr. Goldstein's bank accounts in Montenegro, and also (2) the funds that he transferred from those overseas accounts to his U.S. law firm's bank account in 2016. Years later, the prosecution twice sought the government of Montenegro's assistance in obtaining documents from the Montenegrin bank that held those accounts. In turn, prosecutors applied *ex parte* for orders suspending the statute of limitations on certain offenses relating to Mr. Goldstein's 2016 taxes. Each application was supported principally by a sworn declaration of IRS Special Agent Andrew Accardi. The Court granted the requested orders.

Those applications and accompanying declarations were based on material misrepresentations and outright falsehoods. The defense summarized some of these falsehoods — those that the government has already admitted — in its reply brief in support of its emergency motion for grand jury discovery. ECF No. 96, at 12-13. The government then filed a sur-reply at the Court's direction, but nonetheless refused to explain those false statements pending the filing of this further motion. ECF No. 102, at 11-12.

1

As set forth below, those misrepresentations and falsehoods in the applications and accompanying declarations warrant invalidation of the two orders tolling the statute of limitations. The defense requests an evidentiary hearing on this motion to question Agent Accardi. Prior to that hearing, the Court should order the government to disclose statements by Agent Accardi on the topics discussed in his declarations (including his grand jury testimony), as well as any other evidence that is inconsistent with any statement in Agent Accardi's declarations.[1]

## BACKGROUND

### I.  THE MONTENEGRIN BANK AND TRANSFERS INVOLVING "FOREIGN GAMBLER 3."

In 2016, Mr. Goldstein opened bank accounts for himself and his law firm at UCB Bank in Montenegro. He did so because a significant client and personal friend — identified in the Indictment as Foreign Gambler 3 — had assets in that bank, not in the United States. *See* Ex. C, ¶ 17 (memorandum of October 14, 2020 interview with Mr. Goldstein by Agent Accardi).

In the October 2020 interview, Mr. Goldstein told Agent Accardi that he had instructed the firm office manager to ensure that the Montenegro accounts were reported to the accountants who handled both Mr. Goldstein's personal tax returns and the law firm tax returns. Emails provided by Mr. Goldstein to Agent Accardi corroborated that assertion. As the emails showed, the firm officer managers unambiguously directed the accountants to disclose the Montenegrin bank accounts. Documents produced by Mr. Goldstein also showed that he himself directed the

---

[1]    The invalidity of the tolling orders affects the timeliness of certain counts in the Indictment related to the 2016 tax year. The defense expects to file a motion to dismiss those charges pending the resolution of this motion on or before the pretrial motions deadline. Because the validity of the 3292 orders is a legal rather than factual question, it is properly decided on a motion to dismiss. *E.g.*, *United States v. Ratti*, 365 F. Supp. 2d 649 (D. Md. 2005).

office managers to inform the accountants about transactions through the Montenegrin accounts, underscoring that Mr. Goldstein knew the accountants were aware of the Montenegrin accounts. But the accountants failed to disclose the Montenegrin accounts on the personal or firm tax returns through their own negligence: the lead accountant's home flooded; that distraction caused him to ignore the accounts. *See* Ex. D, at 2 (email between accountants admitting that the office manager "did send me an email regarding [the Montenegro accounts]. I was dealing with my house flood and they never mentioned it again so it was forgotten.").[2]

That same year, Foreign Gambler 3 deposited the equivalent of just over $1 million in Mr. Goldstein's personal Montenegrin bank account. *See id.* at 4 (bank statement). Mr. Goldstein then promptly wired $885,000 to the firm's U.S. bank account (via initial transfers to the firm's Montenegrin account). *See id.* at 4, 10 (bank statements). Mr. Goldstein properly declared as income the $885,000, which was taxed as such. *See* Ex. E ("Third 3292 Application"), at 2 n.1.

The prosecution team (and Agent Accardi in particular) was very familiar with those undisputed facts. In November and December 2020, Mr. Goldstein and his law firm Goldstein & Russell produced to the government an array of relevant documents including bank statements for the Montenegro accounts and email exchanges with the firm accountants. In May 2021, defense counsel met with the then-assigned prosecutors and Agent Accardi to walk them through the evidence.

---

[2]    The accountants' inexplicable failure to follow the firm's repeated instructions to disclose the Montenegro bank accounts is just one example of the numerous significant errors committed by the accountants, some of which are nonetheless charged in the Indictment as felonies willfully committed by Mr. Goldstein. *See also infra* at 9 (describing accountants' failure to follow instruction to report income from Malaysia); *id.* at 24 (describing the accountants' admitted destruction of tax documents reflecting income received from other firms).

At that meeting, defense counsel voluntarily disclosed that a small portion of the funds in the Montenegro accounts was not transferred to the United States and was mistakenly omitted from Mr. Goldstein's declared income — an error that Mr. Goldstein's accountants would not have made if they had followed instructions and paid attention to the accounts in the first place. *See* Ex. F, at 2. Defense counsel suggested discussing a civil resolution of that error. The prosecutors (none of whom has entered an appearance in this case) advised defense counsel that this issue would be discussed at a future meeting. No such meeting was ever scheduled, and defense counsel's repeated inquiries to the U.S. Attorney's Office about discussion of a civil resolution were ignored.

Thus, by May 2021, Agent Accardi was fully aware that: (1) the accountants had been instructed to disclose the Montenegro bank accounts; (2) Mr. Goldstein's own emails show that he knew and believed that the Montenegrin accounts had been disclosed to the accountants; (3) the vast majority of the funds deposited in the Montenegro accounts in 2016 were properly reported as income; and (4) Mr. Goldstein through counsel had voluntarily identified the funds that had inadvertently not been reported and offered to resolve any outstanding tax liability.

## II.    THE SUSPENSION OF THE LIMITATIONS PERIOD UNDER SECTION 3292.

Under 18 U.S.C. § 3292, a court may enter an order tolling the statute of limitations for an offense while the government seeks a foreign government's assistance gathering evidence. To obtain such an order, the prosecution submits an *ex parte* application. But the prosecution may not proceed merely by "proffer." Section 3292 requires a finding "by a preponderance of the evidence" that it reasonably appears that relevant evidence is located abroad. Therefore, the prosecution must include with its application actual supporting proof — generally an agent's sworn declaration. *United States v. Jenkins*, 633 F.3d 788, 797-98 (9th Cir. 2011) (citing *United States v. Trainor*, 376 F.3d 1325, 1331 (11th Cir. 2004)).

The government's investigation in this case included potential offenses relating to Mr. Goldstein's 2016 taxes. Unless tolled, the limitations period for willful tax violations is at most six years. 26 U.S.C. § 6531. In April 2023, Mr. Goldstein declined the government's request to enter into a tolling agreement for these offenses. Without more, the limitations period would therefore have expired in October 2023 — six years after Mr. Goldstein filed his 2016 taxes. *See* ECF No. 1, at 41 (Indictment alleging a filing date of October 16, 2017).

In late-September 2023, the government began seeking Montenegro's assistance in securing documents from UCB Bank. Two requests are relevant here. The first sought records related to the accounts of Mr. Goldstein and his firm. *See* Ex. G (October 27, 2023 application) ("First 3292 Application"). The second sought records related to the accounts of Foreign Gambler 3. *See* Ex. H (May 6, 2024 application) ("Second 3292 Application").

The government submitted *ex parte* applications under Section 3292 seeking tolling with respect to both requests. Each application was supported principally by a sworn declaration submitted by Agent Accardi, which in turn was largely parroted by the application itself. *See* Ex. G, at Ex. A ("First Accardi Decl."), 1-5; Ex. H, at Ex. A ("Second Accardi Decl."), 1-8. Both requests were granted. *See* Exs. A, B.

## ARGUMENT

Tolling orders obtained by the government pursuant to 18 U.S.C. § 3292 are subject to post-indictment review. Indeed, adversarial testing of those *ex parte* orders provides the due process that makes the statutory scheme constitutional. The tolling orders are valid only if supported by a "preponderance of the evidence," *id.*, which of course cannot exist if the supporting affidavits are false. *See Trainor*, 376 F.3d at 1331 (preponderance standard requires that evidence "must tend to prove or disprove the existence of a material fact"); *cf. Ratti*, 365 F. Supp.2d 649 (government ceased relying on application to foreign government, where it

conceded that representation that the application had been previously submitted was inadvertently false). Courts have recognized that a tolling order obtained based on an application that was not accompanied by a sworn declaration is invalid. *Trainor*, *supra*. Strict adherence to the requirements of Section 3292 is necessary because "in an *ex parte* proceeding the Court needs to protect the absent defendant's rights and because a statute of limitations is meant to protect against overly stale criminal charges and potentially unreliable witnesses. A decision to toll, therefore, should be carefully made." *Ratti*, 365 F. Supp.2d at 658. Where the defense substantially contests the prosecution's *ex parte* factual representations, the district court holds an evidentiary hearing. *See, e.g.*, *United States v. Wilson*, 249 F.3d 366, 372-73 (5th Cir. 2001) (holding that it was error not to hold an evidentiary hearing where a defendant "raise[d] a factual issue" relating to the validity of a tolling order under section 3292 and remanding for purposes of an evidentiary hearing), *abrogated on other grounds by Whitfield v. United States*, 543 U.S. 209 (2005); *see also, e.g.*, *United States v. Kachkar*, No. 16-20595-CR, 2018 WL 6933159, at *1 (S.D. Fla. Dec. 19, 2018) (noting that the court conducted an evidentiary hearing after the defendant argued that the government failed to comply with section 3292 and that the government's application was pretextual), *report and recommendation adopted*, No. 16-20595-CR, 2019 WL 116864 (S.D. Fla. Jan. 4, 2019); *United States v. Bogucki*, 316 F. Supp. 3d 1177, 1183 (N.D. Cal. 2018) ("[T]he defense was entitled to an evidentiary hearing to inquire into the government's true motivations for obtaining the [tolling] order."); *United States v. Titterington*, 354 F. Supp. 2d 778, 789 (W.D. Tenn. 2005) ("[A] hearing as to whether the government complied with the requirements of § 3292 is appropriate based on Defendants' arguments.").

    As discussed below, the applications at issue here do not meet this standard. Those applications depended on and largely parroted sworn declarations signed by Agent Accardi that

rested on false and misleading factual assertions. Those declarations therefore do not provide the reliable evidence required by Section 3292. As a consequence, the tolling orders are invalid.

## I.    THE SUSPENSION APPLICATIONS DEPEND ON TWO SETS OF MATERIAL FALSEHOODS.

The applications at issue requested tolling of the statute of limitations based on requests to the government of Montenegro for assistance obtaining bank records. The applications represented to the Court that those records were relevant to the government's investigation for two principal reasons: (1) to determine whether Mr. Goldstein had used the Montenegrin accounts to avoid taxes; and (2) to determine whether Mr. Goldstein willfully failed to report the Montenegrin bank accounts. This connection between the requested evidence and the offenses under investigation by the grand jury was critical, as the evidence sought must be "reasonably specific to elicit evidence of the . . . violations then under investigation by the grand jury." *United States v. Michel*, 2019 WL 5797669, at *9 (D.D.C. Nov. 6, 2019) (citation omitted). To make that connection, both the applications and the accompanying declarations relied on a series of factual representations that were deeply misleading or downright false.

### A.    The false representations about the 2016 "loan," Mr. Goldstein's failure to pay taxes, and the Malaysian payment

The government sought tolling of the limitations period because the grand jury was supposedly seeking to determine whether Mr. Goldstein "may have used the UCB accounts to further hide his income from the IRS and further evade U.S. taxes." First Accardi Decl. ¶ 14; *see also* Second Accardi Decl. ¶ 18. In support of that assertion, the government represented that Mr. Goldstein had falsely claimed in his October 2020 interview attended by Agent Accardi that the $1 million transfer in 2016 from Foreign Gambler 3 to Mr. Goldstein was a loan: "when criminal law enforcement agents from the IRS [including Agent Accardi] questioned Goldstein [about the

funds] he stated that they were loans from [Foreign Gambler 3] to pay Goldstein's personal income taxes." Second 3292 Application ¶ 13.

That was an outright falsehood, as the government later admitted. In a third suspension application, filed in July 2024, the prosecution was forced to confess that Mr. "Goldstein did not claim that the 2016 UCB transfers were loans." Third 3292 Application, at 2 n.1. But even in making that admission, the government did not acknowledge to the Court that its original false "loan" claim was an essential premise of the initial tolling applications.

The contrast between the application and declaration on this point strongly suggests that the government made a knowingly false representation. Whereas virtually every other factual allegation in every other application tracks a parallel representation in the accompanying declaration, this (false) "loan" allegation is not mentioned in Agent Accardi's declaration. That left this allegation without any evidentiary support—a flat violation of Section 3292. The defense intends to determine the reason for this discrepancy at the evidentiary hearing.

Agent Accardi did, however, reinforce the application's false assertion that Mr. Goldstein had claimed the money was a "loan" by falsely stating that Mr. Goldstein did not report as income the approximately $1 million deposited in the Montenegro accounts by Foreign Gambler 3 in 2016. Second Accardi Decl. ¶ 17. As the government was forced to admit, this assertion was false too. Third 3292 Application, at 2 n.1.

In fact, as the bank records produced by Mr. Goldstein in November 2020 and discussed by Mr. Goldstein's counsel at the May 2021 meeting clearly show, Mr. Goldstein paid taxes on the vast majority of those funds. *See* Ex. F, at 2. Mr. Goldstein's counsel moreover offered to

discuss a civil resolution of any outstanding obligation on the remaining funds, which were inadvertently omitted.[3]

Agent Accardi also added an additional supposed basis for asserting that the Montenegrin records "will help the U.S. authorities assess whether Goldstein conspired with [Foreign Gambler 3] to have income due and owing to Goldstein to be directed or filtered through [Foreign Gambler 3] — using [Foreign Gambler 3's] UCB account(s)." Second Accardi Decl. ¶ 27. Agent Accardi represented that "the investigation has revealed that income due and owing to Goldstein was sent by certain foreign officials in Malaysia to [Foreign Gambler 3]." *Id*.

In fact, that was untrue. In 2018, Mr. Goldstein was paid directly $500,000 in cash in Malaysia by that country's government. Mr. Goldstein immediately had an intermediary deliver the cash to partially repay a loan Mr. Goldstein had received from Foreign Gambler 3 in 2018. (As discussed, the earlier 2016 deposit from Foreign Gambler 3 was income, not a loan. *See supra* at 3.) When Mr. Goldstein returned to the United States, he directed the law firm's manager to be sure the accountants included the $500,000 as taxable income, because it would not show up in the law firm's accounts and indeed would be entirely untraceable by the IRS. *See* Ex. F, at 2 (Mr. Goldstein: "I got $500k in income from Malaysia that went to someone else overseas (as loan repayment) and never came into our bank account. So we need to record it as income even though there isn't a record of it happening."). The accountants failed to do that,

---

[3]    The government noted that Mr. Goldstein had not reported as income the $125,000 that remained in the Montenegrin account. Second Accardi Decl. ¶ 17. It described that failure as nefarious. But it failed to disclose that it was Mr. Goldstein himself who had voluntarily raised the issue, recognized his responsibility, and immediately offered to resolve it. But in any event, it was Agent Accardi's false representation that Mr. Goldstein had not reported *any* of the money as income that had supported the applications' representation that Mr. Goldstein had claimed that the funds from Foreign Gambler 3 were a loan.

either, despite contemporaneous emails showing that the office manager conveyed the message to the accountants at Mr. Goldstein's express instruction. Ex. D, at 2-3.

That conduct by Mr. Goldstein — specifically making sure that the accountants declared as income a large amount of money that otherwise would be utterly untraceable — was the *exact opposite* of an attempt to evade taxes. By contrast, Agent Accardi both misdescribed and mischaracterized the events as a scheme under which Malaysia gave the money to Foreign Gambler 3 to avoid Mr. Goldstein being associated with the funds and thereby evade taxation.

Agent Accardi inserted this allegation at the end of his affidavit, seemingly entirely out of context. It supposedly supported the grand jury's inquiry into whether Mr. Goldstein had used Foreign Gambler 3's accounts to hide his income. In that sense, the Malaysia allegation replaced the "loan" allegation that appeared in the application but that Agent Accardi omitted from his declaration. But in another significant departure from the prosecution's practice, the application itself does not include this assertion about the funds from Malaysia. This inconsistency suggests that Agent Accardi made a last-minute change to his affidavit to avoid personally making a false sworn representation about the loan, while nonetheless leaving it in the prosecution's application to the Court.

### B.    <u>The false representations about Mr. Goldstein's disclosure of the Montenegrin accounts.</u>

The government sought suspension of the limitations period with respect to the 2016 tax year on the further ground that the grand jury was supposedly investigating whether Mr. Goldstein had "*[w]illfully* fail[ed] to file a report [sic] the ownership or control of, or signatory authority, or other authority over," the Montenegrin accounts. Second 3292 Application, ¶ 1 (emphasis added); *see also* Second Accardi Decl. ¶ 1; First 3292 Application ¶ 1; First Accardi Decl. ¶ 2. In support, Agent Accardi represented that Mr. Goldstein "failed to file FBARs

[Foreign Bank Account Reports] for these four Montenegrin bank accounts for the years 2016 through 2020 and failed to report these bank accounts on the Schedule B to his income tax returns." First Accardi Decl. ¶ 15; *see also* Second Accardi Decl. ¶¶ 1, 14 & n.1; First 3292 Application ¶ 6; Ex. H, at 1, ¶ 9. Agent Accardi explained that "personnel from Goldstein's firm informed his outside accountants of one or more of the UCB accounts." First Accardi Decl. ¶ 14 n.1. But by contrast, Mr. Goldstein *himself* supposedly "made statements to an agent from the Internal Revenue Service [*i.e.*, Agent Accardi] in which he indicated, in substance and part, that he was unaware of the FBAR filing requirement." Second Accardi Decl ¶ 16; *see also* Second Accardi Decl. ¶ 19; First 3292 Application ¶ 7.

Agent Accardi relied heavily on the allegation that Mr. Goldstein had *purposefully* failed to disclose the Montenegrin accounts. He asserted: "Goldstein's repeated failures to properly report the UCB accounts on FBARs reinforces the suspicion that he was using the accounts to hide his income from the IRS and evade payment and/or assessment of U.S. taxes." Second Accardi Decl. ¶ 18; *see also* First Accardi Decl. ¶ 14.

Agent Accardi's repeated representation that Mr. Goldstein had *intentionally* failed to disclose the Montenegrin accounts, and had moreover claimed not to even know he was required to do so, was false. From the earliest days of the investigation, Agent Accardi in fact knew that the office managers *had* disclosed the accounts to the accountants. Agent Accardi also knew that Mr. Goldstein had instructed the office managers to report transactions in the Montenegrin accounts to the accountants, and therefore Mr. Goldstein obviously was aware that the accounts had been disclosed to the accountants. The documents showed that the accountants themselves acknowledged that the failure to disclose the accounts was their fault, not Mr. Goldstein's. *See supra* at 2-3.

Agent Accardi artfully worded his declarations to avoid disclosing this critical fact to the Court. Thus, Agent Accardi advised the Court that "personnel from Goldstein's firm informed his outside accountants" about the Montenegro bank accounts, Second Accardi Decl. ¶ 14 & n.1, while omitting the fact that Mr. Goldstein told the office managers to disclose transactions in the Montenegrin accounts to the accountants.

The government was obviously persuaded by these contemporaneous emails. Between December 2023 and May 2024, the government served Goldstein & Russell with numerous document subpoenas demanding communications concerning a variety of matters, yet the government never requested firm communications regarding disclosure of the Montenegrin accounts. The firm's emails obviously would be the likeliest source of evidence concerning Mr. Goldstein's intent. The fact that the government chose not to subpoena emails concerning the Montenegrin accounts shows that by December 2023 even the government no longer seriously believed that there was any basis to pursue criminal charges against Mr. Goldstein for failure to disclose the accounts.

Again, Agent Accardi was *intimately* familiar with all of this. In his October 2020 interview with Agent Accardi, Mr. Goldstein explained the instructions to his staff and provided the relevant emails, which were attached to Agent Accardi's interview report. *See* Ex. C, at 18. And in May 2021, defense counsel walked the prosecution team, including Agent Accardi, through those emails. *See* Ex. F. Nor were these some inconsequential details that might have slipped Agent Accardi's mind: They went directly to the *entire stated purpose* for opening the investigation in the first place. *See supra* at 3. Under these circumstances, the only possible conclusion is that Agent Accardi intentionally withheld these key details from the Court in his declarations.

\*      \*      \*      \*      \*

Taken together, these false and misleading factual assertions in the applications and accompanying declarations, as well as the mysterious and important discrepancies between the second application and the second declaration on key points, warrant an evidentiary hearing to determine whether the orders obtained by the government based on the flawed applications and declarations should be set aside. The defense requests that the Court order Agent Accardi to testify at that hearing, and that the Court order the government to disclose to the defense evidence all relevant testimony by Agent Accardi, as well as any documents in the government's possession that contradict any of the factual allegations in the applications and declarations, in advance of the hearing.[4]

## II.      THE SUSPENSION APPLICATIONS RELY ON STILL MORE FALSEHOODS BY AGENT ACCARDI.

The suspension applications represented that Mr. Goldstein had engaged in various willful tax crimes, to support the allegation that he might have hidden additional income in the UCB accounts. Agent Accardi specifically identified three offenses. Second Accardi Decl. ¶ 2. With respect to each, Agent Accardi's factual representations were — yet again — either outright false or at least extremely misleading.

---

[4]      The government also sought tolling with respect to the 2016 tax year on a third basis: the grand jury was investigating whether Mr. Goldstein in fact controlled Foreign Gambler 3's UCB accounts, but had unlawfully failed to report them on his taxes. In particular, the grand jury was allegedly exploring whether Mr. Goldstein potentially "routed payments from other law firms and clients, or gambling winnings, through Foreign Gambler 3's UCB accounts back to himself in order to conceal income that should have been reported to the IRS." Second 3292 Application ¶ 14. This third rationale rested on the first two: that Mr. Goldstein had represented that the 2016 funds were a loan, and had moreover purposefully failed to disclose the Montenegrin accounts. As discussed, the assertions underlying this allegation were either outright false or grossly misleading.

### A.    <u>Agent Accardi knew that Mr. Goldstein did not hire employees who did no work.</u>

*First,* Agent Accardi represented as fact that Mr. Goldstein "placed on his law firm's payroll young women with whom he appears to have been having intimate personal relationships and paid them through the law firm, even though those women performed no work for the law firm." First Accardi Decl. ¶ 11; *see also* Second Accardi Decl. ¶ 9 (shifting slightly to allege "the women performed little or no work"); Second 3292 Application, at 1 (alleging "sham employment of his romantic partners"). The government seemingly concedes that its theory is that the law firm was not entitled to deduct "the *full* salary and health insurance premiums" because it believes the employees' salaries were too high. ECF No. 102, at 12 (emphasis added). That would be an unprecedented and breathtaking expansion of criminal tax law.

Preliminarily, contrary to the prosecution's submission, this is not a "mere disagreement" with the evidence that amounts to just "a trial issue." ECF No. 102, at 12. Agent Accardi's sworn declarations made these representations as *statements of fact* to fulfill the evidentiary requirement of Section 3292 discussed above. Where, as here, those factual representations were false and misleading, the government cannot rely on the tolling orders issued based on those representations to toll the statute of limitations.

Agent Accardi and the government knew from extensive document productions that this allegation was false. Agent Accardi's representations relate to four employees. The documents summarized below, which were in the possession of the government *before* the second application was submitted, show that three of the employees performed extensive work for the firm. The fourth employee went on unpaid medical leave just days after she was scheduled to begin working for the firm, and the firm's office manager confirmed that the firm's handling of

this employee's medical leave was consistent with the requirements of the firm's health insurance plan. Agent Accardi's declarations did not mention any of this evidence.

### 1.    __Employee 1__[5]

Employee 1 worked for the firm initially on a contract basis beginning in December 2017, then full-time from February 2 to March 31, 2018. *See* Ex. I, at 1, 2; *see also id.* at 3-5 (after Employee 1 was hospitalized after having a seizure while at work in the office, they went on unpaid leave until April 25).

Employee 1's annual salary was $45,000, equivalent to just under $22 / hour — lower than the national average hourly wage. *Id.* at 1. In total, they were paid $7,312.50 by the firm in 2018. *Id.* at 9.[6]

Employee 1 did extensive marketing and business development work arising from an important Supreme Court antitrust case (*Ohio v. American Express Co.*). Employee 1, who had their own marketing agency, was given principal responsibility for developing the strategy for marketing the proposal to potential clients. *E.g.*, *id.* at 14 (exchanges on proposal to use project management tool Slack).

---

[5]    The defense understands that the government received most of the underlying documents referenced in this subsection directly from Employee 1 on May 6, 2024, the same day that the government submitted its second application to toll the statute of limitations under Section 3292. Yet the government either did not review the documents it had just received from Employee 1 before alleging that the employee did "no work for the law firm," or the government reviewed the documents and failed to disclose their import to the Court. In any event, Agent Accardi's declaration in support of the third application, filed two months after Employee 1's production, alleged that Employee 1 and others "performed little or no work for the law firm," Third 3292 Application, at Ex. A ¶ 9, without mentioning the many documents to the contrary produced by Employee 1.

[6]    Although the firm's initial meeting with Employee 1 to discuss becoming a direct employee was on February 1, the firm took care not to start her salary until her precise February 2 start date "and prorate her February pay accordingly," *id.* at 12.

Employee 1 began their work on this project on a contract basis in December 2017. They initially identified retail industries with large credit card volumes, *id.* at 17-19, 21, a list they revised and organized through additional research, *id.* at 22, 26, 27, 30, 33.

Impressed by Employee 1's work, the firm hired them full time. Within the firm, they created, compiled, and revised a database of potential targets. *E.g.*, *id.* at 35-41. They also researched each of these companies' general counsels and created accompanying biographies. *E.g.*, *id.* at 54, 55, 59, 127-28; *see also, e.g.*, *id.* at 131 (narrowing to domestic general counsels); *id.* at 132 (exchanges on how Employee 1 "did a really great job with this"). After developing an initial database, Employee 1 developed tiers of potential clients with the largest gross revenue to identify those with the largest claims. *E.g.*, *id.* at 133-35. Employee 1 also identified the lines of business with the largest proportion of business customers — who naturally would be most likely to use American Express. *id.* at 137, 139. Employee 1 also researched and compiled a list of media coverage of the *American Express* litigation. *Id.* at 140-43.

Employee 1 was directly involved in the strategy for determining which companies were most likely to accept American Express, and thus to have the largest potential claims. *E.g.*, *id.* at 147, 149-50. This effort also included researching media coverage of the *American Express* litigation. *Id.* at 151, 155, 160, 162, 164, 167.

The firm consulted with multiple other law firms which represented retailers in related litigation, to determine which already were represented by antitrust counsel. Working with the firm's staff attorney, *id.* at 169-70, Employee 1 revised the database to remove those companies, *e.g.*, *id.* at 171, 173, 177, 189-90.

The firm collaborated with a trade association client to identify potential clients and prepare to contact them. It used Employee 1's database, which the trade association notated to

identify its members. *E.g.*, *id.* at 191-92, 193-250. Employee 1 in turn revised the database to focus on the members as potential targets. *Id.* at 251-57.

Employee 1 also worked extensively on potential marketing. They researched Internet domains for a website to describe the claim acquisition. *id.* at 258-59. They developed and revised both the design and the content for the website. *E.g.*, *id.* at 260-91. They also assisted in developing a strategy under which multiple retailers could be invited to attend in-person meetings on the proposed strategy. They sorted and divided the potential clients geographically. *E.g.*, *id.* at 292-98. They then prepared marketing materials for the in-person meetings. *E.g.*, *id.* at 299.

### 2.    Employee 2

Employee 2 worked for the firm from April 20 to July 13, 2018. Ex. J, at 1, 3, 4. This was soon after Employee 1 had left the firm for medical reasons, leaving the project uncompleted. *See supra*. As explained in an introductory email to Employee 2, they were hired to "finish [Employee 1's] project. It involves the companies in the spreadsheet. We need a summary about the company and then the general counsel (who is their lead lawyer)." *id.* at 7, 8, 10.

Employee 2 started as a part-time employee at a salary of $26,000, *id.* at 43, then later converted to full-time "as we ramp up AmEx for the next couple of months" for the Supreme Court's ruling that would lead to the project's implementation, *id.* at 45. The equivalent hourly rate was just under $22 / hour — again, less than the average national hourly wage. In total, they received $10,949 in income. *Id.* at 46.

Over their period of employment, Employee 2 continued and expanded on all of Employee 1's work. For example, they researched, collected, and organized materials related to the general counsels of target businesses. *Id.* at 52, 53, 61, 129. They also developed additional materials related to meetings with target businesses. *Id.* at 142.

17

Employee 2's work concluded when the Supreme Court surprisingly decided *Ohio v. American Express* 5-4 in favor of the defendants. That ruling eliminated any potential follow-on litigation by private plaintiffs. After the firm concluded that the project could not go forward, Employee 2 was promptly removed from the payroll. *Id.* at 143. The firm took care to ensure she only received "a prorated salary . . . because [they] stopped working for us in mid-July." *Id.* at 144. They were also promptly removed from the firm's health insurance. *Id.* at 145, 146; *see id.* at 147 ("Tom let me know that the AmEx case finished. So we will close out your payroll as of this past week. I will send you a healthcare termination letter tomorrow; you will have coverage effective through the end of July. It's been good working with you.").

### 3. <u>Employee 3</u>

Employee 3 worked part-time for the law firm from April 20 to August 31, 2018. Ex. K, at 1, 3. Their annual salary was $26,000, equivalent to $25 / hour — again, less than the average national hourly wage. *Id.* at 8-9. In total, they were paid $9,388.90. *Id.* at 10-15. Their hours increased only when there was additional work to do. *Id.* at 16-17. The firm and Employee 3 took care to ensure that the work balanced out through busier and less-busy periods, and they were paid appropriately. *E.g.*, *id.* at 18 (Q: "Did you work extra hours so that I owe you more money?" A: "I did some weeks, but I worked less the last couple of weeks so I think it works out to be even.").

Employee 3 worked for the firm on a major Supreme Court copyright case (*Google LLC v. Oracle America, Inc.*) in which Mr. Goldstein was lead counsel for Google. The firm thus hired them for a "regular, research job" about "a lawsuit between Google and Oracle." *Id.* at 19; *see also id.* (providing introductory articles on the case). Specifically, they compiled a comprehensive list of ongoing opinionated media coverage related to the case, including details of the publication; the author; the date; the nature of the piece as news or opinion; whether the

piece favored Google; notable quotes; and information about the author. *Id.* at 20-32. They then created a comprehensive database of interested reporters. *E.g.*, *id.* at 33 (Mr. Goldstein: "I would like you please to put together a pretty comprehensive list of reporters who are writing about the case. Please collect their name, their publication, and their contact email. That's going to require you to go back to some of the articles you skipped because they were just straight reporting.").

Employee 3 dutifully performed this work. They shared the first version of the media compilation on April 26. *Id.* at 34. They transmitted a further version on May 9. *Id.* at 35. Another version was transmitted on May 15. *Id.* at 36.

Subsequent revisions were conducted throughout Employee 3's time with the firm within a shared Google document. They regularly corresponded with Mr. Goldstein to ensure the project was being done correctly. *E.g.*, *id.* at 37 (asking for input on "the last entry on the workbook" and requesting "a quick Skype call tonight to make sure we are on the same page"); *id.* at 38 ("So far I've been including Law Firms that publish articles about the case on their business webpages . . . but is that relevant to you?"). Both the document's contents and the version history show that Employee 3 constantly updated the document. *Id.* at 39 . They ultimately compiled this information for 178 separate articles, dating back to 2011, locating the contact information for each author. *Id.* at 20-32.

On behalf of the firm, Employee 3 located, studied, and subscribed to third-party services to locate the contact information for the authors of various articles. They secured a law firm email address for that purpose. *Id.* at 40; *see also id.* at 41 (records showing 203 messages from the firm account). The record contains communications to that effect in June. (*See, e.g.*, *id.* at 42, 45, 48.)

The firm integrated Employee 3 directly into their work with the client and the client's outside media consultant. On June 4, the media team was granted access to the document. *Id.* at 50.

Employee 3 left the firm when they finished the project. *Id.* at 51 ("Now is probably a reasonable cut off. I feel like anything further is almost so deep it doesn't matter."). When they sought to extend their health insurance for a month, Defendant explained that they would need to pay to do so themselves. *Id.*

Long after Employee 3's departure, their work product remained valuable. The firm sought additional access to the document in January 2019. *Id.* at 53-54.

### 4.    <u>Employee 4</u>

Employee 4 was on the firm payroll from October 1, 2018, for five weeks. Ex. L, at 1, 3. Their total income was $4,320. *Id.* at 7.

Employee 4 performed no work because she immediately had to go on medical leave. Just *two days after being hired*, Employee 4 advised the firm that she was seriously ill. On October 3, she wrote to the firm's manager: "I have to see [a] doctor today. And I have to go to [the] ER." *Id.* at 12. Through the end of November they were still "very busy with doctors appoi[n]tments." *Id.* at 15; *see also id.* at 16 (requesting insurance information "for [the] hospital to resolve [a] future bill").

When Employee 4 was removed from the payroll, the firm promptly "processed [an] insurance coverage" change, advising Employee 4 that they would "have coverage through the end of the [sic] November," but "we cannot keep you on the plan past November." *Id.* at 15. Employee 4 requested, however, that they be allowed to remain on the firm's health insurance. The firm's manager had previously learned from the outside benefits manager that this was permissible under governing law. *Id.* at 19, 26 ("No law requires [an employer] to PAY an

employee who is out on leave."). The benefits manager had also confirmed this was permissible under the firm's health insurance policy. *Id.* at 19, 25 (Question: "Is there any requirement in our health insurance contract?" Answer: "I looked in the CareFirst contract booklet and do not see anything specific to timeframes for remaining covered during a leave of absence."). Employee 4's removal from the health insurance plan was therefore rescinded, but they were *not* returned to the law firm's payroll. *Id.* at 22.

On December 26, 2018, the firm's manager re-confirmed the benefit manager's prior advice. The benefits management company responded that the previously provided information "is correct." They explained: "I have addressed this very question many times over the last 20 years. . . . CareFirst does not specify the length of time an employee can be covered while on leave of absence (paid or unpaid)." *Id.* at 24. In turn, the firm's manager advised Defendant that Employee 4 "does not need to be paid to stay on healthcare, according to our insurance reps." *Id.* at 28. Defendant responded, "Ok." *Id.*

In this period, the firm transitioned between two managers. The ongoing firm manager explained that Employee 4 was on "unpaid leave" due to "a chronic illness," so that the firm should "continue to pay the bills" for health insurance. *Id.* at 32.

The firm removed Employee 4 from its health insurance once again on March 7, 2019. *Id.* at 41. But Employee 4 again asked to remain on the plan, this time promising to reimburse the firm for the premiums. They were then reinstated on April 5, 2019. *Id.* at 43.

At the start of 2020, Mr. Goldstein instructed the firm manager that Employee 4 be removed from the firm's health insurance. But that was not done due to an "error[]" by the manager, who "assumed that would be done automatically." *Id.* at 44 (January 24, 2020). That

resulted in an extension of the insurance for three months, at which point they were removed from the plan. *Id.* at 46, 47.

These documents were all in the government's possession when the second application was submitted to the Court. The documents show that Agent Accardi's representation to the Court that these employees did no work was thus transparently and obviously false. Yet Agent Accardi's declarations did not mention them.

### B.      Agent Accardi knew that Mr. Goldstein did not willfully evade taxes by redirecting income from his law firm to personal uses.

Agent Accardi next asserted that the government's tolling applications were supported by the fact that Mr. Goldstein supposedly "diverted millions of dollars from his law firm, G&R, to pay for personal expenses." First Accardi Decl. ¶ 11; Second Accardi Decl. ¶ 9. In particular, Agent Accardi represented that Mr. Goldstein "allow[ed] [a] New York law firm to offset $125,000 in fees that the New York law firm owed to G&R" and "directed [a] California-based firm to send [a $250,000] fee to his personal bank account." Second Accardi Decl. ¶¶ 11-12; *see also* Second 3292 Application ¶¶ 6-8.

These representations were grossly misleading, because there is no basis to assert that Mr. Goldstein sought to avoid his tax liability through these transactions. Agent Accardi knew from interviews of G&R office managers and the accountants, as well as the law firm's voluminous document production, that Mr. Goldstein himself reported income to the accountants only in unusual circumstances (such as the payment from Malaysia). Instead, the accountants determined the amount of taxable income through financial records. With respect to these specific two transfers, the law firms in question were *legally required* to document the payments formally to both the IRS and Mr. Goldstein law firm. The law firm's accountants were in turn professionally obligated to account for those disclosures in determining its taxable income.

By law, a party must record any material compensation that it pays to a law firm on a form 1099-NEC. (Law firms are an exception to the ordinary rule that corporations do not receive 1099-NECs.) This document is known as an "information return." 26 C.F.R. 1.6045-5(a)(1). The payor must both file that form with the IRS and provide it to the payee. *Id.* 1.6045-5(a)(3)(i) ("A person required to file an information return under paragraph (a)91) of this section must furnish *to the attorney a written statement of the information required to be shown on the return*.") (emphasis added). This obligation is unaffected by the mechanism by which the compensation is paid — such as the bank account into which money is wired, if any. Instead, a form 1099-NEC is required with respect to the beneficial owner of the income; its *entire purpose* is to create a record of who must pay the resulting taxes. IRS regulations thus provide (with exceptions not applicable here) that a business that "makes payments aggregating $600 or more during a calendar year to an attorney in connection with legal services . . . *must* file an information return for such payments." *Id.* 1.6045-5(a)(1) (emphasis added). The payor *must* then "furnish to the attorney a written statement of the information required to be shown on the return." *Id.* 1.6045-5(a)(3); *see also* 26 U.S.C. § 6041A(a) & (e) (statutory authority); IRS Instructions for Form 1099-NEC ("File Form 1099-NEC, Nonemployee Compensation, for each person in the course of your business to whom you have paid the following during the year. At least $600 in: . . . Payments to an attorney.").

For one transaction cited by Agent Accardi, the prosecution knew that the payor law firm *did* provide Mr. Goldstein's law firm with a 1099 that included the funds that were sent directly to Mr. Goldstein's personal account. *See* Ex. D, at 12. The failure to report this income is therefore directly attributable to the accountants' incorrect decision — *which they admitted*, *see supra* at 3 n.2 (noting this pattern) — not to consult 1099s when calculating the firm's income.

The accountants erroneously believed that law firms were subject to the ordinary rule that corporations do not receive 1099s at all. They then took this view to the extreme of *disposing* of those documents. *See* Ex. D, at 14 (accountant to G&R office manager: "I talked to [the lead accountant] and he confirmed that as a corporation companies don't need to issue 1099s to G&R for services. You might get a few by mistake but don't require them *so we don't keep them*." (emphasis added)).

For the other transaction cited by Agent Accardi, the government knew — from documents received by subpoena — that the payor (like the accountants) *also* erroneously believed that it was not required to provide a 1099-NEC to Mr. Goldstein's firm. Ex. D, at 16 (Nov. 23, 2020 notice from payor firm's accounts payable department: "If an entity is a legal corporation, we are not required to file a 1099, however, we are required by law to have the enclosed W-9 form on file."). So in violation of its legal obligations, that firm never provided the required tax document to Mr. Goldstein's firm. During the course of this investigation, the payor firm discovered its error. *Id.* at 17 (Jan. 23, 2021 email relating to "Goldstein & Russell, P.C." with subject "Didn't we send 1099s last year"; staff member: "No we did not. . . . Yes they should get one — I corrected the spreadsheet attached.") The payor firm subsequently created and filed the required 1099-NEC. *Id.* at 20 (Form 1099-NEC); *id.* at 21 (filed June 10, 2022); *id.* at 22 (same); *id.* at 23 (same).

There is of course no allegation that Mr. Goldstein expected that these sophisticated law firms would violate their legal obligations to submit the required tax documents, much less that he encouraged them to do so. There also is no allegation that Mr. Goldstein ever interfered with his own firm's transmission of tax documents to the accountants, or expected that the

24

accountants would ignore them. Agent Accardi therefore knew that it was wildly misleading to represent that Mr. Goldstein willfully avoided his taxes through these transactions.

C.    **Agent Accardi knew that Mr. Goldstein did not direct that personal expenses be treated as deductible business expenses.**

Agent Accardi finally asserted that tolling was supported by the fact that Mr. "Goldstein caused $175,000 to be sent from the G&R bank account" to a New York firm to whom he owed a personal debt. Second Accardi Decl. ¶ 11; *see also* Second 3292 Application ¶ 7. In turn, "[t]hat $175,000 transfer was classified as a G&R 'legal fee' expenses when, in reality, it was an expense attributable to Goldstein personally, as a poker-related debt." Second Accardi Decl. ¶ 11.

Once again, Agent Accardi's representation that this transaction was an example of willful tax evasion was grossly misleading. Of note, the agent's declaration carefully uses the word "caused" to create the knowingly false impression that Mr. Goldstein directed that the payment be treated as business expense.

The documents on which Agent Accardi relied in describing the $175,000 transfer in fact prove the opposite: that Mr. Goldstein did not cause the transaction to be mischaracterized on the law firm's books. Instead, the law firm's manager (who was also Mr. Goldstein's assistant) made an error. Mr. Goldstein instructed the manager: "Please wire $175k to [the firm]. We've sent them money recently." *See* Ex. M, at 1. That recent transaction was a $38,000 wire *using Defendant's personal funds from his personal account*. Ex. M, at 2. Instead of making the subsequent payment the same way, from Mr. Goldstein's personal account, the assistant wired the funds from the firm account. Either the assistant or the accountants recorded the transaction as a business expense. Defendant never suggested that they do either; nor (prior to the investigation) was he ever told that had happened. It was grossly misleading to assert that Mr.

Goldstein willfully caused this payment to be treated as a business expense, when Agent Accardi knew that he never even instructed that it be made from the law firm's account.

No less important, Agent Accardi's assertion that this one transaction supported tolling the limitations period while the government sought evidence from Montenegro depended on the claim that this was but one example. But the government had in its possession *overwhelming* evidence that Mr. Goldstein *uniformly* instructed the law firm's staff and accountants to *always* correctly characterize personal expenses. For example, in an email exchange predating Mr. Goldstein's awareness of this investigation by several years, a firm employee told Mr. Goldstein that the accountants had advised that classifying a particular payment as a personal distribution rather than a business expense "will end up costing you around $220k in taxes." Ex. N, at 4. Mr. Goldstein responded that "it's unfortunate. But we always play completely by the rules." *Id.* Attached to this motion is a compilation of *two dozen* additional examples in which Mr. Goldstein directed that income and personal expenses be properly treated as such, most of which were in the government's possession at the time of the government's second Section 3292 application. *See* Ex. N, at 1-2 (chart compiling examples alongside underlying documents). Yet Agent Accardi presented the Court with this one example (falsely suggesting the mischaracterization of the expense was intentional) and withheld *all* the rest. As noted, the government has never identified a *single* instance in which Mr. Goldstein ever suggested that a personal expense be treated as a deductible business expense. But Agent Accardi withheld that information too.

## III.   THE COURT SHOULD ORDER DISCLOSURE OF THE RELEVANT GRAND JURY MATERIALS BEFORE ANY EVIDENTIARY HEARING.

For the foregoing reasons, the defense is entitled to an evidentiary hearing to test the factual representations made by Agent Accardi and the prosecution in support of its applications

to toll the statute of limitations under Section 3292. *See supra* at 6. In preparation for that hearing, Mr. Goldstein is entitled to disclosure of any statements by Agent Accardi concerning the topics discussed in the declarations (including grand jury testimony), as well as any other evidence that is inconsistent with any statement in Agent Accardi's declarations.

The failure of the government to satisfy the statute of limitations is of course a basis to dismiss the relevant charges of the Indictment relating to the 2016 tax year. It is accordingly a proper basis for the disclosure of grand jury testimony. Fed. R. Crim. P. 6(e)(3)(E)(ii).

A request for disclosure of grand jury materials generally requires that the defense make a showing of "particularized need." Central to that inquiry is whether the defense is relying on mere assertions or instead has demonstrated the substance of its allegations through evidence. *West v. United States*, No. 08 CR 669, 2010 WL 1408926, at *5 (N.D. Ill. Apr. 5, 2010) ("Courts finding that a defendant did not satisfy this requirement have done so where the defendant failed to present evidence supporting his claim." (collecting cases)).

That standard is obviously satisfied here, through the detailed demonstrations above of the prosecution's multiple falsehoods — including those to which the government itself has admitted. That particularized showing is further supported by the material discrepancies between Agent Accardi's sworn declarations and the applications discussed above.

An especially compelling basis for disclosing grand jury testimony arises when the defense establishes that a government agent's representations have been false. *See, e.g.*, *United States v. Red Owl*, No. 5:16-CR-50163-03-JLV, 2019 WL 7811359, at *3 (D.S.D. Sept. 18, 2019) ("Here, the court is mindful of the prior findings regarding SA Lucas' inaccurate testimony, and finds that, combined with the inconsistencies alleged in the present case between his affidavit and 302, provides a compelling necessity permitting the particularized need of SA

Lucas' grand jury transcript."). In turn, impeaching the credibility of a witness is perhaps the single most accepted basis for disclosing grand jury materials to the defense. "Particularized need is most often established when there is a need to impeach a witness, refresh his recollection, or test his credibility." *United States, ex rel. Stone v. Rockwell Int'l Corp.*, 173 F.3d 757, 759 (10th Cir. 1999) (cleaned up); *see also Dennis v. United States*, 384 U.S. 855, 870 (1966); *United States v. Woody's Trucking, LLC*, No. CR 17-138-BLG-SPW, 2018 WL 457781, at *1 (D. Mont. Jan. 17, 2018) (citing *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 683 (1958); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959)).

The fact that the defense has no other source of comparable impeachment evidence substantially enhances the basis for disclosure. *United States v. Moten*, 582 F.2d 654, 663 (2d Cir. 1978) ("Thus, it would seem that a party's need varies in proportion to the degree of access he has to other sources of the information he seeks."). The fact that the underlying events occurred eight years ago makes the disclosure of the testimony for impeachment purposes even more appropriate. *In re Catfish Antitrust Litig.*, 164 F.R.D. 191, 195 (N.D. Miss. 1995) ("Relevant events reach several years into the past, and this court needs no authority to acknowledge the occasional failure of the human mind to recall events with precise clarity. As well, '[e]very experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls precious memory.'" (quoting *Jencks v. United States,* 353 U.S. 657, 667 (1957)).

Here, the grand jury is almost certain to have heard testimony on the topics discussed in the declarations from Agent Accardi, who is the lead investigative agent. Agent Accardi's testimony very likely addressed the matters that the prosecutors and Agent Accardi misrepresented to the Court. The very point of the Section 3292 applications was that the grand

28

jury was considering bringing charges on the basis of those supposed facts. Agent Accardi made a variety of unequivocal false factual representations in support of the applications, and therefore the transcript of his grand jury testimony on this topics is likely to include important evidence that would impeach his sworn statements in the declarations filed with the Court.

Testimony of government agents is least likely to implicate grand jury secrecy, because there is no concern that third-party witnesses will be discouraged from participating in the grand jury process. In addition, Agent Accardi is almost certain to be a central trial witness; the fact that his grand jury testimony will ultimately be disclosed under *Jencks* substantially reduces the need to keep it secret now. *West*, 2010 WL 1408926, at *5; *United States v. Obiuwevbi*, No. 89 CR 1062, 1990 WL 36733, at *3 (N.D. Ill. Mar. 2, 1990).

The defense's right to evidence that would tend to impeach Agent Accardi extends beyond grand jury testimony. Evidence in the government's possession that is inconsistent with allegations in the applications and declarations would constitute *Brady* material, which the government has agreed to produce to the defense by April 18. Similarly, any statements Agent Accardi's investigative reports or other written statements concerning the topics discussed in the applications and declarations could also be *Brady* material, and at a minimum would be subject to production in advance of trial under the Jencks Act. There is no basis to withhold the production of that evidence when Agent Accardi's credibility is at issue now. The only possible consequence of failing to provide that material until right before trial would be potentially to cause the Court to make an inaccurate ruling with respect to the Section 3292 applications. No doubt, the government will attempt to make use of all the evidence it possesses that would *bolster* the agent's credibility. That imbalance would be inequitable.

## **CONCLUSION**

For the foregoing reasons, the Court should invalidate the two tolling orders with respect to the relevant alleged offenses in 2016. The government's dismissal of its obvious pattern of deception as "molehills of disagreement," ECF No. 102, at 12, demonstrates that it does not take seriously its duties to the Court.[7] Based on the testimony at the evidentiary hearing, the Court should also consider an appropriate sanction for the government's lack of candor in the applications.

---

[7] The government's misconduct here appears to follow a broader pattern of prosecutors' abuse of Section 3292 tolling applications. As a recent complaint to the DOJ Inspector General from a former federal prosecutor noted, prosecutors make a "'deliberate effort to deceive the relevant judges into believing that [a Justice Department unit] had, in fact, made its requests for foreign evidence because of a legitimate interest in obtaining that evidence,'" where the "'real purpose of the request and the application to the judge was to buy more time to build a case.'" Aruna Viswanatha & Dave Michaels, *Justice Department Accused of Abusing Process to Extend Statute of Limitations*, The Wall St. Journal (Feb 2, 2020, 2:31 PM), https://www.wsj.com/articles/justice-department-accused-of-abusing-process-to-extend-statute-of-limitations-11580657654 (quoting the complaint); *see also* Ankush Khardori, *Pretext and Nonsense: Recent Decisions on Statutory Tolling in International Criminal Investigations*, 58 No. 1 Crim. Law Bull. 1 (2022).

Respectfully submitted,

/s/ *Jonathan I. Kravis*
_____
Jonathan I. Kravis (*pro hac vice*)
Stephany Reaves (Bar No. 19658)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com

Adeel Mohammadi (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*

Dated: March 31, 2025