**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**DEFENDANT THOMAS C. GOLDSTEIN'S**
**<u>MOTION TO SUPPRESS STATEMENTS</u>**

## INTRODUCTION

Thomas Goldstein, through undersigned counsel, moves this Court to suppress any and all statements allegedly made by Mr. Goldstein to Customs and Border Protection officers on October 25, 2018, because those statements were taken in violation of Mr. Goldstein's Fifth Amendment rights. Mr. Goldstein requests an evidentiary hearing on this motion. In support of this motion, counsel states:

## PROCEDURAL AND FACTUAL BACKGROUND

Mr. Goldstein is before the Court charged with tax evasion, false statements, and related offenses. As most relevant to this motion, the government alleges that Mr. Goldstein told a United States Customs and Border Protection ("CBP") officer that approximately $968,000 in cash that he brought into the United States was gambling income. ECF No. 1, ¶¶ 54. The government relies on this statement to support its allegation that Mr. Goldstein committed tax evasion by failing to report the money as income on his 2018 Form 1040. Mr. Goldstein pleaded not guilty to all charges and awaits trial on January 13, 2026. The underlying allegation is based on the following:

On October 25, 2018, Mr. Goldstein entered the United States arriving at Dulles International Airport in Virginia on a flight from Hong Kong carrying approximately $968,000 in cash. In a contemporaneous text message, Mr. Goldstein told a witness that the cash was a loan from a friend that he intended to use to pay his taxes. Upon arriving at Dulles, Mr. Goldstein appropriately declared on his CBP entry form that he was carrying cash in excess of $10,000.

When Mr. Goldstein provided the declaration form to CBP officials, rather than provide Mr. Goldstein with a Currency and Monetary Instrument Report and allow him to continue on his way, armed CBP officers pulled Mr. Goldstein aside for additional investigation. He was

separated from other members of the public and forced to wait in a secondary screening area for a significant time.  As a U.S. Citizen, Mr. Goldstein had a right to reenter the United States, and Mr. Goldstein's admissibility into the country was not at issue.  Moreover, carrying a large amount of money into the country was lawful as long as Mr. Goldstein disclosed it—which he did.  Yet Mr. Goldstein was brought to a smaller, even more private, interrogation room, and questioned.  During this time, the government took possession of the money Mr. Goldstein had borrowed—almost $1,000,000.  Although Mr. Goldstein was restrained in circumstances that were functionally equivalent to arrest, the officers did not warn Mr. Goldstein of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), prior to questioning.  Eventually, finding he had committed no crime, officers manually counted the money in Mr. Goldstein's possession and allowed him to leave.

Months later, as part of an IRS investigation conducted by Special Agent ("S.A.") Andrew Accardi, Special Agent Accardi spoke with a CBP Officer about Mr. Goldstein's Currency and Monetary Instrument Report.  Special Agent Accardi claims that the CBP Officer began the interview by stating that he completes too many Currency and Monetary Instrument Reports to remember any one by name.  According to Special Agent Accardi, after prompting, the CBP Officer eventually claimed to remember Mr. Goldstein's report, because it involved a particularly large amount of currency.  Then, despite the lack of any contemporaneous record to this effect, Special Agent Accardi asserts that the CBP Officer remembered specific statements Mr. Goldstein allegedly made months prior: that "the cash was gambling winnings from Macau" and that Mr. Goldstein "had to take the winnings in cash through Hong Kong because he was not able to transfer the money out of the country."  Special Agent Accardi's account provides no additional information about the CBP Officer's supposed recollection,  And the government has

not disclosed what details Special Agent Accardi provided during the interview with the CBP

Officer—for example, whether Special Agent Accardi told the CBP Officer that Mr. Goldstein

played high-stakes poker or whether Special Agent Accardi suggested to the CBP Officer that

the money might have been gambling winnings before the CBP Officer claimed to remember

Mr. Goldstein's statement.

Based on Special Agent Accardi's account of the CBP Officer's recollection about Mr.

Goldstein's statements, despite contradictory evidence in the government's possession, the

indictment alleges Mr. Goldstein (1) caused false and incomplete information to be provided to

his accounting firm; (2) caused the preparation, signing, and filing with the IRS of a false and

fraudulent Form 1040; and (3) made false statements to IRS representatives about funds brought

back from Hong Kong.  ECF No. 1, Counts 3, 9.

## ARGUMENT

In order to protect and effectuate the right against self-incrimination in the inherently

coercive atmosphere of a custodial interrogation, the Supreme Court in *Miranda v. Arizona,* 384

U.S. 436 (1966), ruled that the government cannot introduce statements in its case-in-chief,

"whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant

unless it demonstrates the use of procedural safeguards effective to secure the privilege against

self-incrimination."  *Miranda*, 384 U.S. at 444.  Specifically, "[p]rior to any [custodial]

questioning," the police must warn a suspect that he has the right to remain silent, that any

statement he makes may be used against him in court, that he has the right to the presence of an

attorney during any questioning, and that—if he cannot afford a lawyer—one will be appointed

to him.  *Id*.; *see also Dickerson v. United States*, 530 U.S. 428 (2000).

"If the accused indicates that he wishes to remain silent, 'the interrogation must cease.'

If he requests counsel, 'the interrogation must cease until an attorney is present.'"  *Edwards v.*

*Arizona*, 451 U.S. 477, 481 (1981) (quoting *Miranda*, 384 U.S. at 474).  "Interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (quoting *Miranda*, 384 U.S. at 444) (emphasis omitted) (citation and internal quotation marks omitted).  "[T]he term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300-01 (footnote and internal quotation marks omitted).

 "When deciding whether a defendant not under formal arrest was in custody—and thus if the *Miranda* requirements apply—a court asks whether 'under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest.'" *United States v. Giddins*, 858 F.3d 870, 879-80 (4th Cir. 2017) (quoting *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013)). The inquiry is objective, asking "whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (citation omitted).  This fact-specific analysis requires courts to consider, among other things, "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." *Id.* (quoting *Hashime*, 734 F.3d at 283).

 While the Fourth Circuit lacks binding precedent analyzing when questioning by Customs and Border Protection officers amounts to custodial interrogation, guidance from sister circuits demonstrates that Mr. Goldstein was in custody and should have been afforded *Miranda*

warnings prior to his interrogation. As a preliminary matter, although inspection upon reentry to the U.S. requires some minimal amount of screening in order to determine a person's admissibility to the country, courts have rejected a blanket rule that questioning by CBP officers can never be custodial interrogation. *See United States v. FNU LNU*, 653 F.3d 144, 146 (2d Cir. 2011) (rejecting the district court's reasoning that a general exception to *Miranda* for border questioning exists). Instead, it is well-established that courts apply a fact-specific analysis in this context, as with any other *Miranda* inquiry. *See, e.g.*, *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996) ("The line between routine Customs questioning and custodial interrogation is not easily drawn, but it requires careful examination of all the circumstances.").

For example, in *United States v. Chavira*, the Fifth Circuit assessed whether a defendant was subject to custodial interrogation when she was taken "to a passport control secondary processing area" and questioned "for thirty to forty minutes while she was hand-cuffed to a chair." 614 F.3d 127, 129 (5th Cir. 2010). There, the Court acknowledged that "routine citizenship checks at fixed checkpoints are characteristic of ordinary traffic stops, and not the type of 'stationhouse interrogation' that renders a person in custody." *Id.* at 133. Consequently, the initial "questioning at the primary pedestrian entry" to the border, involving "brief detention and the production of relevant documents," was not custody requiring *Miranda* warnings. *Id.* However, "[t]he situation changed" when the defendant was brought to secondary processing because of all the circumstances: that there was no longer a reasonable immigration purpose to the questioning, and that the defendant's freedom movement was "severely restrained" not just at the point officers handcuffed her, but also because important belongings were confiscated, she was placed "in a windowless fourteen by ten foot room," and she was "in a secured area not accessible to the public." *Id.* at 133-35. Similarly, in *United States v. Butler*, 249 F.3d 1094,

1096-97 (9th Cir. 2001), the Ninth Circuit concluded that border inspection "evolved into 'custody' triggering the requirement of *Miranda*," when a defendant was transported to secondary screening, where he was forced to wait in a locked holding cell with his belongings confiscated. This was the case even though the defendant was simply waiting in the holding cell for the government to complete its search of his car—the government had not yet discovered the contraband that eventually led to arrest. *Id*.

Considering all of the circumstances of Mr. Goldstein's detention, Mr. Goldstein was subject to a custodial interrogation. As a U.S. citizen who had appropriately declared the amount of money he carried back to the U.S., Mr. Goldstein should have expected to complete a Currency and Monetary Instrument Report and continue on his way. Instead, he was transported to a secondary screening area, separated from the public, forced to wait for a significant period of time, and questioned in an even smaller, more isolated room where he was clearly not free to leave, by an armed CBP officer. Moreover, the government's possession of almost $1,000,000 that Mr. Goldstein had borrowed to pay his taxes sent a clear message that Mr. Goldstein could not leave the interrogation. His lawful presence and dutiful completion of the customs declaration form underscore the fact that there was no immigration need for extended investigation. Instead, the facts objectively demonstrate that the CBP officers were attempting to identify whether Mr. Goldstein had committed some other, still unidentified crime. Because the CBP officers should have advised Mr. Goldstein of his rights under *Miranda* prior to this prolonged questioning, his alleged statements must be suppressed. At a minimum, Mr. Goldstein is entitled to an evidentiary hearing to establish a full record of the ways in which his detention became the functional equivalent of arrest.

## <u>OUTSTANDING DISCOVERY</u>

In support of this motion, Mr. Goldstein requested that the government provide Rule 16 discovery, and evidence under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, so that the Court can assess all of the circumstances relevant to whether Mr. Goldstein was in custody and the credibility of the witnesses the government will present in opposing this motion.  As of the time of this filing, the government has still not disclosed: (a) the CBP Traveler Entry declaration form that Mr. Goldstein completed; (b) any video or audio recording of Mr. Goldstein's statements and/or interactions with CBP; (c) any photographs of the CBP screening area; (d) CBP policies, procedures, and directives for interaction with travelers; (e) grand jury transcripts with statements relating to the source of the money Mr. Goldstein declared to CBP, including but not limited to the statements by the CBP Officer, Special Agent Accardi, and Employee 4; (f) any adverse credibility findings and/or disciplinary actions involving the CBP Officer or Special Agent Accardi; and (g) any additional information regarding the number of Currency and Monetary Instrument Reports the CBP Officer has processed and his memory of this particular incident.  Because the ability to present a complete record is material to preparing Mr. Goldstein's defense, the Court should compel the government to provide these materials in advance of a hearing on this motion.  *See United States v. Caro*, 597 F.3d 608, 616-21 (4th Cir. 2010) (citing *Brady*, 373 U.S. at 87, and Fed. R. Crim. P. 16(a)(1)(E)) (holding that courts should compel discovery when "evidence favorable to an accused . . . is material either to guilt or to punishment" and when "the item is material to preparing the defense").

\* \* \*

For these reasons, and for any other reasons that may be apparent to this Court after a hearing on this matter, Mr. Goldstein requests that the Court grant this motion.

Respectfully submitted,


/s/ Jonathan I. Kravis
Jonathan I. Kravis (Bar No. 31556)
Stephany Reaves (Bar No. 19658)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com

Adeel Mohammadi (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*

Dated: May 16, 2025