**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.  LKG-25-6** |
| | * | |
| **THOMAS CHE GOLDSTEIN,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\*\***

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO SUPPRESS STATEMENTS**

The United States of America respectfully requests that the Court deny Defendant's Motion to Suppress Statements, ECF 119.  Defendant was subjected to nothing more than routine processing when he went through customs at Washington Dulles International Airport ("Dulles") with a bag containing approximately $1,000,000 in cash.  Because Defendant was neither in custody nor subject to interrogation, *Miranda* warnings were not required, and the motion should be denied.

## FACTUAL BACKGROUND

The Government expects to establish the following facts.

On October 25, 2018, Defendant traveled from Hong Kong to the United States, arriving at Dulles in Virginia.  Defendant carried a bag containing $968,000 in cash.  As with all travelers arriving from international destinations, Defendant was required to pass through a Customs and Border Protection ("CBP") check prior to entering the country.

### I.  The Dulles Airport Customs Procedure Generally

At Dulles Airport, there are primary and secondary screening areas for customs.  After travelers arrive on an international flight, they take a shuttle to the primary screening area.

1



**Ex. 1 at 1 – Dulles CPB Primary Screening Arrival Area from Shuttles[1]**

The primary screening area is a large room, where travelers form lines corresponding to their traveler status, including lines designated for United States citizens and foreign nationals.



**Ex. 1 at 2 – Dulles CPB Primary Screening Area Lines**

---

[1] The photographs contained in Exhibit 1 were taken on June 6, 2025. During the suppression hearing, the Government will present testimony that these photos are consistent with the primary and secondary processing areas at Dulles in October 2018, with minor differences in things like signage, updated Global Entry kiosks, and the layout of seats in the secondary waiting area.



**Ex. 1 at 3 – Dulles CPB Primary Screening Area Lines**

Travelers with Global Entry status, like Defendant, may go to a line designated for Global Entry participants where they enter their identification and complete declarations at a kiosk. Travelers proceed on their own through the lines, and restrooms are available for travelers to use.



**Ex. 1 at 4 – Dulles CPB Primary Screening Global Entry Line**



**Ex. 1 at 5 – Dulles CPB Primary Screening Global Entry Kiosks**

As part of the primary screening, all travelers must pass through a CBP checkpoint, where a CBP officer reviews each passenger's entry declaration and asks routine screening questions. The routine questions include, for example, questions about where a passenger is coming from, how long they were there, the purpose of their travel, and whether they are bringing into the United States any food, alcohol, tobacco, commercial merchandise or money over $10,000.



**Ex. 1 at 6 – Dulles CPB Primary Screening Checkpoint**

4

Following this primary screening, travelers either complete their customs processing or proceed to secondary screening. As relevant here, CBP policies and procedures require that secondary screening be conducted for all travelers who bring over $10,000 into the country, so that the traveler can complete a FinCEN Form 105. Travelers are provided advanced notice of this. Specifically, the traveler declaration form that can be completed while a passenger is on a flight or at a Global Entry kiosk provides:

> The transportation of currency or **monetary instruments**, regardless of the amount, is legal. However, if you bring in to or take out of the United States more than $10,000 (U.S. or foreign equivalent, or a combination of both), you are required by law to file a report on FinCEN 105 (formerly Customs Form 4790) with U.S. Customs and Border Protection.

Ex. 2 (Customs Declaration, CBP Form 6059B) (emphasis in original). FinCEN Form 105 is a routine currency questionnaire that the passenger is required to complete, which is then sent to the Department of Treasury. *See* Ex. 3 (FinCEN Form 105, Currency or Monetary Instruments Report). This report is required by statute, 31 U.S.C. 5316, and Treasury Department regulations, 31 CFR Chapter X. FinCEN Form 105 explains, "Travelers carrying currency or other monetary instruments with them shall file FinCEN Form 105 at the time of entry into the United States or at the time of departure from the United States with the Customs officer in charge at any Customs port of entry or departure." Ex. 3 (FinCEN Form 105) at 2.

If a traveler is referred to secondary screening to complete a FinCEN Form 105, or for any other reason, the traveler's travel documents are placed in a Radio Frequency Identification (or "RFID") protected box. The traveler then typically proceeds, on his or her own, with his or her travel documents, to collect any baggage and then walk down a hallway to the secondary screening area.



**Ex. 1 at 7 – Dulles CPB Screening RFID Box for Travel Documents**



**Ex. 1 at 8 – Baggage Claim Following Primary Screening**



**Ex. 1 at 9 – Hallway to CPB Secondary Screening Area**

Once at the secondary screening area, travelers check in at a desk and wait for their turn to be called to speak with a CPB officer. The secondary screening waiting area consists of approximately 100 seats, a restroom, and a water fountain. Travelers are free to sit, stand, walk around, use their phones or devices, or use the restroom as they wait for their turn to be called to speak with a CPB officer at one of four desks.



**Ex. 1 at 10 – Hallway to CPB Secondary Screening Area**



**Ex. 1 at 11 – Dulles CPB Secondary Screening Check-In**



**Ex. 1 at 12 – Dulles CPB Secondary Screening Waiting Area**

Once it is a traveler's turn, the traveler approaches the designated desk to speak with CPB secondary screening officers.  The CPB officers would then ask routine questions.   The routine questions depend on the reason for the referral.  For example, when a traveler is referred to secondary screening for declaring over $10,000, the CPB officer will ask the traveler to complete a required FinCEN Form 105.  The CPB officer will also typically ask questions designed to determine the amount and source of the funds, as well as the occupation of the traveler.



**Ex. 1 at 13 – Dulles CPB Secondary Screening Waiting Area and Desks**



**Ex. 1 at 14 – Dulles CPB Secondary Screening Officer Desk**

In addition to the $10,000 threshold for a FinCEN Form 105, CBP policies and procedures specify that for currency over $100,000, officers may count the currency to verify the amount. *See* Ex. 4 (CBP Directive No. 3340-010D), ¶ 6.1.1. In practice at Dulles at the time of Defendant's entry in 2018, CPB officers routinely performed a verification count for currency over $100,000, and certainly would have performed a count on anything close to the approximately $1,000,000 that Defendant brought into the country. This count would have been performed in a separate adjoining room with a second officer present. In 2021, the CPB Standard Operating Procedures at Dulles were memorialized in a written document and state that officers are required to count currency over $100,000 and the procedures for doing so are as follows:

> All currency declarations by international travelers in excess of $100,000 **must** be verified. All CMIRs reporting the importation/exportation of currency in excess of $100,000 must have the Supervisor's signature prior to verification in the upper left-hand corner of the FinCEN Form 105. Verification will be conducted in a private and secure area away from view of other travelers by at least two CBP Officers; one Officer must be of the same gender as the traveler. Ensure that the traveler always has an unobstructed view of his/her currency. The currency will be examined to verify that it is in fact the currency as stated on the FinCEN Form 105 and that the amount reported is accurate.

Ex. 5 (Washington Dulles International Airport Standard Operating Procedure, Currency and Monetary Instruments) at ¶ 6.5 (emphasis in original). The purpose of counting the money in a separate room with two officers present is to ensure the traveler's privacy and safety so that other people do not see how much cash a traveler is carrying.

At Dulles, there is a room in the secondary screening area where money is counted. The room has an open door (itself made of glass) and is located just beyond the screening desks and waiting area. Excluding its adjoining hallway, the space measures approximately 14 by 16 feet. The money can be counted by performing an exact count, performing bundle counts, or weighing the currency. *See id.* at ¶ 6.6; Ex. 4 (CBP Directive No. 3340-010D) at ¶ 6.2.1. There is a money counting machine and a scale in the secondary screening room at Dulles.



**Ex. 1 at 15 – Dulles CPB Secondary Screening Room with Money Counter**



**Ex. 1 at 16 – Dulles CPB Secondary Screening Money Counter and Scale**

After money is counted and a traveler completes a FinCEN Form 105, the CPB officer collects the form and places it in a collection area to be sent to the Treasury Department. The traveler is then cleared to leave secondary screening, and the next traveler is called for a secondary inspection.[2]

---

[2] If, by contrast, a traveler is suspected of a crime, the traveler may be subjected to additional procedures, such as being patted down or detained in a secure cell. If an interrogation of a traveler



**Ex. 1 at 17 – Dulles CPB Secondary Screening FinCEN 105 Forms**



**Ex. 1 at 18 – Dulles CPB Secondary Screening Exit**

---

takes place, that interrogation would be conducted by a Homeland Security Investigations (HSI) special agent.  If any of these additional procedures are used, they would be noted in the screening report and logged as an incident in CPB's system.  None of that happened here.



**Ex. 1 at 19 – Dulles CPB Exit to Airport**

## II. Defendant's Routine Processing

On October 25, 2018, Defendant completed this routine processing at Dulles Airport. Defendant arrived on Cathay Pacific Airways Flight 860 from Hong Kong. Ex. 6 (Secondary Inspection Report) at 1. Defendant first passed through the primary screening area at Dulles. As a Global Entry holder, Defendant would have proceeded to one of the Global Entry kiosks to complete his arrival declaration. At that time, paper declarations were also still used on some flights, and Defendant may have completed one on his flight. Per CPB policy, Defendant was automatically referred to secondary screening at 10:09 PM for a "FINCEN" check, indicating that he declared more than $10,000. *Id.* CPB Officer Karime Foy began the secondary screening at 10:37 PM. *Id.* Therefore, in total, the time between Defendant completing primary inspection, walking to the secondary inspection area, and waiting to be called for the secondary screening was approximately 28 minutes. *Id.*

14

Because Defendant was carrying over $100,000 in cash, per CPB policy and the Dulles standard operating procedures, Officer Foy and another officer counted the money. Defendant was present when the officers counted the money in the room just beyond the screening desk for Defendant's privacy and safety. As part of the secondary screening, Officer Foy asked Defendant routine questions like how much money Defendant was carrying, where did Defendant get the money, and what kind of work did Defendant do. Defendant stated to Officer Foy that the cash was gambling winnings and that he brought the money in cash because he was not able to transfer it. Defendant also said that he was an attorney and gave Officer Foy his business card. Defendant was given a FinCEN Form 105 to complete. After the officers finished counting the money, and Defendant completed the form, Defendant exited the secondary screening. The secondary screening ended at 10:50 PM, lasting just 13 minutes. *Id.*

## APPLICABLE LAW

Generally, a person must be advised of certain rights before being subject to a "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). *Miranda* warnings are required only if a court finds both that (1) there was an "interrogation" of the defendant, and (2) the interrogation was while he was in "custody." *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980); *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011).

"A person is 'in custody' for purposes of *Miranda* either if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest." *United States v. Sullivan*, 138 F.3d 126, 130 (4th Cir. 1998) (*citing Stansbury v. California*, 511 U.S. 318, 322 (1994). *Accord California v. Beheler,* 463 U.S. 1121, 1125 (1983). "The 'custody' that implicates the *Miranda* rule is conceptually distinct from a seizure implicating the Fourth Amendment." *United States v. Sullivan*, 138 F.3d at 130. For example, individuals are not free to leave during

15

routine traffic stops, nor in investigative *Terry* stops, and those forms of detention are therefore seizures under the Fourth Amendment; yet they do not generally constitute *Miranda* custody. *See Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("[T]he temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop . . . does not constitute *Miranda* custody."). *Accord United States v. Sullivan*, 138 F.3d at 131.

The test of whether someone is in *Miranda* custody is objective, based upon the perspective of a reasonable person in the individual's position. *See Berkemer v. McCarty,* 468 U.S. 420, 442 (1984). Thus, an officer's subjective intention to arrest an individual does not necessarily render the individual in custody for *Miranda* purposes, *see id.*, nor does an officer's subjective belief that an individual is not a suspect preclude a finding of *Miranda* custody, *see Stansbury v. California*, 511 U.S. 318, 324-25 (1994). The reasonable person from whose perspective "custody" is defined is a reasonable innocent person. *Florida v. Bostick*, 501 U.S. 429, 437-38 (1991). Whether a person knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant. *Id*.

The *Miranda* custody inquiry "remains a holistic one in which the nature and context of the questions asked, together with the nature and degree of restraints placed on the person questioned, are relevant." *FNU LNU*, 653 F.3d at 154. This inquiry "necessarily involves considering the circumstances surrounding the encounter with authorities," including:

> the interrogation's duration; its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion . . .

*Id.* at 153.

Critically, questioning at the border presents unique factors that must be considered in the

foregoing analysis.  As the Fourth Circuit explained, "Interrogation at the border is considered to be noncustodial in nature." *United States v. Leung*, 820 F.2d 1220 (4th Cir. 1987) (citing *Carroll v. United States*, 267 U.S. 132 (1925)). "Detention and routine questioning at the border concerning who and what is coming into the country is not governed by *Miranda* until probable cause is found."  *Id.* (citing *United States v. Mejia*, 720 F.2d 1378, 1381 (5th Cir.1983) and *Chavez-Martinez v. United States*, 407 F.2d 535 (9th Cir. 1969)).  In a comprehensive opinion (cited by Defendant) analyzing questioning at the border, the Second Circuit observed that when arriving at an American airport, "compulsory questioning—with no freedom to enter the United States and with nowhere else to go—inheres in the situation" and the traveler "has voluntarily submitted to some degree of confinement and restraint by approaching the border." *FNU LNU*, 653 F.3d at 153. As a result, "a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on." *Id.* at 153-54.  This expectation of both constraints and questions, and the fact that "at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave[,] reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest." *Id.* at 154.

## DISCUSSION

Defendant's motion to suppress his statements should be denied because Defendant was neither in custody nor subject to interrogation, and therefore no *Miranda* warnings were required, when he went through routine processing at Dulles Airport on October 25, 2018 with a bag containing nearly $1,000,000 in cash.

### I.    Defendant was not in *Miranda* Custody

Defendant's standard processing at Dulles was nothing like the "restraint on freedom of

movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. at 1125. Rather, it was routine from start to finish:  Defendant arrived on an international flight; took a shuttle to primary screening; found the line for Global Entry; declared over $10,000 in U.S. Currency on a document or kiosk that informed him, if he did not already know, that he would need to complete a FinCEN Form 105.  At 10:09 PM, Defendant spoke with a CPB officer at primary screening, who referred him to secondary screening to complete the FinCEN Form 105.

The process continued:  Defendant walked down the hallway to secondary screening; checked in with a CPB officer at secondary screening; found a seat among the 100 chairs; and waited with other passengers.  If Defendant wanted, he could have used the restroom or got some water if needed.

At 10:37 PM, Defendant was called for his turn:  CPB Officer Foy asked standard questions attendant to the currency check.  Defendant freely provided answers, explaining that he was a lawyer and stating that the funds were gambling winnings.  Defendant even gave Officer Foy a copy of his business card.  Per CPB policy and standard procedures, Officer Foy counted the money because it exceeded $100,000 and did so in the presence of Defendant in an adjoining room for Defendant's privacy.  Per CBP policy, a second officer attended the count as a witness. Officer Foy also gave Defendant a required FinCEN Form 105.  After Defendant completed the Form 105, Officer Foy sent him on his way.  After Defendant had left, Officer Foy completed his secondary inspection report at 10:50 PM.

Money counted.  Form completed.  Next passenger.

Defendant alleges that after he completed the initial declaration, "armed CBP officer pulled [him] aside for additional investigation" where "[h]e was separated from other members of the public and forced to wait in a secondary screening area."  Mot. 2-3.  The notion that an armed

officer physically "pulled [him] aside for additional investigation" is directly contradicted by the standard CBP procedures as well as Dulles Airport's physical layout. Moreover, Defendant's description is belied by his own contemporaneous text messages, in which he describes the CBP officers as "very patient and helpful."

| | |
|---|---|
| 10/25/18, 10:30 PM – [Defendant]: | I'm still in customs, declaring the cash |
| 10/25/18, 10:31 PM – [Defendant]: | They are basically like "wtf?" but very patient and helpful. |
| 10/25/18, 10:39 PM – [Woman-4]: | Let me know how it goes. |
| 10/25/18, 10:41 PM – [Defendant]: | Got through. All good. |

Ex. 7 at 1.

In total, Defendant spent only 28 minutes between his referral from primary screening to beginning his secondary screening, including the time to wait for his turn to be called at secondary screening. And it took only 13 minutes from the start of the secondary screening to its completion, including the time it took Defendant to complete a FinCEN Form 105 and two officers to count approximately $1,000,000 in cash. Defendant was not detained, patted down, placed in handcuffs, interrogated, or even suspected of a crime. The only thing unusual about the interaction was the fact that he was carrying into the United States a bag with approximately $1,000,000 in cash. Despite this, the CPB officers stuck to the book, were "very patient and helpful," efficiently and professionally completed the required customs screening, and sent Defendant on his way.

This was nothing at all like an arrest. The Fourth Circuit has previously found that similar and more onerous circumstances amount to nothing more than routine, non-custodial border processing. For example, in *United States v. Zhang*, the Fourth Circuit held that the defendant's "referral to secondary inspection [at Dulles airport] for further questioning did not amount to custody such that his statements made without the benefit of a recitation of his rights should have

been suppressed." *United States v. Zhang*, 217 F.3d 843 (4th Cir. 2000). In that case, the defendant was convicted for using a counterfeited and altered passport, in violation of 18 U.S.C. § 1543, and appealed the district court's denial of his suppression motion. *Id.* The defendant arrived at Dulles airport as a passenger on a Korean Airways flight. *Id.* At the primary inspection, the defendant presented himself as a lawful permanent resident, but a CPB officer was suspicious of the documents presented by the defendant, performed a computer check on the defendant's passport, and referred the defendant to secondary screening. *Id.* After repeated questioning without *Miranda* warnings, the defendant informed the officials of his name and date of birth. Considering these circumstances, the Fourth Circuit held that the defendant was not in custody such that *Miranda* warnings were required. *Id.* In doing so, the Fourth Circuit cited with approval *United States v. Moya,* 74 F.3d 1117, 1119-20 (11th Cir. 1996), which recognized the "strong governmental interest in patrolling national borders and [found] 'events which might be enough often to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into the country.'" *Id.* The Fourth Circuit also cited *United States v. Silva,* 715 F.2d 43, 47 (2d Cir. 1983), quoting its holding that "'[A]lthough there was a detention of appellant with attendant questioning by immigration and customs officials, the circumstances surrounding the inquiry (namely, a border detention) and the routine questions asked of Silva did not require the giving of *Miranda* warnings.'" *Id.*

Like in *Zhang*, Defendant's referral to secondary screening and routine questioning at Dulles did not amount to custody for purposes of *Miranda*. Moreover, the CPB Officers in *Zhang* were suspicious of the defendant's travel documents and repeatedly questioned him about his identity. Here, by contrast, the secondary screening was even more prosaic, taking only 13 minutes during which Defendant answered routine questions, Defendant completed a required form, and

the CPB officers counted the money consistent with CPB policy and procedure.

As another example, in *United States v. Akinmukomi*, the Fourth Circuit affirmed the district court's denial of the defendant's motion to suppress statements he made to CPB officers at Dulles. *See United States v. Akinmukomi*, 369 F. App'x 522, 524 (4th Cir. 2010). In that case, CPB officers received a tip that the defendant, who was about to board a plane at Dulles, was carrying an amount of cash that needed to be declared. *See* Ex. 8 (Transcript of Suppression Hearing) at 47–48. The officers pulled the defendant off the jetway and into a private hallway to ask the defendant questions and search the defendant's baggage. *Id.* The Fourth Circuit affirmed the denial of the defendant's motion to suppress statements he made to the officers, explaining, "We have reviewed the record and find that a reasonable person in Akinmukomi's position would not have felt that his freedom of action was limited to a degree associated with a formal arrest." *United States v. Akinmukomi*, 369 F. App'x 522, 524 (4th Cir. 2010) (citing *United States v. Colonna,* 511 F.3d 431, 435 (4th Cir. 2007)). The Fourth Circuit "conclude[d] that Akinmukomi was not in custody at the time he made the statements and, therefore, the agents were not required to inform Akinmukomi of his *Miranda* rights." *Id.* Given the Fourth Circuit's holding that pulling a passenger off a jetway and into a private hallway to ask questions about a tip of criminal wrongdoing and searching a defendant's bag did not amount to custody for *Miranda*, the routine secondary inspection that occurred in this case certainly should not.

Consistent with these cases, a District of Maryland Court previously held that a defendant stopped in a vehicle at the Canadian border and questioned by CPB officers in secondary screening was not in custody such that *Miranda* warnings were required. *See United States v. Saboonchi*, 990 F. Supp. 2d 536, 544 (D. Md. 2014) (Grimm, J.) ("At the conclusion of the hearing, I resolved the Fifth Amendment issue, finding that neither the initial questioning of Saboonchi by CBP nor

his conversation with Special Agent Baird were custodial for the purposes of *Miranda,* relying in part upon *United States v. FNU LNU,* 653 F.3d 144, 153–54 (2d Cir.2011) (noting that the likelihood that those entering the country expect some degree of confinement and questioning reduces the likelihood that such restrictions would be perceived as custodial) . . . ."). In *Saboonchi,* the defendant and his wife were stopped by CPB officers returning from a day trip in Canada. *Id.* at 539. The couple went through primary screening and were referred to secondary screening when the defendant's name produced a "hit" in the CPB TECS system. *Id.* at 540–41. The defendant was separated from his wife and questioned in a locked room. *Id.* at 539. Without the defendant's knowledge or consent, his electronics were seized. *Id.* In total, the defendant and his wife spent over two-and-a-half hours in secondary screening before they were cleared to enter the United States. *Id.* at 542. In summarizing these and other factors during the suppression hearing, Judge Grimm concluded:

> He was not placed under arrest. He was not given *Miranda* warnings. He was not placed in handcuffs. He wasn't patted down. He wasn't told he couldn't leave, but, of course, he knew, under the circumstances, he couldn't leave. And his *Miranda* rights were not given because, according to Agent Burkhardt, he wasn't under arrest. He was detained. And the questioning that he was asked took place in under 30 minutes. Even though he was there for a longer period of time, the questioning only took place for under 30 minutes, and it could have been as little as ten to 15 minutes.

> The questions that were asked were routine questions: Where was he born?, what was his citizenship?, why was he in Canada?, how long was he there?, did he buy anything?, does he have any currency?, and the like.

> [W]hen I also take into consideration the expectations, everyone knows, whether you are coming into this country or leaving this country, you are going to another country, that at a border, that you have -- that the border -- that the sovereign has the right to detain folks to a preliminary detention just to say, Where are you coming from?, what are you doing?, but also the right to have a secondary. So the expectation of some form of detention that the sovereign has the right to invoke is such that I do not believe, under the totality of these facts, that it would constitute custodian interrogation. For that reason, I do not find that the *Miranda* warnings were required.

*United States v. Saboonchi*, PWG-13-100, ECF 89 at 16:10–17:11 (D. Md. Nov. 22, 2013).  Here, Defendant's short and standard secondary processing was much less involved than that in *Saboonchi*, presenting an even clearer picture that Defendant's processing was not even close to *Miranda* custody.

The conclusion that Defendant was not in *Miranda* custody is further supported by decisions of other circuit and district courts.  *See, e.g.*, *FNU LNU*, 653 F.3d at 155 (finding non-custodial a 90-minute airport interrogation in a private room, during which defendant was finger-printed and confronted with apparent false statements in an old passport application); *United States v. Broughton*, 600 F. App'x 780, 783 (2d Cir. 2015) (affirming that defendant was not in custody after being escorted by law enforcement officers to a private part of the airport to field test a white powdery substance found on the defendant's belongings); *United States v. Hassan*, No. 18- cr-603, 2019 WL 5684367, at *3 (E.D.N.Y. Nov. 1, 2019) (defendant affidavit alleging CBP officers took him to "a separate room, questioned him about his travels, searched his luggage, copied his paperwork, took his cell phone, and would not allow him to be alone," amounted to nothing more than a "modern border inspection").

Even the cases cited by Defendant demonstrate that he was not in *Miranda* custody.  In *United States v. Chavira*, the Fifth Circuit found that the defendant was in custody and failed to receive *Miranda* warnings, after determining that the circumstances of that stop went beyond routine border processing. *See United States v. Chavira*, 614 F.3d 127, 135–36 (5th Cir. 2010). Specifically, in *Chavira*, the defendant was suspected of making a false statement to officers at the Texas border that a minor she was traveling with was her child.  *Id.* at 129.  CPB officers referred the defendant and the minor to secondary screening, separated them, placed the defendant in a small trailer in a secure area, *handcuffed her to a chair*, and began to question her.  *Id.* at 129–132.

23

Notably, CPB officers had already determined that the minor was not the defendant's child, and "[t]here was no reasonable immigration related purpose behind further questioning other than to elicit incriminating statements for potential prosecution." *Id.* at 133. Indeed, the officers obtained a confession from the minor that the defendant was not her mother, and then confronted the still-handcuffed defendant with the minor's confession, demanding that the defendant "tell them the truth." *Id.* at 130 (alterations in original omitted). Unsurprisingly, the Fifth Circuit found that these circumstances bore the hallmarks of traditional custodial interrogation rather than a routine border inspection where *Miranda* warnings are not required. *Id.* at 135. This case is nothing like *Chavira*.

Likewise, in *United States v. Butler*, the Ninth Circuit found that a defendant referred to secondary screening when entering the United States from Mexico was in custody when "agents conducted an intensive inspection of the defendant's car, [and] he was taken to the inspection station's security office, patted-down, and placed in a locked holding cell where his shoes and belt were confiscated." *United States v. Butler*, 249 F.3d 1094, 1096 (9th Cir. 2001). None of those circumstances are present in this case.

Despite this avalanche of legal authority undermining his motion, Defendant argues nonetheless that he was in custody because he was not free to leave the secondary screening. But that is not the test. Indeed, the Supreme Court has "[made] clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody," which is not accorded "'talismanic power,' because *Miranda* is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'" *Shatzer*, 559 U.S. at 112. Defendant chose to present himself at the border with a bag containing approximately $1,000,000 cash, seeking entry. When he sat in secondary inspection waiting to be admitted, he was not "free

to leave" only in the sense that, per CBP policies and standard operating procedures Defendant had to complete a FinCEN Form 105 and the officers could count the money. In short, *waiting* at the border to complete entry screening is not akin to arrest and cannot, by itself, constitute *Miranda* custody. Nor can sitting with CBP officers while they conduct a standard cash count and ask routine questions. *See FNU LNU*, 653 F.3d at 153–54 (2d Cir. 2011) ("[I]n the context of arriving at an American airport, (a) in which compulsory questioning—with no freedom to enter the United States and with nowhere else to go—inheres in the situation and (b) in which the traveler has voluntarily submitted to some degree of confinement and restraint by approaching the border, a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on."); *United States v. Butler*, 249 F.3d at 1098 ("[A] brief detention at the border by immigration and customs officials of persons presenting themselves for admission to the United States is not custody, even though such persons are not free to leave or to refuse to be searched."); *cf. Shatzer*, 559 U.S. at 113 ("[T]he temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop . . . does not constitute *Miranda* custody."). Because Defendant was not in custody, no *Miranda* warnings were required and Defendant's motion to suppress should be denied.

## II.    Defendant was Not Subject to Interrogation

Even if Defendant were in *Miranda* custody, which he was not, Defendant was not subject to interrogation, providing an independent reason to deny Defendant's motion.

"Interrogation" includes express questioning of the suspect and its "functional equivalent"—that is, "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. at 300-01. Statements

made by law enforcement agents as they fulfill their employment responsibilities do not qualify as interrogation. *See United States v. Ferj-Inostroza*, 129 F.3d 1261, 1997 WL 716458, at *1 (4th Cir. Nov. 18, 1997) ("Routine booking questions and questions attendant to legitimate police procedures do not require *Miranda* warnings.") (citing *Pennsylvania v. Muniz*, 496 U.S. 282, 601 (1990)); *United States v. Taylor*, 799 F.2d 126, 128 (4th Cir. 1986) ("Ordinarily, the request for identifying information, however phrased, is inherently ministerial and does not violate *Miranda*."); *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir.2004) (It is "well established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation."); *United States v. Figueroa*, 300 F. App'x 93, 95 (2d Cir. 2008) (statements made "while the officers were going about their routine tasks in conducting a search, securing a crime scene, and making an arrest" were not "reasonably likely to elicit an incriminating response").

As the Supreme Court explained in *Carroll v. United States*, 267 U.S. 132, 154 (1925), the rationale behind a routine customs inquiry is that "national self protection reasonably requir[es] one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in."

Here CPB officers asked Defendant routine questions attendant to the required currency check at the border. These questions were not "reasonably likely to elicit an incriminating response." Indeed, Defendant had voluntarily declared the currency and was not suspected of a crime. CPB officers were completing their legitimate and required customs checks; they were not conducting a police interrogation to elicit incriminating statements. This is underscored by that fact that Defendant's act of carrying $968,000 into the country *was not* criminal, nor was the fact that it was gambling income.

The Fourth Circuit and other courts have held that similar or more intensive questioning at the border did not amount to interrogation requiring *Miranda* warnings. In *Zhang*, in addition to holding that the Defendant was not in custody during a secondary inspection at Dulles, the Fourth Circuit also held that the defendant was not interrogated. As described above, CPB officers were specifically suspicious of the travel documents that the defendant presented and after "repeated[ly] questioning" the defendant in secondary screening, the defendant informed the officials of his name and date of birth. *United States v. Zhang*, 217 F.3d 843 (4th Cir. 2000). The Fourth Circuit explained, "Eliciting routine information, such as that elicited from Zhang during the secondary inspection is generally not interrogation under *Miranda,* even if the information turns out to be incriminating." *Id.*; *see also Silva*, 715 F.2d at 47 (holding that routine questions including about the defendant's "citizenship, the length and purpose of her trip to Canada, what items she had acquired or brought in Canada, and what items she had to declare upon entering the country . . . are necessary to enforce immigration and customs regulations, and border officials are charged with the responsibility of detaining those seeking admission in order to determine their admissibility"). Like these cases, the routine questions CPB officers asked Defendant at a border entry did not amount to an interrogation, even if Defendant's answers ultimately prove to be incriminating for entirely different conduct (his willful failure to report the cash as income) years after the interaction.

Defendant's motion to suppress should be denied.

### III.    Defendant's Request for Discovery are Moot or Should otherwise be Denied

At the end of his meritless motion, Defendant asks the Court to compel seven categories of information under Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963). Defendant's requests are moot or should otherwise be denied.

    **a.  The Government has produced CBP policies and procedures, photographs of the inspection area at Dulles, and information regarding Defendant's processing**

Defendant requests "any photographs of the CBP screening area" and "CBP policies, procedures, and directives for interaction with travelers."  The Government has produced to Defendant photographs of the primary and secondary screening areas at Dulles, as well as relevant CBP policies and procedures.  The Government obtained these items in connection with preparing its response to Defendant's instant motion.  Therefore, these requests should be denied as moot.

Defendant requests "any additional information regarding the number of Currency and Monetary Instrument Reports the CBP Officer has processed and his memory of this particular incident."  The Government has produced additional information regarding Officer Foy's interaction with Defendant based on recent interviews with Officer Foy.  The Government does not currently have information regarding the number of Currency and Monetary Instrument Reports Officer Foy has processed.  That is something the Defense is welcome to ask Officer Foy on cross-examination.  The Government has otherwise disclosed all Rule 16 information it has regarding this incident.  Therefore, these requests should be denied.

    **b.  The Government does not have the CBP Travel Entry declaration from Defendant or any photos or videos of Defendant's interaction with CBP officers**

Defendant requests "the CBP Traveler Entry declaration form that [Defendant] completed;" and "any video or audio recording of [Defendant]'s statements and/or interactions with CBP."  As the Government has previously informed Defendant, the Government has inquired into but has not obtained any such records.  The Government will disclose any such records if it obtains them.

    **c.  The Court should deny Defendant's request for Grand Jury transcripts**

Defendant requests Grand Jury transcripts with statements relating to the source of the

money Defendant declared to CBP, including but not limited to the statements by the CBP Officer, Special Agent Accardi, and "Employee 4." The Government will produce any *Jencks* material for Government witnesses who will be testifying at the hearing on Defendant's motion. Likewise, the Government will produce any *Jencks* material for witnesses who will be testifying at trial in advance of the trial consistent with the Court's Pretrial Scheduling Order (ECF 107 at 2). Defendant's request should otherwise be denied for the reasons explained in the Government's separate response to Defendant's motion to compel *Brady* and Grand Jury material.

### d. The Government will produce any *Giglio* information regarding CBP Officer Foy and any other witness; Defendant's request for *Giglio* information about Special Agent Accardi should be denied

Finally, Defendant requests "any adverse credibility findings and/or disciplinary actions involving the CBP Officer or Special Agent Accardi." The Government anticipates calling Officer Foy as a witness for the suppression hearing. Accordingly, prior to the hearing, the Government will produce any *Giglio* information for Officer Foy and any other Government witness who will testify at the hearing, to the extent such information exists and has not already been produced. The Government will not be calling Special Agent Accardi, who was not present for Defendant's interaction with CBP, as a witness for the suppression hearing and therefore will not be producing any *Giglio* material. *See United States v. Pearson*, No. 1:15-CR-193, 2016 WL 7647523, at *4 (E.D. Va. Aug. 11, 2016), *aff'd*, 676 F. App'x 202 (4th Cir. 2017) ("'*Giglio* appl[ies] only to impeachment information relating to a government witness.'") (quoting *United States v. Green*, 178 F.3d 1099, 1109 (10th Cir. 1999)). Therefore, Defendant's request as to Officer Foy should be denied as moot, and Defendant's request as to Special Agent Accardi should be denied as inapplicable.

## **CONCLUSION**

Defendant spent 13 minutes in a secondary customs inspection at Dulles where, unfettered by handcuffs, a locked cell, or other restraints, he was required to fill out a form and CPB officers followed standard procedures to count the approximately $1,000,000 in cash Defendant brought into the United States.  Defendant was not in custody and the routine questions asked by the CPB officers were not an interrogation.  No *Miranda* warnings were required.  Defendant's motion to suppress should be denied.

Respectfully submitted,

Kelly O. Hayes
United States Attorney
/s/ _____
Patrick D. Kibbe
Assistant United States Attorney
District of Maryland

Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice—Tax Division