**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\*\***

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
COUNTS 1, 5, 6, AND 15 AS BARRED BY THE STATUTE OF LIMITATIONS
AND MOTION TO INVALIDATE CERTAIN ORDERS
SUSPENDING THE STATUTES OF LIMITATIONS**

The United States of America respectfully requests that the Court deny Defendant's Motion to Dismiss Counts 1, 5, 6, and 15 as Barred by the Statute of Limitations, ECF 121 ("Motion to Dismiss"), and his Motion to Invalidate Certain Orders Suspending the Statute of Limitations, ECF 116 ("3292 Motion"). Both Motions attack the timeliness of the charges for tax year 2016: the 3292 Motion by seeking to invalidate two tolling orders, and the Motion to Dismiss by arguing that, once tolling from those two orders is excluded, the 2016 charges are not timely. Because the facts undergirding the timeliness of the 2016 charges relate to both motions, and because the timeliness of two of the 2016 charges depends on multiple forms of tolling, the Government responds to both Motions herein.

The Court should deny Defendant's Motion to Dismiss. First, the District Court issued four separate orders tolling the limitations periods under Title 18, United States Code, Section 3292. Defendant does not challenge the third order, which tolled the limitations period starting on April 5, 2024. Second, Title 26, United States Code, Section 6531, tolled the statutes of limitations for the relevant tax charges for the entire time that Defendant was outside the United States.

Defendant spent hundreds of days abroad after the limitations periods began running and thereby tolled the limitations periods through (and after) April 5, 2024, when § 3292 tolling began even under Defendant's approach. Third, the Indictment was not required to allege that the charges were timely or that any tolling applied. Fourth, the extent of § 6531 tolling is a factual issue reserved for the jury. Defendant may not, in a pre-trial motion to dismiss, test the sufficiency of the proof for out-of-country tolling, let alone use an evidentiary hearing to do so.

Together, § 6531 and § 3292 tolling from the third order kept open the limitations periods for all the 2016 charges such that they remained timely on September 30, 2024, when Defendant agreed to toll them until January 16, 2025. The Indictment was returned on this latter date and thus the charges are timely.

The Court therefore may deny Defendant's Motion to Dismiss on simple grounds: Defendant does not challenge the third § 3292 order; the Government proffers that his time outside the country tolled the limitations periods until the tolling from that undisputed third order applied; and any disagreement with this proffer is a factual dispute reserved for trial.

The Court also should deny Defendant's 3292 Motion. First, Section 3292 requires only that the Government show by a preponderance of the evidence that (1) an official request had been made for evidence of an offense located in a foreign country, and (2) it reasonably appeared at the time of the request that such evidence was in the foreign country. *See* 18 U.S.C. § 3292(a)(1). The Government's 3292 applications met these two requirements by showing that (1) official requests had been made to Montenegro for records related to Defendant's Montenegrin bank accounts (which contained evidence of tax and other crimes), and (2) it reasonably appeared at the time of the requests that those records were located in Montenegro. Second, although the Government's first two applications incorrectly stated that Defendant said money he received in 2016 was a loan

and failed to report it as income, these minor errors were not material and the Government itself explicitly identified and corrected them in its third § 3292 application, long before indictment. Third, all the other misstatements and omissions alleged by Defendant are not material to § 3292's requirements and have no bearing on the validity of the Government's applications or the resulting tolling orders. Fourth, no evidentiary hearing is warranted on the applications because Defendant has not meaningfully disputed either § 3292 requirement, the alleged misstatements were not necessary to the tolling orders, and the omitted information, even if included, would not have changed the validity of those orders.

The stakes of Defendant's 3292 Motion are low but meaningful. On one hand, that Motion challenges only the first two § 3292 orders, but the unchallenged third order still provides sufficient tolling to make all 2016 charges timely in combination with the out of country tolling. In fact, two of the four charges for 2016 would still be timely even if all three orders were invalidated. On the other hand, the validity of the first order affects the number of days that the Government must prove Defendant spent outside the United States and the statute-of-limitations instructions necessary for the jury.

Because the validity of the orders is a significant issue for trial proof and instruction, the Government respectfully requests that the Court find the first and second § 3292 orders valid and deny Defendant's 3292 Motion on that basis. Fortunately, this result is straightforward: the first and second applications met § 3292's requirements and none of the alleged inaccuracies were material to those applications, so the orders are valid.

Ultimately, statutory tolling under § 6531 and § 3292 applies, the 2016 charges are timely, and both Motions should be denied.

## **BACKGROUND**

Between 2016 and 2022, Defendant committed various tax crimes, including evading assessment of his income taxes, aiding and assisting in the preparation of false Forms 1040 for himself and false Forms 1120S for his law firm, Goldstein & Russell, P.C. ("G&R"), and willfully failing to pay his income taxes. *See generally* Indictment, ECF 1. During and after committing these crimes, Defendant spent hundreds of days travelling outside the United States.

During the investigation, the Government made four Official Requests—two to Montenegro, one to China, and one to Hong Kong, as described below.

- On September 25, 2023, the Government transmitted an Official Request for evidence to Montenegro ("First Official Request") seeking records related to Defendant's foreign bank accounts at Universal Capital Bank ("UCB"), located in Montenegro.

- On April 5, 2024, the Government transmitted a supplemental Official Request for evidence to Montenegro ("Second Official Request"), seeking documents related to UCB accounts owned by the person identified in the Indictment as Foreign Gambler 3 (herein, "Gambler 3"). On July 19, 2024, after Montenegro produced some but not all records responsive to this Second Official Request, the Government sent a follow-up letter seeking the documents that had initially been requested on April 5 but were still missing.

- On May 21, 2024, the Government transmitted Official Requests to China and Hong Kong seeking records of Defendant's travel and transportation of fiat currency.

Based on the four Official Requests, the Government submitted *ex parte* applications to toll the statutes of limitations under § 3292.

In response, the District Court issued four orders tolling the limitations periods:

- On October 27, 2023, the Government applied for tolling based on the First Official

Request to Montenegro ("First Application"), and on November 3, 2023, the court ordered the limitations periods tolled starting on the date of that First Official Request ("First Order"). *See* 1st App., Ex. 1A; 1st Order, Ex. 1C. On December 28, 2023, Montenegro took final action on the First Official Request.

- On May 6, 2024, the Government applied for tolling based on the Second Official Request to Montenegro ("Second Application"), and on May 7, 2024, the court ordered the limitations periods tolled starting the date of that Second Official Request—April 5, 2024 ("Second Order"). *See* 2nd App., Ex. 2A; 2nd Order, Ex. 2C.

- On July 22, 2024, the Government applied for tolling based on the Second Official Request to Montenegro and its July 19, 2024, follow-up letter to Montenegro seeking documents missing from that country's initial response to the Second Official Request ("Third Application"). On July 23, 2024, the court ordered the limitations periods tolled again starting April 5, 2024, the day of the Second Official Request ("Third Order"). *See* 3d App., Ex. 3A; 3d Order, Ex. 3C. To date, Montenegro still has not taken final action on this Second Official Request.

- On July 31, 2024, the Government applied for tolling based on the Official Requests to Hong Kong and China, and on August 5, 2024, the court ordered the limitations periods tolled starting May 21, 2024, the date on which both requests had been made. China and Hong Kong took final action on these requests on September 23, 2024, and January 21, 2025, respectively.

While the investigation was ongoing, Defendant entered written agreements tolling the limitations period for the relevant charges from September 30, 2024, through January 16, 2025.

On January 16, 2025, a grand jury sitting in Greenbelt, Maryland, returned a 22-count Indictment charging Defendant with tax and other crimes. *See id.* at 37-50. That Indictment included four criminal tax charges related to tax year 2016.

Defendant now moves to invalidate the First and Second Orders tolling the limitations periods and dismiss the four 2016 charges on the theory that, without those tolling orders, the charges are not timely. Defendant is wrong.

## ARGUMENT

### I. The 2016 charges are timely.

The statute of limitations for all the tax charges, including Counts 1, 5, 6, and 15, is six years. *See* 26 U.S.C. § 6531(2)-(4). The limitations period starts the day after the offense is completed and runs for six years. *See id.* § 6531 (requiring information be found "within [6] years next after the commission of the offense" for the relevant crimes); *see, e.g.*, *United States v. Guerro*, 694 F.2d 898, 901 (2d Cir. 1982) ("[A] statute of limitations begins to run on the day following the day on which the event giving rise to the cause of action occurred.").

Given this six-year statute of limitations, three forms of tolling make the 2016 charges timely from the time the offenses were completed in 2017 and 2018. First, Defendant spent hundreds of days outside the country from April 2017 through September 2024, which tolled the limitations periods under 26 U.S.C. § 6531 through (and beyond) when other tolling applied. Second, § 3292 orders tolled the limitations periods starting in April 2024. Third, this § 3292 tolling continued until (and after) Defendant entered agreements tolling the statute of limitations from September 30, 2024, through January 16, 2025—the date on which the grand jury returned the Indictment. Together, these three types of tolling render all 2016 charges timely.

**A.  Defendant's 2016 crimes were completed in 2017 and 2018.**

As relevant here, the Indictment charges four counts—1, 5, 6, and 15—related to tax year 2016.

Count 1 charges tax evasion, in violation of 26 U.S.C. § 7201, and alleges Defendant committed various affirmative acts, including "making false and misleading statements to an IRS Revenue Officer." Indictment, ECF 1 at 37. Defendant made these statements, which obscured the true source of much of his 2016 income and helped hide its true amount, on March 26, 2018. *Id.* ¶ 38. This is Defendant's last affirmative act alleged for Count 1 and therefore the date on which he completed that offense. *See United States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997) ("The limitations period for a violation of § 7201 begins to run on the date of the last affirmative act of tax evasion."); *United States v. Ferris*, 807 F.2d 269, 271 (1st Cir. 1986) ("[I]t is the date of the latest act of evasion, not the due date of the taxes, that triggers the statute of limitations.").

Counts 5 and 6 charge aiding and assisting in the preparation of a false tax return, in violation of 26 U.S.C. § 7206(2), for Defendant's 2016 Form 1040 and his law firm's 2016 Form 1120S, respectively. ECF 1 at 41-42. These offenses were completed on the dates that the Forms were filed: October 16, 2017 for his Form 1040, and April 15, 2017 for his Form 1120S. *See id.* at 41-42.[1]

Count 15 charges willful failure to pay taxes due, in violation of 26 U.S.C. § 7203, and alleges a payment due date of April 18, 2017. *Id.* at 45. Defendant completed this crime on that same day because his failure to pay was willful that day. *See id.* ¶ 37 (quoting Defendant's earlier

---

[1] The Indictment contains a typographical error that alleges the Form 1120S was filed on "0**9**/15/17," instead of the correct "0**4**/15/17." ECF 1 at 42. The analysis herein uses the correct April 15, 2017, date, which is earlier and requires more tolling.

acknowledgment of his duty to pay his 2016 taxes and his decision to "just pay[] penalties instead"); *see also United States v. Sams*, 865 F.2d 713, 716 (6th Cir. 1988).[2]

The dates on which these crimes were completed dictate when the limitations periods would have expired without tolling.

### B. Multiple tolling provisions apply to make the 2016 charges timely.

#### 1. Section 6531 out-of-country tolling and § 3292 tolling apply.

Section 6531 of Title 26 not only sets the six-year statute of limitations, but also tolls the statute of limitations clock (without the need for a judicial order) for all time during which a defendant is "outside of the United States," for whatever reason. 26 U.S.C. § 6531 (flush text) ("The time during which the person committing any of the various offenses arising under the internal revenue laws is outside the United States . . . shall not be taken as any part of the time limited by law for the commencement of such proceedings."); *see United States v. Myerson*, 368 F.2d 393, 395 (2d Cir. 1966) ("The statute is unambiguous on its face and clearly covers appellant's absences. There is nothing unreasonable or arbitrary about the tolling of the statute of limitations during an offender's absence from the country."); *United States v. Marchant*, 774 F.2d 888, 892 (8th Cir. 1985) (holding § 6531 tolled limitations period while defendant was abroad on pleasure trip); *United States v. Edkins*, 421 F. App'x 511, 513 (6th Cir. 2010) (holding tax evasion statute of limitations tolled while defendant lived in Bahamas); *United States v. Levine*, 249 F. Supp. 3d 732, 738 (S.D.N.Y. 2017) (holding limitations period tolled for times when defendant was outside the United States, "for whatever reason"); *United States v. Ohle*, 678 F. Supp. 2d 215, 230 (S.D.N.Y. 2010) ("The tolling provision is applicable even if the defendant is outside of the

---

[2] Defendant asserts this crime was completed on October 16, 2017, when his Form 1040 was filed. The Government disagrees but the disagreement makes little difference for the instant Motion because the analysis herein assumes the crime was completed on April 18, 2017—which is earlier and requires more tolling than Defendant's later date.

country for business or pleasure trips."); *United States v. Yip*, 248 F. Supp. 2d 970, 973 (D. Haw. 2003) (concluding tolling applied to any travel that brought defendant "*physically* outside the boundaries of the United States").

Meanwhile, § 3292(a)(1) tolls or "suspends" the statute of limitations for Title 18, Title 26, and Title 31 offenses while the government seeks evidence in a foreign country if the district court enters an order suspending the limitations periods. *See* 18 U.S.C. § 3292(a)(1). Tolling under this provision ends when the foreign country takes "final action" on the request, but the suspension period may not exceed three years. 18 U.S.C. § 3292(b)-(c).

Finally, multiple provisions, such as § 6531 and § 3292, may independently toll the limitations period for the same charge during separate time periods and thereby keep that charge within the limitations period for far longer than either provision would on its own. Here, they do exactly that.

### 2. Out-of-country and § 3292 tolling make the 2016 charges timely.

The district court issued the Second and Third Montenegrin § 3292 Tolling Orders on May 7, 2024, and July 23, 2024. *See* 2d Order; 3d Order. Both Orders tolled the limitations periods for the tax charges starting April 5, 2024—the day on which the Government made its supplemental official request to Montenegro for evidence related to Gambler 3's foreign bank accounts.[3] *See* 3d Order 2 (finding official request was made "on April 5, 2024," and ordering suspended "the

---

[3] On March 5, 2025, Defendant asked the government to "provide the actual legal requests (e.g. subpoenas) submitted to the foreign governments," and "confirm that there have been a total of five requests to foreign governments for legal assistance in connection with this investigation . . . ." The Government responded in a March 14, 2025, letter identifying the dates that various requests were sent to foreign jurisdictions. The letter listed separately the April 5, 2024, supplemental official request to Montenegro and the July 19, 2024, follow-up letter requesting omitted documents. The Third Application, Declaration and Order make clear that the July 19 request was merely a follow-up seeking documents that had been sought in the April 5 Official Request but still not provided. The July 19 request was not a separate, third "official request" to Montenegro. *See* 3d App. 1, 4 (identifying April 5, 2024, official request as "the Official Request" and stating letter was transmitted to Montenegro on July 19, 2024, seeking documents missing from Montenegro's initial response to that Official Request); 3d Decl. ¶¶ 5-6, 8-9, 14 (same); 3d Order ¶ 3.

running of the statutes of limitations . . . for the period authorized by 18 U.S.C. § 3292(b) and (c)"). Montenegro still has not taken final action on that request.

Although Defendant challenges the validity of the First and Second Montenegrin Applications and Orders, he *does not* contest the validity of the Third Application and Order, and does not contest the fact that Montenegro had not yet taken final action when the Indictment was returned on January 16, 2025. *See* 3292 Mot. 3 (requesting the "Court invalidate two orders," dated October 31, 2023, and May 7, 2024); *see generally id.*

As a result, regardless of whether this Court invalidates the first two Orders (and it should not), the statutes of limitations would still be tolled under § 3292 starting on April 5, 2024, and continuing into the present. The only question then is whether Defendant spent enough time outside the United States to toll the 2016 limitations periods until April 5, 2024.

He did. The following table summarizes the number of days necessary for § 6531 tolling.

| Count | Offense | Offense Date | Approximate Limitations Period Expiration Date without Tolling | Required Days Out of Country for Charge to be Within Limitations Period |
|---|---|---|---|---|
| 6 | § 7206(2) - Form 1120S | 4/15/2017 | 4/15/2023 | 356 |
| 15 | § 7203 - Willful Failure to Pay | 4/18/2017 | 4/18/2023 | 353 |
| 5 | § 7206(2) - Form 1040 | 10/16/2017 | 10/16/2023 | 172 |
| 1 | § 7201 - Tax Evasion | 3/26/2018 | 3/26/2024 | 10 |

The columns identify: (1) the Indictment Count; (2) the offense charged; (3) when each of these 2016 offenses was completed ("Offense Date"); (4) when the six-year limitations period would have expired without any tolling (*i.e.*, the last in-limitations period date without tolling); and (5) the number of days (counted from that initial expiration date through and including April 5, 2024) that Defendant would have to have been outside the United States in order to toll the limitations period through April 5, 2024, when § 3292 tolling began.

For example, the last day on which Count 1 could have been charged without any tolling was March 26, 2024, so Count 1 would be timely if Defendant spent 10 days outside the country between March 27, 2018 (when the limitations period started), and April 5, 2024 (when § 3292 tolling began). *See also Guerro*, 694 F.2d at 901 (explaining limitations period begins to run on the day *after* the date on which the offense was completed).

This is because § 6531 excludes from the limitations period time spent outside the country—it stops the clock while Defendant is abroad. *See* 26 U.S.C. § 6531 ("The time [outside the United States] shall not be taken as any part of the time limited by law . . . ."). Each interval of time that Defendant spent outside the country paused the running of the limitations period, thereby extending that limitations period (and delaying the last date on which the offense could be charged) by the length of that interval of time. Thus, if Defendant spent 10 days outside the United States from March 27, 2018, through April 5, 2024, the limitations period would have remained open on April 5, 2024.[4]

As this example shows, the Government need prove only that Defendant was outside the country for the number of days listed in the final column. In fact, Defendant made dozens of international trips between 2017 and 2024, spending more than 360 entire days outside the country from May 2017 through March 2024 alone, with more than 322 of those occurring after October 16, 2017, and more than 240 of them occurring after April 1, 2018.[5]

As discussed further below, if Defendant raises a statute-of-limitations defense at trial, the Government will prove that he spent sufficient time outside the United States to toll the statute of

---

[4] It would not matter if Defendant spent 10 whole days outside the United States starting March 27, **2018**, or did the same starting March 27, **2024**, or spent a series of 10 separate entire days outside the country intermittently on dates between March 27, 2018, and April 5, 2024. In every case, the limitations period would still be open on April 5, 2024.

[5] This is a conservative tally that excludes the dates on which Defendant departed or re-entered the United States, and instead reflects only complete, contiguous 24-hour days in which he was outside the United States the entire time. As a result, Defendant's actual total amount of time outside the country under § 6531 is significantly higher.

limitations under § 6531 until § 3292 tolling began on April 5, 2024. Moreover, even if the Second and Third Montenegrin § 3292 Orders were invalid (which they are not), Counts 1 and 5 would still be timely because Defendant spent so much time outside the country and a separate § 3292 Order tolled the statute of limitations starting May 21, 2024, which Defendant does not contest, *see* SOL Mot. 3-4. Indeed, Defendant spent so much time outside the United States that Counts 1 and 5 would be timely even if there were no § 3292 tolling orders at all because Defendant agreed to toll the limitations periods from September 30, 2024, through January 16, 2024. *See* SOL Mot. 2 & n.2.

Moreover, the proof of Defendant's time abroad is sweeping. The Government has produced hundreds of documents related to his international travel, including airline records, bank statements, vacation itineraries, text messages, and emails, as well as Customs and Border Protection ("CBP") records listing each time he departed and returned to the United States, and Federal Aviation Administration data reflection the precise times when many of his international flights exited or entered United States airspace.

Finally, the First § 3292 Order tolled the limitations period for 95 days from the date of the official request on September 25, 2023, through December 28, 2023, when Montenegro took final action. *See* 18 U.S.C. § 3292(c) ("[A] period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request."). Out-of-country tolling makes the charges timely regardless of whether this First Order is valid. But that Order *is valid* and further significantly reduces the number of days that the Government must prove Defendant was outside the country. *See* Part II.A.3, *infra* (explaining validity of First Application, Declaration and Order).

Ultimately, all the 2016 charges are timely because Defendant spent hundreds of days outside the United States between the dates on which his 2016 crimes were complete and the date on which § 3292 tolling began.

### 3. Defendant has waived any argument concerning § 6531 tolling.

Defendant writes, "Documents produced in discovery also suggest that the government *may rely on* another statutory tolling provision, 26 U.S.C. § 6531 . . . If the government . . . argues in its opposition that these charges are timely based on tolling under Section 6531, *then the defense will address that argument* in its reply brief." SOL Mot. 4 n.1 (emphasis added).

This statement is misleading because it ignores that the Government has repeatedly told Defendant—for more than a year—that the 2016 charges are timely precisely because he spent hundreds of days outside the country between 2017 and 2024 (which tolled the limitations period long enough for § 3292 tolling to apply starting in April 2024), and has repeatedly explained that this is a matter properly reserved for trial. *See, e.g.*, 3/3/24 DOJ Letter 1, Ex. 4 (explaining § 6531 tolling applied); 5/16/25 DOJ Letter 3-5, Ex. N to Government's Opposition to Defendant's Motion to Compel Disclosure of *Brady* and Grand Jury Material (reiterating, hours before Defendant filed instant motion, that 2016 charges were timely due to Defendant's time abroad, and explaining that precedent reserves the issue for trial). The Government has also explained this in telephone conversations with defense counsel.  Defendant's offer to address any § 6531 arguments for the first time *in his reply* reflects a deliberate choice not to argue the issue in his opening brief despite knowing full well that it is the core of the statute of limitations dispute and that an evidentiary hearing on § 6531 proof would be improper at this juncture. This unfortunate tactic deprives the Government of the opportunity to address his arguments in writing, and the Court of the benefit of full briefing. *See De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 531 (4th Cir. 2022) ("Generally, 'new arguments cannot be raised in a reply brief' before the district court.

A contrary rule runs the risk of depriving a nonmovant an opportunity to respond." (citation omitted)).

In any event, the 2016 charges are timely and, for the reasons discussed below, an evidentiary hearing on the out-of-country tolling proof would be improper.

### C. The timeliness of the 2016 charges is an issue reserved for trial.

#### 1. The Indictment did not need to allege that tolling provisions applied.

Two black-letter rules govern: An indictment need not allege the timeliness of its charges. As a result, it also need not allege that statutory exceptions apply to the statute of limitations.

First, an indictment need not show the timeliness of its charges because a challenge to the statute of limitations is an affirmative defense that it need not anticipate. *See United States v. Matzkin*, 14 F.3d 1014, 1017 (4th Cir. 1994) ("'The statute of limitations is a defense and must be asserted on the trial by the defendant in criminal cases.'" (citation omitted)); *United States v. Sisson*, 399 U.S. 267, 288 (1970) ("It has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses."); *Smith v. United States*, 568 U.S. 106, 112, (2013) ("Commission of the crime within the statute-of-limitations period is not an element of the conspiracy offense. The Government need not allege the time of the offense in the indictment[.]").

Second, long-settled precedent makes clear that the there is no requirement to reference exceptions or tolling to a statute of limitations in an indictment. *See United States v. Cook*, 84 U.S. 168, 179-80 (1872); *Ferebee v. United States*, 295 F. 850, 851 (4th Cir. 1924) (affirming conviction on charge that would have been untimely but for fugitive tolling because, while Information did not allege defendant suspended the "running of the statute" of limitations by fleeing, it was not required to do so); *Capone v. Aderhold*, 65 F.2d 130, 131 (5th Cir. 1933) (rejecting Al Capone's *habeas* challenge to the timeliness of his tax convictions because statute of

limitations was an affirmative defense that the prosecution could rebut by showing that an exception applies, and Capone failed to raise the defense on direct appeal).

Over 150 years ago, the Supreme Court's opinion in *United States v. Cook*, 84 U.S. 168 (1872), established that a court may not dismiss an indictment just because it appears on its face that charges were not brought within the limitations period because doing so would deprive the prosecutor of the right to "give evidence" at trial that an exception to the statute of limitations applied. *Id.* at 179-80. *Cook* "remains good law," *United States v. Titterington*, 374 F.3d 453, 457 (6th Cir. 2004), and its animating principle—that an indictment need not allege an exception to the statute of limitations—applies to tax cases for the out-of-country tolling exception in § 6531. *United States v. Levine*, 249 F. Supp. 3d 732, 737-39 (S.D.N.Y. 2017) (Rakoff, J.) (applying precedent to § 6531 out-of-country tolling); *United States v. Yip*, 248 F. Supp. 2d 970, 974 (D. Haw. 2003) (same); *United States v. Stein*, 429 F. Supp. 2d 633, 638 (S.D.N.Y. 2006).

Together, these two rules command that the Indictment was not required to allege that tolling under § 3292 or § 6531 applied or rendered the 2016 charges timely.

### 2. An evidentiary hearing is inappropriate because the extent of tolling is reserved for trial.

Defendant has not made any argument on § 6531 tolling, let alone requested an evidentiary hearing on it. However, he has repeatedly demanded unwarranted evidentiary hearings, and he claims that he will make any § 6531 arguments for the first time in his Reply. To the extent that his Reply seeks a hearing on proof for out-of-country tolling, he has waived this argument. Even if he had not, such a hearing would be improper.

The extent of out-of-country tolling is a factual issue reserved for trial. When a motion to dismiss involves contested factual issues, a court must defer the issue to trial because it may not assess the sufficiency of the evidence earlier. *See United States v. Wills*, 346 F.3d 476, 488 (4th

Cir. 2003) ("[C]ourts lack authority to review the sufficiency of evidence supporting an indictment."); *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) ("A district court may dismiss an indictment under Rule 12 'where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial.'" (citation omitted)); *United States v. Treacy*, 677 F. App'x 869, 874 (4th Cir. 2017) (unpublished) (affirming denial of statute-of-limitations dismissal motion where defendant contested the fact of timeliness); *see also United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994) ("[A] decision on a motion should be deferred, if disposing of the motion involves deciding issues of fact that are inevitably bound up with evidence about the alleged offense itself.").

Simply put: a Rule 12 motion to dismiss cannot be used as a motion for summary judgment. *See United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011) ("[T]here is no provision for summary judgment in the Federal Rules of Criminal Procedure . . . ."); *United States v. Swain*, 2019 WL 1763249, at *2 (W.D.N.C. Apr. 22, 2019) ("'There is no such thing as a motion for summary judgment in a criminal case.'" (quoting *Russell v. United States*, 369 U.S. 749, 791 (1962) (Harlan, J., dissenting))).

This is especially true in the context of § 6531 tolling, which can entail years of evidence that may be intertwined with the evidence of the offenses themselves. *See Levine*, 249 F. Supp. 3d 732, 736-38; *cf. United States v. Shabbir*, 64 F. Supp. 2d 479, 481 (D. Md. 1999) ("[Defendant]'s 12(b) motion cannot be used as a summary judgment mechanism, nor can the court grant [his] motion if his legal contentions are inextricably bound up with the facts of the case.").

Here much of the evidence demonstrating Defendant's willful failure to pay taxes and tax evasion—including extravagant vacations, foreign cash, work travel, and ultrahigh stakes poker games abroad—also establishes his time out of country for tolling purposes. Moreover, the

Government intends to prove at trial, through myriad evidence and testimony, that Defendant spent hundreds of days outside the country from April 2017 through 2024 such that the limitations periods were tolled for all 2016 charges until § 3292 orders suspended the running of the statutes of limitations, he agreed to toll the limitations periods, or both.

This proffer suffices to establish the timeliness of the 2016 charges and overcome his Motion for dismissal on statute of limitations grounds. *See United States v. Ohle*, 678 F. Supp. 2d 215, 230 (S.D.N.Y. 2010) ("The Government states that it will prove at trial that Ohle spent at least two months outside of the country, which would result in the counts at issue being timely. Ohle's motion to dismiss [these] Counts . . . as time-barred is denied."); *United States v. Stein*, 429 F. Supp. 2d 633, 638 (S.D.N.Y. 2006) ("Although the indictment alleges no international travel during that time, the government claims that it will prove at trial that [defendant] spent several weeks per year outside of the United States. Accordingly, [his] motion is denied."); *Levine*, 249 F. Supp. 3d at 738 (denying motion to dismiss tax charges as time barred because government proffered it would prove adequate § 6531 tolling at trial); *United States v. Gyetvay*, No. 2:21-CR-83-TPB-NPM, 2022 WL 17811469, at *1 (M.D. Fla. Dec. 19, 2022) (same); *see also Yip*, 248 F. Supp. 2d at 972, 974 (denying motion where government "asserted" defendant was abroad for "a conservative estimate of eighty-seven days").

Nonetheless, Defendant's Reply may invite the Court to evaluate the sufficiency of the evidence for out-of-country tolling. Doing so, however, would violate the Fourth Circuit's clear rule that a district court "lack[s] authority to review the sufficiency of the evidence supporting an indictment," *Wills*, 346 F.3d at 488, and therefore may not dismiss an indictment "'on a determination of facts that should have been developed at trial,'" *Engle*, 676 F.3d at 415 (4th Cir. 2012) (citation omitted). *See also United States v. Brewbaker*, 87 F.4th 563, 579 (4th Cir. 2023).

Where courts have dismissed indictments based on the sufficiency of evidence not fully presented**,** they have been consistently reversed. *See, e.g.*, *United States v. Sampson*, 898 F.3d 270, 279 (2d Cir. 2018) (reversing and vacating district court's grant of motion to dismiss on statute of limitations grounds where "the government had not yet proffered *all* of its evidence" and question was "factual, not legal" so court exceeded its authority); *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998); *United States v. Salman*, 378 F.3d 1266, 1267-68 (11th Cir. 2004) (per curiam) (reversing and remanding where district court dismissed indictment by "looking beyond the face of the indictment and ruling on the merits" that criminal statute did not apply to defendant based on "undisputed facts"); *see also United States v. Cooper*, 77 F.3d 471 (4th Cir. 1996) ("[T]o interpret the trial court's [dismissal of count how defendant] suggests—as a determination on the merits with prejudice that he could not be tried for a violation of § 7201 in connection with the 1987 tax year—would undermine precedent prohibiting a district court from reviewing the substance of evidence which produces an indictment."); *cf. United States v. Neely*, 966 F.2d 1445 (4th Cir. 1992) (reversing and remanding where district court dismissed indictment based on the improper ground that it "was not supported by adequate or competent evidence").

Moreover, a court may not require a full presentation of the evidence at the motion to dismiss stage. *See Sampson*, 898 F.3d at 282 ("[O]ur research reveals . . . no federal appellate case upholding the authority of a district court to require the government, before trial, to make such a presentation [of evidence]. Indeed, if the district court possessed such authority, it could effectively force a summary judgment-like motion on the government [but] summary judgment does not exist in federal criminal procedure.").

The Fourth Circuit's ruling in *United States v. Treacy*, 677 F. App'x 869 (4th Cir. 2017), underscores this principle. Two cases laid its foundation: *United States v. Weaver*, 659 F.3d 353

(4th Cir. 2011), recognized the narrow, longstanding exception that a district court may look beyond the indictment to decide "a pretrial dismissal motion" if the government (1) "does not dispute [the district court's ability] to reach the motion" and (2) "proffers, stipulates, or otherwise does not dispute the pertinent facts." *Id.* at 355 n.[*]. Then *United States v. Engle*, 676 F.3d 405 (4th Cir. 2012), held that a district court properly denied a motion to dismiss contesting the sufficiency of the evidence because, among other things, "the government did not proffer or stipulate to the pertinent facts" so *Weaver*'s exception did not apply. *Id.* at 415-16 & n.7.

In this context, *Treacy*'s defendant moved to dismiss his indictment as untimely, and the district court, in addressing his motion, "requested material from the [government] pertaining to the statute of limitations." *Treacy*, 677 F. App'x at 873-74. After concluding the defendant's motion challenged the indictment's sufficiency, the Fourth Circuit critiqued the court, finding "doubtful" that its request for timeliness evidence fell within *Weaver*'s exception and admonishing that the motion, "[p]roperly considered," should "have been denied in accordance with our *Engle* decision." *Id.* at 873-74 (affirming district court where it denied defendant's motion despite incorrectly requiring evidence from the government). In light of *Treacy*, Defendant may not use an evidentiary hearing to challenge the Government's proffer on out-of-country tolling before trial.

The three cases Defendant does cite do not counsel differently. First, his invocation of *United States v. Duff*, 931 F. Supp. 1306 (E.D. Va. 1996), is unavailing because that case falls within the longstanding exception recognized by *Weaver*. In *Duff*, the government effectively made a full proffer with three witnesses and seemingly did not contest the court's ability to decide whether defendant was a fugitive within meaning of fugitive tolling statute. *Compare Duff*, 931 F. Supp. 1308-12, *with Weaver*, 659 F.3d at 355 n.[*] (stating exception and finding that district court could rule on "purely legal question" that because "the government did not challenge the trial

court's authority to decide the motion, and it conceded its inability to obtain convictions under the court's interpretation of [18 U.S.C.] § 922(h)"). Unlike in *Duff* or *Weaver*, the Government here has not made a full presentation of all the evidence it will use at trial to show Defendant's time abroad and support the timeliness of the 2016 charges, so *Weaver*'s exception does not apply.

Second, *United States v. Craft*, 105 F.3d 1123 (6th Cir. 1997), does not apply for the same reason. There, the government conceded that only one act could constitute an overt act that would make the indictment timely. *Id.* 1127. As a result, the "facts [we]re essentially undisputed and raise[d] a legal issue, not a factual one"—namely, whether that one act constituted an overt act. *Id.* The statute-of-limitations facts were "easily isolated from the issues on the merits" precisely because (unlike here) they were undisputed. *See id.* This is exactly the exception *Weaver* recognized. *See also United States v. Crossley*, 224 F.3d 847, 858 n.3 (6th Cir. 2000) ("[*Craft*] only had to determine whether the statute-of-limitations defense involved essentially undisputed factual issues . . . ."); *United States v. McCormack*, 31 F. Supp. 2d 176, 180 (D. Mass. 1998) (identifying *Craft* as an example of exception that a court may address a question of law when "[t]he underlying facts are uncontested" for a pretrial dismissal motion).

Third, in *United States v. Magalnik*, 160 F. Supp. 3d 909 (W.D. Va. 2015), the government agreed that the Indictment did not allege a timely overt act within the limitations period, so there was only a pure legal question about whether an unalleged act could suffice and, unlike here, no factual dispute (such as the extent of tolling) that required trial. *See id.* at 915-17 (citing *United States v. Head*, 641 F.2d 174, 178 n.5 (4th Cir. 1981)). None of these cases apply to the present dispute and those that do, including *Treacy* and *Engle*, demonstrate that the proper approach is to deny Defendant's statute-of-limitations Motion or defer it to after trial.

Fourth, accepting Defendant's unprecedented invitation to weigh the sufficiency of the evidence now would not only violate the prohibition on criminal summary judgment, but also contravene the Supreme Court's mandate that, if a defendant raises a statute of limitations defense, the government has the right to "give evidence" at trial showing that an exception to the statute of limitations applies and makes the indictment timely. *Cook*, 84 U.S. at 179-80; *see Capone*, 65 F.2d at 131 ("[T]he prosecution is entitled to an opportunity where the statute of limitations contains exceptions to introduce evidence and bring the defendant within one of the exceptions.").

Finally, a full presentation of the evidence concerning Defendant's out-of-country travel at this premature juncture would undermine judicial efficiency, waste time, and needlessly distract the Court and parties from issues that may be appropriately decided through pretrial motions. It would take days of testimony—potentially from a wide range of witnesses including Defendant's travel partners, Government representatives, and custodians of record from the airlines Defendant patronized—to create a record sufficient to evaluate the extent of Defendant's out-of-country travel, given the vast extent of his out of country time. The parties would have to introduce, and the Court would have to consider, numerous exhibits on the issue. And then, even if the Court denied Defendant's motion to dismiss, he potentially could re-assert the statute-of-limitations defense at trial (where it is properly decided) and the Government would have to make the same presentation again to a jury.

In sum, § 6531 and § 3292 tolling make all the 2016 charges timely. Further, Defendant is not permitted to test, in a pre-trial setting, the sufficiency of the Government's proof of out-of-country tolling pursuant to § 6531—a disputed factual issue on which the Government bears the burden of proof *at trial*.

## II. The District Court properly tolled the limitations periods based on the Government's § 3292 Applications.

The First, Second, and Third Montenegrin § 3292 Applications all met that statute's requirements. Defendant's arguments to the contrary contort § 3292 beyond recognition by demanding an exculpatory information requirement totally absent from the statute and flipping the law on its head to require that the government prove a crime has occurred before it can even seek evidence of that crime. All the § 3292 orders are valid and Defendant's Motion should be denied.

### A. All Three Montenegrin Applications met § 3292's requirements.

Section 3292 states:

> Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

18 U.S.C. § 3292(a)(1). Based on this statutory language, a district court must suspend the limitations period if it finds by a preponderance of the evidence that (1) an official request has been made for evidence of an offense in a foreign country, and (2) it reasonably appeared, at the time the request was made, that such evidence was in the foreign country. *See id*.; *United States v. Broughton*, 689 F.3d 1260, 1273 (11th Cir. 2012) ("[A] district court's decision to suspend the running of a statute of limitations is limited to [those] two considerations[.]").

Because Defendant primarily contests the validity of the Second Order, and because the Third Order provides tolling identical to the Second Order, the Government begins by addressing the Second and Third Applications. Both Applications satisfied § 3292's two requirements.

### 1. These Applications showed that an official request had been made.

To start, it is uncontested that the Applications and accompanying Declarations demonstrated that the Government made an official request to Montenegro on April 5, 2024. *See* 2d App. ¶ 22 ("On April 5, 2024, . . . [OIA] made a supplemental official request to Montenegro for legal assistance in obtaining evidence."); 2d Decl. ¶¶ 26-27 (detailing that "supplemental official request to Montenegro" made on April 5, 2024); 3d App. 1-3, 6 (explaining that Montenegro responded to the April 5 official request but its response was "materially incomplete in multiple ways" so it had not taken final action and the limitations periods "should continue to be extended"); 3d Decl. ¶¶ 5, 9-14 (detailing April 2024 official request, documents missing from Montenegro's response, and OIA's transmittal of letter to Montenegro seeking the missing documents).

Courts have interpreted § 3292's "official request" prong to further require that the offense be under investigation and the official request be "reasonably specific in order to elicit evidence of the alleged violations under investigation." *United States v. Neill*, 952 F. Supp. 831, 832-33 (D.D.C. 1996); *see United States v. Ratti*, 365 F. Supp. 2d 649, 656 (D. Md. 2005) (applying same standard); *United States v. Wilson*, 249 F.3d 366, 374 (5th Cir. 2001) ("The request for evidence must only be 'reasonably specific in order to elicit evidence of the alleged violations under investigation by the grand jury.'" (quoting *Neill*)), *abrogated on other grounds by Whitfield v. United States*, 543 U.S. 209 (2005). The Applications met these official-request requirements.

First, each Application demonstrated that the relevant offenses were under investigation. The Second Application stated, "A grand jury duly impaneled in this District has been conducting an investigation of Goldstein and other individuals for the following possible criminal offenses," including "evading taxes, in violation of 26 U.S.C. § 7201," "willfully failing to pay individual income tax and failing to file income tax returns, in violation of 26 U.S.C. § 7203," and "aiding

and assisting the preparation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2)." 2d App. ¶ 1. Special Agent Accardi's Declaration in support of the Second Application also stated that "[t]he grand jury has been investigating Goldstein and other individuals for the following possible criminal offenses," including these same violations of 26 U.S.C. §§ 7201, 7206(2), and 7203. 2d Decl. ¶ 2, Ex. 2B. Similarly, the Third Application "expressly incorporated" the Second Application, 3d App. 1, while Special Agent Accardi's accompanying Declaration identified the same offenses as under investigation by the grand jury, 3d Decl. ¶ 2, Ex. 3B, and incorporated his previous declaration, *id.* ¶ 4. The Applications' and Declarations' explicit statements that a District of Maryland grand jury was investigating violations of Sections 7201, 7203, and 7206(2) readily established that these offenses were under investigation. *See Neill*, 952 F. Supp at 832-33 (finding requirement met where grand jury investigation into "possible tax violations" "was ongoing" at time of request).

Second, the April 2024 official request was reasonably specific to elicit evidence of the alleged violations under investigation. As the Applications made clear, Defendant received millions of dollars from Gambler 3 in 2018 but did not report this money as income, instead claiming that the funds were "loans" to pay his taxes—and a core purpose of the April 2024 official request was to investigate whether these funds were in truth taxable income. *See* 2d Decl. ¶¶ 12-14, 17-19; 3d App. 2 n.1 and 3d Decl. ¶ 4 n.1. Thus, the official request sought "various evidence of the Target Offenses in the form of records relating to [Gambler 3]'s accounts at UCB." 2d App. ¶ 23. The accompanying Declaration explained:

> [R]ecords from UCB for [Gambler 3]'s accounts will help the U.S. authorities assess whether Goldstein conspired with [him] to have income due and owing to Goldstein to be directed or filtered through [Gambler 3] using [his] UCB account(s). *Records of the opening, closing, and account signatories* for [Gambler 3]'s account(s) will establish [his] ownership and control of the account(s) and whether Goldstein possessed any signatory or other authority with respect to the

account(s). *Records of the transfers, wires, deposits, and withdrawals from the account(s)* will show where the money in the account(s) came from and went, and whether any of it constituted income to Goldstein (rather than loans) further establishing the extent of Goldstein's tax evasion. In addition, *records relating to the deposits into the [Gambler 3] account(s)* will show whether Goldstein utilized the account(s) to divert additional fees from his law firm, or otherwise receive income that was not reported to the IRS.

2d Decl. ¶ 27 (emphasis added). This statement made explicit the types of bank records sought by the official request. The Third Declaration later averred that Montenegro's response omitted records for one apparent bank account, wire transfer records (including underlying authorizations and instructions), and the documents that led to transfers by Gambler 3 being labelled things like loans or gifts on the bank records. 3d Decl. ¶¶ 10-13.

These statements specified the bank records sought and made clear that the official request was sufficiently specific to elicit evidence of the alleged tax violations under investigation. As the Third Application itself explained: records reflecting how Gambler 3 typically transacted with debtors and other poker players could "substantiat[e] or undermin[e] Goldstein's claims about the reason for [Gambler 3]'s payments to him," and if UCB documents showed "[Gambler 3]'s transfers to Goldstein are loans," then these documents would be exculpatory because loans do not need to be reported as income. 3d App. 5; *see also* 2d App. ¶¶ 18-19 (detailing records' relevance to Defendant's failure to report 2018 cash as income). The official request sought the bank records precisely because they could inculpate or exculpate Defendant and his failure to report the vast sums that he received from Gambler 3 as income.[6]

---

[6] Defendant *does not contest* that such records would inculpate or exculpate him of tax crimes. Moreover, despite the first two Applications' inaccurate statements that Defendant said the 2016 transfers were loans and did not report them as income (addressed at length in Part II.C.2 below), the Second and Third Applications accurately summarized Defendant's claim that the 2018 funds were loans—and the ongoing investigation into whether that was true. *See* 2d Decl. ¶¶ 13, 17-19; 3d App. 2 n.1 and 3d Decl. ¶ 4 n.1 (identifying previous inaccuracies and explaining Defendant still did not report millions from Gambler 3 as income). And it remained true that Defendant had not reported the 2016 funds that he kept at UCB. *See* 3d App. 2 n.1.

Moreover, the instant applications far exceed the little proof found sufficient to toll the statutes of limitations in other cases. For example, in *United States v. Neill*, 952 F. Supp. 831 (D.D.C. 1996), the court initially ruled that an official request had not suspended limitations periods for tax charges because the request was "barren of any mention of criminal tax offenses" and thus "did not request foreign evidence regarding tax violations." *Neill*, 940 F. Supp. 332, 337 (D.D.C. 1996), *vacated on reconsideration*, 952 F. Supp. 831. The court later reversed, ruling that evidence newly proffered by the Government "demonstrate[d] that a grand jury was in fact investigating tax offenses." *Neill*, 952 F. Supp. at 832-33. The court ultimately held that the official request had tolled the limitations periods for tax crimes in part because the criminal tax "investigation was ongoing at the time the foreign evidence request was made." *Neill*, 952 F. Supp. at 832-33. The court further reasoned, "Among the evidence sought was *bank records.* This request was *reasonably specific to elicit evidence probative of the tax violations* then under investigation by the grand jury . . . ." *Id.* (emphasis added). Requesting bank records sufficed; the court did not scrutinize the precise type of bank records sought or how they would evidence tax crimes. *See id.*

As in *Neill*, the Applications here showed that the official request would elicit evidence of tax crimes because it sought bank records. *See id.*; *see Ratti*, 365 F. Supp. 2d at 656 (finding request sufficiently specific to toll wire fraud limitations period where defendant was a "principal target[]" of the investigation" and request called for foreign authorities to ask "witnesses whether they knew of [his] participation in the potentially illegal" scheme); *see also Wilson*, 249 F.3d at 374 (holding, without explicitly examining how evidence sought would evince offense under investigation, that official request's reference to "money laundering" sufficed to toll limitations period for 18 U.S.C. § 1957); *United States v. Swartzendruber*, 2009 WL 485144, at *5 (D.N.D. Feb. 25, 2009) (finding § 3292 tolled limitations where "tax fraud [wa]s intimately related to the other counts in the

indictment that were specifically tolled"). The Applications proved this far beyond a preponderance of the evidence, which required only that the fact be more probable than not. *See United States v. Trainor*, 376 F.3d 1325, 1331 (11th Cir. 2004) (defining this for § 3292); *Wilson*, 322 F.3d at 361; *see also Salem v. Holder*, 647 F.3d 111, 116 (4th Cir. 2011) ("[A] preponderance of the evidence simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." (quotations omitted)).

### 2. It reasonably appeared, at the time the Second Official Request was made, that the evidence sought was in Montenegro.

For the second prong of § 3292, the Applications needed to provide only "something with evidentiary value"—such as a sworn declaration—"tending to prove it [wa]s reasonably likely that evidence of the charged offenses" was in Montenegro when the official request was made. *See Trainor*, 376 F.3d at 1332-33; 18 U.S.C § 3292. They did. As explained in the Second Application and Declaration, in December 2023, Montenegro produced bank records of Defendant's accounts at UCB detailing transfers from Gambler 3's UCB accounts to Defendant's in 2016 and 2018. 2d App. ¶¶ 10-12, 20-21; 2d Decl. ¶¶ 15-17. Thus, the supplemental April 2024 official request sought "various evidence of the Target Offenses in the form of records relating to [Gambler 3]'s accounts at UCB." 2d App. ¶ 23; 2d Decl. ¶ 27. Given that Montenegro had recently produced the UCB bank records for Defendant's accounts, and those records showed the transfers from Gambler 3's UCB accounts, it was virtually inevitable—and at the least reasonably apparent—that the UCB records for Gambler 3's accounts were in Montenegro at the time of the April 2024 official request. Defendant does not argue otherwise.

The Third Application further reinforced the likelihood that records of Gambler 3's bank accounts were in Montenegro because, as that Application stated in July 2024, Montenegro produced many such records the previous month. 3d App. 3; 3d Decl. ¶ 8. That Application also

identified records that UCB normally kept but had not produced, underscoring that additional evidence likely remained in Montenegro. *See* 3d App. 3; 3d Decl. ¶ 12. This exceeds the proof found sufficient elsewhere. *See United States v. Titterington*, 354 F. Supp. 2d 778, 787 (W.D. Tenn. 2005) (holding certified copy of order from Barbados court for "the issuance and execution of search warrants at the premises of" defendant's lottery operation adequately established that evidence was in Barbados).

### 3. The First Application also met § 3292's requirements.

The First Application and Declaration demonstrated that the Government made an official request to Montenegro on September 25, 2023, and provided the accompanying OIA transmittal letter. 1st App. ¶ 10; 1st Decl. ¶ 17, Ex. 1B. They explicitly stated that Sections 7201, 7203, and 7206(2) were under investigation. 1st App. ¶ 1; 1st Decl. ¶ 2. They showed that the official request would elicit evidence of tax crimes because the official request sought Defendant's UCB records, he had received more than €860,000 into his UCB accounts in 2018, he had not reported that money as income, and he previously had underreported his gambling income. 1st App. ¶ 5; 1st Decl. ¶ 10, 12-14. Finally, they showed that it reasonably appeared, at the time the official request was made, that the evidence sought was in Montenegro, where UCB was located. *See* 1st App. ¶¶ 5-6, 8-9; 1st Decl. ¶¶ 12-13, 17-18. Thus, the First Application met both prongs of § 3292 and the First Order is also valid.

In sum, all three Montenegrin Applications showed—by far more than a preponderance of the evidence—that (1) an official request was made to Montenegro for evidence of tax crimes, and (2) it reasonably appeared at the time of the request that this evidence was in Montenegro. That is all that was necessary. *See Broughton*, 689 F.3d at 1273 ("A plain reading of § 3292 demonstrates that a district court's decision to suspend the running of a statute of limitations is limited to two

considerations: 1) whether an official request was made; and 2) whether that official request was made for evidence that reasonably appears to be in the country to which the request was made."). And because both of those requirements were met, the District Court correctly suspended the statutes of limitations. *See id.* ("If both those considerations are met, *the statute of limitations 'shall' be suspended.*" (emphasis added) (citations omitted)); *United States v. Belayneh*, 672 F. Supp. 3d 1317, 1337-39 (N.D. Ga. 2023) (holding "that the statute of limitations was properly suspended" because the government showed "an official request was made; and that official request was for evidence that reasonably appeared to be in the foreign country" (citations omitted)). Section 3292's requirements are straightforward and the Court need not tarry further. The Government does so only to address Defendant's misplaced allegations.

### B.  Defendant's § 3292 argument misunderstands the law.

Defendant argues that Special Agent Accardi's first two Declarations "rested on false and misleading factual assertions," so these "do not provide the reliable evidence required by Section 3292," and the tolling orders are therefore invalid. 3292 Mot. 9. Defendant points to statements that fall into two categories: (1) the inaccurate statements in the first two Applications and Declarations about Defendant's characterization and income reporting of the 2016 funds from Gambler 3 ("2016 inaccuracies"); and (2) various alleged additional material falsehoods ("alleged falsehoods").[7] *Id.* at 9-28.

From these, Defendant argues that the Government and Special Agent Accardi "knew" from exculpatory information that he did *not* commit various crimes or have the necessary *mens*

---

[7] These alleged falsehoods include allegations that the Applications and/or Declarations misleadingly: portrayed "a scheme under which Malaysia gave the money to Foreign Gambler 3 to . . . thereby evade taxation," 3292 Mot. 12; claimed Defendant "had *intentionally* failed to disclose the Montenegrin accounts," *id.* at 13 (emphasis in original); stated that the women Defendant placed on G&R insurance and payroll did no work, *id.* at 16; "represent[ed] that [he] willfully avoided taxes" by diverting income from G&R for personal expenses; and created "the knowingly false impression that [Defendant] directed [a personal] payment to be treated as a business expense," *id.* at 27.

*rea*, and that omitting such information would mislead the court, and the Declarations therefore did not provide reliable evidence for § 3292 tolling. *See id.* at 3, 6, 10, 13, 16, 24, 25, 26, 27, 28, 29 (all arguing Government or agent "knew," "admitted," or was "aware" of various facts not provided in applications); *see also, e.g.*, *id.* at 28 ("Yet Agent Accardi presented the Court with this one example (falsely suggesting the mischaracterization of the expense was intentional) and withheld *all* the rest [where Defendant correctly reported personal expenses]."). While Defendant does not use the words "exculpatory" or "innocent," the gravamen of his argument is that the alleged falsehoods were misleading because they failed to provide information or context tending to show he had not committed a crime or acted willfully, or that he had acted lawfully in other instances. In making his argument that Special Agent Accardi knew he did not commit crimes, Defendant appears to forget that a Grand Jury in the District of Maryland in fact indicted him for his tax crimes.

Moreover, Defendant's argument cannot be squared with the plain text of § 3292. That law begins, "Upon application of the United States, *filed before return of an indictment*, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled *to investigate the offense* shall suspend the running of the statute of limitations . . . ." 18 U.S.C. § 3292(a)(1) (emphasis added). Thus, § 3292 applies when a grand jury is "investigat[ing] the offense" and has not yet returned an indictment. *See id.* Its entire function is to toll the limitations period while a grand jury *investigates* a *potential* crime *before* it has returned an indictment.

Whether exculpatory information might exist, whether a crime occurred, whether a grand jury might not indict, whether a petit jury might acquit, or whether a court might conclude a crime was not committed are all irrelevant. This is so common sense that courts recognize it in passing.

*See United States v. Atiyeh*, 402 F.3d 354, 365 (3d Cir. 2005) (stating § 3292 provides the government "as long to review the evidence, consider its ramifications, and *persuade the grand jury to indict, if appropriate*, as was left on the statute of limitations when the suspension began" (emphasis added)); *Ratti*, 365 F. Supp. 2d at 656 (describing official request as seeking evidence of defendant's "participation in the *potentially illegal* manufacturing process and cover-up" (emphasis added)); *see also Neill*, 952 F. Supp. at 832 ("[Section 3292 requires] that an offense be *under investigation* by a grand jury." (emphasis added)); *Michel*, 2019 WL 5797669, at *9 ("'[T]he request for evidence must nevertheless be reasonably specific in order to elicit evidence of the *alleged* violations under investigation by the grand jury.'" (quoting *Neill*, 952 F. Supp. at 833.) (emphasis added)).[8]

Indeed, "'[a] grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way *to find if a crime has been committed*.' Section 3292 does not alter this long-standing precept, but rather facilitates it by providing a means to suspend the statute of limitations while evidence is sought from abroad." *United States v. Lyttle*, 667 F.3d 220, 225 (2d Cir. 2012) (emphasis added) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 701 (1972)); *accord Broughton*, 689 F.3d at 1275.

Setting aside the 2016 inaccuracies,[9] the alleged falsehoods (which do not exist) are irrelevant for the simple reason that they have no bearing on the requirements of § 3292 or the validity of the tolling orders. Section 3292 does not require a crime to have actually been committed or that the government is able to prove it; a crime need only be under investigation.

---

[8] Defendant replaced the word "alleged" from *Michel*'s recitation of *Neill*'s rule with an ellipsis. *See* 3292 Mot. 9 ("[T]he evidence sought must be 'reasonably specific to elicit evidence of the . . . violations then under investigation by the grand jury.' *United States v. Michel*, 2019 WL 5797669, at *9 . . . ."). This misleading elision highlights both his awareness of the actual § 3292 precedent and his attempt to obscure it.

[9] These are discussed in more detail in the next subsection.

When and to whom Defendant disclosed the Malaysia payment; the amount of work various women did for G&R; when and how he disclosed his Montenegrin bank accounts; whether other parties could have ensured that he reported legal fees he diverted as income; whether he properly treated many personal expenses—*none* of these are relevant. They do not alter the fact that the grand jury was investigating whether Defendant had committed tax and other crimes. Nor do they alter the fact that (1) an official request for evidence of an offense had been made to Montenegro, and (2) it reasonably appeared at the time of the request that this evidence was in Montenegro. *See* 18 U.S.C. § 3292(a)(1). Nor do they alter the fact that the Applications proved this far beyond a preponderance of the evidence.

Rather, these alleged falsehoods affect *whether a crime actually had been committed*. Defendant does not explain how these alleged falsehoods are relevant to § 3292's requirements and does not explain how they prevent the Applications from fulfilling either prong of § 3292. *See* 3292 Mot. 10-28.  In other words, Defendant does not (and cannot) connect the alleged falsehoods to any specific § 3292 requirement or precedent, aside from his initial reference to rule that request must be reasonably specific to elicit evidence of alleged violations under investigation. There are four ways to interpret Defendant's argument but none justify invalidating the tolling orders.

***First***, to the extent Defendant is arguing that a § 3292 application must show that offenses were committed and thus must provide the reviewing court any exculpatory information tending to show they had not, the argument turns § 3292 on its head. Section 3292 does not "depend[] on what evidence the Government already has or whether it has sufficient evidence to bring a charge." *Michel*, 2019 WL 5797669, at *10. This is for good reason: § 3292 would become a false promise if the government had to prove that a crime had been committed (and thus already possess evidence

sufficient to prove each element) in order to toll the statute of limitations *while it sought that very evidence* abroad.

Moreover, to the government's knowledge, no court has ever ruled that a § 3292 application was invalid because the government knew or should have known that the defendant was innocent of an offense under investigation, let alone that such an application must exhaustively recite all potentially exculpatory material even if it was irrelevant to whether a grand jury was investigating an offense, an official request for evidence of that offense had been made to a foreign country, or that evidence likely was in the foreign country. Such a rule would require courts to second-guess the conduct of the investigation, inquire into the subjective views of Government representatives, and scrutinize the viability of potential future charges in a manner totally untethered from § 3292. *Cf. DeGeorge v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 219 F.3d 930, 938-39 (9th Cir. 2000) (rejecting defendant's interpretation that § 3292 requires the evidence sought "must be essential to bringing charges" because § 3292 requires only "evidence of an offense" and his interpretation "would require district courts to make a determination of the value of the foreign evidence the government seeks—to second-guess the government's investigation—which the statute simply does not contemplate"). Even if the statute's text did not govern, it would make little sense for § 3292 to require exculpatory information when this is not even required for a grand jury to return an Indictment. *See Williams*, 504 U.S. at 53.

***Second***, to the extent Defendant is arguing that a § 3292 application must establish probable cause to believe a crime has been committed, this similarly fails because § 3292 contains no such requirement.

***Third***, to the extent that Defendant argues the alleged falsehoods are material because, if the court had known the truth, then it would have concluded that no crimes had been committed,

and it therefore would have concluded that the April 2024 official request was not seeking evidence of an offense (or that such evidence could not have been in Montenegro because no offense had occurred): this too fails because whether crimes had actually been committed is irrelevant to § 3292.

Further, this argument cannot withstand factual scrutiny. For example, Defendant quips, "the grand jury *was supposedly seeking* to determine where [Defendant] 'used the UCB accounts to . . . evade U.S. taxes.'" 3292 Mot. 9 (quoting 1st Decl. ¶ 14). And doubles down, "[T]he grand jury *was allegedly exploring* whether" he routed "'gambling winnings through Foreign Gambler 3's UCB accounts in order to conceal income that should have been reported to the IRS.'" *Id.* at 15 (emphasis added) (quoting 2d App. ¶ 14). Of course the grand jury was exploring this: Defendant had failed to report gambling winnings, and had told IRS agents that all 2018 funds from Gambler 3 were loans even though he told a Customs & Border Protection ("CBP") officer that the 2018 cash was gambling winnings. *See* 2d Decl. ¶¶ 8, 19-22. Indeed, whether Defendant used his UCB accounts to evade taxes was a core question of the investigation and the grand jury returned an Indictment charging that he did.

Defendant similarly inveighs that "the grand jury *was supposedly investigating* whether" he willfully failed to report his Montenegrin bank accounts. 3292 Mot. 12 (emphasis added). It was: Although Defendant provided exculpating documents during the investigation, the government and grand jury remained entirely justified in seeking corroborating documentation from the foreign bank itself—and any other evidence tending to show if a crime had been committed. *See Lyttle*, 667 F.3d at 225 ("A grand jury investigation is not fully carried out until every available clue has been run down . . . to find if a crime has been committed."). The grand

jury was clearly investigating these potential crimes; the ultimate outcome of the grand jury's investigation on a particular charge is irrelevant.

**Fourth**, that Defendant argues the alleged falsehoods themselves were *not* relevant to § 3292 but, if the court had broader context, then it would have found non-credible the parts of the Declarations that *were* relevant. This argument distorts the Applications and fails for the many reasons discussed in the next subsections.

In any event, because the alleged falsehoods are irrelevant to § 3292, the tolling orders would remain valid even if the allegedly missing information were provided.

### C. No misstatement or omission was material, so the Applications remain valid and an evidentiary hearing is not appropriate.

A hearing is not appropriate because the Applications meet § 3292's requirements even if the alleged falsehoods (which, apart from a few minor errors that the Government corrected, are nothing more than Defendant's disagreements with the Indictment) were excised or the allegedly omitted information was included in the Applications.

#### 1.  Defendant has a heavy burden to justify an evidentiary hearing.

The leading § 3292 precedent demonstrates the proper approach to determining when misrepresentations require an evidentiary hearing. In *United States v. Ratti*, 365 F. Supp. 2d 649 (D. Md. 2005), the district court issued a § 3292 tolling order based on an application in which the government represented that official requests had been made to Italy and Romania. *Id.* at 654. In truth, no request had been made to Romania and the Government never brought this to the court's attention; instead, the Defendant did while challenging the tolling order. *Id.* & n.3. He argued that the application and order "were based on [the] false premise" that an official request had been made to Romania. *Id.* at 656. The court noted this misrepresentation was "troublesome" and "the Government's failure to . . . promptly advise the Court after the suspension order was signed is a

further cause for concern." *Id.* at 658. However, the court rejected his argument, holding "that the misrepresentation . . . does not vitiate [the tolling] Order." *Id.* at 657. The court explained:

> There has been no showing of bad faith on the Government's part and, while the Government's failure to verify that a request had been made to Romania is hardly commendable, the fact remains that the allegations regarding the MLAT application to Italy were accurate and, if the application was otherwise in proper form, sufficient to sustain the Order.

*Id.* Thus, "the references to Italy independently sustained the application." *Id.* at 660. The Court effectively excised the false statement that there had been a request to Romania and assessed whether the remainder of the application materials provided sufficient evidence to satisfy § 3292. Moreover, the court did so without holding an evidentiary hearing. *See id.* at 660, 670-71.

    *Ratti* charts the proper course for assessing the validity of a § 3292 application containing alleged misrepresentations: excise the misrepresentations and assess whether the remaining information presents sufficient evidence to meet the requirements of § 3292. If so, the application and order are valid and no hearing is warranted.

    If, however, the excised material is necessary to the application, then an evidentiary hearing is warranted. *See Wilson*, 249 F.3d at 371-73 (remanding for evidentiary hearing on factual issue of whether November 1993 official request letter was actually sent to Bahamas, where "this letter" was the only basis for § 3292 order). "An evidentiary hearing need not be set as a matter of course, but *only if* the motion alleges facts that, if proved, would *require* the grant of relief." *Id.* at 372 n.3 (emphasis added) (quoting 3 Charles Alan Wright, Fed. Prac. and Proc. § 675 (2d ed. 1982)).

    This approach aligns with that for determining whether to conduct an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), which provides a narrow way for a defendant to attack a facially valid search warrant affidavit. *See United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019). "[T]o obtain the hearing, a defendant must make a substantial preliminary showing that

(1) law enforcement made a false statement; (2) the false statement was made knowingly and intentionally, or with reckless disregard for the truth; and (3) the false statement was necessary to the finding of probable cause." *Id.* (quotation marks omitted). For the first requirement, defendant cannot rely on "a purely subjective disagreement with how the affidavit characterizes the facts"; instead, he must show "the statements at issue are objectively false." *Id.* For the second requirement, the defendant must prove the officer "subjectively acted with intent to mislead, or reckless disregard for whether the statements would mislead the judge. *Id.* at 371. For the third requirement, he must show "materiality"—"that the false statements were necessary to the finding of probable cause." *Id.*[10]

These requirements are a heavy burden and are even harder to meet "[w]hen a defendant relies on an omission." *United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021). In that situation, the defendant must show that the officer (1) made an omission, (2) knowingly and intentionally, or with reckless disregard for the truth, and (3) "the *inclusion* of the omitted evidence in the affidavit would have *defeated* its probable cause." *Id.* (emphasis added). If a defendant makes this showing, then a court must hold a *Franks* evidentiary hearing. *See id.*

The *Franks* hearing requirements reinforce that *Ratti*'s approach is correct: an evidentiary hearing applies only where a defendant shows that either (1) a misstatement was *necessary* to the finding of a preponderance of evidence under § 3292, or (2) omitted evidence, if included, would have *prevented* such a finding. *See Ratti*, 365 F. Supp. 2d at 657-658 (finding, without providing hearing, tolling order valid where application was sufficient even after misstatement was set aside);

---

[10] Defendant does not address this *Franks* hearing methodology despite his recurring description of the alleged misstatements as "material," a standard term in the *Franks* context but overwhelmingly absent from § 3292 precedent. His drumbeat of "materiality" reinforces that he is well aware of the *Franks* methodology—and avoids addressing it because that methodology shows his argument and accusations are misplaced.

*Wilson*, 249 F.3d at 372-73 (requiring hearing where defendant provided evidence that § 3292 order relied on official request that had not been made).

### 2. The Applications are valid regardless of the 2016 inaccuracies.

The First and Second Applications and Declarations contained inaccuracies about the 2016 funds from Gambler 3. The First Application and Declaration incorrectly stated that Defendant did not report any of the 2016 funds as income, and the Second Declaration repeated this. *See* 1st App. ¶ 5; 1st Decl. ¶ 14. 2d Decl. ¶ 18. The Second Declaration and Application also stated that Defendant told IRS-CI agents that the 2016 and 2018 transfers from Gambler 3 were loans, when in fact he said this about only the 2018 transfers. 2d App. ¶¶ 13. However, the Applications meet § 3292's requirements regardless of these mistakes for three reasons.

***First***, the Second Application meets § 3292's requirements even if these mistakes about the 2016 funds are removed. Without those mistakes, the Second Declaration still showed that an official request for evidence—Gambler 3's bank records—had been made to Montenegro; the grand jury was investigating possible tax crimes, including violations of Sections 7201, 7203, and 7206(2); and the request was reasonably specific to elicit evidence of these crimes, in the form of those bank records. *See* 2d Decl. ¶¶ 2, 12-14, 17-22, 26-27; Part II.A.1, *supra* (detailing how Applications met § 3292's "official request" prong). For example, that Declaration averred that Defendant received millions from Gambler 3 in 2018, including from Gambler 3's Montenegrin bank account, reported none of it as income, and claimed it was all loans—even though he told a CBP officer that the nearly $1 million in cash was gambling winnings. *See* 2d Decl. ¶¶ 17-22. The Second Application also stated all this and also remains sufficient even if its errant statement that he said the 2016 transfers were loans is removed. *See* 2d App. ¶¶ 1, 12-19.

The Second Declaration also established that it reasonably appeared this evidence was in Montenegro at the time of the official request—as Montenegro recently had provided UCB records for Defendant showing that he received transfers from Gambler 3's UCB account. *See* 2d Decl. ¶¶ 165-17, 27; Part II.A.2, *supra* (detailing how Applications met location prong). Removing the misstatements about the 2016 transfers from the Second Declaration does not change this. The Second Application drew on that Declaration and similarly explained how it reasonably appeared the evidence sought was in Montenegro. *See* 2d App. ¶¶ 20-23. Thus, the Second Application easily provides a preponderance of the evidence for both prongs even if the 2016 inaccuracies are removed.

**Second** and conversely, the Applications also meet § 3292's requirements even if the omitted information—that Defendant correctly reported as income $885,000 of the approximately $1,000,000 he received from Gambler 3 through UCB in 2016—is included. That information only reinforces that Defendant failed to report more than $100,000 from Gambler 3 as income in 2016, which was an additional reason for the grand jury to seek Gambler 3's UCB records while investigating possible tax crimes.

**Third**, the Third Application and Declaration reinforce that the Second Application is valid regardless of the 2016 inaccuracies. The Third Application sought to toll the limitations periods based on the same April 5, 2024 official request (seeking Gambler 3's UCB records) as the Second Application, expressly incorporated the Second Application, and reiterated its same general reasons for seeking the records. *See* 3d App. 1-2.

When the government discovered these inaccuracies, it promptly alerted the court in its Third Application. *See* 3d App. 2 n.1. Special Agent Accardi's Third Declaration acknowledged, "[T]he [Second] declaration stated that that Goldstein did not report the 2016 or 2018 sets of UCB

transfers to the IRS as income. However, . . . he reported as income the $885,000 that he wired to his law firm's U.S. bank account." 3d Decl. ¶ 4 n.1. Similarly, the Third Application stressed:

> Further review of evidence has shown the government's prior submission . . . contained three inaccuracies. *First*, the prior application stated that Goldstein told IRS-CI agents that two sets of UCB transfers from [Gambler-3]—in 2016 and 2018, for a total of over $2 million—were loans. However, Goldstein told agents that the 2018 UCB transfer from [Gambler-3] and the more than $950,000 in cash that he received from [Gambler-3] that year were loans. Goldstein did not claim that the 2016 UCB transfers were loans. *Second*, the declaration attached to the prior application stated that Goldstein did not report the 2016 or 2018 sets of UCB transfers to the IRS as income. However, further investigation has shown that of the approximately $1,000,000 that Goldstein received from the 2016 set of UCB transfers, he reported as income the $885,000 that he wired to his law firm's U.S. bank account.

*See* 3d App. 2 n.1.[11] The Third Application, which explicitly acknowledged and corrected these inaccuracies, met § 3292's requirements, so the District Court ordered "that the running of the statutes of limitations for the offenses set forth in the government's *ex parte* application is hereby SUSPENDED for the period authorized by 18 U.S.C. § 3292(b) and (c)." 3d Order. If the 2016 inaccuracies had been material to the Second Application, the Third Application would have been rejected because it depended on the Second Application and the same general bases.

This conclusion is reinforced by the fact that Defendant does not seek to invalidate the Third Order, issued on July 23, 2024. *See* 3292 Mot. 3 (requesting the "Court invalidate two orders," dated October 31, 2023, and May 7, 2024).

Finally, the First and Second Applications' inaccurate descriptions of the 2016 funds were inadvertent mistakes made in a good faith. The Government had no incentive to make these mistakes because, as the foregoing discussion shows, the 2016 inaccuracies were not material, let alone indispensable, to the Applications. Moreover, the Government promptly identified and

---

[11] The Third Application and Declaration also identified and corrected another inaccuracy: the Second Declaration had referenced an amicus brief filed by G&R "in the United States Supreme Court" but that brief actually was filed in the U.S. Court of Appeals for the Fifth Circuit. *See* 3d App. 2 n.1; 3d Decl. ¶ 4 n.1.

addressed these inaccuracies to the Court in its Third Application on July 22, 2024, less than three months after its Second Application. Both applications were filed *ex parte* so only the Government was equipped to identify or rectify its mistake—and it did so expeditiously, long before indictment, and without prompting by Defendant or the District Court. If the Government had been seeking to mislead the court through these inaccuracies, it makes little sense to promptly draw the court's attention to them. Thus, Defendant's claim that the government was "forced to confess" and "admit" the errors defies logic. 3292 Mot. 10.

Ultimately, the Applications and tolling orders remain valid regardless of the immaterial 2016 inaccuracies, and no hearing is warranted to address them.

### 3. The alleged falsehoods about foreign account reporting.

The alleged misstatements about Defendant's failure to report his foreign bank accounts are not relevant, were not material, and do not warrant an evidentiary hearing. First, the Indictment does not charge Defendant with willful failure to file a foreign bank account report ("FBAR"), in violation of § 31 U.S.C. §§ 5314, 5322, so whether a § 3292 order tolls that statute is not relevant.

Second, Defendant asserts Special Agent Accardi "relied heavily on the allegation that [Defendant] *purposefully* failed to disclose the Montenegrin accounts" and made a "repeated representation that [he] *intentionally* failed to disclose" them. 3292 Mot. 13 (emphasis added). This is false. The Declarations never alleged Defendant had "purposefully" or "intentionally" failed to report his foreign accounts. Rather, they stated that he had failed to report the accounts (a fact Defendant concedes), that the grand jury was investigating his failure to do so, and that the official request sought evidence of those accounts. *See* 1st App. ¶¶ 1-3; 1st Decl. ¶¶ 1-2, 15-18; 2d App ¶¶ 1, 9, 20; 2d Decl. ¶¶ 1-2, 14, 18, 26-27. The Declarations also emphasized that Defendant told investigators he was unaware of the FBAR filing requirement even though he had been part

of an amicus brief addressing FBAR-related issues. *E.g.*, 1st Decl. ¶ 16; 2d Decl. ¶ 19. These statements were factually accurate descriptions of the investigation and they supplied a preponderance of the evidence to toll the FBAR-related limitations period. *See also* Part II.B, *supra* (further discussing state of FBAR investigation).

Defendant faults the Government for not also disclosing that he told his office managers to report the Montenegrin accounts to the accountants, and that the accountants said they would file reports but did not. *See* 3292 Mot. 11-12. However, this is not material to the Applications: including the omitted information would not have changed the fact that the grand jury was investigating potential FBAR violations (which, it bears noting, were never cured by the Defendant), that an official request had been made for evidence of those violations, and that such evidence reasonably appeared in Montenegro. Moreover, Defendant's persistent failure to report the accounts on FBARs and his Forms 1040 and his claim that he was unaware of FBAR requirements warranted investigating whether he knew he had to report the accounts but had been intentionally blind to his accountants' ongoing failure to do so.

Third, the Government did not omit this information in bad faith. The Government omitted it, along with myriad other facts, precisely because they were not relevant to § 3292. *Cf. United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008) ("[B]ecause every piece of information cannot be expected to be included, the very process of selecting facts to include for the demonstration of probable cause must also be a deliberate process of omitting pieces of information . . . [so] merely showing an intentional omission of a fact does not fulfill *Franks'* requirements."); *Haas*, 986 F.3d

at 475 ("The 'mere fact' that the agent did not include every piece of information known . . . in the affidavits 'does not taint their validity.'" (citation omitted)).[12]

The alleged FBAR falsehoods are not material and do not affect the validity of the tolling orders. A hearing would not change this and is not warranted.

### 4. Alleged falsehoods about women at G&R.

Defendant fixates on a handful statements about women with whom he had or was seeking intimate personal relationship and whom he placed on his law firm's payroll and healthcare, and argues that these women did do (or in one's case, medically could not do) work, so Special Agent Accardi's "representation to the Court that these employees did no work was thus transparently and obviously false." 3292 Mot. 24. This misunderstands the facts and misapplies the law.

As to the facts: the First Declaration, made in October 2023, provided various examples of Defendant's misconduct and, in one part of one paragraph, explained: "[H]e placed on his law firm's payroll young women with whom he appears to have been having intimate personal relationships and paid them through the law firm, even though those women performed no work for the law firm." 1st Decl. ¶ 11 (emphasis added). At that time, the investigation had identified only two women as apparent romantic partners, whom a G&R firm manager thought Defendant had placed on G&R payroll even though they did no work. Thus, the Application hedged that

---

[12] Defendant claims that the Government "never requested [G&R's] communications regarding disclosure of the Montenegrin accounts," and this shows that it "no longer seriously believed that there was any basis to pursue [FBAR charges]." 3292 Mot. 14. This is misleading at best. In 2023 and 2024, the Government subpoenaed G&R for various categories of documents related to Defendant's treatment and disclosure of the Montenegrin accounts—including "all correspondence" with Defendant's accountants; "[a]ny and all corporate records and books of account related to the financial transactions" of G&R; all "loan records" and all "corporate bookkeeping records"; and his communications with Gambler 3. In response, G&R produced hundreds of documents related to UCB, including many emails about disclosing the accounts. Until Defendant's 3292 Motion, the Government had been under the impression that it received all discoverable communications with UCB and all communications with his accountants—including those "regarding disclosure of the Montenegrin accounts." If Defendant, despite producing all these documents in 2023 and 2024, somehow construed the subpoenas to *avoid* producing certain responsive communications about his foreign bank accounts or their disclosure, this is a separate problem that may constitute an intentional violation of a grand jury subpoena. Regardless, the Government intended to seek and in fact received precisely the types of documents that Defendant now claims it did not seek.

Defendant "appear[ed]" to have had personal relationships with them. Further, Defendant now concedes one of those two women never did any work and, as he well knows, the investigation did not even receive documentation of the scant work the other did for him until 2024.[13] At most, the phrase "no work" was a simple overstatement, made in good faith based on the information known to the investigation in late October 2023.

Similarly, the Second Declaration stated in a single paragraph that he placed "younger women with whom he had or was seeking to have intimate personal relationships" on the firm payroll and healthcare "even though the women performed little or no work for the law firm." 2d Decl. ¶ 9. Defendant makes much of the fact that the Government received records for the first woman, whom he dubs "Employee 1," on the same day that it submitted the Second Application and claims it either "did not review the documents . . . from Employee before alleging that the employee 'did no work for the law firm' or [it] reviewed the documents and failed to disclose their import to the Court." *See* 3292 Mot. 15 n.5. However, this misconstrues the Declaration, which never specified any of the women and was referring to only the other three women, whom the investigation had identified and sought documents from much earlier in 2024.

At base, Defendant disagrees with the Declaration's characterization that these three women did "little to no work," and the Indictment's allegation—made after a thorough review of "Employee 1's" documents and communications with Defendant—that, in fact, all four women did "little to no work." ECF 1 ¶ 13. The grand jury concluded that "little to no" is an entirely accurate description, and this conclusion is well justified. For example, Defendant claimed all four women were full-time employees eligible for healthcare and deducted their insurance premiums as business expenses when he knew that, in truth, none of them were full-time and none were

---

[13] He terms these women as "Employee 4" and "Employee 2," respectively. *See* 3292 Mot. 19-20, 22-24.

entitled to coverage. Defendant went as far as telling one of the women that she needed to work only ten hours per week, even while he recognized that what he called the "nominal[]" requirement for insurance eligibility was higher. He similarly claimed that another woman, whose first language was not English, was an employee "translator" on medical leave without pay—all while vacationing with her and telling her she could not speak English and had "no job."[14] The Second Declaration was entirely accurate.

As to the law: these statements all appeared as a few passing sentences in the introductory sections of the First and Second Declarations and the Second Application. They contextualized the range of topics under investigation. The brevity of these statements and their absence from the substantive body of the documents highlights that they were not material to the Applications. Moreover, even if the Government had included additional information about the extent of work (or purported inability to work) for the three women in either Application, they would nonetheless have met § 3292's preponderance of the evidence standard because the alleged crimes, including Defendant's apparent healthcare fraud and improper deduction of payments to the women, would still have been under investigation.

   **5. Other alleged falsehoods.**

Defendant also alleges various other falsehoods but none of these were material either. For example, the Second Declaration's single sentence that "the investigation has revealed that income due and owing to Goldstein was sent by certain foreign officials in Malaysia to [Gambler 3]" merely provided another example of income that Defendant received abroad without it ever touching his U.S. bank accounts. *See* 2d Decl. ¶ 27. Additional context that Defendant had alerted his accountants to the transaction would not have changed this fact, and would not have changed

---

[14] The Government explains these and other facts at length in its separate Opposition to Defendant's Motion to Dismiss Allegations Concerning Employees, ECF 122.

the fact that tax crimes were under investigation, an official request for evidence of those crimes had been made to Montenegro, and that evidence reasonably appeared to be located in Montenegro at the time of the request.

Similarly, excising or adding additional context to the Applications' and Declarations' discussions of Defendant's diversion of legal fee income to pay personal expenses and his improper deduction of personal expenses as business expenses would not have prevented the Applications from meeting and exceeding § 3292 preponderance of the evidence standard.

Ultimately, the alleged falsehoods are just Defendant's disagreements with the charges returned against him and were neither material nor relevant to the § 3292 applications establishing that an investigation was ongoing and evidence was reasonably likely to be located abroad. Additional context or exculpatory material was not provided for this same reason. The alleged falsehoods (whether viewed individually in isolation or as a group) do not defeat the validity of any Application or Order. The 2016 inaccuracies—promptly identified and addressed in the Third Application—also were not material. The Applications and Orders are valid, and no hearing is warranted.

### 6. Cases in which hearings were held reinforce that one is not justified here.

In the leading case in which an evidentiary hearing was held, *United States v. Wilson*, 249 F.3d 366 (5th Cir. 2001), the court did so because the defendant argued that no official request had ever been made and identified various aspects of the purported transmittal letter that suggest it had not, in fact, been sent to the foreign jurisdiction. *See id.* at 371-73. This went to the core of § 3292's first prong—whether an official request had been made—and an evidentiary hearing was required because the tolling order clearly would have been invalid if an official request had not been made. *See id.* & n.3. Similarly, the defendants in *United States v. Titterington*, 354 F. Supp. 2d 778, 789 (W.D. Tenn. 2005), argued "the government ha[d] not established whether Barbados ha[d] or ha[d]

not taken final action," and sought a hearing to assess this. *Id.* at 789; *see also* Order Granting in Part and Denying in Part Defendants' Motion to Compel, ECF 503 at 14-16, 18, *Titterington*, Case No. 2-CR-20165 (May 5, 2005) (discussing defendant's final action argument and request for relevant documents). Much like *Wilson*, *Titterington*'s dispute went to a central aspect of § 3292: when final action had occurred.

These cases reinforce why a hearing is not warranted here. None of the alleged misstatements or omissions here bear on the statutory requirements for § 3292. Defendant's other cases are similarly unpersuasive. *See United States v. Bogucki*, 316 F. Supp. 3d 1177, 1183 (N.D. Cal. 2018) (noting, without further analysis, that court had set "an evidentiary hearing to inquire into the government's true motivations for obtaining the [§ 3292] order"); *United States v. Kachkar*, 2018 WL 6933159, at *1 (S.D. Fla. Dec. 19, 2018) (noting, without analysis, "The undersigned held an evidentiary hearing on this matter on October 2, 2018."), *rep. and rec. adopted*, 2019 WL 116864 (S.D. Fla. Jan. 4, 2019).

Defendant is correct that the *ex parte* nature of a § 3292 application means "'[a] decision to toll . . . should be carefully made.'" 3292 Mot. 8 (quoting *Ratti*, 365 F. Supp. 2d at 658). But the way to do this is by faithfully applying § 3292 requirements to ensure an application meets both its prongs to a preponderance of the evidence; not by requiring a deluge of largely irrelevant, extraneous, potentially exculpatory information. For example, one of § 3292's actual safeguards against government misconduct is its requirement that the official request be reasonably specific to elicit evidence of the alleged violations. Thus, "[t]he United States could not reasonably request foreign evidence related to tax violations to toll the statute of limitations regarding conspiracy to import a controlled substance under Title 21, U.S. Code." *Neill*, 952 F. Supp. at 833 n.2; *see Ratti*,

365 F. Supp. 2d at 656 (reiterating the requirement and citing, "*Neill* 942 F. Supp. at 833, especially Note 2").

Here, the Government's Applications met the requirements and three district courts made the careful decision to grant those Applications and toll the limitations period. The Government respectfully submits that this Court should be equally careful in reviewing those Orders. As the Eleventh Circuit wrote:

> Just as district courts do not regularly overturn magistrates' probable cause determinations, however, we expect that an initial district court's preponderance of the evidence determination will not often be overturned by a later district court ruling on a post-indictment motion where the Government puts forward some reliable evidence. *See Illinois v. Gates*, 462 U.S. 213, 236 (1983) ("[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'"); *United States v. Miller*, 24 F.3d 1357, 1363 (11th Cir. 1994) (same). The only reason we are faced with a post-indictment reversal in this case is the Government's failure to submit *any* evidence to support the § 3292 tolling order.

*Trainor*, 376 F.3d at 1335. *See also United States v. Flynn*, No. 016CR00347ADMKMM, 2017 WL 8947195, at *5 (D. Minn. Aug. 11, 2017), ("[I]t is worth noting that two United States District Judges found the [previous two] Applications sufficient to meet the preponderance of the evidence standard established by § 3292, which is entitled to some degree of deference and should not be lightly overturned."), *report and rec. adopted*, 2017 WL 5462184 (D. Minn. Nov. 14, 2017).

**7. This dispute does not entitle Defendant to grand jury transcripts broadly.**

Defendant argues that, if an evidentiary hearing were set and Special Agent Accardi were to testify, then he should receive two categories of documents. 3292 Mot. 29. First, any statements by Special Agent Accardi, including grand jury testimony and written reports "concerning the topics discussed in the [§ 3292] declarations." *Id.* at 29-31 (invoking a combination of *Brady*, *Giglio*, and *Jencks*). If the Court were to conduct an evidentiary hearing on the Applications and

Special Agent Accardi to testify, the Government agrees that Defendant would then be entitled to his prior written and oral statements (including grand jury testimony) concerning the topics in the Declarations, as well as any *Giglio* material. The Government already independently disclosed the *Brady* material in its possession and will continue to comply with its discovery obligations.

Second, Defendant also seeks "any other evidence that is inconsistent with any statement" in the Declarations, by which he seems to mean everything, including any other witness's grand jury testimony even if it is not impeachment material. *See* 3292 Mot. 29. He argues that he is entitled to this category because "[t]he failure of the government to satisfy the statute of limitations is . . . a basis to dismiss the relevant charges [and] is accordingly a proper basis for disclosure of grand jury testimony" under Rule 6(e)(3)(E)(ii). *Id.*

That Rule permits disclosure to a defendant who "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). However, he fails to meet the "heavy burden of establishing that particularized and factually based grounds exist to support the proposition that irregularities in the grand jury proceedings may create a basis for dismissal of the indictment.'" *United States v. Mosby*, No. 22-CR-00007-LKG, 2022 WL 4240835, at *6 (D. Md. Sept. 14, 2022) (quoting *United States v. Loc Tien Nguyen*, 314 F. Supp. 2d 612, 616 (E.D. Va. 2004) (internal quotation marks omitted)); *see* Mem. Op. 3, *United States v. Goldstein*, 25-CR-0006, 2025 WL 934495, at *2 (D. Md. Mar. 27, 2025) ("Disclosure under Rule 6(e)(3)(E)(i) requires 'a strong showing of particularized need.'" (quoting *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983))).

To start: Defendant has not demonstrated any irregularities occurred in the grand jury. Instead, the 2016 inaccuracies and alleged falsehoods appeared in tolling applications entirely outside the grand jury. Moreover, none of these were material misstatements and all occurred long before the grand jury returned its Indictment on January 16, 2025. Defendant has established no

particularized, factual support for the conclusion that irregularities occurred in the grand jury, let alone that they would create a basis for dismissal. Indeed, the alleged falsehoods boil down to Defendant's misguided belief that such Applications must provide all exculpatory information, and even that is not a basis to dismiss an indictment. *See United States v. Williams*, 504 U.S. 36, 53 (1992) (holding that a district court may not dismiss an indictment based on the government's failure to disclose substantial exculpatory evidence to the grand jury).

Finally, Defendant suggests, "Based on the testimony at the evidentiary hearing, the Court should consider an appropriate sanction for the government's lack of candor in the applications." 3292 Mot. 32. This request for sanctions, inexplicably based on future testimony that has not even occurred, appears to stem from his misunderstanding of § 3292's requirements and his disagreement with inferences about his conduct, such as his improper deduction of personal expenses as business expenses. However, the § 3292 law is clear, and the inferences are reserved for the jury. The Government's Applications made no material, let alone intentional, misstatements. Indeed, the Government promptly corrected three minor inaccuracies in the Third Application, which the District Court then granted.  Defendant's request for potential sanctions is gamesmanship that this Court should not tolerate.

In conclusion, all three Montenegrin § 3292 Applications are valid, as are the corresponding Orders, and no hearing is warranted. When combined with the time Defendant spent outside the United States, these Orders more than suffice to make the 2016 charges timely. The Motions should be denied.

## **CONCLUSION**

For all the reasons stated above, the Government respectfully requests that the Court deny Defendant's Motion to Dismiss Counts 1, 5, 6, and 15 as Barred by the Statute of Limitations, ECF 121, and his Motion to Invalidate Certain Orders Suspending the Statute of Limitations, ECF 116.

Respectfully submitted,

Kelly O. Hayes
United States Attorney
/s/
Patrick D. Kibbe
Assistant United States Attorney
District of Maryland

Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice—Tax Division