# Exhibit 2A

FILED ___ ENTERED
LOGGED ___ RECEIVED

MAY 9, 2024

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

IN RE POSSIBLE VIOLATIONS OF
18 U.S.C. §§ 371, 1001, 1014, 1343, 1347;
26 U.S.C. §§ 7201, 7203, 7206, 7212; 31
U.S.C. §§ 5314, 5322

Misc. No. 24MC234

FILED EX PARTE & UNDER SEAL

## *EX PARTE* APPLICATION FOR SUSPENSION OF THE RUNNING OF THE STATUTES OF LIMITATIONS

The United States of America, by and through its undersigned attorneys, applies to this Court pursuant to Title 18, United States Code, Section 3292, to suspend the running of the statute of limitations for offenses arising out of the grand jury's investigation of Thomas Che Goldstein ("Goldstein"). A U.S. citizen, Goldstein appears to have evaded assessment and payment of federal income tax on millions of dollars in income since at least 2016. Goldstein repeatedly failed to report significant amounts of income on his federal tax returns and lied to federal investigators about the sources of certain income. He also failed to report on those returns, and elsewhere, his interest in or signature authority over foreign financial accounts, despite funneling millions of dollars through those accounts. Further, the government's investigation has uncovered other frauds committed by Goldstein, including healthcare fraud arising from sham employment of his romantic partners and materially false statements and omissions to lenders, including mortgage lending institutions and individuals.

In support of this application, the United States represents the following:

1. A grand jury duly impaneled in this District has been conducting an investigation of Goldstein and other individuals for the following possible criminal offenses: (i) conspiring to

defraud the United States, in violation of 18 U.S.C. § 371; (ii) evading taxes, in violation of 26 U.S.C. § 7201; (iii) making and subscribing to a false tax return, in violation of 26 U.S.C. § 7206(1); (iv) aiding and assisting the preparation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2); (v) willfully failing to pay individual income tax and failing to file income tax returns, in violation of 26 U.S.C. § 7203; (vi) corruptly endeavoring to obstruct the due administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a); (vii) willfully failing to file a report the ownership or control of, or signatory authority, or other authority over, a foreign financial account, in violation of 31 U.S.C. §§ 5314, 5322; (viii) wire fraud, in violation of 18 U.S.C. § 1343; (ix) healthcare fraud, in violation of 18 U.S.C. § 1347; (x) making false statements on a loan application, in violation of 18 U.S.C. § 1014; and (xi) making false statements to an agency of the United States, in violation of 18 U.S.C. § 1001 (collectively, "Target Offenses").

2. The grand jury has not returned an indictment.

3. Title 18, United States Code, Section 3292(a)(1), provides:

Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

4. Section 3292(d) defines an "official request" to include "a request under a treaty or convention" or a request by "an authority of the United States having criminal law enforcement responsibility" to an "authority of a foreign country." 18 U.S.C. § 3292(d).

5. As described in the Declaration of Andrew Accardi, Internal Revenue Service ("IRS") Criminal Investigation Special Agent, attached as Exhibit A and incorporated herein, the

investigation to date has revealed, in substance and in part, that Goldstein has evaded assessment and/or payment of federal income taxes, filed materially false income tax returns, concealed from the United States his ownership of assets exceeding $10,000 maintained in foreign financial accounts and any income that flowed through those accounts, and committed other frauds to further his own romantic and financial interests.

## Diverted Firm Funds

6.     The investigation has revealed that Goldstein used funds taken or diverted from the bank account of his law firm, Goldstein & Russell, P.C. ("G&R"), to pay various personal debts, including debts owed to poker players.

7.     For example, in November 2017, Goldstein caused $175,000 to be sent from the G&R bank account to the bank account of a New York-based law firm to which Goldstein owed a personal debt of approximately $475,000. That $175,000 transfer was classified as a G&R "legal fee" expense when, in reality, it was an expense attributable to Goldstein personally. During the 2018 tax year, Goldstein satisfied part of that personal debt, totaling $125,000, by allowing the New York law firm to offset $125,000 in fees that the New York law firm owed to G&R. Based on these two events, Goldstein effectively took $300,000 in G&R funds to pay his personal gambling debts, but never reported the $300,000 to the IRS as income.

8.     Similarly, in February 2017, Goldstein's law firm, G&R, was scheduled to receive a $250,000 legal fee payment from a California-based law firm. But rather than having the fee sent to G&R—which was owed the fee—Goldstein directed the California-based firm to send the fee to his personal bank account. Goldstein used a substantial portion of those funds to pay personal poker debts and never reported the legal fee as income on his tax returns.

UCB Bank Accounts: Failures to Report and Transactions with ▬

9. The investigation has revealed that Goldstein has opened and controlled four bank accounts at Universal Capital Bank AD Podgorica ("UCB") in Podgorica, Montenegro. Specifically, between 2016 and 2020, Goldstein opened and controlled a domestic account and an international account in his own name, and domestic and international accounts held in the name of his law firm, G&R. (Here, "domestic" accounts refers to Montenegro-based accounts at UCB.) During those same years, 2016 to 2020, Goldstein failed to report the UCB bank accounts on his federal tax returns and failed to file Reports of Foreign Bank and Financial Accounts ("FBARs") disclosing the accounts to the Department of the Treasury.

10. Pursuant to an earlier official request for assistance to Montenegro authorities, those authorities produced information related to the four UCB bank accounts opened and controlled by Goldstein.

11. Examination of those records revealed that ▬, a Malaysian national who was a well-known poker player and repeat legal client of Goldstein, transferred over $2,000,000 to Goldstein's accounts at UCB between 2016 and 2018.

12. Those transfers included: (1) a group of transfers from ▬ to Goldstein's domestic account at UCB (Account No. ▬) in October 2016 totaling €926,872.70, followed by Goldstein wiring $885,000 of those funds to a U.S. bank account that he controlled; and (2) a transfer of €862,142.19 by ▬ on September 25, 2018, to Goldstein's domestic account at UCB (Account No. ▬), followed by Goldstein engaging in a series of transfers culminating in the deposit of the funds in a U.S. bank account controlled by Goldstein. The records indicate that the September 25, 2018, transfer by ▬ was made from ▬'s personal account at UCB.

13. On October 14, 2020, when criminal law enforcement agents from the IRS questioned Goldstein about these two sets of UCB transfers totaling over $2,000,000, he stated that they were loans from ■ to pay Goldstein's personal income taxes.

14. The investigation is assessing whether Goldstein routed payments from other law firms and clients, or gambling winnings, through ■'s UCB accounts back to himself in order to conceal income that should have been reported to the IRS.

## Goldstein's Transport of Cash into the United States

15. The investigation has revealed that on or about October 25, 2018, Goldstein traveled from Hong Kong to the United States carrying over $950,000 in United States currency. When a United States border protection agent questioned Goldstein about the source of the funds at a Washington, D.C.-area airport, Goldstein told the agent that the cash constituted poker winnings that Goldstein had won in Macau.

16. On October 29, 2018, Goldstein and a personal assistant brought the cash to a Wells Fargo Bank branch in Bethesda, Maryland, and deposited it into Goldstein's personal bank account.

17. On October 14, 2020, when IRS criminal law enforcement agents questioned Goldstein about the cash he carried into the United States, he changed his story and claimed that it was another loan from ■ for Goldstein to further pay the IRS, and that ■ had to provide cash because ■ lacked adequate funds in his own UCB accounts to do wire transfers. The investigation also revealed that approximately one week prior to the trip, Goldstein sent a text message to another individual stating, in substance and part, that he was going Hong Kong/Macau to pick up $1 million to $2 million in cash that he was borrowing to pay taxes.

5

18. However, Goldstein's own payments to the IRS contradict his claim that the wires and cash from ▮ were to pay taxes to the IRS: between September and October 2018, Goldstein received nearly $2,000,000 from the roughly $1,000,000 in UCB wires and more than $950,000 in cash. Despite this, between September 2018 and February 2019, he made payments to the IRS totaling only $992,903.85, with the vast majority in a $954,119.02 payment on December 14, 2018. Thus, it appears nearly half the Fall 2018 money that Goldstein claimed was to pay taxes was not actually for this purpose. If ▮ had significant funds in his own UCB accounts at the time of the cash transport, this would further undermine Goldstein's claim about the reason for the cash.

19. The investigation continues to examine whether the cash brought into the United States by Goldstein in October 2018, in whole or part, represents gambling winnings or diverted legal income that should have been reported to the IRS, or a loan—which does not constitute income.

### Official Requests and Status

20. In or about September 2023, the United States transmitted to the government of Montenegro an official request seeking, among other things, the UCB records for the four financial accounts opened by Goldstein at that bank. A copy of the letter transmitting the request is attached as Exhibit B. On or about December 28, 2023, the United States received certain records from the Montenegro authorities, including detailed account statements showing transfers into and out of the Goldstein accounts at UCB. Included on those statements were indications that ▮ had made, or caused to be made, significant transfers into one or more of the Goldstein accounts, including from an account that was ostensibly maintained by ▮ at UCB in Montenegro.

21. Based on the above and the Declaration of Special Agent Accardi, it reasonably appears that evidence of the Target Offenses, including bank account and business records, is located in Montenegro.

22. On April 5, 2024, at the prosecutors' request, the Office of International Affairs of the United States Department of Justice ("OIA") made a supplemental official request to Montenegro for legal assistance in obtaining evidence. A copy of the letter transmitting the request is attached as Exhibit C.

23. As detailed in Exhibit A, the request seeks various evidence of the Target Offenses in the form of records relating to ▮'s accounts at UCB.

24. No final action has been taken by Montenegro on the April 5, 2024 request.

WHEREFORE, based on the above, this Court should grant the government's application for a suspension of the statute of limitations in accordance with the time limits set forth in Sections 3292(b) and (c).

Respectfully submitted,

Erek L. Barron
United States Attorney

Dated: May 6, 2024

Patrick D. Kibbe
Assistant United States Attorney
District of Maryland

Stanley J. Okula, Jr.
Senior Litigation Counsel

Hayter Whitman
Emerson Gordon-Marvin
Trial Attorneys
U.S. Department of Justice, Tax Division
950 Pennsylvania Avenue NW
Washington, D.C. 20530