# Exhibit 2B

USDC - GREENBELT
'24 MAY 9 PH 1:33

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

| | |
|---|---|
| **IN RE POSSIBLE VIOLATIONS OF** | Misc. No. 24MC234 |
| **18 U.S.C. §§ 371, 1001, 1014, 1343, 1347;** | |
| **26 U.S.C. §§ 7201, 7203, 7206, 7212; 31** | **FILED EX PARTE & UNDER SEAL** |
| **U.S.C. §§ 5314, 5322** | |

DECLARATION IN SUPPORT OF THE UNITED STATES' *EX PARTE*
APPLICATION FOR SUSPENSION OF THE RUNNING OF
THE STATUTES OF LIMITATIONS

I, Andrew Accardi, hereby state the following:

1.      I am a Special Agent at the Internal Revenue Service ("IRS") Criminal Investigation ("CI"), and I submit this declaration in support of the accompanying application pursuant to 18 U.S.C. § 3292 to suspend the running of the statute of limitations for possible offenses arising out of the grand jury investigation of Thomas Che Goldstein ("Goldstein"). The investigation to date indicates that since 2015, Goldstein has evaded assessment and/or payment of federal income tax on millions of dollars in income, repeatedly failed to report significant amounts of income on his federal tax returns, and failed to report his interest in or signature authority over foreign financial accounts, despite funneling millions of dollars through those accounts. The investigation also indicates that Goldstein has committed other frauds, including healthcare fraud arising from sham employment of his romantic partners, and materially false statements and omissions to lenders, including lending institutions and individuals.

2.      The grand jury has been investigating Goldstein and other individuals for the following possible criminal offenses: (i) conspiring to defraud the United States, in violation of 18 U.S.C. § 371; (ii) evading taxes, in violation of 26 U.S.C. § 7201; (iii) making and subscribing to

Exhibit A

false tax returns, in violation of 26 U.S.C. § 7206(1); (iv) aiding and assisting the preparation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2); (v) willfully failing to pay individual income tax and willfully failing to file income tax returns, in violation of 26 U.S.C. § 7203; (vi) corruptly endeavoring to obstruct the due administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a); (vii) willfully failing to file a report the ownership or control of, or signatory authority, or other authority over, a foreign financial account, in violation of 31 U.S.C. §§ 5314, 5322; (viii) wire fraud, in violation of 18 U.S.C. § 1343; (ix) healthcare fraud, in violation of 18 U.S.C. § 1347; (x) making false statements on a loan application, in violation of 18 U.S.C. § 1014; and (xi) making false statements to an agency of the United States, in violation of 18 U.S.C. § 1001 (collectively, "Target Offenses").

3.      The grand jury has not returned an indictment.

4.      As detailed below, I believe that evidence of the offenses under investigation is located in Montenegro.

### Introduction to the Investigation

5.      Goldstein was born in the United States and is a United States citizen. He resided in Maryland between 2016 and 2021.

6.      After graduating from college and law school, Goldstein became an attorney. He rose to national prominence in the United States arguing cases before the United States Supreme Court as a founding partner at the law firm Goldstein & Russell, P.C. ("G&R"), which he and his wife founded and owned jointly until he became its sole owner in 2017. Goldstein also founded a popular American legal blog, named SCOTUSblog, which covers U.S. Supreme Court cases. In or about 2023, Goldstein announced his retirement from G&R.

Exhibit A

7.    In addition to his work as an attorney, over the past decade Goldstein has also become a high-stakes poker player, sometimes betting or winning millions of dollars in a single poker game or series of games.

8.    Between 2016 and 2019, Goldstein earned over $30 million in gambling winnings through his participation in poker matches. Although gambling winnings must be reported in full on the income tax returns filed with the IRS by United States taxpayers, Goldstein failed to report the accurate amount of his gambling winnings on his tax returns. On other occasions between 2016 and 2020, Goldstein reported certain gambling income but offset that income by claiming false deductions, thereby understating the true amount of income tax he owed to the IRS. For example, in 2016, Goldstein earned and was paid over $26 million in gambling winnings through a series of one-on-one poker games—known as "heads-up" matches—against another California-based player. Goldstein, however, failed to report on his 2016 income tax return the full amount of those winnings. The investigation to date indicates that Goldstein underreported his 2016 gambling income by millions of dollars.

9.    Goldstein also engaged in other tax misconduct beyond falsely understating his poker income. For example, he diverted over a million of dollars from his law firm, G&R, to pay for personal expenses. Similarly, between 2018 and 2020, he placed on G&R's payroll younger women with whom he had or was seeking to have intimate personal relationships and paid them through the law firm, and caused them to be placed on the law firm's healthcare plan, even though the women performed little or no work for the law firm. Under U.S. law, Goldstein should have reported, as his own personal income, the law firm funds paid to these women and the law firm funds he used to pay his personal expenses. Goldstein, however, omitted that income from his personal income tax returns. In doing so, Goldstein used G&R to hide and/or disguise those

3                                                                                          Exhibit A

payments and thereby evade material tax liabilities for himself. In the process, Goldstein also filed, or caused the filing of, false tax returns for G&R.

### Diverted Firm Funds

10.    The investigation has revealed that Goldstein used funds taken from the bank account of his law firm, Goldstein & Russell, P.C. ("G&R"), to pay various personal debts, including debts owed to poker players.

11.    For instance, in November 2017, Goldstein caused $175,000 to be sent from the G&R bank account to the bank account of a New York-based law firm to which Goldstein owed a personal debt of approximately $475,000. That $175,000 transfer was classified as a G&R "legal fee" expense when, in reality, it was an expense attributable to Goldstein personally, as a poker-related debt. During the 2018 tax year, Goldstein satisfied part of that personal debt, totaling $125,000, by allowing the New York law firm to offset $125,000 in fees that the New York law firm owed to G&R. Based on these two events, Goldstein effectively took $300,000 in G&R funds to pay his personal gambling debts, but never reported the $300,000 to the IRS as income.

12.    Likewise, in February 2017, Goldstein's law firm, G&R, was scheduled to receive a $250,000 legal fee payment from a California-based law firm. But rather than having the fee sent to G&R—which was owed the fee—Goldstein directed the California-based firm to send the fee to his personal bank account. Goldstein thereafter used a substantial portion of those funds to pay his personal poker debts and never reported the legal fee as income on his tax returns.

### UCB Bank Accounts: Failures to Report and Transactions with █████

13.    The investigation has revealed that Goldstein has opened and controlled four bank accounts at Universal Capital Bank AD Podgorica ("UCB") in Podgorica, Montenegro. Specifically, between 2016 and 2020, Goldstein opened and controlled a domestic account and an

Exhibit A

international account in his own name, and domestic and international accounts held in the name of his law firm, G&R. (Here, "domestic" accounts refers to Montenegro-based accounts at UCB.)

14.    During those same years, 2016 to 2020, Goldstein failed to report the UCB bank accounts on his federal tax returns and failed to file Reports of Foreign Bank and Financial Accounts ("FBARs") disclosing the accounts to the Department of the Treasury.[1]

15.    On September 25, 2023, the United States transmitted to the government of Montenegro an official request seeking, among other things, the UCB records for the four financial accounts opened by Goldstein at that bank. A copy of the letter transmitting the request to the Montenegro authorities is attached as Exhibit B of the government's application.[2]

16.    On or about December 28, 2023, the United States received certain records from the Montenegro authorities in response to its request. Examination of those records revealed that ████████████████, a Malaysian national who is also a well-known poker player (and former client of Goldstein's firm), transferred over $2,000,000 to Goldstein's accounts at UCB between 2016 and 2018.

17.    Those transfers included: (1) a group of transfers from ████ to Goldstein's domestic account at UCB (Account No. ██████████████) in October 2016 totaling €926,872.70, followed by Goldstein wiring $885,000 of those funds to a U.S. bank account that he controlled; and (2) a transfer of €862,142.19 by ████ on September 25, 2018 to Goldstein's domestic account at UCB (Account No. ██████████████), followed by Goldstein engaging

---

[1] Although certain correspondence indicates that personnel from Goldstein's firm informed his outside accountants of one or more of the UCB accounts, no FBARs were ever filed for those accounts, acknowledging Goldstein's ownership and control of the accounts. Moreover, Goldstein's tax returns for certain years during which the accounts were open did not even acknowledge Goldstein's signatory authority over the accounts—which is a separate reporting requirement contained on Schedule B to IRS Form 1040.

[2] The date of the signed letter from the United States Department of Justice, Office of International Affairs to the Montenegro authorities requesting the records is September 13, 2023. This request was transmitted to the Montenegro Authorities on September 25, 2023, via the transmittal letter attached as Exhibit B to the government's application.

Exhibit A

in a series of transfers culminating in the deposit of the funds in a U.S. bank account controlled by Goldstein. The records indicate that the September 25, 2018 transfer by ███ was made from ███ personal account at UCB.

18.    Goldstein did not report this money, or any interest earned on this money, as income on his federal tax returns. Given Goldstein's unreported gambling income and his use of G&R to evade taxes, he also may have used the UCB accounts to further hide his income from the IRS and evade payment and/or assessment of U.S. taxes. Goldstein's repeated failures to properly report the UCB accounts on FBARs reinforces the suspicion that he was using the accounts to hide his income from the IRS and evade payment and/or assessment of U.S. taxes.

19.    During the Government's investigation, Goldstein made statements to an agent from the Internal Revenue Service in which he indicated, in substance and part, that he was unaware of the FBAR filing requirement. Goldstein, however, was previously involved in a United States Supreme Court case that addressed FBAR-related issues, with an amicus brief by G&R listing him as an attorney for the amici. Goldstein also claimed to the agent that transfers from ███ were for Goldstein to pay his own personal taxes.

### Goldstein's Transport of Cash into the United States

20.    The investigation has revealed that on or about October 25, 2018, Goldstein traveled from Hong Kong to the United States carrying over $950,000 in United States currency.

21.    When a United States border protection agent questioned Goldstein about the source of the funds at a Washington, D.C.-area airport, Goldstein told the agent that the cash constituted poker winnings that Goldstein had won in Macau.

22.    On October 14, 2020, when criminal law enforcement agents from the IRS subsequently questioned Goldstein about the cash he carried into the United States, he changed his

Exhibit A

story and claimed that that the funds represented a loan from ▆ for him to pay the IRS and that ▆ did not have the ability to transfer the money through UCB as he had previously. Goldstein also claimed he was unable to open an account in Macau to accept the funds via wire.

23.    The investigation also revealed that approximately one week prior to the trip, Goldstein sent a text message to another individual stating, in substance and part, that he was going Hong Kong/Macau to pick up $1 million to $2 million in cash that he was borrowing to pay taxes.

24.    On October 29, 2018, Goldstein and a personal assistant brought the cash to a Wells Fargo Bank branch in Bethesda, Maryland and deposited it into his personal bank account.

25.    The investigation continues into whether the cash brought into the United States by Goldstein in October 2018, in whole or part, represents gambling winnings or diverted legal income that should have been reported to the IRS, or a loan—which does not constitute income.

## The Supplemental Request to Montenegro

26.    Based on the information outlined above, on April 5, 2024, at the prosecutors' request, the Office of International Affairs of the United States Department of Justice ("OIA") made a supplemental official request to Montenegro for legal assistance obtaining evidence. A copy of the letter transmitting the request is attached as Exhibit C of the government's application.

27.    The Supplemental request seeks various evidence of the Target Offenses in the form of records relating to ▆ accounts at UCB. As noted above, as a result of Goldstein's relationship with ▆ Goldstein has received over $3,000,000 from ▆ between 2016 and 2018, including through the UCB accounts controlled by ▆ and Goldstein. Additionally, the investigation has revealed that income due and owing to Goldstein was sent by certain foreign officials in Malaysia to ▆ As a result of the relationship between Goldstein and ▆ records from UCB for ▆ accounts will help the U.S. authorities assess whether Goldstein conspired

Exhibit A

with ▮ to have income due and owing to Goldstein to be directed or filtered through Phua—

using ▮ UCB account(s). Records of the opening, closing, and account signatories for ▮

account(s) will establish ▮ ownership and control of the account(s) and whether Goldstein

possessed any signatory or other authority with respect to the account(s). Records of the transfers,

wires, deposits, and withdrawals from the account(s) will show where the money in the account(s)

came from and went, and whether any of it constituted income to Goldstein (rather than loans)—

further establishing the extent of Goldstein's tax evasion. In addition, records relating to the

deposits into the ▮ account(s) will show whether Goldstein utilized the account(s) to divert

additional fees from his law firm, or otherwise receive income that was not reported to the IRS.

28.     I declare under penalty of perjury that the foregoing is true and correct.


Executed on May 6, 2024.


*Andrew Accardi*
Andrew Accardi
Special Agent
IRS, Criminal Investigation

8                                                                 Exhibit A