# Exhibit 3B

**Exhibit C**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division

| | |
|---|---|
| **IN RE POSSIBLE VIOLATIONS OF**<br>**18 U.S.C. §§ 371, 1001, 1014, 1343, 1347;**<br>**26 U.S.C. §§ 7201, 7203, 7206, 7212;**<br>**31 U.S.C. §§ 5314, 5322** | **Misc. No. _____**<br><br>**FILED EX PARTE & UNDER SEAL** |

### DECLARATION IN SUPPORT OF THE GOVERNMENT'S
### *EX PARTE* APPLICATION TO EXTEND THE SUSPENSION
### OF THE STATUTES OF LIMITATIONS

I, Andrew Accardi, hereby state the following:

1.      I am a Special Agent at the Internal Revenue Service ("IRS") Criminal Investigation ("CI"), and I submit this declaration in support of the government's application pursuant to 18 U.S.C. § 3292 to extend the suspension of the statutes of limitations for possible offenses arising out of the grand jury investigation of Thomas Che Goldstein ("Goldstein"), who since 2015, has evaded payment of federal income tax on more than ten million dollars in income, repeatedly failed to report significant amounts of income on his federal tax returns, and failed to report his interest in or signature authority over foreign financial accounts, despite funneling millions of dollars through those accounts. The investigation indicates that Goldstein has committed other frauds, including healthcare fraud arising from sham employment of his romantic partners, and materially false statements and omissions to lenders, including lending institutions and individuals.

2.      The grand jury has been investigating Goldstein and other individuals for the following possible criminal offenses: (i) conspiring to defraud the United States, in violation of 18 U.S.C. § 371; (ii) evading taxes, in violation of 26 U.S.C. § 7201; (iii) making and subscribing to

Exhibit C

a false tax return, in violation of 26 U.S.C. § 7206(1); (iv) aiding and assisting the preparation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2); (v) willfully failing to pay individual income tax, in violation of 26 U.S.C. § 7203; (vi) corruptly endeavoring to obstruct the due administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a); (vii) willfully failing to file a report the ownership or control of, or signatory authority, or other authority over, a foreign financial account, in violation of 31 U.S.C. §§ 5314, 5322; (viii) committing wire fraud, in violation of 18 U.S.C. § 1343; (ix) committing healthcare fraud, in violation of 18 U.S.C. § 1347; (x) making false statements on a loan application, in violation of 18 U.S.C. § 1014; and (xi) making false statements to an agency of the United States, in violation of 18 U.S.C. § 1001 (collectively, "Target Offenses").

3.      The grand jury has not returned an indictment.

4.      As detailed in my prior declaration, which is dated May 6, 2024, and which I understand comprises part of Exhibit B to the government's application, I believe that evidence of the offenses under investigation is located in Montenegro. I incorporate by reference my May 6, 2024, declaration here.[1]

5.      On April 5, 2024, the government transmitted an official request (the "Official Request") to Montenegro for assistance in obtaining bank records of a Malaysian national, ▮▮▮ ▮▮▮ who had transferred millions of dollars to Goldstein between 2016 and 2018.

---

[1] My further review of evidence has shown that the May 6, 2024, declaration contained two inaccuracies. *First*, the declaration stated that that Goldstein did not report the 2016 or 2018 sets of UCB transfers to the IRS as income. However, further investigation has shown that of the approximately $1,000,000 that Goldstein received from the 2016 set of UCB transfers, he reported as income the $885,000 that he wired to his law firm's U.S. bank account. Nonetheless, it remains true that Goldstein failed to report as income roughly $2 million that he received from ▮▮ — either via UCB transfers or cash—during the period under investigation. *Second*, the prior declaration also referenced an amicus brief filed by Goldstein's law firm in the United States Supreme Court, but that brief was filed in the United States Court of Appeals for the Fifth Circuit.

6.      The Official Request sought records from          accounts at the Montenegro-based

Universal Capital Bank AD ("UCB") to further corroborate the extent and nature of the transferred

funds, and whether they should have been reported as income.

7.      Specifically, the Official Request asked Montenegro to cause "Universal Capital

Bank AD Podgorica ("UCB"), located in Podgorica, Montenegro, to produce complete copies of

records relating to all UCB accounts opened and controlled by                                ." The

Official Request further stated:

> Records should be for the period from the date each account was created through
> the present, and should include, but not be limited to, the following:
>
> a. signature cards;
>
> b. documents relating to the opening (and if applicable, closing) of the
> account, including any identification records of the account holder(s);
>
> c. account ledger cards;
>
> d. periodic account statements;
>
> e. records (including all checks, each copied front and back) of all items
> deposited;
>
> f. instructions relating to the receipt or transfer of any funds in or out of the
> account (by telex and any other means of communication);
>
> g. records of wire transfers, including all instructions, authorizations
> (written or memos of verbal authorizations), documentation of dates, places,
> persons receiving the funds, amounts of monies transferred in or out, and
> Fedwire, CHIPS, or SWIFT transmissions and detail;
>
> h. due diligence file relating to the account;
>
> i. records of correspondence to, from, or on behalf of the account holder;
>
> j. memoranda relating to the account, including any reports of suspicious
> activities;
>
> k. information regarding the contents of any safe deposit box opened in the
> name or for the benefit of the account holder; and,

3                              Exhibit C

l. information regarding any other accounts held at the institution in the same name.

8.     On June 17, 2024, the government received a response to the Official Request from Montenegro. The responsive production included documents related to UCB accounts controlled by ██████ including bank statements, wire transfer records, and bank account opening documents and signature cards.

9.     The response from Montenegro was materially incomplete in multiple ways.

10.     First, the responsive production indicated the existence of at least one other UCB account controlled by ██████ for which no records were produced. By way of background, the UCB records show the existence of numerous accounts controlled by ██████ When funds are transferred between the accounts, the transfers are labelled "██████████" and documented in the produced bank statements of both the UCB account sending the funds and the UCB account receiving the funds. The labelling and documentation is different from when a wire from an outside bank account transfers money into an account. However, the records show some apparent inter-account transfers labelled "██████████" in the bank statement for the receiving UCB account, but the records produced for the other accounts do not show a corresponding transfer out. For example, one of ██████ UCB accounts received €776,388.04 on May 12, 2017, from "██████████," but none of the other produced records show an account sending this money. Therefore, it appears Montenegro did not produce UCB records for the ██████ bank account that sent this money. As explained above, the Official Request asked for records related to "*all* UCB accounts opened and controlled by ██████████." (Emphasis added.) Thus, Montenegro's response appears incomplete because the Government did not receive information for an apparent UCB account controlled by ██████

4                                                          Exhibit C

11. Second, Montenegro did not produce information sufficient to determine the meaning of various codes and abbreviations that appear throughout the records that were produced. Most transactions are labelled with a numerical code, and the same handful of numerical codes are applied to many transactions, suggesting the codes identify the type of transaction or way in which money was transferred. Without knowing the meaning of the codes, however, it is unclear how specific transactions were conducted. As explained above, the Official Request asked for "*complete copies* of records relating to all UCB accounts opened and controlled by

." (Emphasis added.) The Official Request further stated that the request seeks records including, but not limited to, *inter alia*, "periodic account statements," "records . . . of all items deposited," "records of wire transfers," and "memoranda relating to the account[s]." The fact that this information may have been produced, but in codes without a corresponding key or guide, indicates that Montenegro's production was incomplete because it does not contain the complete records necessary for the government to review the information received. Indeed, any key or guide defining the numerical codes applied to transactions in          accounts constitutes a "record[]" relating to" those accounts and was sought by the Official Request.

12. Third, Montenegro produced wire records but not the underlying wire transfer request documents or invoices related to wire transfers, but the government understands, based on responsive productions from prior official requests[2] and other sources, that UCB often requires such documents. Again, the Official Request asked for "records of wire transfers, including all instructions, authorizations (written or memos of verbal authorizations), documentation of dates, places, persons receiving the funds, amounts of monies transferred in or out, and Fedwire, CHIPS, or SWIFT transmissions and detail." The fact that the Government did not receive the underlying

---

[2] This understanding is based on documents Montenegro produced in response to an earlier official request, transmitted in or about September 2023, seeking UCB records for accounts controlled by Goldstein.

instructions or authorizations, when this material is often required by UCB, indicates that Montenegro's production was incomplete.

13.     Fourth, the records produced by Montenegro showed many of the internal UCB transfers that were labelled on the memo line (for example, as loans or gifts), sometimes in Montenegrin, which suggests a UCB employee wrote the memo line. However, Montenegro did not produce any underlying documentation or communications that led to the labelling of these transfers. As explained above, the Official Request asked for "instructions relating to the receipt or transfer of any funds in or out of the account (by telex and any other means of communication)." The fact that some information was included on a memo line for some transactions in Montenegrin, without underlying documentation or communications related to those instructions, indicates that Montenegro's production was incomplete.

14.     Based on the information outlined above, the prosecutors provided to the Office of International Affairs of the United States Department of Justice ("OIA") a letter addressed to the government of Montenegro identifying the missing types of documents and requesting that Montenegro seek those from UCB and produce them. This letter was translated into Montenegrin and transmitted by OIA to Montenegro on July 19, 2024..

15.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 22, 2024.

*Andrew Accardi*

Andrew Accardi
Special Agent
IRS, Criminal Investigation

6                                                      Exhibit C