**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

**DEFENDANT THOMAS C. GOLDSTEIN'S
REPLY IN SUPPORT OF
<u>MOTION TO SUPPRESS STATEMENTS</u>**

**INTRODUCTION**

In October 2018, Defendant Thomas Goldstein borrowed money from a friend abroad as a loan to pay his taxes. He communicated this intent (as the government knows) in a text message well in advance of the trip, and upon reentering the United States appropriately declared the money to Customs and Border Patrol ("CBP"). His actions were indisputably lawful and there was no question of his eligibility to enter the country. Yet armed officers sent him into secondary screening, forced him to wait in a controlled area, took possession of his money, and (allegedly) questioned him about the source of the funds. Considering all of the circumstances, including facts that will be presented at a hearing on this matter, Mr. Goldstein was entitled to Fifth Amendment warnings prior to interrogation.

In response to Mr. Goldstein's motion to suppress the alleged statements, the government does not dispute that Mr. Goldstein was compelled to secondary screening, that he was not free to go, or that he was questioned. Instead, the government's opposition relies on proffers about events that occurred almost seven years ago to suggest there were no coercing circumstances that could amount to custody—without contemporaneous documentation of the facts that matter, and without providing sworn testimony from the relevant witnesses. The government then cherry-picks language from largely outdated and unpublished cases to argue that Mr. Goldstein was not subject to custodial interrogation. But as the government concedes, the inquiry before the Court is "a holistic one" that requires fact-specific consideration of "the circumstances surrounding the encounter with authorities." *See* ECF No. 133 ("Opp."), at 16 (quoting *United States v. FNU LNU*, 653 F.3d 144, 146 (2d Cir. 2011)). And the government does not appear to dispute that Mr. Goldstein is entitled to an evidentiary hearing on this motion. On the facts that will be presented at that hearing, Mr. Goldstein's alleged statements must be suppressed.

## **ARGUMENT**

Before turning to the substance of the Fourth Amendment issues it is important to note that the allegations related to Mr. Goldstein's alleged statements, like the Indictment generally, rest on a ridiculous theory that the jury will never accept if Mr. Goldstein's alleged statements are not suppressed. The government represents that Mr. Goldstein told CBP Officer Foy that approximately $986,000 in cash that Mr. Goldstein openly declared to customs "was gambling winnings." Opp. at 15. Based on that claim, the Indictment alleges that Mr. Goldstein "failed to report the $968,000 as income on his 2018 Form 1040" and "falsely stated that the funds brought back from Hong Kong represented a 'loan.'" ECF No. 1, ¶ 54.

But the proof that these funds were a loan is overwhelming. In particular, Mr. Goldstein communicated in detail—including in writing—about the loan *before* the trip. For example, Mr. Goldstein explained that he was going to travel to Hong Kong to "pick up" the funds "in cash I'm *borrowing* to pay taxes," then he would "bring it in and declare it and take it to the bank." PROD-USA-0175237-38 (emphasis added). And there is no doubt the government knows this—they pointed it out in one of their concurrently filed oppositions. *See* ECF No. 132, at 8. As the government also knows, Mr. Goldstein paid close to $1,000,000 in taxes soon after this trip. *See* PROD-USA-00341302. The government's seeming position that Mr. Goldstein *clairvoyantly* knew that he was going to bring back a certain amount of gambling winnings from the trip, and knew in advance to mischaracterize a specific amount as a loan, is absurd.

There is no way that the government can prove this claim beyond a reasonable doubt. The government does not dispute that in the past Mr. Goldstein has reported income from foreign sources even when there was no record of the income. *See* ECF No. 111, at 9 (discussing $500,000 in cash Mr. Goldstein received from the Malaysian government and then directed his accountants

"to record it as income even though there isn't a record of it happening"). And the government does not base its claim on any contemporaneous materials at all—including any record or report regarding Mr. Goldstein's arrival. Just as important, the government also has no evidence whatsoever that Mr. Goldstein gambled on the trip, much less that he won—*i.e.*, it has absolutely no evidence of the actual income.

Instead, this charge rests entirely on a customs agent's supposed recollection years later after the fact. The government omits that in a subsequent interview, the agent conceded that he "*does not recall* mentions of gambling." PROD-USA-0346535. The government will surely claim that Officer Foy's memory somehow improved a week later, despite repeated assertions that he had no additional memory, based on viewing prosecution notes. PROD-USA-0346540. But the agent's memory (or lack thereof) of the interaction is insufficient to meet the government's burden. This alleged "affirmative act" is one of many attempts by the government to shoehorn prejudicial allegations into the trial without competent evidentiary support. Here, it is also impermissible because the government violated *Miranda*.

I. **MR. GOLDSTEIN WAS IN CUSTODY**

The government devotes half of its opposition to factual proffers based on information the government had not previously disclosed, or representations about how CBP Officer Foy will testify. *See* Opp. at 1–15. It talks in generalities about what "typically" happens with passengers directed to secondary screening, Opp. at 5, 9, and describes what CBP officers "may" or "would" do to process such travelers, Opp. at 11. And based on what a CBP officer would or should do, combined with interviews the government belatedly conducted with Officer Foy—specifically in response to this motion—the government concludes that "standard processing at Dulles was nothing like the 'restraint on freedom of movement of the degree associated with a formal arrest.'" Opp. at 18 (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). But the question at issue is

3

not what "typically" happens at Dulles or what a CBP officer "may" or "would" do. The question is what *actually* happened to Mr. Goldstein on October 25, 2018—an objective inquiry that the Court assesses looking at "the totality of the circumstances." *United States v. Giddins*, 858 F.3d 870, 879-80 (4th Cir. 2017) (citation and internal quotation marks omitted).

During the secondary screening CBP officers confiscated nearly one million dollars from Mr. Goldstein—money that he needed to pay his taxes, and that he would have to repay to the person who loaned it to him. No reasonable person would feel free to leave while the government took possession of that sum of money. Moreover, despite his compliance with disclosure requirements and his eligibility to enter, the CBP officer had not yet admitted Mr. Goldstein into the country at the time of the secondary screening. While Mr. Goldstein was physically separated from the passengers who were granted admission, in a separate part of Dulles Airport, Mr. Goldstein was neither physically nor figuratively free to go. Assessing all of the circumstances, including evidence that will be presented at a hearing on this motion, Mr. Goldstein was subjected to a custodial interrogation.

Amidst the many pages and attachments of its factual proffer, the government makes a number of admissions (and omissions) of factors showing that Mr. Goldstein's freedom of movement was curtailed to the degree associated with formal arrest. The government concedes Mr. Goldstein was sent to secondary screening, Opp. at 14, whereas other travelers were allowed to leave after completing their customs processing, Opp. at 4. The government includes photos of the highly-controlled path that travelers in secondary screening must follow to get to the waiting room. Opp. at 7. The government acknowledges that CBP officers would have taken Mr. Goldstein to a separate room to count his money, Opp. at 11, while the officers questioned him, Opp. at 15. The secondary screening process lasted at least 41 minutes, Opp. at 19, though it is not

clear how long Mr. Goldstein was subjected to screening in total. The last stage of this, during which CBP officers allegedly elicited the statements at issue, would have occurred outside the view of any other travelers. Opp. at 11.

The government does not dispute that the officers were armed, that Mr. Goldstein was not told he was (nor was he in fact) free to leave, and that Mr. Goldstein was targeted for this additional screening and questioning despite having committed no crime. And the government does not address various other circumstances that both parties agree are relevant to the custody question. *See, e.g.*, ECF No. 119 ("Mot."), at 4 (citing *Giddins*, 858 F.3d at 879-80 (courts consider "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, . . . and whether there was any physical contact between the officer and the defendant")); Opp. at 16 (citing *FNU LNU*, 653 F.3d at 153 (inquiry includes "the interrogation's duration; its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion").[1] Because this analysis is so fact-specific, the government's citations to a supposed "avalanche of legal authority," Opp. at 24, are not persuasive, let alone decisive, in the Fourth Circuit.

First, the government relies heavily on *United States v. Zhang*, 217 F.3d 843 (4th Cir. 2000) (unpublished table decision), for conclusory statements that "referral to secondary inspection" did

---

[1] The government also highlights a text message Mr. Goldstein allegedly sent at some point during secondary screening to suggest that Mr. Goldstein thought the officers were "like 'wtf?' but very patient and helpful." Opp. at 19. But as even the government notes, the "test of whether someone is in *Miranda* custody is objective," Opp. at 16, and that text message does not describe what was happening during secondary screening, nor does it reveal how the situation would be objectively perceived by a reasonable person.

5

not amount to custody in that case, and the government has an "interest in patrolling national borders." Opp. at 19-20 (citations and internal quotation marks omitted). The opinion does not discuss what factors the court analyzed in assessing custody, and the "[r]outine questions" were truly routine—the incriminating information was the defendant's name and date of birth. *Zhang*, 217 F.3d 843, at *1. Next, the government cites another unpublished opinion, *United States v. Akinmukomi*, 369 F. App'x 522, 524 (4th Cir. 2010) (unpublished), where after describing the basic law, the Court's *entire* analysis consisted of one sentence. *See* Opp. at 21. But the facts in *Akinmukomi* were nothing like those presented here. The questioning occurred while the defendant was on a jetway, with surrounding passengers, boarding an international flight, and then in a hallway just three feet away from the jetway door. *See* Opp. at 21, Ex. 8 (6:4-17, 10:17-24). Mr. Goldstein, in contrast, was not steps away from boarding his flight and going on his way; he was indefinitely confined to secondary screening until the CBP officers informed him otherwise.

Troublingly, the government appears to suggest that this Court should apply an outdated standard in its analysis, because "'[i]nterrogation at the border'" is supposedly "'noncustodial in nature.'" Opp. at 17 (citing *United States v. Leung*, 820 F. 2d 1220, at *1 (1987) (unpublished table decision). And in relying on this antiquated, unpublished decision, the government even goes so far as to state that "[d]etention and routine questioning at the border concerning who and what is coming into the country is not governed by *Miranda* until probable cause is found." Opp. at 17 (citing to cases from 1983 and 1969) (citations and internal quotation marks omitted). But as the government should know, that is not good law. Indeed, the government repeatedly cites *FNU LNU*, which rejected the government's assertion in that case that "a general exception to *Miranda* for border questioning exists or that the officer's intent in posing the questions is relevant." 653 F.3d at 146. While "a reasonable traveler will expect some constraints" on

6

reentering the country, Opp. at 17 (citing *FNU LNU*, 653 F.3d at 153), when those constraints cross a line equivalent to custody—a fact specific analysis, as in any other situation—*Miranda* warnings are required.

## II. MR. GOLDSTEIN WAS INTERROGATED

The government's argument that the questions asked of Mr. Goldstein do not amount to interrogation are equally unconvincing. The alleged statements at issue, reported by Officer Foy months after the fact and after prompting by the prosecution team, is that Mr. Goldstein purportedly identified the money he carried as gambling winnings. According to the government, the statement was the product of "routine questions attendant to the required currency check at the border." Opp. at 26. Yet this supposedly routine question about the source of the funds is not required by the Customs Declaration form, *see* Opp. Ex. 2; nor by the financial reporting form, *see* Opp. Ex. 3; and is not included in the CBP directives for amounts in excess of $100,000, *see* Opp. Ex. 4. Tellingly, the CBP notes for this incident *do not* include any documentation of Mr. Goldstein's supposed statement—further evidence that if a question about the source of the money was asked at all, it was not pursuant to routine verification for a law-abiding traveler who appropriately reported the money.

Again, the government's citation to outdated, factually distinct cases lends no support to its argument. *See, e.g.*, Opp. at 26-27. The cases either involve officers asking for "identifying information" (not at issue here), *see, e.g.*, *United States v. Taylor*, 799 F.2d 126, 128 (4th Cir. 1986); making conclusions about "routine questions" without any analysis of the facts, *see, e.g.*, *United States v. Figueroa*, 300 F. App'x 93, 95 (2d Cir. 2008) (unpublished); or pointing to factors that may not stand the test of time, *see, e.g.*, *United States v. Ferj-Inostroza*, 129 F.3d 1261, at *1 (4th Cir. 1997) (unpublished table decision) (noting the suspects "spoke with Hispanic accents [and] did not have a good command of the English language."). Here, there was no question about

7

Mr. Goldstein's identity, citizenship, or right to enter the United States—and Mr. Goldstein does not challenge statements responding to such questions. Instead, there was no routine reason for CBP officers to question the source of Mr. Goldstein's money in order to verify that he had reported it correctly. Such questions were "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). And because the government seeks to introduce these alleged statements, without having provided *Miranda* warnings, they must be suppressed.

Because the *Miranda* inquiry is fact-specific, Mr. Goldstein is entitled to an evidentiary hearing on this motion. The cases from this District cited by the government were all decided after an evidentiary hearing, and the government's opposition does not appear to dispute this point. Additionally, as an experienced attorney, Mr. Goldstein requests that the Court grant him permission to participate personally in the hearing on this motion, as it has previously done.

### III. THE GOVERNMENT MUST PRODUCE OUTSTANDING DISCOVERY

Finally, while the government produced cherry-picked documents and information as part of its opposition, Mr. Goldstein's discovery requests are not moot unless and until the government provides outstanding documents sufficiently in advance of a hearing on this motion for Mr. Goldstein's defense to adequately prepare. Specifically, the government has not produced (1) any grand jury transcripts regarding the source of the money Mr. Goldstein declared to CBP or (2) any adverse credibility findings and/or disciplinary actions involving Officer Foy or Special Agent Acardi. Separately, the government represents that it does not have in its possession: (3) information regarding the number of Currency and Monetary Instrument Reports Officer Foy has processed; (4) the CBP Traveler Entry declaration form that Mr. Goldstein completed; or (5) audio or video recording of Mr. Goldstein's statements and/or interactions with CBP. This Court should order the government to produce outstanding documents in advance of a hearing and, to the extent

that the government does not have possession of the discoverable information, to be prepared to explain why the evidence no longer exists or has not been obtained from other arms of the prosecution team.

Respectfully submitted,

/s/ Jonathan I. Kravis
Jonathan I. Kravis (Bar No. 31556)
Stephany Reaves (Bar No. 19658)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com

Adeel Mohammadi (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*

Dated: July 2, 2025