IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal Action No. 25-cr-00006-LKG |
| ) | |
| THOMAS C. GOLDSTEIN, ) | Dated: October 14, 2025 |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION ON PRE-TRIAL MOTIONS

### I.     INTRODUCTION

Pending before the Court are the following pre-trial motions: (1) the Government's motion for a *Faretta* hearing (ECF No. 158); (2) the Defendant's motion to suppress statements (ECF No. 119); (3) the Defendant's motion to dismiss Counts 1, 5, 6 and 15 as barred by the statute of limitations (ECF No. 121); and (4) the Defendant's motion to invalidate certain orders suspending the statute of limitations (ECF No. 116). These motions are fully briefed. ECF Nos. 116, 119, 121, 133, 136, 144, 152, 158, 163 and 164. The Court held a hearing on the motions on October 7, 2025. ECF No. 187. For the reasons that follow, and stated during the October 7, 2025, hearing, the Court: (1) **DENIES-as-MOOT** the Government's motion for a *Faretta* hearing (ECF No. 158); (2) **DENIES** the Defendant's motion to suppress statements (ECF No. 119); (3) **DENIES** the Defendant's motion to dismiss Counts 1, 5, 6 and 15 as barred by the statute of limitations (ECF No. 121); and (4) **HOLDS-in-ABEYANCE** the Defendant's motion to invalidate certain orders suspending the statute of limitations (ECF No. 116), pending the evidentiary hearing on the motion.

### II.     FACTUAL AND PROCEDURAL BACKGROUND

On January 16, 2025, a federal grand jury returned a 22-Count Indictment against the Defendant, Thomas C. Goldstein, for violations of federal tax laws and for making false statements on mortgage loan applications. ECF No. 1. On January 27, 2025, the Defendant made his initial appearance and pleaded not guilty to all charges. ECF No. 4. On August 7, 2025, the Grand Jury returned a Superseding Indictment. ECF No. 159.

The Superseding Indictment

The Superseding Indictment alleges that, between 2016 and 2022, the Defendant committed various tax crimes, including evading assessment of his income taxes, aiding and assisting in the preparation of false Forms 1040 for himself and false Forms 1120S for his law firm, Goldstein & Russell, P.C. ("G&R"), and willfully failing to pay his income taxes. *See generally* ECF 159. Specifically, the Superseding Indictment alleges, among other things, that:

> Between 2016 and 2022, [the Defendant] engaged in a scheme to evade the assessment of taxes, file false tax returns, and fail to pay his tax obligations when they were due. In furtherance of that scheme:
>
> [The Defendant] used over $1.1 million of G&R funds to pay personal debts in 2016, including gambling debts owed to poker players and payments due on Note-1, causing the filing of false Forms 1120S and 1040 and the evasion of a substantial amount of his 2016 income tax;
>
> [The Defendant] falsely understated his gambling winnings by more than $3.9 million on his 2016 Form 1040, causing the filing of a false Form 1040 and the evasion of a substantial amount of his 2016 income tax;
>
> In March 2018, [the Defendant] falsely told an IRS Revenue Officer seeking to collect his unpaid taxes for 2016 that his unpaid tax liability for that year was attributable to a legal case resulting in a large payment to [the Defendant] whereas, in truth, his liability was attributable principally to gambling income;
>
> [The Defendant] diverted $250,000 in legal fees due and owing to G&R from Law Firm-1 to his Gambling Account, causing the false understatement of G&R's corporate receipts and the evasion of a substantial amount of his 2017 income tax;
>
> [The Defendant] used $175,000 of G&R funds in 2017 to pay a personal gambling-related debt that he owed to Law Firm-2, causing the filing of false Forms 1120S and 1040 and the evasion of a substantial amount of his 2017 income tax;
>
> [The Defendant] falsely omitted $200,000 in gambling winnings from his 2017 Form 1040 by directing a Nevada-based professional poker player ("Professional Gambler-1") to send winnings that he owed to [the Defendant] to Law Firm-2 in order to satisfy part of a personal gambling-related debt that [the Defendant] owed to Law Firm-2;
>
> [The Defendant] falsely stated in an October 11, 2018, email to the Accounting Firm that he had "[n]o gambling winnings" in 2017, causing the preparation and filing of a 2017 Form l040 that falsely omitted over $3.4 million in gambling winnings;

2

[The Defendant] falsely omitted from his 2017 Form l040 over $210,000 in income from a 401K distribution;

[The Defendant] used G&R assets in 2018, in the form of a $125,000 legal fee due to G&R from Law Firm-2, to satisfy a $125,000 gambling-related debt owed personally by [the Defendant] to Law Firm-2, causing the filing of false Forms 1040 and 1120S and the evasion of a substantial amount of his 2018 income tax;

[The Defendant] used tens of thousands of dollars of G&R funds in 2018 to pay health insurance premiums and full salaries to women, despite the fact that the women were not entitled to insurance coverage and performed little or no work for G&R and the payments were actually personal in nature;

[The Defendant] falsely understated substantial amounts of gambling and other income on his 2018 Form 1040, resulting in the evasion of a substantial amount of his 2018 income tax;

[The Defendant] used $170,000 of G&R funds to pay a personal gambling debt in 2019, causing the filing of false Forms 1120S and 1040 and the evasion of a substantial amount of his 2019 income tax;

[The Defendant] falsely omitted from his Forms 1040 for the 2016, 2017, and 2018 tax years certain interest income received through the Gambling Account, the records for which [the Defendant] failed to provide to the Accounting Firm;

[The Defendant] falsely stated on his 2020 and 2021 Forms 1040 that he had not received, sold, sent, exchanged, or otherwise acquired or disposed of any financial interest in any virtual currency—despite the fact that he had engaged in dozens of cryptocurrency transactions totaling over $10 million over those two tax years;

[The Defendant] falsely omitted $500,000 in legal fee income from the 2021 G&R Form 1120S, resulting in the filing of a false Form 1040 and the evasion of a substantial amount of his 2021 income tax;

[The Defendant] willfully failed to pay his 2016, 2017, 2019, 2020, and 2021 taxes when due, despite spending millions of dollars on personal expenses, including luxury purchases and payments to and on behalf of women;

[The Defendant], throughout the relevant period, systematically and repeatedly failed to provide to the Accounting Firm, or to G&R's firm managers, records of his gambling wins and losses, despite the fact that [the Defendant] at times kept records of his gambling activity, and throughout the relevant period had access to such information, including Forms 1099 and bank records;

[The Defendant] made false and misleading statements to IRS representatives during an interview on October 14, 2020;

> [The Defendant] repeatedly offered things of value, including cryptocurrency and a $10,000 bonus, to a G&R firm manager in late 2020 through early 2021, at least in part to dissuade her from cooperating with the IRS's ongoing criminal investigation; and
>
> [The Defendant] transferred at least $960,000 in personal funds into G&R's Interest on Lawyers' Trust Account ("IOLTA") in March 2021 so that he could prevent the IRS from levying the funds before using them to purchase a new home.

*Id.* at ¶ 24.

Relevant to the pending motions, the Superseding Indictment charges the Defendant with the following tax crimes for the 2016 tax year:

- Count 1: tax evasion, in violation of 26 U.S.C. § 7201. *Id.* at ¶¶ 104-105.
- Count 5: aiding and assisting the preparation of a false and fraudulent tax return (Form 1040), in violation of 26 U.S.C. § 7206(2). *Id.* at ¶ 113.
- Count 6: aiding and assisting the preparation of a false and fraudulent tax return (Form 1120S), in violation of 26 U.S.C. § 7206(2). *Id.*
- Count 15: willful failure to pay taxes, in violation of 26 U.S.C. § 7203. *Id.* at ¶ 115.

In this regard, the Superseding Indictment alleges that the Form 1120S underlying Count 6 was filed on April 15, 2017. *Id.* at ¶ 113. The Superseding Indictment also alleges that the Form 1040 underlying Counts 1, 5, and 15 was filed on October 16, 2017. *Id.*

The Government contends that, during and after committing these crimes, the Defendant spent hundreds of days travelling outside the United States. ECF No. 136 at 6. It is also undisputed that the tax-related counts in this case are subject to a six-year statute of limitations period under 26 U.S.C. § 6531. ECF No. 121 at 1; ECF No. 136 at 6.

The Tolling Orders And Agreement

During the investigation of this matter, the Government made the following official requests for evidence to Montenegro, China and Hong Kong:

- On September 25, 2023, the Government transmitted an Official Request for evidence to Montenegro ("First Official Request") seeking records related to Defendant's foreign bank accounts at Universal Capital Bank ("UCB"), located in Montenegro.
- On April 5, 2024, the Government transmitted a supplemental Official Request for evidence to Montenegro ("Second Official Request"), seeking documents related to UCB accounts owned by the person identified in the Indictment as Foreign Gambler 3 (herein, "Gambler 3"). On July 19, 2024,

4

after Montenegro produced some but not all records responsive to this Second Official Request, the Government sent a follow-up letter seeking the documents that had initially been requested on April 5 but were still missing.

- On May 21, 2024, the Government transmitted Official Requests to China and Hong Kong seeking records of Defendant's travel and transportation of fiat currency.

ECF No. 136 at 4. The Government also submitted the following four *ex parte* applications to the Court to toll the statutes of limitations under Section 3292 related to these official requests:

- On October 27, 2023, the Government applied for tolling based on the First Official Request to Montenegro (the "First Tolling Application"). ECF No. 136 at 4-5; ECF No. 136-1 (First Tolling Application). On December 28, 2023, Montenegro took final action on the First Official Request. ECF No. 136 at 5.

- On May 6, 2024, the Government applied for tolling based on the Second Official Request to Montenegro (the "Second Tolling Application"). *Id.*; ECF No. 136-4 (Second Tolling Application).

- On July 22, 2024, the Government applied for tolling based on the Second Official Request to Montenegro and its July 19, 2024, follow-up letter to Montenegro seeking documents missing from that country's initial response to the Second Official Request (the "Third Tolling Application"). ECF No. 136 at 5; ECF No. 136-7 (Third Tolling Application). To date, Montenegro has not taken final action on this Second Official Request. ECF No. 136 at 5.

- On July 31, 2024, the Government applied for tolling based on the Official Requests to Hong Kong and China (the "Fourth Tolling Application"). ECF No. 136 at 5. China and Hong Kong took final action on these requests on September 23, 2024, and January 21, 2025, respectively. *Id.*

To support its Tolling Applications, the Government also submitted the following Declarations from Internal Revenue Service Criminal Investigation Special Agent Andrew Accardi:

- On October 27, 2023, Special Agent Accardi submitted a Declaration in support of the United States' *ex parte* application for suspension of the running of the statute of limitations (the "First Accardi Declaration"). ECF No. 136-2 (First Accardi Declaration).

- On May 6, 2024, Special Agent Accardi submitted a Declaration in support of the United States' *ex parte* application for suspension of the running of the statute of limitations (the "Second Accardi Declaration). ECF No. 136-5 (Second Accardi Declaration).

- On July 22, 2024, Special Agent Accardi submitted a Declaration in support of the United States' *ex parte* application for suspension of the running of the statute of

limitations (the "Third Accardi Declaration").  ECF No. 136-8 (Third Accardi Declaration).

Based upon this information, the Court issued the following four Tolling Orders:

- On October 31, 2023, the Court ordered the limitations periods tolled starting on the date of the First Official Request (the "First Tolling Order").  ECF No. 136-3 (First Tolling Order).

- On May 7, 2024, the Court ordered the limitations periods tolled starting the date of that Second Official Request—April 5, 2024 (the "Second Tolling Order").  ECF No. 136-6 (Second Tolling Order).

- On July 23, 2024, the Court ordered the limitations periods tolled starting April 5, 2024, the day of the Second Official Request (the "Third Tolling Order").  ECF No. 136-9 (Third Tolling Order).

- On August 5, 2024, the Court ordered the limitations periods tolled starting May 21, 2024, the date on which the Official Requests to China and Hong Kong had been made (the "Fourth Tolling Order").  ECF No. 136 at 5.

Lastly, the Defendant entered into written agreements tolling the limitations period for the relevant charges for the period September 30, 2024, through January 16, 2025.  ECF No. 136 at 5.

### III.    STANDARDS OF DECISION

#### A. Motions To Dismiss-Statute Of Limitations

Before trial, a defendant may "raise a motion alleging a defect in the indictment, including its failure to comport with the applicable statute of limitations." *United States v. Magalnik*, 160 F. Supp. 3d 909, 913 (W.D. Va. 2015) (citing Fed. R. Crim. P. 12(b)(3)(B)). "The government bears the burden of proving that it began its prosecution within the statute of limitations period." *United States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997).  Courts in the Fourth Circuit have granted pretrial motions to dismiss on statute of limitations grounds where the Government is unable to meet its burden.[1]  *See, e.g., Magalnik*, 160 F. Supp. 3d at 916-17;

---

[1] The statute of limitations "normally begin[s] to run when the crime is complete." *Toussie v. United States*, 397 U.S. 112, 115 (1970) (citations omitted).  For purposes of calculating timeliness, the offenses of tax evasion by filing a false return in violation of 26 U.S.C. § 7201 and aiding in the preparation of a false return in violation of 26 U.S.C. § 7206(2) are complete "at the time the return is filed." *United States v. Habig*, 390 U.S. 222, 223 (1968) (citations omitted).  The offense of willful failure to pay taxes in violation of 26 U.S.C. § 7203 is also complete when "the failure to pay the tax becomes [willful]." *United States v. Andros*, 484 F.2d 531, 532 (9th Cir. 1973), *overruled on other grounds by United States v. Easterday*, 564 F.3d 1004 (9th Cir. 2009).

6

*United States v. Duff*, 931 F. Supp. 1306, 1314 (E.D. Va. 1996). In this regard, the United States Court of Appeals for the Fourth Circuit has held that a challenge to the statute of limitations is an affirmative defense that the indictment need not anticipate. *See United States v. Matzkin*, 14 F.3d 1014, 1017 (4th Cir. 1994); *United States v. Sisson*, 399 U.S. 267, 288 (1970) ("It has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses." (citation omitted)); *Smith v. United States*, 568 U.S. 106, 112, (2013) ("Commission of the crime within the statute-of-limitations period is not an element of the conspiracy offense. . . . The Government need not allege the time of the offense in the indictment . . . ." (emphasis removed)). And so, "[t]he statute of limitations is a defense and must be asserted on the trial by the defendant in criminal cases." *Matzkin*, 14 F.3d at 1017 (citation omitted).

The Supreme Court has also held that a court may not dismiss an indictment simply because it appears on its face that charges were not brought within the limitations period, because doing so would deprive the prosecutor of the right to "give evidence" at trial that an exception to the statute of limitations applied. *United States v. Cook*, 84 U.S. 168, 179-80 (1872). "*Cook* remains good law." *United States v. Titterington*, 374 F.3d 453, 457 (6th Cir. 2004); *see also United States v. Levine*, 249 F. Supp. 3d 732, 737-39 (S.D.N.Y. 2017) (applying *Sisson* and *Smith* to § 6531 out-of-country tolling). In addition, the Fourth Circuit has recognized that, when a motion to dismiss involves contested factual issues, the Court must defer the issue to trial, because it may not assess the sufficiency of the evidence earlier. *See United States v. Wills*, 346 F.3d 476, 488 (4th Cir. 2003) ("[C]ourts lack authority to review the sufficiency of evidence supporting an indictment . . . ."); *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) ("A district court may dismiss an indictment under Rule 12 'where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial.'" (citation omitted)); *United States v. Treacy*, 677 F. App'x 869, 874 (4th Cir. 2017) (affirming denial of statute-of-limitations dismissal motion where the defendant contested the fact of timeliness); *see also United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994) ("[A] decision on a motion should be deferred, if disposing of the motion involves deciding issues of fact that are inevitably bound up with evidence about the alleged offense itself."). And so, the Government's proffer suffices to establish the timeliness of the charges. *See United States v. Ohle*, 678 F. Supp. 2d 215, 230 (S.D.N.Y. 2010) ("The Government states that it will prove at trial that [the defendant] spent at

7

least two months outside of the country, which would result in the counts at issue being timely. [The defendant's] motion to dismiss [these] Counts . . . as time-barred is denied."); *United States v. Stein*, 429 F. Supp. 2d 633, 638 (S.D.N.Y. 2006) ("Although the indictment alleges no international travel during that time, the [G]overnment claims that it will prove at trial that [the defendant] spent several weeks per year outside of the United States."); *cf. United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011) (recognizing that a district court may look beyond the indictment to decide "a pretrial motion to dismiss" if the Government (1) "does not dispute [the district court's ability] to reach the motion" and (2) "proffers, stipulates, or otherwise does not dispute the pertinent facts").

### B. Section 6531

Pursuant to 26 U.S.C. § 6531, the statute of limitations for the tax charges in this case is six years. *See* 26 U.S.C. § 6531(2)-(5). This limitations period starts the day after the offense is completed and runs for six years. *See id.* § 6531 (requiring information be found "within [6] years next after the commission of the offense" for the relevant crimes); *see, e.g.*, *United States v. Guerro*, 694 F.2d 898, 901 (2d Cir. 1982) ("[A] statute of limitations begins to run on the day following the day on which the event giving rise to the cause of action occurred."). Section 6531 also tolls the statute of limitations clock for all time during which a defendant is "outside the United States." 26 U.S.C. § 6531 ("The time during which the person committing any of the various offenses arising under the internal revenue laws is outside the United States . . . shall not be taken as any part of the time limited by law for the commencement of such proceedings."); *see United States v. Myerson*, 368 F.2d 393, 395 (2d Cir. 1966) ("The statute is unambiguous on its face . . . . There is nothing unreasonable or arbitrary about the tolling of the statute of limitations during an offender's absence from the country."); *United States v. Marchant*, 774 F.2d 888, 892 (8th Cir. 1985) (holding Section 6531 tolled limitations period while the defendant was abroad on pleasure trip); *United States v. Edkins*, 421 F. App'x 511, 513 (6th Cir. 2010) (holding tax evasion statute of limitations tolled while defendant lived in Bahamas).

### C. *Miranda* Warnings

Generally, a person must be advised of certain rights before being subject to a "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The so-called "*Miranda* warnings" are required if the Court finds that: (1) there was an "interrogation" of the defendant,

8

and (2) the interrogation was while he was in "custody." *See Rhode Island v. Innis*, 446 U.S. 291, 297 and 300 (1980); *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011).

In this regard, the Fourth Circuit has held that "[a] person is 'in custody' for purposes of *Miranda* either if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest." *United States v. Sullivan*, 138 F.3d 126, 130 (4th Cir. 1998) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)); *see also California v. Beheler*, 463 U.S. 1121, 1125 (1983). The test of whether someone is in *Miranda* custody is objective and based upon the perspective of a reasonable person in the individual's position. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *see also Florida v. Bostick*, 501 U.S. 429, 437-38 (1991) (The reasonable person from whose perspective "custody" is defined is a reasonable innocent person.). In this regard, the *Miranda* custody inquiry "remains a holistic one in which the nature and context of the questions asked, together with the nature and degree of restraints placed on the person questioned, are relevant." *FNU LNU*, 653 F.3d at 154.

An "[i]nterrogation" includes express questioning of the suspect and its "functional equivalent"—that is, "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300-01. Statements made by law enforcement agents as they fulfill their employment responsibilities, such as routine booking questions, do not qualify as interrogation. *See United States v. Ferj-Inostroza*, 129 F.3d 1261 (Table), 1997 WL 716458, at *1 (4th Cir. Nov. 18, 1997) ("[R]outine booking questions and questions attendant to legitimate police procedures do not require *Miranda* warnings.") (citing *Pennsylvania v. Muniz*, 496 U.S. 282, 601 (1990)); *United States v. Taylor*, 799 F.2d 126, 128 (4th Cir. 1986) ("Ordinarily, the request for identifying information, however phrased, is inherently ministerial and does not violate *Miranda*."); *United States v. Figueroa*, 300 F. App'x 93, 95 (2d Cir. 2008) (statements made "while the officers were going about their routine tasks in conducting a search, securing a crime scene, and making an arrest" were not "reasonably likely to elicit an incriminating response"). And so, the Court's inquiry "necessarily involves considering the circumstances surrounding the encounter with authorities," including: "the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether

9

officers told the suspect he was free to leave or under suspicion . . . ."); *FNU LNU*, 653 F.3d at 153.

Relevant to the pending motion to dismiss, questioning at the border presents unique factors that must be considered within the context of *Miranda*. In this regard, the Fourth Circuit explained that an "[i]nterrogation at the border is considered to be noncustodial in nature." *United States v. Leung*, 820 F.2d 1220 (Table), 1987 WL 37643, at *1 (4th Cir. June 1, 1987) (citing *Carroll v. United States*, 267 U.S. 132, 254 (1925)). Given this, "a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on." *FNU LNU*, 653 F.3d at 153-54 ("That one expects both constraints and questions—and that, at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave—reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest."). And so, "[d]etention and routine questioning at the border concerning who and what is coming into the country is not governed by *Miranda* until probable cause is found." *Leung*, 1987 WL 37643, at *1 (citing *United States v. Mejia*, 720 F.2d 1378, 1381 (5th Cir. 1983) and *Chavez-Martinez v. United States*, 407 F.2d 535, 539 (9th Cir. 1969)); *see also Carroll*, 267 U.S. at 154 (holding that the rationale behind a routine customs inquiry is that "national self-protection reasonably requir[es] one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in").

### D. Hybrid Representation

Lastly, a defendant has a constitutional right to be represented by counsel, *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963), or to proceed *pro se*, *Faretta v. California*, 422 U.S. 806, 819-20 (1975), but he does not have a constitutional right to "hybrid representation." *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984). Given this, a defendant must demonstrate a "special need" to act as co-counsel. *United States v. West*, 877 F.2d 281, 293 (4th Cir. 1989); *United States v. Sacco*, 571 F.2d 791, 793 (4th Cir. 1978) (finding that even after *Faretta*, a defendant must show special need to serve as co-counsel and that the defendant's "greater familiarity with the facts" did not suffice as special need to permit him to cross-examine witnesses because the defendant "could have sufficiently informed his counsel about the facts to allow him to perform adequately"); *see, e.g.*, *United States v. Olano*, 62 F.3d 1180, 1193 (9th Cir. 1995) (affirming a district court's denial of hybrid representation where the defendant was

an attorney with specialized legal knowledge, finding the defendant could have shared his expertise with his attorney so that they could make use of it at trial).

A defendant must also first waive his right to counsel to serve as his own attorney for any portion of the proceedings before the Court. *United States v. Singleton*, 107 F.3d 1091, 1100-02 (4th Cir. 1997) ("The *Faretta* Court clearly contemplated that the right to self-representation cannot be exercised without first eliciting a valid waiver of the right to counsel from the defendant."); *see also United States v. Hunt*, 99 F.4th 161, 184 (4th Cir. 2024) (holding that a defendant must first "relinquish his right to counsel" before the Court can determine, what, if any level of assistance standby counsel may provide at trial). And so, the Fourth Circuit has held that "[a]lthough a criminal defendant has both a right to counsel and a right to represent himself, those rights are 'mutually exclusive.'" *United States v. Beckton*, 740 F.3d 303, 307 (4th Cir. 2014) (quoting *Singleton*, 107 F.3d at 1100).

Relevant here, the decision whether to preclude, or to allow hybrid representation falls within the Court's discretion. *United States v. Lawrence*, 161 F.3d 250, 253 (4th Cir. 1998). Notably, courts in the Fourth Circuit have consistently precluded hybrid representation. S*ee, e.g.*, *United States v. Ayesh*, 765 F. Supp. 2d 763, 764-65 and 768-70 (E.D. Va. 2011) (denying defendant's motion to proceed *pro se* during closing arguments after attorney represented him through most of trial); *United States v. Thompson*, No. 4:08-CR-4-FL2, 2008 WL 11456158, at *2 (E.D.N.C. Aug. 15, 2008) (denying motion for third, new counsel where defendant was effectively attempting "hybrid representation at trial"); *see also Hunt*, 99 F.4th at 184 ("[A] *pro se* defendant has no Sixth Amendment right to standby counsel or hybrid representation, and district courts have broad discretion to decide how much assistance, if any, standby counsel may provide."); *U.S. v. Miller*, 54 F.4th 219, 226 (4th Cir. 2022); *Beckton*, 740 F.3d at 307; *United States v. Ramos*, 21 F.3d 426 (Table), 1994 WL 118034, at *2 (4th Cir. Apr. 8, 1994) ("As many courts have noted, a trial judge's decision to permit 'hybrid' representation or a co-counsel structure is well within the district court's discretion, and a court is free to permit or deny such representation in accordance with the individual circumstances of the case.").

### IV.     ANALYSIS

Pending before the Court are the following pre-trial motions: (1) the Government's motion for a *Faretta* hearing (ECF No. 158); (2) the Defendant's motion to suppress statements (ECF No. 119); (3) the Defendant's motion to dismiss Counts 1, 5, 6 and 15 as barred by the

11

statute of limitations (ECF No. 121); and (4) the Defendant's motion to invalidate certain orders suspending the statute of limitations (ECF No. 116). The Court addresses and resolves these motions below.

### A. The Court Declines To Allow Hybrid Representation And Denies-as-Moot The Government's Motion For A *Faretta* Hearing

As an initial matter, the Court declines to allow the Defendant to engage in hybrid representation during the pendency of this criminal matter. It is well-established that a criminal defendant has a constitutional right to be represented by counsel, *Gideon*, 372 U.S. at 344-45, or to proceed *pro se*, *Faretta*, 422 U.S. at 819-20. But it is also well-established that a criminal defendant does not have a constitutional right to "hybrid representation." *McKaskle*, 465 U.S. at 183. And so, the Defendant in this case must demonstrate a "special need" to act as co-counsel for the Court to allow hybrid representation. *West*, 877 F.2d at 293; *Sacco*, 571 F.2d at 793 (finding that even after *Faretta*, a defendant must show special need to serve as co-counsel and that the defendant's "greater familiarity with the facts" did not suffice as special need to permit him to cross-examine witnesses because the defendant "could have sufficiently informed his counsel about the facts to allow him to perform adequately"); *see, e.g.*, *Olano*, 62 F.3d at 1193 (affirming a district court's denial of hybrid representation where the defendant was an attorney with specialized legal knowledge, finding the defendant could have shared his expertise with his attorney so that they could make use of it at trial).

In this regard, this Court has discretion regarding whether to preclude, or to allow hybrid representation. Notably, courts in the Fourth Circuit have consistently declined to allow such hybrid representation. *Lawrence*, 161 F.3d at 253; *see, e.g.*, *Ayesh*, 765 F. Supp. 2d at 764-65 and 768-70 (denying defendant's motion to proceed *pro se* during closing arguments after attorney represented him through most of trial); *Thompson*, 2008 WL 11456158, at *2 (denying motion for third, new counsel where defendant was effectively attempting "hybrid representation at trial"); *see also Hunt*, 99 F.4th at 184 ("[A] *pro se* defendant has no Sixth Amendment right to standby counsel or hybrid representation, and district courts have broad discretion to decide how much assistance, if any, standby counsel may provide."); *Miller*, 54 F.4th at 226; *Beckton*, 740 F.3d at 307; *Ramos*, 1994 WL 118034, at *2 ("As many courts have noted, a trial judge's decision to permit 'hybrid' representation or a co-counsel structure is well within the district court's discretion, and a court is free to permit or deny such representation in accordance with the individual circumstances of the case.").

In this case, the Defendant, who is an experienced lawyer, requests that the Court allow him to participate personally in the legal arguments to be presented during the hearings on the parties' pre-trial motions. ECF No. 144 at 5-6; ECF No. 149 at 15; ECF No. 150 at 3; ECF No. 151 at 5; ECF No. 152 at 9; ECF No. 153 at 5; ECF No. 154 at 6. In this regard, the Defendant states that he is not seeking to participate as counsel in the trial, but solely for the oral arguments on the parties' pre-trial motions. ECF No. 163 at 6. The Defendant also states that he was "deeply involved in preparing" these motions. *Id.* at 3. And so, the Defendant requests that he be permitted to present oral arguments to the Court on the parties' pending pre-trial motions. ECF No. 144 at 5-6; ECF No. 149 at 15; ECF No. 150 at 3; ECF No. 151 at 5; ECF No. 152 at 9; ECF No. 153 at 5; ECF No. 154 at 6.

The Court concludes that the Defendant has not shown that hybrid representation is warranted in this case for several reasons. First, as discussed above, the Defendant does not have a constitutional right to hybrid representation. *McKaskle*, 465 U.S. at 183. And so, such a right will not automatically be granted by this Court here.

Second, there is no basis for allowing hybrid representation in this case. The Defendant acknowledges that he is represented by attorneys of his own choosing and that there is no tension between the Defendant and his retained counsel. *See* ECF No. 163 at 7. In fact, the Defendant represents to the Court that he and his counsel are in agreement with regards to the legal positions and litigation strategy for this case. *Id.* Given this, the facts of this case are distinguishable from the three out-of-circuit cases cited by the Defendant to support allowing hybrid representation. *See id.* at 6-7; *see also United States v. Porter*, No. 19-20115, 2022 WL 1547751, at *5-6 (E.D. Mich. May 16, 2022) (allowing hybrid representation for the limited purpose of considering the defendant's *pro se* motions where counsel declined to file them); *United States v. Middleton*, No. 15-40018-02-DDC, 2020 WL 2473692, at *1 n.2 (D. Kan. May 13, 2020) (permitting hybrid representation for the limited purpose of considering and rejecting the defendant's *pro se* motion); *United States v. Stile*, No. 1:11-cr-00185-JAW, 2013 WL 6389592, at *1 (D. Me. Dec. 6, 2013) (permitting hybrid representation for the limited purpose of considering the defendant's *pro se* motions in order to resolve disagreements between defendant and counsel).

The Defendant also has not articulated any "special need" to justify hybrid representation in this case. The Defendant argues that there is a special need for hybrid representation, because

he was "principally responsible" for the motions that he wishes to argue before the Court. ECF No. 163 at 7. But the Defendant's acknowledged experienced and skill in presenting oral arguments on legal questions does not constitute a special need to warrant hybrid representation in this case.

The Court is also concerned that allowing the Defendant to represent himself along with his attorney, for the purpose of oral arguments, could muddy the factual record in this case and even create factual issues. Such hybrid representation could also create significant problems for appellate courts in analyzing the issue of any waiver of counsel. Given these concerns, the Court declines to allow the Defendant to present oral arguments during the pre-trial motions hearings in this case. For this reason, the Court also DENIES-as-MOOT the Government's motion for a *Faretta* hearing (ECF No. 158).

### B. The Court Denies The Defendant's Motion To Suppress Statements

Turning to the Defendant's motion to suppress certain statements made when he entered the United States on October 25, 2018, the Court also DENIES this motion for the reasons stated below.

The Defendant has moved to suppress certain statements that he allegedly made to Customs and Border Protection ("CBP") officers on October 25, 2018, after he entered the United States *via* Dulles International Airport, upon the grounds that these statements were taken in violation of *Miranda* and his Fifth Amendment rights. ECF No. 119. Specifically, the Defendant argues that the Court should suppress these statements, because he was subjected to a custodial interrogation during the customs screening process and he was not given *Miranda* warning before making the statements to the CBP officers. *Id.* at 6; *see also* ECF No. 152 at 3-8.

The Government counters that the subject statements should not be suppressed, because the Defendant was not subjected to a custodial interrogation during the customs screening process. ECF No. 133. And so, the Government requests that the Court deny the Defendant's motion to suppress. *Id.* at 30.

Because the evidence shows that the Defendant was not in custody during his October 25, 2018, customs screening process, the Court declines to suppress the Defendant's statements for several reasons.

As an initial matter, the evidence before the Court shows that the Defendant was not in custody for *Miranda* purposes during his primary screening on October 25, 2018. The Fourth

Circuit has held that "[a] person is 'in custody' for purposes of *Miranda* either if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest." *Sullivan*, 138 F.3d at 130 (citing *Stansbury*, 511 U.S. at 322); *see also Beheler*, 463 U.S. at 1125. The test of whether someone is in *Miranda* custody is objective and based upon the perspective of a reasonable person in the individual's position. *See Berkemer*, 468 U.S. at 442; *see also Bostick*, 501 U.S. at 437-38 (The reasonable person from whose perspective "custody" is defined is a reasonable innocent person.). Given this, the Court's *Miranda* custody inquiry in this case "remains a holistic one in which the nature and context of the questions asked, together with the nature and degree of restraints placed on the person questioned, are relevant." *FNU LNU*, 653 F.3d at 154.

In this case, the nature and context of the questions asked of the Defendant, together with the nature and degree of restraints placed on the Defendant, do not show that he was in custody during his primary screening for international travelers after he deplaned. In this regard, it is undisputed that the Defendant participated in primary customs screening for international travelers at Dulles International Airport after he deplaned from a flight from Hong Kong. ECF No. 119 at 1; ECF No. 133 at 1. The evidence before the Court shows that the primary screening at Dulles airport is performed in a large room where travelers form lines corresponding to their traveler status. ECF No. 133 at 2-4.

The evidence also shows that, as a part of the primary screening process, the Defendant passed through a CBP checkpoint, where a CBP officer reviewed his entry declaration and asked him routine screening questions. *Id.* at 4. Relevant here, the evidence shows that, at 10:09 p.m., the Defendant participated in the primary screening process and that he spoke with a CBP officer who referred him to secondary screening to complete the FinCEN Form 105, because the Defendant declared that he was traveling with over $10,000 in U.S. Currency. *Id.* at 14. It is undisputed, that the Defendant was not restrained and that he was free to move around the primary screening area during the primary screening. *See* ECF No. 133 at 2-5 and 14; ECF No. 152 at 3-7. In fact, the Defendant acknowledged during the hearing on this motion that he was not in custody during primary screening process.

Given this, the Court is satisfied that the Defendant's temporary queue and routine questioning in a large room during primary screening, did not constitute the restriction of movement or questioning typically attendant to an arrest. And so, the circumstances surrounding

15

the Defendant's primary screening process for international travelers did not constitute custody for *Miranda* purposes. *See Leung*, 1987 WL 37643, at *1 ("Interrogation at the border is considered to be noncustodial in nature." (citing *Carroll*, 267 U.S. at 154)).

The totality of the circumstances surrounding the Defendant's secondary screening at Dulles Airport also makes clear that he was not in custody during this process. In this regard, the evidence shows that, at 10:09 p.m., the Defendant was automatically referred to secondary screening for a "FINCEN" check, because he declared more than $10,000 in U.S. Currency. ECF No. 133 at 14. The evidence before the Court also shows that the secondary screening waiting area at Dulles International Airport consists of approximately 100 seats, a restroom and a water fountain. *Id.* at 7-10.

It is undisputed that the Defendant and other travelers were free to sit, stand, walk around, use their phones or devices, and to use the restroom, during the secondary screening. *See id.* It is also undisputed that, once it was his turn, the Defendant approached one of the designated desks for secondary screeding to speak with a CBP officer about the reason for his referral to secondary screening. *Id.* at 9.

In this regard, the evidence also shows that, at 10:37 p.m., CBP Officer Karime Foy began the Defendant's secondary screening. *Id.* at 14. Given this, the Defendant waited in the secondary screening room waiting area for less than 28 minutes before being called for his secondary screening. *See id.*

The Court is satisfied that the Defendant was not in custody during the period of time that he waited in the secondary screening waiting area to commence secondary screening. As discussed above, the Defendant was free to sit, walk around the room, use the restroom, and drink at the water fountain, during this portion of the secondary screening. *See id.* at 7-10. And so, again, the Court concludes that there was no requirement for the CBP officer to give a *Miranda* warning during this part of the Defendant's screening process.

The Court is also satisfied that no *Miranda* warning was required when the Defendant met with CBP officers in the money counting room (the "Money Counting Room") during the later portion of his secondary screening. In this regard, the evidence shows that CBP Officer Foy and another CBP Officer began counting the money that the Defendant declared in the Money Counting Room, in accordance with CBP's policy for international travelers carrying more than $100,000 in cash. *Id.* at 15. The evidence also shows that the Defendant was present in the

16

Money Counting Room while the CBP Officers counted his money. *Id.* It is undisputed that the CBP Officers were armed, but not displaying their weapons at this time. *See id.* at 15 and 18-19; *see also* ECF No. 152 at 5.

The evidence before the Court also shows that the Money Counting Room is located just beyond the screening desk and the secondary screening waiting area, and that this room has an open door. ECF No. 133 at 11. The evidence also shows that, when the adjoining hallway is excluded, the Money Counting Room measures approximately 14 by 16 feet. *Id.*

During the evidentiary hearing on the Defendant's motion to suppress, Officer Foy testified that he asked the Defendant questions related where he got the money and what kind of work he did, after he finished counting the money. *See id.* at 15. The evidence also shows that, thereafter, the Defendant completed a FinCEN Form 105 and he exited the secondary screening area. *Id.* at 18. And so, the evidence makes clear that the Defendant's secondary screening ended at 10:50 p.m., after the passage of approximately 13 minutes. *Id.* at 18-19.

Given this evidence, the totality of the circumstances in this case makes clear that the Defendant was also not custody during the portion of his secondary screening that occurred in the Money Counting Room. Notably, the Defendant was neither handcuffed, nor restrained in any way, while he was in the Money Counting Room. The CBP Officers also did not tell the Defendant that he could not leave the Money Counting Room and it is notable that the Money Counting Room had an open door. *See id.* at 14-15 and 18. In addition, while they were armed, the CBP Officers did not draw or display their weapons while the Defendant was in the Money Counting Room. *See id.*

The Court is satisfied that, under these circumstances, a reasonable person would not believe that their freedom of movement was restricted to a degree associated with an arrest. *Leung*, 1987 WL 37643, at *1 (holding that an "[i]nterrogation at the border is considered to be noncustodial in nature"); *see also FNU LNU*, 653 F.3d at 153-54 ("That one expects both constraints and questions—and that, at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave—reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest."). And so, the Court

17

concludes that the Defendant was also not in custody during the time he was in the Money Counting Room. *See Sullivan*, 138 F.3d at 130.[2]

For this reason, the CBP Officers had no obligation to give the Defendant a *Miranda* warning. And so, the Court DENIES the Defendant's motion to suppress (ECF No. 119).[3]

### C. The Court Denies The Defendant's Motion To Dismiss Counts 1, 5, 6 and 15

As a final matter, the Defendant has also not shown that dismissal of Counts 1, 5, 6 and 15 of the Superseding Indictment as time-barred is appropriate in this case. It is well-established that the statute of limitations is an affirmative defense that must be raised by the Defendant at trial. *See Matzkin*, 14 F.3d at 1017 ("The statute of limitations is a defense and must be asserted on the trial by the defendant in criminal cases." (citation omitted)); *Sisson*, 399 U.S. at 288 ("It has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses."). The Fourth Circuit has also recognized that, when a motion to dismiss involves contested factual issues, which is the case here, the Court also must defer the issue to trial. *See, e.g., Wills*, 346 F.3d at 488 ("[C]ourts lack authority to review the sufficiency of evidence supporting an indictment."); *Engle*, 676 F.3d at 415 ("A district court may dismiss an indictment under Rule 12 'where there is an infirmity of law in the prosecution; a court may not dismiss an

---

[2] Because the Court concludes that the Defendant was not in custody, the Court does not address whether the Defendant was subjected to an interrogation.

[3] The Defendant has also not shown that he is entitled to conduct discovery before the Court resolves his motion to suppress. The Defendant requests that the Government produce the CBP Traveler Entry declaration form that he completed and any video or audio recording of his statements and/or interactions with the CBP Officers on October 25, 2018. ECF No. 119 at 7. But, the Government represents to the Court that it has inquired into whether this evidence exists and that it has not obtained any such records. ECF No. 133 at 28. The Defendant also seeks certain CBP policies and procedures, photographs of the inspection area at Dulles and information regarding his customs processing. ECF No. 119 at 7. The Court understands that the Government has provided the Defendant with photographs of the primary and secondary screening areas at Dulles International Airport, as well as with the relevant CBP policies and procedures. ECF No. 133 at 28. These photographs were also entered into evidence at the October 7, 2025, hearing. In addition, the Defendant seeks access to certain Grand Jury transcripts regarding the source of the money that he declared to the CBP Officers. ECF No. 119 at 7. But the Defendant has not shown a particularized need for this information as it relates to his motion to suppress. Lastly, the Defendant seeks any additional information regarding the number of Currency and Monetary Instrument Reports that Officer Foy has processed. *Id.* The Government represents to the Court that it does not have any such information. ECF No. 133 at 28. More importantly, the Defendant was afforded the opportunity to cross-examine Officer Foy on these matters during the October 7, 2025, suppression hearing.

indictment, however, on a determination of facts that should have been developed at trial.'" (citation omitted)). And so, courts have declined to dismiss charges within the context of Section 6531 tolling when the Government proffers that it will prove at trial that a defendant spent sufficient time outside of the country, which would result in the counts at issue being timely. *See Ohle*, 678 F. Supp. 2d at 230 ("The Government states that it will prove at trial that [the defendant] spent at least two months outside of the country, which would result in the counts at issue being timely. [The defendant's] motion to dismiss [these] Counts . . . as time-barred is denied."); *Stein*, 429 F. Supp. 2d at 638 ("Although the indictment alleges no international travel during that time, the government claims that it will prove at trial that [defendant] spent several weeks per year outside of the United States.").

Applying these standards here, the Defendant has not shown that the Court should dismiss Counts 1, 5, 6 and 15 of the Superseding Indictment upon the grounds that the limitations period has expired. In the Superseding Indictment, the Government charges the Defendant with the following tax crimes for the 2016 tax year:

- Count 1: tax evasion in violation of 26 U.S.C. § 7201. ECF No. 159 at ¶ 105.
- Count 5: aiding and assisting the preparation of a false and fraudulent tax return (Form 1040) in violation of 26 U.S.C. § 7206(2). *Id.* at ¶ 113.
- Count 6: aiding and assisting the preparation of a false and fraudulent tax return (Form 1120S) in violation of 26 U.S.C. § 7206(2). *Id.*
- Count 15: willful failure to pay taxes in violation of 26 U.S.C. § 7203. *Id.* at ¶ 115.

In this regard, the Superseding Indictment alleges that the Form 1120S underlying Count 6 was filed on April 15, 2017. *Id.* at ¶ 113. The Superseding Indictment also alleges that the Form 1040 underlying Counts 1, 5 and 15 was filed on October 16, 2017. *Id.*

There is no dispute in this case that a six-year statute of limitations applies to these Counts. *See* 26 U.S.C. § 6531; *see also* ECF No. 121 at 1; ECF No. 136 at 6. There is also no dispute that the offenses charged in the subject Counts accrued more than six years before the Indictment issued on January 16, 2025. ECF No. 121 at 1; ECF No. 136 at 4-6. And so, the Counts are time-barred, unless the applicable six-year statute of limitations period has been tolled.

In this regard, it is undisputed that the Government obtained several Tolling Orders from the Court to toll the limitations period during the periods: (1) October 27, 2023, to December 28,

2023, for the First Official Request to Montenegro; (2) April 5, 2024, to present for the Second Official Request to Montenegro; (3) May 21, 2024, to September 23, 2024, for the official request to Hong Kong; and (4) May 21, 2024, to January 21, 2025, for the official request to China. *See* ECF No. 136 at 4-5. The Government also contends that the limitations period was tolled, because the Defendant spent hundreds of days travelling outside the United States. ECF No. 136. And so, the Government maintains that the subject Counts are not time-barred, because the limitations period was tolled by the Court's Tolling Orders, the Defendant's time abroad and/or a combination thereof. *See id.* at 8-13.

As the Government correctly observes, the question of whether the statute of limitations was actually tolled, due to the Defendant's time abroad, is a factual question that must be resolved by the jury. *See id.* at 11-12 and 14-15. Given this, the Court agrees with the Government that it would be improper for the Court to dismiss Counts 1, 5, 6 and 15 of the Superseding Indictment, upon the grounds of being barred by the statute of limitations, at this stage of the case. And so, the Court DENIES the Defendant's motion to dismiss these Counts as barred by the statute of limitations (ECF No. 121).[4]

## V. CONCLUSION

For the foregoing reasons, the Court:

(1) **DENIES-as-MOOT** the Government's motion for a *Faretta* hearing (ECF No. 158);

(2) **DENIES** the Defendant's motion to suppress statements (ECF No. 119);

(3) **DENIES** the Defendant's motion to dismiss Counts 1, 5, 6 and 15 as barred by the statute of limitations (ECF No. 121); and

(4) **HOLDS-in-ABEYANCE** the Defendant's motion to invalidate certain orders suspending the statute of limitations (ECF No. 116), pending the evidentiary hearing on the motion.

**IT IS SO ORDERED.**

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge

---

[4] For the reasons stated during the October 7, 2025, motions hearing, the Court HOLDS-in-ABEYANCE the Defendant's motion to invalidate certain orders suspending the statute of limitations (ECF No. 116), pending the evidentiary hearing on that motion.