**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| v. ) | Criminal Action No. 25-cr-00006-LKG |
| ) | |
| THOMAS C. GOLDSTEIN, ) | Dated:  November 18, 2025 |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION ON PRE-TRIAL MOTIONS

## I.    INTRODUCTION

Pending before the Court are the following pre-trial motions: (1) the Defendant's motion to invalidate certain orders suspending the statute of limitations (ECF No. 116); (2) the Defendant's motion to dismiss for failing to allege affirmative acts (ECF No. 120); (3) the Defendant's motion to dismiss allegations concerning employees (ECF No. 122); (4) the Defendant's motion for a bill of particulars (ECF No. 125); (5) the Defendant's motion to dismiss Counts 15 through 19 of the Superseding Indictment (ECF No. 126); (6) the Defendant's motion to compel disclosure of *Brady* and Grand Jury material (ECF No. 127); and (7) the Defendant's motion to permit him to sell the Hawthorne Property to fund his defense (ECF No. 166).  These motions are fully briefed.  ECF Nos. 116, 120, 122, 125, 126, 127, 130, 131, 132, 134, 135, 136, 149, 150, 151, 153, 154, 166, 175 and 179.  The Court held a hearing on the motions on November 6, 2025.  ECF No. 214.  For the reasons that follow, and those stated during the November 6, 2025, hearing, the Court: (1) **DENIES** the Defendant's motion to invalidate certain orders suspending the statute of limitations (ECF No. 116); (2) **DENIES** the Defendant's motion to dismiss allegations for failure to allege affirmative acts (ECF No. 120); (3) **HOLDS-in-ABEYANCE** the Defendant's motion to dismiss allegations concerning employees (ECF No. 122); (4) **DENIES** the Defendant's motion for a bill of particulars (ECF No. 125); (5) **DENIES** the Defendant's motion to dismiss Counts 15 through 19 of the Superseding Indictment (ECF No. 126); (6) **DENIES** the Defendant's motion to compel disclosure of *Brady* and Grand Jury material (ECF No. 127) **WITHOUT PREJUDICE**; and (7) **DENIES** the Defendant's motion to permit him to sell the Hawthorne Property to fund his defense (ECF No. 166).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On January 16, 2025, a federal grand jury returned a 22-Count Indictment against the Defendant, Thomas C. Goldstein, for violations of federal tax laws and for making false statements on mortgage loan applications.  ECF No. 1.  On January 27, 2025, the Defendant made his initial appearance and pled not guilty to all charges.  ECF No. 4.  On August 7, 2025, the Grand Jury returned a Superseding Indictment.  ECF No. 159.  On October 7, 2025, the Defendant pled not guilty to the charges in the Superseding Indictment.  ECF No. 185.

The Superseding Indictment

The Superseding Indictment alleges that, between 2016 and 2022, the Defendant committed various tax crimes, including evading assessment of his income taxes, aiding and assisting in the preparation of false Forms 1040 for himself and false Forms 1120S for his law firm, Goldstein & Russell, P.C. ("G&R"), and willfully failing to pay his income taxes.  *See generally* ECF No. 159.  Specifically, the Superseding Indictment alleges, among other things, that:

> Between 2016 and 2022, [the Defendant] engaged in a scheme to evade the assessment of taxes, file false tax returns, and fail to pay his tax obligations when they were due. In furtherance of that scheme:
>
> [The Defendant] used over $1.1 million of G&R funds to pay personal debts in 2016, including gambling debts owed to poker players and payments due on Note-1, causing the filing of false Forms 1120S and 1040 and the evasion of a substantial amount of his 2016 income tax;
>
> [The Defendant] falsely understated his gambling winnings by more than $3.9 million on his 2016 Form 1040, causing the filing of a false Form 1040 and the evasion of a substantial amount of his 2016 income tax;
>
> In March 2018, [the Defendant] falsely told an IRS Revenue Officer seeking to collect his unpaid taxes for 2016 that his unpaid tax liability for that year was attributable to a legal case resulting in a large payment to [the Defendant] whereas, in truth, his liability was attributable principally to gambling income;
>
> [The Defendant] diverted $250,000 in legal fees due and owing to G&R from Law Firm-1 to his Gambling Account, causing the false understatement of G&R's corporate receipts and the evasion of a substantial amount of his 2017 income tax;

[The Defendant] used $175,000 of G&R funds in 2017 to pay a personal gambling-related debt that he owed to Law Firm-2, causing the filing of false Forms 1120S and 1040 and the evasion of a substantial amount of his 2017 income tax;

[The Defendant] falsely omitted $200,000 in gambling winnings from his 2017 Form 1040 by directing a Nevada-based professional poker player ("Professional Gambler-1") to send winnings that he owed to [the Defendant] to Law Firm-2 in order to satisfy part of a personal gambling-related debt that [the Defendant] owed to Law Firm-2;

[The Defendant] falsely stated in an October 11, 2018, email to the Accounting Firm that he had "[n]o gambling winnings" in 2017, causing the preparation and filing of a 2017 Form l040 that falsely omitted over $3.4 million in gambling winnings;

[The Defendant] falsely omitted from his 2017 Form l040 over $210,000 in income from a 401K distribution;

[The Defendant] used G&R assets in 2018, in the form of a $125,000 legal fee due to G&R from Law Firm-2, to satisfy a $125,000 gambling-related debt owed personally by [the Defendant] to Law Firm-2, causing the filing of false Forms 1040 and 1120S and the evasion of a substantial amount of his 2018 income tax;

[The Defendant] used tens of thousands of dollars of G&R funds in 2018 to pay health insurance premiums and full salaries to women, despite the fact that the women were not entitled to insurance coverage and performed little or no work for G&R and the payments were actually personal in nature;

[The Defendant] falsely understated substantial amounts of gambling and other income on his 2018 Form 1040, resulting in the evasion of a substantial amount of his 2018 income tax;

[The Defendant] used $170,000 of G&R funds to pay a personal gambling debt in 2019, causing the filing of false Forms 1120S and 1040 and the evasion of a substantial amount of his 2019 income tax;

[The Defendant] falsely omitted from his Forms 1040 for the 2016, 2017, and 2018 tax years certain interest income received through the Gambling Account, the records for which [the Defendant] failed to provide to the Accounting Firm;

[The Defendant] falsely stated on his 2020 and 2021 Forms 1040 that he had not received, sold, sent, exchanged, or otherwise acquired or disposed of any financial interest in any virtual currency—despite the fact that he had engaged in dozens of

cryptocurrency transactions totaling over $10 million over those two tax years;

[The Defendant] falsely omitted $500,000 in legal fee income from the 2021 G&R Form 1120S, resulting in the filing of a false Form 1040 and the evasion of a substantial amount of his 2021 income tax;

[The Defendant] willfully failed to pay his 2016, 2017, 2019, 2020, and 2021 taxes when due, despite spending millions of dollars on personal expenses, including luxury purchases and payments to and on behalf of women;

[The Defendant], throughout the relevant period, systematically and repeatedly failed to provide to the Accounting Firm, or to G&R's firm managers, records of his gambling wins and losses, despite the fact that [the Defendant] at times kept records of his gambling activity, and throughout the relevant period had access to such information, including Forms 1099 and bank records;

[The Defendant] made false and misleading statements to IRS representatives during an interview on October 14, 2020;

[The Defendant] repeatedly offered things of value, including cryptocurrency and a $10,000 bonus, to a G&R firm manager in late 2020 through early 2021, at least in part to dissuade her from cooperating with the IRS's ongoing criminal investigation; and

[The Defendant] transferred at least $960,000 in personal funds into G&R's Interest on Lawyers' Trust Account ("IOLTA") in March 2021 so that he could prevent the IRS from levying the funds before using them to purchase a new home.

*Id.* at ¶ 24.

<u>The Alleged Affirmative Acts</u>

The Superseding Indictment also describes two categories of "affirmative acts" by the Defendant that the Government alleges constitute tax evasion: (1) the Defendant mischaracterized transactions and (2) the Defendant redirected certain payments owed to G&R. *See id.* at ¶ 105. Specifically, the Superseding Indictment alleges that the Defendant mischaracterized the following transactions:

When causing those four gambling debt payments and two promissory note payments totaling $1,171,600 to be sent from the G&R bank account, [the Defendant] failed to inform the G&R firm manager that the transfers were to satisfy his personal debts rather than those of G&R, resulting in those transfers being falsely classified as "Legal Fee[]" expenses of G&R. Moreover, despite

having been provided by the firm manager in late December 2016 with a written, year-end summary spreadsheet of transfers from the G&R bank account that classified the six payments as "Legal Fees" paid by G&R, [the Defendant] did not inform the firm manager or the Accounting Firm that those six payments were to satisfy [the Defendant's] personal debts. Consequently, [the Defendant] caused the $1,171,600 in payments to be falsely classified and deducted, for tax reporting purposes, as G&R expenses. . . .

To partially satisfy his $500,000 personal debt to Law Firm-2, [the Defendant] caused the G&R firm manager to send, via wire transfer from a G&R business bank account, $175,000 of G&R's funds to Law Firm-2 on or about November 7, 2017. When directing the $175,000 wire be sent, [the Defendant] did not disclose to the G&R firm manager that this transfer-which was between two law firms-was to satisfy [the Defendant's] personal gambling-related debt and not a legal fee or other G&R business expense. To further satisfy part of his debt, on or about November 14, 2017, [the Defendant] caused Professional Gambler-1 to send to Law Firm-2 $200,000 that he owed to [the Defendant] personally as a result of a poker match that [the Defendant] had won. By the end of 2017, [the Defendant] still owed $125,000 to Law Firm-2 in connection with the gambling "investment." . . .

During 2019, [the Defendant] was involved in a poker match involving a California Movie Producer ("the Producer"). In that match, [the Defendant] lost $170,000 to the Producer. To satisfy that poker debt, [the Defendant] caused a $170,000 wire transfer to be sent from the G&R bank account to the Producer.

*Id.* at ¶¶ 32, 47 and 63. The Superseding Indictment also alleges that the Defendant "divert[ed]" G&R fees either "to his personal bank account," or "to a third party to pay personal gambling debts," in the following manner:

[The Defendant] used G&R assets in 2018, in the form of a $125,000 legal fee due to G&R from Law Firm-2, to satisfy a $125,000 gambling-related debt owed personally by [the Defendant] to Law Firm-2, causing the filing of false Forms 1040 and 1120S and the evasion of a substantial amount of his 2018 income tax . . .

In early February 2017, [the Defendant] engaged in a scheme to divert to his Gambling Account a $250,000 legal fee owed by Law Firm-1 to G&R in connection with G&R's Supreme Court briefing in a securities class-action case. . . .

Pursuant to his agreement with [the Defendant], the Actor owed a fee of $500,000 to [the Defendant] and G&R. But rather than directing the Actor to transfer this fee income to the G&R bank

account or otherwise to him, [the Defendant] directed the Actor to transfer the fee to California Businessman-3 to pay down part of the multi-million poker debt still owed to him by [the Defendant], as memorialized in Note-2.

*Id.* at ¶¶ 24, 42 and 81.

In addition, the Superseding Indictment alleges that the Defendant "received taxable income . . . on which taxable income there was owing to the United States of America an income tax . . . which required [the Defendant] to pay, on or before the payment due dates set forth below, that income tax to the Internal Revenue Service." *Id.* at ¶ 115. The Superseding Indictment also alleges that "[w]ell-knowing the foregoing, on or about the tax payment due dates set forth below," the Defendant "did willfully fail to pay the income tax due," as follows:

| COUNT | TAX YEAR | TAXABLE INCOME (Reported on Tax Return) | APPROXIMATE TAX DUE | PAYMENT DUE DATE |
|-------|----------|------------------------------------------|---------------------|------------------|
| 15 | 2016 | $4,350,019 | $1,690,527 | 04/18/2017 |
| 16 | 2017 | $2,707,866 | $1,037,595 | 04/17/2018 |
| 17 | 2019 | $2,004,734 | $512,522 | 07/15/2020 |
| 18 | 2020 | $2,941,485 | $947,137 | 05/17/2021 |
| 19 | 2021 | $3,675,863 | $1,139,488 | 04/18/2022 |

*Id.*

<u>The Tolling Orders And Agreement</u>

During the investigation of this matter, the Government made the following official requests for evidence to Montenegro, China and Hong Kong:

- On September 25, 2023, the Government transmitted an Official Request for evidence to Montenegro ("First Official Request") seeking records related to Defendant's foreign bank accounts at Universal Capital Bank ("UCB"), located in Montenegro.

- On April 5, 2024, the Government transmitted a supplemental Official Request for evidence to Montenegro ("Second Official Request"), seeking documents related to UCB accounts owned by the person identified in the Indictment as Foreign Gambler 3 (herein, "Gambler 3"). On July 19, 2024, after Montenegro produced some but not all records responsive to this Second Official Request, the Government sent a follow-up letter seeking the documents that had initially been requested on April 5 but were still missing.

6

- On May 21, 2024, the Government transmitted Official Requests to China and Hong Kong seeking records of Defendant's travel and transportation of fiat currency.

ECF No. 136 at 4. The Government also submitted the following four *ex parte* applications to the Court to toll the statutes of limitations under Section 3292 related to these official requests:

- On October 27, 2023, the Government applied for tolling based on the First Official Request to Montenegro (the "First Tolling Application"). *Id.* at 4-5; ECF No. 136-1 (First Tolling Application). On December 28, 2023, Montenegro took final action on the First Official Request. ECF No. 136 at 5.

- On May 6, 2024, the Government applied for tolling based on the Second Official Request to Montenegro (the "Second Tolling Application"). *Id.*; ECF No. 136-4 (Second Tolling Application).

- On July 22, 2024, the Government applied for tolling based on the Second Official Request to Montenegro and its July 19, 2024, follow-up letter to Montenegro seeking documents missing from that country's initial response to the Second Official Request (the "Third Tolling Application"). ECF No. 136 at 5; ECF No. 136-7 (Third Tolling Application). To date, Montenegro has not taken final action on this Second Official Request. ECF No. 136 at 5.

- On July 31, 2024, the Government applied for tolling based on the Official Requests to Hong Kong and China (the "Fourth Tolling Application"). *Id.* at 5. China and Hong Kong took final action on these requests on September 23, 2024, and January 21, 2025, respectively. *Id.*

To support its Tolling Applications, the Government also submitted the following Declarations from Internal Revenue Service Criminal Investigation Special Agent Andrew Accardi:

- On October 27, 2023, Special Agent Accardi submitted a Declaration in support of the United States' *ex parte* application for suspension of the running of the statute of limitations (the "First Accardi Declaration"). ECF No. 136-2 (First Accardi Declaration).

- On May 6, 2024, Special Agent Accardi submitted a Declaration in support of the United States' *ex parte* application for suspension of the running of the statute of limitations (the "Second Accardi Declaration"). ECF No. 136-5 (Second Accardi Declaration).

- On July 22, 2024, Special Agent Accardi submitted a Declaration in support of the United States' *ex parte* application for suspension of the running of the statute of limitations (the "Third Accardi Declaration"). ECF No. 136-8 (Third Accardi Declaration).

Based upon this information, the Court issued the following four Tolling Orders:

- On October 31, 2023, the Court ordered the limitations periods tolled starting on the date of the First Official Request (the "First Tolling Order"). ECF No. 136-3 (First Tolling Order).

- On May 7, 2024, the Court ordered the limitations periods tolled starting on the date of the Second Official Request—April 5, 2024 (the "Second Tolling Order"). ECF No. 136-6 (Second Tolling Order).

- On July 23, 2024, the Court ordered the limitations periods tolled starting April 5, 2024, the day of the Second Official Request (the "Third Tolling Order"). ECF No. 136-9 (Third Tolling Order).

- On August 5, 2024, the Court ordered the limitations periods tolled starting May 21, 2024, the date on which the Official Requests to China and Hong Kong had been made (the "Fourth Tolling Order"). ECF No. 136 at 5.

Lastly, the Defendant entered into written agreements tolling the limitations period for the relevant charges for the period September 30, 2024, through January 16, 2025. *Id.*

## III.   STANDARDS OF DECISION

### A.  Section 3292

Section 3292(a)(1) tolls, or suspends, the statute of limitations for offenses under Titles 18, 26 and 31 while the Government seeks evidence in a foreign country, if the Court enters an order suspending the limitations periods. *See* 18 U.S.C. § 3292(a)(1). Specifically, Section 3292 provides that:

> Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

*Id.* § 3292(a)(1).

Tolling under this provision ends when the foreign country takes "final action" on the request, but the suspension period may not exceed three years. *Id.* § 3292(b)-(c). And so, a district court must suspend the limitations period, if it finds by a preponderance of the evidence that: (1) an official request has been made for evidence of an offense in a foreign country and (2) it reasonably appeared, at the time the request was made, that such evidence was in the foreign country. *See id.* § 3292(a)-(b); *United States v. Broughton*, 689 F.3d 1260, 1273 (11th Cir. 2012)

("[A] district court's decision to suspend the running of a statute of limitations is limited to [those] two considerations . . . ."); *United States v. Ratti*, 365 F. Supp. 2d 649, 657 (D. Md. 2005) (applying same standard). Courts have interpreted Section 3292's "official request" prong to further require that the offense be under investigation and the official request be "reasonably specific in order to elicit evidence of the alleged violations under investigation." *United States v. Neill*, 952 F. Supp. 831, 832-33 (D.D.C. 1996); *see also Ratti*, 365 F. Supp. 2d at 657; *United States v. Wilson*, 249 F.3d 366, 374 (5th Cir. 2001) ("The request for evidence must only be 'reasonably specific in order to elicit evidence of the alleged violations under investigation by the grand jury.'" (quoting *Neill*, 952 F. Supp. at 833)), *abrogated on other grounds by Whitfield v. United States*, 543 U.S. 209 (2005).

Tolling orders obtained by the Government pursuant to 18 U.S.C. § 3292 are subject to post-indictment review, due to the *ex parte* nature of the tolling applications under Section 3292. *See* 18 U.S.C. § 3292; *see also Ratti*, 365 F. Supp. 2d at 658 ("[I]n an *ex parte* proceeding the Court needs to protect the absent defendant's rights . . . ."). The tolling orders are valid only if supported by a "preponderance of the evidence." *See Ratti*, 365 F. Supp. 2d at 658; *cf. United States v. Trainor*, 376 F.3d 1325, 1331 (11th Cir. 2004) (preponderance standard requires that evidence "must tend to prove or disprove the existence of a material fact").

In addition, the Court must excise the misrepresentation and assess whether the remaining information in the tolling application presents sufficient evidence to meet the requirements of Section 3292. *See, e.g.*, *Ratti*, 365 F. Supp. 2d at 657, 660-61. If so, the application and order are valid and no evidentiary hearing is warranted. If not, an evidentiary hearing is warranted. *See Wilson*, 249 F.3d at 371-73 (remanding for evidentiary hearing on factual issue of whether November 1993 official request letter was actually sent to Bahamas, where "this letter" was the only basis for Section 3292 order). Where the defense substantially contests the prosecution's *ex parte* factual representations, the district court holds an evidentiary hearing. *See, e.g.*, *id.* at 372-73 (holding the district court erred by failing to hold an evidentiary hearing where a defendant "raise[d] a factual issue" relating to the validity of a tolling order under section 3292 and remanding for purposes of an evidentiary hearing).

### B. Section 7201 Tax Evasion

The tax evasion statute, 26 U.S.C. § 7201, provides that "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment

thereof shall, in addition to other penalties provided by law, be guilty of a felony . . . ." 26 U.S.C. § 7201. The elements of the crime of tax evasion are "1) that the defendant acted willfully; 2) that the defendant committed an affirmative act that constituted an attempted evasion of tax payments; and 3) that a substantial tax deficiency existed." *United States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997).

The Supreme Court in *Spies v. United States* set forth a non-exclusive set of examples that would satisfy the affirmative act requirement, and specifically noted:

> [An affirmative willful attempt] may be inferred from conduct such as keeping a double set of books, making false entries of alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.

317 U.S. 492, 499 (1943). The *Spies* Court emphasized that "[i]f the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime." *Id.* And so, an "affirmative act" is simply an act committed with an intent to evade taxes. *See id.*; *Sansone v. United States*, 380 U.S. 343, 351 (1965) (describing an affirmative act as an act "constituting an evasion or attempted evasion of the tax").

Following *Spies*, courts have found the "affirmative act" element satisfied even where the act is an otherwise innocent or legal one—so long as it is done with an intent to mislead or conceal. *See United States v. Voigt*, 89 F.3d 1050, 1090 (3d Cir. 1996) (affirmative act element satisfied based on defendant's entry into confidentiality agreements, refusing to pay cash for jewelry when it would have caused reporting to the IRS, and use of overseas bank account); *United States v. Jungles*, 903 F.2d 468, 474 (7th Cir. 1990) (taxpayer's entry into an "independent contractor agreement," although a legal activity in and of itself, satisfied "affirmative act" element); *United States v. Thompson*, 518 F.3d 832, 854 (10th Cir. 2008) (domestic and foreign commission checks deposited in defendant's personal savings account); *United States v. Conley*, 826 F.2d 551, 556-57 (7th Cir. 1987) (use of nominees and cash with intent to evade payment of taxes). Courts have also found the affirmative act element satisfied where a defendant's personal use of corporate funds or diversion of corporate receipts is accompanied by a failure to alert bookkeepers or accountants of such acts. *See, e.g.*, *United States v. Kaatz*, 705 F.2d 1237, 1246

10

(10th Cir. 1983) (affirmative act element satisfied where defendants "handled their affairs so as to avoid making the records usual to the businesses which they operated, and they did not disclose to their accountant the receipts which they diverted.").  And so, the law is clear that tax evasion cases "simply require that there be some evidence from which a jury could infer an intent to mislead or conceal beyond mere failure to pay assessed taxes; 'it is for the jury to determine, as a matter of fact, whether the affirmative act was undertaken, in part, to conceal funds from or mislead the government.'"  *United States v. Hassebrock*, 663 F.3d 906, 918-19 (7th Cir. 2011) (quoting *United States v. King*, 126 F.3d 987, 993 (7th Cir.1997)); *Voigt*, 89 F.3d at 1090 (same).

### C.  Fed. R. Crim. P. 6(e)

All grand jury materials and testimony are presumptively secret.  *See* Fed. R. Crim. P. 6(e)(2); *see also United States v. Silva*, 745 F.2d 840, 846 (4th Cir. 1984) ("While the aura shrouding grand jury proceedings has perhaps become less opaque over the years, it is indisputable that there is still a substantial interest in maintaining the secrecy of those proceedings.").  But, Fed. R. Crim. P. 6(e) contains certain exceptions that allow for the disclosure of grand jury materials.  Fed. R. Crim. P. 6(e)(3).

Relevant to the Defendant's motion to compel, "[t]he court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter: (i) preliminarily to or in connection with a judicial proceeding."  Fed. R. Crim. P. 6(e)(3)(E)(i).  The presumption of secrecy applies equally to legal instructions given to the Grand Jury by the prosecutor, requiring that those seeking access to such legal instructions demonstrate a particularized need for those portions of the transcripts.  *See, e.g., United States v. Mosby*, No. 22-cr-00007-LKG, 2022 WL 4240835, at *6 (D. Md. Sept. 14, 2022) (denying request for Grand Jury instructions for failing to meet the "particularized need" standard); *United States v. Johnson*, 92-CR-39A, 1994 WL 805243, at *7 (W.D.N.Y. May 26, 1995) ("As with a request for a review of grand jury minutes, the secrecy of the grand jury will not be compromised by an order to disclose grand jury instructions without a showing of 'particularized need.'"), *aff'd*, 108 F.3d 1370 (2d Cir. 1997).  Disclosure under Rule 6(e)(3) requires "a strong showing of particularized need."  *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983).

### D.  Section 7203 Willful Failure To Pay Taxes

Under 26 U.S.C. § 7203, a defendant can be charged with a misdemeanor for willfully failing to perform a number of specified acts at the time required by law, including the failure to

file and failure to pay a tax when due. *Sansone*, 380 U.S. at 351. If a taxpayer willfully fails to report his income by not filing a return, or fails to timely pay his tax, the violation of Section 7203 is complete, irrespective of whether the taxpayer intends to comply with those duties at a later date. *See id.* at 354 ("[T]he intent to report the income and pay the tax sometime in the future does not vitiate the willfulness required by [26 U.S.C. § 7203]."); *see also id.* at 351 (stating that Section 7203 requires only "willfulness and the omission of the required act—here the payment of the tax when due"). And so, the Supreme Court has emphasized that there "are sanctions to assure punctual as well as faithful performance of these duties," including criminal sanctions for the "[w]illful failure to pay the tax when due." *Spies*, 317 U.S. at 496-97.

### E. Bill Of Particulars

"A defendant is entitled to a bill of particulars when an indictment fails to adequately inform the defendant of the charges against [him]," or "if certain portions of the indictment are so general that they do not advise a defendant of the specific acts that []he must defend against." *United States v. Mosby*, 22:cr-00007-LKG, 2022 WL 1120073, at *3 (D. Md. Apr. 14, 2022). "[T]he decision to grant or deny a motion for a bill of particulars is within the sound discretion of the trial court." *United States v. Cuong Gia Le*, 310 F. Supp. 2d 763, 781 (E.D. Va. 2004); *see also United States v. Anderson*, 481 F.2d 685, 690 (4th Cir. 1973). "A bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985) (citation omitted).

### F. Use Of Assets To Pay For Counsel

It is well-established that criminal defendants have no constitutional right to use tainted property to pay for counsel. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989); *see also United States v. Farmer*, 274 F.3d 800, 802 (4th Cir. 2001) (citing *Caplin* and stating that "any Sixth Amendment right to obtain counsel of choice does not extend beyond the individual's right to spend his own legitimate, nonforfeitable assets"). In this regard, the Supreme Court has held that "[t]here is a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense." *Caplin*, 491 U.S. at 630-31.

To use an asset subject to forfeiture to pay for counsel, a criminal defendant must show that "a portion of the assets restrained pursuant to criminal forfeiture statutes are untainted and

that he has no other funds from which to secure the counsel of his choice." *Farmer*, 274 F.3d at 803. To do so, the defendant must make a *prima facie* showing that the seized assets are not subject to forfeiture, which involves presenting evidence that the assets are untainted or otherwise nonforfeitable, and that the government lacked probable cause to seize them. *See United States v. Byrd*, 153 F. Supp. 3d 851, 855-56 (D. Md. 2015); *United States v. Cohen*, No. CR. WDQ-14-0310, 2015 WL 2261661, at *31 (D. Md. May 7, 2015), *aff'd in part and dismissed in part*, 888 F.3d 667 (4th Cir. 2018). To demonstrate that the defendant has no other funds to hire an attorney of his or her choice, the defendant must provide evidence, such as affidavits or other admissible proof, showing that they are effectively indigent due to the government's seizure of their assets. *See Byrd*, 153 F. Supp. 3d at 856; *Farmer*, 274 F.3d at 804. Both conditions must be met for the Court to grant a *Farmer* hearing. *See Byrd*, 153 F. Supp. 3d at 856.

## IV.    ANALYSIS

Pending before the Court are the following pre-trial motions: (1) the Defendant's motion to invalidate certain orders suspending the statute of limitations (ECF No. 116); (2) the Defendant's motion to dismiss for failing to allege affirmative acts (ECF No. 120); (3) the Defendant's motion to dismiss allegations concerning employees (ECF No. 122); (4) the Defendant's motion for a bill of particulars (ECF No. 125); (5) the Defendant's motion to dismiss Counts 15 through 19 of the Superseding Indictment (ECF No. 126); (6) the Defendant's motion to compel disclosure of *Brady* and Grand Jury material (ECF No. 127); and (7) the Defendant's motion to permit him to sell the Hawthorne Property to fund his defense (ECF No. 166). The Court addresses and resolves these motions below.

### A.  The Court Declines To Invalidate The Tolling Orders

As an initial matter, the Defendant has not shown that the Court should invalidate the First and Second Tolling Orders issued in this case. And so, the Court DENIES the Defendant's motion to invalidate certain orders suspending the statute of limitations (ECF No. 116) for the reasons stated below.

In his motion to invalidate, the Defendant seeks to invalidate the Court's First Tolling Order issued on October 31, 2023, which tolled the statute of limitations from October 27, 2023, to December 28, 2023, and the Court's Second Tolling Order, which tolled the statute of limitations from April 5, 2024, to January 16, 2025. ECF No. 136 at 4-5. To support this

motion, the Defendant argues that the following three statements by the Government in the First and Second Accardi Declarations contain materially false statements and/or omissions that warrant invalidating the First and Second Tolling Orders: (1) Agent Accardi falsely stated in his First Declaration that the Defendant did not report certain money that he received in his Montenegro bank account, or any income earned on this money, on his federal tax returns made in 2016; (2) Agent Accardi falsely stated in his First and Second Declarations that the Defendant failed to file reports of Foreign Bank and Financial Accounts ("FBAR") for his four Montenegrin bank accounts and omitted material and exculpatory information about the FBARs; and (3) that Agent Accardi falsely represented in his Second Declaration that "the investigation has revealed that income due and owing to [the Defendant] was sent by certain foreign officials in Malaysia to [Gambler 3]." ECF No. 116 at 7-10; First Accardi Decl. at ¶¶ 13-15 (ECF No. 136-2); Second Accardi Decl. at ¶¶ 13-18 and 27 (ECF No. 136-5). For the reasons below, the Court declines to invalidate the First and Second Tolling Orders based on these claims.

First, a careful reading of the Government's Tolling Applications and Declarations show that these filings generally comply with the requirements of Section 3292. It is well-established, that under 18 U.S.C. § 3292, the Court must suspend the limitations period, at the request of the Government, if it finds by a preponderance of the evidence that: (1) an official request has been made for evidence of an offense in a foreign country and (2) it reasonably appeared, at the time the request was made, that such evidence was in the foreign country. *See* 18 U.S.C. § 3292(a)(1); *United States v. Broughton*, 689 F.3d 1260, 1273 (11th Cir. 2012) ("[A] district court's decision to suspend the running of a statute of limitations is limited to [those] two considerations . . . ."); *United States v. Ratti*, 365 F. Supp. 2d 649, 657 (D. Md. 2005) (applying same standard). Tolling under this provision ends when the foreign country takes "final action" on the request, but the suspension period may not exceed three years. 18 U.S.C. § 3292(b)-(c). Courts have interpreted Section 3292's "official request" prong to further require that the offense be under investigation and the official request be "reasonably specific in order to elicit evidence of the alleged violations under investigation." *United States v. Neill*, 952 F. Supp. 831, 832-33 (D.D.C. 1996); *see also Ratti*, 365 F. Supp. 2d at 657; *United States v. Wilson*, 249 F.3d 366, 374 (5th Cir. 2001) ("The request for evidence must only be 'reasonably specific in order to elicit evidence of the alleged violations under investigation by the grand jury.'" (quoting *Neill*, 952 F. Supp. at 833)), *abrogated on other grounds by Whitfield v. United States*, 543 U.S. 209 (2005).

In this case, the evidence shows that the First Tolling Application and the First Accardi Declaration comply with Section 3292, because the First Tolling Application makes clear that the Government made an official request for evidence to a foreign country. First Appl. at ¶ 10 (ECF No. 136-1) (stating that "[o]n September 25, 2023, at the prosecutor's request, the Office of International Affairs of the United States Department of Justice ('OIA') made an official request to Montenegro for legal assistance in obtaining evidence" and that no final action had been taken by Montenegro in response to this request). The First Tolling Application also states that "it reasonably appears that evidence of" the offenses that a grand jury was investigating, "including bank account and business records, is located in Montenegro." *Id.* at ¶ 9.

Agent Accardi also reliably describes the evidence expected to be located in Montenegro, in his First Declaration:

> In 2016, his domestic UCB account received €926,872.70, which led [the Defendant] to wire $885,000 of those funds to a U.S. bank account that he controlled. In 2018, after [the Defendant's] domestic account at UCB received €862,142.19, he transferred that money to the G&R domestic UCB account, then to the G&R international UCB account, and from there wired the money to a U.S. bank account. . . . [the Defendant] did not report this money, or any interest earned on this money, as income on his federal tax returns. . . .
>
> [The Defendant] also failed to file FBARs for these four Montenegrin bank accounts for the years 2016 through 2020 and failed to report these bank accounts on the Schedule B to his income tax returns.

First Accardi Decl. at ¶¶ 13-15 (ECF No. 136-2). And so, the First Tolling Application and First Accardi Declaration generally satisfy the requirements of Section 3292.

The evidence before the Court similarly shows that the Second Tolling Application and Second Accardi Declaration comply with Section 3292. The Second Tolling Application states that "[o]n April 5, 2024, at the prosecutors' request, the Office of International Affairs of the United States Department of Justice ('OIA') made a supplemental official request to Montenegro for legal assistance in obtaining evidence" and that no final action has been taken on the April 5, 2024, request. Second Appl. at ¶ 22 (ECF No. 136-4). The Second Tolling Application also states represents that "it reasonably appears that evidence of" the offenses in the grand jury investigation, "including bank account and business records, is located in Montenegro." *Id.* at ¶

21.  In addition, Agent Accardi describes the evidence expected to be located in Montenegro in his Declaration as follows:

> On or about December 28, 2023, the United States received certain records from the Montenegro authorities in response to its request. Examination of those records revealed that [Gambler 3], a Malaysian national who is also a well-known poker player (and former client of [the Defendant's] firm), transferred over $2,000,000 to [the Defendant's] accounts at UCB between 2016 and 2018.
>
> Those transfers included: (1) a group of transfers from [Gambler 3] to [the Defendant's] domestic account at UCB . . . in October 2016 totaling €926,872.70, followed by [the Defendant] wiring $885,000 of those funds to a U.S. bank account that he controlled; and (2) a transfer of £862,142.19 by [Gambler 3] on September 25, 2018 to [the Defendant's] domestic account at UCB . . . , followed by [the Defendant] engaging in a series of transfers culminating in the deposit of the funds in a U.S. bank account controlled by [the Defendant]. The records indicate that the September 25, 2018 transfer by [Gambler 3] was made from [Gambler 3's] personal account at UCB. . . .

Second Accardi Decl. at ¶¶ 16-17 (ECF No. 136-5).   And so, again, the Court is satisfied that the Second Application and the Second Accardi Declaration generally satisfy the requirements for tolling pursuant to Section 3292.

The Defendant also argues without persuasion that the Government's filings contain material misrepresentations and/or omissions that warrant invalidating the Court's Tolling Orders.  In this regard, the Defendant first argues that Agent Accardi made a material misrepresentation to the Court in his First Declaration, by stating that the Defendant did not report certain money that he received in his Montenegro bank account, or any income earned on this money, on his federal tax returns for 2016.  ECF No. 116 at 7-10.  During the evidentiary hearing on the Defendant's motion, Agent Accardi acknowledged that his statement that the Defendant did not report this money, or any income earned on this money, on his federal tax returns for 2016, is incorrect.  Hr'g Tr. (Unofficial) at 117:1-10; *see also* Third Appl. at 2 n.1 (ECF No. 136-7) (stating that "further investigation has shown that of the approximately $1,000,000 that [the Defendant] received from the 2016 set of UCB transfers, he reported as income the $885,000 that he wired to his law firm's U.S. bank account").  But, Agent Accardi's testimony also makes clear that this inaccuracy was not made with an intent to deceive the Court. Hr'g Tr. (Unofficial) at 113:16-120:12 (testifying that he failed to verify this statement in the

First Declaration, which he admits was drafted by a member of the Government's prosecution team, with the evidence prior to signing the declaration).

The Court also observes that, when this statement is excised from the rest of the First Accardi Declaration, there is still sufficient information in that declaration to show that it reasonably appeared to the Government, at the time, that the evidence of the tax crimes cited in the declaration was located in Montenegro. *See Broughton*, 689 F.3d at 1273. Notably, removing this statement does not alter the fact that the Defendant "failed to report as income the remainder of the 2016 UCB transfers [approximately $115,000] that he kept at UCB and did not wire to his law firm's bank account," as the Government alleges. *See* Third Appl. at 2 n.1 (ECF No. 136-7). The First Accardi Declaration also contains other facts regarding the Defendant's alleged failure to report the accurate amount of his gambling winnings and diverting G&R funds to pay for his personal expenses, to support the Government's Tolling Application. First Accardi Decl. at ¶¶ 10-11 (ECF No. 136-2). And so, the Defendant has not shown that the Government's acknowledged error in the First Accardi Declaration constitutes a material misrepresentation that warrants invalidating the First Tolling Order.

The second alleged error by the Government also does not warrant invalidating the Court's First and Second Tolling Orders. The Defendant argues that Agent Accardi's statements in his First and Second Declarations that the Defendant failed to file FBARs for his four Montenegrin bank accounts are materially false and that the Government also omitted material information showing that he did not willfully evade paying taxes. *See* ECF No. 116 at 10-12; First Accardi Decl. at ¶ 14 (ECF No. 136-2); Second Accardi Decl. at ¶ 14 (ECF No. 136-5). Specifically, the Defendant argues that these statements are false and misleading, because he had provided Government investigators with emails showing that he did not willfully fail to report these bank accounts and Agent Accardi failed to provide this exculpatory information in his Declaration. *See* ECF No. 116 at 11-12.

But, the fact that the Defendant may have requested in an email that his accountant be informed about certain transactions involving his Montenegrin bank accounts does not render the statement in the Declaration, that the Defendant failed to file FBARs for the Montenegrin bank accounts, false. In addition, Agent Accardi's Second Declaration also explicitly acknowledges that there is evidence indicating that personnel from G&R informed the Defendant's outside

accountants about the UCB accounts.  Second Accardi Decl. at ¶ 14 n.1 (ECF No. 136-5).
Notably, Agent Accardi states in his Second Declaration that:

> Although certain correspondence indicates that personnel from [the
> Defendant's] firm informed his outside accountants of one or more
> of the UCB accounts, no FBARs were ever filed for those accounts,
> acknowledging [the Defendant's] ownership and control of the
> accounts. Moreover, [the Defendant's] tax returns for certain years
> during which the accounts were open did not even acknowledge [the
> Defendant's] signatory authority over the accounts—which is a
> separate reporting requirement contained on Schedule B to IRS
> Form 1040.

*Id.*  And so, the Defendant has not shown that the statement about his failure to file FBARs for
the Montenegrin bank accounts was false, let alone materially false, to warrant invalidating the
subject Tolling Order.

The final error alleged by the Defendant, that Agent Accardi represented that "the
investigation has revealed that income due and owing to [the Defendant] was sent by certain
foreign officials in Malaysia to [Gambler 3]," also does not warrant invalidating the Court's
Second Tolling Order.  ECF No. 116 at 9; *see* Second Accardi Decl. at ¶ 27 (ECF No. 136-5).  In
this regard, Agent Accardi states in his Second Declaration that:

> [A]s a result of [the Defendant's] relationship with [Gambler 3], [the
> Defendant] has received over $3,000,000 from [Gambler 3] between
> 2016 and 2018, including through the UCB accounts controlled by
> [Gambler 3] and [the Defendant]. Additionally, the investigation has
> revealed that income due and owing to [the Defendant] was sent by
> certain foreign officials in Malaysia to [Gambler 3]. As a result of
> the relationship between [the Defendant] and [Gambler 3], records
> from UCB for [Gambler 3's] accounts will help the U.S. authorities
> assess whether [the Defendant] conspired with [Gambler 3] to have
> income due and owing to [the Defendant] to be directed or filtered
> through [Gambler 3]— using [Gambler 3's] UCB account(s).

Second Accardi Decl. at ¶ 27 (ECF No. 136-5).  The Defendant argues that this statement is
materially false, because Agent Accardi was aware of an email that shows that the Defendant
"was paid directly $500,000 in cash in Malaysia by that country's government" and that he
"immediately had an intermediary deliver the cash to partially repay a loan [the Defendant] had
received from . . . Gambler 3 in 2018."  ECF No. 116 at 9.  But, when excised from the Second
Accardi Declaration, the Government's submissions still satisfy Section 3292's tolling
requirements, because there is ample information in the rest of the Second Accardi Declaration to

show that the Government reasonably believed, at the time, that there was evidence of tax crimes in Montenegro. *See* Second Accardi Decl. at ¶¶ 13-14 and 16-19 (ECF No. 136-5).

Notably, the Second Accardi Declaration states that the Government's investigation revealed evidence that: (1) the Defendant diverted firm funds for his personal expenses; (2) the Defendant failed to report the UCB bank accounts on his federal tax returns and failed to file FBARs regarding these accounts; and (3) records received from Montenegro show that a Malaysian national transferred more than $2,000,000 into the Defendant's UCB accounts between 2016 and 2018. *Id.* at ¶¶ 10-12, 14-16; *see also id.* at ¶¶ 20-25 (alleging that the Defendant transported $950,000.000 in cash into the United States from Hong Kong and told the customs agent that the cash was poker winnings).[1] And so, invalidating the Court's First and Second Tolling Orders is not warranted.

For these reasons, the Court DENIES the Defendant's motion to invalidate certain orders suspending the statute of limitations (ECF No. 116).

### B. The Court Denies The Defendant's Motion To Dismiss For Failure To Allege Affirmative Acts

Turning to the Defendant's motion to dismiss certain allegations in Counts I-IV of the Superseding Indictment for failure to allege affirmative acts, the Court also DENIES this motion. In *Spies*, the Supreme Court set forth a non-exclusive set of examples that would satisfy the affirmative act requirement for a tax evasion offense, and specifically noted that:

> [An affirmative willful attempt] may be inferred from conduct such
> as keeping a double set of books, making false entries of alterations,
> or false invoices or documents, destruction of books or records,

---

[1] The Defendant also fails to show that the Government's inaccurate statement in the Second Tolling Application that the Defendant told criminal law enforcement agents that certain "UCB" transfers to his Montenegro bank account, totaling over $2,000,000, were loans, warrants invalidating the Second Tolling Order. *See* Second Appl. at ¶¶ 12-13 (ECF No. 136-4). In this regard, the Defendant argues that this statement was a "knowingly false representation," because this "allegation is not mentioned in Agent Accardi's Declaration," leaving "this allegation without any evidentiary support." ECF No. 116 at 8. During the evidentiary hearing, Agent Accardi testified that he could not recall why the subject statement appears in the Second Tolling Application, but not his Declaration. Hr'g Tr. (Unofficial) at 139:4-19. Agent Accardi also testified that he recalls the Defendant saying two different things to him about the UCB transfers to his Montenegro bank account, during an interview: at one point, the Defendant said that the UCB transfers was legal fees from a foreign gambler and at another point he said all the money in the accounts were loans. Hr'g Tr. (Unofficial) at 139:20-25. Given this testimony, the Defendant has not shown that the Government's error was made knowingly. This error is also not material, because, as discussed above, the Second Accardi Declaration and the Government's Second Tolling Application contain ample other evidence to show that that the Government believed, at the time, that there was evidence of tax crimes in Montenegro. *See* ECF Nos. 136-5 at ¶¶ 10-12, 14-16; *see also id.* at ¶¶ 20-25.

> concealment of assets or covering up sources of income, handling of
> one's affairs to avoid making the records usual in transactions of the
> kind, and any conduct, the likely effect of which would be to mislead
> or to conceal.

*Spies v. Unites States*, 317 U.S. 492, 499 (1943).  Given this, "[i]f the tax-evasion motive plays

any part in such conduct the offense may be made out even though the conduct may also serve

other purposes such as concealment of other crime." *Id.*  And so, an "affirmative act" is simply an

act committed with an intent to evade taxes.  *See id.*; *Sansone v. United States*, 380 U.S. 343, 351

(1965) (describing an affirmative act as an act "constituting an evasion or attempted evasion of

the tax").

       Following *Spies*, courts have found the "affirmative act" element satisfied even where the

act is an otherwise innocent or legal one—so long as it is done with an intent to mislead or conceal.

*See United States v. Voigt*, 89 F.3d 1050, 1090 (3d Cir. 1996) (affirmative act element satisfied

based on defendant's entry into confidentiality agreements, refusing to pay cash for jewelry when

it would have caused reporting to the IRS, and use of overseas bank account); *United States v.*

*Jungles*, 903 F.2d 468, 474 (7th Cir. 1990) (taxpayer's entry into an "independent contractor

agreement," although a legal activity in and of itself, satisfied "affirmative act" element); *United*

*States v. Thompson*, 518 F.3d 832, 854 (10th Cir. 2008) (domestic and foreign commission checks

deposited in defendant's personal savings account); *United States v. Conley*, 826 F.2d 551, 556-

57 (7th Cir. 1987) (use of nominees and cash with intent to evade payment of taxes).  Courts

have also found the affirmative act element satisfied where a defendant's personal use of

corporate funds or diversion of corporate receipts is accompanied by a failure to alert

bookkeepers or accountants of such acts.  *See, e.g.*, *United States v. Kaatz*, 705 F.2d 1237, 1246

(10th Cir. 1983) (affirmative act element satisfied where defendants "handled their affairs so as to

avoid making the records usual to the businesses which they operated, and they did not disclose

to their accountant the receipts which they diverted.").  And so, courts have held that tax evasion

cases "simply require that there be some evidence from which a jury could infer an intent to

mislead or conceal beyond mere failure to pay assessed taxes; 'it is for the jury to determine, as a

matter of fact, whether the affirmative act was undertaken, in part, to conceal funds from or

mislead the government.'"  *United States v. Hassebrock*, 663 F.3d 906, 918-19 (7th Cir. 2011)

(quoting *United States v. King*, 126 F.3d 987, 993 (7th Cir.1997)); *Voigt*, 89 F.3d at 1090 (same).

       Here, the Defendant seeks to dismiss certain allegations supporting Counts I-IV of the

Superseding Indictment upon the grounds that the Superseding Indictment lacks factual allegations to show an affirmative act. In this regard, the Defendant argues that the Government's "mischaracterized transactions" and "redirected income" theories of tax evasion do not meet Section 7201's affirmative act requirement. ECF No. 120 at 2-6. But, a careful reading of the Superseding Indictment shows that the Government alleges several types of conduct that a jury could reasonably infer constitute an affirmative act to accomplish tax evasion.

Notably, the four tax evasion counts each allege that the Defendant committed multiple "affirmative acts" to carry out his willful attempt to evade assessment of his income taxes. ECF No. 159 at ¶ 105. Among the affirmative acts common to the tax evasion counts are that the Defendant: (1) mischaracterized certain transactions by "using funds and assets of G&R to pay personal gambling debts" and (2) redirected payments by "diverting G&R fees" either "to his personal bank account" or "to a third party to pay personal gambling debts." *Id.* at ¶¶ 105(a), 107(a)-(b), 109(a)-(c) and 111(a)-(b).

The Superseding Indictment also details how the Defendant's alleged personal use of G&R funds "caused" the transfer of those funds to be improperly characterized on the books and tax returns of G&R, resulting in the Defendant's alleged evasion of assessment of taxes. *See id.* at ¶¶ 24, 32, 42, 47, 63 and 81. While the Defendant argues that this alleged conduct cannot constitute an affirmative act, because he did not commit these acts with the requisite intent to evade taxes, that is a question for the jury to decide. *Hassebrock*, 663 F.3d at 918–19 (holding that *the jury* must decide whether an act—even an innocent or innocuous one—was done with intent to mislead or conceal such that it constitutes an "affirmative act" of evasion under Section 7201). Given this the Defendant has not shown the dismissal of these charges is warranted. And so, the Court DENIES the Defendant's motion to dismiss for failure to allege affirmative acts (ECF No. 120).

### C. The Court Denies The Defendant's Motion To Dismiss Counts 15 Through 19

The Defendant also fails to show that the Court should dismiss the willful failure to pay tax charges in this case. Under 26 U.S.C. § 7203, a defendant can be charged with a misdemeanor for willfully failing to perform a number of specified acts at the time required by law, including the failure to file and failure to pay a tax when due. *Sansone*, 380 U.S. at 351. If a taxpayer willfully fails to report his income by not filing a return or fails timely pay his tax, the violation of Section 7203 is complete, irrespective of whether the taxpayer intends to comply

with those duties at a later date. *See id.*, 380 U.S. at 354 ("[T]he intent to report the income and pay the tax sometime in the future does not vitiate the willfulness required by [26 U.S.C. § 7203]."); *see also id.* at 351 (stating § 7203 requires only "willfulness and the omission of the required act—here the payment of the tax when due").

In his motion to dismiss, the Defendant argues that the Court should dismiss these charges, because he previously participated in the IRS's civil enforcement process and he ultimately paid the tax liability and penalties to resolve the outstanding tax. ECF No. 126 at 4; *see e.g.*, ECF No. 153 at 4. But, the Defendant acknowledges that he did not pay these taxes by the payment due dates identified in the Superseding Indictment. ECF No. 153 at 3.

As this Court and other courts have long held, the fact that a taxpayer has made belated payments to resolve an outstanding civil tax liability, does not preclude the Government from pursuing a criminal prosecution for willful failure to timely pay that tax. *See United States v. Ross*, 135 F. Supp. 842, 847 (D. Md. 1955); *Sansone*, 380 U.S. at 354; *see, e.g.*, *United States v. Houser*, 754 F.3d 1335 (11th Cir. 2014); *United States v. Ming*, 466 F.2d 1000, 1005 (7th Cir. 1972); *United States v. Palermo*, 259 F.2d 872, 875 (3d Cir. 1958). Given this, the Defendant's previous participation in an IRS payment plan to resolve his outstanding tax liability does not preclude the Government from bringing criminal charges for willful failure to pay tax in this case. And so, the Court also DENIES the Defendant's motion to dismiss Counts 15 through 19 of the Superseding Indictment (ECF No. 126).

### D. The Defendant Has Not Shown He Is Entitled To A Bill Of Particulars

The Defendant has also not shown that he is entitled to a bill of particulars in this criminal matter. "A defendant is entitled to a bill of particulars when an indictment fails to adequately inform the defendant of the charges against [him]," or "if certain portions of the indictment are so general that they do not advise a defendant of the specific acts that []he must defend against." *United States v. Mosby*, 22:cr-00007-LKG, 2022 WL 1120073, at *3 (D. Md. Apr. 14, 2022). "[T]he decision to grant or deny a motion for a bill of particulars is within the sound discretion of the trial court." *United States v. Cuong Gia Le*, 310 F. Supp. 2d 763, 781 (E.D. Va. 2004); *see also United States v. Anderson*, 481 F.2d 685, 690 (4th Cir. 1973). And so, when evaluating a request for a bill of particulars, courts generally consider whether any "essential detail[s] . . . may have been omitted from the indictment." *Anderson*, 481 F.2d at 690 (4th Cir. 1973) (quotations and citations omitted).

In his motion for a bill of particulars, the Defendant argues that he is entitled to a bill of particulars on three topics: (1) the specific amounts of net gambling income (including both wins and losses) that the Superseding Indictment alleges he underreported for 2016; (2) the specific amount of the four employees' salaries and insurance premiums that the government alleges were improperly deducted as business expenses; and (3) when the Defendant's tax payments should have been sent and in what amount.  ECF No. 125 at 4-9.  But, a careful reading of the Second Superseding Indictment shows that the Defendant is not entitled to a bill of particulars on the specific amounts of his net gambling income from 2016, because the Superseding Indictment provides this information.  *See* Fed. R. Crim. P. 7(c)(1).

Notably, the Superseding Indictment provides extensive, specific allegations concerning the alleged underreported gambling winnings in the Defendant's 2016 tax forms.  In fact, the Superseding Indictment alleges, among other things, that the Defendant "falsely understated his gambling winnings by more than $3.9 million on his 2016 Form 1040."  ECF No. 159 at ¶ 24.  The Superseding Indictment also identifies: (1) specific poker matches; (2) the location; (3) time frame; (4) the individuals involved in these poker matches; and (5) numerous transactions that the Government alleges to be poker winnings.  *See id.* at ¶¶ 25-30 and 36.  And so, the Court is satisfied that the Superseding Indictment provides sufficient details as to the Defendant's net gambling income from 2016.

The Court is also satisfied that the Superseding Indictment contains sufficient details regarding the amount of the employee salaries and insurance premiums that the Government alleges that the Defendant improperly deducted as business expenses.  While the Defendant argues that the Superseding Indictment provides insufficient information for him to "understand the nature of the charges against him, leaving him to guess about the government's theory of improper business deductions," ECF No. 125 at 7, a careful reading of the Superseding Indictment makes clear that this document contains, among other things, the specific amount of the funds used for the subject employees, and alleges that the Defendant "caused over $8,000 in G&R funds to be used to pay the four women's health care premiums and over $31,000 in G&R funds to be paid to them as salaries."  ECF No. 159 at ¶ 56; *see also id.* at ¶ 57 (alleging "the false overstatement of G&R's expenses and deductions by approximately $40,000, as a result of [the Defendant's] use of G&R funds to pay for salaries and healthcare premiums for the women whom he placed on G&R's payroll, who were not bona fide employees and who did not qualify

for G&R's health insurance"). And so, again, the Defendant has not shown that the Superseding Indictment fails to provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

Lastly, the Defendant's request for additional information about when his tax payments should have been sent, and in what amount, is also unwarranted. The Superseding Indictment contains a chart providing this information. *See* ECF No. 159 at ¶ 115. And so, the Court also must DENY the Defendant's motion for a bill of particulars (ECF No. 125).

### E. The Court Denies The Defendant's Motion To Compel Disclosure Of *Brady* And Grand Jury Materials Without Prejudice

The Defendant also fails to show a particularized need for any legal instructions that the Government provided to the Grand Jury. It is well-established that Grand jury materials and testimony are presumptively secret. *See* Fed. R. Crim. P. 6(e); *see also United States v. Silva*, 745 F.2d 840, 846 (4th Cir. 1984). But, "[t]he court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter: (i) preliminarily to or in connection with a judicial proceeding." Fed. R. Crim. P. 6(e)(3)(E)(i). Such disclosure under Rule 6(e)(3) requires "a strong showing of particularized need." *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983).

The Defendant has not shown a particularized need for any Grand Jury instructions in this case. The Defendant seeks the Government's legal instructions to the Grand Jury related to: (1) the four women employees; (2) "what the [G]overnment told the [Grand Jury] about willfulness and 1099 reporting"; and (3) "how the [G]overnment explained the willfulness requirement in instructing the grand jurors on probable cause." ECF No. 127 at 12-14. To support this request, the Defendant alleges, without any support, that "transcripts of the grand jury instructions are likely to demonstrate that the government misstated the law." *Id.* at 14. But, such bald speculation is insufficient to warrant the disclosure of Grand Jury transcripts. *See Sells Eng'g, Inc.*, 463 U.S. at 443; *see also Loc Tien Nguyen*, 314 F. Supp. 2d 612, 616 (E.D. Va. 2004) (Rule 6(e)(3)(E)(ii) is not "an invitation to engage in a fishing expedition to search for grand jury wrongdoing and abuse when there are no grounds to believe that any wrongdoing or abuse has

occurred.").  And so, the Court DENIES the Defendant's motion to compel disclosure of *Brady* and Grand Jury Materials (ECF No. 127) WITHOUT PREJUDICE.[2]

### F.  The Court Declines To Permit The Defendant To Sell The Hawthorne Property Fund His Defense

As a final matter, the Defendant has renewed his motion to permit him to sell his residence located at 4323 Hawthorne Street, NW, Washington, DC (the "Hawthorne Property"), which is subject to an appearance bond and agreement to forfeit the property if he fails to appear as required for any court proceeding.  *See* ECF No. 166; ECF No. 8-1.  The Court also DENIES this motion for the following two reasons.

First, as the Court previously held, the Defendant is a flight risk and requiring the Defendant to post the Hawthorne Property as collateral, along with the other conditions imposed by the Court, are the least restrictive conditions to reasonably assure his appearance in this criminal matter.  ECF No. 76 at 4-7.  Notably, there is no dispute that the Defendant has engaged in extensive foreign travel and that the alleged offenses in this case involve significant international travel, unreported income and contacts with gamblers and other individuals in other countries.  ECF No. 175 at 15.  And so, while the Defendant is presumed innocent of these charges, the nature and circumstances of the alleged offenses, the weight of the evidence and the Defendant's personal history and characteristics weigh in favor of requiring the Defendant to agree to forfeit the Hawthorne Property if he fails to appear.

Second, the Defendant has not met his burden to show that he has no other assets to pay his counsel and that the Hawthorne Property is not subject to forfeiture.[3]  *See, e.g.*, *United States v. Byrd*, 153 F. Supp. 3d 851, 856 (D. Md. 2015) (finding that the Defendant had "made a prima facie showing that the assets at issue are not subject to forfeiture").  It is well-established that

---

[2] During the November 6, 2025, hearing, the Defense stated that the Government produced a large production of Grand Jury transcripts on Monday, November 3, 2025, and that the Defense was still reviewing that production.  And so, the Court will allow the Defendant to renew his motion to compel, for good cause shown, should the Defense determine that the Government's production is not sufficient to resolve the request for Grand Jury material.

[3] The Court must order the forfeiture of any property "constituting, or derived from, proceeds the person obtained directly or indirectly" as the result of making false statements on a loan application in violation of 18 U.S.C. § 1014.  18 U.S.C. § 982(a)(2); *see United States v. Farkas*, 474 F. App'x 349, 359 (4th Cir. 2012).  "To obtain forfeiture, the Government must establish by a preponderance of the evidence a nexus between the property for which it seeks forfeiture and the crime."  *United States v. Jones*, 622 F. App'x 204, 207 (4th Cir. 2015); *see also* Fed. R. Crim. P. 32.2(b)(1)(A).

criminal defendants have no constitutional right to use tainted property to pay for counsel. *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989); *see also United States v. Farmer*, 274 F.3d 800, 802 (4th Cir. 2001) (citing *Caplin* and stating that "any Sixth Amendment right to obtain counsel of choice does not extend beyond the individual's right to spend his own legitimate, nonforfeitable assets"). Indeed, as the Supreme Court has recognized, "there is a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense." *Caplin*, 491 U.S. at 631. And so, the Defendant must make a *prima facie* showing that "a portion of the assets restrained pursuant to criminal forfeiture statutes are untainted and that he has no other funds from which to secure the counsel of his choice," to prevail on his motion to sell. *Farmer*, 274 F.3d at 803; *see also Byrd*, 153 F. Supp. 3d at 856; *United States v. Cohen*, No. CR. WDQ-14-0310, 2015 WL 2261661, at *31 (D. Md. May 7, 2015), *aff'd in part and dismissed in part*, 888 F.3d 667 (4th Cir. 2018). Both of these conditions must be satisfied for the Court to allow a *Farmer* hearing. *See Byrd*, 153 F. Supp. 3d at 856.

In this case, the Superseding Indictment supports the Government's view that the Hawthorne Property is a tainted asset that is subject to forfeiture. In Count 22 of the Superseding Indictment, the Government alleges that:

> [On or about September 29, 2021, the Defendant] knowingly [made] false statements and reports for the purpose of influencing . . . the action of NFM Lending, a mortgage lending business . . . in connection with a loan application seeking $180,000, [where the Defendant] (1) represented that the information he provided was "true, accurate, and complete," when, in truth and fact, [he] knew that the application omitted personal liabilities over $14,500,000 and federal liability owed to the IRS over $945,000 . . .; (2) answered "No" in response to the question whether [he] was "currently delinquent or in default on a federal debt," when, in truth and fact, [he] knew that he had over $945,000 in tax liabilities for the 2020 tax year; and (3) answered "No" in response to the question whether [he] was "a co-signer or guarantor on any debt or loan that is not disclosed in this application," when, in truth and fact, [he] knew that he was a guarantor on the two financing agreements between G&R and the Funder, which were in the amounts of $1,600,000 and $4,000,000, respectively.

ECF No. 159 at ¶ 121. The Government also alleges that the Defendant's false statement on the NFM mortgage loan allowed the Defendant to obtain this loan and to use the loan proceeds to

repay an individual who provided him with funds to purchase the Hawthorne Property. ECF *See* No. 175 at 8. Given this, the Government argues that, but for the Defendant's false statements on the NFM loan application, the Defendant would have lost his ownership interest in the Hawthorne Property. *See id.* at 7-8. And so, the Government seeks to forfeit the Hawthorne Property in the event of the Defendant's conviction of Count 22. ECF No. 159 at ¶ 122.

Given the factual allegations in the Superseding Indictment, the Defendant has not shown that the Hawthorne Property is not tainted and subject to forfeiture. *See United States v. Chamberlain*, 868 F.3d 290, 296-97 (4th Cir. 2017) ("By its terms, Section 853(e) authorizes restraining orders to preserve the availability of property . . . that would be subject to forfeiture upon conviction." (citation and internal quotations omitted)); *Luis v. United States*, 578 U.S. 5, 10 (2016) (holding that only "the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment"). Given this, the Defendant has no Sixth Amendment right to sell the Hawthorne Property to fund his defense. *See Farmer*, 274 F.3d at 803. And so, the Court DENIES the Defendant's motion to permit him to sell the Hawthorne Property to fund his defense (ECF No. 166).

V.    **CONCLUSION**

For the foregoing reasons, the Court:

(1) **DENIES** the Defendant's motion to invalidate certain orders suspending the statute of limitations (ECF No. 116);

(2) **DENIES** the Defendant's motion to dismiss allegations for failure to allege affirmative acts (ECF No. 120);

(3) **HOLDS-in-ABEYANCE** the Defendant's motion to dismiss allegations concerning employees (ECF No. 122);

(4) **DENIES** the Defendant's motion for a bill of particulars (ECF No. 125);

(5) **DENIES** the Defendant's motion to dismiss Counts 15 through 19 of the Superseding Indictment (ECF No. 126);

(6) **DENIES** the Defendant's motion to compel disclosure of *Brady* and Grand Jury material (ECF No. 127) **WITHOUT PREJUDICE**; and

(7) **DENIES** the Defendant's motion to permit him to sell the Hawthorne Property to fund his defense (ECF No. 166).

**IT IS SO ORDERED.**

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge