**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. LKG-25-6 |
| | * | |
| THOMAS C. GOLDSTEIN, | * | |
| | * | |
| Defendant | * | |
| | * | |

\*\*\*\*\*\*\*

## GOVERNMENT'S OPPOSITION TO GOLDSTEIN'S MOTION TO DISMISS FOR GRAND JURY ABUSE (Dkt. 234)

The Court should deny Goldstein's untimely motion to dismiss because (1) he has not established good cause for his delay in seeking this relief, and (2) there was no abuse of the grand jury process here.

Goldstein complains that government attorneys questioned three of the four women identified in the Superseding Indictment (Women 2, 3, and 4) about the sordid details of Goldstein's extramarital relationships with these women prior to and during their "employment" at Goldstein's firm. However, the nature and extent of Goldstein's relationship with each of these women was an important factor in the grand jury's determination of whether Goldstein's purported employment of these women was mere nepotism or criminal evasion of Goldstein's tax obligations.

Moreover, those questions are only a small piece of the testimony that each of these women gave before the grand jury, and only a sliver of the total evidence the grand jury had before it when it returned its indictment against Goldstein. There is simply no evidence of grand jury abuse here.

There is, however, one abuse here that the Court should not countenance: Goldstein lied to the Court. The United States has noted Goldstein's repeated failure of

candor to the Court, and the government urges the Court to bear in mind Goldstein's serial dishonesty as this case proceeds to trial and as it decides Goldstein's pending motion to dismiss allegations concerning employees. Dkt. 122. On the bright side, now that Goldstein has admitted that he had or sought personal, non-platonic relationships with Women 2 through 4 while he supported them financially through payments from his firm, the government expects that (unless Goldstein flip-flops again) it will not need to present the intimate details of Goldstein's relationship with these women.

## ARGUMENT

### I. Goldstein has not articulated good cause for his failure to file this motion earlier.

Goldstein's pretrial motions were due on May 16, 2025 (Dkt. 155), and therefore this motion is untimely unless Goldstein demonstrates good cause for failing to comply with the Court's Scheduling Order. Goldstein has not met his burden here, and the Court has discretion to deny Goldstein's untimely motion on those grounds alone. *See United States v. Johnson*, 953 F.2d 110, 116 (4th Cir. 1991); *United States v. Chavez*, 902 F.2d 259, 262 (4th Cir. 1990).

During the criminal investigation, Goldstein paid attorneys to represent Women 2 and 4 (*see* Sealed Ex. A, Tr. 32:22 – 33:10; Sealed Ex. E, Tr. 4:4-12), and he remained in contact with Woman 3 even after she was served with a subpoena to testify. Insomuch as witnesses are free to disclose their testimony before the grand jury to whomever they want, the Court could infer that Goldstein had the ability to ascertain the questions asked of his former paramours shortly after they testified in May, June, and September 2024.

However, the Court need not speculate about what Goldstein knew regarding the scope of the grand jury's examination of his former "employees" because Goldstein memorialized it in a January 6, 2025, complaint written to the Department of Justice.[1]

> This roving search for a crime appears to be motivated in large part by personal animus towards Mr. Goldstein. We are aware that witnesses have been asked—in interviews and before the grand jury—about Mr. Goldstein's sexual habits and proclivities, the details of his marriage, and his personal relationships. The government has demanded that third parties produce sexually explicit photographs and videos involving Mr. Goldstein. Needless to say, these topics and materials have nothing to do with any possible theory of criminal liability. Instead, they reflect an inappropriate, prurient obsession with Mr. Goldstein's personal life.[1]

This letter proves that Goldstein was aware of the purported improprieties about which he now complains even *before* the grand jury returned its initial Indictment against him on January 16, 2025. Dkt. 1.

Goldstein's argument that he could not have fully articulated the scope of the alleged misconduct without access to the grand jury transcripts for Women 2 through 4 falls flat. First, because he was "aware" of what witnesses had been asked before the grand jury as of January 6, 2025, Goldstein could have moved the Court for relief after he was indicted and asked the Court to conduct an *in camera* review of the grand jury transcripts to determine if there had been, in fact, any abuse or misconduct. Indeed, Goldstein asked the Court for this *very relief* in March 2025 when he previously (and falsely) alleged misconduct against the government. *See* Dkt. 89 at 3.

Moreover, Goldstein's "good cause" argument—that he was "aware" of grand jury abuse but was permitted to sit on it until he received the women's *Jencks* material—would make a mockery of the Court's Scheduling Order and the District of Maryland's discovery practices. Under Goldstein's theory, the substantive motion deadline would be

---

[1] *See* Gov't Ex. 1 (redacted letter from Kravis to Deputy Attorney General Monaco), p. 7.

meaningless because this Court ordered the government to produce *Jencks* material two weeks before trial (*see, e.g.*, Dkt. 107 at 2) and this District's ordinary practice is to produce *Jencks* material one week before trial. *See* Standing Order 2020-01, ¶ 7(a). The *Jencks* production deadline does not automatically qualify as good cause to trigger a new round of motions on the eve of trial.

## II. There was no abuse of the grand jury process in this case.

The grand jury enjoys extensive investigatory powers. "[T]he grand jury 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'" *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991) (*quoting United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950)). Thus, "[t]he function of the grand jury is to inquire into *all information* that *might possibly* bear on its investigation until it has identified an offense or has satisfied itself that none has occurred." *Id.* (emphasis added). "The breadth of [the grand jury's] powers reflects the importance of the grand jury's investigatory mission." *In re Grand Jury Proceedings No. 92-4 Doe No. A93-155*, 42 F.3d 876, 878 (4th Cir. 1994). It could be said that the Supreme Court has thus aptly (and repeatedly) described grand juries' investigations as 'leaving no stone unturned.' *See, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 701 (1972) ("A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'" (quoting *United States v. Stone*, 429 F.2d 138, 140 (2nd Cir. 1970))); *United States v. Dionisio*, 410 U.S. 1, 13 (1973) (same).

Because of their important role in our criminal justice system, there is a "presumption of regularity" attached to grand jury proceedings. *United States v. Bros. Constr. Co.*, 219 F.3d 300, 314 (4th Cir. 2000); *United States v. Moss*, 756 F.2d 329, 331-

4

32 (4th Cir. 1985); *see also, R. Enters., Inc.*, 498 U.S. at 300-01 ("We begin by reiterating that the law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority."); *United States v. Mechanik*, 475 U.S. 66, 75, (1986) (O'Connor, J., concurring in judgment) ("The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process"). Thus, district courts in the Fourth Circuit do not intervene in the grand jury process "absent compelling evidence of grand jury abuse." *United States v. McTague*, 840 F.3d 184, 189-90 (4th Cir. 2016); *see also Moss*, 756 F.2d at 331-32; *In re Grand Jury Subpoenas*, 581 F.2d 1103, 1108 (4th Cir. 1978).

Goldstein bears the burden of rebutting the presumption of regularity. *Bros. Constr. Co.*, 219 F.3d at 314; *Moss*, 756 F.2d at 332. As the Fourth Circuit held in *McTague*, although it is not insurmountable, "[a] defendant claiming grand jury abuse faces an uphill climb […]." *McTague*, 840 F.3d at 193. Goldstein is only entitled to dismissal of the indictment where he can establish actual prejudice arising from the purported abuse. *Bank of N.S. v. United States*, 487 U.S. 250, 256 (1988); *United States v. Feurtado*, 191 F.3d 420, 424 (4th Cir. 1999). "Dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of N.S.*, 487 U.S. at 256 (quoting *Mechanik*, 475 U.S. at 78); *see also, Feurtado*, 191 F.3d at 424 (requiring "proof that the grand jury's decision to indict was substantially influenced […] by testimony which was inappropriately before it."). Goldstein simply cannot meet his burden here.

A. <u>The testimony offered by Women 2 through 4 was directly relevant to the tax evasion charged in this case.</u>

The government has not found—nor has Goldstein cited—any case supporting dismissal of an indictment solely because one or more witnesses provided the grand jury with "sordid" details about a defendant's extracurricular romantic entanglements. And, while it is quaint for Goldstein to suggest—in 2025—that mere infidelity may have shocked the conscience of the grand jury, there is simply no evidence of that here.

While there are no cases on point, this Court can draw a useful parallel from the Supreme Court's decision in *R. Enterprises, Inc.*, in which it held—in the context of a grand jury subpoena for documents including "sexually oriented" books and videotapes—that challenges to relevancy of information sought by the grand jury "must be denied unless the district court determines that there is *no reasonable possibility* that the [information sought] will produce information relevant to the general subject of the grand jury's investigation." *R. Enterprises, Inc.*, 498 U.S. at 301 (emphasis added); *see also, In re Grand Jury Proceedings No. 92-4 Doe No. A93-155*, 42 F.3d at 878 ("The inquiry centers on the information's potential usefulness. 'Once it is shown that a subpoena might aid the grand jury in its investigation, it is generally recognized that the subpoena should issue even though there is also a possibility that the prosecutor will use it for some other purpose than obtaining evidence for the grand jury.'" (quoting *In re Antitrust Grand Jury Investigation*, 714 F.2d 347, 350 (4th Cir. 1983))). Most importantly, "[one] simply cannot know in advance whether information sought during the investigation will be relevant and admissible in a prosecution for a particular offense." *R. Enterprises, Inc.*, 498 U.S. at 301.

However, the Court need not struggle here, because the testimony sought from Women 2 through 4 was directly relevant to the grand jury's investigation of Goldstein's criminal tax evasion. The grand jury was entitled to examine the precise nature and extent of Goldstein's relationship with Women 2 through 4—including before, during, and after their purported "employment"—to determine whether Goldstein was guilty of mere nepotism or criminal tax evasion. For example, the fact that Goldstein was financially supporting—and had or was pursuing romantic relationships with—Women 2 through 4 before he "hired" them to work at the firm provides important context from which the jury could evaluate whether they were *bona fide* employees. Similarly, testimony regarding Goldstein's *continued* contacts and relationship with Women 2 through 4 after they were no longer "employed" by the firm also bear on the witness's credibility (*e.g.*, if Goldstein continued his financial support or if they continued an intimate, non-platonic relationship, the jury could draw inferences about how that might influence the witnesses' testimony).

Finally, while the primary focus of the grand jury's investigation was Goldstein's tax crimes and associated mortgage fraud, the grand jury had every right to explore whether Goldstein's financial support of various women in the hopes of—or in exchange for—their intimate companionship crossed into other federal offenses, particularly in light of evidence the grand jury had gathered regarding Goldstein's communications with these women. "In the grand jury context, the decision as to what offense will be charged is routinely not made until after the grand jury has concluded its investigation." *R. Enters., Inc.*, 498 U.S. at 300. The fact that the grand jury did not ultimately charge Goldstein with any other crimes—such as violations of the *Mann Act*—does not retroactively invalidate its investigation of those crimes.

B. <u>The live testimony presented to the grand jury stands in stark contrast to the cases upon which Goldstein relies.</u>

Many of the cases Goldstein cites in support of his motion are simply inapposite to the facts here. For example, in *Feurtado*, the Fourth Circuit affirmed the defendants' convictions on a second indictment after the district court dismissed the initial indictment without prejudice. *Feurtado*, 191 F.3d at 425. However, the district court dismissed the initial indictment only because the case agent testified to the grand jury—incorrectly— that the defendants, under investigation for drug distribution, were connected to a series of homicides in New York, including the death of a police officer. *Id.*, at 423. The case agent acknowledged at a hearing on the motion to dismiss that he based his grand jury testimony on a conversation that he had with an NYPD detective, but that he later learned that the defendant did not have any connection to that murder. *Id.*, at 424.

Similarly, in *United States v. Lawson*, this Court dismissed an indictment without prejudice, finding that the prosecutor deliberately misled the grand jury by (i) introducing a witness's prior statement only by having it read to the grand jury by a law enforcement witness, (ii) failing to disclose to the grand jury evidence the Court found to be exculpatory (and bolstering the witness's prior statement),[2] and (iii) recalling the same witness with the express purpose of impeaching them in an attempt to get them to change their testimony. *United States v. Lawson*, 502 F. Supp. 158, 172 (D. Md. 1980).

Here, the grand jury did not rely on hearsay about the nature and extent of Goldstein's relationships with Women 2 through 4, but rather they heard from those women directly. Moreover, Goldstein *does not* argue that the prosecutors taking

---

[2] Notably, this Court's decision in *Lawson* precedes the Supreme Court's clear statement in *United States v. Williams,* 504 U.S. 36 (1992), that the failure to present exculpatory evidence to the grand jury does not provide a basis for the dismissal of an indictment.

8

testimony from Women 2 through 4 misled the grand jury in any way during their examinations or otherwise misrepresented facts to the grand jury in conjunction with their testimony. Indeed, the grand jury was empowered to directly question the witnesses if they had questions about the veracity of the testimony they were providing. Finally, it strains credulity to analogize this case to one in which the grand jury heard false evidence that the defendants were involved in a series of homicides, including of a police officer.

    C. <u>The grand jury gathered a significant volume of evidence regarding Goldstein's tax crimes and bank fraud.</u>

Finally, the testimony about which Goldstein now complains was only a small portion of the total testimony—157 pages, combined—the government elicited from Women 2 through 4 before the grand jury. Most of the questions asked did not relate to Goldstein's sexual history with these women but (i) how they met Goldstein, (ii) how they came to be paid through his law firm, (iii) why they agreed to "work" for Goldstein, (iv) the nature and extent of the "work" they performed as "employees" of the firm, (v) the amounts Goldstein spent on these women rather than paying his income taxes, and (vi) their separation from Goldstein and his firm. *See generally*, Sealed Exs. A, B, and E.

Moreover, testimony from these three women represent only a sliver of the total evidence the grand jury gathered and considered before returning an indictment against Goldstein. The grand jury heard from more than twenty witnesses regarding Goldstein's criminal tax evasion, his failures to pay his federal taxes, and his serial lies to mortgage lenders in conjunction with mortgage applications. As the Court recognized (in the context of the initial Indictment): it was "supported by, among other things, the Defendant's contemporaneous communications, documented loans that were not disclosed to mortgage lenders, bank and wire records, gambling-related memoranda

authored by the Defendant, tax and accounting records and records reflecting the Defendant's spending habits during the relevant period." Dkt. 108 at 5. Because the grand jury had substantial evidence of Goldstein's crimes before it at the time of indictment, Goldstein cannot establish that the grand jury would not have returned an indictment but for the testimony about which he now complains, and that dooms his motion to dismiss. Indeed, the notion that the grand jury returned the indictment based solely on animus triggered by a few minutes' testimony, rather than the avalanche of evidence demonstrating his many crimes, strains credulity.

### III. Goldstein lied to the Court.

On July 2, 2025, Goldstein filed a reply brief with the Court (Dkt. 154 at 5) seeking dismissal of the tax evasion allegations regarding the women and *expressly denied having a "personal relationship" with three of the four women* identified in the Indictment.

> and his relationships after their period of employment. Worse still, a great deal of what the government wrote is entirely inaccurate. The best example is that, in fact, there was no personal relationship at all with *three* of the employees while they were employed by Mr. Goldstein's law firm. But the government hides behind an array of bald assertions—saying that it should be given the opportunity to prove irrelevant, prejudicial facts at trial—to try and create the opposite, false impression.

However, Goldstein must now concede this representation to the Court was false. In his brief, Goldstein admits that the government established that he had a "romantic relationship" with Woman 2 in 2016 and the transcript of her testimony establishes that, in March 2018—immediately prior to her "employment" at the firm, Goldstein paid for

Woman 2 to travel with him to Hong Kong and sent her $2,000 over Venmo.³ Sealed Ex. A (Woman 2), Tr. 21:2-10; 15:10-25. Despite being paid as an "employee" through the end of July 2018, Woman 2 testified that she only recalled receiving two assignments from Goldstein (*Id.*, Tr. 27:11-15)—the last of which she completed on May 11, 2018—and she spent no more than 29 hours total on the two assignments. *Id.*, Tr. 24-22 – 27:10.

Goldstein also admits that he was seeking a physically intimate relationship with Woman 3, whom he met on WhatsYourPrice.com, and acknowledges that Goldstein sent Woman 3 sexually explicit photos and videos during the time she was "employed" by the firm. Even if Goldstein did not ultimately persuade Woman 3 to have a *physically* intimate relationship with him, there is no universe in which an experienced Supreme Court advocate could credibly claim that he did not have a "personal relationship" with Woman 3 when he was sending her explicit photos while paying her as an "employee."

Finally, Goldstein now admits that he had a "romantic relationship" with Woman 4, whom he claims he "hired" to work as a "translator" for his firm. Throughout his motion, Goldstein cites select portions of testimony from Women 2 through 4, but omits critical portions of their transcripts—including this one from Woman 4's testimony that exemplifies his criminal tax evasion:

> Q. Well, did he explain to you what you would be doing at the law firm?
> A. No. There is no obligations for me doing anything. I wasn't really obligated doing anything. I was his girl. I --

---

³ Goldstein also persuaded Woman 2 to engage in physical intimacy with Goldstein and Woman 4 on two occasions, though it is presently unclear whether either of the women were Goldstein's "employees" at those times. Sealed Ex. A, Tr. 29:22 – 30:2.

11

```
Q.    And in fact --
A.    I didn't work --
Q.    And in fact, you never did any services for the
law firm, correct?
A.    No, nothing.
```

*See* Sealed Ex. E (Woman 4), Tr. 29:21 – 30:4; *see also id.* at 36:16 – 37:3 (explaining that, when she was given an insurance enrollment form, she *did not know* what to write as her occupation at the firm so she asked Goldstein and he told her to write "translator"). The record makes clear he was in a personal relationship with each of these women.

Goldstein's attempt to deceive the Court—whether intentionally or merely through too-clever-by-half phrasing—is reminiscent of his criminal conduct charged in the Superseding Indictment. Worse, it suggests that—just as the Court cannot count on the cases he cites to stand for the propositions he claims[4]—the Court can no longer rely on any of Goldstein's factual representations, including those in support of his pending motion to dismiss.

---

[4] *See, e.g.*, Goldstein's citations to *United States v. Outlaw*, 464 F. App'x 165 (4th Cir. 2012) and *Williams*, 504 U.S. at 36, for the proposition that "the appropriate remedy for the prejudicial grand-jury [*sic*] misconduct in this case is dismissal of the indictment *with prejudice*." *See* Dkt. 234 at 13 (emphasis added). Neither case stands for the proposition that dismissal with prejudice is the "appropriate remedy" here. In *Williams*, the Supreme Court *reversed* a lower court's dismissal of an indictment *without prejudice*, finding the indictment was valid, and, in *Outlaw*, the Fourth Circuit affirmed the defendant's conviction (and only used the word "prejudice" twice to discuss the *Bank of Nova Scotia* test for dismissal).

## IV. Goldstein's admissions regarding his relationships with Women 2 through 4 confirm the propriety of the tax evasion charges as alleged and will obviate the need for explicit testimony at trial.

Now that Goldstein has finally admitted that he had or sought personal, non-platonic relationships with Women 2 through 4 while he supported them financially through payments from his firm, the government expects that it will not need to present the intimate details of Goldstein's relationship with these women. Indeed, as the government advised Goldstein in its September 2025 prophylactic Rule 404(b) notice (Dkt. 210-1), the government stood prepared to present evidence of the intimate details of Goldstein's relationship with these "employees" *if* Goldstein was going to assert—as he did in his July 2 reply brief—that he had a purely platonic employer-employee relationship with each of these women. So long as Goldstein does not once again change his position about the nature of his relationships with these women, the government does not see any need to present graphic or explicit evidence of Goldstein's romantic entanglements with Women 2 through 4.

Moreover, Goldstein has now marshaled and highlighted for the Court the very evidence that supports the government's position that the four women identified in the indictment were not *bona fide* employees (*i.e.*, Goldstein hired them with an ulterior motive of maintaining or establishing a romantic relationship). As explained in the government's supplemental brief (Dkt. 230), the jury is entitled to determine whether Goldstein's conduct with respect to hiring the four women identified in the Superseding Indictment was willful tax evasion (or, as he asserts, mere nepotism).

[ * * * ]

## **CONCLUSION**

Based on the foregoing, the United States asks the Court to deny Goldstein's newest—untimely—motion to dismiss the indictment.

Respectfully submitted,

KELLY O. HAYES

United States Attorney

Sean Beaty
Senior Litigation Counsel
Department of Justice, Tax Division

Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice, Tax Division

Adeyemi Adenrele
Assistant United States Attorney
District of Maryland