## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. LKG-25-0006** |
| **THOMAS C. GOLDSTEIN,** | |
| **Defendant.** | |

## GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S
## MOTION TO EXCLUDE EMPLOYEE EVIDENCE

Despite the Court's clear ruling that it would defer until trial decisions regarding the admissibility of evidence regarding Goldstein's four paramours—romantic partners Goldstein was already financially supporting when the defendant "hired" them so he could pay them through his law firm—as it relates to Goldstein's false tax returns and failure to timely pay his taxes, Goldstein now moves to exclude *all* evidence related to the four women. *See* Mot., ECF 309. While styled as an evidentiary motion, Goldstein's request amounts to yet another untimely motion, this one to dismiss certain allegations from Counts 10 and 12 of the indictment and then exclude damning evidence that Goldstein spent money on himself and his love interests rather than paying his taxes. Goldstein's Motion is untimely and raises factual challenges to Counts 10 and 12, which are issues reserved for the jury. Moreover, the evidence is squarely relevant to Counts 10, 12, and 16 through 19, and is far more probative than it is prejudicial. The Court should deny this motion.

## BACKGROUND

The Second Superseding Indictment alleges: "Between 2016 and 2022, Goldstein was involved in, or pursued, intimate personal relationships with at least a dozen women, transferring hundreds of thousands of dollars to them from his financial accounts or joint bank accounts he set

up with the women, and paying for travel and other expenses for many of them." Second Superseding Indictment ("Indictment") ¶ 11, ECF 239.

It also alleges that Goldstein caused four of these women to be nominally "hired" as employees of G&R and that he caused G&R "to pay salaries to the four women and pay health insurance premiums on their behalf" even though he "knew that these women would and did perform little or no work for G&R, and were not eligible for G&R's health insurance." *Id.* ¶¶ 12-15. Thus, Goldstein caused the "salary payments to, and insurance premiums for, these women . . . to be deducted as G&R business expenses, thereby falsely reducing his taxable income." *Id.* ¶ 17.

Based on these allegations, Counts 10 and 12 of the indictment charge Goldstein with causing the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2), and allege, among several lines of the 2018 and 2019 Forms 1120S, false items on the "Salaries and Wages," and "Employee Benefit Programs" lines. *Id.* ¶ 117.

In his Motion to Dismiss Allegations Concerning Employees, ECF 122, Goldstein argued the Court should dismiss the tax evasion allegations about the employees as void-for-vagueness because § 7201 did not provide adequate notice of when it becomes criminal to deduct payments to an employee who did "little work." *Id.* at 4, 8-9, 11. The government opposed, arguing that Goldstein had adequate notice about the criminality of deducting the salaries and insurance premiums for all four women. As to Woman 4, the government argued Goldstein had adequate notice because he and she "knew she was never going to do any work for G&R," was not a "translator," and both later confirmed that in texts, so all of her salary and insurance premiums were improper. Opp. 24, ECF 135. As to the insurance premiums for Women 2 and 3, the government argued that Goldstein had adequate notice that deducting these was criminal because he knew the women were completely ineligible for the firm's health insurance and the then he lied

about it. *See* Opp. 5-9; Suppl. Br. 12-16, ECF 230. The government also argued that he had adequate notice that deducting the salary paid to Women 1-3 was criminal for various reasons. Suppl. Br. 9, ECF 230.

At the December 12 hearing, the Court dismissed the allegations about the women from Count 3 (tax evasion for tax year 2018), but emphasized that Goldstein's void-for-vagueness argument pertained only to Count 3, which was the only count Goldstein challenged, and reiterated that the Court was not striking the allegations elsewhere in the Indictment or as they pertained to Goldstein causing the preparation of false tax returns. The Court's subsequent memorandum opinion reflected this, dismissing "the allegations concerning the four women employees related to the Government's tax evasion charges in Count 3." Mem. Op. 14, ECF 297; *see also id.* at Mem. Op. 6 (quoting allegation in ¶ 113(b)). The Court also concluded that § 7201's willfulness requirement could not overcome the vagueness concerns. *Id.* at 13.

Goldstein now moves to exclude the "evidence of the employee allegations for all purposes," arguing it is not admissible for the charges for his aiding the preparation of false tax returns (Counts 9-13), or the willful failure to pay charges (Counts 15-19). Mot. 5-6, ECF 309.

## ARGUMENT

### I.    Goldstein has not demonstrated good cause for his late motion.

The instant motion is a seven-months-late motion to dismiss masquerading as an evidentiary one. The Court's original Pretrial Scheduling Order set a pretrial motions deadline of May 16, 2025—more than six months ago. ECF 107. Goldstein filed his motion to dismiss Count 3's tax evasion allegation related to the women on that date. *See* Mot. Dismiss, ECF 122. In that brief, he chose not to challenge the § 7206(2) Counts 10 and 12. He also chose not to challenge or Counts 16-19, which charge him with willfully failing to pay his taxes, in violation of 26 U.S.C.

§ 7203, or the related allegation that, while not paying his taxes, he "spen[t] millions of dollars on personal expenses, including luxury purchases and payments to and on behalf of women." Indictment ¶ 28. Moreover, its original June 2025 opposition, the government explained Goldstein's payments to these women were also relevant the "other counts not at issue in the Motion," including, "[f]or example," Counts 15-19. Opp. 27-28, ECF 135. Despite this, Goldstein did not argue that these charges also were void-for-vagueness in any of his many subsequent filings. *See* Reply 13, ECF 154 (contesting only relevance to § 7203); Def. Notice, ECF 171; Def. Suppl. Filing, ECF 190; Reply to Gov. Suppl. Br., ECF 246.

If Goldstein had wished to argue these charges were also void-for-vagueness as applied to the four women, then he should have made that argument in his original motion. Or in his original motion to dismiss the failure to pay counts, ECF 126. Or in an entirely separate motion to dismiss. Or in his multiple reply briefs. He did not.

Although Goldstein dresses up his motion as an evidentiary matter, it is in fact a motion to dismiss filed seven months late. By seeking to exclude all evidence related to the four women from Counts 10 and 12, he effectively seeks to dismiss the false items charged on Line 8 (Salaries and Wages) and Line 18 (Employee Benefits). Goldstein has not even attempted to show good cause, and the Court should deny Goldstein's motion as untimely. *See, e.g.*, Potomac Elec. Power Co. v. Elec. Motor Supply, Inc., 190 F.R.D. 372, 375 (D. Md. 1999).

## II.    The evidence regarding these four women is relevant to the § 7206(2) false return charges in Counts 10 and 12.

### A.    The Court's ruling on the tax evasion allegation does not extend to these false return charges.

The Court held that the tax evasion allegation about the women in paragraph 113(b) of Count 3 was void for vagueness because it did not provide adequate notice about the point at which

a legitimate employee's salary or insurance premiums become shift from being business expenses to criminally deducted personal payments. Mem. Op. 13. Specifically, the Court reasoned that "at least some of the salaries and health insurance premiums paid to, or on behalf of the women, were business expenses." *Id.* It then focused on two of the government's theories of notice: excessive payments, and payments made after the women stopped working. On the first, the Court reasoned that there was no clear standard for when a salary became "excessive" and thus criminal. *Id.* On the second, the Court reasoned that there also was no clear standard for "how much time may elapse after an employee completes her tasks before the payments" for salaries and insurance become a personal expense, and similarly no clear standard for when "continuing to pay the health insurance premiums for an employee who has taken medical leave" would become criminal. *Id.*

The core of the Court's ruling is that *if* an employee does some work (or was expected to do some work) and was initially eligible for health insurance, *then* an ordinary person could not know the point at which it becomes criminal to overpay the employee or keep paying their salary and insurance premiums after they stop working. *See id.* This is a narrow ruling on the notice provided by § 7201 and, although the government respectfully disagrees, it need not and does not contest the ruling here.

The Court's ruling, however, does not—and should not—extend to the § 7206(2) charges. Here, Counts 10 and 12 charge Goldstein with violating § 7206(2) by causing various false items on G&R's 2018 and 2019 Forms 1120S, including Line 8 "Salaries and Wages" and Line 18 "Employee Benefits Programs" (which includes insurance). Indictment ¶ 117. As discussed below, the Court's ruling on the notice provided by § 7201 does not presage dismissal of these false items or a finding that Goldstein could not have been willful in causing them.

**B.     Goldstein willfully caused his personal payments to Woman 4—who was a complete sham employee—to be improperly included as business expenses on both Forms 1120S.**

"[T]he parties agree that it would be improper for the Defendant to treat the salary and health insurance premiums paid to a so-called 'sham' employee who performs no work as a business expense." Mem. Op. 12.

That is precisely what Woman 4 was: a sham employee. First, she and Goldstein expected and "knew that she was never going to do any work for G&R, but they created false documents declaring that she was a 'translator' despite [her] clear inability to perform that role." Opp. 24, ECF 135. Indeed, when Goldstein was adding her as an "employee" in October 2018, she did not even know her purported job, causing him to tell her, "Your occupation is translator." *Id.* at 10.

Second, Woman 4 remained on G&R's insurance as an "employee" translator on supposed "unpaid medical leave" almost a year later when Goldstein texted her that she had "*[n]o job*," "[n]o skills," and could not "speak English." *Id.* 12-13. She replied that she had worked various jobs, including as a model and a medical office assistant—but conspicuously did mention *any job at G&R* or as a translator. *Id.* 24. These texts incontrovertibly prove Woman 4 was never a translator at G&R, Goldstein never thought she could even be a translator, and her purported year-long "medical leave" was a lie Goldstein concocted to keep her on insurance. Her extensive travel with him while on "medical leave" and his later request that *she* pay *the firm* for her insurance premiums further underscore her status as a sham employee.[1]

---

[1] The Government has maintained this from the beginning. The Indictment alleged that G&R paid her more than $4,000 in salary and paid her health insurance between 2018 and 2020 even though she "performed no work for G&R." Indict. ¶ 16. The government's original opposition discussed these facts in detail, arguing Goldstein "knew she was never going to do any work," and they both "understood that there was not any expectation of work." Opp. 9-14, 24. Its supplemental brief returned to these facts, concluding that he paid her "for a no-show job" for which he "knew [she] would never 'actually render' any services." Suppl. Br. 17-10, ECF 230.

6

The Court's ruling on § 7201 does not apply to Goldstein's violations of § 7206(2) involving Woman 4. The Court held that § 7201 does not give a person adequate notice of when it becomes criminal to overpay a legitimate employee for work they complete, or continue paying that employee salary or health insurance premiums after they finish their work or go on genuine medical leave. Mem. Op. 12. That assessment does not apply to Goldstein's deduction of the Woman 4's salary and insurance premiums because she was a sham employee from the beginning. He knew she would never do any translator work for G&R and he never expected her to do any such work. Her "medical leave" was a sham for the same reason—as Goldstein himself effectively said when he told her she had "[n]o job" and could not "speak English."

Thus, the Indictment adequately alleges Goldstein willfully violated § 7206(2) with G&R's salary and insurance premium payments to Woman 4. *See* Indictment ¶¶ 16, 117 (alleging Woman 4 did no work, and Goldstein "did willfully aid and assist in, . . . the preparation and presentation" of false 2018 and 2019 Forms 1120S that including the false salary and insurance premium items related to Woman 4). The government's briefing has only reinforced this.

Despite the Indictment's allegations and all the evidence, Goldstein maintains Woman 4 truly was a "translator" for G&R and truly was on unpaid medical leave. That is a factual issue for the jury to decide, not one that Goldstein can make now or that this Court can resolve on a pretrial motion, let alone one to exclude evidence. *See United States v. Wills*, 346 F.3d 476, 488 (4th Cir. 2003) ("[C]ourts lack authority to review the sufficiency of evidence supporting an indictment."); *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) ("'[A] court may not dismiss an indictment [based] on a determination of facts that should have been developed at trial.'").

Because improper deductions related to Woman 4 are alleged and charged in Counts 10 and 12, the evidence regarding Woman 4 is squarely relevant.

### C.    Goldstein willfully caused insurance premiums paid for Women 1-3 to be improperly included as business expenses on Line 18 "Employee Benefit Programs."

Just as a defendant cannot deduct personal payments to a "sham employee" who does no work for the business, *see* Mem. Op. 12, a defendant also cannot deduct insurance premium payments for an employee whom the defendant knows is *completely ineligible* for the insurance.

Here, Women 2 and 3 were never eligible for G&R's insurance plan and Goldstein knew it, so he lied to his firm manager (and thus to the insurer) when he was hiring them.

Specifically, Goldstein learned in April 2018 that employees were eligible for G&R's health insurance only if they worked 30 or more hours per week. Opp. 5, ECF 135. Nonetheless, Goldstein instructed Woman 3 to only work 10 hours per week. *Id.* at 7-8. He similarly gave Woman 2 only two assignments, which took less than two days total to complete. *Id.* at 6. He never told either woman that they would or needed to work 30 hours per week, let alone that they would be full-time employees. *See id.* at 6, 8.

Despite telling Woman 3 to work only 10 hours and giving Woman 2 less than two days' worth of work, Goldstein told his firm manager that both women would work at G&R as "FTEs"— full-time employees. Opp. 5. Thus, he lied to the firm manager about their hours worked to secure insurance for which he *knew they were ineligible* because they would work far fewer than 30 hours.[2]

The eligibility of Women 2 and 3 was a complete sham: they never qualified for health care but for Goldstein's fraud. Because insurance eligibility was a binary—either they worked the required number of hours or they did not (and they *did not*)—no part of the insurance payment

---

[2] Woman 4 was ineligible *ab initio* because she was a sham employee and thus never would or did hit the required number of hours per week.

premiums could be business expenses.

Even if the court's § 7201 notice analysis applied to § 7206(2) generally, it does not apply to the § 7206(2) charges for the insurance premiums paid to those three women. The Court's § 7201 ruling hinged on the conclusion that "at least *some* of the . . . health insurance premiums paid to, or on behalf of the women, were business expenses." Mem. Op. 12 (emphasis added). The government understands the Court's ruling to be that, if Goldstein thought Woman 1 (or any of the women) would work enough hours to be eligible for insurance, then that insurance could have been a business expense and he would not have had adequate notice. *See id.*

In contrast, Goldstein knew that Women 2, 3, and 4 would never be eligible for health insurance. There is no void-for-vagueness issue for § 7206(2) here because Goldstein knew from the very beginning that Women 2, 3, and 4 were ineligible so *no part* of their premiums could ever be a business expense.

The Indictment alleges precisely this: "Goldstein knew that the women . . . were not eligible for G&R's health insurance." Indictment ¶ 14. Thus, it charges Line 18 "Employee Benefit Programs" as false on the 2018 Form 1120S (for Women 2 and 3, as well as 4). *Id.* ¶ 117. This suffices. To the extent that Goldstein argues he genuinely though they were eligible for the insurance (despite his lies to his firm manager), this is a factual issue reserved for the jury and cannot be resolved here. *See, e.g.*, *Engle*, 676 F.3d at 415.

The Indictment charges Goldstein with willfully causing the preparation of false Forms 1120S by, among other things, causing the improper deduction of the insurance premiums for Women 2, 3, and 4. Thus, the evidence related to them is directly relevant to Counts 10 and 12.

### III. Evidence regarding the four women remains relevant to the willful failure to pay charges in Counts 16-19.

In criminal tax cases, "[t]he Fourth Circuit has recognized that "'intentional preference of other creditors over the United States is sufficient to establish the element of willfulness.'" *United States v. Akins*, No. 24-CR-0255, 2025 WL 2720003, at *6 (D. Md. Sept. 24, 2025) (quoting *United States v. Boccone*, 556 Fed. App'x 215, 239); *accord Turpin v. United States*, 970 F.2d 1344, 1347 (4th Cir. 1992)). So have other circuits. *See United States v. Blanchard*, 618 F.3d 562, 569 (6th Cir. 2010); *United States v. Ellis*, 548 F.3d 539, 543 (7th Cir. 2008).

#### A. Even if the Court strikes the allegations about these four women as to Counts 10 and 12, Goldstein's other payments to them remain relevant to Counts 16-19.

The Indictment alleges that between 2016 and 2022, Goldstein had personal relationships with more than a dozen women, "transferring hundreds of thousands of dollars to them from his financial accounts or joint bank accounts he set up with the women, and paying for travel and other expenses for many of them." Indictment ¶ 11.

Indeed, Goldstein paid the instant four women significant sums. He paid Woman 1 more than $7,000 over PayPal in 2017—and soon after failed to pay his full 2017 taxes. He paid Woman 2 more than $19,000 through PayPal and Venmo in 2018 through 2019. He gave Woman 3 access to his credit card for her personal use. And he paid more than $55,000 to Woman 4 between 2018 and 2020 while owing millions in taxes. All told, his payments in 2017 through 2020 to these four women exceed $80,000.

That Goldstein made substantial personal payments to these four erstwhile romantic partners despite failing to pay millions of dollars on his 2017, 2019, and 2020 taxes is paradigmatic evidence of his willfulness. *See Boccone*, 556 Fed. App'x at 239.

**B.    The four women also provide evidence relevant to other personal spending.**

Women 1, 2, 3, and 4 were present for much of Goldstein's life in 2016 through 2020. As a result, they were also present for many other major purchases that he made and can corroborate that these purchases were personal expenses, rather than business ones. For example, Goldstein flew Woman 2 and Woman 4 to Hong Kong for personal trips, once arranging for a Rolls Royce to pick up Woman 4 from the airport. He also repeatedly attended Burning Man, spending $14,000 to rent an RV for it in 2018 alone; he told Woman 2 about attending Burning Man, and then attended it with Woman 4.

Equally important, Woman 1, 2, and 4 also can confirm Goldstein's extravagant spending on rental properties in California, including an apartment and two Hermosa Beach homes—which cumulatively cost him more than $350,000 in rent between 2017 and 2019, while he owed millions in unpaid taxes.

Women 2 and 4 can also corroborate that a woman to whom Goldstein transferred more than €35,000 from his personal Montenegrin bank account was another romantic partner of his. This, in turn, tends to show that Goldstein's payments to her were personal expenses and that, as a result, the money he received from Foreign Gambler 3 in 2016 was entirely income that should have been reported.

Finally, Goldstein told Woman 1 and 2 various details about his travels to Asia for high-stakes poker games in 2017 and 2018, and brought Woman 4 to Asia during a 2018 trip on which he helped prepare for an upcoming trial involving Foreign Gambler 3—and for which he failed to report roughly $235,000 that Foreign Gambler 3 paid him in 2019.

In sum, the four women provide relevant evidence to much of Goldstein's charged unreported income, and much of the personal spending that demonstrates his willfulness. Thus, their evidence is overwhelmingly relevant to the § 7206(2) and § 7203 charges.

**IV.    The evidence should not be excluded under Rule 403.**

Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. "Because the evidence sought to be excluded under Rule 403 is concededly probative, the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded *only sparingly*." *Aramony*, 88 F.3d at 1378; *see also United States v. Chaudhri*, 134 F.4th 166, 183 (4th Cir. 2025) ("Rule 403 is a rule of inclusion . . . .").

"Of course, 'all evidence suggesting guilt is prejudicial to a defendant.'" *Chaudhri*, 134 F.4th at 183 (quoting *United States v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2008)); *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998) (quoting Weinstein's Federal Evidence for the proposition "that prejudice 'under Rule 403 does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence'").

General prejudice does not warrant exclusion. *Id.* Rather, "the prejudice must be unfair, and even then the unfair prejudice must substantially outweigh the probative value of the evidence." *Id.* at 184 (cleaned up). "Evidence is unfairly prejudicial and thus should be excluded under Rule 403 when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." *Id.* (quoting *United Stated v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006)). Moreover, the danger of unfair prejudice "'can be generally obviated by a cautionary or limiting instruction, particularly if the danger of prejudice is slight in view of the overwhelming evidence of guilt.'" *Aramony*, 88

12

F.3d at 1378 (quoting *United States v. Masters*, 622 F.2d 83, 87 (4th Cir. 1980)).

Here, the evidence regarding the women is *far* more probative than it is prejudicial.

On the one hand, as discussed above, this evidence is not only relevant but a substantial part of Goldstein's § 7206(2) violations charged in Counts 10 and 12. Simply put, his false deduction of the salary payments to Woman 4, and of all the insurance premiums paid for Women 2, 3, and 4, cannot be proven without the evidence related to them.

The government must prove willfulness for the tax charges, an exceedingly high *mens rea* standard that is often hard to prove. *See Cheek v. United States*, 498 U.S. 192, 201 (1991); *Siegel*, 536 F.3d at 320 (stating, "Intent is often a difficult element to prove," and reversing district court's wholesale exclusion of other acts evidence under Rule 403). Without basic testimony from these women, it will be exceedingly difficult for the government to demonstrate Goldstein knew they were not eligible for insurance premiums (and, in the case of Woman 4, salary).

Furthermore, this evidence is important because Goldstein's apparent defense is to blame his firm managers and accountants, claiming his crimes were actually their mistakes. As a result, this evidence is particularly probative of his willfulness because it shows him *affirmatively lying* to his firm managers (and thus accountants). He cannot blame these improper deductions on them because he intentionally lied to them. This, in turn, reinforces his general attitude toward his taxes, and his willfulness in violating the tax laws for years on end.

The evidence regarding all four women is also highly probative of Goldstein's willful failure to pay his taxes in many years. First, the evidence and testimony regarding their roles establishes Goldstein's recurring choice—to the tune of more than $80,000—to make personal payments to them rather than pay his overdue taxes.

Second, testimony and evidence related to the women also demonstrates his profligate

13

luxury spending on rental homes, hotels, and luxury travel, which is further evidence of his willful failure to pay taxes.

Third and most importantly, their evidence establishes these expenditures were genuinely personal and were not business expenses. Unless Goldstein is now stipulating that his rental homes and luxury vacations were actually personal—and not business related—expenses, the government bears the burden of proving this at trial.

On the other hand, the danger of unfair prejudice to Goldstein is low. He no longer contests the fact that he had romantic relationships with these women. Unless he changes his mind and argues their relationships were not personal, then there is no need for *any* additional evidence or testimony about the nature of those relationships or any intimate details related to them.

In 2025, the notion that extramarital relationships would excite a jury to "irrational behavior" or "subordinate reason to emotion" is quaint. *See Chaudhri*, 134 F.4th at 184; *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997). Indeed, Goldstein himself has now publicized—in the New York Times—that he at one point had relationships with three women and lived with all three together in a house, and at another point "brought four of his girlfriends with him" abroad. *See* Jeffrey Toobin, *He Was a Supreme Court Lawyer. Then His Double Life Caught Up With Him*, N.Y. Times (Dec. 28, 2025) ("NYT Article"), https://www.nytimes.com/2025/12/28/magazine/thomas-goldstein-supreme-court-gambling.html. He similarly publicized that he spends "many weekends" in New York practicing "*shibari*, a form of Japanese rope bondage," and is now "asked to do performances around the country." *Id.*

Goldstein's comfort telling all this to the New York Times shows he is well aware of how unprejudicial the mere fact of his multiple relationships is—and reveals his claims of substantial

14

prejudice are disingenuous, at best.[3] Moreover, to the extent that there is any risk of prejudice, that risk can be screened out through *voir dire* questions and an appropriate jury instructions. Indeed, the government has already proposed both. *See* Joint Proposed Voir Dire Questions 12, ECF 313 (proposing *voir dire* questions related to biases about extramarital relationships); Joint Proposed and Disputed Jury Instructions 16, ECF 312 (proposing instruction that jurors should not consider their personal feelings about such relationships when deliberating).

These suffice to remove the risk of prejudice. *See United States v. Ebert*, 61 F.4th 394, 404 (4th Cir. 2023) ("Generally speaking, cautionary instructions will cure any unfair prejudice except in the most extraordinary circumstances." (internal quotations omitted)); *Aramony*, 88 F.3d at 1378 ("[T]he unfair prejudicial value of evidence can be generally obviated by a cautionary or limiting instruction . . . ." (internal quotations omitted)); United States v. Mohr, 318 F.3d 613, 620 (4th Cir. 2003) (finding the court's "careful limiting instruction significantly ameliorated any possible unfair prejudice").

Finally, if the Court excludes the evidence on Rule 403 grounds (it should not), Goldstein may use that ruling to flip the narrative at trial, arguing in his own case in chief that his various criminal acts were motivated not by an intent to cheat on his taxes or defraud mortgage lenders, but by a desire to hide his debts and affairs from others. *See* NYT Article ("Goldstein told me that he omitted that information because he wanted to keep that debt secret from Howe, as he had kept her in the dark about most of his poker activity."). Goldstein also may reference the excluded evidence to argue the government misled the jury. Thus, to the extent that the Court excludes discussion of these four women, it should exclude that discussion from *both parties*' cases in chief.

---

[3] To the extent a jury might be prejudiced by the fact that Goldstein kept his relationships (and, according to him, virtually everything) secret from his wife, *see id.*, the jury need never hear this.

## <u>CONCLUSION</u>

The evidence related to the four women is relevant to the § 7206(2) and § 7203 charges and is far more probative than prejudicial. The Court should deny Goldstein's Motion.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

Dated: January 2, 2026                    /s/  *Emerson Gordon-Marvin*
Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice—Criminal Division

Sean Beaty
Senior Litigation Counsel
Department of Justice—Criminal Division

Adeyemi Adenrele
Assistant United States Attorney
District of Maryland