# He Was a Supreme Court Lawyer. Then His Double Life Caught Up With Him.

Thomas Goldstein was a superstar in the legal world. He was also a secret high-stakes gambler, whose wild 10-year run may now land him in prison.



Listen to this article · 30:48 min    Learn more



By Jeffrey Toobin

Dec. 28, 2025

The high point of Thomas Goldstein's career as a Supreme Court advocate took place a few minutes after 10 on the morning of Oct. 7, 2020. Goldstein had just begun his argument before the justices on behalf of Google in an immensely complicated, but highly significant, copyright dispute with Oracle. The controversy arose when Google, in developing its Android operating system for smartphones, used about 11,500 lines of computer code from Oracle's Java SE, a platform that allows developers to write programs that can run on various devices. In a lower court, Oracle won a judgment that Google's use of the code violated Oracle's copyright. Google was facing $9 billion in damages.

Before Goldstein appeared in front of the court, he had focused on one main point in his written brief: Oracle's platform was simply not copyrightable, so Google could not have committed infringement. But after hearing the first few questions from the justices, Goldstein made a sharp pivot — and took a big gamble. Even if

Oracle possessed a valid copyright in Java SE, he argued, Google had made "fair use" of the platform, which was a distinctly subsidiary point in his brief. "Fair use" of copyrighted material is not infringement.

Goldstein's shift was so dramatic that even the justices took note of it. "Mr. Goldstein," Justice Neil M. Gorsuch said, "if I understand the conversation so far, you are moving past, rather rapidly, the primary argument in your brief that the code just simply isn't copyrightable. And I think that's probably a wise move."

It was. The following April, the Supreme Court gave Google a smashing victory, entirely along the lines that Goldstein had raised on the fly at the oral argument. In a 6-to-2 majority opinion, Justice Stephen G. Breyer said that Google's copying of the lines of software amounted to fair use, and thus the court overturned Oracle's victory. Google wouldn't have to pay a cent.

For Goldstein, the decision was the latest chapter in an extraordinary story of professional ascent. The Supreme Court bar is a priesthood within a priesthood, an especially rarefied corner of the legal profession where almost all the leading performers share the same credentials: graduation from an elite law school, clerkship for a Supreme Court justice and service in the Office of the Solicitor General, which represents the federal government before the court. Goldstein did none of these things, but he still rose to the very top. At age 50, he had already argued more than 40 cases before the justices and co-founded SCOTUSblog.com, an authoritative guide to the work of the court. Thanks to a high-profile victory for a blue-chip client like Google, he could look forward to years of similarly important, and lucrative, assignments.

It hasn't worked out that way. Just a couple of years after his victory in Google v. Oracle, Goldstein stunned the world of Supreme Court advocates and insiders by announcing that he would no longer represent clients before the justices. In public, he attributed the decision to the rightward drift of the court, but that explanation contained only a sliver of the truth. In fact, over the previous decade-plus,

Goldstein had been leading a secret life of ultra-high-stakes gambling and "sugar daddy" relationships with multiple young women — a life so sheltered from those around him that no one knew the full extent of it, least of all his wife.

When it came to light, his life unraveled. His friends have largely abandoned him. His marriage of three decades is ending. He is nearly bankrupt. Most pressing of all, Goldstein is staring down a 22-count federal indictment on tax-fraud charges and a trial that is scheduled to begin in January. If convicted on the most serious charges, he will almost certainly face prison time.

Contemplating his future from his home office in Washington, Goldstein is frequently reminded of his current predicament. His bail conditions limit him to just two electronic devices — a phone and a desktop computer, where a message pops up every five minutes to inform him that the federal authorities are monitoring his activity. Goldstein sought to sell the house, valued at about $3 million, to pay his lawyers and expert witnesses, but prosecutors barred the sale; they plan to seize it, as the fruit of his crimes, if he is convicted.

Outside the front door, his two Bentleys, among other family vehicles, are gone, replaced by a Honda. But Goldstein is uncowed. "I have never, ever believed that I did anything wrong," he told me. For his defense at trial, he's planning the same kind of bold, all-in strategy that he used at the Supreme Court, this time with his own freedom on the line.

**Goldstein's fall has** been as precipitous as his rise was meteoric. An indifferent student at the University of North Carolina, he survived academically by relying on the class notes of his girlfriend since freshman year, Amy Howe, who would later become his wife. He was admitted to the law school at American University only because a distant relative, who happened to be an adjunct professor there, went to bat for him with the admissions office.

During law school, though, something clicked, and Goldstein excelled. While he was a student, he developed a particular fascination with the Supreme Court, and he was hired as a summer intern by Nina Totenberg, the longtime Supreme Court

reporter for National Public Radio. (As a law student at Georgetown, Howe also interned for her.) The couple, who married in 1994, became like family to Totenberg, and their first child, born in 2001, is named Nina in her honor.

Thanks in part to Totenberg's recommendations, Goldstein started working for the celebrated lawyers David Boies and Laurence Tribe on the cases that became Bush v. Gore. I was covering the contested aftermath of the 2000 presidential election when I first met Goldstein. He was just 30, and he already displayed the premature aging — the wispy comb-over, the indoor pallor — of the prototypical Washington nerd. Still, his dweeby look deceived. Most young lawyers in the bag-carrying stage of their careers kept a cautious distance from reporters like me, but Goldstein was an opinionated schmoozer who gave off the unmistakable vibe of someone destined for big things. He'd mastered the inside game — "No one knew more about the Supreme Court than he did," Boies told me recently — but he also thirsted to play in the broader culture, including the media and the internet, at a time when many other lawyers were first signing up for email.



Thomas Goldstein represented Epic Games, makers of the popular Fortnite video game, in an antitrust case brought against Apple in the Court of Appeals for the Ninth Circuit, in San Francisco, in 2022.  Jeff Chiu/Associated Press

As a young lawyer at the large firm Jones Day, Goldstein had an original insight. He could use the primitive computer tools then available to uncover so-called split circuits — cases in which circuit courts had decided the same question of law differently. Then — and here was Goldstein's real innovation — he would call the lawyers on the losing side and offer his law firm's services to file appeals to the Supreme Court. At the time, prospecting for clients was seen as somehow vulgar, sort of like advertising, and thus beneath the dignity of advocates who appeared before the justices. As Chief Justice John G. Roberts Jr. put it, back when he was still a private lawyer with an active Supreme Court practice: "If I'm going to have heart-bypass surgery, I wouldn't go to the surgeon who calls me up."

Goldstein ignored such etiquette with his cold calls — and they worked. "So I go and get five of these cases, and the first four are granted: *bang, bang, bang, bang,*" he told me. When Jones Day wouldn't let him argue the cases he'd found — at that point he had never argued a case in any court — Goldstein left and started his own firm, where he was able to rustle his own split-circuit clients. Soon, Amy joined him in what would become Goldstein & Howe. In the years that followed, many Supreme Court practitioners, indeed most lawyers, began recruiting clients in a similar way.

By his early 30s, Goldstein had established himself as a successful, and prosperous, Supreme Court advocate, an adjunct professor at Stanford and Harvard law schools and, through his blog, a leading public commentator on the justices. On the day that the court upheld the Affordable Care Act, in 2012, as many as a million people would follow along as his site live-blogged the outcome.

In the early 2000s, ESPN began broadcasting poker, a game Goldstein had never played. "I loved watching," he told me. "I think of it as a pretty intellectual thing. Actually, I like it because what poker is, fundamentally, is management of luck and management of risk."

Goldstein quickly graduated from games around the kitchen table with jars of quarters to tables of high-rollers in Washington and New York. "I would play in home games where you could win and lose $100,000," he told me.

Goldstein's style of play reflected his swaggering, risk-friendly approach to litigation. "Very often lawyers, or people in general, want to make every conceivable argument, and you get in the situation where, by making every point, you essentially make no points," he told me. "I'm a big believer that you have to figure out what your winning argument is. It is a poker thing, and that is being willing to say: This is not working. And if I just sit here and hedge my bets and argue both, I'm not going to accomplish anything." As Bill Perkins, an Austin, Texas-based hedge fund manager, put it: "Tom is extremely wild and crazy, like a lunatic at the poker table. He's fearless, an overbluffing kind of a player, what we call a chip bully. He tried to run people over at the table. You want controlled aggression, and he had unbridled aggression." For better or worse, in poker and elsewhere, Goldstein believed in going all-in.

**The first major** turning point in Goldstein's poker career came in 2008, when he put up the $10,000 fee to enter the World Series of Poker, a multiday extravaganza in Las Vegas. On the first night, after the tournament had ended for the day, Goldstein sat down at a table at the Bellagio. "I end up playing without looking at my cards," Goldstein said. That, to put it mildly, was an unconventional strategy. He bet wildly and recklessly, but his opponents were flummoxed by his blind aggression. Goldstein told me he ultimately played that way for 18 hours and won some $400,000.

That night was also significant because it's when Goldstein met Dan Bilzerian. An heir to a family fortune, Bilzerian became famous for his extravagant and louche lifestyle as a professional poker player in Las Vegas, and later for being a social media influencer whose posts often featured guns and women in bikinis. Bilzerian recalled Goldstein's antics that night: "People were all watching the game and talking about what a [expletive] maniac he was."

Goldstein appeared to regard Bilzerian with admiration; he contributed a passage to "The Setup," Bilzerian's 2021 memoir, calling him a "weed-smoking, gun-toting, multiple-girl-banging dude. … I'm lucky enough to say that he's one of my best friends." The nerd became a player, in more ways than one. Goldstein started

wearing chunky silver jewelry and, like Bilzerian, sporting a thick, full beard. "Dan wanted to do all kinds of bets," Goldstein told me, "He wanted to do a TV show where it was him and me doing all kinds of crazy things around the world."

The TV show never came to fruition, but the pair did make one famous nonpoker bet. Goldstein had bought a Ferrari, which cost about $300,000. "I was jealous," Bilzerian later recalled, "so I did what most jealous people do. I talked [expletive]." Specifically, Bilzerian boasted that his souped-up 1965 Shelby Cobra could beat the Ferrari in a race. One thing led to another, and they agreed to a quarter-mile showdown at a drag-racing track in Las Vegas. According to Bilzerian's memoir, the original wager was $100,000, but the night before the race, Goldstein raised the stakes to $300,000 with poker chips from the Bellagio. The battle took place on March 9, 2011. Goldstein pushed his Ferrari to 121 miles per hour; but Bilzerian cranked his Cobra up to 133, and won handily.



Screenshot of the drag race Goldstein had with Dan Bilzerian to settle a $300,000 wager.  Screenshot from YouTube

During a photo shoot for Hustler magazine, Bilzerian threw a naked porn actress named Janice Griffith off a roof in Los Angeles into a swimming pool. She broke her foot, and her lawyer threatened to sue Bilzerian. Goldstein's legal response on

his friend's behalf went viral in both the Supreme Court and poker worlds. "She was under contract to Hustler and agreed with Hustler's request that she be photographed while being thrown off the roof," he wrote. "I always thought that this kind of thing was Photoshopped instead. Perhaps Hustler's editorial standards would not permit it. Perhaps she insists on doing all her own stunts. I really do not know. In all events, she agreed. Very few people I know would make that choice. But there it is." He continued: "Like your client, the facts of the claim won't, quite, fly." TMZ obtained a video of the pool incident, which has nearly five million views on YouTube. (In later years, Bilzerian became notorious for his antisemitic views and conspiracy theorizing.)

That Goldstein had law clients in the poker world helped him explain to his wife his increasingly long absences from Washington. (He also represented the website Poker Stars, which was headquartered on the Isle of Man.) Goldstein told me that over the years he had actively misled his wife and friends about how much he was gambling. But once he started playing in public tournaments like the World Series of Poker, the size of the stakes unnerved those who cared about him. "I've been on his case about this for years and years, as was his wife," Nina Totenberg told me recently. "He just lied to us about it. In 2010, he promised her he wasn't going to gamble anymore." (Amy Howe, Goldstein's wife, declined to comment. To be clear, the Amy Howe who is the chief executive of FanDuel, the sports gambling company, is a different person.)

Most litigators have to engage in time-consuming tasks like reviewing documents, taking depositions and negotiating with adversaries. But the core of Goldstein's work was writing briefs (which could be done remotely) and then parachuting back into the capital for oral arguments. And throughout his career, Goldstein's forays didn't hurt his law practice — or his skills in court. A few weeks after the drag race, on April 26, 2011, Goldstein represented a company that challenged, on First Amendment grounds, a Vermont law that restricted pharmacies from selling various data. His argument, delivered with conversational ease, was a tour de force. He directed the justices to page numbers in the briefs and court record as if he were their peer. Later, by a 6-to-3 vote in the case, Sorrell v. IMS Health, the

court agreed with Goldstein that the law was unconstitutional. Thanks to victories like this one, Goldstein had secured his place as an elite Supreme Court practitioner, at the same time that he was disappearing, for ever longer periods, into the poker world.

**Goldstein quickly realized** that even with his successful law practice, he didn't have the cash to compete. "The idea was to be able to play very, very, very deep and not be out of money," Goldstein told me. He took out a $10 million line of credit from Stewart Resnick, a California billionaire who owns the parent company of Pom juice, a former client of Goldstein's. (Resnick declined to comment.)

In 2014, Goldstein met a Malaysian businessman who would bring his poker career to the next level. The businessman, Paul Phua, has been called the "world's biggest bookie" because he owned one of the leading sports betting sites in Asia. He was also an inveterate gambler who traveled the world looking for high-stakes poker games. On July 9 that year, the F.B.I. raided Phua's villa at Caesars Palace in Las Vegas, which went for tens of thousands of dollars a night, as part of an investigation into $400 million in illegal wagers on the 2014 FIFA World Cup. Through connections in the poker world, Phua hired Goldstein as his defense lawyer. Goldstein learned that the F.B.I. had gained access to Phua's villa by posing as cable TV technicians. Goldstein convinced the court that the ruse made the search illegal, and the case against Phua fell apart. A great friendship between the two men was born, and Phua introduced Goldstein to the kind of poker that made his contests with Bilzerian look penny-ante by comparison.

With Phua, Goldstein no longer flew commercial. They took Phua's jet to Hong Kong and Manila, and Goldstein increasingly operated in hushed private suites or homes. Two types of poker predominated as Goldstein moved his action into Phua's world: In "ring games," six to 10 players compete against one another; "heads-up games" are one on one, with just a dealer.

After getting the loan from Resnick, Goldstein promptly lost $9 million playing ring games. "Playing ring poker against a bunch of people requires enormous discipline, enormous patience, and those are just not things in poker that I have,"

Goldstein said. "If you're playing against eight people, just mathematically, the odds that somebody has a hand that's better than yours are quite high. If you're playing against one person, you don't have to be nearly as patient. What's rewarded is being very aggressive. So heads-up, in essence, is built for me." Goldstein started taking on investors in his heads-up contests, who would share in his wins and losses.

In heads-up games, most of Goldstein's opponents were billionaires with an expensive hobby. With just three men in the room, the games didn't feature a lot of conversation. "You can imagine people who are just super, super focused," he told me. "They're not chatting. There's me, there's the dealer, there's them and, you know, somewhere between two and 20 hours of pretty stone silence, except for the bets." In Manila, Goldstein played poker with a gambler known as Tango and won $13.4 million. He also won $9.96 million from a gambler known as Chairman. From 2016 to 2018, Goldstein was out of the country for almost a full year. (He generally told his wife he was on business trips for Phua.)



Goldstein at the Triton Super High Roller Series in Montenegro, in 2018. The buy-in for the event was $1 million. Danny Maxwell, via PokerNews

At the end of 2016, Goldstein played a California businessman named Alec Gores in Beverly Hills and won $26.435 million — the biggest score of his life. (Earlier that year, Goldstein also won $200,000 in a game that included the actor Kevin Hart.) During this run he won a total of about $50 million, and even though he had sold roughly 75 percent of his stakes to investors, he still personally cleared about $12 million. Flush with his success against Gores, Goldstein sat down to a heads-up match with a real estate magnate named Bob Safai — and this time he didn't spread the risk by taking on backers. "I just have convinced myself, because I won $50 million in heads-up poker, that I am a savant at heads-up poker," Goldstein told

me. He promptly lost $14 million to Safai, all out of his own pocket. (Phua, Tango and the Chairman could not be reached; Gores, Hart and Safai declined to comment.)

I asked Goldstein how he could stand the stress of playing for such gargantuan stakes. "I have both the benefit and the great disadvantage of not placing particular value on the money," he said. "So that means that I can play at very large stakes and not get psyched out about it, but it also means that I will take too many risks with too much money. So it's a blessing and a curse. It does not bother me. It doesn't cause my heart rate to go up. I mean, I can think of $26 million like $26,000, really, genuinely."

Around this time, at least when he was on the road, Goldstein also began to adopt the kind of decadent lifestyle he saw in the jet-set poker world. This included contacting women on a website called Seeking Arrangement, which existed to foster "sugar dating" — that is, to connect wealthy men to young women. According to the indictment, "between 2016 and 2022, Goldstein was involved in, or pursued, intimate personal relationships with at least a dozen women, transferring hundreds of thousands of dollars to them from his financial accounts or joint bank accounts he set up with the women, and paying for travel and other expenses for many of them." Goldstein's wife remained in the dark. "Amy had no idea about any aspect of this — the poker, the women, anything," he told me. "I just had this entirely separate life."

**In November 2020,** criminal investigators from the Internal Revenue Service and the Justice Department showed up unannounced at Goldstein's office to serve grand-jury subpoenas. Goldstein supplied the information demanded, but for long stretches afterward he heard nothing; he was neither charged with a crime nor cleared of potential wrongdoing.

The investigation arose at a time of increasing disquiet for Goldstein, as the rightward political drift of the Supreme Court led to more judgments in favor of corporate defendants. Goldstein, who often represented plaintiffs, felt that his

cases were becoming uphill, if not futile, battles. And he still owed millions to Stewart Resnick, who had extended the $10 million line of credit.

In addition, Goldstein became more estranged from his life in Washington as he pursued relationships with women he met online. At one point, he rented a house in California where three of the women lived together, and carried on relationships with each of them.

Goldstein hit on what seemed like a solution to his money problems: the perfect opponent. After he started playing poker for seven- and eight-figure stakes, he began seeking out a particular Southern businessman who was an especially profligate player. If Goldstein could line up heads-up games against him, perhaps he could clear his debts and start making real money. But Goldstein had a hard time setting up a game with him. (Goldstein told me about his dealings with the businessman on the condition that I not use his name. The businessman did not respond to a request for comment.)

Finally, Goldstein found his way to the Southern businessman through a game at the Beverly Hills home of Alec Gores, which included, among others, Leonardo DiCaprio and an old-school gambler known as Big Al DeCarolis. (Al Pacino came by to watch, but he didn't play.) DeCarolis then invited Goldstein to a poker game in Costa Rica where the Southerner would be playing.

The Southerner had a reputation as an inveterate womanizer, so Goldstein thought he would impress him by showing that he was a kindred spirit. Goldstein brought four of his girlfriends with him to Costa Rica. "He found this to be the most interesting thing in the world," Goldstein recalled. "That was on purpose." Starting in Costa Rica, Goldstein and the businessman struck up a friendship as well as a poker rivalry, and Goldstein began flying to play against him, usually successfully. Goldstein traveled back and forth so often that he rented an apartment in the city where the man lived.

Goldstein's poker rivalry with the Southerner was one reason for his announcement, in March 2023, that he would give up his law practice. In public, Goldstein portrayed his decision as a kind of protest against the conservatism of

the Supreme Court. "There's very little that an advocate for the little guy can hope to accomplish anymore," he told Bloomberg Law. Goldstein's frustration with the justices was real, but he told me that the main reason he ultimately abandoned the law was because he was finally playing heads-up games against the Southern businessman. "I was beating him," Goldstein said. "And that was just a way more interesting life." Goldstein won roughly $50 million from the Southerner, netting $15 million for himself after paying off his investors.

**Then suddenly, Goldstein** got the worst break of his life. The tax investigation, which had drifted inconclusively for years, was taken over by a federal prosecutor named Stanley Okula. Through decades of service in New York and Washington, Okula had earned a reputation as a bulldog whose aggressive tactics had twice been criticized by judges. The prosecution team issued 300-plus subpoenas and interviewed dozens of people.

The formal charges were handed down on Jan. 16, 2025, four days before the end of the Biden administration, and it was a thunderclap in the legal world. Goldstein's friends knew that he played poker, but they had no idea that he was playing for such high stakes. The 50-page indictment laid bare Goldstein's double life and included 22 counts, which carried the possibility of dozens of years in prison. The legal press was ablaze with the story — one prominent podcast posted an "emergency episode!" — and the reactions included both schadenfreude ("Tom Goldstein Should've Stuck With High-Stakes Go Fish") and sympathy, especially for Howe.



Goldstein says: "I think of it as a pretty intellectual thing. Actually, I like it because what poker is, fundamentally, is management of luck and management of risk."  Jonno Rattman for The New York Times

The core of the government's case is that Goldstein used funds from his law firm to pay several million dollars in personal expenses, including some poker debts, thus reducing his taxable income. Goldstein acknowledges that this did happen on occasion, but he said the payments were errors by his office manager or his accountant. To make that case, he showed me a 2014 email that he sent to his office manager in response to a question about taxes: "We always play completely by the rules," it read.

There were several years in which Goldstein asked for a delay in paying his taxes, saying that he did not have the money when his returns were due. The government believes the delays were unjustified, given that Goldstein was making large

payments to the women in his life around the same time. Goldstein asserts that his bank records will prove his point. "Millions of people file and then pay late, as I did," he told me.

The criminal charges asserted that Goldstein briefly hired four of the women he met on his travels but that they did no work for the firm; thus, according to the government, the payments to them were personal expenditures by Goldstein laundered, tax-free, through his firm. As a government brief in his case put it, he met "Woman-1, then a recent college graduate, on a dating website for individuals seeking to receive or provide financial support as part of an intimate personal relationship. He paid her $500 for their first meeting, and they began an intimate personal relationship." (These four women are different from the three who shared the house in California.)

But Goldstein established — and the government conceded — that three of the four women did some work for the firm. (The fourth immediately went on medical leave.) In a recent ruling, Judge Lydia Kay Griggsby prohibited the government from arguing at trial that the four women were sham employees. The payments to the women were very small, just a few thousand dollars in total, so the tax issues were almost trivial. "Those charges have nothing to do with taxes," Goldstein told me, "They just put in those charges to dirty me up, to make the jury dislike me." The judge said she would carefully monitor the government's evidence, especially about Goldstein's extramarital affairs, to make sure it was not unduly prejudicial.

The most difficult counts for Goldstein to defend relate to applications that he and Howe filled out for mortgages. In those bank forms, Goldstein understated his debts, especially the multiple millions of dollars that he still owed to Resnick for his line of credit. Knowingly misstating your financial condition on a mortgage application can be bank fraud. Goldstein told me that he omitted that information because he wanted to keep that debt secret from Howe, as he had kept her in the dark about most of his poker activity. Because Goldstein appears to have little defense to the bank-fraud counts, those charges would seem to be ripe for a plea

bargain, which is how most federal prosecutions end. But Goldstein told me that the government's plea offer involves a prison sentence of roughly five years, and he will not plead to anything that includes a prison sentence.

One day when Goldstein and I were talking in his office in Washington, he rose from the chair in front of his computer and invited me to take his place. "Go ahead," he said. "Look at anything you like." He offered to show me his tax returns, bank records that Goldstein and his law firm had turned over pursuant to subpoenas, thousands of emails and texts to and from his poker opponents and all of his lawyers' pleas to the Justice Department. I didn't take full advantage of Goldstein's characteristically dramatic gesture, but he made his point. He had nothing to fear because, he insisted, the evidence showed he was innocent.

**Goldstein's bail conditions** prohibit him from playing poker, so his lifetime win-loss record has been frozen for the past year. He's won upward of $88 million in heads-up contests, a vast majority of which went to his investors. Most of Goldstein's losses came in ring games, which he financed himself. He told me that overall he was a net loser, with a deficit of between $10 million and $15 million.

Most of his acquaintances have kept their distance from him since he was indicted, either because they're barred from contact as a bail condition or out of loyalty to Howe, whom they regard as a wronged party. Still, when I spoke with Goldstein's friends, I was struck by their enduring affection for him and their genuine distress at his current plight. To a person, they described him as "generous" and "loyal." As one friend put it: "When I came out of the government and wanted to start a Supreme Court practice — that is, to become a competitor to Tommy — no one was more helpful and enthusiastic than he was." They also all think he's addicted to gambling.

I asked Goldstein whether he thought he had a problem. "Definitely not," he said. "Because, for example, I haven't played in quite a while; I feel no desire to. I was very happy not gambling. I have no interest in other forms of gambling." He pointed out that it might help with his legal troubles if he could claim that he was in

the grip of an addiction, but that just wasn't the case. At his wife's insistence, after his indictment, he attended a few meetings of Gamblers Anonymous, but he quickly deemed it unnecessary.

As the months have passed since he closed his law firm, Goldstein has moved ever further from the staid routines of a Washington lawyer. He told me that he escapes to New York on many weekends to join a new group of friends who share his interest in *shibari*, a form of Japanese rope bondage that can involve suspending people in the air. "I have spent the last year becoming, weirdly, very good at that," he said, with the same pride he talks about the cases he argued in front of the Supreme Court. "Now I'm asked to do performances around the country."

Goldstein's plans for the future start with being acquitted. At his January trial, in Greenbelt, Md., Goldstein will be defended by Jonathan Kravis, a well-known white-collar defense lawyer in Washington, but there's no question about who will be calling the shots. "The way that I'm having Kravis argue this is that I'm going to make him stand up and say, Look, when the government files a 22-count indictment and several counts have different alternative theories, at least one of two things is happening," Goldstein told me. "One is, you are dealing with a horrible person who absolutely doesn't give a damn about the law and should be convicted of all these things and should spend the rest of their life in jail. Or something has gone very wrong, and somebody is out to get somebody. And you're going to decide which of those two is true here, because this is going to come down to: Am I a good guy or a bad guy?"

Goldstein still speaks knowledgeably about the Supreme Court, but he recognizes, perhaps with justification, that his current troubles foreclose a return to his prior life. He insists, almost believably, that he's content to abandon his law practice — and that poker represents the route to his salvation, not just the cause of his downfall. In this version of his life, the Southern businessman remains a talisman of a bright future that only he can see. Playing him, Goldstein told me, "is a way I can make a quarter-billion dollars for the rest of my life."

**Jeffrey Toobin** is a former assistant U.S. attorney who writes about the intersection of law and politics. He is the author of "The Nine: Inside the Secret World of the Supreme Court," "The Pardon: The Politics of Presidential Mercy" and other books.