IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CRIMINAL NO. LKG-25-6 |
| | * | |
| THOMAS C. GOLDSTEIN, | * | |
| | * | |
| Defendant. | * | |
| | ******** | |

### DEFENDANT THOMAS C. GOLDSTEIN'S MOTION FOR RELIEF RELATED TO THE GOVERNMENT'S DISCOVERY VIOLATIONS

On January 20, 2026—well into the government's case-in-chief at trial—the defense received for the first time exculpatory materials that are crucial to Thomas C. Goldstein's defense. Those materials were in the government's possession for years—indeed, they consisted of email correspondence between the government's lead case agent, Special Agent Andrew Accardi, and one of the key witnesses in this case, GRF accountant Ian Shuman. And yet the defense received copies of these emails for the first time mid-trial *from GRF*, and not the government. Had those materials been timely disclosed, they would have constituted a key part of the defense's trial preparation. At trial, the defense would have used those materials in its opening statement to the jury and could have used them in its examination of trial witnesses. When the defense raised the undisclosed correspondence with the government, the government produced additional undisclosed emails between Special Agent Accardi and trial witnesses. The defense has now twice asked the government to confirm that (1) it had searched the emails of the other law enforcement agents who worked on this investigation and (2) it had searched text

1

messages and messaging apps as well as emails for discoverable communications. The government has not responded.

Because the jury has already been seated and because this trial is now entering its third week, the defense respectfully requests that the Court exercise its discretion in fashioning appropriate remedies to cure the fundamental unfairness that the government's discovery violations have created for Mr. Goldstein. Specifically, the defense requests that the Court:

- Instruct the jury about the government's discovery violations and instruct that the jury is permitted to draw an adverse inference as a result;

- Permit the defense to make a brief, supplemental opening statement to the jury about the import of the heretofore undisclosed but crucial evidence;

- Permit the defense to question Agent Accardi about the government's failure to timely disclose the exculpatory materials; and

- Prevent the government from eliciting testimony from Mr. Shuman that GRF may have conducted monthly reconciliations with Goldstein & Russell office managers.

Additionally, because the government has not responded to questions from the defense about the steps it took to identify any similar discovery violations, the defense requests that the Court order the government to answer the defense questions about the steps taken by the government to identify discoverable agent communications.

## BACKGROUND

Shortly after Mr. Goldstein's indictment, in February 2025, the defense served formal discovery requests on the government, demanding the production of all relevant materials

pursuant to Rule 16 of the Federal Rules of Criminal Procedure, *Brady*, *Giglio*, and the Jencks Act.

On January 20, 2026, in response to a Rule 17(c) subpoena, GRF produced to the defense four email communications between one of the key witnesses in this case—GRF accountant Ian Shuman—and the government's lead case agent, Special Agent Andrew Accardi. These communications had never been previously disclosed to the defense, by the government or anyone else. The communications, all pre-dating Mr. Goldstein's indictment, are plainly exculpatory. For example, the January 16-19, 2024 email attached herein as Exhibit A begins with the lead case agent, Special Agent Accardi, writing to Mr. Shuman that Agent Accardi cannot find in the GRF production documents "that would have been sent to Mr. Goldstein or his firm" reviewing the classification of firm expenditures by GRF. This evidence would have been critical to rebutting the government's allegation that Mr. Goldstein willfully caused the accountants to mischaracterize personal payments as business expenses. After all, Agent Accardi acknowledges in that email being unable to find records showing that "Mr. Goldstein or his firm . . . review[ed]" GRF's classifications "to determine if items were appropriately classified." Mr. Shuman responds that the evidence Agent Accardi is looking for *does not exist*. Mr. Shuman explains that GRF (and not Goldstein & Russell) was "maintaining a QuickBooks file so we were doing transaction coding monthly when we updated the file each month." Mr. Shuman further states that, prior to Goldstein & Russell's transition to Bench, GRF "controlled that process." Mr. Shuman states, "*that communication would be with Tom's assistant rather than with Tom directly*." This email directly rebuts the government's allegations that Mr. Goldstein mischaracterized personal payments as business expenses.

This email is critical exculpatory evidence. The government has alleged that Mr. Goldstein committed tax evasion and caused the filing of false tax returns by mischaracterizing certain personal payments from the firm bank account as business expenses. As the Court is aware, the government will not present any evidence that Mr. Goldstein actually told any office manager or accountant to misclassify these eight payments cherrypicked from the hundreds of transactions through the firm bank account in the relevant period. Nevertheless, the government's contention is that Mr. Goldstein somehow caused the transactions to be misclassified. This email thoroughly undermines that contention in two respects.

First, Special Agent Accardi's email to Mr. Shuman expressly states that the government *cannot find* documents in the GRF production showing that Goldstein & Russell reviewed the classification of the relevant firm expenditures. That is because no such documents exist. There is no email or spreadsheet or journal entry where GRF expressly asks Goldstein & Russell to confirm that the mischaracterized transactions charged in the indictment were business expenses. Second, Mr. Shuman's email expressly states that any communications about the classification of the firm expenditures would have been with the firm office managers and not with Mr. Goldstein.

Hours after receiving the exculpatory materials from GRF on January 20, 2026, the defense sent a letter to the government notifying it of the *Brady* violation and requesting the government to confirm in writing that it had reviewed "the emails and text messages of all law enforcement agents related to this case" for further *Brady* materials.[1] On January 23, 2026, the

---

[1] The government did produce to the defense approximately 110 additional emails on January 21, 2026, between Agent Accardi and various witnesses in the case, mostly related to scheduling interviews. This production does not appear to include any emails other than those including Agent Accardi, and does not include any text messages or messages sent using messaging apps like Signal or Telegram.

4

defense sent the government another email specifically asking it to review its records for correspondence from members of the prosecution team other than Agent Accardi, and for non-email communications like text messages or other phone messaging platforms.  To date, the government has failed to do so.

## ARGUMENT

**I.     The Government Violated Its *Brady* Disclosure Obligations.**

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Courts in the Fourth Circuit find *Brady* violations where (1) "undisclosed information was favorable, either because it was exculpatory or because it was impeaching"; (2) "the information was material"; and (3) "the prosecution knew about the evidence and failed to disclose it."  *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015).  The government's non-disclosure of email correspondence between Special Agent Accardi and the GRF accountants plainly meets this test.

**Favorability.**  The Accardi/GRF emails are exculpatory and therefore favorable to the defense.  For example, the email attached as Exhibit A shows that Agent Accardi was unable to identify GRF documents "that would have been sent to Mr. Goldstein or his firm for review to determine if items were appropriately classified" by GRF.  Agent Accardi acknowledges "not see[ing] any account specific files," and asks for Mr. Shuman's help in "identify[ing] these files."  In response, Mr. Shuman acknowledges that these files did not exist.  Instead, GRF had only "just" general ledgers (though not any specific files showing that Mr. Goldstein or his law firm reviewed whether items were "appropriately classified").  This correspondence directly undermines the government's theory that Mr. Goldstein willfully failed to correct GRF's classification of certain transactions—the very accountants responsible for maintaining Goldstein

5

& Russell's general ledger admit that they have no record of reviewing those ledgers for accuracy.

Moreover, Mr. Shuman's response to Agent Accardi explained that GRF (and not Mr. Goldstein or his law firm's staff) "maintain[ed] a QuickBooks file" and that GRF (and, again, not Mr. Goldstein or his law firm's staff) was responsible for "doing transaction coding monthly." Mr. Shuman also acknowledged that the GRF accounting firm's "communication[s] would be with Tom's assistant rather than with Tom directly." These statements undermine the government's allegations that Mr. Goldstein was responsible for transactions that were erroneously classified.[2]

**Materiality.** The Accardi/GRF emails are also material because they "hindered [Mr. Goldstein's] ability to prepare his case fully and make stronger opening statements." *See United States v. Cloud*, 102 F.4th 968, 980 (9th Cir. 2024) (citation modified); *see also United States v. Liberto*, No. CR RDB-19-0600, 2021 WL 4459219, at *8 (D. Md. Sept. 29, 2021) ("The documents in question are likewise material to the Defendant because, as stated above, they cut against one of the central allegations in the indictment[.]").[3] The suppressed emails show that

---

[2]   These statements also demonstrate that the government has been soliciting factually incorrect testimony from witnesses about the role of the office managers vis-à-vis the law firm's books, which the Accardi/GRF emails plainly show were maintained by GRF, and not the office managers. Still, the government—for example—asked Kevin Russell, a partner at Goldstein & Russell, "how did the office managers reconcile the firm's bank accounts with the firm's books and records" and "[w]hat kind of software did they use" in order to keep the firm's books. 1/20/26 Tr. 124:10-14.

[3]   Courts acknowledge that the traditional articulation of the *Brady* materiality test—"a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citation omitted)—is "a poor fit in cases . . . where the suppression is discovered during trial and before a 'look back' is possible." *Cloud*, 102 F.4th at 979. In such cases, courts examine materiality by "evaluat[ing] the relative value of the withheld evidence on the basis of the indictment, the pretrial proceedings, the opening statements, and the evidence introduced up to that point." *Id.* at 980 (internal quotation marks and citation omitted).

*even the government's lead case agent* was unable to find evidence that Mr. Goldstein willfully failed to correct the GRF accountants' erroneous classifications of transactions. Had the defense received a copy of this email in pretrial discovery—as required by the Due Process Clause—it would have made that email chain a central part of trial preparation. The defense would also have used that critical email chain in its opening statement.

**Suppression.** Finally, the previously undisclosed Accardi/GRF emails were plainly in the possession of the prosecution team, who knew about their existence. The emails were sent and received by Agent Accardi himself, the government's lead case agent in the investigation against Mr. Goldstein. Though the government's lead trial lawyer stated that he "didn't know about" the discovery violation, 1/21/26 Tr. 15:13-14, Agent Accardi's knowledge is imputed to the rest of the prosecution team. *See United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010) ("[T]he knowledge of some of those who are part of the investigative team is imputed to prosecutors regardless of the prosecutors' actual awareness.").

## II.     The Government Also Violated Its Discovery Obligations Under Rule 16 and the Jencks Act.

In addition to *Brady*, the Accardi/GRF emails were also discoverable under Rule 16 and the Jencks Act.

Rule 16 of the Federal Rules of Criminal Procedure requires the government to disclose to the defendant upon request "books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and . . . the item is material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).[4] Upon finding a violation of Rule 16, the Court has

---

4     The defense formally requested Rule 16 discovery from the government by letter on February 17, 2025.

discretion to determine the proper remedy.  *See* Fed. R. Crim. P. 16(d)(2); *United States v. Muse*, 83 F.3d 672, 675 (4th Cir. 1996) ("[A] trial court's decision as to the appropriate remedy [for a discovery violation] may only be reversed for abuse of discretion.").  For the same reasons discussed above, the government's failure to disclose the Accardi/GRF emails also constitutes a violation of Rule 16.  In particular, the email at Exhibit A would have been crucial in both assisting to prepare Mr. Goldstein's defense as well as forming a part of the defense's trial presentation, including in the defense's opening statement.

The Jencks Act requires the government to disclose statements of witnesses that the government intends to call at trial concerning the subject matter of the witness's testimony.  18 U.S.C. § 3500.  Mr. Shuman is a government witness, and the emails plainly concern the subject matter of his testimony.  Indeed, recognizing the importance of the accountants to this case, the government disclosed Jencks materials for Mr. Shuman and his GRF colleagues *last April*.  Special Agent Accardi's emails with Mr. Shuman were not included in that production, and the government never informed the defense that it was withholding additional Jencks material for the accountants.

### III. The Court Should Order Remedies to Help Cure the Government's Discovery Violations.

Courts have broad discretion to fashion remedies for criminal discovery violations.  *United States v. Sterling*, 724 F.3d 482, 512 (4th Cir. 2013) (for *Brady*/*Giglio* violations); *United States v. McLean*, 715 F.3d 129, 142 (4th Cir. 2013) (for Rule 16 violations).  Given that the government's discovery violation was not uncovered until the second week of this complex trial—following robust pretrial motion practice, opening statements, and several days of the

presentation of evidence to the jury—the defense respectfully requests two forms of relief in order to cure the unfairness resulting from the government's suppression of critical evidence.[5]

*First*, the defense requests that the Court instruct the jury that it may draw an adverse inference from the fact that the government failed to disclose the Accardi/GRF emails. A court in this District recently recognized that such an adverse inference instruction can be appropriate "to ensure that [the] defense will not be unfairly impaired by" the government's discovery violations. *United States v. Gaines*, No. CR SAG-22-0125, 2025 WL 20024, at *8 (D. Md. Jan. 2, 2025). That instruction will both inform the jury of the government's misconduct in failing to produce the critical emails and help remedy the unfairness to the defense of the government's suppression.

*Second*, because the critical Accardi/GRF emails were not disclosed to the defense in time for the defense to use them in its opening statement, the Court should permit the defense to make a brief supplemental opening statement to the jury to present its theory about the heretofore undisclosed Accardi/GRF emails. *See, e.g.*, *United States v. Davis*, No. 4:18-CR-00011, 2020 WL 522146, at *7 (W.D. Va. Jan. 31, 2020) ("[T]o address the concern that the [discovery material] was not provided until after opening statements were made, the court will permit defense counsel an opportunity to make any additional opening statement solely occasioned by the late disclosure of the [materials].").

---

[5]   In other cases, courts in this District have found it appropriate to preclude the calling of a government witness at trial as an appropriate sanction against the government for its discovery violations. *See, e.g.*, *United States v. Liberto*, No. CR RDB-19-0600, 2021 WL 4459219, at *8 (D. Md. Sept. 29, 2021). But here, curiously, the government has declined to identify Agent Accardi—its own lead case agent—on its 68-person witness list, and so the *defense* has listed Agent Accardi on its witness list.

*Third*, in light of the government's flagrant discovery violations, the Court should permit the defense to question Agent Accardi about the government's failure to produce the exculpatory materials to the defense. The Accardi/GRF emails were sent and received by Agent Accardi himself, and he will have personal knowledge about the circumstances surrounding their non-disclosure.

*Fourth*, the Court should prevent the government from eliciting testimony from Mr. Shuman that GRF may have conducted regular, monthly reconciliations with Goldstein & Russell office managers. In the critical Accardi/GRF emails, Mr. Shuman alleges that "[his] staff" was doing "transaction coding monthly" by discussing with the Goldstein & Russell office managers "throughout the year." Ex. A. But there is no evidence that there were regular reconciliations that involved the Goldstein & Russell office managers, and the GRF staff person who had the most communications with the office managers—Jill Leonard—is deceased and unable to provide testimony on the regularity (or non-regularity) of any reconciliations. Had the government provided the defense with the Accardi/GRF emails in a timely disclosure, the defense would have sought further discovery and elicited testimony from prior witnesses showing that there were no regular, monthly reconciliations. Because the government's discovery violation has put the defense at a disadvantage, the Court should instruct the government that it is precluded from eliciting Mr. Shuman's testimony about these purported regular reconciliations, particularly since there is no evidence that any regular reconciliations happened with Goldstein & Russell office managers.

### IV. The Court Should Order the Government to Respond to the Defense Inquiries.

Finally, the Accardi/GRF emails also raise troubling questions about whether the government has taken appropriate steps to comply with its discovery obligations in this case. These emails should not have been difficult to find—they were sent and received by the lead

10

case agent, and a simple search for the email address of Mr. Shuman (a key government witness) would have located them immediately. Accordingly, as soon as it received the emails from GRF, the defense asked the government to confirm that it had searched emails and text messages of all law enforcement agents who worked on this case. In response, the government produced approximately 110 additional emails between Agent Accardi and witnesses, but did not respond to the defense questions about the communications of other agents or about text messages.

The defense is deeply concerned that the government has not searched the emails of the other law enforcement agents or their text messages and messaging app communications for additional undisclosed *Brady*, Jencks, or Rule 16 discovery. And with each passing day, the potential prejudice to the defense from additional discovery violations grows. The defense therefore asks that the Court order the government to respond to the following question by 9:00am on Tuesday, January 27: has the government searched the emails, text messages, and messaging apps of all law enforcement agents who worked on this case for discoverable communications.

## **CONCLUSION**

For the reasons discussed above, the Court should:

- Instruct the jury about the government's discovery violations and instruct that the jury is permitted to draw an adverse inference as a result;

- Permit the defense to make a brief, supplemental opening statement to the jury about the import of the heretofore undisclosed but crucial evidence;

- Permit the defense to question Agent Accardi about the government's failure to timely disclose the exculpatory materials; and

- Prevent the government from eliciting testimony from Mr. Shuman that GRF may have conducted monthly reconciliations with Goldstein & Russell office managers.

In addition, the Court should order the government to respond to the defense inquiries about other law enforcement communications with witnesses.

Dated: January 26, 2026

Respectfully submitted,

/s/ *Jonathan I. Kravis*
Jonathan I. Kravis (Bar No. 31556)
Stephany Reaves (Bar No. 19658)
Sarah E. Weiner (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com
Sarah.Weiner@mto.com

Adeel Mohammadi (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*