# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. LKG-25-0006** |
| **THOMAS C. GOLDSTEIN,** | |
| **Defendant.** | |

## GOVERNMENT'S OPPOSITION TO *THE NEW YORK TIMES*' MOTION TO QUASH SUBPOENAS *AD TESTIFICANDUM* (Dkt. 374)

On December 28, 2025, *The New York Times Magazine* published an article on Goldstein and the (then upcoming) trial. *See* https://www.nytimes.com/2025/12/28/magazine/thomas-goldstein-supreme-court-gambling.html. Prior to trial, the United States moved to preadmit into evidence Gov't Ex. 5 (attached anew)—a redacted copy of the *Times* article containing Goldstein's numerous statements directly relevant to the charges for which he now stands trial. Dkt. 327. Goldstein opposed the motion, insisting that the government call a witness from the *Times* to authenticate the article and its contents (*i.e.*, his own voluntary statements to the *Times*). Dkt. 335. The Court denied the government's motion, holding that the United States must bring a live witness from the *Times* to testify about the contents of the article (*i.e.*, Goldstein's statements and information attributed to him). Dkt. 338.

The Attorney General authorized the issuance of subpoenas *ad testificandum* for Jeffrey Toobin and Rudy Lee on January 23, 2026, and they were served on counsel for the *Times* that night. Consistent with the Court's Order, the United States plans to call one or both witnesses to provide the requisite authentication of Mr. Goldstein's statements and information attributed to him contained in Gov't Ex. 5.

As the *Times* acknowledges in its motion, the Fourth Circuit has held that "there is no First Amendment testimonial privilege, absolute or qualified," or any common law privilege, that "protects a reporter from being compelled to testify by the prosecution […] in criminal proceedings […]." *United States v. Sterling*, 724 F.3d 482, 492, 499 (4th Cir. 2013). But the United States did not undertake this process lightly: after the Court denied the government's motion to preadmit Gov't Ex. 5, the government asked counsel for the *Times* whether it would produce Lee and Toobin for testimony voluntarily.[1] Only when the *Times* declined to do so did the prosecution team work through the lengthy process, as codified in 28 C.F.R. 50.10(c)(4), of seeking authorization from the Attorney General for the issuance of subpoenas for testimony from Lee and Toobin.

And the United States strongly agrees with the *Times*' ultimate point: the examination of Lee and Toobin at trial need not delve into the "newsgathering and reporting process." *Times* Mtn. at 8. The government only intends to elicit the testimony required to establish "the accuracy and authenticity of the statements made by [Goldstein] that were included in the Article." *Id*. Goldstein's admissions speak for themselves, and once the *Times* witnesses authenticate the statements and information attributed to Goldstein—contained in Gov't Ex. 5—sufficiently to garner their admission into evidence, the *Times*' witnesses' testimony is complete.

As explained below, the government's subpoenas were timely, and Lee and Toobin have failed to show that their compliance with the subpoenas "would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). The Court should therefore deny the *Times*' motion to quash and Order Lee and Toobin to appear for testimony at trial.

---

[1] The United States also asked the *Times* to engage with defense counsel regarding a stipulation to the authenticity and admissibility of the article; however, the government understands that, to date, Mr. Goldstein has not reached any such agreement with the *Times*.

## BACKGROUND

Prior to trial, Goldstein chose to sit for multiple on-the-record interviews with Toobin, who wrote the article published in the *Times* on December 28, 2025. The published article quoted statements Goldstein made to Toobin during their sessions and contained information that the article attributed to Goldstein.

Those statements and the information attributed to Goldstein in the article are directly relevant to the charges for which Goldstein now stands trial. First, most of the portions of the *Times* article that the government will offer through the *Times* witnesses are relevant to the tax crimes charged in the indictment. For example, Goldstein admitted that in 2016 he won $50 million in heads-up poker in 2016 and told the *Times* that he personally "cleared about $12 million" from those games.

> At the end of 2016, Goldstein played a California businessman named Alec Gores in Beverly Hills and won $26.435 million — the biggest score of his life. (Earlier that year, Goldstein also won $200,000 in a game that included the actor Kevin Hart.) During this run he won a total of about $50 million, and even though he had sold roughly 75 percent of his stakes to investors, he still personally cleared about $12 million. Flush with his success against Gores, Goldstein sat down to a heads-up match with a real estate magnate named Bob Safai — and this time he didn't spread the risk by taking on backers. "I just have convinced myself, because I won $50 million in heads-up poker, that I am a savant at heads-up poker," Goldstein told

Gov't Ex. 5, p. 11. However, Goldstein only reported to the IRS net gambling proceeds of $2.7 million on his 2016 tax return. *See* Gov't Ex. 54. Goldstein's statements to the *Times* also further confirm the government's theory of the case: that Goldstein only repatriated $27 million to the United States in 2016 and left the remainder of his net winnings with a nominee in Asia. *See* Gov't Ex. 12.

Not only are Goldstein's statements relevant to his net gambling income in 2016, but they are also relevant to prove specific amounts of money won and lost while playing poker that year. *See* Gov't Ex. 5, pp. 5-7, 9-11, 13, 16. Indeed, Goldstein admitted to matches and wins and losses against specific poker players, including some who were not publicly linked to the case until Goldstein spoke to the *Times*. Moreover, Goldstein admitted to his state of mind at various points in time while attempting to ascend the ultrahigh-stakes poker ladder. *Id*. at 11 ("I just have convinced myself, because I won $50 million in heads-up poker, that I am a savant at heads-up poker."). These statements are relevant to the tax counts because they prove Goldstein's income from poker, the falsity of his tax returns, and his years-long pattern of prioritizing ultrahigh-stakes poker over paying his debts to the IRS.

Other portions of the *Times* article that the government will offer through the *Times* witnesses are Goldstein's statements relevant to the mortgage fraud counts. The article confirms that "Goldstein understated his debts" on mortgage applications in 2021 by "multiple millions of dollars." *Id*. at 15. "Goldstein told [the reporter] that he omitted that information because he wanted to keep that debt secret from [his wife], as he had kept her in the dark about most of his poker activity." *Id*.

The parties here agree that the first two elements of the mortgage fraud counts are (1) Goldstein made or caused to be made a false statement or report relating to an application to a mortgage lending business; and (2) Goldstein acted knowingly. Dkt. 312 at 112-113. By describing to the *Times* reporter his motive for failing to disclose the debts, Goldstein admitted to the first two elements of mortgage fraud—making a false statement on a mortgage application and doing so knowingly. The admission is thus powerful evidence of guilt on Counts Fourteen through Sixteen.

The testimony from Lee and Toobin will establish that Goldstein was quoted accurately in the article, and that he provided the information attributed to him in Gov't Ex. 5. Lee and another *Times* fact-checker verified Goldstein's contributions to the article <u>directly with Goldstein</u> over the course of multiple phone calls. The fact-checkers also verified the content of the article by reviewing audio recordings and transcripts of Toobin's interviews with Goldstein. One month since publication, Goldstein still has not asked the *Times* to retract or correct any portion of the article. At their pretrial conference, Goldstein demanded that the government produce a live witness from the *Times* to authenticate the statements and information attributed to him at trial; however, Goldstein has *never* claimed that he was genuinely *disputing* the accuracy of the article.

## I.    <u>The United States' subpoenas were timely issued.</u>

From the moment the government learned about the *Times* article, the government worked on ways to admit portions of the article without the need for a live witness. First, the government sought a stipulation to authenticity and admissibility from Goldstein, who declined any such agreement. The government then contacted the *Times* to confirm that the article had been fact-checked and that the statements and information attributed to Goldstein were accurate. The government then moved the Court for pre-admission of the *Times* article, which Goldstein opposed. The Court denied the government's motion on January 9, 2026, and the parties commenced jury selection on January 12, 2026.

While working through the jury selection process, the prosecution team began the rigorous internal review process for the authorization of subpoenas *ad testificandum* for members of the news media. Attorney General Bondi approved the prosecution team's subpoenas for testimony from Lee and Toobin on January 23, 2026, and the government immediately provided counsel for the *Times*—with whom the government had been in contact since January 6, 2026—with copies

5

of the subpoenas.

The *Times*' argument that the subpoenas were not timely issued is wholly undercut by its insistence that the Court recognize the significance of subpoenaing members of the news media. Recognizing the gravity of the request, the government took multiple steps to *avoid* having to issue subpoenas to Lee and Toobin. The prosecution team pursued approval from the Attorney General—traversing the rigorous standards required under 28 C.F.R. 50.10(c)(4)—only after it determined that there was no other way to offer this critical evidence at trial without issuing subpoenas to Lee and Toobin.

## II.    <u>Compliance with the subpoenas would not be unreasonable or oppressive.</u>

"There is no First Amendment testimonial privilege, absolute or qualified," or any common law privilege, that "protects a reporter from being compelled to testify by the prosecution […] in criminal proceedings […]." *Sterling*, 724 F.3d at 492, 499. Thus, even with respect to testimony sought from members of the news media, the ultimate question for the Court is whether Lee and Toobin's compliance with their subpoenas would be "unreasonable or oppressive." *See* Fed. R. Crim. P. 17(c)(2). It is neither.

The *Times* does not suggest that Lee or Toobin *cannot* testify at trial, but rather that the Court should not require them to do so because of their profession. This argument fails for three reasons.

First, the Fourth Circuit has already considered, and rejected, each of the arguments the *Times* asserts here. In *Sterling*, the Fourth Circuit rejected any existence of a First Amendment or common law privilege excusing a member of the news media from being compelled to testify at trial in a criminal case. *Sterling*, 724 F.3d at 492, 499. While the government acknowledges the significant value of journalism, the quotes from Judge Wilkinson's concurrence in *In re Shain*, 978

F.2d 850, 854 (4th Cir. 1992), predates *Sterling* by more than 20 years. And even in *Shain*, the Fourth Circuit followed the Supreme Court's holding in *Branzburg v. Hayes*, 408 U.S. 665 (1972) and held that "absent evidence of governmental harassment or bad faith, the reporters have no privilege different from that of any other citizen not to testify about knowledge relevant to a criminal prosecution." *Shain*, 978 F.2d at 852.

Second, although the United States need not satisfy the Fourth Circuit's *LaRouche*[2] test—established for *civil* cases—here, the government would do so easily. Goldstein's statements and information attributed to him contained in Gov't Ex. 5, offered through the *Times* witnesses (1) is relevant to the tax and mortgage fraud charges Goldstein faces and (2) cannot be offered into evidence without a witness's testimony (per the Court's prior Order). And there is a compelling basis for the Court to Order Lee and Toobin to testify: the jury has a right to hear all relevant, competent evidence bearing on Goldstein's guilt and evaluate Goldstein's admissions regarding the crimes with which he is charged.

Third, there is zero risk of a "grave intrusion into journalistic processes" here. Goldstein sat for multiple on-the-record interviews with the *Times* and then confirmed the statements and information he provided with a fact-checker over multiple phone calls. As discussed below, the government is not seeking testimony from Lee or Toobin beyond whether Goldstein in fact made the statements and provided the information attributed to him in Gov't Ex. 5.

This is not a case about a confidential source. This is not a case about compelling a journalist to provide copies of their work product (e.g., notes, drafts, and recordings of interviews). This is simply a matter of authenticating statements Goldstein voluntarily made to the *Times*.

---

[2] *See LaRouche v. National Broadcasting Co.*, 780 F.2d 1134 (4th Cir. 1986).

### III.     The testimony from Lee and Toobin will be limited to the authentication and admissibility of Gov't Ex. 5.

The United States agrees that Lee and Toobin's trial testimony need not be particularly long. The government does not intend to ask either man who else they spoke to in preparation of the *Times* article or anything about investigative work that went into the article that does not pertain to Goldstein himself. The government only plans to ask enough questions to satisfy the jury that the statements and information attributed to Goldstein—excerpted in Gov't Ex. 5—are authentic and accurate, and to establish for the Court that they are admissible as statements of a party opponent or adopted statements by a party opponent.

Insomuch as the government only intends to elicit the testimony required to establish "the accuracy and authenticity of the statements made by [Goldstein] that were included in the Article" (*Times* Mtn. at 8), the United States submits there is no basis to quash the subpoenas.

### CONCLUSION

The government has used every reasonable means to offer Goldstein's statements and information attributed to him that was published in the *Times* without the need for testimony from a live witness. Mr. Goldstein insisted he wants a live witness from the *Times*, and the Court agreed that a live witness was required.

Goldstein played a cynical game prior to trial—seeking to influence (or worse, taint) the jury pool with pretrial publicity—a narrative Goldstein crafted and delivered to the *Times*, while denying the authenticity of his own narrative. The defendant counted on the *Times* to move to quash the subpoenas for testimony from Lee and Toobin, hoping to prevent the jury from hearing Goldstein's damning admissions. The Court should not grant Goldstein the benefit of having sought this publicity without bearing the burden of having done so.

Gov't Ex. 5, the government's redacted version of the *Times* article, contains critical admissions directly relevant to the charges in the indictment, and the United States is obligated to call a witness from the *Times* to authenticate and admit Gov't. Ex. 5 into evidence. The government therefore respectfully requests that the Court deny the *Times*' motion to quash the subpoenas for Lee and Toobin.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

Dated: January 28, 2026

Sean Beaty
Senior Litigation Counsel
Hayter L. Whitman
Emerson Gordon-Marvin
Trial Attorney
Department of Justice—Criminal Division

Adeyemi Adenrele
Assistant United States Attorney
District of Maryland