IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CRIMINAL NO. LKG-25-6 |
| | * | |
| THOMAS C. GOLDSTEIN, | * | |
| | * | |
| Defendant. | * | |

********

**DEFENDANT THOMAS C. GOLDSTEIN'S STATEMENT OF INTEREST REGARDING NON-PARTIES JEFFREY TOOBIN AND RUDY LEE'S MOTION TO QUASH**

The defense agrees with the non-party Journalists' position that the government's subpoenas to Jeffrey Toobin and Rudy Lee are untimely, and even if timely are unreasonable under the circumstances. The government's blithe assertion that the Journalists' "trial testimony need not be particularly long" because "[t]he government only plans to ask enough questions to satisfy the jury that the statements and information attributed to Goldstein … are authentic and accurate," ECF No. 376, at 8, misses a basic fact about criminal trial: the defendant is permitted to cross-examine witnesses against him. Indeed, the government has glossed over this inconvenient fact over and over again—in proposing a dozen 404(b) topics, *see* ECF No. 210; in proposing to introduce hundreds of pages of lifestyle evidence, *see* ECF No. 375; and even in estimating the length of its own case-in-chief. The government continually claims that its detours into topics only tangentially related (if that) to the conduct charged in the indictment will be quick and uncomplicated because it forgets that the defense is required to respond in kind to each new allegation. Here, for example, if the government is permitted to put the Journalists' on

the stand, then their testimony will necessitate a minitrial over what happened during Mr. Goldstein's "multiple on-the-record interviews with Toobin." ECF No. 376, at 3. That minitrial will confuse the issues and waste the jury's time. *See* Fed. R. Evid. 403. The subpoenas should be quashed.

If, however, the Court were to deny the Journalists' motion to quash, the Journalists' alternative request for relief—i.e., that "questioning by either party should be strictly limited to the accuracy and authenticity of the statements made by [Mr. Goldstein] that were included in the Article"—would both infringe on Mr. Goldstein's constitutional rights under the Confrontation Clause and inappropriately restrict the defense's ability to invoke the rule of completeness, *see* Fed. R. Evid. 106. The government has agreed to limit its direct examination to confirming (1) that any copy of the Article admitted into evidence is an authentic version of the story as published, and (2) that the witness believes that the Article accurately captures what he learned in his interviews. *See* ECF No. 376, at 8; *see also* ECF No. 374-1, at 8. But that concession cannot limit Mr. Goldstein's rights. Once the Journalists' testimony has been elicited, the defense on cross examination is entitled to explore "the subject matter of the direct examination and matters affecting the witness's credibility," Fed. R. Evid. 611(b)[1]—even if that means going beyond the four corners of the Article. The Journalists' request to limit *both parties* to confirming the authenticity and accuracy of the Article would prejudice Mr. Goldstein's rights in at least two ways.

---

[1] For the sake of efficiency (and to avoid recalling witnesses), the government and the defense have agreed that the defense may on cross-examination exceed the scope of the government's direct examination. While reserving all rights, the defense notes that, if Mr. Toobin and/or Mr. Lee testify, the defense does not anticipate going beyond the subject matter of the direct examination or matters affecting the witness's credibility.

2

*First*, the Confrontation Clause guarantees Mr. Goldstein "an opportunity for *effective* cross-examination" of all testimonial witnesses against him. *United States v. Ayala*, 601 F.3d 256, 273 (4th Cir. 2010) (emphasis added); *see also United States v. Abu Ali*, 528 F.3d 210, 245 (4th Cir. 2008) (the "'main and essential purpose'" of the Confrontation Clause "'is to secure for the opponent the opportunity of cross-examination'" (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986)).  Therefore, while a trial court may "impose reasonable limits on cross-examination, premised on such concerns as prejudice, confusion, repetition, and relevance," the "exercise of such discretion is limited by the Constitution and the applicable rules of evidence." *United States v. Smith*, 451 F.3d 209, 221 (4th Cir. 2006) (citing Fed. R. Evid. 403); *see also United States v. Larson*, 495 F.3d 1094, 1102 (9th Cir. 2007) (noting the Supreme Court's "policy favoring expansive witness cross-examination in criminal trials" (citation and internal quotation marks omitted)).

To effectively cross-examine the Journalists, the defense must be able to explore not only the authenticity and literal accuracy of the Article, but also the editorial choices the Journalists made about which quotations to include and exclude, what information to paraphrase (and how to paraphrase it), and what context and "color" to provide the reader.  *Cf. Larez v. City of Los Angeles*, 946 F.2d 630, 644 (9th Cir. 1991) ("[T]he denial of the right to cross-examine the reporters may have deprived [the defendant] of the opportunity to show the context in which the statements were made.").  To the extent those decisions rest on "information that the Journalists chose *not* to include in the Article" and/or "communications with sources other than [Mr. Goldstein]," ECF No. 374-1, at 8, they are not only an appropriate but a *critical* subject of cross-examination.

As the defense already explained in its opposition to the government's motion to preadmit the Article, *see* ECF No. 335, at 13, a defendant does not waive his Confrontation Clause rights by speaking to the press. (Indeed, that right is separately protected by the First Amendment.) In all events, the government's repeated (and unfounded) accusations that Mr. Goldstein's decision to sit for interviews with Mr. Toobin was a "cynical game" to "influence (or worse, taint) the jury pool," ECF No. 376, at 8, is belied by the *government's own effort* to admit the Article into evidence. And, of course, the government makes no mention of the fact that the DOJ issued a press release about this case the day the grand jury issued the indictment.[2]

*Second*, Federal Rule of Evidence 106 provides that "[i]f a party introduces all or part of a statement, an adverse party may" *even "over a hearsay objection"* "require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106 (emphasis added). To the extent the government elicits on direct examination statements made by Mr. Goldstein to the Journalists, the defense is entitled under Rule 106's "rule of completeness" to put those statements in context—including by inquiring into statements made by Mr. Goldstein that did *not* make their way into print.

For example, in its opposition to the motion to quash, the government argues that the following excerpt from the Article ostensibly "confirms" its *entirely new* "theory of the case"—one which does not appear in the indictment, which the government made no mention of in its

---

[2] *See* Archives, *Maryland Attorney and Poker Player Charged with Tax Crimes and Making False Statements to Mortgage Lenders*, U.S. Department of Justice (Jan. 16, 2025) https://www.justice.gov/archives/opa/pr/maryland-attorney-and-poker-player-charged-tax-crimes-and-making-false-statements-mortgage.

4

opening, and which no witness has yet substantiated—that Mr. Goldstein left millions of dollars in "net winnings with a nominee in Asia."³ ECF No. 376, at 3.

> At the end of 2016, Goldstein played a California businessman named Alec Gores in Beverly Hills and won $26.435 million — the biggest score of his life. (Earlier that year, Goldstein also won $200,000 in a game that included the actor Kevin Hart.) During this run he won a total of about $50 million, and even though he had sold roughly 75 percent of his stakes to investors, he still personally cleared about $12 million. Flush with his success against Gores, Goldstein sat down to a heads-up match with a real estate magnate named Bob Safai — and this time he didn't spread the risk by taking on backers. "I just have convinced myself, because I won $50 million in heads-up poker, that I am a savant at heads-up poker," Goldstein told

*Id.* The government apparently reads this passage to concede that Mr. Goldstein won *net* $12 million in 2016. That is incorrect. In fact, what Mr. Goldstein told the Journalists was that he "personally cleared about $12 million" *from the specific games discussed in the preceding sentences*. *See id.* As Mr. Goldstein explained to the Journalists, and as the government has conceded in a stipulation, he incurred *other losses* in 2016 which substantially reduced that $12 million. Under the rule of completeness (not to mention the Confrontation Clause), Mr. Goldstein is entitled to elicit that clarifying testimony from the Journalists.

Without knowing more about how the government plans to present its case, the defense cannot predict which additional statements, if any, "ought to be considered at the same time" as

---

³ It would appear that the government has finally discovered that the theory it opened on—i.e., that Mr. Goldstein failed to disclose $26 million in winnings from Gores to his accountants—is factually untenable, as Mr. Goldstein expressly disclosed "wins [of] 27,185,050" via email to GRF. *See* DX-317. Notably, the government's opposition to the motion to quash for the first time floats *$27 million* (not $26 million) as the amount Mr. Goldstein allegedly "repatriated." ECF No. 376, at 3. (And even that new "repatriation" theory is itself incoherent; what matters is that Mr. Goldstein disclosed more than $27 million in winnings to GRF, not whether that money was physically located in the United States or abroad.)

the government's evidence. Fed. R. Evid. 106. But it would be premature, at this stage, to rule that the defense cannot elicit testimony about Mr. Goldstein's statements to the Journalists simply because the Journalists made the editorial choice not to include those statements in the final Article.

## CONCLUSION

For the reasons set forth herein, the Court should grant the Journalists' motion to quash. In the alternative, to the extent the Court grants the Journalists' request to "strictly limit the scope of any questioning of the Journalists at trial," ECF No. 374-1, at 9, any such limitation should not interfere with Mr. Goldstein's right to conduct an effective cross-examination and should not preclude the defense from invoking the rule of completeness.

Dated: January 28, 2025

Respectfully submitted,

/s/ *Jonathan I. Kravis*
Jonathan I. Kravis (Bar No. 31556)
Stephany Reaves (Bar No. 19658)
Sarah E. Weiner (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com
Sarah.Weiner@mto.com

Adeel Mohammadi (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*