## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. LKG-25-0006** |
| **THOMAS GOLDSTEIN,** | |
| **Defendant.** | |

## GOVERNMENT'S BRIEF IN COMPLIANCE WITH
## THE COURT'S FEBRUARY 4, 2026, ORDER

On February 4, 2026, the Court Ordered the United States to submit a brief with the Court outlining the relevant facts regarding its January 28, 2026, meeting with Walter Deyhle in preparation for trial in this matter. This brief outlines those facts.

- According to the government's discovery database, on or about April 30, 2024, Goldstein & Russell produced to the grand jury the two documents that were later marked and admitted into evidence as DX317 (produced to the grand jury with Bates Stamp GR0060334) and GX148 (produced to the grand jury with Bates Stamp GR0058586). The two exhibits are attached to this brief for the Court's convenience.

  - In the October 12, 2017, email admitted as DX317, Mr. Goldstein discloses to Walter Deyhle that he had gross gambling of $27,185,050, "losses and distributions" of $24,436,700, and net gambling income of $2,748,350.

  - In the October 13, 2017, email admitted as GX148, Mr. Goldstein provides Mr. Deyhle a further breakdown of the "losses and distributions" of his 2016 gambling figures, claiming "$13,498,000 is losses. The rest is distributions."

- On January 16, 2025, the grand jury indicted Goldstein for various tax crimes and mortgage fraud. Dkt. 1. Immediately following the indictment, the government began producing its voluminous discovery to the defense. By the time the parties engaged in motions practice, the government produced nearly 125,000 documents pursuant to Rule 16, Jencks material in the form of sworn testimony related to five potential witnesses, as well as summaries of potential Brady information for thirty-three potential witnesses derived from interviews and testimony.

  o In its discovery production, the government produced copies of DX317 (produced *back* to Goldstein with Bates Stamp PROD-USA-0060104) and GX148 (produced *back* to Goldstein with Bates Stamp PROD-USA-0059356).

- On April 18, 2025, the United States sent the defense a sixteen-page letter outlining the various statements made by numerous witnesses in the case, including Walter Deyhle, and producing to Goldstein memoranda of interviews with Deyhle and the transcript of Deyhle's November 14, 2024, grand jury testimony.

  o In his grand jury testimony—used by Goldstein to cross-examine and impeach Mr. Deyhle while he was on the witness stand on February 4, 2026—Deyhle testified that Goldstein had only provided the gambling figures for 2016 *verbally*, and not in writing. Deyhle made similar statements to the IRS in prior interviews, which were memorialized in memoranda produced to Goldstein. The defense made use of these many memoranda of interview with Deyhle throughout its cross-examination.

- In preparation for trial, on December 28, 2025, prosecutors met with Deyhle at the offices of his attorney in Northwest Washington, DC. Prosecutors Sean Beaty and Emerson Gordon-Marvin attended that meeting in person, and prosecutors Adeyeme Adenrele and

Hayter Whitman and Special Agent Andrew Accardi attended the meeting in person. As of the December 28, 2025, meeting with Deyhle, the United States had not yet compiled its exhibit list for trial, and the prosecution team had not yet identified (what were later marked as) GX148 or DX317 as documents it might use at trial with Deyhle.

o   Insomuch as the government had not yet identified GX148 or DX317 as potential exhibits to use with Deyhle at trial by its December 28, 2025, meeting with the witness, the prosecution team did not show those documents to Deyhle during that meeting.

o   Deyhle testified on cross examination that he thought he had seen the emails admitted as DX317 and GX148 during his in-person meeting in December 2025; however, he plainly testified that he did not remember exactly when he had seen the documents. On redirect examination, Deyhle confirmed that while he had testified on cross-examination that it may have been in December, he acknowledged that he was not certain about the date and that it could have been at a meeting with the prosecution team on January 28, 2026.

o   During the December 28, 2025, meeting, Deyhle's statements were entirely consistent with his prior testimony and the statements that he had made previously to the IRS (*i.e.*, that Goldstein had given the gambling numbers for 2016 to Deyhle verbally).

o   As is the prosecution team's usual practice, Special Agent Accardi was the designated law enforcement witness for the December 28, 2025, interview with Deyhle. The prosecution team instructed Special Agent Accardi that he needed to record only statements made by Deyhle that were substantially different from prior statements such that they potentially impacted his credibility. Insomuch as Deyhle's statements in his December 28, 2025, interview were entirely consistent with his prior statements,

Special Agent Accardi did not take any notes during that interview. No other members of the prosecution team took substantive notes during the December 28, 2025, meeting with Deyhle.

- The United States first provided the Court with its trial exhibit list on January 9, 2026. At that time, the United States still had not identified GX148 as a potential exhibit to be used at trial with Deyhle. *See* January 9, 2025, email from AUSA Adenrele to Mr. Cook.

- Goldstein first provided the Court with his trial exhibit list on January 12, 2026, which included DX317.

- On January 23, 2026, in preparation for trial, prosecutor Sean Beaty reviewed the numerous emails and documents Goldstein had listed as potential trial exhibits that pertained to Deyhle, including DX317. Having reviewed Deyhle's grand jury testimony and memoranda of prior interviews with Deyhle, the prosecution team surmised—correctly, as demonstrated by Deyhle's February 4, 2026, testimony on cross-examination—that Deyhle had simply forgotten that Goldstein had provided him with the 2016 poker figures *in emails* and not (or not just) verbally.

  o Having reviewed DX317, on January 23, 2026, the prosecutors searched its discovery database to determine whether there were further written communications between Deyhle and Goldstein regarding the 2016 poker figures. In its search, the prosecutors identified GX148.

- The United States marked GX148 as a new trial exhibit on January 27, 2026, and produced a copy of the stamped exhibit to Goldstein that day.

4

- On January 28, 2026, the government filed its opposition to the *Times*' motion to quash the subpoenas for Toobin and Lee. Dkt. 376. In its brief, the government noted that it had incorporated into its theory of the case the newly discovered evidence:

> Gov't Ex. 5, p. 11. However, Goldstein only reported to the IRS net gambling proceeds of $2.7 million on his 2016 tax return. *See* Gov't Ex. 54. Goldstein's statements to the *Times* also further confirm the government's theory of the case: that Goldstein only repatriated $27 million to the United States in 2016 and left the remainder of his net winnings with a nominee in Asia. *See* Gov't Ex. 12.

Dkt. 376, p. 3.

- Later that same day (January 28, 2026), Goldstein *confirmed that he was aware* that the United States had augmented its theory of the case to recognize that Goldstein *had* disclosed gross poker winnings to Deyhle of $27 million (reporting only the money he brought back to the United States) but still falsely reported to Deyhle net gambling income of $2.7 million:

> [3] It would appear that the government has finally discovered that the theory it opened on—i.e., that Mr. Goldstein failed to disclose $26 million in winnings from Gores to his accountants—is factually untenable, as Mr. Goldstein expressly disclosed "wins [of] 27,185,050" via email to GRF. *See* DX-317. Notably, the government's opposition to the motion to quash for the first time floats *$27 million* (not $26 million) as the amount Mr. Goldstein allegedly "repatriated." ECF No. 376, at 3. (And even that new "repatriation" theory is itself incoherent; what matters is that Mr. Goldstein disclosed more than $27 million in winnings to GRF, not whether that money was physically located in the United States or abroad.)

*See* Dkt. 378, p. 3.

- January 28, 2026, was a busy day. After the trial day ended, prosecutors met with Deyhle virtually (over Microsoft Teams) for an additional trial preparation session. Prosecutor Beaty and Special Agent Accardi attended the virtual meeting from the same conference

room in the U.S. Attorney's Office. Prosecutors Adenrele, Gordon-Marvin, and Whitman attended only portions of the January 28, 2026, meeting, and all three attended separately from different locations when they participated.

o  At the outset of the January 28, 2026, meeting with Deyhle, prosecutor Beaty informed him that the prosecution team had identified emails that *substantiated* the numbers Deyhle ultimately reported on Goldstein's 2016 tax return. Prosecutor Beaty then walked Deyhle through a similar math demonstration as the one used on direct examination with Deyhle on February 3, 2026. As proved during Deyhle's direct examination, the additional information from DX317 and GX148—information Goldstein had in his own possession since October 2017—ties perfectly to the figures that Deyle ultimately reported on Goldstein's 2016 individual tax return. GX54, pp. 33 and 34.

o  During the January 28, 2026, meeting, no one from prosecution team asked or challenged Deyhle about his prior statements to the IRS or the grand jury regarding having received the 2016 poker figures from Goldstein verbally or when he received them. Going into and leading the meeting, prosecutor Beaty assumed that Deyhle's prior statements were based on solely on his memory and—insomuch as no one from the government had previously showed Deyhle the emails with Goldstein regarding the 2016 poker figures (prosecutor Beaty himself had only learned that the emails existed days before the interview)—prosecutor Beaty's unstated presumption was that Deyhle previously had simply stated his best (if inaccurate) recollection.

- o No one from the prosecution team recalls Deyhle making any statements about his prior recollection, or about having a new or different recollection. During the January 28, 2026, meeting, the prosecution team observed significant consistency with what Deyhle had said previously: Goldstein provided him with the numbers that Deyhle used to report Goldstein's 2016 gambling winnings and losses.

- o Per the prosecution team's usual practice, Special Agent Accardi was the designated law enforcement witness for the January 28, 2026, interview with Deyhle, and the same instructions applied: Special Agent Accardi only needed to record any statements made by Deyhle that were substantially different from prior statements such that they potentially impacted his credibility. Special Agent Accardi did not take any notes during the January 28, 2026, meeting with Deyhle and none of the other members of the prosecution team took substantive notes during the January 28, 2026, meeting. Prosecutor Beaty took some non-substantive handwritten notes (e.g., checkmarks) on the outline he was using during the meeting.

- o Insomuch as Goldstein had produced to the grand jury the information contained in DX317 and GX148 and, indeed, Goldstein himself had identified DX317 as a trial exhibit for use with Deyhle, no one on the prosecution team identified any basis to make supplemental discovery disclosure to Goldstein regarding Deyhle's statements explaining how he used the figures provided by Goldstein to prepare his 2016 tax return.

- The prosecution team conducted one additional virtual prep session with Deyhle on January 30, 2026; however, the government did not discuss DX317 or GX148, or any of Deyhle's prior statements to the grand jury or the government—at that meeting.

- On January 31, 2026, Deyhle reached out directly to prosecutor Beaty with a request for a phone call to clarify an answer he provided during the January 31, 2026, virtual meeting. Prosecutor Beaty instructed another IRS Special Agent, Maggie McClellan, to contact Deyhle and take notes of any clarification Deyhle wanted to provide to the government. After speaking with Deyhle on January 31, 2026, Special Agent McClellan prepared a memorandum of her conversation with Deyhle, which the United States produced to Goldstein the same day.

\*\*\*

Given the limited time the United States had to assemble and outline the facts above, the United States has not had the opportunity to apply these facts to the law regarding the government's Rule 16 disclosure, *Brady*, *Giglio*, or Jencks Act obligations. The government requests an opportunity to do so before the Court holds any hearing on any motion Goldstein files on this issue.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

Sean Beaty
Senior Litigation Counsel
Hayter L. Whitman
Emerson Gordon-Marvin
Trial Attorney
Department of Justice—Criminal Division

Adeyemi Adenrele
Assistant United States Attorney
District of Maryland