IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CRIMINAL NO. LKG-25-6 |
| | * | |
| THOMAS C. GOLDSTEIN, | * | |
| | * | |
| Defendant. | * | |
| | ******** | |

**DEFENDANT THOMAS C. GOLDSTEIN'S RESPONSE TO THE GOVERNMENT'S BRIEF IN COMPLIANCE WITH THE COURT'S FEBRUARY 4, 2026, ORDER**

The government's Court-ordered filing confirms that it willfully violated *Brady* by withholding exculpatory statements made by Walter Deyhle, the government's key witness, in a meeting with prosecutors to prepare for his trial testimony.[1]

Mr. Deyhle is the GRF accountant who reviewed and signed the tax returns at issue in this case. As the Court knows, in several law enforcement interviews and in sworn testimony before the grand jury, Mr. Deyhle said that Mr. Goldstein reported his 2016 gambling winnings and losses *orally* in a January 2017 meeting, that Mr. Goldstein withheld key details about the numbers, and that Mr. Goldstein provided no further information in response to requests from Mr. Deyhle. This was the centerpiece of the government's case—as it explained in the very beginning of its opening statement: that Mr. Goldstein "hid his poker winnings from his tax preparer." Gov't Opening Stmt., 1/15/26 Tr. 40:9-10; *see also id.* at 42:15-44:24.

---

[1] This is the government's second *Brady* violation. The defense strongly disagrees with the government's characterization of the first *Brady* violation in its motion for reconsideration, and the defense plans to file a response before closing statements.

1

An October 2017 email exchange between Mr. Deyhle and Mr. Goldstein produced by Goldstein & Russell in February 2024 (and not, as the government maintains, on April 30, 2024) and disclosed as a trial exhibit shows that this account of events was completely false. This email is highly exculpatory. As the government admitted in court today, the government's discovery of this email mid-trial caused the government to shift its entire theory of the case.

During Mr. Deyhle's cross-examination, the defense learned for the first time—and from the witness, not the government—that Mr. Deyhle attended a meeting with numerous members of the prosecution team during which he was shown the October 2017 email. The government's filing describing that meeting confirms that the government withheld critical exculpatory evidence.

Preliminarily, the Court should know that the government's submission omits several key facts. First, the government fails to mention that, on January 27, 2026—*the very day before* the January 28, 2026 meeting at which Mr. Deyhle was shown the October 2017 email—defense counsel emailed the government about this very issue, flagging a serious concern that there might be such a meeting and no notes might be taken and no memorandum might be produced, all in violation of *Brady*. That email, attached as Exhibit A, reads:

> Counsel,
>
> I have noticed that over the past few weeks you have been sending us interview memos from recent meetings with trial witnesses. I am writing to make sure that the defense's discovery requests with respect to these meetings are clear. We request (and we believe the government is obligated to provide) prompt production of all *Brady* information disclosed in these meetings, whether or not that information is memorialized in a memo or notes. I am raising this issue now because it looks to me like some of these memos are getting written and sent to us weeks after the interview occurs, and I want to be clear that we believe the government is not permitted to wait until an interview memo is generated to produce exculpatory information that is disclosed in these meetings—that information must be disclosed right away so that the defense can make use of it at trial.

The government did not respond to that email.

Second, as discussed further below, the government does not mention that its decision to take no notes and prepare no interview memoranda of the two key trial prep sessions with Mr. Deyhle was contrary to its regular practice in this case. To date, the government has disclosed eight interview memoranda from prep sessions with trial witnesses in January alone, on the basis of written notes. The government even prepared a memorandum of a phone call with Mr. Deyhle about a peripheral issue on the same day as the second prep session. *See* Exhibit B.

Third, the government's submission pretends that its duty of disclosure is limited to Mr. Deyhle's reaction to receiving the email. That barely scratches the surface, because it ignores the numerous significant inconsistencies between Mr. Deyhle's trial testimony (which obviously was practiced in substantial part in the preparation session) and the false story that he told the government and the grand jury over a period of four years, including:

- Mr. Deyhle's sworn testimony that Mr. Goldstein gave him the 2016 gambling numbers orally rather than in writing.

- Mr. Deyhle's sworn testimony before the grand jury that he "never received" any additional information about the gambling numbers from Mr. Goldstein after the January 2017 meeting.

- Mr. Deyhle's sworn testimony that he had the impression that Mr. Goldstein "didn't want to send me an email" about the gambling numbers.

- Mr. Deyhle's sworn testimony that Mr. Goldstein told him that he had won "roughly $1.6 million" gambling in 2016.

- Mr. Deyhle's statements to law enforcement that he did not know whether the numbers provided by Mr. Goldstein included the shares paid to investors.

3

- Mr. Deyhle's statement to law enforcement that Mr. Goldstein did not provide him with the gross gambling winnings.

Mr. Deyhle's trial testimony was completely at odds with these prior statements. At trial, Mr. Deyhle testified that in October 2017, Mr. Goldstein sent him emails disclosing his gross gambling winnings, his gambling losses, and the amounts paid to investors in 2016. Mr. Deyhle confirmed that the numbers in those October 2017 emails are almost exactly consistent with a document prepared by Mr. Goldstein that the government had argued Mr. Goldstein kept secret.

The government's filing admits that the prosecutors held two prep sessions with Mr. Deyhle, one on December 28, 2025 and one on January 28, 2026. Incredibly, the government now claims that no one took any notes during Mr. Deyhle's January 28 interview because, in the government's view, Mr. Deyle did not make any "statements … that were substantially different from prior statements such that they potentially impacted his credibility." ECF No. 395, at 7. That is patently and obviously untrue. While neither the Court nor the defense has any record of the witness's statements in the January 28 interview because the five law enforcement officials who attended the meeting made the conscious choice *not* to write anything down, *see* ECF No. 395, at 5-7, the government's account of the meeting in its filing belies this assertion. By the government's own account, Mr. Deyhle apparently admitted for the first time in this meeting that the numbers he entered in the 2016 tax return came from the October 2017 email and not (as he had previously maintained) from a January 2017 meeting with Mr. Goldstein. Mr. Deyhle apparently also admitted for the first time that he arrived at the numbers on the 2016 tax return by performing (incorrectly, as he admitted on cross) calculations using *gross* gambling winnings, losses, and investor shares that Mr. Goldstein provided him, and not (as he had previously

maintained) based on net figures only. This is plainly exculpatory information that should have been disclosed to the defense.

Critically, the government's filing does *not* claim that Mr. Deyhle's testimony today somehow dramatically departed from what he said in his January 28 interview. On the contrary, it was abundantly clear during the government's direct examination that Mr. Deyhle was extensively prepared to discuss how he ostensibly used the October 2017 email to prepare Mr. Goldstein's return. The government's filing admits as much. *See* ECF No. 395, at 6 ("[P]rosecutor Beaty informed [Mr. Deyhle] that the prosecution team had identified emails that *substantiated* the numbers Deyhle ultimately reported on Goldstein's 2016 tax return" and "[p]rosecutor Beaty then walked Deyhle through a similar math demonstration as the one used on direct examination with Deyhle on February 3, 2026").

The government may argue that its failure to disclose information about Mr. Deyhle's January 28, 2026 interview is excusable because the defense managed to elicit testimony from Mr. Deyhle about the October 2017 email on the stand today. If that were the rule, then the government could withhold exculpatory witness-interview material with impunity, because either the defense would discover it during cross-examination of the witness (making it immaterial, under the government's theory), or the defense would never discover it (meaning that the *Brady* violation would go undetected). Fortunately, the government's tails-I-win-heads-you-lose position is not the rule. As the Fourth Circuit recently reiterated, "[i]t is not sufficient for the prosecution to merely disclose *Brady* evidence *at some point* before the close of trial. Rather, the *Brady* evidence must be disclosed in time for defense counsel to have the opportunity to use the material effectively." *Moore v. Maryland*, No. 24-6325, 2026 WL 40957, at *8 (4th Cir. Jan. 7, 2026) (emphasis in original).

Here, the government's decision to withhold Mr. Deyhle's January 28 statements plainly impaired the defense. The details of the January 28 meeting would have featured prominently in the defense's cross-examination of Mr. Deyhle. As the Court heard, the gravamen of the defense's cross-examination was that Mr. Deyhle's prior statements were inconsistent with the October 2017 email. If the government confronted Mr. Deyhle with those inconsistencies in the January 28 prep session, the statements from that confrontation would obviously have featured prominently in the cross-examination. On the other hand, if the government chose *not* to confront Mr. Deyhle with those inconsistencies in the January 28 prep session, that too would have been a key defense point—that the government had simply turned a blind eye to the prior false statements of its key witness.

The defense also could have used the details of the January 28 meeting to establish that Mr. Deyhle had a motive to curry favor with the government, such that the substance of the meeting was required to be disclosed under *Giglio*. According to the government's filing, in that meeting Mr. Deyhle was shown for the first time an October 2017 email establishing that he had made numerous false statements to law enforcement and that he may have committed perjury before a federal grand jury. The revelation of this email gave Mr. Deyhle an obvious incentive to testify favorably to the government at trial.

The defense's inability to prepare with the withheld material means that the government's non-disclosure of Mr. Deyhle's interview statements was material. *See Moore*, 2026 WL 40957, at *9 ("Suppressed evidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." (citation and internal quotation marks omitted)). Mr. Deyhle is arguably the most important witness in the entire case: At the end of the trial, the jury will be asked to decide

whether the errors in the returns that Mr. Deyhle indisputably prepared are a result of Mr. Deyhle's negligence or Mr. Goldstein's willful acts of tax evasion.  And the October 2017 email is without a doubt the most important piece of evidence on that question:  It demonstrates both that Mr. Goldstein did in fact disclose information to Mr. Deyhle, and that Mr. Deyhle either forgot (at best) or lied (at worst) about receiving that information.  What Mr. Deyhle did when confronted with that evidence, and how (if at all) he reconciled his inconsistent statements on the issue, is absolutely critical.  Thus, "[g]iven the centrality of this evidence to the [government's] case," this Court can infer that "there is a reasonable probability that the result of the proceeding would have been different had the [evidence] been timely disclosed." *Id.* at *9; *see also, e.g.*, *United States v. Service Deli, Inc.*, 151 F.3d 938, 943 (9th Cir. 1998) (conviction vacated because *Brady* violated by the failure to disclose that in fourth interview, "one key witness" for "the foundation" of the prosecution contradicted prior interview statements, and defense was premised on attacking that witness's credibility); *United States v. Tavera*, 719 F.3d 705, 710 (6th Cir. 2013) (conviction vacated because "[i]n the week before … trial," government failed to describe that witness who was central to prosecution participated in preparation sessions and contradicted his representations regarding defendant's guilt).

     Indeed, the government's own conduct confirms the materiality of the withheld material. The government all but concedes that the primary purpose of the January 28 interview was to discuss the October 2017 email:  In December 28, 2025, the government held a trial preparation session with Mr. Deyhle.  *See* ECF No. 395, at 3.  On January 23, 2026, the government discovered the October 2017 email.  *See id.* at 4.  And then just five days later—at the end of an already "busy day"—the government held *another* "trial preparation session" with Mr. Deyhle at which prosecutor Beaty "*at the outset*" informed Mr. Deyhle that the "prosecution team had

7

identified" the new email. *Id.* at 6 (emphasis added). And that email, as noted, was so significant that it has caused the government to shift its entire "theory of the case" mid-trial. ECF No. 376, at 3. The government's opening statement promised the jury evidence that Mr. Goldstein failed to tell Mr. Deyhle about $26 million in poker winnings from Alec Gores, *see* 1/15/26 Tr. 40:9-10, 42:15-44:24; the government has now pivoted to the theory (among others) that Mr. "Goldstein only repatriated $27 million to the United States in 2016 and left the remainder of his net winnings with a nominee in Asia," ECF No. 376, at 3.

It is simply untrue that, as the government appeared to suggest today, the government can dodge its *Brady* obligations by declining to memorialize exculpatory material in writing. On the contrary, it is well-established that, "[w]hen the Government is in possession of material information that impeaches its witness or exculpates the defendant, it does not avoid the obligation under *Brady/Giglio* to disclose the information by not writing it down." *United States v. Rodriguez*, 496 F.3d 221, 222 (2d Cir. 2007); *see also, e.g.*, *United States v. Spurlock*, No. 3:23-CR-00022-MMD-CLB-1, 2025 WL 1224720, at *1 (D. Nev. Apr. 25, 2025) ("The government cannot avoid its disclosure obligation by intentionally not reducing inculpatory statements to writing or by selectively recording certain statements while omitting others ….").

The scope of the government's willful *Brady* violation is obvious from two other facts. First, in the preparation session that the prosecution specially called to address the October 2017 email and related exchanges, the prosecutors took no notes and produced no memorandum. That stands in stark contrast to the prosecution's practice in other preparation sessions. The government provided the defense with *eight* separate Memorandums of Interviews that it conducted with witnesses in January 2026, many of which involve witnesses of little significance discussing minor points. Those memoranda make clear that the government's claim that its

8

practice was to record only express *inconsistent* statements by witnesses is absolutely absurd. *See* Exhibit C (memorandum of January 19, 2026 meeting with Daniel Woofter based on "notes made during and after the interview" discussing IOLTA accounts and his purchase of a house; memorandum of January 5, 2026 meeting with Bill Caldwell discussing numerous consistent statements based on "notes made during and immediately after the interview"; memorandum of January 8, 2026 interview with Paul Napoli based on "notes made during and immediately after the interview"; memorandum of January 18, 2026 interview with Yvette Parrish to record recollection that Mr. Goldstein "asked if she was a part of the civil or criminal division"; memorandum of January 6, 2026 interview with Sarah Harrington confirming that she knew that Tobey Maguire and Kevin Hart were clients of the firm based on "notes made during and immediately after the interview").

Second, the Court can also easily infer willfulness from the questions that the prosecution conspicuously decided *not* to ask Mr. Deyhle. Obviously, to anyone with the slightest experience with criminal law, the fact that the central witness to the government's case completely reversed his position on the critical facts regarding the central charge would raise a number of vital questions. These include most obviously how the witness managed not to recall the truth despite all his prior statements and sworn testimony on such a vital question. They also include whether the witness now realized that any of his other recollections were incorrect, including with respect to this same issue. It is exceptionally telling that the prosecution—according to its own best effort to explain its conduct—did none of that. In other words, the prosecution departed from every ordinary step of trial preparation for the obvious, sole purpose to attempt to avoid the witness making any express statement that was inconsistent with what he

9

had said before, and thus to evade its obligations under *Brady*. That effort was deeply misguided and fails for all the reasons detailed in this response, but the prosecution's willfulness is plain.

Dated: February 4, 2026

Respectfully submitted,

/s/ *Jonathan I. Kravis*
Jonathan I. Kravis (Bar No. 31556)
Stephany Reaves (Bar No. 19658)
Sarah E. Weiner (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com
Sarah.Weiner@mto.com

Adeel Mohammadi (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*