**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | |
| | * | |
| **Defendant.** | * | |
| | ******** | |

**DEFENDANT THOMAS C. GOLDSTEIN'S MOTION FOR JUDGMENT OF
<u>ACQUITTAL OR, IN THE ALTERNATIVE, REQUEST FOR JURY INSTRUCTIONS</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

LEGAL STANDARD ............................................................................................7

ARGUMENT .........................................................................................................7

I.      TO THE EXTENT JUDGMENT OF ACQUITTAL IS NOT AN APPROPRIATE
        REMEDY, THE DEFENSE REQUESTS A JURY INSTRUCTION IN THE
        ALTERNATIVE ..........................................................................................7

II.     THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A CONVICTION AS TO
        COUNT 1 (TAX EVASION IN 2016) ...........................................................9

        A.      The Government Has Failed To Prove That Mr. Goldstein Willfully
                Evaded Payment Of His 2016 Taxes ..............................................10

                1.      The Evidence Is Insufficient To Prove That "Transferring At Least
                        $960,000 In Personal Funds Into G&R's IOLTA Account In
                        March 2021" Was A Willful Act of Evasion ............................10

                2.      The Evidence Is Insufficient To Prove That "Making False And
                        Misleading Statements To An IRS Revenue Officer In March
                        2018" Was A Willful Act of Evasion .......................................13

        B.      The Government Has Failed To Prove That Mr. Goldstein Willfully
                Evaded Assessment Of His 2016 Taxes, Including Because The Evidence
                Is Insufficient To Prove That "Using Funds And Assets Of G&R To Pay
                Personal Gambling Debts" Was A Willful Act of Evasion ..................15

III.    THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A CONVICTION AS TO
        COUNTS 2-9 (FALSE RETURNS) ...............................................................19

        A.      The Government Has Failed To Prove That Mr. Goldstein Willfully
                Assisted The Preparation Of A False Return By Omitting Interest Income ..........19

        B.      The Government Has Failed To Prove That Mr. Goldstein Willfully
                Assisted The Preparation Of A False Return By Omitting A 401(k)
                Distribution From Income .....................................................................20

        C.      The Government Has Failed To Prove That Mr. Goldstein Willfully
                Assisted The Preparation Of A False Return By Failing to Separately
                Report Gambling Wins and Losses ........................................................20

        D.      The Government Has Failed To Prove That Mr. Goldstein Willfully
                Assisted The Preparation Of A False Return By Accepting Legal Fee
                Payments In Non-Firm Accounts ..........................................................22

i

E.      The Government Has Failed To Prove That Mr. Goldstein Willfully
        Assisted The Preparation Of A False Return By Using Firm Funds to Pay
        Personal Debts ............................................................................................25

F.      The Government Has Failed To Prove That Mr. Goldstein Willfully
        Assisted The Preparation Of A False Return By Causing Salary And/Or
        Benefits To Be Paid To Certain Employees ...............................................27

IV.     THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A CONVICTION AS TO
        COUNTS 10-13 (WILLFUL FAILURE TO PAY).............................................28

A.      The Government Has Failed To Prove That Mr. Goldstein Willfully
        Violated Section 7203 ................................................................................28

B.      As Applied In This Case, Section 7203 Is Void For Vagueness ...........................32

C.      The Government's Novel Theory Of Section 7203 Liability Violates Due
        Process .......................................................................................................34

V.      THE GOVERNMENT MAY NOT SEEK CONVICTION ON THE BASIS OF
        ANY UNCHARGED ACTS...............................................................................36

CONCLUSION.....................................................................................................................37

## INTRODUCTION

Pursuant to Federal Rule of Criminal Procedure 29(a), the defendant Thomas C. Goldstein moves for judgment of acquittal. As to each and every count in the Second Superseding Indictment, "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). To the extent the Court deems any deficiency in the government's case an inappropriate basis to grant a judgment of acquittal, the defense requests in the alternative a jury instruction directing the jury that it may not convict on the basis of that invalid theory.

As to the charge of tax evasion in 2016 (Count 1), the evidence is insufficient to sustain a conviction. Most notably, the government has failed to prove an affirmative act of evasion of *payment* within the statute of limitations period because, *first*, the IRS was not levying Mr. Goldstein's accounts at the time he transferred money into G&R's IOLTA account (which the IRS could have levied, in any event), and *second*, Mr. Goldstein did not conceal the fact that he had significant 2016 gambling winnings from Officer Parrish. And as to the government's allegations that Mr. Goldstein evaded *assessment* of his 2016 taxes, the evidence is insufficient to show that Mr. Goldstein willfully mischaracterized six payments made from the G&R account as legal fee expenses because there is no evidence that Mr. Goldstein instructed anyone regarding how to classify those payments, and no reasonable jury could conclude that he became aware of their misclassification after the fact.

As to the charges of assisting the preparation of false returns in 2017 through 2021 (Counts 2-9), the evidence is insufficient to sustain a conviction. Most notably, the government has abandoned the allegations that Mr. Goldstein willfully omitted interest income and income from a 401(k) distribution. The government has also failed to offer sufficient evidence from which a reasonable jury could conclude that Mr. Goldstein willfully failed to separately report gambling wins and losses, as both of Mr. Goldstein's former accountants testified that they never

1

informed him of that rule.  Nor is there sufficient evidence to support a conviction for allegedly "diverting" legal fee payments or using firm funds to pay personal expenses.  As to the former allegation, the evidence conclusively shows that Mr. Goldstein did not act willfully; either the third-party payors breached their legal obligations to send Form 1099s recording that income, or GRF acted negligently in ignoring those forms.  And as to the latter allegation, there is simply no evidence from which a reasonable jury could conclude that Mr. Goldstein ever knew the two payments at issue were misclassified.

As to the charges willful failure to pay (Counts 10-13), the evidence is insufficient to sustain a conviction because no reasonable juror could conclude that Mr. Goldstein understood that he would be breaching a legal duty to the IRS by choosing to pay late with penalties and interest—much less that he we be committing a crime.  Additionally, Section 7203 is void for vagueness as applied in this case, because the government's standardless interpretation of what constitutes a crime under that statute encourages arbitrary and discriminatory enforcement.  For similar reasons, this prosecution violates Mr. Goldstein's due process rights, as he lacked fair notice that his conduct could lead to criminal prosecution.

## **BACKGROUND**

Shortly before trial, the government dismissed several counts in the Second Superseding Indictment (the "indictment").  *See* ECF Nos. 337, 343.   The following sixteen counts remain in the Indictment.

***Count 1 (tax evasion in 2016).***  Count 1 of the indictment charges tax evasion in 2016, in violation of 26 U.S.C. § 7201.  *See* ECF No. 337-2, ¶ 109.  That count alleges eight specific affirmative acts of tax evasion:

      a.   using funds and assets of G&R to pay personal gambling debts in specific instances identified by the Indictment;

    b.   providing false and incomplete information to the Accounting Firm;

    c.   making false and misleading statements that the Indictment specifies to an IRS Revenue Officer in March 2018;

    d.   making false and misleading statements to IRS representatives that the Indictment specifies in October 2020;

    e.   transferring at least $960,000 in personal funds into G&R's IOLTA account in March 2021 to shield the funds from collection by the IRS;

    f.   using foreign individuals and foreign bank accounts to receive income in a manner specified by the Indictment;

    g.   causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1120S for G&R; and

    h.   causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1040 for himself and his wife.

ECF No. 337-2, ¶ 109.

    ***Counts 2-9 (false returns in 2017-2021).***  Counts 2 through 9 of the indictment charge aiding and assisting in the preparation of a false and fraudulent tax return in tax years 2017 through 2021, in violation of 26 U.S.C. § 7206(2).  *See* ECF No. 337-2, ¶ 117.  Across those five years, the indictment alleges that the following conduct aided or assisted in the preparation of false returns:  (1) failing to report gross gambling winnings in years where Mr. Goldstein had no net gambling income (Counts 2, 6, 8, and 9); (2) directing the payment of legal fees to personal accounts or third parties, namely, (a) by diverting a $250,000 legal fee from Robbins Geller to Mr. Goldstein's personal account (Count 3), (b) using $125,000 in legal fees due from Napoli Shkolnik to satisfy a personal debt of $125,000 (Count 5), and (c) redirecting a $500,000 legal

fee payment from Tobey Maguire to Bob Safai (Count 9); (3) using Goldstein & Russell ("G&R") funds to pay personal expenses and/or debts, namely, (a) by using $175,000 of G&R funds to pay a personal debt to Napoli Shkolnik (Count 3), and (b) using $170,000 of G&R funds to pay a personal debt to Chuck Pacheco (Count 7); (4) omitting interest income (Counts 2 and 4); (5) omitting $215,971 "in pension-related income" in 2017 (Count 2); (6) causing salary and/or benefits to be paid to employees who allegedly did little or no work (Counts 5, 7, and 8); (7) failing to report three payments from Paul Phua as income, namely, (a) a $1,000,000 transfer into Mr. Goldstein's Montenegrin bank account in September 2018 (Count 5), (b) $968,000 in cash given to Mr. Goldstein in October 2018 (Counts 4 and 5), and (c) a $235,000 transfer into G&R's Montenegrin bank account in February 2019 (Count 7); and (8) answering "no" to the question of whether Mr. Goldstein had cryptocurrency transactions in 2020 and 2021 (Counts 8 and 9).

| Count | Return (Year) | Paragraph | Introductory Language | Allegation(s) |
|---|---|---|---|---|
| 2 | Goldstein Form 1040 (2017) | ¶ 52 | "Meanwhile, **GOLDSTEIN**'s 2017 Form 1040 falsely omitted …" | 1) Failed to report $3,250,000 in gambling income by telling accountants Mr. Goldstein had "no gambling winnings" (¶ 52) 2) Omitted $215,971 in "pension-related income" (¶ 52) 3) Omitted $263 in interest income (¶ 52) |
| 3 | G&R Form 1120S (2017) | ¶ 52 | "As a result of the conduct described in paragraphs 45 through 51, **GOLDSTEIN** caused the following false tax reporting on the Form 1120S for | 1) Diverted $250,000 legal fee from Robbins Geller to gambling account (¶ 52) 2) Used $175,000 of G&R funds to pay debt to Napoli Shkolnik (¶ 52) |

| Count | Return (Year) | Paragraph | Introductory Language | Allegation(s) |
|---|---|---|---|---|
| | | | G&R for the 2017 tax year:" | |
| 4 | Goldstein Form 1040 (2018) | ¶ 62 | "As a result of the conduct described in paragraphs 56 through 61, **GOLDSTEIN** also caused the following false tax reporting on his 2018 Form 1040 for the 2018 tax year:" | 1) Omitted $968,000 in alleged cash income (gambling theory) (¶ 62)<br><br>2) Omitted interest income (¶ 62) |
| 5 | G&R Form 1120S (2018) | ¶ 61 | "As a result of the conduct described in paragraphs 56 through 60, **GOLDSTEIN** caused the following false tax reporting on the 2018 G&R Form 1120S for the 2018 tax year:" | 1) Used $125,000 legal fee due from Napoli Shkolnik to satisfy debt of $125,000 (¶ 61)<br><br>2) Omitted $1,000,000 in alleged income transferred into Montenegrin account by Phua (¶ 61)<br><br>3) Omitted $968,000 in alleged cash income (legal fee theory) (¶ 61)<br><br>4) Deducted approx. $40,000 in salaries and healthcare premiums paid to four employees (¶ 61) |
| 6 | Goldstein Form 1040 (2019) | ¶ 72 | "As a result of the conduct described in paragraphs 67 through 71, **GOLDSTEIN** caused the following false tax reporting for the 2019 tax year:" | 1) Failed to report $359,000 in gambling income (¶ 72) |
| 7 | G&R Form 1120S (2019) | ¶ 72 | "As a result of the conduct described in paragraphs 67 through 71, **GOLDSTEIN** caused the following false tax reporting for the 2019 tax year:" | 1) Used $170,000 G&R funds to pay debt to Chuck Pacheco (¶ 72)<br><br>2) Deducted $5,997 in healthcare premiums (¶ 72) |

| Count | Return (Year) | Paragraph | Introductory Language | Allegation(s) |
|---|---|---|---|---|
| | | | | 3) Omitted $235,000 in alleged legal fee income from Phua (¶ 72) |
| 8 | Goldstein Form 1040 (2020) | ¶ 77 | "As a result of the conduct described in paragraphs 74 through 76, **GOLDSTEIN** caused his 2020 Form 1040 to falsely omit …" | 1) Failed to report $93,180 in gambling income (¶ 77)<br><br>2) Omitted $1,800 as income paid in healthcare premiums (¶ 77)<br><br>3) Failed to check cryptocurrency box (¶ 77) |
| 9 | Goldstein Form 1040 (2021) | ¶¶ 88-89 | "As a result of the conduct described in paragraphs 81 through 87, **GOLDSTEIN** caused …" | 1) Redirected $500,000 legal fee payment from Maguire to Safai (¶ 88)<br><br>2) Failed to check cryptocurrency box (¶ 89)<br><br>3) Failed to report $267,000 in gambling income (¶ 89) |

***Counts 10-13 (failure to pay in 2017, 2019, 2020, and 2021).*** Counts 10 through 14 of

the indictment charge willful failure to pay taxes in tax years 2017, 2019, 2020, and 2021, in

violation of 26 U.S.C. § 7203, on the following "payment due dates":

- Tax year 2017: April 17, 2018;

- Tax year 2019: July 15, 2020;

- Tax year 2020: May 17, 2021; and

- Tay year 2021: April 18, 2022.

*See* ECF No. 337-2, ¶ 119.

***Counts 14-16 (false statements on mortgage applications).*** Counts 14 through 16

charge making false statements on a loan application, in violation of 18 U.S.C. § 1014. *See* ECF

No. 337-2, ¶¶ 121, 123, & 125.

## LEGAL STANDARD

"After the government closes its evidence," a court "must enter a judgment of acquittal of

any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P.

29(a). The government must show that "substantial evidence" supports a guilty verdict. *United*

*States v. Smith*, 54 F.4th 755, 766 (4th Cir. 2022) (citation and internal quotation marks omitted).

Under that standard, to deny a motion for judgment of acquittal, "[t]he court must be satisfied

that there is 'evidence that a reasonable finder of fact could accept as adequate and sufficient to

support a conclusion of a defendant's guilt beyond a reasonable doubt.'" *United States v.*

*Bonner*, 648 F.3d 209, 213 (4th Cir. 2011) (citation omitted).

## ARGUMENT

## I.     TO THE EXTENT JUDGMENT OF ACQUITTAL IS NOT AN APPROPRIATE REMEDY, THE DEFENSE REQUESTS A JURY INSTRUCTION IN THE ALTERNATIVE

With respect to the tax evasion count (Count 1) and most of the false returns counts

(Counts 2, 3, 4, 5, 7, 8, and 9), the indictment charges multiple acts that each constitute

alternative theories of criminal liability. For example, as to Count 1, the indictment charges

eight separate affirmative acts of tax evasion. *See* ECF No. 337-2, ¶ 109. And as to Count 2, the

indictment charges that three separate acts assisted the preparation of Mr. Goldstein's allegedly

false Form 1040 in 2017: failing to report $3,250,000 in gambling income, omitting $215,971 in

"pension-related income," and omitting $263 in interest income. *Id.* at ¶ 52. If this Court were

to conclude that there is no substantial evidence to support *any* theory of liability, then judgment

of acquittal as to an entire count would be appropriate. But if this Court were to find some of

theories legally invalid and others valid, then a technical question would arise regarding whether the Court may grant a partial judgment of acquittal.

The defense submits that, albeit rare, it is procedurally permissible for the Court to grant a judgment of acquittal as to particular theories of liability within individual counts. *See, e.g.*, *United States v. Beverly*, 913 F.2d 337, 360, 365 (7th Cir. 1990) (stating, in a case in which the defendant had been found guilty on a "dual-objective conspiracy charge," that the Court "d[id] not understand why, once the government admitted it could not link [the defendant] to the DEA objective of the conspiracy count, the district court failed to grant a partial judgment of acquittal with respect to that count."); *United States v. Weise*, No. 13-CR-20092-KMM, 2013 WL 11318867, at *1 (S.D. Fla. Sept. 4, 2013) (entertaining motion for "partial judgment of acquittal with respect to the Force theory but not the Age theory" in case in which defendant was charged with sex trafficking a minor).

However, even this Court were not inclined to grant partial judgment of acquittal as to any particular count, the fact remains that the jury must not be permitted to convict Mr. Goldstein on the basis of a theory that the evidence is legally insufficient to support. *See, e.g.*, *Turner v. Marshall*, 63 F.3d 807, 816 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999) ("A conviction based on insufficient evidence violates due process."). Therefore, the defense requests in the alternative that the jury be instructed that it cannot convict Mr. Goldstein on the basis of any acts that this Court deems to be legally insufficient to sustain a conviction.[1] *See, e.g.*, *Mahon v. United States*, No. CR-09-0712-PHX-

---

[1] Of course, the government should not be permitted to close on any legally invalid theories of liability, either. *Cf. Beverly*, 913 F.2d at 365 (finding no substantial prejudice where district court failed to grant partial judgment of acquittal, in part, because "in acknowledging a misstatement made in closing argument, the Assistant United States Attorney specifically noted that the government did not contend that Ms. Griffin had conspired to defraud the DEA.").

DGC, 2018 WL 8188212, at *54 (D. Ariz. Nov. 5, 2018), *report and recommendation adopted*, No. CR-09-00712-PHX-DGC, 2019 WL 1556147 (D. Ariz. Apr. 10, 2019) (denying motion for "partial judgment of acquittal … with the understanding we will talk about what should … be in jury instructions and the Indictment when it goes back").  And to ensure that the jury follows those instructions—a difficult task, given the complexity of the evidence at trial and the government's sprawling presentation of both charged and uncharged misconduct—the defense renews its request for a special verdict form.  *See, e.g. United States v. Ameyapoh*, 293 F. Supp. 3d 568, 571 (E.D. Va. 2018) (denying motion for judgment of acquittal "[a]t the close of the government's case" but using special verdict form—which, ultimately, supported post-verdict judgment of acquittal).

## II.  THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A CONVICTION AS TO COUNT 1 (TAX EVASION IN 2016)

Count 1 of the indictment charges Mr. Goldstein with both evading *assessment* and evading *payment* of his 2016 taxes.  *See Kawashima v. Holder*, 565 U.S. 478, 488 (2012) ("[Section] 7201 includes two offenses: 'the offense of willfully attempting to evade or defeat the *assessment* of a tax as well as the offense of willfully attempting to evade or defeat the *payment* of a tax.'" (citation omitted)); ECF No. 337-2, ¶ 109.  To obtain a conviction for tax evasion under 26 U.S.C. § 7201, the government must prove beyond a reasonable doubt "willfulness, a substantial tax deficiency, and an affirmative act constituting an attempted evasion of the tax."  *United States v. Goodyear*, 649 F.2d 226, 227-28 (4th Cir. 1981).  Furthermore, to satisfy the six-year statute of limitations, the government has conceded that "to convict Goldstein on Count One, [the jury] must find that he committed an affirmative act of evasion on or after January 1, 2018."  ECF No. 341, at 1.

Without waiving or forfeiting, and expressly preserving, all arguments challenging the sufficiency of the evidence as to Count 1, the defense highlights the following deficiencies in the government's case-in-chief as to the charge of tax evasion in 2016.

### A.    The Government Has Failed To Prove That Mr. Goldstein Willfully Evaded Payment Of His 2016 Taxes

In contrast to "evasion of assessment" cases, "evasion of payment cases … are rare and generally require an affirmative act that occurs after any filing." *Williams v. Comm'r of Internal Revenue*, 498 F. App'x 284, 289 n.5 (4th Cir. 2012).  In this case, the indictment alleges that two affirmative acts of evasion of payment occurred within the statute of limitations (i.e., after January 1, 2018):  "transferring at least $960,000 in personal funds into G&R's IOLTA account in March 2021 to shield the funds from collection by the IRS," and "making false and misleading statements to an IRS Revenue Officer in March 2018."  ECF No. 337-2, ¶ 109(c), (e); *see also* ECF No. 312, Instruction No. 44 [Government's Version] ("Affirmative acts of evasion of payment are attempts to conceal a taxpayer's ability to pay a tax due and owing.").

The government has failed to offer sufficient evidence to sustain a conviction based on either affirmative act.  As a result, the government should not be permitted to proceed on an evasion-of-collection theory as to Count 1.

### 1.    The Evidence Is Insufficient To Prove That "Transferring At Least $960,000 In Personal Funds Into G&R's IOLTA Account In March 2021" Was A Willful Act of Evasion

The indictment alleges that, in March of 2021, Mr. Goldstein evaded payment of his 2016 taxes by briefly wiring $960,000 from his retirement accounts into G&R's IOLTA account before transferring that money into G&R's business account (and, ultimately, then using that money to complete a home purchase).  *See* ECF No. 337-2, ¶ 103; *see also* GX-421 (funds in IOLTA account for no more than five days); 2/9/26 Tr. 99:17-101:20 (Mr. Goldstien's funds in

IOLTA account over a weekend).  The government's theory is that Mr. Goldstein transferred the

money into the IOLTA account in order "to shield the funds from collection by the IRS."  ECF

No. 337-2, ¶ 109(e).

     The government's theory is legally impossible, however, because it is undisputed that

Mr. Goldstein's accounts *were not being levied* in March 2021.  *See* 1/28/26 Tr. 130:8-154:15.

The government's own witness, Revenue Officer Parrish, testified that Mr. Goldstein entered

into an installment agreement with the IRS on May 22, 2019.  *See* GX-73, p.4; 1/28/26 Tr.

134:16-135:8.  And because Mr. Goldstein was on that payment plan, the IRS did not levy his

accounts after May 22, 2019.[2]  *See* GX-73, pp.4-7; 1/28/26 Tr. 135:9-19, 145:14-20.  As a result,

transferring money into the IOLTA account could not possibly have "shield[ed] the funds from

collection by the IRS," as the indictment alleges, ECF No. 337-2, ¶ 109(e), because the IRS was

not collecting funds from Mr. Goldstein's accounts at that time.[3]  Instead, Mr. Goldstein was

making regular, agreed-upon payments pursuant to his installment agreement.  *See* 1/28/26 Tr.

140:5-142:11, 146:5-14 (Mr. Goldstein stayed current on his payment plan through the relevant

period); GX-73, pp.6-7 (same); *compare with United States v. Doyle*, 956 F.2d 73, 75 (5th Cir.

---

[2] Because the Count 1 charges tax evasion only with respect to tax year 2016, that is the only tax balance for which levies would be relevant, as Mr. Goldstein is not charged with evading collection of taxes owed for any other tax year.  That said, Officer Parrish's testimony confirmed that in March 2021 the IRS was not levying Mr. Goldstein's accounts to collect an outstanding balance for *any* tax year.  *See* 1/28/26 Tr. 147:18-148:24, 149:12-151:1, 154:12-15; GX-74; GX-76; GX-78.

[3] The government's pursuit of its IOLTA theory is particularly egregious given that the government unquestionably has always known that this crime was impossible and the charge was unsupported by any evidence. The defense consistently objected when the government sought to introduce evidence on the IOLTA allegation. The government then represented to the Court that it was genuinely pursuing the charge. But that was *never true*. The IOLTA allegation was therefore never anything but a vehicle to interject highly prejudicial evidence without complying with Rule 404(b) and without any evidentiary basis whatsoever. The defense anticipates requesting an instruction directing the jury to disregard the IOLTA evidence because there was never any basis for that charge.

1992) ("The felony [of tax evasion] requires 'proof of specific intent of the accused to defeat or evade the payment of tax.'" (citation omitted)).

That the IRS was not levying any of Mr. Goldstein accounts completely forecloses the government's theory that Mr. Goldstein willfully evaded paying his 2016 taxes by moving funds into G&R's IOLTA account over a long weekend. But there is another reason, too, why Mr. Goldstein's use of the IOLTA account was legally incapable of constituting an affirmative act of tax evasion: the IRS can, in fact, levy IOLTA accounts. *See, e.g. L. Offs. of Scott E. Combs v. United States*, 767 F. Supp. 2d 758, 760 (E.D. Mich. 2011); *Hwang L. Firm, LLC v. United States*, No. 07-2973, 2008 WL 2704316, at *1 (E.D. Pa. July 9, 2008). And, critically, the government offered absolutely *no evidence* to the contrary. (In fact, Walter Deyhle—Mr. Goldstein's former accountant and arguably the government's most important witness, testified that "[t]here would … be[] nothing wrong with" opening and using entirely new accounts even *while* the IRS was levying Mr. Goldstein's existing bank accounts. 2/4/26 Tr. 48:15-50:5, 54:18-55:9.) Thus, because Mr. Goldstein's use of the IOLTA account did not legally "mov[e] his assets beyond the reach of the Internal Revenue Service," that transfer of funds cannot constitute an "affirmative step[] to evade payment."[4] *Kawashima*, 565 U.S. at 488.

---

[4] The government offered no evidence that Mr. Goldstein *thought* the IOLTA account could not be levied, either. And even if Mr. Goldstein had held that mistaken view, the legal impossibility of evading payment by moving funds into an IOLTA account would mean that, as a matter of law, Mr. Goldstein could not have committed the crime of tax evasion. *See, e.g.*, *United States v. Hamrick*, 43 F.3d 877, 885 (4th Cir. 1995) ("The defense of legal impossibility is available where the defendant's acts, even if fully carried out as intended, would not constitute a crime."); *accord, e.g.*, *United States v. Carter*, 15 F.4th 26, 36 (1st Cir. 2021); *In re Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000); *United States v. Frazier*, 560 F.2d 884, 888 (8th Cir. 1977).

2.    **The Evidence Is Insufficient To Prove That "Making False And Misleading Statements To An IRS Revenue Officer In March 2018" Was A Willful Act of Evasion**

The indictment also alleges that Mr. Goldstein evaded payment of his 2016 taxes by telling Officer Parrish during a March 2018 meeting that "his outstanding liability for 2016 was attributable to his receipt of a significant legal fee" instead of "his gambling income."  ECF No. 337-2, ¶ 42.  The government's apparent theory for why this alleged misstatement "would likely mislead the IRS or conceal [Mr. Goldstein's] assets," *United States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997), is that if Mr. Goldstein had told Officer Parrish "about winning or losing millions of dollars playing poker," then Officer Parrish would have "investigated further" to determine if "that would have been another levy source."  1/22/26 Tr. 228:13-230:19.  There are two fatal flaws with this theory.

First, Mr. Goldstein *had* disclosed on his Form 1040 for tax year 2016 that he had significant gambling winnings.  *See* 1/28/26 Tr. 158:4-161:1.  As a matter of law, it is not an act of tax evasion to fail to tell the IRS something that it already knows.  *See, e.g.*, *United States v. Romano*, 938 F.2d 1569, 1573-74 (2d Cir. 1991) (holding that defendant's failure to file a tax return was not an affirmative act of evasion where it would have provided only "information which the government already had and which [the defendant] knew the government had"); *see also Goodyear*, 649 F.2d at 228 ("a willful attempt may be inferred" from conduct "having the *likely effect* of misleading or concealing" (emphasis added)).  And, for similar reasons, no reasonable jury could find that Mr. Goldstein intentionally mislead Officer Parrish about his 2016 taxes by withholding information that he had already freely disclosed to the IRS.

Second, although the indictment charges Mr. Goldstein with misstating the reason for his "liability" for 2016, ECF No. 337-2, ¶ 42, the evidence at trial revealed that Officer Parrish actually asked Mr. Goldstein about the reason for the "balance" due on those taxes.  *See* GX-19,

p.13; 1/28/26 Tr. 170:2-173:22.  In fact, Officer Parrish testified that that *at no point* during the March 2018 meeting did she did ask Mr. Goldstein about his sources of income in 2016.  1/28/26 Tr. 173:14-22.  And so when Officer Parrish asked Mr. Goldstein about why he had an outstanding *balance* on his 2016 taxes, he answered honestly:  He was having cashflow issues stemming from a legal case.  *See id.* at 171:19-22 ("Q. And in order to pay the balance on those taxes, Mr. Goldstein told you he was waiting for money to come in for a big legal case; right? A. Correct.").  The government presented no evidence to the contrary.

In all events, even if it were possible that Officer Parrish and Mr. Goldstein simply misunderstood each other—i.e., that Officer Parrish was asking why Mr. Goldstein's 2016 tax bill was so large, and Mr. Goldstein was explaining why he had not yet been able to pay it—no reasonable jury could find that Mr. Goldstein *willfully* answered the Revenue Officer's question untruthfully with "a specific intent to evade the tax debt."  *United States v. Yurek*, 925 F.3d 423, 434 (10th Cir. 2019).  As demonstrated by Officer Parrish's testimony, her question was, at the very least, open to multiple reasonable interpretations.[5]

---

[5] The government also intimated in its examination of Jonthan Levitan, a former G&R firm manager, that Mr. Goldstein's "Collection Information Statement" (Form 433-F) omitted Mr. Goldstein's personal Wells Fargo bank account.  *See* 1/21/26 Tr. 263:14-266:25; GX-226.  But the government offered no evidence that this form was ever submitted to the IRS (much less submitted during the March 2018 meeting), as it was unsigned and found in G&R's files—not the IRS's.  *See* 1/22/26 Tr. 9:22-12:6.  Moreover, Officer Parrish's testimony confirmed that, in the version of that form she prepared based on her March 2018 interview with Mr. Goldstein, Mr. Goldstein *did in fact* disclose his personal Wells Fargo account.  *See* 1/22/26 Tr. 232:20-233:8; 1/28/26 Tr. 92:22-93:11; GX-92, p.3 (Form 433-A listing "personal bank accounts" at CitiBank, Wells Fargo, and Bank of Montenegro); GX-19, p.12 ("[ICS] history" listing "CitiBank,' "Wells Fargo," and "Bank of Montero" [sic] as "levy source[s]").

**B.    The Government Has Failed To Prove That Mr. Goldstein Willfully Evaded Assessment Of His 2016 Taxes, Including Because The Evidence Is Insufficient To Prove That "Using Funds And Assets Of G&R To Pay Personal Gambling Debts" Was A Willful Act of Evasion**

The remaining six affirmative acts charged in the indictment allege evasion of assessment. *See* ECF No. 337-2, ¶ 109(a), (b), (d), (f), (g), (h); *see also* ECF No. 312, Instruction No. 44 [Government's Version] ("Affirmative acts of evasion of assessment are attempts to prevent the government from determining a taxpayer's true tax liability."). Notably, only one of those acts—"making false and misleading statements to IRS representatives in October 2020," *id.* ¶ 109(d)—occurred within the statute of limitations period. The government has failed to offer sufficient evidence to sustain a conviction based on these affirmative acts.

In particular, the evidence is insufficient to prove that "using funds and assets of G&R to pay personal gambling debts" was a willful act of evasion. The indictment alleges that, in 2016, six wire transfers made from G&R's firm account were incorrectly classified as legal fee expenses of G&R, rather than personal distributions to Mr. Goldstein. *See* ECF No. 337-2, ¶¶ 35-36, 109(a). Those payments were: (1) a July 2016 wire to Alfred Decarolis for $196,600; (2) a July 2016 wire to The 1988 Trust for $100,000; (3) an August 2016 wire to Andrew Robl for $200,000; (4) an October 2016 wire to Andrew Robl for $200,000; (5) an October 2016 wire to The 1988 Trust for $200,000; and (6) a November 2016 wire to Bob Safai for $275,000. *See* GX-48; GX-81. The government has failed to present sufficient evidence from which a reasonable jury could conclude that these payments were willfully mischaracterized—that is, that Mr. Goldstein engaged in some affirmative conduct with an "intent to mislead or conceal" income from the IRS. ECF No. 237, at 20 (citing *United States v. Voigt*, 89 F.3d 1050, 1090 (3d Cir. 1996)).

To begin with, the government has offered *zero* evidence that Mr. Goldstein directed the firm manager and/or his accountants at GRF to mischaracterize any of those six payments as deductible firm expenses.[6]  The government could not find *any* email, text, or other written communication to that effect.  And not one witness testified that Mr. Goldstein told them how to characterize those payments for tax purposes.  *See* 2/10/26 Tr. ___ (testimony of Agent Ranahan).

Instead, the government's entire case rests on the allegation that, on December 27, 2016, Molly Runkle (the G&R office manager) sent Mr. Goldstein an email attaching a spreadsheet titled "G&R wires" that listed those payments on a tab titled "Legal fees."  GX-555.  But that single email is woefully insufficient to establish beyond a reasonable doubt that Mr. Goldstein knew that GRF had mischaracterized those transactions.

To begin with, there is no evidence that Mr. Goldstein even saw Ms. Runkle's email.  Mr. Goldstein never acknowledged receipt or discussed its contents with Ms. Runkle.  *See* 1/20/26 Tr. 240:24-241:13.  And, in fact, there is affirmative evidence supporting the inference that Mr. Goldstein just missed the email entirely.  Ms. Runkle sent her December 27 email in response to an earlier request by Mr. Goldstein for "how much we sent in wires $40k or more to individuals like Dan Bilzerian" in 2016.  GX-18; 1/20/26 Tr. 234:12-235:3.  Ms. Runkle's response on December 27 attached both the "G&R wires" spreadsheet and a spreadsheet titled "Wires from Wells and Bilzerian etc 2016."  *See* GX-18.  There are significant discrepancies between these

---

[6] In fact, other than two payments of $100,000 each to Michael McGuiness in 2020—*uncharged* conduct that occurred four years after tax year 2016, *see* 1/29/26 Tr. 214:9-216:17—the government has offered no examples of Mr. Goldstein *ever* incorrectly directing a personal payment made from G&R's account to be characterized as a deductible business expense.  (The defense will present evidence that this was an innocent error that Mr. Goldstein promptly corrected *before* the relevant return was filed.)

spreadsheets and the separate "poker ledger" that Mr. Goldstein himself prepared, including mismatched dates and even entirely missed transactions. *Compare* GX-451 (poker ledger), *with* GX-557 ("Wires from Wells and Bilzerian etc 2016"); *see* 1/20/26 Tr. 242:11-249:16; 2/10/26 Tr. ___ (testimony of Agent Ranahan). No reasonable juror could conclude that Mr. Goldstein used the documents attached to Ms. Runkle's email to prepare his own "poker ledger." And the fact that Mr. Goldstein did not use Ms. Runkle's spreadsheets strongly supports the inference that he simply never saw Ms. Runkle's email.

Moreover, even if Mr. Goldstein had seen the *email*, there is no evidence from which a reasonable juror could conclude that Mr. Goldstein opened the "G&R wires" *attachment*, much less that he understood its significance or reviewed it closely enough to discover GRF's classification errors. Mr. Goldstein had never asked to see a spreadsheet identifying all the transactions that GRF had charactered as legal fee payments  *See* GX-18; 1/20/26 Tr. 234:12-235:3. As noted, when Ms. Runkle responded to Mr. Goldstein's request, she attached two spreadsheets. *See* GX-18. She described in detail how she had created the "Wires from Wells and Bilzerian etc 2016" spreadsheet, which directly answered Mr. Goldstein's question. But as to the "G&R wires" spreadsheet, she simply noted, "I've also attached a general breakdown of firm wires this year from Jill." *See id.* Ms. Runkle did not tell Mr. Goldstein that the "G&R Wires" spreadsheet contained *accounting records* that would be used to prepare G&R's taxes. *See* 1/20/26 Tr. 234:5-236:11; 239:1-240:23. And she certainly did not ask Mr. Goldstein to review and verify its contents. *See id.*

It is blackletter law that an affirmative act of tax evasion must be an *affirmative* act; it cannot be an omission. *See Sansone v. United States*, 380 U.S. 343, 351 (1965); 1/28/26 Tr. 97:14-17 (government counsel conceding that "[a]n omission is not an affirmative act"). Thus,

the fact that Mr. Goldstein failed to notice and correct the mischaracterized payments in the "G&R wires" spreadsheet cannot, as a matter of law, constitute an affirmative act of evasion. Instead, the government is left to argue—as it did in opposing the defense's earlier motion to dismiss the "mischaracterized payment" allegations, *see* ECF No. 120—that Mr. Goldstien's "affirmative act" was directing that those six payments be made out of the G&R account while ostensibly "withholding" the information that they were personal payments.  ECF No. 130, at 10. This Court denied the defense's motion to dismiss (thereby permitting the government to pursue its "using firm funds" theory at trial) on the ground that the jury should decide whether those acts, even if "innocent or innocuous," were "done with intent to mislead or conceal."  ECF No. 237, at 21.

The government's case is now over, and it simply did not offer any evidence from which a reasonable juror could reach that conclusion beyond a reasonable doubt.  A jury is permitted to "infer[]" a "willful attempt" to evade a tax only from "conduct having the *likely effect* of misleading or concealing."  *Goodyear*, 649 F.2d at 228 (emphasis added) (citing *Spies v. United States*, 317 U.S. 492, 499 (1943)).  But the government has not offered sufficient evidence that using the G&R account to make personal payments would *likely* have had the effect of producing inaccurate deductions because the vast majority of G&R's wires for personal purposes were, in fact, *correctly* characterized as personal distributions.  If in a sea of transactions only *six* were incorrectly characterized, then mathematically it is not "likely" that "using funds and assets of G&R to pay personal gambling debts," ECF No. 337-2, ¶ 109, would have the "effect of misleading or concealing."  *Goodyear*, 649 F.2d at 228.[7]

---

[7] The government has also failed to offer "evidence that a reasonable fact-finder could accept as adequate and sufficient" to prove "beyond a reasonable doubt," *Smith*, 54 F.4th at 766, that Mr. Goldstein willfully engaged in an affirmative act constituting an attempted evasion of the tax, *see*

18

III.    **THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A CONVICTION AS TO COUNTS 2-9 (FALSE RETURNS)**

To obtain a conviction for assisting in the filing of a false tax return under 26 U.S.C.

§ 7206(2), the government must prove beyond a reasonable doubt that "(1) the defendant aided,

assisted, or otherwise caused the preparation and presentation of a return; (2) that the return was

fraudulent or false as to a material matter; and (3) the act of the defendant was willful."  *United*

*States v. Kimble*, 855 F.3d 604, 614 (4th Cir. 2017) (citation omitted).  Without waiving or

forfeiting, and expressly preserving, all arguments challenging the sufficiency of the evidence as

to Counts 2 through 9, the defense highlights the following deficiencies in the government's

case-in-chief as to the charges of assisting in the filing of false tax returns in years 2017-2021.

A.    **The Government Has Failed To Prove That Mr. Goldstein Willfully Assisted The Preparation Of A False Return By Omitting Interest Income**

Although the indictment alleges that Mr. Goldstein omitted $263 of interest income from

his 2017 Form 1040, *see* ECF No. 337-2, ¶ 52 (Count 2), and an unspecified amount of "certain

interest income" from his 2018 Form 1040, *see id.* ¶ 62 (Count 4), the government chose not to

present any evidence to support those allegations at trial.  *See* GX-429, at 1 (government

summary table for tax year 2017 not listing any adjustment for interest income); GX-429, at 2

---

*Goodyear*, 649 F.2d at 227-28, by "providing false and incomplete information to the
Accounting Firm," "making false and misleading statements to IRS representatives that the
Indictment specifies in October 2020," "using foreign individuals and foreign bank accounts to
receive income in a manner specified by the Indictment," "causing the preparation, signing, and
filing with the IRS of a false and fraudulent Form 1120S for G&R," or "causing the preparation,
signing, and filing with the IRS of a false and fraudulent Form 1040 for himself and his wife."
ECF No. 337-2, ¶ 109.  In addition, the government has failed to offer "evidence that a
reasonable fact-finder could accept as adequate and sufficient" to prove "beyond a reasonable
doubt," *Smith*, 54 F.4th at 766, that Mr. Goldstein owed a substantial tax deficiency for tax year
2016, *see Goodyear*, 649 F.2d at 227-28; *see also Voigt*, 89 F.3d at 1090 (an "affirmative act"
must be "done to mislead the government or conceal funds to avoid payment of an admitted *and
accurate* deficiency" (emphasis added) (citation omitted)).

(government summary table for tax year 2018 not listing any adjustment for interest income).

Thus, no reasonable juror could find that these omissions even occurred, much less that they

were willful.  *See Whalen*, 769 F.2d at 224.

**B.     The Government Has Failed To Prove That Mr. Goldstein Willfully Assisted The Preparation Of A False Return By Omitting A 401(k) Distribution From Income**

Although the indictment alleges that Mr. Goldstein's 2017 Form 1040 "falsely omitted

$215,971 in pension-related income he received during 2017," ECF No. 337-2, ¶ 52, the

government chose not to present any evidence to support that allegation at trial.  *See* GX-429, at

1 (government summary table for tax year 2017 not listing any adjustment for pension-related

income).  Thus, no reasonable juror could find that this omission even occurred, much less that it

was willful.  *See Whalen*, 769 F.2d at 224.

**C.     The Government Has Failed To Prove That Mr. Goldstein Willfully Assisted The Preparation Of A False Return By Failing to Separately Report Gambling Wins and Losses**

The indictment alleges that in tax years 2017, 2019, 2020, and 2021, Mr. Goldstein failed

to *separately* report his gambling wins (of $3,250,000, $359,000, $93,180, and $267,000,

respectively) and gambling losses.  *See* ECF No. 337-2, ¶¶ 52, 72, 77, 89.  It is undisputed that in

each of those years, Mr. Goldstein was a *net* gambling loser, meaning that he did not owe any

taxes on his gambling income.  *See* 1/29/26 Tr. 36:13-38:6 (reading the parties' stipulation to the

jury); 2/2/26 Tr. 141:15-25 (no taxes owed).  Nonetheless, Counts 2, 6, 8, and 9 charge Mr.

Goldstein with willfully aiding and assisting in the preparation of false Form 1040s by failing to

direct his accountants to separately list out all his gambling wins and losses.

No reasonable juror could find that this omission was willful—that is, that Mr. Goldstein

"acted voluntarily and intentionally … and by not mistake, accident, negligence or other

innocent reason … with the specific intent to aid and assist in the filing of a false tax return."

*Poole*, 2009 WL 2246668, at *2. Indeed, there is no evidence that Mr. Goldstein *ever knew* that he was required to report gambling wins to the IRS in years in which he had no net gambling income. The government attempted to prove Mr. Goldstein's knowledge in two different ways, but both are clearly insufficient to persuade a reasonable juror of willfulness beyond a reasonable doubt.

First, the government offered evidence that Mr. Goldstein was audited in 2012, and a "lead sheet" associated with that audit stated that "[t]axpayer was educated as to the record-keeping and reporting requirements for gambling wins/losses." GX-86. The IRS agent who prepared that lead sheet, however, admitted that he provided that guidance *only to Mr. Goldstein's accountant*, Bill Caldwell. *See* 1/22/26 Tr. 93:7-97:5. Mr. Goldstein was not present at that meeting. *See id.* 94:7-10.

Mr. Caldwell's testimony, in turn, made it perfectly clear that he did not explain to Mr. Goldstein that he was required to report gross gambling winnings. Instead, Mr. Caldwell understood the issue in the 2012 audit to have been a failure to report *net* gambling winnings, *see id.* 128:24-130:12, and Mr. Caldwell confirmed that in any year in which Mr. Goldstein "lost more than [he] won," he would not have reported gambling winnings on Mr. Goldstein's tax returns, *id.* at 130:13-131:17; *see also id.* 117:14-118:11 ("[I] would have said that, well, if you have losses more than gambling winnings, they would not show up on this form."). And because Mr. Caldwell apparently never understood that winnings and losses must be separately reported (even in losing years), no reasonable juror could infer that he informed Mr. Goldstein about the very rule that Mr. Caldwell himself failed to grasp.

Second, the government offered testimony from Walter Deyhle, Mr. Goldstein's accountant during the relevant years. But Mr. Deyhle's testimony did not nothing to prove

willfulness.  On the contrary, Mr. Deyhle specifically testified that he never told Mr. Goldstein

that he was required to report gross gambling winnings in years in which he was a net gambling

loser.  *See* 2/4/26 Tr. 98:20-100:11, 102:11-16.  And Mr. Deyhle—the person responsible for

preparing Mr. Goldstein's allegedly false tax returns—testified that he never actually asked Mr.

Goldstein whether he had gross gambling wins, either.  *See id.* at 101:3-102:17.  The closest he

came was sending a single email to Mr. Goldstein asking if it was "correct" that he did not "have

any gambling winnings for 2017."  DX-319.  But that email was fatally ambiguous about

whether Mr. Deyle was asking about *gross* winnings or *net* winnings.  *See* 2/4/26 Tr. 102:3-16.

And without ever having been told that the IRS required gamblers to report gross winnings even

in losing years, Mr. Goldstein would have had no reason to interpret Mr. Deyle's email to

request such information.

### D.  The Government Has Failed To Prove That Mr. Goldstein Willfully Assisted The Preparation Of A False Return By Accepting Legal Fee Payments In Non-Firm Accounts

The indictment alleges that, on three occasions, Mr. Goldstein assisted in the filing of a

false return by accepting legal fee payments that were not wired into G&R's firm account—

namely, by directing Robbins Geller to send a $250,000 legal fee payment to Mr. Goldstein's

personal account in 2017, *see* ECF No. 337-2, ¶¶ 46-47, 52 (Count 3); by allegedly agreeing to

"offset" a $125,000 legal fee owed by Napoli Shkolnik with a $125,000 personal debt owed by

Mr. Goldstein in 2018, *see id.* ¶¶ 56-57, 61 (Count 5); and by directing Tobey Maguire to send to

Bob Safai a $500,000 legal fee owed to G&R in 2021 (Count 9), *see id.* ¶¶ 81-86, 99.

The problem with these allegations is that each of those payors was legally obligated to

send a Form 1099 to both the IRS and G&R reporting their payment.  *See* 26 C.F.R. § 1.6045-

5(a)(1) ("every payor engaged in a trade or business who, in the course of that trade or business,

makes payments aggregating $600 or more during a calendar year to an attorney in connection

with legal services (whether or not the services are performed for the payor) must file an information return for such payments"); 2/9/26 Tr. 195:11-22.  As a result, the specific account into which those payments were made (whether G&R's or someone else's) should not have mattered for purposes of calculating G&R's gross receipts and income, because the amount of payment should have been reported on a Form 1099.

Of course, the evidence in the government's case-in-chief revealed that the 1099 process broke down with respect to the three charged payments:

- Robbins Geller did, in fact, send a Form 1099.  *See* 1/21/26 Tr. 112:22-117:3; DX-226.  But GRF ignored it.  *See* 2/2/26 Tr. 223:11-226:18; 2/4/26 Tr. 139:17-142:5; 2/9/26 Tr. 193:12-194:9; 2/10/26 Tr. ___ (testimony of Ian Shuman); DX-252.

- Napoli Shkolnik did not send a Form 1099 to G&R.  *See* 1/21/26 Tr. 176:21-177:2, 179:12-182:20.  Instead, it wrote off Mr. Goldstein's debt on its own books, without informing Mr. Goldstien it had done so.  *Id.* at 171:24-175:10.

- And Mr. Maguire simply failed to send a Form 1099 entirely.  *See* 1/28/26 Tr. 82:4-83:25.

It was *those errors* by third parties—errors which, if committed willfully, could themselves be considered a crime, see 26 U.S.C. § 7203—and not Mr. Goldstein's perfectly lawful decision to accept payment for services into an account other than the G&R firm account, which caused the corresponding tax returns to under-report G&R's legal fee income.

The government's theory of liability therefore must be that Mr. Goldstein decided to accept payment from Robbins Geller, Napoli Shkolnik, and Tobey Maguire by means other than a wire into G&R's account while *knowing* either that the payors would (in violation of the law)

23

fail to remit a Form 1099, or that GRF (in an act of gross professional negligence) would simply ignore those Form 1099s in reporting G&R's income.[8]  *See United States v. Salerno*, 902 F.2d 1429, 1433 (9th Cir. 1990) (a violation of Section 7206(2) "requires specific intent to defraud the I.R.S.").  That is a wildly implausible inference to draw—and the government's case offered precisely zero evidence from which a reasonable juror could reach that conclusion.  *See Whalen*, 769 F.2d at 224.  There is no evidence that Mr. Goldstein ever tried to stop or dissuade a payor from sending a Form 1099; on the contrary, Mr. Goldstein promptly sent a Form W9 to Robbins Geller when asked.  *See* 1/21/26 Tr. 117:13-120:4; 83:11-25.  There is no evidence that Mr. Goldstein knew (or even suspected) that Napoli Shkolnik and Mr. Maguire would fail to send Form 1099s.  And there is no evidence that Mr. Goldstein was aware of GRF's improper practice of ignoring any Form 1099s that *were* sent to the law firm.  In fact, Ian Shuman (one of G&R's accountants at GRF) testified that he never spoke to Mr. Goldstein about how GRF handled Forms 1099s sent to G&R.  2/10/26 Tr. ___ (testimony of Ian Shuman).

    The government's answer cannot be that it would have been more prudent for Mr. Goldstein to have directed payment into G&R's account, or to have affirmatively told GRF about those payments, or to have double-checked that the returns prepared by GRF correctly included those payments as income.  Section 7206(2) is violated only where a person "*[w]illfully* aids or assists" or in the filing of a return that is "*fraudulent or is false* as to any material matter."  26 U.S.C. § 7206(2) (emphasis added).  That means that, "to be guilty of aiding in the preparation and presentation of false tax returns," the defendant (here, Mr. Goldstein) must have "engage[d]

---

[8] Indeed, the government told the Court that this was precisely the theory it hoped to prove.  *See* 1/21/26 Tr. 18:4-9 (government counsel stating that "[w]e believe the circumstantial evidence offered … throughout this trial will show that the accountants were not using these 1099s" and that Mr. Goldstein "knew full well that there were not 1099s being used by them to prepare the corporate returns and do the corporate records").  The evidence, however, is simply lacking.

in 'some affirmative participation which at least encourages the perpetrator'" (here, GRF, which

actually prepared the returns).  *United States v. Sassak*, 881 F.2d 276, 277 (6th Cir. 1989);

*accord, e.g.*, *United States v. Graham*, 758 F.2d 879, 885 (3d Cir. 1985); *cf. United States v.*

*Snider*, 502 F.2d 645, 655 (4th Cir. 1974) (interpreting "false or fraudulent" in the context of 26

U.S.C. § 7205 to require that "the information must either be (1) supplied with an intent to

deceive, or (2) false in the sense of deceptive").  Failing to correct third parties' errors—even if

those errors were made possible by the defendant's unknowing conduct—is simply not enough.

The defense is not arguing that, as a matter of law, diverting legal fee payments could

*never* give rise to liability under Section 7206(2).  But in this case, the government has failed to

prove that Mr. Goldstein willfully assisted GRF in preparing false returns merely by accepting

payment for legal services into non-firm accounts.  There is simply no evidence from which a

reasonable juror could conclude decide that Mr. Goldstein willfully assisted GRF in preparing a

false return by assuming (1) that payors would comply with their mandatory tax reporting

obligations by sending Form 1099s to G&R, and (2) that GRF would properly take those Form

1099s into account when preparing G&R's tax returns.  The government's baseless conjecture

that Mr. Goldstein must have known that third parties would flout their legal or professional

obligations, and that Mr. Goldstein further accepted legal fee payments with the willful intent to

capitalize on those anticipated errors, is a theory that no jury could reasonably accept.

### E.    The Government Has Failed To Prove That Mr. Goldstein Willfully Assisted The Preparation Of A False Return By Using Firm Funds to Pay Personal Debts

The indictment alleges that, in addition to the six mischaracterized payments in 2016

(charged as affirmative acts of tax evasion, *see* pp.15-18, *supra*), on two occasions after 2016

Mr. Goldstein assisted in the filing of a false return by using G&R funds to pay personal debts—

namely, by directing the firm manager to wire $175,000 to Napoli Shkolnik in 2017, *see* ECF

No. 337-2, ¶¶ 51-52 (Count 3); and by directing the firm manager to wire $170,000 to Chuck Pacheco in 2019 (Count 7), *id.* ¶¶ 67-68, 72.

The government has failed to offer sufficient evidence from which a reasonable jury could conclude that, on either of these occasions, Mr. Goldstein *willfully* used G&R funds to pay personal debts knowing that doing so would result in a false return.  To sustain a conviction under 26 U.S.C. § 7206(2), the government must prove that Mr. Goldstein "affirmative[ly] participat[ed]" in some conduct "which at least encourages" the preparation of the false return. *United States v. Gambone*, 314 F.3d 163, 173 (3d Cir. 2003) (citation and internal quotation marks omitted).  But as with the 2016 mischaracterized transactions, *see* p.16, *supra*, the government has offered no evidence that Mr. Goldstein directed the firm managers or his accountants to characterize the two payments at issue as firm expenses (rather than personal distributions), *see* 2/10/26 Tr. ___, ___ (testimony of Agent Ranahan), nor that he ever discovered the mischaracterizations after the fact.

That is a fatal gap in the government's evidence.  The government chose to charge this case under Section 7206(2), which generally applies to *tax preparers*, instead of Section 7206(1), which applies to *taxpayers*.  *See Kimble*, 855 F.3d at 614.  That decision meaningfully changes the burden of proof:  Where (as here) the defendant has not actually prepared the return, "the government must prove that the defendant knowingly provided false documentation with the expectation that it would be used in the filing of a tax return."  *United States v. Kottwitz*, 614 F.3d 1241, 1269 (11th Cir. 2010), *opinion withdrawn in part on other grounds,* 627 F.3d 1383 (11th Cir. 2010).  Thus, in the handful of cases in which courts have sustained convictions under Section 7206(2) where the defendant did not actually prepare the tax return, the trial evidence affirmatively demonstrated that the defendant *actually knew* that false records had been used to

26

prepare the return.  *See, e.g.*, *United States v. Thomas*, 41 F.3d 1508 (6th Cir. 1994) (collecting

cases).  By contrast, where, as here, the government has failed to offer evidence that the

defendant "knew that [his] scheme would result in the filing of false tax returns," a conviction

under Section 7206(2) cannot be sustained.  *Kottwitz*, 614 F.3d at 1269 (citation omitted).

> **F.** **The Government Has Failed To Prove That Mr. Goldstein Willfully Assisted The Preparation Of A False Return By Causing Salary And/Or Benefits To Be Paid To Certain Employees**

The indictment alleges that Mr. Goldstein assisted in the filing of false returns by

"caus[ing] G&R to list as employees four women with whom he was having or pursuing intimate

personal relationships."  ECF No. 337-2, ¶ 60, *see also id.* ¶¶ 61, 72, 77.  The defense continues

to take the position that this theory of liability is void for vagueness.  *See, e.g.*, ECF No. 357, at

3.  In all events, the evidence offered at trial is insufficient to sustain a conviction under this

theory, as the government did not offer any evidence or testimony that the employees' salaries

and benefits were unlawfully deducted as a G&R business expense.[9]  *See* 1/21/26 Tr. 21:8-23:3;

ECF No. 360.[10]

---

[9] The government did offer testimony from Kevin Russell about whether G&R had a need for a Russian translator, *see* 1/20/26 Tr. 92:21-93:3, but Mr. Russell testified that he was not aware that the firm had, in fact, hired a Russian translator, *see id.* at 97:20-22.  The government did not pursue this theory any further.  For example, it did not identify the employee hired as a Russian translator, nor show the jury evidence that that employee's salary and benefits were, in fact, deducted from G&R's returns.  So no rational juror could find that *any* G&R employee's salary and/or benefits was unlawfully deducted—much less that Mr. Goldstein willfully caused such deductions to be taken.

[10] The government has also failed to offer "evidence that a reasonable fact-finder could accept as adequate and sufficient" to prove "beyond a reasonable doubt," *Smith*, 54 F.4th at 766, that Mr. Goldstein engaged in any other conduct constituting willful assistance in the filing of a false tax return, *see Kimble*, 855 F.3d at 614, including by "omi[tting] approximately $1,000,000 paid to his Montenegrin bank accounts by [Paul Phua] or his associate," ECF No. 337-2, ¶ 61; failing to report or omitting "approximately $1,000,000 in cash that he received from [Paul Phua] or his associate," *id.* ¶¶ 61-62; falsely understating "G&R's gross receipts by approximately $235,000, based on the failure to report as fee income the funds received from [Paul Phua]," *id.* ¶ 72; "falsely answer[ing] 'no' on his 2020 Form 1040 to the question, 'At any time during 2020, did

## IV.    THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A CONVICTION AS TO COUNTS 10-13 (WILLFUL FAILURE TO PAY)

To obtain a conviction for willful failure to pay taxes under 26 U.S.C. § 7203, the government must prove beyond a reasonable doubt that "Mr. Goldstein owed income taxes for the … tax year in question," "that Mr. Goldstein failed to pay the tax by the due date for the tax year in question," and "that Mr. Goldstein's failure to pay the tax was knowing and willful." 1/15/26 Tr. 26:9-17 (preliminary jury instructions); *cf. United States v. Dorsey*, 378 F. App'x 330 (4th Cir. 2010) (unpub.) ("To sustain a conviction for willful failure to file a tax return, the Government must show that the defendant had a legal duty to file, that he failed to file, and that the failure was willful.").  Without waiving or forfeiting, and expressly preserving, all arguments challenging the sufficiency of the evidence as to Counts 10 through 13, the defense highlights the following deficiencies in the government's case-in-chief as to the charges of willful failure to pay in years 2017, 2019, 2020, and 2021.

### A.    The Government Has Failed To Prove That Mr. Goldstein Willfully Violated Section 7203

The degree of willfulness required to prove a tax crime is "an extremely demanding form of scienter." *United States v. Sanchez*, No. 12-2377 MCA, 2015 WL 13668429, at *2 (D.N.M. Jan. 16, 2015).  The evidence in the government's case-in-chief is insufficient to sustain a conviction under Section 7203 because the government has offered no evidence that Mr. Goldstein willfully failed to pay his taxes.

---

you receive, sell, send, exchange, or otherwise acquire any financial interest in any virtual currency?'" *id.* ¶ 77; or "falsely answer[ing] 'no' on his 2021 Form 1040 to the question, 'At any time during 2021, did you receive, sell, exchange, or otherwise dispose of any financial interest in any virtual currency?'" *id.* ¶ 89.

Section "7203's willfulness element … mean[s] the 'voluntary, intentional violation of a known legal duty.'" *United States v. Rogers*, 18 F.3d 265, 267 n.4 (4th Cir. 1994) (quoting *Cheek v. United States*, 498 U.S. 192, 201 (1991)).  The government has taken the position in this case that it needs to prove only that Mr. Goldstein knew his conduct was *civilly* wrongful.  *See, e.g.*, 2/4/26 Tr. 154:15-22.  That is incorrect.  Instead, the government must prove beyond a reasonable doubt that Mr. Goldstein understood that his conduct was *criminal* in nature.  That is the only way to read the Supreme Court's holding in *Bryan v. United States*, 524 U.S. 184 (1998), that, to convict a defendant for a "willful violations of the tax laws," the "jury must find that the defendant was aware of the *specific provision of the tax code* that he was charged with violating." *Id.* at 194 (emphasis added).  In line with that precedent, several Courts of Appeal have expressly recognized that "subjective knowledge of [a] criminal violation[]"—and not that conduct is "merely unlawful"—"is necessary for willful conduct" in "the tax … context[]."[11] *United States v. Efthimiatos*, 799 F. App'x 75, 77 (2d Cir. 2020); *see also, e.g.*, *United States v. Marder*, 48 F.3d 564, 572 n.6 (1st Cir. 1995) (in the "tax evasion context[]," willfulness "requir[es] specific knowledge that the conduct at issue was criminal," which is different from merely "act[ing] in violation of some known legal duty"); *United States v. Bunchuk*, 799 F. App'x 100, 103 (3d Cir. 2019) ("To act willfully requires knowledge of a legal duty, and a defendant is not guilty if she honestly believed … that her conduct was not criminal under the law."); *cf. United States v. Whab*, 355 F.3d 155, 161-62 (2d Cir. 2004) ("[W]ith the exception of … cases involving willful violations of tax laws, 'willfully' does not require specific knowledge that a defendant's conduct is criminal ….").

---

[11] The defense is not aware of any controlling Fourth Circuit precedent on this question.  That is hardly surprising, of course, because—as noted below, *see* pp.32-33, 35—it is incredibly rare for the government to charge failure to *pay* (as opposed to failure to *file*) under Section 7203.

Not a single person, including Mr. Goldstein's former accountants at Caldwell and GRF and the IRS revenue officer assigned to his case, testified that they ever informed Mr. Goldstein that he would be committing a federal crime by paying late (with penalties and interest) rather than paying in full on tax day.  *See* 1/22/26 Tr. 128:11-23 (testimony of William Caldwell); 2/4/26 Tr. 148:10-150:17 (testimony of Walter Deyhle); 1/28/26 Tr. 180:8-11 (testimony of Officer Parrish).  In fact, Officer Parrish testified that she had never advised *any* taxpayer on an installment plan "that, if they don't pay on the day the taxes are due, that they're committing a crime."  *Id.* at 180:16-22.  And although the IRS sent Mr. Goldstein various notices about the consequences of paying late—e.g., that he would be charged penalties and interest, *see* DX-455, p.2, and that his installment agreement could be canceled, *see* GX-455—the IRS never mentioned that it was a criminal offense to pay his taxes at any time after April 15.  *See* 1/28/26 Tr. 177:11-180:15.

And even if the degree of willfulness required to prove an offense under Section 7203 were less demanding (as the government claims), the government has *still* failed to carry its burden in this case.  The government contends that it can prove willfulness by persuading the jury that Mr. Goldstein "kn[e]w his obligation to pay."  2/4/26 Tr. 154:19-22.  But all the evidence is to the contrary:  Mr. Goldstein's accountants provided him with two options—pay in full now, or pay later with penalties and interest—and *never informed him* that he had a legal "obligation," *id.*, to choose the former.  *See, e.g.*, 1/22/26 Tr. 127:11-128:23 (testimony of William Caldwell).  For example, in March of 2016, Mr. Deyhle asked G&R's office manager to "convey … to [Mr. Goldstein]" that he had "the following options" with respect to his 2015 taxes:  (1) "[f]ile returns on 4/15 and pay the tax in full," (2) "[f]ile returns on 4/15 and ask for an installment plan," which would "avoid some penalties but start the collection process," or (3)

"[f]ile an extension and pay what he can on 4/15 with the balance due on 10/15," which would result in "a penalty and interest on the unpaid balance." GX-587; *see* 2/4/26 Tr. 150:19-152:18. Mr. Deyhle presented all three options as legally valid—and certainly never warned Mr. Goldstein that he had a legal duty to select option #1.

The IRS notices that Mr. Goldstein received did not inform him, either, that he would be breaching a legal duty to the government by paying late with penalties and interest. On the contrary, those notices explained that the IRS would make itself whole *even if* Mr. Goldstein paid late. They explained in detail that, if Mr. Goldstein failed to pay "on time," the IRS would "charge interest" and "a penalty." DX-455. And they warned Mr. Goldstein that if he did not "meet the conditions of [his] installment agreement," including by "pay[ing] any federal taxes … on time," then the IRS could "cancel" the agreement and "collect the entire amount [he] owe[d] by levy … or by seizing your property." GX-455. But those notices did not state that failure to pay on time would be *wrongful* or *unlawful*—only that it would be financially costly to Mr. Goldstein.

To be sure, the government has offered some evidence that Mr. Goldstein knew his taxes were due on April 15. But all that demonstrates is that Mr. Goldstein was aware of the day he would start accruing penalties and interest. What the government's case-in-chief lacks is *any* evidence that Mr. Goldstein understood that, by failing to pay in full on tax day, he was violating a *legal* obligation rather than taking on a more costly *financial* obligation (in exchange for more time). And without that evidence, no reasonable jury could convict. *Cf. Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 418 (4th Cir. 2001) (holding that "no reasonable jury could conclude that [the defendant] acted willfully" where there was not evidence that the defendant "was aware" that it was not in compliance with the Fair Credit Reporting Act).

31

**B.**     <u>As Applied In This Case, Section 7203 Is Void For Vagueness</u>

As applied to Mr. Goldstein, Section 7203 is unconstitutionally vague. "[T]he void-for-vagueness doctrine requires that a penal statute define [a] criminal offense" both "with sufficient definiteness that ordinary people can understand what conduct is prohibited" and "in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The Supreme Court has emphasized that "the more important aspect of vagueness doctrine 'is … the requirement that a legislature establish minimal guidelines to govern law enforcement" because, if Congress "fails to provide such minimal guidelines," then "a criminal statute may permit 'a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Id.* at 357-58 (citations modified).

That is precisely the problem with Section 7203 as the government has applied it in this case. As relevant here, that statute provides that "[a]ny person required … to pay any … tax, … who willfully fails to pay such … tax, … shall … be guilty of a misdemeanor." 26 U.S.C. § 7203. In advance of trial, the defense moved to dismiss the Section 7203 charges on the ground that a taxpayer who pays their taxes late with all applicable penalties and interest cannot have violated Section 7203 because their conduct cannot have been "willful." *See* ECF No. 126, at 3. The government disagreed, taking the position that taxpayers violate Section 7203 whenever they fail to pay their taxes "on the original tax return due date," regardless of whether those taxpayers received an extension and/or eventually paid their entire tax balance with penalties and interest. *See* ECF No. 131, at 9-10.

Under the government's interpretation, nearly *15 million taxpayers* committed a crime in 2024 by filing "returns … with additional tax due."[12]  And yet the government has struggled mightily to cite *any* case to this Court in which a taxpayer was charged with violating Section 7203 after that taxpayer had already paid their balance in full.  To the defense's knowledge, this prosecution is the only one.  That is the epitome of arbitrary enforcement.

It is no answer to say that the statute is clear that taxes are due on their due date because, under that interpretation of Section 7203, millions and millions of taxpayers violate Section 7203 every year—but only Mr. Goldstein is charged with a criminal offense.  And, in all events, the evidence in this case demonstrates that taxpayers like Mr. Goldstein receive incredibly misleading information about the meaning of Section 7203 *from the IRS itself*, which actively dispatches revenue officers to negotiate installment agreements with taxpayers that, under the prosecution's aggressive reading of Section 7203, merely memorialize the taxpayer's criminality.  *See* 1/28/26 Tr. 110:4-7 ("Q. When is your work effectively done in a collections case?  A. … [I]f it's an installment agreement, once that's finalized, then my work is done with the taxpayer.").  As discussed above, the communications that Mr. Goldstein received from the IRS uniformly implied that late payment could be fully remedied by paying civil penalties and interest.  *See* p.31, *supra*.

In another context, the government previously argued that "[i]ntent or willfulness requirements 'tend[]to defeat any vagueness challenge based on the potential for arbitrary enforcement.'"  ECF No. 135, at 25 (quoting *United States v. Kimble*, No. CRIM. WDQ-13-035, 2015 WL 4164820, at *17 (D. Md. July 8, 2015)).  But here, the government's understanding of

---

[12] IRS, *Collections, Activities, Penalties and Appeals*, Table 27 (last updated May 29, 2025) https://www.irs.gov/statistics/collections-activities-penalties-and-appeals.

what made Mr. Goldstein's failure to pay willful—i.e., that he was spending money on things "instead of paying his taxes," 1/29/26 Tr. 13:14-17—only exacerbates the vagueness problem. To begin with, the statute itself says nothing about criminalizing the conduct of people who spend some impermissible amount of money on personal expenses while owing taxes. And, as painfully evidenced by this case, the government's attempt to read that ostensible limiting language into Section 7203 creates for more ambiguity than it solves. How much personal spending is too much? Is a taxpayer allowed to go to a "restaurant" but not a "nightclub"? 1/29/26 Tr. 13:14-17. Is it permissible to socialize with friends, but not with celebrities? *Id.* at 13:17-20. Or its it merely a matter of the taxpayer's subjective feeling of remorse—in the government's words, whether he is "focused on" matters "besides paying the IRS"? *Id.* at 14:2-4.

The answers to those questions are patently arbitrary. No "ordinary pe[rson]" could be expected to "understand what conduct is prohibited" by the government's know-it-when-you-see-it test for criminally lavish spending. That test clearly, and unconstitutionally, invites "a standardless sweep that allows … prosecutors[] and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 357 (citation modified).

C. **The Government's Novel Theory Of Section 7203 Liability Violates Due Process**

For similar reasons, this case unconstitutionally seeks to impose retroactive criminal liability on Mr. Goldstein for conduct that he could not have fairly known could lead to criminal prosecution. "It is … basic that a person cannot be prosecuted for conduct which he could not reasonably understand to be proscribed … or conduct which he had no reason to suspect would subject him to prosecution." *United States v. Caso*, 935 F.2d 1288 (4th Cir. 1991) (unpub.) (citing *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964)). Thus, "when an 'unforeseeable'

34

construction of a criminal statute is applied retroactively to subject someone to punishment for past conduct, the ex post facto clause, as well as due process concerns, are implicated." *United States v. Torrez*, 869 F.3d 291, 310 (4th Cir. 2017); *see also United States v. Rainey*, 203 F.3d 824 (4th Cir. 2000) (unpub.) ("Due process bars the retroactive application of an unforeseeable judicial construction of a criminal statute.").

In this case, the government seeks to convict Mr. Goldstein for conduct that, to the defense's knowledge, *no taxpayer* has ever before been indicted for.  As noted, millions upon millions of taxpayers every year fail to pay their entire tax bill on tax day.  *See* pp.32-33, *supra*. When that happens, the IRS works with those taxpayers to recover tax balances using civil enforcement mechanisms like liens, levies, and installment plans.  *See* 1/28/26 Tr. 110:4-7.  It is incredibly rare for the government to pursue criminal charges for non-payment.  *See United States v. Koach*, 21 F.3d 1117 (9th Cir. 1994) (unpub.) ("violations of 26 U.S.C. § 7203 are 'rarely prosecuted'").  And the defense is aware of no case in which a defendant was found guilty of willfully failing to pay his taxes where, as here, the defendant had filed his tax return on time and had paid off his outstanding tax balance with penalties and interest.

The defense respects (and does not now seek to relitigate) this Court's ruling that "[i]f a taxpayer willfully … fails [to] timely pay his tax, the violation of Section 7203 is complete, irrespective of whether the taxpayer intends to comply."  ECF No. 237, at 22.  But, as this Court recognized, the failure to pay must be *willful*.  And as to that element—which is distinct from the fact of non-payment—this case breaks entirely new ground.  That "unexpected enlargement of a criminal statute," *United States v. Kelly*, 64 F. App'x 361, 365 (4th Cir. 2003), violates Mr. Goldstein's rights under the Due Process clause, and provides an independent grounds for judgment of acquittal.  *See, e.g. Marks v. United States*, 430 U.S. 188, 191 (1977) (citing *Rabe v.*

*Washington*, 405 U.S. 313 (1972), for the proposition that "reversal [of a conviction] was mandated because affected citizens lacked fair notice that the statute would be thus applied").[13]

## V.   THE GOVERNMENT MAY NOT SEEK CONVICTION ON THE BASIS OF ANY UNCHARGED ACTS

As the defense has already extensively briefed, *see* ECF Nos. 366 & 399—and as this Court has already recognized, *see* 1/28/26 Tr. 20:1-4; ECF No. 381—"a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *United States v. Floresca*, 38 F.3d 706, 711 (4th Cir. 1994), *overruled on other grounds by United States v. Banks*, 29 F.4th 168 (4th Cir. 2022) (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)). The government has now conceded this point.  *See* ECF No. 403.  For the avoidance of doubt, the defense moves for a judgment of acquittal of—or, in the alternative, an order precluding the government from seeking conviction upon the basis of—any uncharged affirmative acts of tax evasion, uncharged acts of assisting the preparation of a false return, uncharged willful failures to pay taxes due and owing, or uncharged false statements on a mortgage application.

---

[13] The government has also failed to offer "evidence that a reasonable fact-finder could accept as adequate and sufficient" to sustain the government's burden to prove, *Smith*, 54 F.4th at 766, that Mr. Goldstein is guilty of violating 18 U.S.C. § 1014 as charged in Counts 14 through 16.  To obtain a conviction for making a false statement on a mortgage loan application under 18 U.S.C. § 1014, the government must prove beyond a reasonable doubt that "(1) the Defendant made or was caused to make a false statement or report relating to an application to a mortgage lending business; (2) the Defendant acted knowingly; (3) the false statement or report was made for the purpose of influencing in any way the mortgage lending business's action; and (4) the statement was submitted to a mortgage lending business." *United States v. Mosby*, No. 22-CR-00007-LKG, 2024 WL 96349, at *14 (D. Md. Jan. 9, 2024).  Additionally, to establish venue, the government must further prove that "an essential conduct element of the offense took place" in this district, meaning that the defendant must have "transmitted" the false statement to the "mortgage lender from the District of Maryland." *United States v. Mosby*, 143 F.4th 264, 280-82 (4th Cir. 2025) (citation and internal quotation marks omitted).  The government has failed to carry this burden.

## <u>CONCLUSION</u>

For the reasons set forth herein, the Court should enter a judgment of acquittal.

Dated: February 10, 2026

Respectfully submitted,

/s/ *Jonathan I. Kravis*
Jonathan I. Kravis (Bar No. 31556)
Stephany Reaves (Bar No. 19658)
Sarah E. Weiner (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com
Sarah.Weiner@mto.com

Adeel Mohammadi (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*