## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. LKG-25-0006** |
| **THOMAS C. GOLDSTEIN,** | |
| **Defendant.** | |

## GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT
## <u>REBUTTAL EVIDENCE FROM TAX YEARS 2022 AND 2023</u>

The government respectfully requests the Court admit select evidence of defendant Thomas Goldstein's failure to file individual income tax returns for tax years 2022 and 2023 to rebut the profoundly misleading impression that his trial strategy and testimony have now inflicted on the jury. Through cross-examination and his own testimony, Goldstein strongly suggested he lacked willfulness because he was unaware of his tax obligations and relied in good faith on his accountants. His testimony further implied that, once he became aware of his obligations and his accountants' failures, he changed his behavior and became fully tax-compliant. Goldstein's strategy and testimony have created a wildly misleading impression, custom-tailored to attack willfulness. To rebut this false impression, the government now seeks to admit evidence of Goldstein's failure to file income tax returns for 2022 and 2023. This request is squarely supported by Fourth Circuit precedent for the relevance of later acts to *mens rea*, and out-of-circuit precedent holding subsequent acts are admissible to establish willfulness in criminal tax cases.

## <u>BACKGROUND</u>

### I.    Pretrial Litigation

On October 24, 2025, Goldstein filed a motion to exclude evidence of uncharged acts, including his failure to file individual income tax returns for years 2022, 2023, and 2024. Dkt. 210.

The government opposed, arguing his subsequent failure to file returns demonstrated his willfulness. Dkt. 224 at 21.

That same day, the government also filed a motion *in limine* to preclude improper jury nullification arguments. Dkt. 204. That motion sought to exclude arguments that Goldstein's late payment of taxes meant he could not be found guilty of willful failure to pay his taxes or could not have been willful when he failed to pay timely. *Id.* at 6-9. It also sought to exclude argument that the government should have pursued civil remedies instead of criminal prosecution. *Id.* at 10-12.

At the December 12, 2025 motions *in limine* hearing, the Court granted in part and denied in part that motion. Order, Dkt. 287. The Court ruled that any argument that Goldstein's subsequent payments somehow preclude the charges "are not appropriate, and they will not be permitted in connection with this case." 12/12/25 Tr. 99:17-22. The Court similarly concluded "we are now in agreement [that] nothing's coming in about" the idea that "this should be a civil case where administrative remedies should have been pursued." *Id.* 101:9-12. Although the Court declined to wholesale prohibit discussion of late payment, the Court emphasized "that the question is really what Mr. Goldstein intended. Was it willful at the time he failed to pay the taxes." *Id.* 101:21-25.

As to Goldstein's subsequent failures to file tax returns, the Court explained it was inclined to exclude the evidence as outside the time period and outweighed by concerns about prejudice. 12/12/25 Tr. 270:24-271:6.

## II.    *New York Times* **Article Motion** *in Limine*

Less than three weeks later, *The New York Times Magazine* published an article on Goldstein and the upcoming trial. *See* 12/28/25 Article, Dkt. 327-1. Among other things, the article quoted him as saying, "Millions of people file and then pay [their taxes] late, as I did," and "I have never, ever believed that I did anything wrong," *Id.* at 15, 3. The article explained that Goldstein

would be defended by his current counsel "but there's no question about who will be calling the shots. They way that I'm having [my attorney] argue this is that . . . [the jury is] going to decide . . . Am I a good guy or a bad guy?'" *Id.* at 18.

In its subsequent motion to admit a redacted version of the article, the government emphasized that these arguments mirrored those it had already moved *in limine* to exclude, and reiterated that they should be foreclosed. NYT Mot. 12-13, Dkt. 327.

At the January 9, 2026, final pretrial conference, the government underscored its concerns about jury nullification arguments articulated in the article, and particularly highlighted the comment that "millions of people file and then pay late as I did." 1/9/26 Tr. 87:18-90:2, 88:5-6.

The Court responded, "I think I already ruled on that," and the government agreed, explaining that the *New York Times* article had prompted it to reraise the issue because—notwithstanding the Court's ruling—Goldstein had explicitly said he was "calling the shots" and ordering his counsel to make similar arguments. *Id.* 88:15-23.

In response, Goldstein's counsel stated that, "The Court's prior rulings on these issues are clear. The defense, obviously, will abide by the Court's rulings on these points." *Id.* at 90:16-18.

The Court reiterated, "I don't anticipate hearing those statements in the opening argument. I think they would be improper . . . I think, in terms of what's been presented, those types of points are not going to appropriate and I think we understand that." *Id.* 90:24-91:5.

## III.    Goldstein's Trial Strategy & Testimony

Despite the Court's clear instructions forbidding these jury nullification arguments, Goldstein systematically pursued them while emphasizing his reliance on his accountants.

### A.        Reliance Defense

A core focus of Goldstein's defense has been that he relied on his accountants—namely Walter Deyhle and Ian Shuman—at GRF, and that they directly or indirectly caused many of his tax violations. For example, during his testimony, Goldstein highlighted that he was new to reporting poker winnings in 2016, and Mr. Deyhle had not asked for his "personal bank statements" or "any other documentation" of his poker wins and losses. 2/11/26 Tr. 188:15-23; *id.* at 237:17-19. He was "relying on" Mr. Deyhle to help him accurately report his 2016 gambling income. *Id.* at 178:10-12. He emphasized that he was counting on GRF "to do this right, and, obviously, they did not." *Id.* at 239:20-240:1. He similarly underscored that Mr. Deyhle had never emailed him or called him to tell him about the cryptocurrency reporting requirement. 2/12/26 Tr. 57:25-58:6. He also stated that if he had known about the cryptocurrency question he "[o]f course" would have answered it truthfully because "It's not hard to do. You just have to know about it." *Id.* 60:11-16.

In sum, Goldstein explained that while he was not "disclaiming responsibility" for his taxes, "I paid somebody to do it. Again, this is not me saying I'm not responsible. But if you just want to know what I was thinking, nobody was telling me I needed to sit down. They said you can sign this and I signed it." 2/11/26 Tr. 122:19-123:2. Similarly, he stated that, "If there is a tax rule that I don't know or information that I don't know to give them, I need them to ask me for it. That's why I hire them." 2/12/26 Tr. 163:3-5. The earlier testimony of his expert, Zachary Marks, foreshadowed and legitimated Goldstein's purported good-faith reliance. *E.g.*, 2/5/26 Tr. 163:18-164:2 (Zachary Marks) ("[C]lients generally hire [tax preparers] to rely on that expertise because the tax client does not have that expertise themselves.").

B.    **Improper Questions**

Goldstein's counsel repeatedly asked witnesses whether anyone had told them or Goldstein that he would be committing a crime by paying his taxes when they were due. *E.g.*, 1/21/26 Tr. 58:10-12 (Molly Runkle) ("Q: And to be clear, at no point did Mr. Deyhle tell you that if you pay penalties and interest, you're committing a crime, right?"); *id.* at 61:5-6 ("He didn't say that if you don't make a payment now, you're going to be committing a crime, right?:); 1/22/26 Tr. 128:16-19 (William Caldwell) ("Q: But you never told Mr. Goldstein, look, if you don't pay all the money now, if you go on an installment plan or you pay late with penalties and interest, you're committing a federal crime. You never told him that; right?") 1/28/26 Tr. 177:19-20 (Yvette Parrish) ("Q: Nothing in this notice says that, if you don't comply with this agreement, you are committing a crime; right?"); *id.* at 180:2-6, 20-21 ("Q: But none of the disclosures that the IRS sends . . . say, if you pay penalties and interest instead of paying all of your tax liability on the day taxes are due, you've committed a crime; right? . . . Q: Have you ever advised [the many thousands of taxpayers you have worked with on installment plans] that, if they don't pay on the day taxes are due, that they're committing a crime?"); 2/2/26 Tr. 55:8-10 (Kathleen Bart) ("Q: But nowhere in this engagement letter does it say that if you pay late, with penalties and interest, you are committing a crime; right?"); *id.* at 155:4-6 (Roman Hernandez) ("Q: Okay. The balance due notices that Mr. Goldstein received did not say anywhere that he was committing a federal crime, did it?").

After myriad questions about whether Goldstein had been told it was a *crime* to willfully fail to pay his taxes, the government asserted it would "ask for a curative instruction because [defense was] actively misleading the jury about what the obligation is . . . it's absolutely outrageous to mislead the jury about what the mental state is required here and now complain that we're trying to make it clear." 2/2/26 Tr. 158:16-25.

Two days later, defense counsel again posed the same questions. 2/4/26 Tr. 149:3-7 (Walter Deyhle) ("Q: And when you were advising Mr. Goldstein and the office managers on those options, you never told them, if you file the extension and don't pay the entire tax bill on the day it's due, you're committing a federal crime. You never told them that; right?"); *id.* at 152:17-18 ("Q: You do not tell Mr. Hamm, if you pick option two, you're committing a federal crime; right?").

In response, the government objected and sought a curative instruction. The Court sustained the objection and stated, "I'm going to instruct counsel not to phrase the question in that way going forward," instructing defense counsel not to ask whether Goldstein had been told his actions would constitute a crime. *Id.* at 154:24-155:12.

### C. Goldstein's Testimony

Despite the Court's clear instruction, counsel returned to these exact questions during Goldstein's own testimony. 2/12/26 Tr. 16:14-16 (Thomas Goldstein) ("Q. Was that your understanding that if you chose option two or three you would be committing a crime? A. Of course not."); *id.* at 18:13-15 ("Is there anywhere in this document where the IRS tells you, if you go on an installment plan, you are committing a crime?"). After the government objected, the Court yet again instructed "defense not to phrase directly, 'Do you think you were doing the crime or not." *Id.* at 21:4-6.

During his testimony, Goldstein also stated many of the exact points the government had previously moved to exclude as jury nullification. First, when it came to payment when taxes were due in April 2017:

**Q:** What was your understanding about what the law allowed you to do?

**A:** My understanding then, my understanding now, is that on April 15th, you can do the following, these are all options to you. One will be cheaper, but these are all

options to you. Pay the whole thing, pay and get on an installment plan, and pay interest if they will give it to you, pay—don't put it on an installment plan, pay penalties and interest and, you know, let those accumulate until you pay it all off. Those are the three things I believed then and I believe now that you can do.

**Q:** And what was your understanding about the lawfulness of each of those options?

**A:** They are all completely lawful. I mean, tens of millions of people do them every year.

2/12/26 Tr. 14:10-24. Second, he later emphasized his failure to pay was a civil issue, not a crime.

My understanding then, as it is now, as it is for everybody else in my position, is that you can pay at the time that you file. If you don't, you are going to pay penalties and interest. There are other mechanisms, but that is an entirely civil set of penalties. That is how that it works, and if you go spend your money on something else, even if it is stupid, it is not a crime.

2/12/26 Tr. 238:8-15.

Goldstein also portrayed himself as having learned his lesson and become fully compliant with his taxes. First, he repeatedly suggested and implied that, since his 2016-2021 conduct and terminating his accountants at GRF, he had learned and changed. For example, on the first day of his testimony, he stated, "[Y]ou have to learn lessons from things. And now, I have, obviously, a much greater understanding of like the kinds of mistakes that can happen and the questions that people can ask later, and so I wouldn't want—I would not want to experience this." 2/11/26 Tr. 123:13-17. He later explained, "[Y]ou try and grow through this process, and through the trial, in particular, you realize, look, your priorities may have been out of whack." 2/12/26 Tr. 23:6-8.

Second, Goldstein repeatedly stated and implied that he had come into full tax compliance. He summarized "the common theme" is that "I will build up debts, but I—I will always pay them." 2/11/26 Tr. 266:23-24. The next day, he reiterated, "I'm not trying to blow this off. I know I'm responsible for all this. I pay all of it. I pay all of the penalties and interest. I have paid a larger

price than that. It is not my intention to just, you know, ignore my responsibilities." 2/12/26 Tr. 23:18-22.  Reflecting on his 2022 winnings from Andrew Beal, Goldstein had this exchange:

**Q.** What did you do with the money?

**A.** A variety of things, but I guess, most importantly, I paid all my back taxes.

**Q.** And by the end 2022, were you paid up on your taxes?

**A.** Yeah.

**Q.** And how did that feel?

**A.** For a while, it felt great.

2/12/26 Tr. 14:19-24. Similarly, when asked about the luxury watch he omitted from his declaration for the Hawthorn property, Goldstein responded "This is [a] really special thing . . . This is to celebrate paying off my taxes." *Id.* at 184:6, 10. He later explained that after beating Mr. Beal in late 2022, he celebrated because he had finally overcome his tax issues: "I am ecstatic because the 2016 to 2021 taxes have been on my back. . . . I celebrate in a variety of ways . . . [W]hen all this is happening, the 2016 to 2021 taxes are paid off. . . . It turns out I have overpaid by a ton. And I have been in huge trouble in variety of ways through that entire period, '16 through '21." 2/12/26 Tr. 239:12-23.

## LEGAL STANDARD

### I.    Federal Rule of Evidence 404(b)

Rule 404(b)(1) prohibits the use of otherwise relevant evidence of other crimes or acts if it is offered solely to prove that a defendant had a particular character trait and acted in accordance with that character trait when committing a charged offense. However, evidence of other acts may be admissible to prove something else, such as motive, opportunity, intent, knowledge, or absence of mistake. Fed. R. Evid. 404(b)(2).

Rule 404(b) is "a rule of inclusion" that "covers evidence of both prior and subsequent acts." *United States v. Mohr*, 318 F.3d 613, 617 (4th Cir. 2003). To evaluate whether evidence is admissible under Rule 404(b), the Fourth Circuit applies a four-part test established in *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997). "The evidence must be (1) relevant to an issue, such as an element of the offense; (2) necessary 'in the sense that it is probative of an essential claim or an element of the offense'; (3) reliable"; and (4) admissible under Rule 403. Mohr, 318 F.3d at 617-18.

On the final step: "Because the evidence sought to be excluded under Rule 403 is concededly probative, the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *United States v. Williams*, 445 F.3d 724, 732 (4th Cir. 2006) (quoting *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996)). "[A]ll evidence suggesting guilt is prejudicial to a defendant. That kind of general prejudice, however, is not enough to warrant exclusion of otherwise relevant, admissible evidence." *United States v. Chaudhri*, 134 F.4th 166, 183-84 (4th Cir. 2025) (quoting *United States v. Siegel*, 536 F.3d 306, 319 (4th Cir. 2008)), *cert. denied*, No. 25-146, 2025 WL 2824227 (U.S. Oct. 6, 2025).

"Evidence may be excluded under Rule 403 only if the evidence is *unfairly* prejudicial and, even then, only if the unfair prejudice *substantially* outweighs the probative value of the evidence." *Siegel*, 536 F.3d at 319. Evidence is unfairly prejudicial "'when there is a genuine risk that the emotions of a jury will be excited to irrational behavior.'" *Id.* (quoting *Williams*, 445 F.3d at 730). But "[w]here the evidence is substantially similar, or at least no more sensational, than the crimes charged, there is *no* unfair prejudice," and evidence *may not be excluded* under Rule 403. *Chaudhri*, 134 F.4th 166, 184 (emphasis added).

## II.    Rebuttal Evidence and Rule 403

"A party 'opens the door' to admitting the other side's otherwise inadmissible evidence when the party creates a misleading impression of factual circumstances." *United States v. McDonald*, No. 24-4362, 2026 WL 303592, at *7 (4th Cir. Feb. 5, 2026) (cleaned up). "Because the 'open door' doctrine is geared towards correcting misleading impressions of fact, the opponent's response must be proportional and directly responsive." *Id.*

Federal Rules of Evidence 608(b) and 609 govern when a party uses extrinsic evidence to prove specific instances conduct during cross examination to attack a witness's character for truthfulness, or a past criminal conviction to do the same. *See* Fed. R. Evid. 608(b) & 609.

However, Rule 403 controls when evidence is offered to prove a fact at issue or rebut a misleading impression, instead of merely attacking the witness's credibility under Rules 608 and 609. *See, e.g.*, *United States v. Leavis*, 853 F.2d 215, 220 (4th Cir. 1988) (concluding Rule 403, not Rule 609, governed admissibility of evidence "introduced to contradict specific statements made by [defendant] on direct examination" and "rebut the false impression [he] was creating by his testimony"); *United States v. McLaurin*, 764 F.3d 372, 384 (4th Cir. 2014) (affirming admission of evidence under Rule 404(b) to correct misleading impression left by defendant's questioning); *United States v. Gray*, 89 F.3d 836 (6th Cir. 1996) (concluding Rule 608(b) did not apply where evidence was introduced not to attack his credibility but "to rebut defendant's inaccurate account of his post-prison conduct"); *United States v. D'Anjou*, 16 F.3d 604, 609 (4th Cir. 1994) (concluding, where defendant did not testify but evidence of his lies was "probative of consciousness of guilt," that Rule 403 governed the admissibility of that evidence and Rule 608 did not); *United States v. Sanders*, 189 Fed. App'x 207, 210 (4th Cir. 2006) (concluding Rule 608(b) did not apply where the evidence was "offered for the purpose of establishing or rebutting

a witness's bias"); *United States v. Carmichael*, 155 F.3d 561, *3 (4th Cir. 1998) (table op.) (noting Rule 609 evidence was independently admissible under Rules 404 and 403 to prove defendant's "intent or absences of mistake or accident" (cleaned up)); *see also Moore v. Volkswagenwerk, A.G.*, 575 F. Supp. 919, 922 (D. Md. 1983) ("Rule 403 applies to any situation unless another rule absolutely bars certain evidence or sets up a decision-making procedure that preempts any 403 weighing."). As discussed below, Rule 403 governs the proposed rebuttal evidence here.

## ARGUMENT

**I.    Controlling precedent makes Goldstein's subsequent failure to file tax returns admissible to prove his willfulness.**

### A.    The Fourth Circuit is clear that subsequent acts demonstrate earlier intent— and should be admitted.

"Intent is often a difficult element to prove," *Siegel*, 536 F.3d at 320, and the government bears a "heavy burden of proving [it] beyond a reasonable doubt," *Mohr*, 318 F.3d at 619. However, "subsequent conduct may be highly probative of prior intent." *United States v. Hadaway*, 681 F.2d 214, 217 (4th Cir. 1982). "The government, which has the burden of proving every element of the crime charged, must have the freedom to decide how to discharge that burden." *Queen*, 132 F.3d at 997. Thus, the Fourth Circuit has repeatedly held that subsequent acts are admissible to prove intent for earlier, charged crimes.

In *United States v. Stephanie Mohr*, the white defendant police officer was charged with "*willfully intending* to deprive" a homeless man, Ricardo Mendez, of his constitutional right to be free of excessive force when she released her police attack dog on him in 1995. 328 F.3d at 619. Under Rule 404(b), the district court admitted two, years-later acts in which Mohr sicced her dog on a 16-year-old, African-American teenager in 1997 and threatened to release the dog on an African-American woman in 1998. *Id.* at 618, 620.

11

Mohr argued these other acts were not necessary to establish her intent "because the government had 'a mass of other evidence' of intent." *Id.* at 619. The Fourth Circuit rejected her argument, countering that Mohr "specifically disputed her intent at trial" and "testified that she released the dog . . . based on her training and her view that it was reasonable and justified." *Id.* Given the government's "heavy burden" of proving her intent, the Fourth Circuit held that the evidence was properly admitted. Moreover, although the 1998 incident occurred three years later and involved a threat rather than releasing the dog, the Fourth Circuit concluded that it still went "to that essential question of willfulness" by suggesting a similar state of mind. *See id.* at 620-21. Finally, the race of the victims in these other incidents did not create "unfair prejudice," let alone that which would substantially outweigh their probative value." *Id.* at 620-21.

Meanwhile, in *United States v. Nancy Jean Siegel*, the Fourth Circuit reversed a district court's exclusion of other-acts evidence under Rule 403 as abuse of discretion. 536 F.3d at 319. The defendant was charged with killing a man, Jack Watkins, for the specific purpose of preventing him from reporting various financial crimes she had committed against him and for which she was also charged. *Id.* at 308. Although the charges all involved Watkins, the indictment alleged a 20-year litany of other misconduct against her three erstwhile husbands, her daughters, and others before and after she killed Watkins—which the district court excluded as propensity evidence that would entail "an enormous waste of time . . . over the course of days and days." *Id.* at 312-14.

The Fourth Circuit reversed, emphasizing that the government had to prove Siegel killed Watkins "*for the purpose* of preventing" him from reporting her other crimes. *Id.* at 320. Recognizing that "[i]ntent is often a difficult element to prove," the court found the other acts were "highly probative" of her intent. *Id.* Further, because the other acts were "substantially similar" to

the charged conduct, they would not create a "substantial risk that jurors would be excited to irrational behavior," and thus could not be properly excluded under Rule 403. *Id.* at 319-20.

*Mohr* and *Siegel* make clear that evidence of later acts should be admitted when they help establish a defendant's intent for an earlier, charged act.

### B. Circuit courts uniformly agree that later acts are critical to prove willfulness in criminal tax cases.

Willfulness is the "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). Thus, in criminal tax cases, the government must "prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Id.* at 202. This is a high standard, and intent is often difficult to prove. *See Siegel*, 536 F.3d at 320.

As a result, evidence of a defendant's conduct *after* the charged period becomes especially important, and all the more admissible, when he claims ignorance or blames the charged conduct on his accountants. For example, in *United States v. David Bok*, the defendant was charged with tax evasion and making false statements on his corporate tax returns. 156 F.3d 157, 159 (2d Cir. 1998). During his cross-examination of his accountant, "Bok had suggested that his *reliance on the accountant* effectively negated his willfulness." *Bok*, 156 F.3d at 166 (emphasis added). Thus, the district court admitted other acts evidence of his corporations' *failure to file* federal corporate tax returns "for the years during *and after* those in the indictment." *Id.* at 165 (emphasis added). The Second Circuit affirmed, holding that, "[a]s a simple matter of logic, Bok's failure to file state or federal returns for either himself or his corporations until told to do so by the IRS [wa]s indicative of an intent to evade the tax system," and admissible to prove willfulness circumstantially. *Id.* at 165-66. "This [wa]s particularly true in light of Bok's legal education, which included coursework in both corporate and personal taxation." *Id.* at 166.

Later tax misconduct demonstrates willfulness for earlier tax violations because willfulness and good faith are two sides of the same coin. Willfulness is "voluntary, intentional violation of a known legal duty." *Cheek*, 498 U.S. at 201. But if a person has "a good-faith misunderstanding" of the law, then that person cannot have acted willfully. *Id.* at 202. Thus, to prove willfulness, the government must "negat[e]" a defendant's claim that he had a good-faith belief he was not violating the tax laws because of ignorance or a misunderstanding of that law. *Id.*

Relatedly, "'[g]ood faith reliance on a qualified accountant has long been a defense to willfulness in cases of tax fraud and evasion.'" *United States v. Witasick*, 443 Fed. App'x 838, 840 (4th Cir. 2011) (quoting *United States v. Bishop*, 291 F.3d 1100, 1107 (9th Cir. 2002)). When this defense is raised, a defendant's acts that were *not* caused by his accountant become critical because they demonstrate his intent and cannot be blamed on his accountant. For example, Bok's later failure to file corporate tax returns evinced his willfulness because those failures could not be traced to "his reliance on [his] accountant." *See Bok*, 156 F.3d at 166. Put simply: the less likely a defendant relied in good faith on his accountants, the more likely he acted willfully.

Circuit courts across the country routinely admit subsequent conduct to prove willfulness in criminal tax cases. *See, e.g.*, *United States v. Johnson*, 893 F.2d 451, 452-53 (1st Cir. 1990) (affirming admission of defendant's failure to "file an income tax return for 1987[]" because it "was relevant to show [his] willfulness and absence of mistake in filing [false forms] during the years 1982-86 [so t]he jury could reasonably infer from that the improper filings in the years immediately previous were likewise infected by tax evasion purpose"); *United States v. Ebner*, 782 F.2d 1120, 1126 n.7 (2d Cir. 1986) ("The jury may consider evidence of intent to evade taxes in one year as evidence of intent to evade payment in prior or subsequent years."); *United States v. Upton*, 799 F.2d 432, 433 (8th Cir. 1986) ("Evidence of [defendant's] questionable compliance

with tax laws, both in the years prior to and *subsequent to* [the years of the charged conduct] is probative of willfulness in the present context." (emphasis added)); *United States v. McKee*, 942 F.2d 477, 480 (8th Cir. 1991) (affirming admission of subsequent 1985 tax filing to show intent for tax evasion charges for 1981-1983); *United States v. Ayers*, 924 F.2d 1468, 1472-74 (9th Cir. 1991) (affirming admission of *subsequent* uncharged acts to support intent in § 371 conspiracy to defraud the United States in the collection of income taxes); *see also United States v. Daraio*, 445 F.3d 253, 264 (3d Cir. 2006) (collecting cases holding prior and subsequent acts admissible to prove willfulness for tax crimes); *United States v. Abboud*, 438 F.3d 554, 581-83 (6th Cir. 2006) (affirming admission of 404(b) other acts evidence, in the form of under-the-table payments to employees, to reinforce willfulness where defendants "presented a good faith defense" that their tax violations "were caused by sloppy bookkeeping"); *cf. United States v. Ringwalt*, 213 F. Supp. 2d 499, 509 (E.D. Pa. 2002) (surveying cases and holding earlier returns were admissible to counter "defendant's theory that the inaccuracies in [his charged] 1994 and 1995 returns were the result of mistake or the fault of the accountants"), *aff'd*, 66 Fed. App'x 446 (3d Cir. 2003).

Indeed, district courts in the Fourth Circuit take the same approach. *See, e.g.*, *Davis v. United States*, No. 3:02-CR-251, 2013 WL 5375628, at *6 (W.D.N.C. Sept. 25, 2013) (citing *Mohr* and admitting subsequent other acts from later uncharged tax years "to prove willfulness and rebut [defendant]'s good faith defense"); *United States v. Tharpe*, No. 20-CR-20, 2023 WL 186823 (W.D. Va. Jan. 13, 2023) (deeming admissible defendant's later uncharged tax misconduct to show intent and absence of mistake because it showed his earlier charged conduct was "not simply unintentional oversight").[1]

---

[1] While the Fourth Circuit does not appear to have squarely addressed subsequent other acts in the tax evasion context, it routinely affirms admission of uncharged false returns to show willfulness

(continued...)

Through his own trial strategy and testimony, Goldstein has made his failure to file tax returns in 2022 through 2023 essential evidence of his willfulness—as reinforced by the standard practice across multiple circuit courts and the repeated practice of district courts in this one.

## II. This evidence now must be admitted to rebut the profoundly false impression created by Goldstein's testimony and trial strategy.

### A. The False Impression

Woven together, the five main threads of Goldstein's trial strategy and testimony have directly disputed his willfulness by creating the unmistakable, false impression that he was unaware of his tax obligations (due in large part to his accountants' errors) and that, once he became aware of those obligations, he promptly came into tax compliance.

First, defense counsel's persistent questions about whether Goldstein had been told that it was a crime to not pay timely are not only legally wrong but also have implied that Goldstein was not willful because he was not aware of the legal implications of his nonpayment. These questions are especially egregious because the Court has now ruled *four times* that such questions and arguments are improper, including at the December 12 hearing, the January 9 final pretrial conference, and then twice during trial. *See* 2/4/26 Tr. 154:24-155:12; 2/12/26 Tr. 21:4-6.

Second, Goldstein's own testimony on this topic further reinforced the idea that he was not willful because, in his words, paying penalties and interest is "completely lawful" and "tens of

---

and lack of mistake in the similar false return preparation context. *E.g.*, *United States v. Toto-Ngosso*, 407 Fed. App'x 687, 690 (4th Cir. 2011) (affirming admission of uncharged false returns to show charged ones were "done knowingly or without mistake," and noting that other acts evidence need only be "necessary in the sense that it is probative" of an element, not "critical" to the government's case); *United States v. Al-Suqi*, 581 Fed. App'x 212, 214 (4th Cir. 2014) (finding uncharged false returns "highly probative" of whether defendant "acted knowingly and without mistake").

millions of people" opt for various payment options each year, including paying penalties and interest without an installment plan. 2/12/26 Tr. 14:10-24.

This "tens of millions of people" comment mirrored and escalated his statement to the *New York Times* that "millions of people file and then pay late as I did," (which triggered the government's earlier motion to exclude such arguments in light of that article, Dkt. 327), all but daring the Court to attempt to enforce its four earlier rulings in the middle of his testimony.[2]

Third, through cross examination, the testimony of Zachary Marks, and his own testimony, Goldstein has hammered that he relied in good faith on his accountants at GRF but they repeatedly failed him by not warning him that it was a crime to not pay taxes timely, not seeking further documentation of his poker activity, not reporting that activity correctly, and not asking the right questions. *See* Background Part III.A, *supra*.

Fourth, Goldstein repeatedly emphasized that he had paid off his debts, stating that he was "paid up on" his taxes by the end of 2022, and purchased his $200,000 watch in November 2022 "to celebrate paying off [his] taxes." 2/12/26 Tr. 14:19-24, 186:6-10. Thus, he summarized "the common theme": "I will build up debts but I—I will always pay them." 2/11/26 Tr. 266:23-24.

Fifth, his testimony implied that he had learned and changed as a taxpayer. "[Y]ou have to learn lessons from things. And now, I have, obviously, a much greater understanding of like the kinds of mistakes that can happen . . . ." 2/11/26 Tr. 123:13-17. "[Y]ou try and grow through this process . . . ." 2/12/26 Tr. 23:6-8. Thus, he summarized, "I pay all of the penalties and interest. I have paid a larger price than that. It is not my intention to just, you know, ignore my

---

[2] Given Goldstein and his counsels' repeated flaunting of the Court's rulings on these misleading questions and jury nullification arguments, the government also seeks a ruling precluding any such statements during closing arguments.

responsibilities." 2/12/26 Tr. 23:18-22. "I have been in huge trouble in variety of ways through that entire period, '16 through '21." 2/12/26 Tr. 239:12-23.

Together, these five strands create a single, unavoidable impression: Goldstein was not willful with respect to the charged 2016-2021 conduct because he relied on his accountants and, once he learned better, he came into full tax compliance which "felt great," *id.* 14:24, accepting his responsibilities and paying off his debts. His use of the past tense to describe the "huge trouble" he "*ha[d] been in*" for 2016-2021, his emphasis on "learn[ing] lessons," and his wistful comment that his watch was a "really special thing" that celebrated "paying off [his] taxes" all implied that his era of tax violations was long past—and that those violations had not been willful.

Unfortunately, this narrative could not be further from the truth. To date, Goldstein still has not filed income tax returns for 2022, 2023, or 2024. Although he paid $3,250,000 toward his 2022 tax liability and $325,000 toward his 2023 liability, both sums appear far less than his likely total taxes due, as evidenced by the parties' Second Joint Stipulations of Fact (which suggests 2022 net gambling income of roughly $21,000,000), and his law firm's 2023 Form 1120S (which was prepared by a different accounting firm and lists ordinary business income flowing to him of $4,079,153).

### B.    The Remedy

The government should be permitted to introduce evidence of Goldstein's failure to file 2022 and 2023 tax returns to rebut his false narrative that he was not willful during 2016-2021 and changed his ways after discovering his and his accountants' mistakes.

When a defendant creates a "false impression" through his testimony, the government is "entitled . . . to rebut" it. *Leavis*, 853 F.2d at 220. Indeed, when a defendant professes his lack of criminal intent because his act was an "unintentional and honest mistake," Rule 404(b) evidence

18

may become admissible to prove his "intent . . . or absence of mistake." *Carmichael*, 155 F.3d 561, *3.

Defense counsel's tactics also may open the door to such evidence. *See, e.g.*, *United States v. Blake*, 571 F.3d 331, 348 (4th Cir. 2009) (affirming admission of otherwise inadmissible polygraph evidence because it "would have been unfair" to let defense counsel imply a statement was coerced). Indeed, the Fourth Circuit has affirmed a district court's decision to admit previously excluded Rule 404(b) evidence on the grounds that the defense counsel's cross-examination created a false impression that made the previously excluded evidence more relevant. *McLaurin*, 764 F.3d at 384.

Here, Goldstein's failure to file 2022 and 2023 tax returns—despite having had years to do so, well after the criminal investigation went overt, and even after hiring a new accounting firm to prepare his law firm's 2023 Form 1120S—would *directly* counter his narrative that his 2016 through 2021 tax violations were caused merely by his ignorance and his GRF accountants' errors. People may pay late, but most do not receive millions of dollars in income and then *file no return at all*. His failure to timely file is particularly stark because he is already charged with § 7203 for his failure to timely pay. His claim that these failures to pay were caused by his accountants and that he subsequently learned his lesson cannot be reconciled with his present failure to file, a violation of the exact same statute. And this evidence, which entails only a few additional documents and a few minutes of testimony, is proportionate to the misleading impression that his testimony and trial strategy have created about his willfulness. *See McDonald*, 2026 WL 303592, at *7.

His 2022 and 2023 failure to file are necessary to rebut his testimony and strategy, which have been "designed generally to plant in the jury's mind a reasonable doubt that [he] could have

possessed the culpability of mind" for tax crimes. *See United States v. Johnson*, 634 F.2d 735, 738 (4th Cir. 1980) (affirming admission of other-acts evidence in tax evasion case where defendant portrayed herself as someone whose conduct was "completely at odds" with the requisite intent for tax evasion). Much as in *Mohr*, he has "specifically disputed h[is] intent at trial," rendering this later, other acts evidence necessary for the government to meet its "heavy burden" of proving his willfulness. *Mohr*, 318 F.3d at 619-20. *See also United States v. Secor*, 73 Fed. App'x 554, 567 (4th Cir. 2003) (holding defense counsel, by asking criminal tax defendant on direct examination about his knowledge of IRS rules and regulations, "opened the door" to government questioning on his failure to produce documents requested by the IRS); *United States v. Whiteside*, 810 F.2d 1306, 1309 (5th Cir. 1987) (affirming admission of 404(b) evidence where § 7203 defendant "put his intent in dispute with testimony that he held his beliefs in good faith and believed that parts of the law did not apply to him").

That his subsequent failure to file tax returns evinces his earlier willfulness is straightforward. First, filing a tax return is a binary; the simplest of tax litmus tests and one intuitive even to lay people. His failure to file for years—after a criminal investigation, indictment, and charges under the same statute—strongly suggests willful disregard for his tax obligations. Moreover, his failure to file long after GRF suggests that his tax violations were the result of his own willfulness, not GRF's shortcomings. This is precisely why multiple circuit courts have affirmed admission of subsequent failure to file to demonstrate willfulness for earlier tax evasion charges. *See Bok*, 156 F.3d at 165-66; *Johnson*, 893 F.2d at 452-53; *McKee*, 942 F.2d 477, 480.

Further, while Goldstein and his counsel may have couched their rhetoric with lawyerly precision to speak in terms of 2016 through 2021, his testimony and strategy has almost certainly been interpreted by the jury to mean his tax problems stopped with 2021. For example, in *United*

*States v. McLaurin*, defense counsel argued she "carefully limited her questions" to proof of whether McLaurin had previously robbed drug dealers. 764 F.3d at 383-84. However, the Fourth Circuit concluded that the questioning implied McLaurin had never committed any robberies, and thus opened the door to evidence of an earlier robbery. *Id.* The court emphasized that despite the technically narrow questioning, "we are not convinced that the jury could be expected to draw such a fine distinction," and counsel's references to a "type of conduct," constituted "language the jury may well have understood as a broader reference to robberies in general." *Id.* at 384.

The same problem applies here: Goldstein's repeated discussion of growth, responsibility, learning lessons, his "greater understanding" of potential mistakes, and feeling "great" once he was "paid up on" his taxes at the end of 2022 all strongly suggest that he entered a new era of tax-compliance at the end of 2022. While attorneys litigating the case may finely parse his language, the jury has almost certainly received a different message: his tax issues stopped with the charged years, and he lacked willfulness during those years because of his reliance on GRF and his ignorance of tax obligations. The solution is simple: admitting straightforward evidence of his failure to file for 2022 and 2023.

This remedy is not only well-founded in willfulness, criminal tax, and rebuttal precedent, but also far more probative than it is prejudicial. Under Rule 403, "[w]here the evidence is substantially similar, or at least no more sensational, than the crimes charged, there is no unfair prejudice," and evidence may not be excluded under Rule 403. *Chaudhri*, 134 F.4th 166, 184. Here, Goldstein's failure to file mirrors his charged misdemeanor failure to pay taxes, and is far less sensational than the felony tax evasion and false return charges. While the evidence is certainly prejudicial in the sense that it damages his case, this does not constitute "unfair prejudice" within the ambit of Rule 403, "Indeed, our adversarial system depends on opposing parties offering

21

evidence that will strengthen their respective positions and damage that of their opponents." *Mohr*, 318 F.3d at 619.

Finally, a limiting instruction that this evidence should be considered only to determine whether Goldstein acted willfully and not because of a mistake would greatly minimize the risk of any unfair prejudice. *E.g.*, *id.* at 620; *Blake*, 571 F.3d at 348; *Carmichael*, 155 F.3d 561 *2-3.

### **CONCLUSION**

The United States respectfully requests the Court rule admissible evidence of Goldstein's failure to file individual income tax returns for 2022 and 2023.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

Dated: February 17, 2025

/s/  *Emerson Gordon-Marvin*
Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice—Criminal Division

Sean Beaty
Senior Litigation Counsel
Department of Justice—Criminal Division

Adeyemi Adenrele
Assistant United States Attorney
District of Maryland