**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. LKG-25-0006** |
| **THOMAS GOLDSTEIN,** | |
| **Defendant.** | |

**GOVERNMENT'S OPPOSITION TO GOLDSTEIN'S MOTION
FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL**

i

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 1

LEGAL STANDARD.......................................................................................................... 2

ARGUMENT ...................................................................................................................... 3

I.      THE COURT APPROPRIATELY OMITTED AN INAPPLICABLE INSTRUCTION ON 18 U.S.C. § 2(a) ............................................................................................................ 3

      A.      Legal Standard ...................................................................................................... 5

      B.      The Court Appropriately Omitted The § 2(a) Instruction...................................... 7

            1.      The Court properly instructed the jury on each substantive offense .......... 7

            2.      The Court did not instruct on § 2 liability and, therefore, did not omit any elements of it....................................................................................... 9

                  a.      Quoting the indictment did not permit conviction under § 2.......... 9

                  b.      The Court appropriately omitted the § 2(a) instruction, and thus did not fail to instruct on its elements .................................................. 13

                  c.      The Court did not need to instruct on § 2(b)............................... 18

      C.      Deleting An Inapplicable § 2(a) Instruction Did Not Prejudice Goldstein........... 29

II.     THE COURT APPROPRIATELY INSTRUCTED THE JURY ON WILLFUL BLINDNESS................................................................................................................. 34

      A.      The Evidence Supported The Willful Blindness Instruction ............................... 34

      B.      Any Error Was Harmless ..................................................................................... 37

III.    THE COURT APPROPRIATELY EXCLUDED VARIOUS TEXT MESSAGES AND IMAGES AS HEARSAY ........................................................................................... 40

      A.      The Court Properly Excluded The Messages And Images ................................... 40

      B.      Any Error Was Harmless ..................................................................................... 44

IV.    THE EVIDENCE SUPPORTING THE TAX EVASION CONVICTION WAS MORE THAN SUFFICIENT................................................................................................... 48

      A.      Goldstein Evaded His Taxes By Funneling Money Through The IOLTA........... 49

B.      Goldstein Evaded His Taxes By Lying To The IRS Revenue Officer ................. 54

V.      THE EVIDENCE SUPPORTING THE FALSE RETURN CONVICTIONS WAS MORE THAN SUFFICIENT ...................................................................................................... 57

     A.      The First Two Elements Were Proven As To All False Return Counts ............... 57

     B.      The Evidence Was Sufficient On Count 3 ............................................................ 58

          1.      Goldstein Falsely Deducted A $175,000 Poker-Related Payment ........... 58

          2.      Goldstein Diverted And Failed To Report A $250,000 Legal Fee ........... 60

     C.      The Evidence Was Sufficient On Count 7 ............................................................ 62

          1.      Goldstein Falsely Deducted A $170,000 Poker-Related Payment ........... 62

          2.      Goldstein Failed To Report A Legal Fee From Phua .............................. 63

     D.      The Evidence Was Sufficient On Count 8 ............................................................ 64

          1.      Goldstein Failed To Report Poker Winnings ........................................... 64

          2.      Goldstein Falsely Denied Cryptocurrency Activity ................................. 66

     E.      The Evidence Was Sufficient On Count 9 ............................................................ 67

VI.     GOLDSTEIN SHOULD NOT BE ACQUITTED FOR WILLFUL FAILURE TO PAY TAXES ................................................................................................................................ 70

     A.      Background .............................................................................................................. 70

          1.      Legal Standard ........................................................................................... 70

          2.      The COVID-19 Declarations And *Kwong* ............................................... 71

     B.      Argument ................................................................................................................ 73

          1.      Goldstein Has Not Shown Good Cause For This Untimely Argument .... 73

          2.      The Disregarded Period Under The Maryland Declaration Was 60 Days From January 20, 2020 ............................................................................. 74

          3.      There Was No Prejudicial Variance ......................................................... 79

          4.      There Was No Legal Uncertainty Or Ambiguity ..................................... 80

CONCLUSION ...................................................................................................................... 80

**INTRODUCTION**

After six weeks of trial and two days of deliberations, the jury convicted Thomas Goldstein on 12 counts of tax and mortgage fraud crimes. By all indications, the verdict resulted from an unbiased, careful review of the evidence and diligent compliance with the Court's instructions. Indeed, the same jury also acquitted Goldstein on 4 tax counts, and declined to find a nexus between his mortgage fraud conviction and his residence. Goldstein now seeks acquittal under Rule 29 or a new trial under Rule 33 on all counts of conviction.

The Court should decline Goldstein's request to overturn the verdict. His challenges to the sufficiency of evidence should be rejected because the verdict was grounded in overwhelming evidence including almost 40 live witnesses, over 400 exhibits, and six detailed factual stipulations. Goldstein also chose to testify in his own defense, and in doing so offered *more* incriminating evidence—as well as incredible denials and excuses. As for Goldstein's legal challenges, many are actually factual defenses that the jury already rejected, and the rest are wrong on the merits and do not warrant disturbing the jury's verdict. The motion should be denied.

**BACKGROUND**

On January 16, 2025, the Grand Jury returned a 22-count indictment against Goldstein, who was charged with 4 counts of tax evasion (26 U.S.C. § 7201), 10 counts of aiding and assisting in the preparation of false tax returns (26 U.S.C. § 7206(2)), 5 counts of willful failure to pay taxes (26 U.S.C. § 7203), and 3 counts of making false statements on loan applications (18 U.S.C. § 1014). Dkt. 1. On August 7 and November 20, 2025, the Grand Jury returned superseding indictments revising certain allegations but not adding or dropping any charges. Dkts. 159, 239.

On January 12, 2026, the Court granted the government's motion to dismiss counts 2-6 and 15 of the second superseding indictment. Dkt. 343. Goldstein was tried on 1 count of tax evasion, 8 counts of aiding and assisting in the preparation of false tax returns, 4 counts of willful

failure to pay, and 3 counts of making false statements on loan applications. *See* Dkt. 337-2 (streamlined indictment for trial).

Trial began on January 15, 2026. Over the next six weeks, the parties called 39 witnesses, introduced over 400 exhibits, and reached six factual stipulations that were read to the jury. Closings were on February 18, 2026, and the jury was instructed on February 19, 2026. The jury deliberated for about 2 days. On February 25, 2026, the jury reached its verdict. Goldstein was convicted on 1 count of tax evasion, 4 counts of aiding and assisting in the preparation of false tax returns, 4 counts of willful failure to pay taxes, and 3 counts of false statements on loan applications. The jury acquitted Goldstein on 4 counts of aiding and assisting in the preparation of false returns. On February 26, 2026, the jury was retained to decide whether there was a sufficient nexus between Goldstein's residence in Washington, D.C. and his commission of count 16. The jury reached a verdict that same day and declined to find such a nexus.

On March 23, 2026, Goldstein filed a motion, under Federal Rules of Criminal Procedure 29 and 33, seeking acquittal or a new trial. Dkt. 485. On March 24, 2026, he filed a corrected version of that motion. Dkt. 487. On April 2, 2026, the Court granted the government's motion for an extension of time to respond, and set a deadline of May 15, 2026. Dkt. 497.

## **LEGAL STANDARD**

Rule 29 requires the district court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). However, "[r]eversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *United States v. Booker*, 146 F.4th 332, 341 (4th Cir. 2025) (quotation omitted). The district court must "uphold the jury's verdict if, viewing the evidence in the light most favorable to the government, the verdict is supported by substantial evidence." *Id.* (quotation omitted). A verdict can be overturned only "if the evidence is so insufficient that *no* rational trier of fact could convict."

*United States v. Rafiekian*, 68 F.4th 177, 186 (4th Cir. 2023) (emphasis in original). In evaluating a Rule 29 motion, the district court does not assess witness credibility, and presumes that the jury resolved any conflicting evidence in the government's favor. *United States v. Reed*, 75 F.4th 396, 401 (4th Cir. 2023).

Rule 33 gives the district court discretion to order a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Defendants face a "demanding burden" when seeking to "disturb the jury's verdict." *United States v. Brasser*, No. 3:23-CR-00006-MOC-SCR, 2024 WL 3659305, at *2 (W.D.N.C. Aug. 5, 2024). Granting a new trial is "highly disfavored" and should only be done "sparingly." *United States v. Ali*, 991 F.3d 561, 570 (4th Cir. 2021) (cleaned up); *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997) (same). Rule 33 motions should be granted "only when fundamental fairness or the integrity of the trial are substantially in doubt," *United States v. Jennings*, 438 F. Supp. 2d 637, 642 (E.D. Va. 2006), such as when there is a "concern that an innocent person may have been convicted," *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

## **ARGUMENT**

### I. **THE COURT APPROPRIATELY OMITTED AN INAPPLICABLE INSTRUCTION ON 18 U.S.C. § 2(a)**

The Court should reject Goldstein two primary arguments regarding 18 U.S.C. § 2.

*On his first argument*: Goldstein contends that a new trial is necessary because the Court erroneously removed a jury instruction on § 2(a). Mot. 29.[1] This is premised on three interlocking claims. First, he argues that reciting the text of § 2 as part of the indictment's allegations "authorized the jury to convict [him] on the basis of either the substantive offense or" § 2 liability. Mot. 22-23, 28. Second, he claims the deleted § 2(a) instruction "defined the requirements of

---

[1] This opposition cites to the PDF page numbers (as reflected on the blue ECF banners) of Goldstein's motion.

Section 2 for purposes of this case," "permitted the jury to convict *only* on the basis of aiding and abetting an offense" under § 2(a), and did "*not*" permit it to convict under § 2(b). Mot. 23 (emphasis in original). Third, because the § 2(a) instruction was removed, and the final instructions quoted § 2 in reciting the allegations without defining the elements, Goldstein inveighs that the jury could have convicted him under § 2(a) or (b) without finding the requisite elements of liability, so a new trial is necessary. Mot. 29, 35-36.

*On his second argument*: Goldstein contends that, by deleting the § 2(a) instruction, the Court violated Federal Rule of Criminal Procedure 30 and inflicted actual prejudice such that retrial is necessary. Mot. 37-40. He asserts that deleting the instruction violated the "plain terms of Rule 30(b)" that the Court must advise counsel of its rulings before closing arguments. Mot. 38. Under the same logic as his first primary argument above, he contends that deleting the instruction "expanded accessory liability" by allowing the jury to convict under § 2(a) or § 2(b) without the constraints imposed by case law. Mot. 37. As a result, Goldstein argues, the deletion prejudiced his closing by depriving him "of the opportunity to argue that [he] should not be convicted under the theories of accessory liability that were presented in the final jury instructions." Mot. 39-40.

These arguments are fundamentally flawed. First, the Court's final instructions permitted the jury to convict Goldstein based *only* on his violations of the substantive offenses and *did not* permit the jury to convict under *any* § 2 theory. As a result, the Court did not err by removing the accessory liability instruction. Second, the Court properly removed the § 2(a) instruction because the evidence did not support such a theory and the government did not seek to convict Goldstein under that theory. The deletion of an inapplicable instruction was entirely appropriate, not an error. Third, the instructions did not enable the jury to convict under § 2(b). The government had intended to rely on § 2(b) liability—causer liability—in a very limited manner for count 15. But

4

the government did not argue that theory to the jury, and the final instructions did not permit the jury to convict under § 2(b). If Goldstein's motion can be understood to argue that the jury was permitted to convict based on a defective § 2(b) instruction, that challenge fails because, among other reasons, the instructions required the jury to find that Goldstein himself committed the charged acts. Fourth, although it occurred after closing, removing the § 2(b) instruction *narrowed* the possible bases for conviction, and did not prejudice Goldstein, whose closing ignored § 2(a) liability (because it was inapplicable to this case).

The Court did not err by deleting the § 2(a) instruction, Goldstein was not prejudiced, and no retrial is warranted. The subsequent sections summarize then apply the relevant legal standards.

### A.    Legal Standard

Generally, a district court's decision to give or refuse to give a jury instruction is reviewed for abuse of discretion. *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010). A district court commits "reversible error" by refusing to give a jury instruction "'only when the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.'" *Id.* (quoting *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009)).

When a defendant timely objects to a legal error, "harmless error" review applies. Fed. R. Crim. P. 52(a). Typically, the harmlessness test is whether "the error had no substantial and injurious effect or influence on the outcome" of the case. *United States v. Ferguson*, 752 F.3d 613, 618 (4th Cir. 2014). When a defendant objects to "a jury instruction that omits an element of the offense," the test is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 8, 17 (1999)

5

(quotation marks omitted); *see United States v. Strickland*, 245 F.3d 368, 380 (4th Cir. 2001) (summarizing *Neder*).

Section 2 defines two ways in which a defendant who does not directly commit an offense can be liable as if he did. Section 2(a) provides that "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a) (hereinafter, "accessory liability"). In other words, an accomplice who aids or abets a principal is punishable the same as the principal. This theory of liability requires that there be a primary offender.

Section 2(b) provides that "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." *Id.* § 2(b) (hereinafter, "causer liability"). This subsection "impose[s] criminal liability on one who causes an intermediary to commit a criminal act, even though the intermediary who performed the act has no criminal intent and hence is innocent of the substantive crime charged." *United States v. Richeson*, 825 F.2d 17, 20 (4th Cir. 1987) (quoting *United States v. Tobon-Builes*, 706 F.2d 1092, 1099 (11th Cir. 1983)). Section 2(b) thus requires only one guilty party. *See id.*

Section 2 does not create an independent or separate crime. *United States v. Rashwan*, 328 F.3d 160, 165 (4th Cir. 2003). Rather, § 2 explains "the scope of criminal liability under existing substantive criminal laws." *United States v. Ruffin*, 613 F.2d 408, 413 (2d Cir. 1979); *see United States v. Cowart*, 595 F.2d 1023, 1031 n.10 (5th Cir. 1979) ("[Section 2(a)] does not define a crime but merely makes punishable as a principal one who aids or abets another in the commission of a substantive offense."). It "mak[es] clear that in all crimes an accessory will be punished as a principal," and thus "is implicit in all indictments." *Rashwan*, 328 F.3d at 160. Consequently, the government need not expressly charge that a defendant's actions fall within the ambit of § 2 to

convict the defendant under § 2. *Id.* The streamlined indictment expressly charged § 2 but did not specify a subsection. *See* Dkt. 337-2 at 1, 40, 49-54.

## B.    The Court Appropriately Omitted The § 2(a) Instruction

### 1.    The Court properly instructed the jury on each substantive offense

The jury returned a guilty verdict on 12 counts: 1 count of willfully attempting to evade tax, in violation of 26 U.S.C. § 7201; 4 counts of willfully aiding and assisting in the preparation of a false or fraudulent tax returns, in violation of 26 U.S.C. § 7206(2); 4 counts of willful failure to pay tax, in violation of 26 U.S.C. § 7203; and 3 counts of making false statements on a loan application, in violation of 18 U.S.C. § 1014.

The Court properly instructed the jury on the elements of each of these offenses. Goldstein does not argue otherwise. *See* Mot. 13-18. A brief review of the Court's instructions reinforces their propriety.

**Count 1 (Tax Evasion).** The instruction listing the elements of tax evasion stated:

> In order for the crime of tax evasion to be proved, the government *must establish beyond a reasonable doubt each of the following elements*: First, that Mr. Goldstein had a substantial tax deficiency for tax year 2016. Second, that Mr. Goldstein attempted to evade or defeat the assessment or payment of the tax by committing at least one affirmative act described in the indictment after January 1, 2018. Third, that in attempting to evade the tax, Mr. Goldstein acted willfully.

Ex. 17, 2/19 Tr. 56 (emphasis added). Thus, the jury was required to find that Goldstein willfully committed an affirmative act of attempted evasion within the limitations period to convict him. The immediately following instructions explained each element in detail. Ex. 17, 2/19 Tr. 57-60.

**Counts 2-9 (False Returns).** The instruction listing the elements of aiding and assisting in the preparation of false returns stated:

> To prove Mr. Goldstein guilty of aiding or assisting in the filing of a false tax return, the government must prove each of the following elements beyond a reasonable doubt: First, that Mr. Goldstein advised or assisted in the preparation of a tax return

7

that was subsequently filed. Second, that the return was false as to any material matter. Third, that Mr. Goldstein acted willfully.

Ex. 17, 2/19 Tr. 65. This instruction thereby required the jury find Goldstein (1) willfully (2) aided or assisted in the preparation of his (3) materially false tax returns.[2] As with count 1, the subsequent instructions detailed the elements of the offense. Ex. 17, 2/19 Tr. 65-68.

**Counts 10-13 (Willful Failure to Pay).** The instruction listing the elements of willful failure to pay stated:

> In order for the government to prove the charge of failure to pay taxes, it must establish beyond a reasonable doubt each of the following elements: First, that Mr. Goldstein owed income taxes for the tax year in question; Second, that Mr. Goldstein failed to pay the tax due by the due date for the tax year in question; and Third, that Mr. Goldstein's failure to pay the tax was knowing and willful.

Ex. 17, 2/19 Tr. 72. The jury was required to find Goldstein owed income taxes and willfully failed to pay them by the due date. Subsequent instructions explained each respective element. Ex. 17, 2/19 Tr. 72-75.

**Counts 14-16 (False Statements on Loan Applications).** The instruction listing the elements of making a false statement on a loan application stated:

> In order to prove Mr. Goldstein guilty of counts 14-16 of the indictment, the government must prove each of the following elements beyond a reasonable doubt: First, that Mr. Goldstein made a false statement or report relating to an application to a mortgage lending business; Second, that Mr. Goldstein acted knowingly; Third, that the false statement or report was made for the purpose of influencing in any way the mortgage lending business's action; and Fourth, that the statement was submitted to a mortgage lending business.

---

[2] Although § 7206(2) is sometimes colloquially referred to as the Internal Revenue Code's "aiding and abetting" provision, *see United States v. Williams*, 644 F.2d 696, 701 (8th Cir. 1981), liability is established solely under § 7206(2), not § 2—as Goldstein's counsel recognized. *See* Ex. 15 (excerpt), 2/17 Tr. 198:20-22 (acknowledging "7206 bakes in aiding and abetting because it says you have to knowingly provide false information").

Ex. 17, 2/19 Tr. 79-80. To convict, the jury was required to find that Goldstein knowingly made a false statement on an application to a mortgage lending business for the purpose of influencing that business's action. Subsequent instructions explained each element. Ex. 17, 2/19 Tr. 80-82.

The instructions for these substantive criminal offenses were proper, and the Court did not omit any essential elements. Indeed, although Goldstein cites cases in which district courts failed to instruct on the elements of a charged substantive offense, *see* Mot. 26-27, he does not argue that occurred here.

### 2. The Court did not instruct on § 2 liability and, therefore, did not omit any elements of it

#### a. Quoting the indictment did not permit conviction under § 2

Goldstein's contention—that the Court omitted the elements of § 2—rests on the mistaken premise that the Court's instructions allowed the jury to convict on the basis of § 2. *See, e.g.*, Mot. 22 (arguing final instructions "authorized the jury to convict" based on "aiding and abetting liability"). Instead, the final jury instructions *precluded* the jury from relying on § 2 to convict because the instructions required the jury to find Goldstein himself committed the elements of the substantive crimes to convict.

Two key rules lead to this conclusion. First, "a single instruction" is not viewed in isolation; rather, the question is whether the jury "instructions accurately and fairly state the controlling law" when "taken as a whole and in the context of the entire charge." *Lighty*, 616 F.3d at 366 (quoting *Passaro*, 577 F.3d at 221); *see also United States v. Tillery*, 702 F.3d 170, 176 (4th Cir. 2012) ("We view an allegedly erroneous instruction in its full context.").

Second, "our legal system presumes that jurors will 'attend closely the particular language of such instructions in a criminal case and strive to understand, make sense of, and follow'" them. *Samia v. United States*, 599 U.S. 635, 646 (2023) (cleaned up) (quoting *United States v. Olano*,

507 U.S. 725, 740 (1993)). That strong presumption can be overcome only in "extraordinary situations." *United States v. Brewbaker*, 87 F.4th 563, 584 (4th Cir. 2023) (quoting *Francis v. Franklin*, 471 U.S. 307, 324 (1985), and citing *Bruton v. United State*s, 391 U.S. 123 (1968), as an example).

Under these precepts, the Court's instructions precluded the jury from convicting Goldstein based on § 2. The Court only mentioned § 2 in the introductory instructions for each offense, in summarizing what the indictment alleged. But the Court had already told the jury in an earlier instruction that "the charging instrument, called an indictment," was "merely a statement of charges and not itself evidence." Ex. 17, 2/19 Tr. 41. And the Court emphasized: "Even if I read a portion of the indictment to you, it is not evidence; it is only a statement of charges." *Id.*

Thus, the introductory instructions referencing § 2 merely summarized the indictment and did not permit the jury to convict based on § 2. For example, the introductory instruction on count 1 (tax evasion) read, "Mr. Goldstein is charged with evasion of income tax and aiding and abetting, counseling, commanding, inducing, or procuring such an offense." Ex. 17, 2/19 Tr. 55:17-19. The instruction then quoted the tax evasion statute (§ 7201) and § 2(a) and (b):

> The indictment *alleges* that Mr. Goldstein violated Section 7201 of Title 26 of the United States Code, which provides in pertinent part as follows . . . . The indictment also *alleges* that Mr. Goldstein violated Section 2 of Title 18 of the United States Code, which provides in pertinent part as follows: Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal and whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Ex. 17, 2/19 Tr. 55-56 (emphasis added). The introductory instructions for counts 2-9 (false returns) and 14-16 (false statements on loan applications) likewise recounted that "[t]he indictment alleges" Goldstein violated the substantive statutes and § 2, and quoted both. *Id.* at 64-65, 78-79.

10

These were the only instructions that mentioned § 2,[3] and all three instructions were cabined as summaries of what the indictment alleged. None of these instructions told the jury that it could convict based on what the indictment alleged. To the contrary, the Court warned the jury that the indictment was "merely a statement of charges," and made clear that the jury must find each element of the substantive offenses to convict Goldstein. Ex. 17, 2/19 Tr. 41-43.

As for the Court's instructions on the substantive offenses, none were predicated on either subsection of § 2. And none allowed the jury to convict Goldstein based on § 2. Instead, the instructions required the government to prove the elements of each substantive offense beyond a reasonable doubt. Ex. 17, 2/19 Tr. 56, 65, 79-80. These instructions required the jury to find that Goldstein committed the charged acts with the requisite intent.

Similarly, the § 1014 venue instruction was not predicated on § 2. It stated that "the government must prove that Mr. Goldstein made the alleged false statement to the mortgage lending business from a location within the District of Maryland." Ex. 17, 2/19 Tr. 82-83. As a result, the jury could not find venue based on Goldstein causing someone else to make a false statement from within Maryland. In fact, as Goldstein acknowledges, the Court stated "that it believed the jury would *not* be able to convict [him] on a [§ 2(b)] 'cause' theory of mortgage fraud." Mot. 24 (emphasis in original).

In light of these instructions on the elements, the three brief quotations of § 2—comprising three sentences out of over 50 transcript pages of instructions—did not permit the jury to convict under § 2. The Court's instruction that the indictment was "merely a statement of the charges" and "not evidence," when combined with the preface that "[t]he indictment *alleges*" Goldstein violated § 2, made clear that the jury could not use § 2 simply because the government alleged it. Indeed,

---

[3] The introductory instruction for counts 10-13 (willful failure to pay) noted that Goldstein was charged with aiding and abetting but did not quote the statutory language of § 2. Ex. 17, 2/19 Tr. 71-72.

11

the Fourth Circuit has held that providing an *entire* indictment to the jury during deliberations is not reversible error if accompanied by an instruction that the indictment is not evidence. *See United States v. Polowichak*, 783 F.2d 410, 413 (4th Cir. 1986); *United States v. Coward*, 669 F.2d 180, 184 (4th Cir. 1982) (providing entire, unredacted indictment was not reversible error).

The instructions were clear, and "we presume the jury follows instructions." *See United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009). Consequently, there was no error in reading portions of the indictment to the jury. Indeed, the jury's decision to acquit Goldstein on counts 2 and 4-6 reinforces that it followed instructions and properly understood the indictment quotations as mere allegations upon which it could not rely to convict. *See also United States v. Cornell*, 780 F.3d 616, 627 (4th Cir. 2015) (split verdict indicated jury "carefully considered the evidence"). Goldstein is incorrect that quoting § 2 "authorized" a conviction based on § 2.

The Court's instructions also stand in stark contrast to the errant § 2 instructions in the cases that Goldstein invokes. *See* Mot. 27-28. In *United States v. Odum*, 65 F.4th 714 (4th Cir. 2023), the district "court charged the jury that it could convict Odum of robbery if, among other things, it found that Odum, 'or someone aided and abetted by him, committed or attempted to commit robbery'" and read § 2's text without explaining the elements of § 2(a). *Id.* That is, the *Odum* jury was explicitly invited to convict based on § 2(a), and yet the district court wholly omitted the intent element of § 2(a)—thereby creating the possibility that the jury convicted under § 2(a) without finding the requisite intent. *Id.* at 720-21. Here, on the other hand, the Court's instructions never even made § 2 an avenue for conviction.

The other § 2 cases Goldstein cites do not apply for the same reason: they all permitted conviction without finding the requisite intent—an issue not present here. In *Nye & Nissen v. United States*, 336 U.S. 613 (1949), the defendant argued on appeal that the factual predicates to

12

*Pinkerton* liability were not submitted to the jury, but the Supreme Court affirmed because "[t]he trial court charged that one 'who aids, abets, counsels, commands, induces, or procures the commission of an act is as responsible for that act as if he committed it directly.'" *Id.* at 618 (quoting prior version of § 2). In *Rosemond v. United States*, 572 U.S. 65 (2014), the Court vacated the defendant's conviction (for aiding or abetting the use or carry of a firearm during a drug-trafficking offense) because the jury instructions failed to require a finding that the defendant knew his confederate would carry a gun. *Id.* at 67, 70. In *Hicks v. United States*, 150 U.S. 442 (1893), the Court held erroneous a jury instruction which permitted the jury to convict the defendant as an aider or abettor based on his mere presence at the crime, without also requiring the jury to find that the defendant intended to aid the crime. *Id.* at 449-450. And in *California v. Roy*, 519 U.S. 2 (1996), the Court held erroneous, but harmless, an instruction that permitted the jury to convict the defendant based on his knowing the *confederate's* intent but not requiring proof of the *defendant's* unlawful intent. *Id.* at 4-6. These cases do not establish that the Court committed error, much less reversible error—because here the jury *was* properly instructed on each element of the substantive offenses, and the instructions did not allow the jury to convict under § 2.

> b.    The Court appropriately omitted the § 2(a) instruction, and thus did not fail to instruct on its elements

Goldstein consistently opposed a § 2(a) instruction, arguing that it did not apply to the facts of this case. The government and the Court eventually agreed. Goldstein now faults the Court for not giving that inapplicable instruction. This argument fails.

First, as a general matter, it is error for a court to issue a jury instruction that is not supported by the evidence at trial. *See, e.g.*, *United States v. Horton*, 921 F.2d 540, 543 (4th Cir. 1990) ("No instruction may be given unless there is 'a foundation in the evidence' to support it." (citation omitted)).

Second, there was no evidence that a principal other than Goldstein committed any of the crimes (as Goldstein repeatedly argued). The parties' Joint Proposed and Disputed Jury Instructions filed on February 16, 2026 included Instruction No. 69, titled "Aiding and Abetting," which addressed only the requirements of § 2(a). *See* Dkt. 416 at 143-45. Goldstein objected to the instruction "on the ground that it lacks any evidentiary basis." Dkt. 416 at 145. He expounded, "There is *no evidence* from which a reasonable jury could find that Mr. Goldstein aided and abetted *any principal* in the commission of any charged offense. Giving this instruction could only serve to confuse and mislead the jury." *Id.* (emphasis added). Goldstein reiterated this in his objection to the aiding-and-abetting language in the introductory instruction for count 1 (tax evasion), and added, "In fact, the government has consistently argued that GRF [Goldstein's outside accounting firm[4]] did nothing wrong, and that any GRF mistakes are either uncharged or immaterial." *Id.* at 60-61. He also lodged similar objections to the aiding-and-abetting language in the introductory instructions for the other substantive offenses including for § 1014. *See id.* at 121. At the charge conference on February 17, 2026, Goldstein continued to press this objection: "[G]iving the jury an instruction on aiding and abetting when there is *absolutely no evidence* that there is some guilty principal who committed the crime of tax evasion who Mr. Goldstein aided and abetted will only serve to mislead the jury." Ex. 15 (excerpt), 2/17 Tr. 184:5-15. Indeed, Goldstein's motion concedes that his "defense theory" instruction was "based on the understanding that accessory liability was not a serious concern, given the absence of another guilty principal." Mot. 40.

Third, the government's arguments leading up to and at the February 17 charge conference about the § 2(a) instruction reinforced that § 2(a) liability did not apply. While (incorrectly)

---

[4] Goldstein's outside accounting firm, where his tax preparer (Walter Deyhle) and accountant (Ian Shuman) worked, was referred to during trial as "GRF" and "Gelman." This brief generally will refer to it as the "outside accounting firm" or "accounting firm."

advocating for the § 2(a) instruction, the government argued it had introduced "more than sufficient evidence to support an aiding and abetting instruction" because "[t]he evidence showed Mr. Goldstein ensnared numerous other people and companies in *his* tax and mortgage *crimes*." *See, e.g.*, Dkt. 416 at 121 (emphasis added). At the charge conference, the government elaborated: "We have testimony and evidence dating back to 2016 . . . that he was reporting his winnings *through his accountant*." Ex. 15 (excerpt), 2/17 Tr. 184:21-185:1 (emphasis added). "There's also been evidence that other people, including firm managers, *helped him* with these crimes. Again, I'm not saying that any of *the firm managers did anything illegal*." *Id.* at 185:8-10 (emphasis added). These statements underscored the government's view that Goldstein sometimes had used his innocent accountants and personal assistants[5] to commit his own crimes, and thereby reinforced that the government viewed him as the principal, not them.

While the government's argument at the time for § 2(a) was misplaced, the parties' disconnect was a matter of imprecise diction. Violations under § 2 are often labelled merely "aiding and abetting," but this catch-all collapses into one confusing term the two very different theories of liability under § 2(a) and (b).[6] Only an accomplice who assists a principal under § 2(a) can be accurately called an "aider and abettor"; a person who causes a third party's criminal act under § 2(b) cannot. *See Ruffin*, 613 F.2d at 416 ("There has been much confusion because of the indiscriminate application of the term aider and abettor to one against whom either Section 2(a) or

---

[5] Throughout the relevant time period, Goldstein's personal assistants generally also served as his law firm's "office manager" or "firm manager."

[6] Goldstein oscillates between using "accessory liability" to mean § 2(a) liability and § 2(b) liability. *Compare, e.g.*, Mot. 29 (calling § 2(a) instruction the "Accessory Instruction") and Mot. 31 (stating jury could convict based on "accessory liability" upon finding elements of § 2(a)), *with* Mot. 34 (arguing "no doubt" jury convicted on count 15 based on "accessory liability"). To the extent that Goldstein argues that the instructions improperly permitted conviction based on § 2(b), or that the Court failed to instruct the jury on the requisite elements, the government's response is the same: the instructions required the jury to find that Goldstein committed all elements of the charged offenses with the requisite state of mind.

15

Section 2(b) is invoked." (cleaned up)). This record makes clear that the Court properly omitted the § 2(a) instruction because it was unsupported by the evidence.

Goldstein's argument that the Court erred by failing to instruct on the elements of § 2(a) when it deleted the § 2(a) accessory instruction, Mot. 28-29, also relies on his flawed premise that quoting the indictment's reference to § 2(a) allowed the jury to convict based on it. But as explained above, the jury was never instructed that it could convict Goldstein based on § 2(a), so no § 2(a) instruction was necessary, and Goldstein's argument fails. Many cases start from the undisputed fact that the jury had to be instructed on the elements of a substantive offense because it was the charged *substantive* offense. *See, e.g.*, *Neder*, 527 U.S. at 12 (noting parties did not contest that omission of element of substantive offense from jury instruction was error); *Polowichak*, 783 F.2d at 415 (noting "[t]he parties do not dispute" that omitted specific intent *mens rea* was an "essential element" of the charged offense). Section 2 is not a freestanding substantive criminal offense, however, so it need not be instructed where it does not apply. *Cf. United States v. Ashley*, 606 F.3d 135, 143 (4th Cir. 2010) ("Because the aiding and abetting provision does not set forth an essential element of the offense with which the defendant is charged or itself create a separate offense, aiding and abetting liability need not be charged in an indictment."). Indeed, in many criminal cases, juries are not instructed on § 2 because it does not apply. Here, as Goldstein argued, § 2(a) did not apply, and the government did not argue that theory of liability to the jury. The Court therefore properly deleted the instruction. As a result, the Court did not commit any "error" by not instructing the jury on an element of § 2(a).

Finally, Goldstein is wrong that keeping the text of § 2(b) but omitting the § 2(a) accessory instruction improperly allowed the jury to convict under § 2(b). *See, e.g.*, Mot. 28. First, as

16

explained above, merely quoting § 2 did not authorize conviction under that statute, and the Court's other instructions effectively prohibited such a conviction.

Second, the deleted § 2(a) instruction did not even mention § 2(b), and had no relevance to it. The deleted instruction explained that "Mr. Goldstein has been charged both with the committing the underlying offenses and also aiding and abetting those crimes." Dkt. 487-2 at 77. It then stated the elements the jury had to find to find that Goldstein aided and abetted: that (1) "another person actually committed every element of the offense" with which he was charged, (2) he knowingly associated with the crime, and (3) he participated in the crime by doing some act to help make it succeed. *Id.* at 77-78. According to the deleted instruction, if the jury found all the elements beyond reasonable doubt, then Goldstein was "an aider and abettor, and therefore guilty of the offense." *Id.* at 78.

Goldstein claims the deleted instruction "permitted the jury to convict *only* on the basis of [§ 2(a)], *not* 'willfully causing' an offense" under § 2(b). Mot. 23 (emphasis in original). However, the instruction does not mention § 2(b)'s "willfully causing" language, let alone prohibit the jury from convicting based on Goldstein willfully causing another to commit a criminal act. *See* Dkt. 487-2 at 77-78. Because the words "aid[ing]" and "abet[ting]" are in § 2(a) but not § 2(b), no lay reader would infer that the instruction's discussion of "aiding and abetting" encompassed § 2(b). As a result, even if Goldstein were correct that quoting the § 2(b) *allegations* made causer liability a basis for conviction,[7] the deleted § 2(a) instruction would not have prevented the jury from convicting on that basis. This reinforces that removing the § 2(a) instruction did not affect whether the jury could convict based on § 2(b).

---

[7] Although Goldstein now argues that merely reciting the indictment's allegations permitted the jury to convict based on § 2(b), he never objected to the omission of an additional instruction explaining the requirements of § 2(b) liability.

c.      The Court did not need to instruct on § 2(b)

Just as the Court did not need to instruct the jury on the elements of § 2(a), it did not need to instruct the jury on the elements of §2(b). As with § 2(a), the instructions did not permit the jury to convict based on § 2(b). Although the government had intended to rely on § 2(b) where applicable and where the evidence supported it—with respect to making a false statement and venue for count 15—the government did not argue that theory to the jury.

**Count 15 did not rely on § 2(b) liability.** Count 15 was the only count for which the government ultimately intended to argue § 2(b), but the government dropped that effort and did not argue it to the jury. That charge was based on the second application, for a bridge loan, submitted to First Savings Mortgage ("FSM"). The government had planned to argue that Goldstein caused his wife to make the false statements on the application, sign it in his name, and submit it to FSM. But the government did not make this argument because the instructions did not permit the jury to convict based on § 2(b).

Indeed, on February 19, 2026, after closings but before the jury was charged, the government explained—in discussing the relationship between § 2(b) and venue for mortgage fraud—that this had been its underlying theory, not § 2(a) accessory liability. Ex. 17, 2/19 Tr. 12-13. However, the government also made clear that it did not realize *until after* closing arguments had begun that it had inadvertently proposed an instruction that had included only § 2(a). *See id.* at 11, 14 ("[I]f we had caught this earlier we . . . would have made sure that [the § 2] instruction was clear, [sic] included both parts."). Because closings had already occurred and the jury needed to be instructed, the government opted for the simplest route: removing the inapplicable § 2(a) instruction and forgoing the opportunity for the jury to apply and convict based on § 2(b). *See id.* at 13:17-19, 23:12-25.

18

Thus, although § 2(b) would have supplied a viable theory as to count 15, the jury instructions *as they existed at the time of closing* did not provide for causer liability (nor did the final instructions read to the jury). The government could not and did not argue to the jury that it should convict Goldstein because he caused his wife to make and transmit false statements to FSM from their home in Maryland. All the government could do is show Goldstein emailed links to the application to his wife and emphasize IP address data showing that the application was signed in his name and submitted from his Maryland home.

Specifically, the government argued in closing, "The records from First Savings show . . . that the IP address assigned to Mr. Goldstein and Ms. Howe's Maryland home was used to transmit their loan applications. They were submitted in Maryland." Ex. 16 (excerpt), 2/18 Tr. 89:17-19. The government reminded the jury about the "email that Mr. Goldstein sent to his wife," and continued, "five minutes later, while Mr. Goldstein was in the Virgin Islands, the loan"—at which point Goldstein objected. *Id.* at 89:18-21. During the sidebar, Goldstein reiterated that "the theory of causing an act on the mortgage applications for venue purposes is out" and the government responded, "I'm not talking about 'cause.' I haven't finished the argument . . . I think we're entirely consistent with what the Court ordered." *Id.* at 88:8-11, 88:19-24.[8] The government added, "[I]t was submitted from Maryland . . . [T]he jury can draw its own conclusion" about who submitted

---

[8] Goldstein misconstrues the government's remark, "while Mr. Goldstein was in the Virgin Islands," as a statement of literal truth. *See* Mot. 34. But that statement was part of a larger rhetorical drumbeat during the closing about Goldstein's incredible attempts to shirk responsibility for his actions—not a literal concession that he was abroad. *See, e.g.*, Ex. 16 (excerpt), 2/18 Tr. 53:14-16, 58:11-15 (stating, "And Mr. Goldstein testified that [his prior accountant] Mr. Caldwell didn't ask him enough questions about his gambling activity. Does that sound familiar?" to undermine Goldstein's claims that it was his subsequent accountants' "fault for not asking for [his] poker journals"); *see also* Mot. 46 (characterizing another portion of the government's closing as "sarcastic[]").

it. *Id.* at 89:4-7. When the closing resumed, the government "submit[ted]" to the jury that there was "substantial evidence that the application was . . . submitted from Maryland." *Id.* at 89:17-19.

Critically, the government *never* argued that the jury could convict Goldstein if it thought he was abroad and his wife made the false statement from Maryland, *never* mentioned "cause" to the jury in that context, and *never* mentioned or quoted § 2.[9] When Goldstein expressed concern that the government's closing might approach a "cause" theory, the government made clear it would not pursue such a theory, and continued arguing that he committed the crime in Maryland.

Indeed, there was ample evidence upon which the jury could conclude that Goldstein *himself* made the false statement and submitted the second application from Maryland. First, Goldstein's testimony made clear that he made the false statement. When asked on direct, "Do you recall where you were *when you signed* the second application on March 1?" Goldstein did not claim someone else had signed it; instead, he answered, "I was away from Maryland . . . I was in the islands." Ex. 14, 2/12 Tr. 121:10-14 (emphasis added). This answer effectively conceded that Goldstein signed the second application to FSM and that he made the false statement. *See also id.* at 188:19-21 (answering "Yep" when asked, "[Y]ou said you were in the islands *when you signed* the second one?" (emphasis added)). Second, the uncontroverted FSM DocMagic data showed that "Thomas Che Goldstein," with email address "TGoldstein@goldsteinrussell.com," used Goldstein's home internet in Maryland to open and complete the application during a few-minute period on March 1, 2021. *See* Ex. 19 (excerpt), GX9 at 16, 72-74; Ex. 6 (excerpt), 1/29 Tr. 147:3-148:23 (testimony showing second FSM application was completed from the IP Address assigned to Goldstein's home internet).

---

[9] Regardless, the Court ordered the jury to follow its instructions even if an attorney "stated a [different] legal principle," and instructed that closing argument "is not evidence"—which together ensured the jury *still* would disregard such an argument. *See* Ex. 17, 2/19 Tr. 33:18-21, 34:14-18.

20

Accordingly, under the Court's instruction on venue for counts 14-16, the jury was left to weigh competing evidence and decide whether the government proved by a preponderance that Goldstein "made the alleged false statement" from "within the District of Maryland." Ex. 17, 2/19 Tr. 82:22-83:2. On the one hand, Goldstein testified that he signed the second FSM application and the DocMagic data showed that it was signed and submitted from Maryland. On the other hand, Goldstein claimed that flight records showed he was in the Virgin Islands at the time. Ex. 14, 2/12 Tr. 226:6-227:3. The record indicates the jury closely examined this question. The jury requested testimony relevant to counts 14-16; the "government exhibits showing IP addresses showing location of mortgage application signature"; and the emails and "DocMagic exhibits relating to IP addresses." Dkt. 461 at 1, 5 (Jury Notes).

Ultimately, the jury convicted Goldstein on count 15. The jury's verdict means it accepted Goldstein's confession that *he* "signed the second application," and also that it credited the IP address data (showing the application was signed and submitted from Maryland) over Goldstein's claim that he was in the Virgin Islands. Goldstein's argument that "there can be no doubt that the jury" convicted him based on § 2(b), Mot. 34, fails to recognize both that the instructions precluded a conviction under § 2 and that *his own testimony*, combined with the DocMagic data, provided a strong basis for the jury to conclude that he made the false statement from Maryland.[10] While the government may have preferred a § 2(b) theory to support venue under count 15, it did not need

---

[10] Revealingly, Goldstein argues that the government's closing "stressed evidence that *would allow* the jury to convict on the basis of accessory liability." Mot. 34 (emphasis added). To be sure, the emails to his wife, combined with the DocMagic data and flight records, would support a conviction under § 2(b)—but the government was never able to argue that to the jury. And the fact that evidence *would* support such a theory does not mean it was the *only* theory that the evidence supported. Here, the evidence and instructions make clear that the jury convicted Goldstein under a much simpler theory: he was the principal, and committed the criminal act himself.

21

that theory and did not argue it to the jury. Instead, a preponderance of the evidence showed Goldstein himself made the false statement from Maryland.[11]

**The other counts did not rely on § 2(b) liability.** The government also did not rely on § 2(b) liability for any of the other counts. Contrary to Goldstein's claims, *see* Mot. 32-34, the involvement of third parties like his tax preparer, Walter Deyhle, and others in Goldstein's crimes does not mean the government was relying on § 2(b) liability.

To start, Goldstein conflates § 2(b) liability, where a defendant *causes* a third party to commit a criminal act, with instances in which a defendant commits a criminal act himself but happens to involve third parties. Under § 2(b), the term "cause" means "'a principal acting through an agent or one who procures or brings about the commission of a crime.'" *United States v. Levine*, 457 F.2d 1186, 1188 (10th Cir. 1972) (quoting *United States v. Inciso*, 292 F.2d 374, 378 (7th Cir. 1961)); *see Richeson*, 825 F.2d at 20 (stating § 2(b) seeks "to impose criminal liability on one who causes an intermediary to commit a criminal act"). Thus, § (2)(b) causer liability is necessary where someone other than the defendant commits the criminal act. For example, in *United States v. Rashwan*, 328 F.3d 160 (4th Cir. 2003), the Fourth Circuit considered § (2)(b) liability for a violation of 18 U.S.C. § 1028(a)(1), which made it a crime to "knowingly produce[] . . . a false identification document." 328 F.3d at 165. The *Rashwan* defendant caused an unwitting DMV clerk to physically "produce[]" a false driver's license and thereby commit the criminal act, and the defendant was liable under § 2(b) because he "caused" the clerk's act. *Id.*

---

[11] Even if Goldstein challenged the sufficiency of the evidence on count 15 (which he does not) it would fail. The question would be whether, viewing evidence in the light most favorable to the government, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Tipton*, 90 F.3d 861, 889 (4th Cir. 1996) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). As explained above, ample evidence showed Goldstein committed every element of count 15 in Maryland. Moreover the test is not how the jury was actually instructed but what a rational, properly instructed jury could have found. *See Musacchio v. United States*, 577 U.S. 237, 243 (2016). If the Court instructed on § 2(b) liability, then the government's case would be stronger because the jury could have found venue in Maryland regardless of whether Goldstein was in fact "in the islands" when he signed the application. Ex. 14, 2/12 Tr. 121:10-14.

In contrast, the statutes at issue here—aiding in the preparation of a false tax return (§ 7206(2)) and tax evasion (§ 7201)—directly criminalize causing a proscribed act and thus do not rely on § 2(b) to impose causer liability. Section 7206(2) makes it a crime to "[w]illfully aid[] or assist[] in, or procure[], counsel[], or advise[] the preparation or presentation . . . of a return, . . . which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return." Not only does the "assists" and "procures" language mirror the language in § 2(a), but the Fourth Circuit also has interpreted § 7206(2) to directly include "causer" liability: "the government must prove . . . '(1) the defendant aided, assisted, or otherwise *caused* the preparation and presentation of a return; (2) that the return was fraudulent or false as to a material matter; and (3) the act of the defendant was willful.'" *United States v. Aramony*, 88 F.3d 1369, 1382 (4th Cir. 1996) (emphasis added) (quoting *United States v. Salerno*, 902 F.2d 1429, 1432 (9th Cir.1990)). In effect, under § 7206(2), the criminal act is aiding or causing the preparation of a false return.

As a result, accessory and causer liability are built into § 7206(2). A defendant who causes a third party (such as his tax preparer) to unwittingly prepare a false tax return is guilty under § 7206(2) wholly independent of § 2. *See, e.g.*, *United States v. Head*, 697 F.2d 1200, 1208 n.13 (4th Cir. 1982) (noting court's dismissal of § 7206(2) charges on grounds that government failed to prove defendant actually prepared the returns "was clearly contrary to decisions by numerous circuits holding that § 7206(2) applies to individuals who are involved in the concealment of a taxable business interest, even if they do not actually prepare the tax return"); *United States v. Hooks*, 848 F.2d 785, 791 (7th Cir. 1988) ("One may be guilty of aiding the preparation or filing of a false tax return under § 7206(2) whether or not the tax preparer knew of such falsity or fraud."). Indeed, the Fourth Circuit has held that "procure" in § 7206(2) is "essentially synonymous" with

"the verb 'cause'" and, in fact, "appears . . . broader" than it. *United States v. Dean*, 64 F.3d 660 (4th Cir. 1995) (unpublished) (holding instruction that jury could convict defendant of § 7206(2) if he "caused the preparation" of a false return was not constructive amendment because it did not expand the possible bases of conviction).[12] Thus, the evidence that Goldstein caused his outside accounting firm to misclassify expenses or prepare false returns falls squarely within the ambit of § 7206(2), and he is incorrect that his convictions necessarily relied on § 2. *See* Mot. 32.

For similar reasons, Goldstein's complaint, Mot. 31, that the government "expressly stated" during closing argument "that [he] 'assisted in the preparation of false tax returns'" is misguided. The government made this statement because it reflects the language *of § 7206(2) itself*, not because, as Goldstein wrongly asserts, it is "the language used by Section 2." *See id.*

Goldstein similarly misapprehends, Mot. 32-33, the criminal act at the heart of tax evasion under § 7201, which likewise does not depend on § 2(b) to impose causer liability. Section 7201 holds liable "[a]ny person who willfully attempts in any manner to evade or defeat any tax . . . ." 26 U.S.C. § 7201. The statute therefore renders criminal any willful *attempt* to evade, including "any conduct, the likely effect of which would be to mislead or to conceal" when committed with a "tax-evasion motive." *Spies v. United States*, 317 U.S. 492, 499 (1943). Because it criminalizes any willful "attempt," § 7201 therefore includes any attempt that happens to involve an innocent third party as a conduit for the attempt, such as causing someone to unwittingly prepare or file a false return. *See United States v. McKee*, 506 F.3d 225, 233 (3d Cir. 2007) ("'The law does not

---

[12] Outside the tax context, other criminal statutes also include causer liability without relying on § 2. For example, the mail fraud statute, 18 U.S.C. § 1341, requires only "(1) the existence of a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme." *United States v. Murr*, 681 F.2d 246, 248 (4th Cir. 1982). It criminalizes not only when someone "places" something in the mail, but also when someone "knowingly *causes* [such a thing] to be delivered by mail." 18 U.S.C. § 1341 (emphasis added). Because § 1341 already criminalizes causing someone else to mail something, a defendant may be held liable for using an innocent third party under that statute on its own. *See, e.g.*, *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1404 (4th Cir. 1993) (holding—without relying on § 2—that use-of-mail element was "satisfied even though [the defendant] personally did not mail any of the invoices . . . because a mailing by [his] agent constitutes a mailing for the purposes of this statute").

require the defendant's own signature to sustain a conviction under § 7201: it merely requires sufficient circumstances . . . from which a reasonable jury could find that the defendant did authorize the filing of the return with his name subscribed to it.'") (quoting *United States v. Fawaz*, 881 F.2d 259, 265 (6th Cir. 1989)). Thus, Deyhle's unwitting filing of false 2016 tax returns for Goldstein and his law firm does not constitute a relevant criminal act under § 2. Instead, it represents how Goldstein himself attempted to evade taxes by *causing* Deyhle to prepare and file false returns, whether by providing Deyhle false information or by using his law firm's funds to pay personal gambling debts without telling Deyhle or Goldstein's personal assistant.[13] In a similar vein, Goldstein used Paul Phua to conceal his foreign income, *see* Mot. 33-34, but this is not the same as saying Phua himself committed a freestanding affirmative act of evasion, let alone that Goldstein aided and assisted such an act under § 2(a), or caused such a criminal act under § 2(b).

Nor does § 2 liability apply on the facts to Goldstein's willful failure to timely pay taxes in violation of § 7203. Goldstein did not pay on time. Regardless of his outside accounting firm's role in "formulat[ing] and execut[ing]" "a payment plan for his back taxes," Mot. 35, the taxes were owed by Goldstein himself. Therefore, another principal could not have committed the crime under § 2(a), and he did not cause another person to fail to pay the money, as necessary for § 2(b).

The mortgage fraud charges for the first FSM application (count 14) and the NFM Lending ("NFM") application (count 16), respectively, also did not rely on § 2. For count 14, the IP address information from the FSM loan application showed the false statements were made from Goldstein's home in Maryland, Ex. 18, GX8 at 849-50, and Goldstein himself testified, "I think I

---

[13] Goldstein also points to various omissions that the government highlighted to argue that this represented an "accessory-by-omission theory" that relied on § 2. Mot. 33. Some examples, such as diverting and failing to report income, *id.*, conflate the criminal act of a willful attempt that involves a third party with a third party themselves committing the criminal act. Other examples, such as Goldstein doing "nothing" to ensure money would be reported as income, *id.*, misconstrue evidence of willful blindness (discussed in the next section) as affirmative acts of evasion.

was in the DMV, but I don't know exactly where." Ex. 14, 2/12 Tr. 188:16-17. Together, this evidence positioned him as the principal who made the false statement. Similarly, for count 16, the NFM application included a notarized page stating it was signed in Maryland, and Maxwell Howell (a representative of the title company) testified that Goldstein signed the application at his office in Maryland. Ex. 20 (excerpt), GX10 at 15; Ex. 10 (excerpt), 2/5 Tr. 75:18-25, 82:21-83:8. While Goldstein testified that he signed the false NFM application at his house in Washington, D.C., he nonetheless acquiesced that he had signed it himself. Ex. 14, 2/12 Tr. 126:13-17. This evidence also positioned him as the principal who made the false statement, obviating the need for reliance on § 2.

Notably, the "essence of the crime" under § 1014 is the "communication of the false statements," so the crime occurs only when the fraudulent material is "communicated." *United States v. Mosby*, 143 F.4th 264, 280 (4th Cir. 2025) (internal quotations omitted). "Preparatory acts, such as preparing, filling out, or signing" a false mortgage application do not suffice for venue. *Id.* at 281. Instead, venue lies where the false statements were transmitted. *Id.* The evidence proved that Howell transmitted the application to NFM from Maryland via FedEx. Ex. 10 (excerpt), 2/5 Tr. 83:9-21. But Goldstein—not Howell—omitted his debts and signed the application, thereby "mak[ing]" the false statements. *See* 18 U.S.C. § 1014. As a result, venue for count 16 did not rely on § 2.[14]

Even if the Court were to conclude that the government's arguments to the jury improperly relied on § 2(b), any error was harmless. Section 2(b) liability is straightforward, and the statute

---

[14] This contrasts with a § 2(b) theory for count 15. There, under a § 2(b) theory in which Goldstein was in the Virgin Islands and emailed his wife the second FSM application, leading her to sign and submit it in his name, his wife would be the innocent principal because she committed the entire criminal act by making the false statement to NFM. She also would supply venue by doing so from his house in Maryland. Under that theory, one person commits both the criminal act and the transmittal for venue purposes. This differs from count 16, where Goldstein himself committed the criminal act and then Howell transmitted the loan application.

itself essentially defines the elements: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b). This requires only that a defendant (1) have the *mens rea* required by the substantive criminal statute and then (2) intentionally cause another to commit the criminal act. *See, e.g.*, *United States v. Gumbs*, 283 F.3d 128, 135 (3d Cir. 2002); *United States v. Gabriel*, 125 F.3d 89, 101 (2d Cir. 1997), *overruling on other ground recognized by United States v. Quattrone*, 441 F.3d 153, 176 (2d Cir. 2006).

The first element—requiring the *mens rea* of the substantive criminal offense—was required by the Court's instruction that "[t]he federal tax charges in this case, which are counts 1-13, require that the government prove Mr. Goldstein acted willfully," and that the mortgage fraud charges required the government to prove he acted "knowingly." Ex. 17, 2/19 Tr. 52, 56, 60, 65, 68, 72, 74, 80-81. The second element—intentionally causing another to commit a criminal act—is self-evident from the statute's text. The only technical term was "willfully," which requires only "*intentionally* caus[ing] another to commit the requisite act" for § 2(b) and (unlike tax crimes) does not require a voluntary and intentional violation of a known legal duty. *Gabriel*, 125 F.3d at 101 (collecting cases). The jury would not have known this, however, because the Court's instructions exclusively defined willfulness using that higher criminal tax standard. Ex. 17, 2/19 Tr. 52, 56, 60, 65, 68, 72, 74; *see also* Ex. 16 (excerpt), 2/18 Tr. 107 (Goldstein arguing in closing that willfulness "is the highest standard in our criminal law"). As a result, even if merely reading the text of § 2(b) had made it an available option for conviction—which it did not—a jury instructed on § 2(b)'s elements would have found them met.[15]

---

[15] The fact that reading § 2(b)'s text and defining willfulness would have sufficed is reinforced by the Ninth Circuit's pattern jury instruction on § 2(b), which does little more than quote the statute's text. *See* U.S. Court of Appeals for the Ninth Circuit, Model Criminal Jury Instruction 4.2, https://www.ce9.uscourts.gov/jury-instructions/node/852.

And any error was harmless because the outcome of the trial would have remained the same. The government adduced ample evidence that Goldstein knew the statements on his mortgage applications were false and intended to make those statements or cause another person to make or transmit them, and that these false statements all were communicated from Maryland to the mortgage lending businesses. *See, e.g.*, Ex. 6 (excerpt), 1/29 Tr. 35 (reading stipulation that summarized email in which Goldstein said he owed "more than $16 million privately"); Ex. 10 (excerpt), 2/5 Tr. 15-16 (reading stipulation stating Goldstein told an acquaintance that he "understated his debts, especially the multiple millions of dollars that he still owed to Resnick" on his mortgage applications); Ex. 6 (excerpt), 1/29 Tr. 141-42, 146-48 (SA Nguyen testimony regarding Verizon record showing applications at issue in counts 14-15 were transmitted from Goldstein's house); Ex. 20 (excerpt), GX10 at 15 (stating, on notarized page, that NFM application was signed in Montgomery County, Maryland); Ex. 10 (excerpt), 2/5 Tr. 75:18-25, 83:9-21 (Howell testimony that Goldstein signed the application at issue in count 16 at Howell's office in Maryland and then Howell would have sent the application package to NFM).

With a § 2(b) instruction, the jury would have had an even easier route to convict on count 15—especially because Goldstein's primary defense was venue, which requires only a preponderance of the evidence. And adding a § 2(b) instruction would not have changed the other counts of conviction. The evidence showed Goldstein himself committed the criminal acts proscribed by the other charged statutes—including § 7201 and § 7206(2), which, as explained, directly impose liability for causing others' actions—and thus was guilty as principal, the very basis on which the jury already convicted him. The outcome of the trial, therefore, would be the same even if the jury was instructed on § 2(b). The omission also does not "seriously affect" the

28

fairness, integrity, or reputation of the proceedings, so reversal still would not be warranted under the final step of plain error review. *See Odum*, 65 F.4th at 721.

### C.      Deleting An Inapplicable § 2(a) Instruction Did Not Prejudice Goldstein

Technical noncompliance with Rule 30(b) warrants reversal only if a defendant can show actual prejudice, which Goldstein cannot. While the § 2(a) instruction was deleted after closing arguments, that deletion narrowed, rather than expanded, the scope of liability. And Goldstein's closing would have been the same—as evidenced by his choice not to request additional argument after the Court removed the § 2(a) instruction. There is no actual prejudice and no reversible error.

Rule 30(b) of the Federal Rules of Criminal Procedure requires that a trial court "inform the parties before closing arguments how it intends to rule on the requested [jury] instructions." Fed. R. Crim. P. 30(b). Rule 30(b) serves two purposes. First, by "inform[ing] trial lawyers in a fair way what the instructions are going to be," the rule "allow[s] counsel the opportunity to argue the case intelligently to the jury." *United States v. Horton*, 921 F.2d 540, 547 (4th Cir. 1990) (internal quotation marks omitted). Second, by informing counsel of instructions prior to closing argument, Rule 30(b) allows counsel to lodge objections to preserve errors for appeal and "aid the court in giving a proper charge in the first instance." *United States v. Clarke*, 842 F.3d 288, 294 (4th Cir. 2016) (quoting *United States v. Guadalupe*, 979 F.2d 790, 794 (10th Cir. 1992)). "A violation of Rule 30 requires reversal only when the defendant can show actual prejudice." *Horton*, 921 F.2d at 547. Actual prejudice occurs where a violation "inhibits [a d]efendant's counsel from making his 'essential' argument to the jury." *Clarke*, 842 F.3d at 295; *see Horton*, 921 F.2d at 547.

Fourth Circuit precedent demonstrates that the deletion inflicted no prejudice on Goldstein. In *Clarke*, the district court "refus[ed] to provide its instructions to counsel before closing arguments," "plac[ing] Defendant's counsel in the difficult position of having to argue to the jury without knowing how the court would ultimately instruct the jury," and "depriv[ing] the parties of

29

the opportunity to lodge objections to the proposed instructions and thereby give the court the opportunity to correct any errors before instructing the jury." 842 F.3d at 295. The Fourth Circuit nonetheless concluded that there was no actual prejudice because "counsel was able to make 'all arguments essential to his case,' because those arguments reflected the instructions ultimately provided by the court, and because the government introduced sufficient evidence to convict Defendant under the correct legal standard." *Id.* at 296. Similarly, in *Horton*, the Fourth Circuit court found no prejudice because "all points essential to the defendant's case were made in the initial closing argument" and "advance notice of the aiding and abetting instruction would not have altered the tenor or substance of defendant's initial closing." 921 F.2d at 547.

As in *Clarke* and *Horton*, Goldstein's counsel was able to make all essential points in his closing argument, and advance notice that the § 2(a) instruction would be deleted after his closing would not have altered the substance of his closing.

First, as explained above, Goldstein opposed the § 2(a) instruction up until the time the government requested it be removed. In opposing the instruction, he consistently argued it should not be given because there was "no evidence" from which a jury could find he aided a principal under § 2(a). *See* Part I.B.2.b, *supra*. Indeed, Goldstein drafted and submitted his "defense theory of the case" instruction with the knowledge that "accessory liability was not a serious concern, given the absence of another guilty principal." Mot. 40. Goldstein could not have been prejudiced by the removal of an instruction that he argued should not be given and that, if it was given, posed no threat because there was no evidence for "another guilty principal."

Second, Goldstein's closing would have remained identical regardless of the § 2(a) instruction's inclusion or removal. Despite believing the instruction would be included, Goldstein's counsel never mentioned § 2 or accessory liability during his two-hour closing. *See*

2/19 Tr. 96-182. Nor did he include it in his closing slides shown to the jury (despite highlighting the language of multiple other instructions). This is consistent with his argument that the instruction was inapplicable. If the instruction had mattered, he would have argued that the evidence did not show Goldstein aided and abetted a principal. His choice not to do so reinforces that including the instruction did not impact his closing or otherwise prejudice Goldstein. Instead, Goldstein's closing focused on claiming innocence, disputing willfulness, denying that he owed taxes for 2016 or lied to IRS representatives, his purported venue defense, and deflecting blame onto others. *See id.*

Third, this is not a situation in which the Court *added* an instruction and *expanded* liability. Rather, Court *removed* an instruction and *narrowed* the scope of liability. Even if the Court had indicated it would not give the § 2(a) instruction before closings, Goldstein still would not have discussed § 2(a) or applied it to the facts because it would not have been an avenue for the jury to convict (and ultimately it was not). Thus, this case is a far cry from *United States v. Gaskins*, on which Goldstein relies. 849 F.2d 454 (9th Cir. 1988). There, the district gave a supplemental instruction *after closing arguments* that the jury could convict based on § 2(a), but defense counsel never had an opportunity to argue against this theory of liability. *Id.* at 457, 459-60.

Fourth, the deletion did not alter the other bases for Goldstein's criminal culpability. As explained above, the Court properly instructed on the essential elements of every substantive criminal offense for which Goldstein was charged. Deleting the § 2(a) instruction did not change those elements or the calculus for addressing them. As a result, Goldstein was able to make "all arguments essential to his case" and "those arguments reflected the instructions ultimately provided by the court." *Clarke*, 842 F.3d at 296.

Fifth, Goldstein's purported surprise at the government's § 2(b) theory of liability on count 15 also does not amount to prejudice under Rule 30. The claim that he was not aware the government held § 2(b) as a theory is belied by the fact that the preliminary (to which Goldstein agreed) and final instructions quoted § 2(b) in summarizing the indictment's allegations. Ex. 1 (excerpt), 1/15 Tr. 19:23-20:5, 26:1-8, 30:3-11; Dkt. 416 at 60, 88, 121.

The government's arguments on February 17, 2026—which Goldstein's motion quotes— further reinforced that the government's theory of prosecution encompassed § 2(b). Mot. 30. The government argued that the aiding and abetting language was appropriate because Goldstein had worked with his personal assistants and outside accounting firm, but the government also *explicitly disclaimed* that those individuals committed crimes—as would be required in a case based solely on § 2(a). Ex. 15 (excerpt), 2/17 Tr. 185:2-12 ("I'm not saying that any of the [personal assistants] did anything illegal. Much the opposite, I think they were more like the victims here" and "whether or not the government's position is that [the outside accounting firm] erred in a criminal manner . . . there is evidence [Goldstein worked] with the accountants throughout the relevant time period").

Even if he were unaware until after his closing that the government's primary theory of liability on count 15 was § 2(b), however, Rule 30 does not entitle a defendant to knowledge of the government's theories of liability—only to notice about *the Court*'s intended rulings on jury instructions. *See* Fed. R. Crim. P. 30(b) ("The court must inform the parties before closing arguments how it intends to rule on the requested instructions."). In any event, because the Court never gave a § 2(b) instruction, it could not serve as a basis for conviction and the government could not argue it at closing. Goldstein could not suffer prejudice under Rule 30(b) from not knowing a theory of liability that was not argued to the jury and was not available for it to convict.

This lack of prejudice is further underscored by the fact that even though the omitted § 2(a) instruction did nothing to preclude § 2(b), Goldstein never sought a § 2(b) instruction.

Finally, Goldstein's decision not to request time for additional argument to the jury even after he purportedly learned about the government's theory on count 15, and after the Court had ruled that it would delete the § 2(a) instruction, proves there was no prejudice. *Cf. Horton*, 921 F.2d at 547 (noting that when "a new theory is presented to the jury in a supplemental instruction after closing argument, the court generally should give counsel time for additional argument").

*    *    *

In sum, the Court did not error by deleting an inapplicable instruction on § 2(a) accessory liability, and Goldstein was not prejudiced by any technical noncompliance with Rule 30. His argument about the deleted instruction requires believing every step of his logic: that the jury was instructed that it could convict under § 2; that the Court improperly deleted a § 2(a) instruction; and that the jury nonetheless relied on § 2 to convict him on every count. But his argument fails at each step: three short sentences quoting § 2 in the context of the indictment's allegations did not authorize the jury to convict under that section (instead, the instructions made clear the jury had to find Goldstein himself committed each element of every substantive criminal offense); the Court properly deleted an inapplicable § 2(a) instruction; and the jury never relied on § 2(a) for any counts. Meanwhile, Goldstein's closing never even mentioned § 2, and he cannot demonstrate any prejudice, let alone actual prejudice as required for reversal under Rule 30.

Goldstein's attempts to conjure a retrial on every count make a mountain out of a molehill: the proper deletion of a jury instruction that he previously argued should not be given. At most, if the jury was instructed on § 2(b), it could have supplied an additional basis for conviction on one charge, count 15. But that basis was not available to the jury. The jury followed the instructions,

33

weighed the evidence, and relied on Goldstein's own testimony to conclude he committed the crime himself from Maryland. The Court did not err, and Goldstein suffered no prejudice.

## II. THE COURT APPROPRIATELY INSTRUCTED THE JURY ON WILLFUL BLINDNESS

Goldstein asks for a new trial based on the Court's decision to instruct the jury on willful blindness. But giving that instruction was well within the Court's discretion, and any error was harmless.

### A. The Evidence Supported The Willful Blindness Instruction

Whether to give a willful blindness instruction is committed to the Court's discretion. *See United States v. Jinwright*, 683 F.3d 471, 478 (4th Cir. 2012). The instruction is appropriate where "a defendant undertook an active and deliberate effort to avoid imbuing himself with the knowledge that would support a criminal conviction." *Id.* "To allow the most clever, inventive, and sophisticated wrongdoers to hide behind a constant and conscious purpose of avoiding knowledge of criminal misconduct would be an injustice in its own right." *Id.* "[D]efendants who behave in this manner are just as culpable as those who have actual knowledge." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).

In criminal tax cases, the jury's willfulness determination requires evaluating whether the defendant intentionally violated a *known* legal duty. *Jinwright*, 683 F.3d at 478 (emphasis added) (quoting *United States v. Pomponio*, 429 U.S. 10, 12 (1976)). "[T]he doctrine of willful blindness permits the government to prove knowledge by establishing that the defendant deliberately shielded himself from clear evidence of critical facts that are strongly suggested by the circumstances." *Jinwright*, 683 F.3d at 478-479 (quoting *Glob.-Tech*, 563 U.S. at 766). "Willful blindness may satisfy knowledge in a criminal tax prosecution, where 'the evidence supports an inference that a defendant was subjectively aware of a high probability of the existence [of a fact],

and purposefully avoided learning the facts pointing to such liability.'" *Id.* (quoting *United States v. Poole*, 640 F.3d 114, 122 (4th Cir. 2011)).

*Jinwright* lays out how to apply these principles in a tax case. 683 F.3d 471. In *Jinwright*, the defendant "denied knowledge of his legal obligations," but the government presented evidence that the defendant (and his wife, a co-defendant) knew there was a "high probability" that they were understating income because of the mismatch between their bank deposits and reported income. *See id.* at 478. And there was evidence that the defendants "purposely avoided learning the fact of their liability" because they never raised any of their "alleged confusion" about the tax treatment of certain items with their accountant. *Id.* at 479. Accordingly, the Fourth Circuit found that the willful blindness instruction was appropriate. *Id.*

The facts here track *Jinwright*. As in *Jinwright*, Goldstein largely denied knowledge of central facts such as his duty to report gambling income and his tax liability. Also as in *Jinwright*, the government introduced evidence tending to show that Goldstein was aware of a high probability that those facts existed. *See id.* at 478-479. And finally, as in *Jinwright*, there was evidence that Goldstein purposefully avoided learning those facts. *See id.*

A few non-exhaustive examples[16] demonstrate this case's similarity to *Jinwright* and the appropriateness of the Court's willful blindness instruction:

**(1)** Goldstein denied knowing various relevant tax rules concerning gambling. *See, e.g.*, Ex. 13 (excerpt), 2/11 Tr. 109:12-16, 243:10-21. However, Goldstein previously was audited by the IRS concerning gambling (Ex. 14, 2/12 Tr. 162:6-15); advised a fellow high-stakes poker player on handling tax issues related to gambling (Ex. 1 (excerpt), 1/15 Tr. 203:20-204:11); and chose not to hire an accountant or tax preparer specializing in gambling (Ex. 14, 2/12 Tr. 163:16-164:3).

---

[16] These examples incorporate certain categories of misconduct identified in Goldstein's brief. Mot. 42-53. But Goldstein cites no authority requiring the Court to analyze the willful blindness instruction by category. In *United States v. Ravenell*, the willful blindness instruction was limited to one count, but that was simply the government's proposed wording, and was not ordered by the district court or Fourth Circuit. 66 F.4th 472, 479 (4th Cir. 2023).

**(2)** Goldstein denied knowing that he underreported his gambling income in 2016. Ex. 13 (excerpt), 2/11 Tr. 268:18-269:8. However, Goldstein failed to provide Deyhle with the very information necessary to determine his gambling income including multiple gambling ledgers and contemporaneous text messages in which Goldstein calculated that he won approximately $50 million playing poker in 2016.

**(3)** Goldstein denied knowing that poker-related payments from his law firm's bank account would be deducted as business expenses. Ex. 14, 2/12 Tr. 72:20-73:18. However, Goldstein was notified by his personal assistant that certain of the 2016 payments would be improperly deducted (*id.* 92:22-94:1), and apparently chose not to reply to the email—much less figure out why this had happened.

**(4)** Goldstein denied knowing about his duty to report cryptocurrency activity on his 2020-2021 tax returns. Ex. 14, 2/12 Tr. 57:10-24. However, Goldstein was notified by his outside accounting firm cryptocurrency use could have tax consequences (*see* Ex. 36, GX490 at 3-4, Ex. 29, GX118 at 2-3); and that the cryptocurrency question was on the very first page of the tax returns (*see* Ex. 23 (excerpt), GX58 at 1; Ex. 24 (excerpt), GX59 at 1).

**(5)** Goldstein denied knowing that the outside accounting firm failed to report income that he diverted to third parties or to his personal Wells Fargo account. Ex. 14, 2/12 Tr. 39:3-20. However, Goldstein knew that he needed to tell the outside accounting firm about income if Goldstein was the only person who was aware of it, and that Goldstein did not give his accounting firm (or his personal assistants) access[17] to the accounts receiving the payments. Ex. 14, 2/12 Tr. 38:8-39:2; Ex. 44, DX290.

These examples are more than sufficient to justify the Court's decision to give the willful blindness instruction because they "support[] an inference that [Goldstein] was subjectively aware of a high probability of the existence [of relevant facts], and purposefully avoided learning" them. *See Jinwright*, 683 F.3d at 478-479 (cleaned up).

The instruction is arguably more appropriate here than in *Jinwright* because Goldstein was an exceptionally intelligent and capable attorney who was able to research legal issues *when he wanted to*. For example, Goldstein "had done some research himself about how to legally bring cash into the country" before carrying approximately $1 million through Dulles Airport in 2018. Ex. 9 (excerpt), 2/4 Tr. 241:8-25. Relatedly, when it benefited his defense at trial, Goldstein

---

[17] Goldstein emphasizes that his personal assistants "were aware of" his Wells Fargo account. Dkt. 487 at 46-47. But he ignores that they were never given *access to* or *records of* the account.

presented himself as an expert on arcane tax-related issues including whether the government of Malaysia was required to issue Forms 1099 to Goldstein. Ex. 14, 2/12 Tr. 37:1-39:20. He also walked the jury through a calculation of his gambling income in 2016, before concluding under oath that he "wildly overpaid his taxes" that year. Ex. 13 (excerpt), 2/11 Tr. 140:15-236:19, 268:25-269:5. Goldstein had the legal acumen to answer his own questions, whatever they may have been. And if Goldstein was too busy to do it himself, he could have tasked his "very talented" employees with researching and answering his questions. *See* Ex. 2 (excerpt), 1/20 Tr. 101:8-16. Goldstein's selective curiosity confirms the Court made the right decision, and certainly did not abuse its discretion, in giving the willful blindness instruction.

### B.      Any Error Was Harmless

Any error in giving the instruction would be harmless for two reasons. First, there was ample evidence that Goldstein had actual knowledge despite his claimed ignorance. Second, the jury was properly instructed regarding the test for willful blindness; so if Goldstein were correct that there was no evidence of willful blindness, the jury would conclude that the relevant standard was not satisfied, and would not convict him on that basis.

As the Fourth Circuit has held, "any error in giving a willful blindness instruction is harmless where there is sufficient evidence in the record of actual knowledge on the defendant's part." *Ravenell*, 66 F.4th at 491 (internal quotation marks omitted). Here, there was sufficient evidence in the record that Goldstein *actually knew* the facts of which he claimed ignorance. As the bulleted list in Part II.A, *supra*, illustrates, there was myriad evidence—including sworn testimony and contemporaneous documents—proving that Goldstein actually knew each fact of which he claimed ignorance. Indeed, much of the evidence proving Goldstein at least had a "high probability" of knowledge also established his actual knowledge. *See United States v. Ebert,* 178

37

F.3d 1287, *23, n.10 (4th Cir. 1999) (table op.) (noting that "evidence of deliberate ignorance can also be circumstantial evidence of a defendant's actual knowledge").

For example, Goldstein's personal assistant sent him a spreadsheet in 2016 indicating that various poker-related payments from the law firm's bank account would be improperly deducted as business expenses. Ex. 14, 2/12 Tr. 92:22-94:1. The jury reasonably could have concluded that Goldstein deliberately ignored the information on the spreadsheet, but could also have concluded that he read and understood the spreadsheet and knew the payments would be improperly deducted. Even assuming there was insufficient evidence of the former (willful blindness), there was sufficient evidence of the latter (actual knowledge). *See United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017) (holding communications involving defendant—"even though [he] did not always respond"—corroborated his actual knowledge and also showed willful blindness). Further, if the jury did not believe Goldstein's testimony that he was unaware of these facts, it could consider that as additional evidence of guilt. *United States v. Burgos*, 94 F.3d 849, 868 (4th Cir. 1996) (en banc) ("A defendant's credibility is a material consideration in establishing guilt, and if a defendant 'take[s] the stand . . . and denies the charges and the jury thinks he's a liar, this becomes evidence of guilt to add to the other evidence.'") (quoting *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir. 1991), *aff'd*, 506 U.S. 534, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993)).

Second, because the Court's willful blindness instruction was proper, even if the evidence of willful blindness were lacking, the jury would simply reject the theory, rendering any error harmless. In *United States v. Lighty*, the Fourth Circuit found that a willful blindness instruction was inappropriate[18] but that the error was harmless. 616 F.3d 321, 378–80 (4th Cir. 2010). *Lighty*

---

[18] Goldstein cites *Lighty*'s holding that the instruction was erroneous, but omits the Fourth Circuit's conclusion that the error was harmless. Dkt. 487 at 41. On the former issue, *Lighty* is distinguishable. Here, unlike in *Lighty*, there was substantial evidence supporting a willful blindness theory, and the government actively pursued that theory. 616

relied on *United States v. Mari*, 47 F.3d 782 (6th Cir. 1995), which held that giving "a willful blindness instruction that is not supported by the record but that contains the proper legal standard is harmless as a matter of law because the jury 'will consider the theory, and then dismiss it for what it is—mere surplusage, a theory of scienter that is insufficient to support the conviction.'" *Lighty*, 616 F.3d at 379 (quoting *Mari*, 47 F.3d at 785-86).

Here, the language of the willful blindness instruction was correct, and Goldstein does not argue otherwise. *See, e.g.*, Mot. 55 (arguing only that there was "no evidentiary basis"). Nor could he. This Court's instruction included the "'two basic requirements'": a "'high probability'" of awareness coupled with "'deliberate actions to avoid learning of the'" fact. *Jinwright*, 683 F.3d at 480 (quoting *Global-Tech*, 563 U.S. at 769); Ex. 17, 2/19 Tr. 84:3-8 (willful blindness instruction with nearly identical language). Additionally, the instruction did not permit the jury to convict Goldstein "for his mere negligence or recklessness with respect to a key fact making his conduct illegal." *United States v. Hale*, 857 F.3d 158, 168 (4th Cir. 2017) (affirming willful blindness instruction). The jury was repeatedly instructed that to establish willfulness, the government had the burden to prove Goldstein intentionally violated a *known* legal duty.[19] *See Jinwright*, 683 F.3d at 478. And the Court's willful blindness instruction explicitly, and at great length, "caution[ed]" the jury *not* to decide based on what Goldstein "should have known" or what "he was reckless or foolish in failing to recognize what was occurring." Ex. 17, 2/19 Tr. 83:21-84:2. There was no "risk that the instruction could mislead a jury into believing that it could convict" based on "mere negligence or recklessness." *Hale*, 857 F.3d at 168.

---

F.3d at 378. Further, unlike the defendant in *Lighty*, Goldstein's defense *was* "premised on the notion that [he] was unaware of what was transpiring around him." *Id.*

[19] Ex. 1, 1/15 Tr. 20:6-15 (prelim. instruction on tax evasion), 24:9-16 (prelim. instruction on false returns), 26:9-17 (prelim. instruction on failure to pay), 26:18-23 (prelim. instruction defining willfulness); Ex. 17, 2/19 Tr. 52:23-53:17 (final instruction defining willfulness), 56:18-25 (final instruction on tax evasion), 60:13-20 (same), 65:7-14 (final instruction on false returns), 68:14-20 (same), 72:9-17 (final instruction on failure to pay), 74:4-10 (same).

The jury was properly instructed. And jurors are presumed to follow the instructions. *See United States v. Ortiz-Orellana*, 90 F.4th 689, 699 (4th Cir. 2024). Thus, the jury was given the correct test to determine if Goldstein was willfully blind. Even if he were correct that the evidence of willful blindness was lacking (one any or all counts), a properly instructed jury would apply the test and reject willful blindness. And so, any error was harmless. *See Lighty*, 616 F.3d at 379.

In sum, this is precisely the type of case that calls for a willful blindness instruction, and the Court did not abuse its discretion in giving one. There should be no new trial.

## III.    THE COURT APPROPRIATELY EXCLUDED VARIOUS TEXT MESSAGES AND IMAGES AS HEARSAY

The Court properly excluded as hearsay a series of text messages between Goldstein and two individuals overseas and a gambling ledger that one of those individuals purportedly maintained. The record clearly shows that Goldstein wanted to use (and ultimately did use) the messages and ledger to prove the truth of matters asserted in the documents. Regardless, any error in excluding the evidence was harmless because, among other reasons, Goldstein was still allowed to extensively rely on, reference, and characterize the excluded evidence during the trial.

### A.    The Court Properly Excluded The Messages And Images

Out-of-court statements offered to prove the truth of the matter asserted are hearsay, and inadmissible unless an exception applies. Fed. R. Evid. 801-802. Here, the Court correctly concluded that the proffered evidence was hearsay to which no exception applied, and therefore excluded it.

First, the excluded evidence does not support the proposition for which they were purportedly offered. Goldstein's motion argues that the records were "critical evidence that [he] had a good faith belief that he did not underreport his 2016 gambling winnings," and "showed his state of mind regarding the Chairman, Gores, and Tango winnings." Mot. 56. According to

Goldstein, the excluded records "[t]aken together" "established that [he] did not underreport his gambling income in 2016—if anything, he *overreported*[.]" *Id.* (emphasis in original).

But that is completely inconsistent with Goldstein's own contemporaneous communications and trial testimony. In October 2017, while working on his 2016 tax return, Goldstein told Deyhle via email that he won $27.1 million, and had losses or staking payments of $24.4 million—and that his net gambling winnings were $2.7 million. Ex. 45, DX317 at 1-2; Ex. 30, GX148 at 2. In other words, *Goldstein told Deyhle that he was a net winner in 2016*. And at trial, Goldstein repeatedly affirmed that he believed in good faith that the numbers he gave Deyhle were accurate.[20] According to Goldstein, he did not learn until the trial—almost a decade later— that he actually was a net loser in 2016, and had "wildly overpaid" his taxes as a result.[21]

Putting aside that story's implausibility,[22] it illustrates that his justification for introducing the excluded evidence was pretext. If the excluded evidence shows that he was a *net loser* in 2016 (as Goldstein asserts), it could not corroborate a good faith belief that he was at the same time a *net winner* (as he told Deyhle). And this was not a question of whether Goldstein won or lost "$5 on a scratch-off lottery ticket" (Ex. 14, 2/12 Tr. 10:13-11:1); it was a massive discrepancy. He told Deyhle that his *net winnings were $2.7 million* (Ex. 45, DX317 at 1-2; Ex. 30, GX148 at 2), and told the jury (after "refreshing" himself on the excluded evidence) that his *net losses were $2.7 million* (Ex. 13 (excerpt), 2/11 Tr. 174:19-22). If Goldstein were contemporaneously relying on the excluded evidence in good faith, he would never have told Deyhle that he was a net winner. He would have told Deyhle what Goldstein now says is the truth: that he was a net loser.

---

[20] Ex. 13 (excerpt), 2/11 Tr. 268:20-21, 270:4-7, 140:8-9.

[21] Ex. 13 (excerpt), 2/11 Tr. 135:16-20, 140:15-236:19, 268:25-269:5.

[22] Goldstein had concrete economic incentives to figure this out earlier (if it were true) including because his tax liability for 2016 would have been significantly lower if he were a net loser in poker.

This fundamental flaw applies to every record that Goldstein argues was improperly excluded. Goldstein says DX737.1, DX737.2, DX737.3, and DX737.7 showed that Goldstein did not win as much from Chairman in 2016 as the government alleged, and that he lost millions of dollars in unspecified gambling abroad in 2016. Mot. 60-61. He argues that DX737.4[23] and DX737.5 showed that that he did not win as much from Alec Gores in 2016 as the government alleged, and relatedly that Phua had a substantial share of Goldstein in those matches against Gores. Mot. 62-63. And Goldstein argues that DX-737.8, DX-737.9, DX-737.10, DX-737.13, and DX-737.14 shows that although he beat Tango for millions in December 2016, Goldstein was not paid until 2017. Mot. 63. The common thread is Goldstein's argument that he won less, and lost more, in 2016 than the government alleged—and that he ultimately was a net loser in 2016. That argument cannot be squared with Goldstein's sworn testimony that he believed in good faith that what he told Deyhle (that he was a net winner) was accurate.

Second, it was clear that Goldstein wanted to introduce the records to prove the truth of facts asserted therein, and specifically to prove that he, in fact, lost money gambling in 2016. Goldstein's direct examination illustrates as much. Goldstein's attorney repeatedly asked what he, in fact, won or lost against Chairman, Gores, and Tango (or, relatedly, what share Phua actually had in those matches):

> Q. Is there anything that would refresh your recollection about *the exact number that you lost to Chairman* in the early spring 2016 games? Ex. 13 (excerpt), 2/11 Tr. 145:9-11.

---

[23] The Court *did* allow Goldstein to introduce a portion of DX737.4 on redirect because it contained a prior consistent statement that was not hearsay. That is further confirmation that the Court carefully considered the applicable rules and arguments and appropriately exercised its discretion in excluding the at-issue messages and images.

42

Q. Do you have a specific recollection of *exactly what Mr. Phua's share of [the] Gores [matches] was*? *Id.* 160:5-6.

Q. As you sit here today, do you have a specific recollection of *Paul Phua's share from the Tango winnings*? *Id.* 247:17-18.

Each time, Goldstein denied remembering the exact numbers, or deferred to the excluded evidence, and his attorney prompted him to refresh his recollection by reading the excluded evidence. *See* Ex. 13 (excerpt), 2/11 Tr. 145:12-146:9, 160:7-161:4, 247:19-248:15. Then, Goldstein told the jury what the excluded evidence said. *See id.* 146:10-18, 161:5-13, 248:16-249:2. Goldstein and his attorney thus effectively admitted the substance of the evidence despite the Court's decision to exclude it.

This carried into Goldstein's closing argument. His attorney made repeated references to the excluded hearsay that Goldstein testified to verbatim after refreshing his recollection. Ex. 16 (excerpt), 2/18 Tr. 124:20-22 ("Mr. Goldstein testified to all of these numbers after using the documents from the time period to refresh his recollection), 130:23-25 (similar), 133:10-13 (similar). The attorney even told the jury that "[t]he *only evidence* you have on those numbers is Mr. Goldstein's testimony, which he gave you refreshing his recollection with documents from the time period." *Id.* 141:8-13 (emphasis added). That claim was false because the government had introduced Goldstein's own contemporaneous documents substantiating what he won and lost in 2016. But more to the point, these arguments belie any notion that Goldstein genuinely sought to introduce the excluded evidence to show his state of mind or the effect on the listener. He wanted to argue that the evidence showed he was in fact a net loser in 2016 and therefore he overpaid his taxes.

The Court rightly excluded these out-of-court statements, which were hearsay to which no exception applied.

43

## B.    Any Error Was Harmless

"Of course, a finding of error [would] not end the matter." *United States v. Ibisevic*, 675 F.3d 342, 350 (4th Cir. 2012). The Court would still need to "determine whether the error requires reversal or was harmless." *Id.* If the error "did not have a substantial or injurious effect or influence [on] the jury's verdict," it is harmless. *See id.* (quotations omitted). In other words, an error is harmless if the Court can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* (quotations omitted).

The Fourth Circuit applies a three-factor test in evaluating whether the exclusion of evidence was harmless error. The factors are "(1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case." *Id.* (quotations omitted). Goldstein's brief does not cite or analyze these factors, likely because they confirm that any error here was harmless.

The first factor—the centrality of the issue affected by the error—weighs in favor of denying the motion. The subject of the excluded evidence—Goldstein's wins and losses in 2016— was relevant to count 1. There were 15 other counts that did not require the jury to analyze Goldstein's wins and losses in 2016, and to which the excluded evidence would be wholly irrelevant. And on count 1, Goldstein would have been convicted even if the evidence were admitted and the jury believed he was a net loser in 2016. That is because Goldstein's evasion involved not only failing to report poker winnings, but also taking false deductions for poker-related payments he sent from his law firm's bank account. In 2016, Goldstein illicitly deducted over $1 million in poker-related payments as business expenses—saving himself almost $500,000 in taxes. Ex. 22, GX48 at 2; Ex. 11 (excerpt), 2/9 Tr. 175:4-176:8. Goldstein thus would have a substantial tax deficiency for 2016 even if he was a net loser at poker. And the government,

44

as explained below, proved multiple affirmative acts of evasion for 2016 including Goldstein's lies to IRS representatives in 2018 and 2020, which are fairly characterized as attempts to conceal the full spectrum of Goldstein's tax-related misconduct in 2016 including the false deductions. The elements of tax evasion would be satisfied regardless of whether the evidence was admitted.

The second factor—steps taken to mitigate the effects of the error—also weighs in favor of denying the motion. Here, Goldstein requested and the Court gave a curative instruction about the Phua ledger, which is part of the excluded evidence. Ex. 17, 2/19 Tr. 85:16-24. That instruction ordered the jury "not to speculate about why the ledger was not admitted into evidence, and further barred the jury from "infer[ring] that . . . the fact that the ledger was not admitted into evidence supports the government's contention that Mr. Goldstein underreported his 2016 gambling winnings." *Id.* 85:16-24. Curative instructions can render erroneous evidentiary rulings harmless. *See Ibisevic*, 675 F.3d at 351-352 (collecting cases in which curative instructions rendered errors harmless); *United States v. Burfoot*, 899 F.3d 326, 341 (4th Cir. 2018) (holding district court's curative instruction rendered error harmless). Notably, the Court did not instruct the jury to ignore Goldstein's testimony about the excluded evidence, nor his arguments that the evidence corroborated his testimony. Goldstein was able to rely on and reference the excluded evidence without the jury holding against him that the evidence had been excluded.

The third factor—whether the case was close—also counsels in favor of denying Goldstein's motion. This was not a close case. The government called dozens of witnesses (including professional gamblers, Goldstein's representatives and employees, and government agents) who testified to the facts underlying the charges on which the jury ultimately convicted. The government introduced voluminous documentary evidence (including Goldstein's contemporaneous communications and admissions) corroborating the testimony and the charges

45

more generally. And the parties agreed to six factual stipulations, on myriad topics, that were read to the jury. Goldstein put on his own evidence and witnesses (including by electing to testify) that buttressed the government's proof—either by confirming the allegations or eroding his credibility.

The jury deliberated for about two days before rendering a verdict. That is not an especially long time given the length of trial, the number of counts, and the sheer volume of evidence introduced. During deliberations, the jury posed questions about certain of the evidence, and about the definition of "materiality" for the false return counts, but never indicated that it was struggling to reach a decision. And that is the type of indication that the Fourth Circuit looks for in deciding whether a case was "close" for purpose of the harmless error analysis. *See, e.g.*, *Ibisevic*, 675 F.3d at 352, 354 (4-hour deliberation in a "narrow, single issue case," along with a note requesting definition of "reasonable doubt," indicated that jury "regard[ed] the case as close"); *United States v. Sanders*, 964 F.2d 295, 299 (4th Cir. 1992) (noting that "the jury could not reach a verdict on the assault charge at [defendant's] first trial and that the second jury deliberated for some hours before reaching a guilty verdict in a relatively simple, straightforward case").

In this case, the Court can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Ibisevic*, 675 F.3d at 350. We know that the judgment was not swayed by the exclusion of the evidence because Goldstein lost *despite* relying on and referencing the excluded evidence, and introducing other evidence making the same points. As Goldstein's attorney acknowledged before he testified, the jury had already heard evidence about his supposed losses abroad in 2016, Phua's investments in Goldstein's poker matches in 2016, and the ledger Phua purportedly maintained to track Goldstein's gambling endeavors. Ex. 13 (excerpt), 2/11 Tr. 86:12-87:1. Goldstein then testified for hours about the amounts that he won or lost in 2016. And

46

as explained above, although the messages and ledger were excluded, Goldstein was permitted to basically read the excluded evidence into the record under the guise of refreshing his recollection, and his attorney highlighted that testimony in closing. Against that backdrop, the excluded evidence would be "a drop in the bucket overflowing with" evidence that Goldstein *was* allowed to introduce, and arguments he *was* allowed to make.[24] *See Burfoot*, 899 F.3d at 341 (affirming admission of what the defendant argued was inadmissible opinion and hearsay testimony).

Finally, any error in excluding the messages and ledger was harmless. Indeed, Goldstein might have been worse off if the evidence was admitted. A central theme of the government's case was that Goldstein hid evidence of his poker wins and losses from Deyhle. To that end, the government highlighted that Goldstein maintained and updated his own poker ledger but never shared it with Deyhle. If the jury saw the excluded messages and Phua ledger, it would be additional evidence that Goldstein hid his poker activity from Deyhle. The evidence would also undermine Goldstein's good faith argument. The jury was instructed that it could consider "evidence that Mr. Goldstein received advice from a tax preparer" in evaluating willfulness and knowledge, but that in doing so it must evaluate "whether he fully and honestly laid all the facts before his tax preparer." Ex. 17, 2/19 Tr. 53:8-54:10. Clearly he did not; the excluded evidence is another example. (It is ironic that Goldstein now argues the messages and ledger are so probative that their exclusion warrants a new trial, given that he never showed them to Deyhle in the context of preparing his 2016 tax return.) Goldstein now insists that excluding the evidence harmed his good faith argument; the opposite is more likely.

---

[24] Goldstein showed the jury the excluded evidence in direct violation of the Court's ruling. During his direct examination, after the Court explicitly excluded the Phua ledger, his attorney showed the jury a PowerPoint slide based solely on the ledger. The Court sustained the government's objection and ordered that the ledger be taken off the screen, but not before the jury saw and heard some testimony about it. Ex. 13 (excerpt), 2/11 Tr. 169:2-170:22.

For similar reasons, the government agrees with Goldstein that admitting the evidence could have "fundamentally impact[ed] the jury's assessment . . . of [his] credibility more broadly," Mot. 57—but not in a good way. The evidence would have been additional support for the government's argument that Goldstein deceived those around him. That is especially true in light of the contradiction between Goldstein's claim that the evidence shows he was a net loser in 2016 and the fact that he told Deyhle, in good faith, that he was a net winner. Those irreconcilable positions would have damaged, not bolstered, Goldstein's credibility.

In sum, there was no error, and any error was undoubtedly harmless. Excluding the evidence had no bearing—let alone a "substantial or injurious" one—on the verdict. The Court should not order a new trial.

## IV.    THE EVIDENCE SUPPORTING THE TAX EVASION CONVICTION WAS MORE THAN SUFFICIENT

Goldstein's argument about two of the affirmative acts of evasion in count 1 is invalid and contrary to the settled law on tax evasion.

To show that Goldstein committed tax evasion, the government must prove three elements: (1) that he had a tax deficiency; (2) that he committed an affirmative act attempting to evade that tax; and (3) willfulness. *See, e.g.*, *Jinwright*, 683 F.3d at 476; *United States v. Goodyear*, 649 F.2d 226, 227-28 (4th Cir. 1981). The affirmative act element is broad. "Any conduct, the likely effect of which would be to mislead or to conceal," can be tax evasion. *Spies*, 317 U.S. at 499.

Whether an act is an affirmative act of evasion turns on the defendant's intent. Even conduct that is "lawful activity in-and-of itself" can be an affirmative act "if it is done with the *intent to evade income tax*." *United States v. Jungles*, 903 F.2d 468, 474 (7th Cir. 1990) (emphasis in original); *see also, e.g.*, *United States v. Boisseau,* 841 F.3d 1122, 1125 (10th Cir. 2016); *United States v. Voigt*, 89 F.3d 1050, 1090 (3d Cir. 1996).

48

Moreover, while a defendant's efforts need not succeed, the "complexities of common-law 'attempt'" are not part of the tax evasion statute. *Spies*, 317 U.S. at 498. Tax evasion is an "independent crime" and "[t]he attempt made criminal by this statute does not consist of conduct that would culminate in a more serious crime but for some impossibility of completion or interruption or frustration." *Id.*

### A.       Goldstein Evaded His Taxes By Funneling Money Through The IOLTA

The first affirmative act of evasion that Goldstein challenges took place in early 2021. Goldstein tried to evade his 2016 tax liability[25] by moving funds from his and his wife's retirement accounts to purchase a home in an unnecessarily convoluted manner that included routing the money through his law firm's Interest on Lawyers' Trust Account ("IOLTA"). Lawyers using their IOLTA or trust accounts to try to shield money from the IRS is a recurring form of tax evasion. *See, e.g.*, *United States v. Hunter*, No. 22-5992, 2024 WL 2032796, at *2-*3 (6th Cir. Mar. 8, 2024); *United States v. Weisberg*, 297 F. App'x 513, 516 (6th Cir. 2008).

Here, it is undisputed that in early 2021, Goldstein still owed the IRS taxes for 2016. Goldstein knew the IRS could levy his bank accounts to collect because it had happened before, including in December 2018 when the IRS levied nearly $1 million from his personal Wells Fargo account. Ex. 5 (excerpt), 1/28 Tr. 184:8-17; Ex. 21 (excerpt), GX19 at 27. Further, in March 2021, Goldstein learned that he defaulted on an IRS installment agreement by failing to timely pay his 2019 taxes. *See* Ex. 7 (excerpt), 2/2 Tr. 177:5-23, 180:5-9; Ex. 37, GX504 at 1; Ex. 38, GX520 at 1-2. The installment agreement made clear that upon default, the IRS could "collect the entire amount [Goldstein] owe[d] by levy on [his] income, bank accounts, or other assets[.]" Ex. 28, GX91 at 8.

---

[25] Factually, Goldstein was also evading payment of his 2017 taxes—which he still owed in March 2021 and which were subject to the same, defaulted installment agreement—but the 2017 tax evasion count was dismissed before trial.

Against that backdrop, Goldstein needed to shield from levy the funds he sought to use to purchase the Washington, D.C. home. So, he engaged in an inexplicable and convoluted series of transactions—from retirement account to personal account to the IOLTA to business account to the title company's escrow account—with the funds sitting for any appreciable time only in the IOLTA. *See* Ex. 35, GX421.

Those facts establish all three elements of tax evasion. While Goldstein seeks to invoke a defense of legal impossibility,[26] Mot. 64-70, any such defense is inapplicable to tax evasion. The Supreme Court has already held that the "complexities of common-law 'attempt,'" including notions of "impossibility of completion or interruption or frustration" are not relevant to tax evasion. *Spies*, 317 U.S. at 498; *see also Osborn v. United States,* 385 U.S. 323, 333 (1966) (holding that doctrine of impossibility did not apply to statute proscribing an "endeavor" to obstruct). Although tax evasion resembles common-law attempt in some respects, there is no completed crime of successful tax evasion for which § 7201 is an attempt. *See Spies*, 317 U.S. at 499. *Spies* explained that tax evasion is a distinct statutory crime and is "complete in its most serious form when the attempt is complete." *Id.* at 498. And contrary to Goldstein's claim, Mot. 66, tax evasion depends on a defendant's subjective beliefs. Indeed, conduct that is otherwise lawful can be tax evasion; what separates criminal from innocent conduct is what the defendant subjectively believes and intends. *See, e.g.*, *Jungles*, 903 F.2d at 474. Goldstein's notion of legal impossibility does not apply here.

Notably, Goldstein cites *no* cases in which a court applied legal impossibility to § 7201, and the government is not aware of any. Nor is there any reason to import such a defense now.

---

[26] To the extent that Goldstein is arguing that he believed the IRS was prohibited from levying, Mot. 67 n.9, rather than making a legal impossibility challenge, that argument is simply one of sufficiency. And the evidence was more than sufficient for the jury to reject Goldstein's purported belief and find that he in fact thought the IRS could levy.

Even had *Spies* not already settled the issue, expanding the defense to tax evasion would buck the "modern trend . . . to reject both factual and legal impossibility as defenses." Paul H. Robinson et al, 1 Crim. L. Def. § 85; *see also* 1 Wharton's Criminal Law § 7:7 (16th ed.); *United States v. Hsu*, 155 F.3d 189, 200-03 (3d Cir. 1998) (rejecting effort to incorporate common-law legal impossibility defense into federal statutory crime of attempted misappropriation of trade secrets).

Modern courts generally reject the impossibility doctrine because the distinction between factual impossibility (not a defense) and legal impossibility (a defense) is "elusive," a "source of utter frustration," and a "morass of confusion." *United States v. Farner*, 251 F.3d 510, 512 (5th Cir. 2001) (collecting cases; internal quotation marks omitted). That morass becomes especially deep for tax evasion because there is no separate, defined crime of successful tax evasion with which to compare attempted tax evasion. There is thus no good reason to impose Goldstein's atextual defense of impossibility, and this Court should not be the first to do so.

Even if legal impossibility could be a valid defense here, Goldstein's premise for that defense is doubly flawed. First, he narrowly focuses on the possible levy, when in reality his conduct could have "misled or concealed" in other ways. *See Spies*, 317 U.S. at 499. For example, after learning that the installment agreement was in default, Goldstein could reasonably have been anticipating another back-and-forth with the IRS in which it would evaluate his ability to pay in installments. Indeed, even if Goldstein had not been in default, the installment agreement expressly stated that the IRS could change the plan if Goldstein's "ability to pay has significantly changed." Ex. 28, GX91 at 7. Using the IOLTA would have concealed and obscured Goldstein's ability to pay in installments and led to an artificially low (and beneficial to Goldstein) installment amount.

Second, even keeping to Goldstein's focus on levies, he ignores that the IRS may undertake jeopardy levies despite an installment agreement and without prior notice. 26 U.S.C. §§ 6330

51

6159(b)(2) & (5) (flush language). Jeopardy levies may be used when there is evidence of concealing, dissipating, or transferring assets. *See e.g.*, *Drake v. Comm'r*, 511 F.3d 65, 70 (1st Cir. 2007). Goldstein's installment agreement stated that the IRS could "cancel the agreement at any time if [it found] that collection of the tax is in jeopardy." Ex. 28, GX91 at 8. At the very least, purchasing the Washington, D.C. home while still owing millions in taxes to the IRS would constitute "dissipating" or "transferring" assets, and doing so in this manner also would constitute "concealing" assets. In any event, there was no absolute legal bar on levy, which is what Goldstein's impossibility argument requires.

Regardless, even if an impossibility defense were available, Goldstein's claim is not genuinely a claim of legal impossibility. Legal impossibility concerns cases where the intended act, if completed, was not criminal. *See United States v. Hamrick*, 43 F.3d 877, 885 (4th Cir. 1995). But successfully evading taxes would be criminal.[27] Where the "objective is proscribed by the criminal law," but the facts prevent its completion, that is factual impossibility, which is not a defense. *Id.* Properly understood, Goldstein's argument is that he did not need to evade because the IRS could not levy. At best for him, that is a mistake about the facts and thus not a defense. *Id.* One case Goldstein cites provides a useful example making the distinction clear: a hunter could not be convicted of attempting to shoot a deer in a place where shooting deer was legal. *See In re Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000). That is not Goldstein's situation: his objective was an unlawful one.

Goldstein's reliance on *Ventimiglia v. United States*, 242 F.2d 620 (4th Cir. 1957), Mot. 67-69, also does not help him. *Ventimiglia*'s musings on impossibility "were entirely in dicta," *Hsu*, 155 F.3d at 204 n.20, and the Fourth Circuit has never since cited *Ventimiglia* for

---

[27] Since the statute proscribes the attempt itself, success would be an added fact of the crime, not a required element.

impossibility (or anything else). Moreover, *Ventimiglia* is contrary to the Supreme Court's characterization of what constitutes factual impossibility (and thus not a defense): when the attempt fails "because the facts were not as the defendant believed." *United States v. Williams*, 553 U.S. 285, 300 (2008). That view of impossibility is the one in the Fourth Circuit's more recent cases, such as in rejecting an impossibility defense to "stash house sting" cases. *See United States v. Min*, 704 F.3d 314, 322 (4th Cir. 2013). Trying to rob a stash house that is only a government fabrication is the equivalent of shooting a wooden dummy—the example *Ventimiglia* gave—but the Fourth Circuit had no trouble finding it was a crime. *See id.*

Finally, Goldstein's backup argument of factual impossibility has even less merit. Even when impossibility is a valid defense, factual impossibility is not. And Goldstein's contention, Mot. 69-70, that the IRS could levy an IOLTA proves nothing. Tax evasion does not require that the defendant execute a bulletproof plan. To the contrary, success is irrelevant. *See Spies*, 317 U.S. at 498. IOLTAs are supposed to only contain funds belonging to others. That is precisely what makes their misuse an attractive vehicle for tax evasion. Using an IOLTA makes it harder for the IRS to detect funds, just as hiding cash under a mattress would. And just as hiding cash can be tax evasion, even though the IRS could theoretically find the money, so too does hiding money in an IOLTA, even though the IRS could theoretically levy it.

To buttress his flawed argument, Goldstein quotes *Kawashima v. Holder*, 565 U.S. 478 (2012), and similar lower-court cases out of context for the proposition that a transfer of funds can be an affirmative act of evasion only if it places assets beyond the reach of the IRS. Mot. 69-70. But these cases say no such thing. In *Kawashima*, the Supreme Court observed that a person "moving his assets beyond the reach" of the IRS commits tax evasion, but the Court was merely illustrating how deceit is not necessary for evasion. 565 U.S. at 488. The Court said nothing about

53

the effort needing to be successful. Goldstein makes the same mistake with similar language in the other cases he cites, and notably none of the cases hold that an affirmative act was *not* evasion simply because the IRS still had some ability to collect.

### B.     Goldstein Evaded His Taxes By Lying To The IRS Revenue Officer

Goldstein's challenge, Mot. 70-74, regarding his lies to IRS Revenue Officer Parrish fails as well. In March 2018, Goldstein told Officer Parrish that his outstanding liability from 2016 was from a legal fee, without mentioning gambling income. Ex. 4 (excerpt), 1/22 Tr. 228:13-20; Ex. 21 (excerpt), GX19 at 14. That was a lie. And lies to IRS employees are quintessential evasive acts. *See, e.g.*, *Goodyear*, 649 F.2d at 228; *United States v. Brimberry*, 961 F.2d 1286, 1291 (7th Cir. 1992).

Goldstein distorts the government's theory by claiming that it is not evasion "to fail to tell the IRS something that it already knows." Mot. 71. But Goldstein was not convicted for *failing* to offer information; he was convicted for *affirmatively* lying. And the legal premise of his claim is wrong too: he ignores that an affirmative act depends on the defendant's intent, not the whether the act succeeded. What is important is whether Goldstein knew he was telling a lie, not whether the IRS already knew the truth or not. *See United States v. Sarihifard*, 155 F.3d 301, 307 (4th Cir. 1998) (false statement needed to be only a statement *capable* of influencing grand jury, so grand jury being instructed to disregard a statement as false did not undermine conviction).

*United States v. Romano*, 938 F.2d 1569 (2d Cir. 1991), does not help Goldstein for the same reason. *Romano* concluded that failing to file a tax return could not be an affirmative act of evasion. *See id.* at 1573. Again, Goldstein was not convicted of evasion for failing to file a return (or failing to do anything) but rather for affirmatively lying. To the extent that he relies on *Romano* for the notion that he could not have misled Officer Parrish officer, Mot. 71 n.11, the key factor in *Romano* was that the defendant corrected his initial misstatements during the same interview with

customs officials. *See United States v. Klausner*, 80 F.3d 55, 62 (2d Cir. 1996) (distinguishing *Romano*). Like the *Klausner* defendant, Goldstein made no such corrections (and his lies were also directly to an IRS employee, rather than a customs official as in *Romano*).

Finally, Goldstein's reliance on *United States v. Sarwari*, 669 F.3d 401 (4th Cir. 2012) is equally misplaced. Mot. 73-74. As *Sarwari* explained, "[f]undamental ambiguity is the exception, not the rule." *Id.* at 407 (internal quotation marks omitted). "A question is fundamentally ambiguous only when it is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *Id.* (internal quotation marks omitted). When a question is "merely susceptible to multiple interpretations, and a defendant's answer is true under one understanding of the question but false under another, the fact finder determines whether the defendant knew his statement was false." *Id.*

At best for Goldstein, Officer Parrish's inquiries were of this latter sort—"merely susceptible to multiple interpretations," thus leaving the falsity determination in the jury's hands. Goldstein suggested that he interpreted Officer Parrish's inquiries as forward-looking (about how he would pay the balance) and not backward-looking or historical (about what caused the balance), and that he was referencing unpaid fees for legal work that he eventually would use to pay his tax liability. Ex. 14, 2/12 Tr. 24:7-25:13. But the jury could have evaluated the testimony of Officer Parrish and Goldstein, along with the documentary evidence of their encounters, and reasonably concluded that Goldstein was not telling the truth and knew it at the time.

## C.    Regardless, Goldstein's Motion As To Count 1 Should Be Denied

Both affirmative acts of evasion that Goldstein challenges were legally valid and amply supported by the evidence, which is sufficient reason to deny Goldstein's motion regarding

count 1. But even if the two affirmative acts he challenges were legally invalid, that is not grounds for a judgment of acquittal as to count 1 because there is sufficient evidence of other affirmative acts within the statute of limitations. Here, the jury was appropriately instructed that the government needed to prove only one affirmative act within the statute of limitations, after January 1, 2018. Ex. 17, 2/19 Tr. 56:15-23. And as even Goldstein acknowledges, Mot. 74, the government alleged other affirmative acts within the statute of limitations. For example, the government proved that Goldstein committed lied to IRS-CI special agents in 2020, and Goldstein has not even attempted to argue that the evidence was insufficient on that act.

Moreover, Goldstein's alternative argument—that he is entitled to a new trial under *Yates v. United States*, 354 U.S. 298 (1957), if the evidence of either of the two affirmative acts he challenges is insufficient, Mot. 74—depends on the premise that his challenges, if successful, would demonstrate the *legal* invalidity of the alleged affirmative acts. As the Supreme Court made clear in *Griffin v. United States*, 502 U.S. 46 (1991), *Yates* has no application to "factually inadequate theor[ies]" of guilt. *Id.* at 59. Instead, it applies only when "a particular theory of conviction submitted to [the jury] is contrary to law," such as when "the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime." *Id.* Although Goldstein attempts to paint his challenges to the 2021 IOLTA transfer and the 2018 lies to Officer Parrish as legal, his arguments depend on additional *facts* that he claims undermine inferences that would otherwise flow from the government's evidence—namely, the installment agreement (for the 2021 IOLTA transfer allegation), and his prior reporting of gambling winnings (for the 2018 Officer Parrish allegation). These are claims about factual sufficiency, not legal validity. Thus, even if Goldstein argued persuasively that additional facts could render the evidence insufficient, he would not be entitled to a new trial under *Yates*.

56

## V.   THE EVIDENCE SUPPORTING THE FALSE RETURN CONVICTIONS WAS MORE THAN SUFFICIENT

There was ample evidence at trial to support the jury's verdict on the false return charges (counts 3 and 7-9). Goldstein does not dispute the jury was correctly instructed on the elements, which were that (1) Goldstein advised or assisted in the preparation of a tax return that was subsequently filed, (2) the return was false as to any material matter, and (3) Goldstein acted willfully. Instead, Goldstein challenges the sufficiency of evidence supporting the jury's verdicts on these counts. But he has not met his "heavy burden to justify reversal" under Rule 29,[28] which requires viewing the evidence in the light most favorable to the government, and presuming that the jury resolved any conflicting evidence in the government's favor. *Reed*, 75 F.4th at 401; *United States v. Collins*, 412 F.3d 515, 519 (4th Cir. 2005).

At the outset, it bears noting that each false return count alleged multiple false items on Goldstein's or his law firm's tax returns. But even if "one of the possible bases of conviction" for a given count was "unsupported by sufficient evidence," it would not justify setting aside the verdict. *Griffin*, 502 U.S. at 56. "[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Turner v. United States,* 396 U.S. 398, 420 (1970). Therefore, Goldstein must show that the evidence was insufficient as to all possible bases for conviction on counts 3 and 7-9 to warrant acquittal.

### A.   The First Two Elements Were Proven As To All False Return Counts

There is no credible dispute that the government proved the first two elements for all the false return counts of conviction. Goldstein aided and assisted in the preparation of the at-issue tax

---

[28] The Court should reject Goldstein's new trial request on the false return counts because although he references Rule 33, he does not meaningfully engage with it or apply it to the facts.

returns including by corresponding directly and indirectly with Deyhle and the outside accounting firm. Goldstein never denied that he assisted in preparing the returns, and he repeatedly testified that the returns were his responsibility. Ex. 13 (excerpt), 2/11 Tr. 105:4-6, 122:9-123:2; Ex. 14, 2/12 Tr. 132:17-22, 169:5-16, 252:9-17. Likewise, Deyhle testified that the accuracy of the tax returns was "totally dependent upon the information [he] receive[d]" from Goldstein or his representatives. Ex. 8 (excerpt), 2/3 Tr. 112:19-114:12. The evidence also proved, and Goldstein did not meaningfully contest, that the returns were materially false. Instead, he denied "willfully and intentionally put[ting that] false information [o]n th[e] tax returns." Ex. 13 (excerpt), 2/11 Tr. 105:1-12. As explained next, however, there was ample willfulness evidence supporting the false return convictions.

### B.      The Evidence Was Sufficient On Count 3

Count 3 charged Goldstein with aiding and assisting the preparation of a false Form 1120S for 2017 by (1) falsely deducting as a business expense a $175,000 poker-related payment to Napoli Shkolnik PLLC ("Napoli Shkolnik"), and (2) diverting and failing to report a $250,000 legal fee from Robbins Geller Rudman & Dowd LLP ("Robbins Geller"). The conduct alleged in count 3 derived from Goldstein's high-stakes poker activities in 2017, when he was in the midst of a series of heads-up poker matches with a California businessman named Bob Safai. Safai was winning significant amounts of money from Goldstein, who needed to timely pay Safai. Ex. 10 (excerpt), 2/5 Tr. 15:3-6. And unlike his heads-up matches in 2016, Goldstein did not have any poker players investing in him to beat Safai, so he turned to a pair of law firms.

#### 1.      Goldstein Falsely Deducted A $175,000 Poker-Related Payment

In early 2017, Goldstein convinced Napoli Shkolnik to invest $500,000 in upcoming poker matches. Ex. 14, 2/12 Tr. 196:11-13. In fact, Goldstein was lying to Paul Napoli, a named partner at Napoli Shkolnik: Goldstein needed the funds to pay a *preexisting* poker debt to Bob Safai, not

to use in *future* matches. Ex. 14, 2/12 Tr. 196:11-16; Ex. 32, GX172. Goldstein also lied to Napoli in the following months by asserting that he won certain poker matches, and by paying Napoli a percentage of those supposed wins. *Id.*

Goldstein had not returned the $500,000 investment to Napoli Shkolnik by July 2017. Between July and November 2017, Napoli Shkolnik repeatedly requested that Goldstein return the investment. On November 7, 2017, Goldstein emailed Napoli Shkolnik to preview that he was finally going to return the investment (less $125,000 that Goldstein said Napoli Shkolnik owed his law firm). Ex. 33, GX198 at 1. Goldstein wrote that Napoli Shkolnik would "be getting $175k from me" and another "$200k from one of the [other] investors." *Id.* at 1. The same day, Napoli Shkolnik received a $175,000 wire from Goldstein's law firm bank account as partial repayment. Ex. 31, GX169 at 7; Ex. 3 (excerpt), 1/21 Tr. 152:22-153:1. Goldstein did not tell his personal assistant or outside accounting firm that the $175,000 payment should be treated as a personal distribution (and not a business expense of the law firm). Ex. 3 (excerpt), 1/21 Tr. 227:4-20; Ex. 8 (excerpt), 2/3 Tr. 192:18-25; Ex. 11 (excerpt), 2/9 Tr. 174:14-175:5; Ex. 12 (excerpt), 2/10 Tr. 62:20-63:10. The $175,000 payment was reported as "Legal & Professional Fees" on the law firm's 2017 Form 1120S, which Goldstein signed under penalties of perjury. Ex. 25 (excerpt), GX65 at 1.

The evidence was sufficient to support the jury's verdict on count 3. Goldstein advised or assisted Deyhle in the preparation of the law firm's 2017 Form 1120S, which was subsequently filed. The return was false as to a material matter because it deducted as a business expense the $175,000 payment to Napoli Shkolnik. As for willfulness, the evidence showed that Goldstein knew how to ensure that personal payments sent from his law firm's bank account would be properly classified. All he had to do was tell his personal assistant and/or the outside accounting

firm. Numerous examples of him doing so were introduced at trial. *See* Ex. 14, 2/12 Tr. 155:3-158:18. Additionally, Goldstein knew how to avoid any possible confusion over such classifications: he could have wired the funds from the law firm's bank account to his own personal account *first* and wired the funds to whomever he wanted to pay for poker *second*. Goldstein conceded that "[w]ires [he] sent himself were always classified correctly." Ex. 14, 2/12 Tr. 158:19-25; *see* Ex. 27, GX81 (payments labeled "Wire to TG" always classified as "Distributions").

Goldstein's contention, Mot. 76-77, that he did not knowingly provide false records fails. Legally, it fails because providing false *records* is not an element of § 7206(2); the Court correctly instructed the jury that it would suffice if Goldstein provided false *information* with the expectation that it would be used to file a return. Ex. 17, 2/19 Tr. 65:21-66:1. Factually, it fails because Goldstein knew that records of the law firm's bank account—from which he paid Napoli Shkolnik—were used to prepare his returns. Goldstein's own exhibit (DX290, attached as Ex. 44) proved that he understood if a transaction *did not* hit the firm's bank accounts, he needed to affirmatively advise Deyhle about the transaction. A reasonable jury could have decided that by the same token, Goldstein understood that transactions (such as the Napoli Shkolnik payment) that *did* hit the law firm's accounts would be used by Deyhle to prepare the returns. This established that Goldstein actively participated in conduct that encouraged the preparation of a false return.

### 2. Goldstein Diverted And Failed To Report A $250,000 Legal Fee

Also in early 2017, Goldstein was retained by Robbins Geller to help with a securities litigation appeal. Ex. 3 (excerpt), 1/21 Tr. 100:17-101:6. On February 1, 2017, Goldstein emailed Robbins setting forth what Goldstein understood to be the terms of his retention. Ex. 34, GX212 at 4-5; Ex. 3 (excerpt), 1/21 Tr. 100:9-102:18. Goldstein asked, and Robbins Geller agreed, to pay $250,000 of the legal fees immediately, or "now," and the rest later. Ex. 34, GX212 at 5; Ex. 3 (excerpt), 1/21 Tr. 101:14-102:18. Goldstein directed Robbins Geller to wire the fee to his personal

Wells Fargo account, Ex. 34, GX212 at 5; Ex. 3 (excerpt), 1/21 Tr. 103:4-14, and Robbins Geller did so on February 1, 2017, Ex. 34, GX212 at 1; Ex. 3 (excerpt), 1/21 Tr. 105:22-106:5. The next day, Goldstein wired most of the funds to Safai to satisfy a poker debt. Goldstein did not tell his personal assistant or Deyhle that the $250,000 payment should be treated as legal fee income to his law firm. Ex. 3 (excerpt), 1/21 Tr. 272:17-20; Ex. 8 (excerpt), 2/3 Tr. 192:15-21. The $250,000 payment was not reported as income on the law firm's 2017 Form 1120S, which Goldstein signed under penalties of perjury. Ex. 25 (excerpt), GX65 at 1.

The evidence was sufficient to support the jury's verdict on count 3. Goldstein advised or assisted Deyhle in the preparation of the law firm's 2017 Form 1120S, which was subsequently filed. The return was false as to a material matter because it omitted $250,000 in legal fee income. As for willfulness, the evidence showed that Goldstein knew he had to report law firm income that did not hit the firm's bank accounts, and simply chose not to for the Robbins Geller payment. Goldstein's own exhibit demonstrated his knowledge that he had to notify Deyhle of legal fee income that "never came into [the law firm's] bank account." Ex. 44, DX290 at 2.

Goldstein blames his outside accounting firm for "ignor[ing]" a Form 1099 that Robbins Geller issued, and suggests that any errors were mere negligence—not willful. Mot. 77-80. But even if Goldstein's representatives theoretically could have prevented his crime, he still violated the law by helping prepare a materially false return. *See, e.g.*, *Reinhardt v. Comm'r*, 66 T.C.M. (CCH) 566, *6 (T.C. 1993) (taxpayer was wrong that "income is not taxable unless there is a Form 1099"); *Welker v. Comm'r*, 74 T.C.M. (CCH) 956, *2 (T.C. 1997) (taxpayer "was aware that he had to report all his income on his tax return regardless of whether he received a Form 1099").

C.    **The Evidence Was Sufficient On Count 7**

Count 7 charged Goldstein with aiding and assisting the preparation of his law firm's false Form 1120S for 2019 by (1) falsely deducting a $170,000 poker-related payment as a business expense, and (2) failing to report $235,000 in legal fee income from Phua.

1.    **Goldstein Falsely Deducted A $170,000 Poker-Related Payment**

The evidence showed that Goldstein lost $170,000 in 2019 playing poker against an individual named Charles Pacheco. Ex. 6 (excerpt), 1/29 Tr. 37:7-12, 115:1-16. On March 4, 2019, Goldstein paid the $170,000 poker debt from his law firm's bank account. Ex. 22, GX48 at 1. Goldstein did not tell his personal assistant or his outside accounting firm that this was a poker-related payment. Ex. 8 (excerpt), 2/3 Tr. 209:9-19; Ex. 11 (excerpt), 2/9 Tr. 175:12-176:16. As a result, the payment was misclassified as "Legal & Professional Fees" and deducted on the law firm's 2019 Form 1120S, which Goldstein signed under penalties of perjury. Ex. 26 (excerpt), GX67 at 1.

The evidence was sufficient to support the jury's verdict on count 7. Goldstein advised or assisted Deyhle in the preparation of his law firm's 2019 Form 1120S, which was subsequently filed. The return was false as to a material matter because it deducted as a business expense the $170,000 payment to Pacheco. As for willfulness, the evidence was similar to that supporting the $175,000 payment to Napoli Shkolnik in 2017 (as alleged in count 3). Goldstein knew multiple ways of ensuring payments sent from his law firm's bank account were not falsely deducted. He could have told his personal assistant or outside accounting firm that it was a personal payment, and he could have avoided the issue entirely by directing that the payment first be wired to his personal bank account, and then to Pacheco. But Goldstein chose to remain silent about the true nature of the payment, the false deduction of which saved Goldstein almost $60,000 in taxes. Ex. 11 (excerpt), 2/9 Tr. 176:13-16; Ex. 22, GX48 at 2.

### 2.    Goldstein Failed To Report A Legal Fee From Phua

The evidence showed that Goldstein assisted with the defense of Phua in a 2019 trial in Macau. *See* Ex. 14, 2/12 Tr. 48:21-49:6. Phua was acquitted on about February 26, 2019. Ex. 12 (excerpt), 2/10 Tr. 136:11-14. On February 27, 2019, Phua wired $229,927 to Goldstein's law firm for the legal work. Ex. 14, 2/12 Tr. 48:21-49:6. The flow of funds, from Phua to the law firm's bank account, was summarized on a chart for the jury. Ex. 39, GX425.

The corresponding invoice sent to Phua stated that Goldstein was requesting payment for acting as "Legal Counsel." Ex. 14, 2/12 Tr. 49:7-24; Ex. 46, DX366. And Goldstein testified that this payment was for "[b]eing [Phua's] lawyer" for the case in Macau. Ex. 14, 2/12 Tr. 49:7-16. However, in 2019, Goldstein directed his personal assistant to write a letter to the Montenegrin bank (through which Phua sent the legal fee) indicating that the payment was a "capital contribution." Ex. 40, GX544; Ex. 12 (excerpt), 2/10 Tr. 234:9-10, 237:6-238:11. The $229,927 payment was not reported as income on the law firm's 2019 Form 1120S, which Goldstein signed under penalties of perjury. Ex. 26 (excerpt), GX67 at 1.

The evidence was sufficient to support the jury's verdict on count 7. Goldstein advised or assisted Deyhle in the preparation of the law firm's 2019 Form 1120S, which was subsequently filed. The return was materially false because it omitted $229,927 in income. And the jury could have reasonably concluded that Goldstein was willful because he never disclosed the true nature of the payment to Deyhle prior to preparation of the return. Moreover, Goldstein was specifically advised by one of his outside accountants, Ian Shuman, that the payment was not treated as income, and Goldstein did nothing to correct or amend it.[29] Ex. 41, GX22 at 1-2.

---

[29] Contrary to Goldstein's argument, Mot. at 83, the government was never asking the jury to convict based on his failure to amend the return. The government was showing that Goldstein's conduct subsequent to filing the return— that is, his failure to correct the misclassification—makes it more likely that he willfully omitted the income in the first place. That was proper. "There is no distinction between 'prior' bad acts and 'subsequent' bad acts." *Lighty*, 616

### D.  The Evidence Was Sufficient On Count 8

Count 8 charged Goldstein with aiding and assisting the preparation of a false Form 1040 for 2020 by (1) failing to report approximately $90,000 in poker winnings and (2) falsely denying involvement in cryptocurrency transactions.

#### 1.  Goldstein Failed To Report Poker Winnings

Goldstein stipulated that he won $23,180 playing poker against Pacheco and $70,000 playing poker against an individual named Michael McGuiness in 2020. Ex. 6 (excerpt), 1/29 Tr. 37:13-16; Ex. 7 (excerpt), 2/2 Tr. 248:1-3. Goldstein did not ask his personal assistant for help tracking or reporting these winnings. *See* Ex. 6 (excerpt), 1/29 Tr. 218:17-219:17. There was no evidence that Goldstein advised his outside accounting firm about the winnings—even after learning he was under criminal investigation in October 2020. No gambling winnings were reported on Goldstein's 2020 Form 1040, which he signed under penalties of perjury. Ex. 23 (excerpt), GX58 at 2.

The evidence was sufficient to support the jury's verdict on count 8. Goldstein advised or assisted Deyhle in the preparation of his 2020 Form 1040, which was subsequently filed. The return was false as to a material matter because it omitted approximately $90,000 in gambling winnings. As for willfulness, the evidence showed that Goldstein either knew about or was willfully blind to his responsibility to report gambling income, and simply chose not to. Goldstein also misled his personal assistant in 2020 about the nature of other poker-related transactions. *See* Ex. 6 (excerpt), 1/29 Tr. 214:9-216:17. Goldstein's failure to report gambling income in 2020 is particularly egregious because at the time, Goldstein testified he was "managing" online poker matches with "a bunch of other people" and was "designated as the person who will handle all of

---

F.3d at 352; *see also United States v. Sarr*, 441 F. App'x 178, 179 (4th Cir. 2011). And Goldstein's later (in)action sheds light on his earlier state of mind.

the finances for everybody sending money in or out" of the matches. Ex. 14, 2/12 Tr. 99:3-22. Goldstein was responsible for ensuring that "everybody's out money [or winnings] will be tax neutral." Ex. 14, 2/12 Tr. 99:11-22.

Goldstein's arguments to the contrary are unavailing. First, Goldstein argues, Mot. 87-88, that the jury "obvious[ly]" "did not convict on th[e] basis" of unreported gambling income because he was a net loser in 2020, and the jury did not convict Goldstein on counts 2 or 6, which likewise concerned his failure to report gambling income in years (2017 and 2019) when he was a net loser. But even if the jury's verdict on count 8 were inconsistent with its decisions on counts 2 and 6, that inconsistency would have no bearing on the sufficiency of the evidence for count 8. *See United States v. Powell*, 469 U.S. 57, 67 (1984) ("Sufficiency-of-the-evidence review . . . should be independent  of the jury's determination that evidence on another count was insufficient."). Regardless, the verdicts are not inconsistent, especially when considered in context of the willful blindness instruction. The jury reasonably could have decided that by 2020, Goldstein was willfully blind regarding his obligation to report all gambling winnings, but that the evidence did not fully establish willful blindness for the prior years (before he realized he was under criminal investigation). Further, the jury heard evidence that Goldstein misled his personal assistant in 2020 about certain poker-related transactions, and at Goldstein's request was instructed that the facts could be considered in evaluating his willfulness for the tax charges, counts 1-13. Ex. 17, 2/19 Tr. 74:11-75:16. Incremental evidence introduced for 2020 could either have convinced the jury that Goldstein in fact knew, or was willfully blind to, his obligation to report gambling wins and losses.

Second, Goldstein suggests, Mot. 88, that his only possible misconduct for 2020 regarding his gambling was "failing to direct his accountants to separately [report] his gambling wins and losses." Mot. 88. That is not true. Goldstein did not report *any* gambling activity for 2020. He also

65

learned in October 2020 that he was under criminal investigation, and sat for an interview with IRS-CI in which he was questioned about his gambling and taxes. All of that context could inform a reasonable jury's conclusion that Goldstein willfully failed to report gambling income for 2020.

### 2.     Goldstein Falsely Denied Cryptocurrency Activity

Goldstein created a Coinbase account in June 2020 to use cryptocurrency. Ex. 6 (excerpt), 1/29 Tr. 228:8-21. A chart summarizing Goldstein's 2020 cryptocurrency activity was introduced at trial. Ex. 42, GX434. That year, Goldstein had $516,646 in deposits and transfers (10 transactions) into the Coinbase account, and $541,805 in withdrawals and transfers (18 transactions) out of the account. Ex. 6 (excerpt), 1/29 Tr. 151:25-152:3, 155:7-11. Additionally, Goldstein repeatedly offered to pay his personal assistant in Bitcoin after learning in October 2020 that he was under criminal investigation. *See* Ex. 6 (excerpt), 1/29 Tr. 255:4-18.

The evidence was sufficient to support the jury's verdict on count 8. Goldstein did not contest the extent of his 2020 cryptocurrency use at trial, nor did he argue that he adequately informed his employees or outside accounting firm about his use of cryptocurrency. Instead, he focused on arguing that he was not willful in failing to report his cryptocurrency use.

But there was plenty of evidence of Goldstein's willfulness. First, his outside accounting firm sent Goldstein a retention letter and tax organizer in 2020 making clear that there could be "tax consequences" for individuals who transact in or possess "virtual currency (e.g. Bitcoin)." *See* Ex. 36, GX490 at 3-4. Goldstein's brief continues to imply (consistent with his defense at trial) that these communications were irrelevant because they concerned tax year 2019—but that is besides the point. He received the communications *in 2020*, mere months before opening a Coinbase account. The communications put Goldstein on notice that he had to report his cryptocurrency activity to the IRS (or at least provide records of it to the accounting firm).

66

Second, a reasonable jury could have relied on Goldstein's selective concealment of his cryptocurrency activity in deciding he was willful. Goldstein knew how to interact with his personal assistant about cryptocurrency *because he directed the assistant to create his Coinbase account*. When Goldstein wanted something (to start using cryptocurrency and Bitcoin), he was willing to communicate with and involve his personal assistant. But when it came time to take responsibility for his cryptocurrency usage (by disclosing it to his accounting firm and the IRS), Goldstein chose to stay silent. Additionally, Goldstein never enlisted his personal assistant's help with tracking cryptocurrency use. Ex. 7 (excerpt), 2/2 Tr. 23:8-16.

Third, the cryptocurrency question was on the very first page of the tax return. Ex. 23 (excerpt), GX58 at 1. Deyhle testified that Goldstein was given an opportunity to review the 2020 Form 1040, and that he was "very confident" that Goldstein was aware of what was being reported on it. Ex. 8 (excerpt), 2/3 Tr. 227:7-20. A fair and reasonable inference from that evidence is that Goldstein knew he was required to report his cryptocurrency use and decided not to, or that he willfully blinded himself.

### E.    The Evidence Was Sufficient On Count 9

Count 9 charged Goldstein with aiding and assisting the preparation of a false Form 1040 for 2021. Goldstein was charged with (1) failing to report approximately $250,000 in poker winnings, (2) falsely denying involvement in cryptocurrency transactions, and (3) failing to report $500,000 in legal fee income from the actor Tobias Maguire.

Goldstein did not contest the extent of his cryptocurrency use in 2021, and he stipulated to earning the poker winnings and the legal fee from Maguire, Ex. 6 (excerpt), 1/29 Tr. 37:22-25, 38:9-39:20; Ex. 7 (excerpt), 2/2 Tr. 248:6-7.

In his motion, Mot. 84-87, Goldstein makes the same arguments about the cryptocurrency use and gambling income for 2021 (count 9) as for 2020 (count 8). The government therefore

incorporates here its prior arguments for why the evidence supported the verdict on count 8. Put simply, Goldstein advised or assisted Deyhle in the preparation of his 2021 Form 1040, which was subsequently filed. The return was false as to a material matter because it omitted Goldstein's cryptocurrency use, gambling income, and the $500,000 legal fee from Maguire. Deyhle testified that he was "very confident" that Goldstein was aware of what was being reported on the return. Ex. 9 (excerpt), 2/4 Tr. 18:19-21. The evidence showed that Goldstein either knew or was willfully blind to the duties he violated in falsifying the return.

Regarding the legal fee from Maguire specifically, the evidence was nearly identical to the Robbins Geller payment at issue in count 3: Goldstein directed that the fee be paid not to his law firm's bank account but rather to an account (here, Safai's) which his personal assistant and outside accounting firm could not access. And Goldstein never affirmatively advised them or his personal assistant that Maguire paid Safai on Goldstein's behalf in 2021. Ex. 6 (excerpt), 1/29 Tr. 252:9-17; Ex. 7 (excerpt), 2/2 Tr. 201:12-202:8; Ex. 9 (excerpt), 2/4 Tr. 28:1-4. Goldstein then signed a false tax return for 2021 that omitted the substantial legal fee income of $500,000. Ex. 24 (excerpt), GX59.

Goldstein's motion ignores incremental evidence specific to 2021 supporting his willfulness. First, Goldstein knew he was under investigation during the entirety of 2021, whereas he was unaware of that fact for most of 2020 (until October 2020). A reasonable jury could have concluded that Goldstein had a much clearer understanding and awareness of his tax obligations regarding cryptocurrency usage and gambling income after he was interviewed by IRS-CI in October 2020 and after collecting and reviewing documents to be produced in response to grand jury subpoenas around the same time. On the other hand, if the jury believed that Goldstein did not know his obligations by 2021, it reasonably could have concluded that the evidence of his

willful blindness was stronger by then. Perhaps the jury believed, for example, that Goldstein's decision to hire a new personal assistant who was equally inexperienced (while equally intelligent and well meaning) as his prior one, while under criminal investigation related to his taxes, showed he was burying his head in the sand.

Second, Goldstein's cryptocurrency use increased significantly in 2021. Whereas in 2020 he engaged in hundreds of thousands of dollars of cryptocurrency transactions on a single exchange, in 2021 he directed millions of dollars of transactions on two exchanges (Coinbase and Binance.com). Goldstein created the Binance.com account in February 2021, and at the time, the exchange did not allow U.S.-based individuals on its platform. Ex. 6 (excerpt), 1/29 Tr. 156:6-18, 163:11-13. Special Agent Nguyen showed the jury a Binance.com access log indicating that Goldstein used a virtual private network or "VPN" to mask his true location (so he appeared to be in Italy, Norway, or Trinidad and Tobago instead of the United States) while using the platform. Ex. 6 (excerpt), 1/29 Tr. 158:20-162:20. Additionally, the jury saw a 2021 retention letter between Goldstein's law firm and a company called Titan Golden Capital, LLC in which the latter agreed to pay the law firm quarterly installments of $250,000 in cryptocurrency. Ex. 43, GX502 at 2. The increased volume, sophistication, and complexity of Goldstein's cryptocurrency use in 2021 could have led a reasonable jury to conclude that he either in fact knew of his obligations to report his cryptocurrency by then, or that he was willfully blind to the obligation. This additional evidence for 2021 is important and left undisputed by Goldstein's motion.

* * *

Goldstein has not carried the "heavy burden to justify reversal" on counts 3 and 7-9. *See Reed*, 75 F.4th at 401; *Collins*, 412 F.3d at 519. The Court should not acquit Goldstein or order a new trial.

69

## VI.   GOLDSTEIN SHOULD NOT BE ACQUITTED FOR WILLFUL FAILURE TO PAY TAXES

Goldstein moves for an acquittal on his convictions for willfully failing to timely pay taxes (counts 10-13).[30] Relying on *Kwong v. United States*, 179 Fed. Cl. 382 (2025), Mot. 89, Goldstein contends that the government proved the wrong due date for each count because tax deadlines were postponed for several years during the COVID-19 pandemic, and that he paid the tax for some of the years before the postponement ended. But *Kwong*, which is not binding on this Court, was incorrectly decided and should not be followed by this Court.

### A.   Background

#### 1.   Legal Standard

Section 7508A of the Internal Revenue Code provides that certain deadlines are or may be postponed after the President of the United States declares a federal disaster. 26 U.S.C. § 7508A. Section 7508A has two main provisions: a discretionary provision allowing the Treasury Secretary to postpone deadlines, and an automatic postponement provision.

During the period pertinent to Goldstein's Rule 29 motion, § 7508A(a) authorized the Treasury Secretary to "specify a period of up to 1 year" to be "disregarded" for taxpayers affected by a "federally declared disaster" or "a terroristic or military action." Under § 7508A(d)—titled "Mandatory 60-day extension"—certain time was mandatorily "disregarded in the same manner as a period specified under subsection (a)" for taxpayers living in a "disaster area." 26 U.S.C. § 7508A(d)(1); *see Abdo v. Comm'r*, 162 T.C. 148 (2024) (holding that § 7508A(d)(1) provides an automatic postponement upon the President's declaration). The period mandatorily disregarded began "on the earliest incident date specified" in the President's disaster declaration and ended

---

[30] Importantly, even if the Court accepted Goldstein's claims generally (which it should not), he presents no actual argument why he should be acquitted on count 10, which charged willful failure to pay his 2017 taxes by the due date (in April 2018). Even Goldstein admits his argument is limited to tax yiears 2019, 2020, and 2021. *See* Mot. 90.

"on the date which is 60 days after the latest incident date so specified" in the President's declaration. 26 U.S.C. § 7508A(d)(1)(A), (B).

Both provisions first require a disaster declaration by the President under the Stafford Act,[31] which provides for both emergency assistance, *see* 42 U.S.C. §§ 5191-93, and major disaster assistance, *see id.* § 5170 et seq. Typically, a state Governor requests federal assistance, and the President determines whether the "severity and magnitude" of the disaster warrants a disaster declaration. *Id.* § 5170 ("Procedure for declaration"). After declaring a major disaster, the President may direct the provision of a wide array of assistance including technical assistance (§ 5170a(3)), distributing food (§ 5170b(a)(2)), removing debris (§ 5173), and legal aid (§ 5182).

### 2.      The COVID-19 Declarations And *Kwong*

On March 13, 2020, the President declared a nationwide emergency under the Stafford Act on account of the COVID-19 pandemic.[32] In his declaration, the President, among other things, instructed the Treasury Secretary to exercise his discretion "to provide relief from tax deadlines" under § 7508A(a).[33] *Id.* The emergency declaration also noted that a major disaster declaration "may be appropriate," and "encourage[d] all governors and tribal leaders to consider requesting Federal assistance under . . . the Stafford Act." *Id.*

On March 26, 2020, the President made a major disaster declaration for Maryland. In that declaration, the President determined that conditions from the COVID-19 pandemic "beginning

---

[31] Section 7508A(a) requires a "federally declared disaster (as defined by section 165(i)(5)(A)," which defines the term as a disaster "determined by the President . . . to warrant assistance" under the Stafford Act. Similarly, § 7508A(d)(1) applies to a "qualified taxpayer," which includes a person living in a "disaster area," *id.* § 7508A(d)(2)(A). "Disaster area" is defined by § 165(i)(5)(B), *see* § 7508A(d)(3) (incorporating definition), as the area that the President determined warranted assistance under the Stafford Act.

[32] Letter from President Donald J. Trump on Emergency Determination Under the Stafford Act, available at https://trumpwhitehouse.archives.gov/briefings-statements/letter-president-donald-j-trump-emergency-determination-stafford-act and https://perma.cc/6M2A-AP55

[33] The Treasury Secretary subsequently postponed the due date for tax year 2019 individual payments until July 15, 2020, *see* IRS Notice 2020-17 (issued March 18, 2020), and postponed the due date for tax year 2020 until May 17, 2021, *see* IRS Notice 2021-21 (issued March 29, 2021).

on January 20, 2020, and continuing," were sufficient "to warrant a major disaster declaration under the" Stafford Act, and the President directed the Federal Emergency Management Agency ("FEMA") to provide federal assistance. 85 Fed. Reg. 21873-02. It was this declaration that triggered the mandatory provisions of § 7508A(d) as to Maryland. There appears to be no dispute between the government and Goldstein that January 20, 2020, constitutes the "earliest incident date specified" in the President's disaster declaration or that, under *Abdo*, the postponement period under § 7508A(d) began on that date. The issue presented is what constitutes "the latest incident date so specified" in the President's declaration, which starts the clock on the 60-day period after which the mandatory postponement period ended.

The Presidential declaration's use of a single date and then stating that the disaster was "continuing" was not novel. Stafford Act declarations have often identified a particular date and then described the conditions as "continuing." For example, after Hurricane Katrina, the President declared a major disaster in Louisiana "beginning on August 29, 2005, and continuing." 70 Fed. Reg. 53803-01. Indeed, as a rule, "Stafford Act declarations do not expire." *Closing the Incident Period for the Stafford Act Declaration for the COVID-19 Pandemic* at 1, Congressional Research Service.

In contrast to Presidential declarations, FEMA regulations do provide for both a beginning and an ending date for a disaster, defined as the "incident period." *See id.*; 44 C.F.R. § 206.32(f). This "incident period" sets the timeframe within which the "damage or hardship to be alleviated" must occur for federal assistance to be provided. In February 2023, FEMA published a notice closing the incident period for the Maryland declaration (and all other similar pandemic declarations) as of May 11, 2023. *See* 88 Fed. Reg. 8884-01. In contrast to the FEMA regulations, neither the Stafford Act, nor 26 U.S.C. § 7508A, use the phrase "incident period."

72

In *Kwong*, the decision relied upon by Goldstein, a judge on the Court of Federal Claims addressed the impact of § 7508A(d) and the COVID-19 pandemic-related Stafford Act declaration for California on a taxpayer's deadline to sue for a refund of tax penalties. *See Kwong*, 170 Fed. Cl. at 383. Like the declaration for Maryland, the California declaration referred to a disaster "beginning on January 20, 2020, and continuing." The judge in *Kwong* concluded that § 7508A(d) postponed the deadline to file suit until July 10, 2023, 60 days after the end of the "incident period" specified in the FEMA notice published in February 2023, closing out the incident period for the COVID-19 pandemic. *See id.* at 388. It is the government's position, in contrast, that because the President's disaster declaration specified a single date, January 20, 2020, that date is also the "latest incident date so specified" in that disaster declaration for purposes of § 7508A(d), so the automatic postponement period ended 60 days after that date, on March 20, 2020.

### B.      Argument

Goldstein cites the holding of *Kwong* while offering no real legal argument. But the *Kwong* decision is not binding on this court. *See, e.g.*, *Camreta v. Greene*, 563 U.S. 692, 709 (2011). When a decision is not precedent, a party cannot outsource their legal argument (and page counts) but must "learn what the opinion has to teach" and incorporate it into the briefing. *RLJCS Enters., Inc. v. Pro. Ben. Tr. Multiple Emp. Welfare Ben. Plan & Tr.*, 487 F.3d 494, 499 (7th Cir. 2007). Accordingly, this Court can simply reject Goldstein's claim for inadequate briefing. *See, e.g.*, *United States v. Caldwell*, 7 F.4th 191, 211 (4th Cir. 2021) (undeveloped arguments are waived). Regardless, *Kwong* was wrongly decided and should not be followed by this Court. Goldstein also has not shown good cause for failing to advance this argument a year ago in pretrial motions.

### 1.      Goldstein Has Not Shown Good Cause For This Untimely Argument

Goldstein's argument can and should be rejected as an untimely attempt to dismiss the indictment for failure to state an offense under Rule 12(b)(3)(B)(v). Goldstein explicitly argues

that "the dates alleged by the indictment . . . are wrong *as a matter of law*." Mot. 90 (emphasis in original). Rule 12 requires that such a defense be raised before trial "if the basis for the motion is then reasonably available and the motion can be determined without trial on the merits." Fed. R. Crim. P. 12(b)(3). A late motion is "untimely" and may be considered only if the defendant "shows good cause." *Id.* 12(c)(3); *see, e.g.*, *United States v. Murillo-Lopez*, 151 F.4th 584, 591 n.2 (4th Cir. 2025); *United States v. Sperrazza*, 804 F.3d 1113, 1119-20 (11th Cir. 2015) (explaining rule). Pretrial motions were due on May 16, 2025. Dkt. 107. Goldstein's *Kwong* argument is nearly a year late. The legal basis for his (incorrect) argument has been available since 2020, and Kwong himself raised it in May 2025. *See Kwong v. United States*, No. 23-CV-0267, Dkt. 30 at 6-10 (Fed. Cl. May 29, 2025). The factual basis for his argument was apparent on the face of the indictment and did not require trial. *See* Dkt. 337-2 at 50 (listing payment due dates). Goldstein has not even attempted to show good cause for this stunning delay. Rule 29 does not authorize making such an untimely argument. *See, e.g.*, *United States v. Ramirez*, 324 F.3d 1225, 1227 (11th Cir. 2003); *United States v. Jackson*, 5 F.4th 676, 682 (7th Cir. 2021). And so, it should be rejected as untimely. *See, e.g.*, *United States v. Fuentes-Morales*, No. 14-CR-0556, 2017 WL 345141, at *2 (D.S.C. Jan. 24, 2017) (denying motion to dismiss for failure to state a claim as untimely where defendant had not shown good cause).

> **2.      The Disregarded Period Under The Maryland Declaration Was 60 Days From January 20, 2020**

The disregarded period under § 7508A(d) lasted 60 days from the one date specified by the President in his declaration—January 20, 2020. *Kwong*'s contrary holding is inconsistent with the text, structure, and history of § 7508A, and rests on two key errors. First, *Kwong* interpreted the word "continuing" in the President's declaration as a specified date, reaching this counter-textual conclusion because the court thought it was necessary to avoid surplusage. But the President's

74

declaration was not primarily about tax, and "continuing" has meaning in the context of the federal assistance efforts that were the declaration's focus. Second, building on this error, *Kwong* understood the mandatory postponement to last until 60 days after FEMA closed the incident period. But that erroneously looks beyond the President's declaration, contrary to what § 7508A requires, to instead apply in the tax context a FEMA administrative action that uses a term of art that Congress chose *not* to use for § 7508A.

The plain text of § 7508A requires a definite date. Any period disregarded begins "on the earliest incident date specified" in the President's declaration and ends "on the date which is 60 days after the latest incident date so specified" in the President's declaration. 26 U.S.C. § 7508A(d)(1)(A) & (B). The only date specified in the President's Maryland Declaration is January 20, 2020. The statute allows for multiple dates, but does not require them, and when only one date is specified, it is both the earliest and latest date. *See Abdo*, 162 T.C. 148, 157 n.7 (parties agreeing on this point in the context of the similar Ohio declaration). Thus, the period disregarded under § 7508(d) began on January 20, 2020, and ended 60 days later on March 20, 2020.

The word "continuing" is not a date. And if there were any doubt that the statute required an actual date, the use of the word "specified" dispels it. *Kwong* reached its atextual reading because the court believed that the word "continuing" in the President's declaration needed to have independent meaning. 179 Fed Cl. at 383. Assuming the surplusage canon applies (though as explained below, it does not), there is no surplusage because the pandemic declarations were not solely, or indeed even mostly, about tax deadlines. The issue before the court in *Kwong* happened to be a tax matter, but that was not the issue before the President, whose disaster declaration authorized the use of federal resources in many areas.[34] Section 7508A(d) merely provides that the

---

[34] The Stafford Act authorizes FEMA to provide financial and direct assistance to individuals and households, including housing assistance and financial assistance for medical, dental, childcare, funeral, and transportation

declaration also had tax-related consequences. With the multifaceted nature of a Presidential disaster declaration, primarily directed at unlocking federal assistance, there is no need for every word to have meaning specifically in the context of tax deadlines under § 7508A(d).

That said, *Kwong* was wrong to apply the surplusage canon at all. *Kwong* sought to avoid surplusage in a non-statutory document—the Presidential declaration—and, in doing so, reached a result inconsistent with the text of an actual statute, § 7508A. Even when construing a statute, however, avoiding surplusage is not an absolute rule that can override plain text. *See, e.g., Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013). Nor does *Kwong* explain why it parsed the President's declaration as though it were "the language of a statute," when, instead, it "must be read with a careful eye to context." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373-74 (2023) (regarding construing Supreme Court opinions) (internal quotation marks omitted). Here, the context—the COVID-19 pandemic and providing federal assistance—was not primarily about tax deadlines.

*Kwong* also relied on Congress amending § 7508A in 2021, "such that it would end 60 days after the earliest incident date or the date the declaration was issued, whichever date is later." *Kwong*, 179 Fed. Cl. at 388 (citing § 7508A(d)(1)(B) (2021 ver.)). *Kwong* viewed this amendment as changing the statute to "no longer have an indefinite automatic extension when a disaster lasts a long time." *Id*. But *Kwong*'s view as to the purpose of the 2021 amendment is colored by its erroneous view that the pre-2021 statute permitted the "latest incident date" to be a non-specific "continuing" postponement. The 2021 amendment does not apply to the COVID-19 declaration

---

expenses. All of these assistance programs have application deadlines, and the Stafford Act sets out guidelines for establishing the proper duration of any such program. Thus, the President's description of a disaster as "continuing" in a declaration would have significant meaning for these disaster aid and recovery programs. *See e.g.,* 42 U.S.C. § 5177 (regarding the process for providing federal unemployment and reemployment assistance to individuals affected by a federally declared disaster, including the application process and duration of the assistance program).

but if it had, the difference would have been that the 60-day countdown period would have begun March 26, 2020, the date of the declaration, as opposed to January 20, 2020, the single incident date specified in the declaration. The practical effect is linking the start of the 60-day countdown period to the date of the President's declaration rather than the date of the disaster itself. This change ensures that the 60-day postponement period under § 7508A(d) does not end before the declaration itself. For example, because the Maryland Declaration was issued March 26, 2020, with an incident date of January 20, 2020, the mandatory postponement ended March 20, 2020, before the declaration itself. But there is no reason to view the 2021 amendment as fixing a non-existent flaw about indefinite postponements in the previous version.

*Kwong*'s second error was interpreting the disregarded period as lasting until 60 days after the date when FEMA closed the "incident period." Section 7508A(d) says nothing about an "incident period." It refers instead to one or more specified "incident date(s)" and—by way of the definition of disaster area (see note 1)—requires a Presidential declaration. The only "incident date" specified by the President was January 20, 2020; FEMA's later administrative action setting an ending date for the "incident period" cannot create a new "incident date."[35]

This conclusion is reinforced by the fact that Congress used the phrase "incident date" in § 7508A(d) rather than "incident period." The latter phrase has long been part of FEMA's regulations, *see* 55 Fed. Reg. 2284-01 (adding definition in January 1990), and Congress has elsewhere relied upon FEMA's "incident period," *see, e.g.* 26 U.S.C. § 72(t)(11)(F)(ii). But when Congress added § 7508A(d) (in December 2019, *see* Public Law 116-94, § 205), it chose to instead use a new term. That deliberate choice in language is telling. *See, e.g.*, *Patel v. Garland*, 596 U.S. 328, 341 (2022). FEMA's administrative action has no relevance to § 7508A.

---

[35] The President has delegated many Stafford Act functions to FEMA but *not* the declaration of a major disaster or emergency. *See* 54 Fed. Reg. 12571, § 1 (Executive Order 12673, issued March 23, 1989).

But even if "continuing" counted as a specified date and even if FEMA's action mattered, the disregarded period would be limited to one year, which is too short to aid Goldstein. Under § 7508A(d), periods are "disregarded in the same manner as a period" under § 7508A(a), which sets a one-year ceiling for a period disregarded by the Treasury Secretary. Thus, that ceiling would apply to § 7508A(d). At best for Goldstein, his payment deadlines were "disregarded" for one year after January 20, 2020, until January 2021. But that would still mean he failed to pay timely. *See* Mot. 90 (2019 taxes paid April 29, 2021; 2020 taxes paid December 8, 2022; 2021 taxes paid October 16, 2022).

*Kwong* addressed this only briefly, concluding that by "in the same manner," the statute "evidently" must refer to the "types of actions that can be delayed" rather than "the length of time." 179 Fed. Cl. at 387-88. But "manner" is best understood as procedural. *See* "Manner," *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/manner. And the Supreme Court has explained that such language elsewhere in the tax code gives "the Secretary the same authority and guidance" as the referred-to provisions. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 546 (2012) (construing "assessed and collected in the same manner as tax" to provide "the same authority and guidance with respect to the penalty"). Selectively incorporating part of 7508A(a), while jettisoning the time restriction, makes no sense. Rather, "in the same manner" incorporates § 7508A(a) more broadly, including a one-year cap on the disregarded period.

The plain text of the statute and the President's Maryland Declaration confirm that *Kwong*'s reasoning and holding is incorrect. But other factors lead to the same conclusion. For one, there is the heading of § 7508A(d), which can aid statutory interpretation. *See Dubin v. United States*, 599 U.S. 110, 121 (2023). The heading reads: "Mandatory 60-day extension." 26 U.S.C.

§ 7508A(d). That suggests Congress intended to provide for a short, defined period of postponement, not an indefinite one.

Additionally, the potential scope of *Kwong*'s alternative reading is breathtaking and creates an absurd statutory scheme. Under *Kwong*'s logic, Congress created a statute that allows for indefinite postponement and gives FEMA administrators greater power over tax administration than the Treasury Secretary. It would be quite surprising if the statute required this result. The statute does not expressly provide that and, contrary to the effect of *Kwong*'s holding, Congress does not "hide elephants in mouseholes." *Santoro v. Accenture Fed. Servs., LLC*, 748 F.3d 217, 223 (4th Cir. 2014) (quoting *Gonzales v. Oregon,* 546 U.S. 243, 267 (2006), further internal quotation marks omitted).

### 3.      There Was No Prejudicial Variance

The plain text of the statute and a common-sense reading of the Maryland Declaration lead to a simple conclusion: the disregarded period began January 20, 2020, and ended March 20, 2020. Even if the Government's primary argument were rejected, the postponement period was limited to one year, until January 20, 2021.

Contrary to Goldstein's claims, Mot. 91, such a difference in dates would not be a fatal variance. Goldstein cites no case law on variance—reason enough to reject his claim—likely because it undermines his argument. A variance is not grounds for a new trial. It must be prejudicial. *See, e.g.*, *United States v. Young*, 989 F.3d 253, 264 (4th Cir. 2021). Differing dates are not inherently prejudicial. Indeed, in a tax case, the Fourth Circuit found that a three-year variance was not prejudicial. *See United States v. Masiarczyk*, 1 F. App'x 199, 207-08 (4th Cir. 2001) (holding alleged variance would not constitute actual prejudice). There is no prejudice because Goldstein's payments were untimely even with an extra year to pay.

####    4.    There Was No Legal Uncertainty Or Ambiguity

Perhaps sensing the weakness of *Kwong*, Goldstein does not actually analyze the opinion or § 7508A, instead urging that "[a]ll that matters is that the question is disputed among the courts," Mot. 91, by which he apparently means the lone *Kwong* opinion. While the Fourth Circuit has found that deeply ambiguous tax laws cannot be the basis for criminal liability regardless of a defendant's own beliefs, *Kwong* does not satisfy that high bar. The potential complexity of the tax laws is normally accommodated by requiring subjective willfulness for a conviction. *See Cheek v. United States*, 498 U.S. 192, 200 (1991). For subjective belief to be irrelevant, the uncertainty must be very high, such as, for example, where the law "is so uncertain that even co-ordinate branches of the United States Government plausibly reach directly opposing conclusions." *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974) (IRS and Interior Department disagreed on taxability of income from a possessory interest in unallocated reservation land that the United States held in trust for the Eastern Cherokee tribe); *see also United States v. Mallas*, 762 F.2d 361, 363 (4th Cir. 1985) (finding the law completely silent whether "annual advance minimum royalties that are recoupable from warranted coal reserves acquired after execution of a lease but before payment of the royalty may be deducted from gross income."). *Kwong*'s erroneous construction of § 7508A does not demonstrate that the statute is so ambiguous that the jury's verdict as to Goldstein's subjective intent is irrelevant. Rather than the government relying on a "pioneering interpretation," it is Goldstein who is trying to create uncertainty with a novel theory.[36] *Critzer*, 498 F.2d at 1164. In sum, Goldstein's motion for acquittal on the § 7203 convictions must be denied.

### CONCLUSION

The government respectfully requests that the Court deny Goldstein's motion in its entirety.

---

[36] The government noticed an appeal of the *Kwong* decision on May 15, 2026. 1:23-cv-00267-MRS, Dkt. 47.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

Dated: May 15, 2026

/s/
Hayter L. Whitman
Trial Attorney
Department of Justice—Criminal Division

Sean Beaty
Senior Litigation Counsel
Emerson Gordon-Marvin
Trial Attorney
Department of Justice—Criminal Division

Adeyemi Adenrele
Assistant United States Attorney
District of Maryland