IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CRIMINAL NO. LKG-25-6 |
| THOMAS C. GOLDSTEIN, | |
| Defendant. | |

**DEFENDANT THOMAS C. GOLDSTEIN'S REPLY IN SUPPORT OF HIS RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.    THE ERRORS RELATED TO ACCESSORY LIABILITY REQUIRE A NEW
      TRIAL ...................................................................................................................... 2

      A.    The Jury Was Erroneously Instructed To Determine Guilt Under Section 2
            Without Instructions Setting Forth Its Required Elements .................................. 2

            1.    The instructions permitted conviction under Section 2 for every count ..... 3

                  (a)    A reasonable juror would have understood the instructions
                         to permit conviction under Section 2 ............................................. 4

                  (b)    The government's contrary arguments lack merit ......................... 7

            2.    The government's complete reversal confirms the instructional error ..... 10

            3.    The government has failed to show that the error was harmless .............. 13

      B.    The Court Impermissibly Expanded Accessory Liability After Closing
            Argument ............................................................................................................ 16

II.   THE COURT'S IMPROPER EXCLUSION OF MESSAGES INCLUDING THE
      LEDGER REQUIRES A NEW TRIAL ON ALL COUNTS .......................................... 17

      A.    The Court Was Required To Admit The Messages Because Mr. Goldstein
            Offered Them As Evidence That He Lacked Willfulness .................................... 20

      B.    The Court's Error Was Not Harmless Because The Evidence Undermined
            The Government's Primary Theory Of Willfulness ............................................ 25

III.  THE CONVICTIONS ON COUNTS 11-13 ARE LEGALLY INVALID ...................... 30

      A.    As A Matter Of Law, Mr. Goldstein Could Not Have Willfully Failed To
            Pay Taxes By The Applicable Due Dates For 2019-2021 ................................... 31

      B.    The Government's Procedural Arguments Lack Merit ....................................... 34

IV.   THE GOVERNMENT'S ARGUMENTS ON THE OTHER ISSUES LACK
      MERIT ................................................................................................................... 35

      A.    Giving The Willful Blindness Instruction Was Error ......................................... 35

            1.    The evidence does not support the instruction ........................................ 35

            2.    The error was not harmless ..................................................................... 36

      B.    Count 1 Allowed The Jury To Convict On Two Legally Invalid
            Allegations .......................................................................................................... 37

      C.    Acquittal Or A New Trial Is Necessary As To Counts 3, 7, 8, And 9 .................. 38

CONCLUSION .................................................................................................................. 40

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyde v. California*,
494 U.S. 370 (1990)................................................................................................. 4-6

*Cheek v. United States*,
498 U.S. 192 (1991).................................................................................................17, 38

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011).......................................................................................................35

*Grayson O Co. v. Agadir Int'l LLC*,
856 F.3d 307 (4th Cir. 2017) ........................................................................................34

*Kwong v. United States*,
179 Fed. Cl. 382 (2025) ............................................................................................ 30-35

*McDougall v. Dixon*,
921 F.2d 518 (4th Cir. 1990) .........................................................................................4

*Samia v. United States*,
599 U.S. 635 (2023)........................................................................................................9

*Spies v. United States*,
317 U.S. 492 (1943)......................................................................................................37

*Taylor v. Kentucky*,
436 U.S. 478 (1978)........................................................................................................8

*Tennessee v. Street*,
471 U.S. 409 (1985)......................................................................................................25

*United States v. Adams*,
139 F.4th 931 (D.C. Cir. 2025)......................................................................................29

*United States v. Ali*,
735 F.3d 176 (4th Cir. 2013) ........................................................................................35

*United States v. Brizuela*,
962 F.3d 784 (4th Cir. 2020) ........................................................................................29

*United States v. Coward*,
669 F.2d 180 (4th Cir. 1982) .........................................................................................8

*United States v. Critzer*,
498 F.2d 1160 (4th Cir. 1974) ...........................................................................31, 32, 35

*United States v. Delavan*,
826 F. App'x 259 (4th Cir. 2020) .................................................................................39

*United States v. Farner*,
251 F.3d 510 (5th Cir. 2001) ........................................................................................37

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

*United States v. Gallagher,*
90 F.4th 182 (4th Cir. 2024) ...............................................................20, 23, 24, 26, 27

*United States v. Goodyear,*
649 F.2d 226 (4th Cir. 1981) ...............................................................38

*United States v. Gumbs,*
283 F.3d 128 (3d Cir. 2002)...............................................................6, 7

*United States v. Harris,*
346 F.2d 182 (4th Cir. 1965) ...............................................................7

*United States v. Harris,*
942 F.2d 1125 (7th Cir. 1991) ...............................................................24

*United States v. Hastings,*
134 F.3d 235 (4th Cir. 1998) ...............................................................13, 15

*United States v. Horton,*
921 F.2d 540 (4th Cir. 1990) ...............................................................6

*United States v. Hutchison,*
338 F.2d 991 (4th Cir. 1964) ...............................................................7

*United States v. Ibisevic,*
675 F.3d 342 (4th Cir. 2012) ...............................................................25-30

*United States v. Ince,*
21 F.3d 576 (4th Cir. 1994) ...............................................................28

*United States v. Jefferson,*
674 F.3d 332 (4th Cir. 2012) ...............................................................37

*United States v. Jinwright,*
683 F.3d 471 (4th Cir. 2012) ...............................................................36

*United States v. Kimble,*
855 F.3d 604 (4th Cir. 2017) ...............................................................38

*United States v. Leake,*
642 F.2d 715 (4th Cir. 1981) ...............................................................24

*United States v. Lighty,*
616 F.3d 321 (4th Cir. 2010) ...............................................................4, 5, 9, 37

*United States v. Mallas,*
762 F.2d 361 (4th Cir. 1985) ...............................................................31, 32

*United States v. Moran,*
493 F.3d 1002 (9th Cir. 2007) ...............................................................25

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

*United States v. Naum*,
   134 F.4th 234 (4th Cir. 2025) ......................................................................13

*United States v. Nealy*,
   729 F.2d 961 (4th Cir. 1984) .................................................................38, 39

*United States v. Odum*,
   65 F.4th 714 (4th Cir. 2023) .................................................................... 6-7

*United States v. Polowichak*,
   783 F.2d 410 (4th Cir. 1986) .....................................................................7, 8

*United States v. Ravelle*,
   947 F.2d 943 (4th Cir. 1991) ........................................................................7

*United States v. Sanders*,
   964 F.2d 295 (4th Cir. 1992) ......................................................................29

*United States v. Stitt*,
   250 F.3d 878 (4th Cir. 2001) ........................................................................6

*United States v. Wellendorf*,
   574 F.2d 1289 (5th Cir. 1978) ....................................................................25

*United States v. Winstead*,
   708 F.2d 925 (4th Cir. 1983) ........................................................................6

*Wong Sun v. United States*,
   371 U.S. 471 (1963)....................................................................................21

**Statutes & Regulations**

Pub. L. No. 117-58, 135 Stat. 429 (2021)................................................................34

18 U.S.C.
   § 2............................................................................................ *passim*
   § 2(a) .......................................................... 2, 5, 6, 10-12, 16, 17
   § 2(b)...........................................................5-7, 11, 12, 14-17

26 U.S.C.
   § 6331(k)(2)(C)............................................................................38
   § 7206(2)...................................................................... 14, 38-40
   § 7508A(d) (2019) ......................................................................31-33
   § 7508A(d)(1)(B) (2019) ...........................................................33
   § 7508A(d) (2021) ......................................................................33

26 C.F.R. § 1451-1(a) ..............................................................................................17

85 Fed. Reg. 21873 (Apr. 20, 2020) ............................................................... 32-33

88 Fed. Reg. 8884 (Feb. 10, 2023) ................................................................. 32-33

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**Page(s)**

Fed. R. Crim. P. 12(b)(3) ...............................................................................................35

Fed. R. Crim. P. 30(b)..................................................................................1, 2, 16, 17

Fed. R. Evid.
Rule 105 ....................................................................................................................25
Rule 402 ....................................................................................................................21
Rule 801(c)(2) ...........................................................................................................20
Rule 803(3) ...............................................................................................................20

**Miscellaneous**

2 McCormick on Evid. (9th ed. 2025) .........................................................................20

H.R. 5027, 117th Cong. (Aug. 2021)...........................................................................34

IRS, Internal Revenue Bulletin: 2021-05 (Feb. 1, 2021)........................................30, 34

S. 2581, 117th Cong. (Aug. 2021)...............................................................................34

**INTRODUCTION**

The government's aggressive legal positions before, during, and after trial—and repeated efforts to impede Mr. Goldstein's defense—directly led the Court into a series of errors that require a new trial. The government's opposition seeks to rewrite that history, but fails.

On accessory liability, the jury instructions permitted the jury to convict Mr. Goldstein under 18 U.S.C. § 2. That gave rise to two errors: (1) the Court violated core due process principles by failing to instruct the jury on the elements of accessory liability; and (2) the Court violated Rule 30(b) by changing the instructions after closing arguments. In the face of these clear errors, the government reverses course entirely and now argues that the instructions did not provide a basis for the jury to convict under Section 2. That claim cannot be squared with the government's repeated representations to the Court, its arguments to the jury, or the verdict. And Section 2 liability applied to every count, so a full new trial is required.

The hearsay error is equally stark. The government asked the jury to infer Mr. Goldstein's willfulness from messages describing his supposed gross gambling winnings in 2016. But the Court excluded on hearsay grounds critical evidence that would have proved Mr. Goldstein did not act willfully because he believed his 2016 net income was far less—including messages describing tens of millions that Mr. Goldstein lost in poker matches and paid to investors, as well as messages indicating that millions in 2016 winnings were not paid until 2017. Under settled doctrine, evidence is *not* hearsay when it is introduced to prove the defendant's knowledge or intent, notwithstanding that the same *also* could tend to prove a fact if accepted for its truth. The Court's error was not harmless because the government emphasized that Mr. Goldstein lacked documentary evidence supporting his testimony about what he believed he had won and urged the jury to infer willfulness on every tax count from his failure to report these alleged winnings as income.

The government's arguments on the remaining issues likewise lack merit.  But if the Court orders a new trial based on the erroneous accessory-liability instruction and/or the improperly excluded evidence, the most efficient course is for the Court to defer ruling on several of those issues and resolve them through new motions *in limine*.

## ARGUMENT

### I. THE ERRORS RELATED TO ACCESSORY LIABILITY REQUIRE A NEW TRIAL

The government's last-minute request to delete the standalone Accessory Instruction misstated the law, leading the Court into two errors.  Each requires a new trial.  First, due process forbids permitting the jury to convict under Section 2 without specifying its elements.  Second, Rule 30(b) forbids amending the instructions after closing arguments.  The government's opposition misrepresents its position throughout the trial—and its new position is meritless.

### A. The Jury Was Erroneously Instructed To Determine Guilt Under Section 2 Without Instructions Setting Forth Its Required Elements

At the charge conference, the Court adopted the standalone Accessory Instruction, recognizing that it was necessary to detail the elements the jury must find to convict under Section 2.  2/17/26 Tr. 223:25-224:3.  Following closing, the government persuaded the Court to delete that instruction on the premise that it was unnecessary, because "in the substantive instructions" for tax evasion, false returns, and mortgage fraud "there is language specifically quoting Section 2(a) and (b)," "[s]o that is already in the instructions" and "sufficiently clear."  2/19/26 Tr. 10:18-20, 21:20-23.  The defense objected, requesting that all the Section 2 language throughout the instructions be deleted. The government responded that it wanted to omit only the standalone instruction while "the other aiding and abetting language should stay in," and it reiterated that "the statute itself is very clear as to the standard" for Section 2 liability, rendering a separate instruction unnecessary.  2/19/26 Tr. 8:17-20, 10:14-15.  The Court granted the government's request.

2

The government now reverses course.  The government cannot—and does not—dispute that it misstated the law to the Court: The unadorned statutory language was insufficient to instruct on Section 2 liability in accordance with due process.  Mot. 13-17.  Nor does the government attempt to satisfy the harmless-error standard, which requires the government to show beyond a reasonable doubt that the jury necessarily would have found Mr. Goldstein guilty of a substantive offense, as opposed to accessory liability, on each Count.  *Id.* at 23-24; Opp. 26-28.

Instead, the government engages in revisionist history.  The government now claims that the instructions "*did not* permit the jury to convict under *any* § 2 theory."  Opp. 4.  That about-face all but concedes the government led the Court astray.  And the government's new theory fails: The jury instructions permitted conviction under Section 2—which is exactly why the government fought to keep that language in over the defense's objection.

### 1.    The instructions permitted conviction under Section 2 for every count

The government contends that the "instructions precluded the jury from convicting Goldstein based on § 2."  Opp. 10.  That is so, the government claims, because the language quoting Section 2 in each substantive count "merely summarized the indictment" and was purely descriptive.  *Id.* at 10.  But that makes no sense.  The government drafted those instructions, and its own statements make clear it always intended to pursue—and did pursue—a conviction under Section 2.  Why would it have opposed removing all of the Section 2 language if it was not seeking a conviction under Section 2?  And why would the Court have approved instructions that the jurors were not permitted to act on, and that therefore could only serve to confuse the jury?

The government's theory also cannot be squared with the instructions as a whole.  As the government itself asserted after closing arguments, even without the Accessory Instruction, the jury charge contained "substantive instructions" on Section 2 liability.  ECF No. 430 at 2.  Those instructions would have led a reasonable jury to conclude that it could convict under Section 2.

#### (a)    A reasonable juror would have understood the instructions to permit conviction under Section 2

The government errs from the start by ignoring the relevant standard for assessing the instructions. If there is a "reasonable likelihood" that a "reasonable juror" would have understood the instructions to allow for conviction under Section 2, that is dispositive. *Boyde v. California*, 494 U.S. 370, 380, 386 (1990); *see McDougall v. Dixon*, 921 F.2d 518, 532 (4th Cir. 1990) (test is "what a reasonable juror would have understood the entire charge to mean").

Under the proper legal standard, there is at least a "reasonable likelihood" that the jury would have understood the instructions to allow for conviction under Section 2. *Id.* The instructions for all four categories of charges provided that Mr. Goldstein was charged with the substantive offense "*and* aiding and abetting, counseling, commanding, inducing or procuring such an offense." 2/19/26 Tr. 55:17-19, 60:24-61:2, 71:1-4, 75:21-76:1 (emphasis added). And the instructions regarding tax evasion, false returns, and mortgage fraud each set forth the full text of Section 2, stating:

> The indictment also alleges that Mr. Goldstein violated Section 2 of Title 18 of the United States Code, which provides in pertinent part as follows: Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal.

> And whoever willfully causes an act to be done, which, if directly performed by him or another, would be an offense against the United States is punishable as a principal.

*See* 2/19/26 Tr. 56:6-14, 64:24-65:6, 78:3-79:6. A reasonable juror could assume that the instructions would invoke "aiding and abetting" liability and quote at length from Section 2 only if the jury could convict under Section 2; otherwise, the Section 2 language would be unnecessary and confusing.

Reading the jury instructions "as a whole and in the context of the entire charge," *United*

4

*States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010); *see* Opp. 9, only strengthens that inference. Before describing the charges in the indictment, the Court instructed that "[t]he indictment contains 16 counts. . . . You must consider each count separately and return a separate verdict of guilty or not guilty for each count. . . . Whether you find Mr. Goldstein guilty or not guilty as to one offense should not affect your verdict as to any other offenses charged." 2/19/26 Tr. 41:24-42:7. And after reciting the instructions that included the text of Section 2, the Court similarly stated that "to prevail *on a given count*," the government "must prove the essential elements by the required degree of proof," "[a]s I already explained in *these instructions*," 2/19/26 Tr. 86:5-9 (emphases added), including, of course, the discussion of Section 2. That language provides ample reason for jurors to believe that their role was to determine guilt or innocence on the offenses charged in the indictment.

Additional "context [from] the proceedings" lends further support to that understanding. *Boyde*, 494 U.S. at 383. Throughout trial and through closing arguments, there was no dispute that the government was pursuing Section 2 liability. The jury received the final instructions against the backdrop of the preliminary instructions, which likewise quoted the language of Section 2(a) and 2(b) for tax evasion, failure to pay, and mortgage fraud and explained for all offenses that Mr. Goldstein was separately "charge[d] with" the substantive offenses "and aiding, abetting, counseling, commanding, inducing or procuring such an offense." 1/15/26 Tr. 19:10-20:5, 20:16-19, 24:17-20, 26:24-27:2, 30:5-11. And the jury received the final instructions only after it had heard the government's case and closing arguments—which stressed the involvement of office assistants, the accounting firm, Walter Deyhle, and Paul Phua. *See* Mot. 20-23. That evidence reinforced to the jury that its role included determining whether Mr. Goldstein aided and abetted an offense or willfully caused another person to commit an offense. *See id.*

The government offers no response to this point. Tellingly, the government itself argues that the preliminary instructions, evidence, and final instructions should have put the defense on notice that the government was pursuing a Section 2(b) theory of liability as to the mortgage fraud charge in Count 15. Opp. 32. If the defense should have understood the case to involve Section 2 liability, then the same should be true for the jury.

It is thus "reasonab[ly] like[ly]" that the jury would have understood the instructions to permit conviction under Section 2. *Boyde*, 494 U.S. at 380; *see United States v. Stitt*, 250 F.3d 878, 894 (4th Cir. 2001). And in turn, that violates due process because the jury did not know that convicting under Section 2 required it to find beyond a reasonable doubt those elements that are not set forth in the statutory text quoted in the instructions. In particular, the jury did not know that Section 2 aiding and abetting liability requires finding (1) that there was another guilty principal, *United States v. Horton*, 921 F.2d 540, 543-44 (4th Cir. 1990); (2) that "the defendant shared in the principal's criminal intent"—in this case, the *willful* intent to commit the tax offenses, *United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983); and (3) that the defendant "took an affirmative act in furtherance of the underlying offense," *United States v. Odum*, 65 F.4th 714, 721 (4th Cir. 2023). Indeed, the Court agreed at the charge conference that it was necessary to instruct the jury on these elements. 2/17/26 Tr. 223:25-224:3. As for Section 2 cause liability, the jury did not know that it was required to find "the defendant had the *mens rea* required by the underlying statute," which here is the willful intent to commit the tax offenses. *United States v. Gumbs*, 283 F.3d 128, 135 (3d Cir. 2002).[1]

---

[1] The government suggests (Opp. 26-27) that the failure to instruct on the elements of Section 2(b) was harmless because "Section 2(b) liability is straightforward, and the statute itself essentially defines the elements." Even if that were true, a retrial would still be required because of the failure to instruct on Section 2(a)'s elements. But it is not true. As the government's cited cases explain (Opp. 27), while Section 2(b)'s text on its face requires only that the defendant "willfully cause[d]

The jury charge here violates a wall of Fourth Circuit precedent establishing that a court must "instruct the jury on the specific elements" of the offenses charged. *United States v. Ravelle*, 947 F.2d 943 (4th Cir. 1991) (per curiam); *see, e.g.*, *United States v. Polowichak*, 783 F.2d 410, 415 (4th Cir. 1986); *United States v. Hutchison*, 338 F.2d 991, 991 (4th Cir. 1964) (per curiam). In *Polowichak*, for instance, the Fourth Circuit reversed a conviction where the relevant instruction "merely identified the charges contained in" the counts "of the indictment." 783 F.2d at 415. The court explained "that we 'cannot and will not affirm a conviction by a jury unless the District Court instructs as to the elements of the offense charged.'" *Id.* (citation omitted). Thus, as the government does not dispute, simply "reading . . . the statute to the jury" does not suffice. *United States v. Harris*, 346 F.2d 182, 184 (4th Cir. 1965); *see Odum*, 65 F.4th at 720.

### (b)     The government's contrary arguments lack merit

Unable to prevail based on a fair reading of the instructions, the government seeks to mischaracterize them. The government claims the Court simply "read[] portions of the indictment to the jury." Opp. 12. That is not true. In fact, the indictment cites 18 U.S.C. § 2 without any quotation or elaboration. *See* ECF No. 337-2 at 40, 49, 51, 52. The Charging Instructions, by contrast, go much further—tasking the jury with determining whether "Mr. Goldstein [is] guilty or not guilty as to [the] . . . offenses charged," 2/19/26 Tr. 41:24-42:7; explaining Mr. Goldstein was charged with the substantive offense "*and* aiding and abetting, counseling, commanding, inducing or procuring such an offense," *id.* at 55:17-19, 60:24-61:2, 71:1-4, 75:21-76:1 (emphasis

---

an *act*," 18 U.S.C. § 2(b) (emphasis added), the government must prove the defendant intended to cause the commission of a specific substantive offense, *see Gumbs*, 283 F.3d at 135. Thus, the Court should have instructed the jury that it could find Mr. Goldstein guilty under Section 2(b) only if he specifically intended to cause the violation of a known legal duty in the tax code (or of the mortgage fraud statute). *See* Mot. 13-15. The government does not (and cannot) seriously contend that the text of Section 2(b) alone conveys that instruction.

added); and quoting Section 2 in full at several points. *Id*. at 56:6-14, 64:24-65:6, 78:3-79:6. The government does not explain why those instructions, viewed in full, must be read to preclude the jury from convicting based on Section 2.

The government's principal response rests on the Court's prefatory statement that "an indictment is merely a statement of charges and is not evidence." 2/19/26 Tr. 41:7-10; *see* Opp. 11. According to the government, that phrase, combined with the Court's "instructions on the elements" of the substantive offenses, rendered the Section 2 language merely descriptive. *See* Opp. 11-12. But telling the jury that the indictment states the "charges" only reinforces the problem because the jury would reasonably understand its task as determining guilt or innocence on those charges. And clarifying that the indictment is not "evidence" of guilt or innocence does nothing to cure that problem. Instead, that clarification addressed a separate issue: that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978).

Unsurprisingly, the government identifies no precedent that supports its theory. The government contends that *Polowichak* and *United States v. Coward*, 669 F.2d 180, 184 (4th Cir. 1982), stand for the proposition that "providing an *entire* indictment to the jury during deliberations is not reversible error if accompanied by an instruction that the indictment is not evidence." Opp. 12. But that description omits two critical facts. First, the indictment in those cases was not quoted in the instructions as part of the jury charge. Second, the district court advised the jury that "certain counts [of the indictment] should be disregarded as irrelevant to the defendants currently before the district court." *Polowichak*, 783 F.2d at 413; *see Coward*, 669 F.2d at 184 (concluding district court did not err by "sending an unedited copy of the indictment to the jury room," because, among other things, "[w]hen the District Judge initially read the

8

indictment to the jury, he explicitly informed them that he omitted portions 'which did not relate to the defendant before this Court'"). *That* limiting instruction is what prevented the jury from erroneously believing that it could convict on those charges—not the admonition that the indictment is "not evidence."

The other cases cited by the government do not speak to whether reading a charge in an indictment, without a limiting instruction, could be reasonably understood to permit a conviction on that ground. *See* Opp. 9-13 (citing *Lighty*, 616 F.3d at 366; *Samia v. United States*, 599 U.S. 635, 646 (2023); *United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009)). If anything, those decisions cut against the government because reading the instructions "as a whole," *Lighty*, 616 F.3d at 366 (citation omitted), and "presum[ing] that jurors will 'attend closely the particular language of [such] instructions,'" *Samia*, 599 U.S. at 646 (citation omitted), only strengthens the inference that a reasonable juror in all likelihood would have understood the instructions to permit conviction under Section 2, *see supra* at 4-6. In fact, it is the government's theory that presumes the jury will ignore whole components of the instructions.

The government also emphasizes the instructions' relatively lengthy discussion of the substantive offenses, as compared with its treatment of Section 2. *See* Opp. 7-9, 11-12. But that disparity will *always* be present in cases involving accessory liability, which *also* requires the jury to find the elements of the substantive offense. The court must set forth the elements of accessory liability only once—here, in the Accessory Instruction. And as elaborated below, the government repeatedly told the court that, even without that standalone instruction, the jury charge contained sufficient "substantive instructions" to permit the jury to convict under Section 2. ECF No. 430 at 2; *see also infra* at 10-11. The government seeks to take advantage of the fact that the Court quoted only Section 2, without instructing the jury on the requirements to apply accessory liability. *See*

9

Opp. 9-13.  But that is the constitutional problem, not its solution.  The due process violation cannot be waved away by simply recharacterizing all the Section 2 language as meaningless.

### 2. The government's complete reversal confirms the instructional error

The government has reversed course on the critical question here: whether the Charging Instructions permitted the jury to convict on Section 2 after the standalone Accessory Instruction was removed.  Following closing arguments, the government argued the answer was yes.  The government's motion asking to delete the Accessory Instruction stated that "[t]he government has charged Mr. Goldstein for violating 18 U.S.C. § 2, which has two subsections, (a) and (b)."  ECF No. 430 at 2.  And the government emphasized that "[t]he *substantive instructions already make that clear* by quoting both subsections."  *Id.* (emphasis added).  Thus, the government's theory was that the instructions it now claims are purely "introductory," Opp. 10, were in fact "substantive instructions" that would permit the jury to convict under Section 2(a) or (b), ECF No. 430 at 2.

At the hearing, the government doubled down on that theory.  It stressed that "in the *substantive instructions* for tax evasion[,] for false returns[,] and for mortgage fraud, there is language specifically quoting Section 2 (a) and (b).  So that is already in the instructions."  2/19/26 Tr. 21:20-23 (emphasis added); *id*. at 23:18-21 ("[T]he reality is that both sections are charged. That's already in part of the jury instructions" apart from the "standalone instruction.").  When the defense objected that the government "wants to . . . tell the jury they can convict Mr. Goldstein of aiding and abetting and then remove the instruction explaining to them what they would have to find to do that," 2/19/26 Tr. 8:3-6, the government did not claim that the remaining instructions "precluded the jury from convicting Goldstein based on § 2," Opp. 9.  Instead, the government argued that the Accessory Instruction "should come out, and the other aiding and abetting language should stay in," reiterating that "the statute is sufficiently clear" and "[i]t's already cited in the instructions, and so there is no reason to have a separate standalone."  2/19/26 Tr. 8:17-10:22.

10

The government ultimately persuaded the Court that the Accessory Instruction was "inappropriate for cases involving violations of subsection (b)," in addition to Section 2(a).  ECF No. 430 at 2; *see* 2/19/26 Tr. 26:5-10.  And because there was not enough "time to go back" and write "better language," the Court decided to "pull out the aiding and abetting standalone," 2/19/26 Tr. 26:5-10.  Importantly, the Court noted that "[t]he other language [on aiding and abetting liability] is in there," *id*., reflecting its agreement with the government's view that the necessary language to convict under Section 2 was "already in the instructions," *id*. at 21:23.

The government's opposition misrepresents the positions it took on Section 2 liability.  It now claims that it "did not seek to convict Goldstein under [a Section 2(a)] theory."  Opp. 4.  But that cannot be reconciled with the government's representations in proposing jury instructions and following closing argument.  When the defense objected to proposed jury instructions that quoted Section 2(a) in describing the charged counts of tax evasion, false returns, and mortgage fraud, the government maintained that it had "introduced more than sufficient evidence to support an aiding and abetting instruction."  ECF No. 416 at 61, 88, 121; *see also* 2/17/26 Tr. 184:21-185:21 (contending there "[a]bsolutely" was sufficient evidence to support an "aiding and abetting instruction").  And on the evening of February 18, 2026, following closing argument, the government emailed the defense with a request to supplement the standalone Accessory Instruction, stating that "this is a § 2(b) case (*in addition to (a)*)."  *See* Exh. A (emphasis added).  At the hearing the next day, the government said "[t]he reality is that both sections are charged.  That's already in part of the jury instructions."  2/19/26 Tr. 23:18-21.  And the government persuaded the Court to delete only the standalone Accessory Liability language, while leaving in all other language covering *both* Section 2(a) and (b), which it characterized as part of the "substantive instructions."  *Id*.; *see supra* at 2-3, 10.

11

Similarly, the government now claims that it "did not argue [any Section 2(b)] theory to the jury." Opp. 4-5. But again, the government stated mere hours after closing argument that "this is a § 2(b) case (in addition to (a))." Exh. A. At the hearing to finalize the instructions, the government argued that "under Section 2B, Mr. Goldstein could . . . be held liable as a principal, and our position is he should be here and the evidence has shown that he should be here, even if he causes an innocent third party to commit that act." 2/19/26 Tr. 12:7-10. And the government emphasized that Mr. Goldstein "was the principal and he caused someone else to do part of the act, and that act that they committed established venue in Maryland." *Id.* at 12:24-13:1.

Ultimately, the government's complete reversal shows that it cannot prevail based on a fair understanding of what actually transpired at trial. The government originally sought to include the standalone Accessory Instruction because it contended the evidence permitted conviction under Section 2. *See* 2/17/26 Tr. 149:20-24 (arguing the Accessory Instruction was "important and necessary given the evidence that's come in about whether other people were involved in or the cause of the wrongdoing"); *id.* at 185:20-23 ("[T]he government's position is there is evidence for this . . . And that's why we put it in there."); *id.* at 199:4-5 ("[W]e think we have put in evidence in the case of aiding and abetting."); Mot. 17-18. And the government in fact had introduced evidence—which it repeatedly invoked in closing—that would have enabled an inadequately instructed jury to mistakenly convict under Section 2. *Id.* at 20-23. Indeed, absent proper instructions that Section 2(a) required a finding that Mr. Goldstein *willfully* intended to commit the substantive tax offenses, the jury could have easily viewed Section 2 as a means to bypass willfulness—one of the most hotly contested points in the case. *Id.* at 23. By urging the Court to keep *some* "substantive instructions" on Section 2—while omitting an explanation of its elements—the government led this Court to issue instructions that permitted the jury to

erroneously convict based on Section 2.

### 3.    The government has failed to show that the error was harmless

Because the accessory liability instruction was erroneous, "the government bears the burden of establishing that the error was harmless." *United States v. Naum*, 134 F.4th 234, 241 (4th Cir. 2025).  To do so, the government must prove "beyond a reasonable doubt[] that a correctly instructed jury would have reached the same conclusion." *United States v. Hastings*, 134 F.3d 235, 241 (4th Cir. 1998).  Where, as here, "the trial court submits a case to the jury on two or more alternate theories, one of which is the subject of an erroneous instruction," the government must show that the "jury *must have* convicted the defendant on the legally adequate ground." *Id.* at 242 (emphasis added).  Thus, because every count in the case was subject to the erroneous accessory liability instruction, the government bears the burden of establishing beyond a reasonable doubt that—*for every count*—the jury must have convicted under the primary liability theory.[2]

The government comes nowhere close to satisfying the proper standard.  It never attempts to explain why the evidence establishes beyond a reasonable doubt that Mr. Goldstein was guilty under the primary liability theory for each count.  And where the government does address the evidence of primary liability, it attempts only to show that there was *sufficient* evidence to uphold the jury's verdict on several counts.  *See, e.g.*, Opp. 57-69 (arguing that there was sufficient evidence for the jury to convict on Counts 3, 7, 8, and 9).  As discussed in the motion and further below, those arguments lack merit.  *See* Mot. 62-78; *infra* at 38-40.  But more importantly, establishing that the jury "could conclude" that Mr. Goldstein was guilty under the primary liability theory for each count does not mean that the jury "must have" reached that conclusion.

---

[2] The government seeks to lower its burden by relying on the plain-error standard.  Opp. 28-29.  But plain-error review applies only where the party challenging an instruction failed to object to it at the appropriate time.  And Mr. Goldstein timely objected to the erroneous instruction at every stage.  *See supra* at 10-12.  Thus, the government bears the burden to show harmless error.

13

The government devotes much of its brief to arguing that there was *insufficient* evidence to convict under Section 2. *See* Opp. 13-15, 19-20, 24-26. That is implausible. As the government acknowledges, "accessory and causer liability are built into" the false returns charges under 26 U.S.C. § 7206(2). Opp. 23. As a result, the government was *required* to present evidence of the involvement of third parties, including accountants and firm managers. The government now argues that *it* supposedly intended for that evidence to support a conviction only on the substantive offenses, but *the jury* had every reason to apply that evidence in convicting under Section 2.

Nor do the government's arguments support finding the error harmless. As discussed, the government vigorously argued to include instructions on Section 2 based on its view that sufficient evidence existed to convict Mr. Goldstein on that basis on each count—and in turn, the Court agreed with the government and included the instructions for that reason. Although the government now takes the remarkable position that its arguments to this Court *undermined* the case for issuing a Section 2 instruction, not even its cherry-picked quotes support that narrative. For instance, the government highlights its statement from the charge conference that Mr. Goldstein allegedly committed the substantive tax crimes "*through his accountant*"—but nowhere in that exchange did the government say (as it now claims) that Mr. Goldstein's accountant was "innocent." Opp. 15 (citing 2/17/26 Tr. 184:21-185:5). Indeed, the government conveniently omits its representation to this Court that there "[a]bsolutely" was evidence that Mr. Goldstein's accountant could have "erred in a criminal manner." 2/17/26 Tr. 184:21-185:5.

Unable to carry its burden, the government attempts to shift that burden to Mr. Goldstein. For instance, it faults Mr. Goldstein for failing to demonstrate that "the involvement of third parties . . . mean[s] the government was relying on § 2(b) liability," Opp. 22; for failing to "challenge[] the sufficiency of the evidence on count 15," *id.* at 22 n.11; and for failing to show "that his

14

convictions necessarily relied on § 2," *id.* at 24. But it is the *government's* "burden" to show that the "jury must have convicted the defendant on the legally adequate ground." *Hastings*, 134 F.3d at 242.

The government misses the point and misstates the record in arguing (Opp. 14) that Mr. Goldstein previously objected to the Section 2 instruction based on a lack of evidence. Despite that objection, the government convinced the Court to give that instruction for each count. And when the government later asked the Court to remove the Accessory Instruction, Mr. Goldstein objected to deleting that standalone provision without *also* deleting the rest of the instructions discussing Section 2. 2/19/26 Tr. 7:18-8:6. It is thus wrong to suggest that the end result is what Mr. Goldstein always wanted. *See* Opp. 14. And having secured a general guilty verdict on each count, the government cannot escape its burden to prove harmlessness simply because Mr. Goldstein objected to the instruction in the first place. Whenever a criminal case goes to trial on two alternate theories, the defendant almost invariably argues that there is insufficient evidence of guilt under *either* theory. And when the court determines that one of those theories is legally inadequate, the government must always prove beyond a reasonable doubt that the jury convicted on the other theory—despite the defendant's categorical objections to both. *Hastings*, 134 F.3d at 242. Indeed, the government's proposed rule would effectively deem "harmless" most such errors in any case involving two or more alternative legal theories.

The government's argument is also belied by its efforts to develop an evidentiary record to support Section 2(b) liability for the mortgage fraud charges, as well as its arguments to the jury on those counts. *See* Mot. 18, 22. Indeed, cause liability provided the *only* basis for the jury to find Mr. Goldstein guilty of the mortgage fraud charge in Count 15. *See id.* at 22. The government affirmatively acknowledged in its closing argument that Mr. Goldstein was not in Maryland when

15

the application relevant for Count 15 was submitted, *see* 2/18/26 Tr. 87, so the only basis for the jury to find venue was under an accessory liability theory.[3]   Thus, the government has failed to establish beyond a reasonable doubt that the erroneous Section 2 instruction was harmless.

> **B.    The Court Impermissibly Expanded Accessory Liability After Closing Argument**

The government does not dispute that it caused the Court to violate Rule 30(b) by changing the accessory instructions after closing argument.  Instead, it contends there is no prejudice because the Court assertedly removed Section 2 as a basis for liability.  *See* Opp. 30-32.  According to the government, the changes "*narrowed* the scope of liability" because Section 2 was no longer "an avenue for the jury to convict."  *Id.* at 31.  But for all the reasons just given, the jury would have reasonably read the instructions to permit conviction under Section 2.  *See supra* at 3-13.

As a backup, the government argues (Opp. 30-31) that Mr. Goldstein was not prejudiced because he would have made the same closing argument knowing that the Accessory Instruction would be deleted.  As supposed proof, the government cites (*id.* at 30) defense counsel's decision to devote little attention to Section 2 in the actual closing argument.  But the government misses the point.  Defense counsel believed the jury would be properly instructed on Section 2(a)'s elements in the standalone Accessory Liability instruction—including the requirement of a guilty principal—and thus saw no need to dwell on Section 2(a), because the jury would recognize that the evidence did not satisfy those elements.  The government itself stresses the absence of that proof from the record.  Opp. 13-14.  The amended instructions, however, did not provide that

---

[3] Contrary to the government's suggestion (Opp. 11), this Court did not understand the final instructions on the whole to preclude the jury from convicting Mr. Goldstein on a Section 2(b) "cause" theory of mortgage fraud.  Instead, the Court appears to have been referencing only the *substantive* mortgage fraud offense.  The Court ruled at the charge conference that the government could not argue that Mr. Goldstein himself committed the substantive offense of mortgage fraud if he "caused" someone else to make a false statement.  *See* 2/17/26 Tr. 212:23-213:24.

guidance.  Had defense counsel known that the jury would be unaware of that requirement, he would have expressly argued that the jury could not convict under Section 2(a) without finding another guilty principal.  *See* Mot. 27-28.  Additionally, because the deletion removed language that limited Section 2 liability to Section 2(a), the deletion made it possible for the government to pursue liability under Section 2(b) as well.  Had defense counsel known that, he would have argued to the jury that Mr. Goldstein was not guilty of mortgage fraud on that theory because there was not sufficient proof that he caused another person to submit the statements from Maryland.  *Id.*

Finally, the government presses the novel argument (Opp. 33) that defense counsel could have mitigated any prejudice by requesting additional argument time after closing arguments.  But the Court overruled the defense's explicit objection that the deletion of the Accessory Instruction violated Rule 30.  There is thus no reason to think it would have granted a request for additional time.  In any event, no court has ever held that the defense *must* make such a request.  On the contrary, abundant precedent makes clear that a Rule 30(b) violation is prejudicial if it affects the defense's ability to adequately address a theory of liability in closing.  *See* Mot. 26-28.

## II.    THE COURT'S IMPROPER EXCLUSION OF MESSAGES INCLUDING THE LEDGER REQUIRES A NEW TRIAL ON ALL COUNTS

Messages between Mr. Goldstein and third parties were central to the government's effort to prove willfulness for every tax charge.  Proving willfulness in a criminal tax case requires the government to establish the "voluntary, intentional violation of a known legal duty"—thus, a "good-faith belief that one is not violating the law . . . negate[s] willfulness."  *Cheek v. United States*, 498 U.S. 192, 201 (1991).  Here, the legal duty is not disputed: an individual must pay taxes on the *net* gambling winnings he actually *received* in the relevant year.  In calculating that income, he may subtract from his gross winnings any losses and any winnings owed to investors.  And he need not include money he won but did not receive in that calendar year.  26 C.F.R. § 1451-1(a).

17

At trial, the government stressed to the jury that the "main question in your deliberations on the tax charges is whether [Mr. Goldstein] acted willfully." 2/18/26 Tr. 48:12-16. The government proceeded to trial on a theory it later had to admit was false: that Mr. Goldstein failed to tell Walter Deyhle about his winnings from Alec Gores. It then shifted to a different, equally false narrative: that Mr. Goldstein knew he had almost $50 million in gambling income in 2016 and sought to avoid paying taxes on that income. The government contended that Mr. Goldstein's 2016 gambling income was proof of willfulness on every other count on the theory that his desire to avoid paying taxes on that income "motivated everything that Mr. Goldstein did from March 2016 through December 2022." 2/18/26 Tr. 46:20-24.

But the government lacked direct evidence that Mr. Goldstein won $50 million gambling in 2016—let alone direct evidence of his intent to hide those winnings from the IRS. Instead, the government relied on various messages between Mr. Goldstein and third parties that described 2016 poker games against three individuals: Chairman, Tango, and Mr. Gores. Based on those messages, the government argued to the jury that Mr. Goldstein had "$27 million of gambling income earned in the United States" in 2016 and that he "secretly won $22 million in Asia" in 2016. 2/18/26 Tr. 46:20-24. The government asserted that Mr. Goldstein necessarily knew that he had such income and that his failure to pay taxes on that income thus must have been willful. In other words, the government derived its proof of willfulness principally from out-of-court messages purportedly showing that Mr. Goldstein knew he won $50 million gambling in 2016.

The government's decision to introduce only those messages misled the jury about Mr. Goldstein's state of mind and motivations. That is because other contemporaneous messages between Mr. Goldstein and third parties reflected his belief that his 2016 gambling income was nowhere close to $50 million. Most of those messages were to or from an assistant to Paul Phua

18

(Mr. Goldstein's primary investor).  The assistant sent Mr. Goldstein images of a ledger that documented Mr. Goldstein's wins and losses in Asia in 2016 and conveyed that in 2016, Mr. Goldstein earned about $5.4 million from his games against Chairman and lost more than $4.4 million in other games in Asia.  *See* Mot. 48-50.  Mr. Goldstein responded that the calculation was consistent with his understanding.  In turn, although the assistant confirmed that Mr. Goldstein won money against Tango, he informed Mr. Goldstein in February 2017 that Tango had not yet paid any money (meaning that those winnings were not 2016 income).  *See id.* at 51-52.  Mr. Goldstein acknowledged the information, confirming his understanding that he would not have access to the money until Tango sent it to Mr. Phua.  As to the games with Mr. Gores, the messages documented calculations of Mr. Phua's shares in which Mr. Goldstein and the assistant agreed that Mr. Phua was entitled to more than $10 million.  *See id.* at 50-51; DX-737.5; DX-737.6.

Just as the messages the government introduced were putative evidence that Mr. Goldstein thought he had a certain income and thus had a motive to avoid taxes, the messages to and from Mr. Phua's assistant were evidence that Mr. Goldstein believed much of the money he won in 2016 was offset by losses, owed to investors, or would be delayed until 2017.  Mr. Goldstein thus sought to introduce those messages alongside evidence that he owed other investors more than $8 million for the games with Mr. Gores and lost more than $10 million in other 2016 games.  DX-340. Through those messages, Mr. Goldstein sought to establish that when he was providing information for his 2016 taxes, he believed in good faith that his net gambling income was not in the tens of millions and the $2.7 million he reported was likely accurate.  That mental-state evidence was critical to Mr. Goldstein's case.  As discussed, the government's theory of willfulness centered on Mr. Goldstein's motive to avoid paying taxes on $50 million in gambling income—a motive he could not have had if he did not believe he earned such income or anything

19

remotely close to it.  Because Mr. Goldstein sought to introduce the messages as evidence of that belief—not to prove the truth of the matter asserted—the Court erred by excluding them under the hearsay rule.  That error was not harmless, and the government's contrary arguments lack merit.

### A. The Court Was Required To Admit The Messages Because Mr. Goldstein Offered Them As Evidence That He Lacked Willfulness

The Court erred by excluding the messages under the hearsay rule.  "Hearsay is an out-of-court statement offered '*to prove the truth of the matter asserted in the statement*.'"  *United States v. Gallagher*, 90 F.4th 182, 195 (4th Cir. 2024) (quoting Fed. R. Evid. 801(c)(2)).  Thus, "[i]f a statement is offered for *any other reason*, it is not hearsay and *may not be excluded* on that basis." *Id.* (emphasis added).  The paradigmatic example of a statement that may not be excluded as hearsay is a statement to the defendant or by the defendant "bearing on the reasonableness [or] good faith . . . of subsequent conduct."  *Id.* (alterations in original) (quoting 2 McCormick on Evid. § 249 (8th ed.)); *see also* Fed. R. Evid. 803(3) (providing that "[a] statement of the declarant's then-existing state of mind," such as "motive, intent, or plan" is admissible).  Accordingly, because the messages "bear[] on" Mr. Goldstein's "good faith" belief when providing information for his 2016 taxes that he won at most $2.7 million gambling in 2016—regardless of whether that number was accurate or not—excluding the messages under the hearsay rule was an "'error of law.'" *Gallagher*, 90 F.4th at 195 (citation omitted).[4]

---

[4] Many out-of-court statements that bear on a person's state of mind are "not assertive of the declarant's present state of mind and are therefore not hearsay" at all.  2 McCormick on Evid. § 274 (9th ed. 2025).  For instance, if a person asks a friend, "when are you going to pay me that $50 back?", the statement reflects the person's belief that his friend owes him $50 even if it is not *assertive* of that belief.  A statement that asserts such a belief—*e.g.*, "I believe my friend owes me $50"—technically *is* hearsay but falls within Rule 803's state of mind exception.  *Id.*  To avoid confusion, courts often "apply[] a general exception to the hearsay rule" that covers both kinds of statements and "ignor[e] the possibility that many of these statements could be treated as nonhearsay."  *Id.*  That general exception applies to the messages at issue here regardless of whether they are nonhearsay or fall within the state-of-mind exception to hearsay.

Indeed, the government itself used other messages about Mr. Goldstein's 2016 gambling winnings as evidence of his state of mind. As already explained, the government's theory of willfulness was that Mr. Goldstein believed he won tens of millions of dollars gambling in 2016 and was motivated to hide that money from the IRS. *See supra* at 17-19. And it sought to prove that motive primarily using messages Mr. Goldstein sent to investors and other third parties. For instance, the government relied heavily on messages Mr. Goldstein sent to Keith Gipson—a poker player who invested in Mr. Goldstein's games against Chairman, Tango, and Mr. Gores—to establish Mr. Goldstein's belief about the amount of money he won in those games. *See* 1/15/26 Tr. 110:6-15, 124:10-26:8, 131:1-11; 2/18/26 Tr. 52:12-25. If those messages bear on Mr. Goldstein's state of mind, it follows that the messages to and from Mr. Phua's assistant—the person responsible for keeping track of Mr. Phua's investments—do the same.

The government does not dispute that out-of-court statements are admissible when they bear on a defendant's good-faith belief that his conduct was legal. Instead, the government primarily argues (Opp. 40-41) that the messages were inadmissible because they "do[] not support" Mr. Goldstein's good-faith belief and are "inconsistent with Goldstein's own contemporaneous communications and trial testimony." But that was not the basis for the government's objection to the evidence or the Court's ruling. And rightly so: it confuses "weight and credibility" with "admissibility." *Wong Sun v. United States*, 371 U.S. 471, 491-92 (1963). Evidence is not inadmissible simply because it is inconsistent with other evidence or may not ultimately carry the day. On the contrary, "*[a]ll* relevant evidence" generally "is admissible," Fed. R. Evid. 402 advisory committee notes (emphasis added)—and the government does not seriously contend that the messages are not "relevant" to Mr. Goldstein's state of mind.

In any event, the government's argument is wrong on its own terms. The government

21

asserts that the excluded messages do not support Mr. Goldstein's good-faith belief about his 2016 income because "[i]f the excluded evidence shows that he was a *net loser* in 2016," it is inconsistent with his 2017 statement that "his net gambling winnings were $2.7 million."  Opp. 41.  But Mr. Goldstein did not offer the messages to show that he had a specific amount of gambling income in 2016—whether he calculated it accurately in his 2017 statement or not. Instead, he offered the messages to show his good-faith belief that he owed a significant share of his gambling winnings to Mr. Phua, that any money he won from Tango should not count as 2016 income, that he lost substantial sums playing other games in Asia, and that, as a result, he did not think he had anywhere close to $50 million in 2016 gambling income.  *See supra* at 18-19.  By establishing Mr. Goldstein's contemporaneous and good-faith belief that his 2016 gambling income was orders of magnitude lower, the messages rebut the government's central theory of willfulness—that "everything that Mr. Goldstein did from March 2016 through December 2022" was "motivat[ed]" by his desire to avoid paying taxes on $50 million of gambling income in 2016. 2/18/26 Tr. 46:20-24.

The government misses the point in asserting (Opp. 41-42) that Mr. Goldstein "would never have told Deyhle that he was a net winner" if he was "relying on the excluded evidence in good faith."  Mr. Goldstein acknowledged at trial that he made several "mistakes" when he calculated his 2016 gambling income for Mr. Deyhle using a wires document.  2/11/26 Tr. 207:13-24.  But his failure to accurately calculate his 2016 income for Mr. Deyhle has no bearing on the legal question here: whether the messages are relevant to his state of mind—specifically, to his belief that his 2016 gambling income was nowhere near $50 million.  Even if Mr. Goldstein did not directly rely on the messages when calculating his income for Mr. Deyhle, those messages gave him reason to believe that the number he calculated using the wires document was accurate.

22

The government insists that Mr. Goldstein's stated purpose for introducing the messages is "pretext" and that "Goldstein wanted to introduce the records to prove the truth of the facts asserted therein." Opp. 41-42. But the record squarely contradicts that assertion. For all the reasons discussed, the messages powerfully demonstrate Mr. Goldstein's good-faith belief that he did not have $50 million in poker income in 2016. And at every stage of the case, Mr. Goldstein has sought to introduce the messages as evidence of that belief. *See* ECF No. 411 at 8-9 ("These contemporaneous messages speak directly to Mr. Goldstein's state of mind — they demonstrate that Mr. Goldstein *believed* that Mr. Phua had significant shares in his poker matches."); 2/11/2025 Tr. 90:1-4 ("These messages show what Mr. Goldstein's state of mind was with respect to his wins and losses in Asia, with respect to Mr. Phua's share of the games against Chairman and Mr. Gores and Tango and so on."). Tellingly, the only evidence the government cites to support its pretext claim (Opp. 42-43) is from *after* the Court had excluded the messages. At that point, the only way for Mr. Goldstein to use the messages was to refresh his recollection. The fact that he did so in no way negates his earlier attempts to use the messages to establish his good-faith belief.

Moreover, the government cites no authority suggesting that a court may exclude a statement offered for a legitimate non-hearsay purpose just because the facts asserted therein *also* tend to disprove another critical fact such as a tax debt. On the contrary, the Fourth Circuit has made clear that an out-of-court statement "may not be excluded" as hearsay if it "is offered for any . . . reason" besides proving the truth of the matter asserted. *Gallagher*, 90 F.4th at 195. For instance, the Fourth Circuit in *Gallagher* reversed the exclusion of "seemingly loving Facebook messages" the defendants had exchanged after a point when, according to the government, their "marriage was over" and they were "conspir[ing] to obtain immigration benefits." *Id.* Even if the messages might bear on the key factual dispute about whether the marriage was over at the relevant

23

time, the court reasoned that the evidence was not inadmissible hearsay because "[w]hether [the defendant wife] truly loved [the defendant husband] when she wrote him saying she did, the messages were relevant to show what [the husband] could have *believed* about the state of the marriage based on what he was hearing from [the wife]." *Id.* at 195 (emphasis added). Similarly, in *United States v. Leake*, 642 F.2d 715 (4th Cir. 1981), the Fourth Circuit reversed a district court decision excluding a conversation between the defendant and a third party about how federal funds were used. *Id.* at 719-20. Although that conversation was relevant to whether the funds had in fact been misused, it was not inadmissible hearsay because "its purpose . . . was to show that [the defendant] *believed* that the funds were being used in a legitimate fashion." *Id.* at 720 (emphasis added). Likewise, here, the messages provided evidence of Mr. Goldstein's belief regarding his 2016 gambling income and thus could not be excluded under the hearsay rule even though the facts asserted therein related to disputed issues in the case.

Courts regularly reject hearsay objections and allow evidence similar to what was excluded here in tax cases where the central disputed issue is whether the defendant had a certain belief about his compliance with the tax laws. For instance, in *United States v. Harris*, 942 F.2d 1125 (7th Cir. 1991), the Seventh Circuit reversed a decision excluding letters to the defendant stating that the sender loved "giving things to [the defendant]" and that jewelry he sent her was a gift. *Id.* at 1130. The case concerned the defendant's failure to pay income tax on money she had received from the sender, and the letters were relevant to the core dispute about whether that money was income or a gift. But the court explained that the letters were not inadmissible hearsay because the defendant could use them to show that she "believe[d] in good faith that the things [the sender] gave her were intended as gifts." *Id.* The messages here similarly tend to establish Mr. Goldstein's good-faith belief about the money he received (and lost). More broadly, numerous courts have

24

allowed defendants to introduce advice they received from third parties that led them to believe they were not violating the tax laws.  *See, e.g.*, *United States v. Moran*, 493 F.3d 1002, 1012-13 (9th Cir. 2007); *United States v. Wellendorf*, 574 F.2d 1289, 1290 (5th Cir. 1978).

If the Court was concerned that the jury might rely on the messages as proof of the facts asserted therein, the right solution was to give a limiting instruction under Rule 105—not to exclude the messages entirely.  In *Tennessee v. Street*, 471 U.S. 409 (1985), for instance, the Court approved a jury instruction "not to consider the truthfulness" of a third party's confession that implicated the defendant in a murder, and instead to consider that confession only as evidence countering the defendant's argument that his own confession was coerced.  *Id.* at 412 (citation omitted).  While noting that the evidence "would have been hearsay" if "the jury had been asked to infer that [the] confession proved that [the defendant] participated in the murder," *id.* at 411-12, 414-15, the Court rested on "the 'crucial assumption' that the jurors followed 'the instructions given them by the trial judge.'"  *Id.* at 415.  Any concern that the jury might rely on the messages here for the truth of the matter could and should have been addressed through a similar limiting instruction—rather than excluding highly exculpatory state-of-mind evidence.

**B.    The Court's Error Was Not Harmless Because The Evidence Undermined The Government's Primary Theory Of Willfulness**

The Court's error was not harmless because the excluded messages would have negated the government's theory of willfulness for all the tax charges and affected the jury's assessment of Mr. Goldstein's credibility for all counts.  Each factor of the Fourth Circuit's "three-factor test" for evaluating whether the exclusion of evidence is harmless error favors a new trial.  Opp. 44.

The government's own cited authority resolves the first element—"the centrality of the issue affected by the error"—in Mr. Goldstein's favor.  *United States v. Ibisevic*, 675 F.3d 342, 350 (4th Cir. 2012).  In *Ibisevic*, the district court erroneously excluded the defendant's out-of-

25

court statement, which he offered to prove that he had contemporaneously "expressed [his] belief" to his mother that customs officials had asked him about the value of his checked luggage, not the value of cash he was carrying. *Id.* at 349 (alteration in original). Because the case turned on the defendant's "intent" to lie about how much cash he was carrying, the court held that the "excluded testimony clearly did go to the central issue." *Id.* at 350. The Fourth Circuit has since reiterated that, where a district court incorrectly excludes an out-of-court statement that is relevant to "defendants' intent," the first factor "points toward vacatur" if "intent" is an element of the relevant counts. *Gallagher*, 90 F.4th at 197. Thus, because the messages here are directly relevant to Mr. Goldstein's willfulness—a necessary and central element of Count 1 (and every other count)—the first factor "points toward vacatur." *Id.*

The government is wrong to contend that the first factor weighs in its favor because "Goldstein's wins and losses in 2016" were only "relevant to count 1." Opp. 44. That framing erroneously assumes that Mr. Goldstein would have used the messages only to prove that he did not have a tax deficiency in 2016. But as already explained, Mr. Goldstein would have used that evidence to prove his lack of willfulness with respect to every tax charge. The government itself argued that willfulness was the "main question" on *all* "the tax charges," 2/18/26 Tr. 48:12-14, and it vigorously pressed the theory that Mr. Goldstein's alleged desire not to pay taxes on his 2016 gambling income "motivated everything that Mr. Goldstein did from March 2016 through December 2022," 2/18/26 Tr. 46:20-24. That is why the government spent "the bulk of [its] time" in closing "talking about Count One," 2/18/26 Tr. 49:24-25, and addressed the other tax counts only briefly "[f]or expediency" because "as we've already suggested, all of this is motivated by his tax evasion in 2016," 2/18/26 Tr. 73:21-23. The government chose to make Mr. Goldstein's

26

2016 income the central issue in this case, and it cannot run away from that decision now.[5]

The government also asserts (Opp. 44) that the messages are not important because "even if . . . the jury believed [Mr. Goldstein] was a net loser in 2016," independent evidence suggested he had a tax deficiency from improper deductions.  But that ignores the harmless error standard: Even assuming that the jury could have convicted based on a different allegation, it also may have convicted based on the gambling allegations after the evidence was erroneously excluded.  And the improper deductions—which were far less than $50 million—could not have proved the government's theory of willfulness.  In any event, Mr. Goldstein did not seek to introduce the messages to establish the lack of a tax deficiency, but rather to show a lack of willfulness.

The second element—"the steps taken to mitigate the effects of the error"—also cuts in Mr. Goldstein's favor.  *Ibisevic*, 675 F.3d at 350 (citation omitted).  Like in *Ibisevic*, this Court "took no steps to mitigate the effects of the error" because it "failed to acknowledge any existence of an error."  *Id.* at 351.

The government errs in asserting (Opp. 45) that Mr. Goldstein's use of the messages to refresh his recollection mitigated any harm.  Fourth Circuit precedent makes clear that Mr. Goldstein's "in-court testimony" about the facts asserted in the messages "did not mitigate the effects of the error"—"[q]uite the contrary." *Gallagher*, 90 F.4th at 197.  Indeed, "excluding 'the sole evidence that directly corroborated [Mr. Goldstein's] own testimony' about what [he] 'believed' is particularly problematic given the risk that jurors may disregard self-serving testimony by criminal defendants." *Id.* (quoting *Ibisevic*, 675 F.3d at 350).  The record here

---

[5] At minimum, the first factor weighs in favor of a new trial on Count 1. Indeed, the Fourth Circuit typically assesses the harmless-error factors on a count-by-count basis. *Gallagher*, 90 F.4th at 197. While the government's own theory that Count 1 motivated all the other tax offenses makes that count-by-count approach unnecessary here, the error was plainly central to Count 1.

27

illustrates that principle because the jury found Mr. Goldstein not guilty on every substantive tax charge on which he was allowed to present documentary evidence (Counts 2, 4, 5, and 6). Moreover, the government repeatedly argued that the jury could not take Mr. Goldstein at his word, including because he lacked documentary evidence to support his narrative. It thus cannot claim that the introduction of contemporaneous messages that directly bear on Mr. Goldstein's state of mind would have made no difference at all.

The government also relies on the Court's curative instruction "not to speculate about why the ledger was not admitted into evidence." 2/19/26 Tr. 85:16-24. But the government fails to cite a single case holding that an instruction can mitigate harm from the improper exclusion of evidence. The cases where a curative instruction mitigated an evidentiary error all involved improperly *admitted* evidence. *See United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994). Moreover, this instruction was necessary only because of the government's *own misconduct*. During its closing argument, the government repeatedly suggested that Mr. Goldstein had no evidence to corroborate his statements regarding the ledger—even though the Court had excluded that evidence at the government's request. *See* 2/18/26 Tr. 58:7-10; 2/18/26 Tr. 71:3-11. As Mr. Goldstein's counsel emphasized immediately after the closing argument, those statements violated Mr. Goldstein's due process rights. *See* 2/18/26 Tr. 91:15-92:17. The Court thus issued a curative instruction to mitigate the government's improper conduct. *See* 2/19/26 Tr. 21:10-13. But that instruction did nothing to diminish the prejudice from the complete *exclusion* of the messages, including the ledger. If anything, it highlighted to the jury that there was no documentary evidence supporting Mr. Goldstein's claims of what the ledger contained.

The third factor—"the closeness of the case"—confirms that a new trial is required. *Ibisevic*, 675 F.3d at 352. Courts of appeals, including the Fourth Circuit, have explained that a

28

"split verdict indicates the case was close, perhaps so much so that the erroneously admitted evidence was the deciding factor." *United States v. Brizuela*, 962 F.3d 784, 799 (4th Cir. 2020); *see United States v. Adams*, 139 F.4th 931, 942 (D.C. Cir. 2025). That is particularly true where "all counts largely relied on the same evidence" and the "matter 'not in evidence' . . . was relevant to all counts." *Adams*, 139 F.4th at 942. Here, the jury returned a not-guilty verdict on four of the nine substantive tax counts. The government urged the jury to find willfulness as to each of these counts—and the rest of the tax counts—based on Mr. Goldstein's alleged desire to avoid paying taxes on his 2016 income. Thus, "all counts largely relied on the same evidence" (testimony and documents describing Mr. Goldstein's 2016 gambling income), and the "matter[s] 'not in evidence'" (the messages) were "relevant to all counts." *Id.*

The government ignores the split verdict and invokes two Fourth Circuit cases emphasizing the length of deliberations. Opp. 46. In those cases, the court concluded the error was *not* harmless because the jury deliberated for several hours on relatively straightforward counts. *Ibisevic*, 675 F.3d at 352; *United States v. Sanders*, 964 F.2d 295, 299 (4th Cir. 1992). But those cases do not establish any bright-line time period for deliberations to deem a case close. And the deliberations here lasted more than two days—far longer than the deliberations in either *Ibisevic* or *Sanders*.

The government's arguments about the evidence also lack merit. Although the government emphasizes that it "called dozens of witnesses" and "introduced voluminous documentary evidence," Opp. 45, the wrongly excluded evidence responded directly to the government's only proof of willfulness. The evidence described by the government related to other issues. In any event, no authority suggests that the volume of evidence alone signals a strong case. And even where the government's evidence is "overwhelming," the "strength of the Government's case does not, in itself, resolve the 'closeness' question." *Ibisevic*, 675 F.3d at 354. Instead, the court must

29

"'assess[] whether the evidence . . . is sufficiently powerful in relation' to the excluded testimony.'" *Id.* (citation omitted).  As discussed, the excluded messages would have provided a powerful rejoinder to the government's case—especially since the government emphasized its own documentary evidence and contended Mr. Goldstein lacked such evidence.  2/18/26 Tr. 71:3-11.

In a last-ditch effort, the government contends (Opp. 47-48) that the Court's error was harmless because the excluded evidence—which would have corroborated Mr. Goldstein's testimony about what he believed at the relevant time—could somehow have *undermined* his credibility.  The Fourth Circuit rejected this exact argument in *Ibisevic*, explaining that, "just as the jury may have concluded . . . that this . . . evidence cast doubt on [the defendant's] credibility, so it might have concluded (if permitted to do so) that [the excluded evidence] had the opposite effect of 'lend[ing] plausibility to an otherwise incredible yarn.'"  *Ibisevic*, 675 F.3d at 353 (citation omitted).  The slim possibility that the excluded evidence could have undermined Mr. Goldstein's credibility thus does not mean its exclusion was harmless.

## III.   THE CONVICTIONS ON COUNTS 11-13 ARE LEGALLY INVALID

Mr. Goldstein is entitled to a judgment of acquittal on the willful failure to pay charges in Counts 11 to 13.  A criminal tax conviction requires that the relevant legal duty be clear.  Yet there is, at minimum, reasonable disagreement about the applicable filing dates for Mr. Goldstein's 2019-2021 taxes.  A federal court has rejected the government's reading of the statutory provisions governing those deadlines, *Kwong v. United States*, 179 Fed. Cl. 382 (2025), and the IRS itself has admitted that the operative provisions are ambiguous.  IRS, Internal Revenue Bulletin: 2021-05 (Feb. 1, 2021), https://perma.cc/63A2-XB7M (IRS Bulletin).  In light of that legal uncertainty, Mr. Goldstein's convictions on Counts 11-13 cannot stand.  *See* Mot. 78-80.  The government responds with an extensive critique of *Kwong*, but that misses the point because even if the government's statutory interpretation were correct (and it is not), *Kwong*'s reasonable and contrary interpretation

precludes any finding of willful failure to pay. And the government's threshold objections about preservation and timeliness of this argument pose no obstacle to reaching the merits.

### A.    As A Matter Of Law, Mr. Goldstein Could Not Have Willfully Failed To Pay Taxes By The Applicable Due Dates For 2019-2021

The government does not dispute that a conviction for willful failure to pay taxes cannot stand when the "governing law offers no clear guidance" on the applicable due date. *United States v. Mallas*, 762 F.2d 361, 361, 363-65 (4th Cir. 1985); *see* Opp. 80. Nor does the government dispute that, where such legal uncertainty exists, a defendant's subjective beliefs are irrelevant. *See* Opp. 80. For good reason: The Fourth Circuit has repeatedly recognized that a "defendant cannot be guilty of willfully evading and defeating . . . taxes on income, the taxability of which is so uncertain that even co-ordinate branches of the United States Government plausibly reach directly opposing conclusions." *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974).

Those well-established principles invalidate the convictions on Counts 11-13. There is undeniably disagreement across "co-ordinate branches of the United States Government" as to the applicable due dates for Mr. Goldstein's 2019, 2020, and 2021 taxes. *Id.* As the government acknowledges (Opp. 74-79), its position on the applicable dates is directly at odds with *Kwong*, which interpreted the relevant provision of the Internal Revenue Code to extend the deadline to file 2019-2021 taxes until July 10, 2023. 179 Fed. Cl. at 386-89 (interpreting 26 U.S.C. § 7508A(d) (2019) (Mandatory Extension Provision)). And it is undisputed that Mr. Goldstein paid his 2019-2021 taxes before July 10, 2023. *See* 2/2/26 Tr. 128-34; GX-410.

The government nevertheless insists that there was insufficient "uncertainty or ambiguity" as to the applicable due dates. Opp. 80 (capitalization altered). It attempts to distinguish *Critzer* and *Mallas* on the grounds that the former involved an intra-branch dispute between the IRS and Interior Department and the latter involved a finding that regulations and judicial opinions were

31

"silent" on the particular legal question. *Id*. (citing *Critzer*, 498 F.2d at 1162; *Mallas*, 762 F.2d at 363). But if silence or intra-Executive-Branch disagreement can create sufficient uncertainty to negate willfulness, it necessarily follows that an *inter*-Branch disagreement—where a federal court rejects the Executive Branch's interpretation—can do the same. And the government never claims that *Kwong*'s reading of the Mandatory Extension Provision is not "plausibl[e]," which is all that *Critzer* and *Mallas* require. *Critzer*, 498 F.2d at 1162; *see Mallas*, 762 F.2d at 364; Opp. 74-79.

Because *Kwong* creates legal uncertainty, the government's lengthy attack on *Kwong*'s merits is beside the point—but that critique is flawed on its own terms. As *Kwong* observed, from 2019-2021, the Mandatory Extension Provision established an "automatic extension [that] runs from the beginning of the disaster declaration, through the end of the declared disaster period, and until 60 days after the end of the declared disaster period." 179 Fed. Cl. at 387 (citing 26 U.S.C. § 7508A(d) (2019)). Specifically, "the period—(A) beginning on the earliest incident date specified in the declaration [of a national disaster for a specified area], and (B) ending on the date which is 60 days after the latest incident date so specified, shall be disregarded" for purposes of calculating a tax payment date. 26 U.S.C. § 7508A(d) (2019). As relevant here, the President declared a "major disaster . . . in the State of Maryland" due to the COVID-19 pandemic "beginning on January 20, 2020, and continuing." 85 Fed. Reg. 21873, 21873 (Apr. 20, 2020). And the Federal Emergency Management Agency (FEMA), which coordinated the response, *see id.*, subsequently declared the "incident period for all COVID-19 major disaster declarations . . . close[d] effective May 11, 2023," 88 Fed. Reg. 8884, 8884 (Feb. 10, 2023). Thus, the Mandatory Extension Provision automatically extended the deadlines for taxes due after January 20, 2020, to 60 days after May 11, 2023: that is, July 10, 2023. *See Kwong*, 179 Fed. Cl. at 388.

The government's contrary view flouts the statute's plain meaning and amendment history.

32

According to the government, the Mandatory Extension Provision means that, "when only one date is specified" in a national-disaster declaration, "it is both the earliest and latest date"—even when the declaration explicitly states that the national disaster remains ongoing. Opp. 75. So, in the government's view, the COVID-19 national disaster lasted a single day, even though the declaration stated that it was "beginning on January 20, 2020, *and continuing*." 85 Fed. Reg. at 21873 (emphasis added); *see* Opp. 75. That theory is implausible. The President's declaration deems the disaster "continuing" until a later determination. 85 Fed. Reg. at 21873. In turn, the 2023 FEMA notice provided that determination, closing the "incident period" for the COVID-19 national disaster effective May 11, 2023, 88 Fed. Reg. at 8884. Nothing in the Mandatory Extension Provision overrides the President's declaration that the "latest incident date," 26 U.S.C. § 7508A(d)(1)(B) (2019), was "continuing," pending subsequent notice.

The government's interpretation is also irreconcilable with the statutory amendment history. In late 2021, nearly two years into the COVID-19 national disaster, Congress amended the Mandatory Extension Provision by deleting the phrase "latest incident date" and adding that the mandatory extension would end "60 days after" the "earliest incident date" specified in the national-disaster declaration or the "date such declaration was issued," whichever is later. *See* 26 U.S.C. § 7508A(d) (2021). This change "ensure[d] that a mandatory 60-day extension is tacked on after a single date rather than after the last day of a multi-day (or multi-year) disaster declaration." *Kwong*, 179 Fed. Cl. at 388.

Congress's amendment responded directly to the IRS's concern about the indefinite nature of the Mandatory Extension Provision. Indeed, in February 2021, the IRS issued a bulletin noting the potential for "open-ended disaster incident periods" caused by "[a]mbiguities in applying section 7508A(d) [that] arise when the incident date is specified in the declaration as beginning on

33

a certain date but remaining open-ended for an extended period of time." IRS Bulletin, *supra*. Just a few months later, Members of Congress introduced bills in both Houses to address that very issue by deleting the term "latest incident date" and replacing it with the language set forth above. *See* S. 2581, 117th Cong. (Aug. 2021); H.R. 5027, 117th Cong. (Aug. 2021). Congress enacted those changes into law in late 2021. *See* Pub. L. No. 117-58, § 80501, 135 Stat. at 1335 (2021). That amendment history thus confirms that *Kwong*'s interpretation is reasonable: Because Congress understood that the 2019 version of the law could plausibly be construed to permit open-ended extensions, it amended the statute to prospectively prevent that result.[6]

The government has no answer for the 2021 amendment. It suggests (Opp. 77) that the amendment merely ensures that the extension "does not end before the [issuance of the] declaration itself." But while the amendment includes certain language to achieve that result, it *also* deletes the phrase "latest incident date"—the only purpose of which could be to prevent an open-ended extension period for filing deadlines that the IRS itself recognized could otherwise exist.

**B.    The Government's Procedural Arguments Lack Merit**

The government's procedural objections fare no better. The government first contends (Opp. 73) that Mr. Goldstein did not adequately brief this argument in his Motion. But the Motion contains a standalone three-page section arguing that "judgment of acquittal is required" on these counts. Mot. 78 (capitalization omitted). That section describes the holding in *Kwong*, identifies how *Kwong*'s analysis applies to the facts of this case, and explains why *Kwong* shows that the necessary "clarity" about Mr. Goldstein's duty to pay was "missing as a matter of law." *Id.* at 79. That briefing is far more detailed than the briefing in cases where the Fourth Circuit has found waiver. *See, e.g.*, *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

---

[6] The 2021 amendment is effective only for disasters "declared after the date of enactment of this Act." Pub. L. No. 117-58, § 80501(b), 135 Stat. at 1335 (2021).

The government also mischaracterizes (Opp. 73) this argument as an "untimely attempt to dismiss the indictment for failure to state an offense."  As the government recognizes, "[p]retrial motions were due on May 16, 2025."  Opp. 74.  But *Kwong*—which establishes the legal uncertainty—was decided November 25, 2025.  179 Fed. Cl. 382.  *Kwong* demonstrates that "even co-ordinate branches of the United States Government plausibly reach directly opposing conclusions," *Critzer*, 498 F.2d at 1162—which now creates enough uncertainty to preclude willfulness as a matter of law.  *See* Fed. R. Crim. P. 12(b)(3) (motion to dismiss indictment must be made pre-trial only "if the basis for the motion is then reasonably available").

## IV.    THE GOVERNMENT'S ARGUMENTS ON THE OTHER ISSUES LACK MERIT

The erroneous accessory liability instruction and exclusion of messages each independently require a new trial.  If the Court orders a new trial based on either of those grounds, then the most efficient way to deal with the remaining issues here would be through a new round of motions *in limine*.  In any event, the government's arguments on those issues lack merit.

### A.    Giving The Willful Blindness Instruction Was Error

#### 1.    The evidence does not support the instruction

The government accepts that to justify the willful blindness instruction, it had to show both that Mr. Goldstein "subjectively believe[d] that there is a high probability that a fact exists," and that he took "deliberate actions to avoid learning of that fact."  *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).  Yet the government fails to show this is one of the "rare" cases in which the instruction is appropriate.  *United States v. Ali*, 735 F.3d 176, 187 (4th Cir. 2013).  Indeed, the government offers only a "few" cherry-picked examples that mischaracterize the trial evidence—and do not show that Mr. Goldstein knew of a high probability of some fact and deliberately shielded himself from learning it.  Opp. 35-36 & n.16.  For instance, though the government states that Mr. Goldstein was "notified by his personal assistant that certain of the

35

2016 payments would be improperly deducted," *id*. at 36, the trial record establishes that Ms. Runkle never notified Mr. Goldstein about the classification of these payments or that they would be deducted, much less "improperly" so.  *E.g.*, 2/12/26 Tr. 93:14-22; 1/21/26 Tr. 31:24-32:11.

Moreover, the government's heavy reliance on *United States v. Jinwright*, 683 F.3d 471 (4th Cir. 2012), *see* Opp. 34-36, is misplaced.  There, the Fourth Circuit approved the willful blindness instruction based on evidence that "several auditors and [co-workers] advised the defendants that they were underreporting their income," and that "defendants never raised these concerns with their personal CPA."  683 F.3d at 479.  By contrast, no evidence here showed that Mr. Goldstein deliberately shielded himself from learning of critical facts.

### 2.    The error was not harmless

The government also incorrectly contends that any error was harmless because "there was ample evidence that Goldstein had actual knowledge despite his claimed ignorance."  Opp. 37. That is incorrect.  At trial, the government presented minimal (if any) evidence of Mr. Goldstein's actual knowledge, and so the jury likely—and, in the case of certain charges, *must have*—relied on willful blindness to convict.  For example, the government presented zero evidence that Mr. Goldstein had actual knowledge that the payments to Napoli Shkolnik and Chuck Pacheco were categorized as business expenses for 2017 and 2019, respectively, ECF No. 337-2 ¶¶ 52, 68, or that the legal fees from Robbins Geller and Tobey Maguire were not included in Mr. Goldstein's business income for 2017 and 2021, respectively, *id.* ¶¶ 52, 85.  As to those counts, the erroneous willful blindness instruction was necessarily prejudicial because the jury convicted despite (i) the absence of any evidence of Mr. Goldstein's actual knowledge and (ii) the absence of a sufficient factual predicate justifying the willful blindness instruction.

The government alternatively contends that the instruction was harmless because it was substantively correct, so "even if the evidence of willful blindness were lacking, the jury would

36

simply reject the theory." Opp. 38. Under that view, however, any error would be harmless whenever a jury was instructed that it "may" (but need not) apply willful blindness to satisfy the scienter element. The government cites no Fourth Circuit case that sweeps so broadly. Contrary to the government's suggestion, *Lighty* held only that "[h]armless error will be found *where there is sufficient evidence in the record of [the defendant's] actual knowledge*." 616 F.3d at 378-79 (emphasis added). And as discussed, there was not sufficient evidence of actual knowledge here.

**B.      Count 1 Allowed The Jury To Convict On Two Legally Invalid Allegations**

The government alleged four theories of tax evasion that relied on affirmative acts within the statute of limitations. Mot. 52-53; ECF No. 341 at 7. Half of those theories were invalid under the legal impossibility doctrine: that Mr. Goldstein (1) transferred money into G&R's IOLTA account to avoid tax levies; and (2) misled Officer Parrish in a 2018 interview. Thus, because a "general verdict" must be "set aside" when it "rests on" at least one "invalid" theory, a new trial on Count 1 is required. *United States v. Jefferson*, 674 F.3d 332, 361 (4th Cir. 2012).

The government asserts that "[m]odern courts generally reject the impossibility doctrine" and that "notions of 'impossibility of completion . . .' are not relevant to tax evasion." Opp. 50-51 (quoting *Spies v. United States*, 317 U.S. 492, 498 (1943)). But even "modern courts" (*id.* at 51) recognize a defense of "true legal impossibility" when a defendant's actions "'would not constitute a crime.'" *United States v. Farner*, 251 F.3d 510, 513 (5th Cir. 2001) (citation omitted). Nor does *Spies* preclude defendants from raising legal impossibility as a defense to attempted tax evasion—it simply recognizes that courts need not assess whether an alleged act of "attempted tax evasion" would qualify as "tax evasion" if completed. 317 U.S. at 498-99.

The government also errs in arguing (Opp. 50) that any "conduct that is otherwise lawful can be tax evasion" if the "defendant subjectively believes" he is evading taxes. That argument ignores a key element of attempted tax evasion: an "affirmative act . . . having the likely effect of

37

misleading or concealing." *United States v. Goodyear*, 649 F.2d 226, 228 (4th Cir. 1981) (citations omitted). And critically, the affirmative act must violate a "known legal duty." *Cheek*, 498 U.S. at 201 (citation omitted).

Mr. Goldstein's transfer of funds into the G&R IOLTA account did not violate a known legal duty and could not have had the effect of misleading or concealing. At trial, the government argued that Mr. Goldstein transferred funds into G&R's "IOLTA account to further evade potential IRS levies." 2/18/26 Tr. 68:5-10; *see* ECF No. 412 at 5-6. But a federal statute prohibited the IRS from levying Mr. Goldstein's accounts at that time because he was on a tax repayment plan. *See* 26 U.S.C. § 6331(k)(2)(C); Mot. 53-54. And it makes no difference whether Mr. Goldstein *thought* his accounts could be levied, because any such belief would be legally incorrect. Thus, the transfer of funds did not violate a known legal duty, *Cheek*, 498 U.S. at 201, and could not have "misle[d] or conceal[ed]" under the government's theory, *Goodyear*, 649 F.2d at 228.

The government (Opp. 51-52) contends for the first time that the IRS could have considered revisiting Mr. Goldstein's repayment plan or entering a jeopardy levy. Nothing in the trial record supports those contentions. And in any event, because the government never submitted those theories to the jury, it cannot rely on them now to uphold the verdict.

### C.       Acquittal Or A New Trial Is Necessary As To Counts 3, 7, 8, And 9

In focusing almost exclusively on Section 7206(2)'s willfulness element, the government disregards the *separate* element of "aid[ing], assist[ing], or otherwise caus[ing] the preparation and presentation" of a false return. *United States v. Kimble*, 855 F.3d 604, 614 (4th Cir. 2017) (citation omitted). The knowing-act-of-assistance element is subject to three requirements, each of which the government ignores. *First*, the willful act of assistance must be affirmative conduct, not an omission. *United States v. Nealy*, 729 F.2d 961, 963 (4th Cir. 1984). *Second*, the defendant must do more than *generally* assist with return preparations; he must provide information that

38

directly "results in a materially fraudulent tax return." *Id.*[7] *Third*, the defendant must know the information provided was false. *United States v. Delavan*, 826 F. App'x 259, 264 (4th Cir. 2020) (per curiam). Judgment of acquittal or, in the alternative, a new trial is necessary as to the Section 7206(2) counts. *See* Mot. 8-10, 62-78.[8]

**Napoli Shkolnik and Pacheco Payments (Counts 3 and 7).** The government concedes (Opp. 59, 62) that Mr. Goldstein did not falsely instruct his accountants or office managers to misclassify payments made from G&R's accounts to Napoli Shkolnik or Chuck Pacheco. And the government does not deny that, because payments are not separately listed as deductions, Mr. Goldstein could not have discovered misclassification errors by reviewing his returns. *See* Mot. 34 n.6. The government's sole remaining theory of liability—that Mr. Goldstein "knew how to ensure that personal payments" would "be properly classified" but "chose to remain silent," Opp. 59, 62—relies on an omission that cannot support a conviction.

**$235,000 Legal Fee (Count 7).** The government does not dispute two key facts: that Mr. Goldstein had this payment transferred into G&R's GRF-monitored bank account, and that GRF never received the email from Mr. Levitan to the Montenegrin bankers describing that payment as a "capital contribution." Mot. 70-71 (citation omitted). The government cannot point to any *information* affirmatively provided to GRF that was false, and the government's suggestion that Mr. Goldstein was required to proactively tell GRF that money paid into the *firm account* should be treated as *firm income* lacks any basis in law.

---

[7] Although the government repeatedly notes that Mr. Goldstein "signed" his tax returns "under penalties of perjury," *e.g.*, Opp. 59, it (correctly) does not argue that signing a return constitutes the provision of false information.

[8] The motion also argued that there was insufficient evidence to support the allegation that "Mr. Goldstein assisted the preparation of false returns by causing salary and/or benefits to be paid to employees who allegedly did little or no work (Counts 5, 7, and 8)." Mot. 77-78. The government's opposition does not address this point and therefore concedes it.

**Cryptocurrency Transactions (Counts 8 and 9).** The government's contention (Opp. 66) that Mr. Goldstein was "on notice that he had to report his cryptocurrency activity . . . to the accounting firm" is insufficient, as a matter of law, to satisfy Section 7206(2)'s affirmative participation requirement. As the defense argued (Mot. 73-75)—and as the government's brief does not refute—there is no evidence that GRF ever asked Mr. Goldstein if he transacted in cryptocurrency in 2020 or 2021, nor that Mr. Goldstein volunteered false information to GRF. The *only* explanation for why the relevant question was answered "no" came from Mr. Deyhle's unrebutted testimony that GRF's software would have checked "no" by default. *See id.* at 74.

**Robbins Geller and Maguire Payments (Counts 3 and 9).** It is illogical—and therefore impermissible—to conclude that the jury convicted on the basis of the Robbins Geller or Maguire payments. *See* Mot. 63, 65-66, 76. And if it had, its verdict would lack sufficient evidence. The government's theory that Mr. Goldstein "never affirmatively advised" GRF about those payments effectively *concedes* the absence of a knowing act of assistance. GRF did not record the fees as income because it either ignored tax documents (in the case of Robbins Geller) or did not receive required documents from a third party (in the case of Maguire). *See id.* at 66-68, 76-77. The failure to catch those errors is not equivalent to providing false information.

**Gambling Winnings (Counts 8 and 9).** The jury also did not convict on the ground that Mr. Goldstein failed to report gross gambling winnings. *See* Mot. 75-76. The government's brief does not cite a *single piece* of evidence that Mr. Goldstein knew he had a legal duty to report gambling winnings in years where he was a net loser, much less that he affirmatively provided false information to GRF to cause those omissions. *See* ECF No. 408 at 20-22.

## CONCLUSION

For the reasons set forth herein, the Court should enter a judgment of acquittal or, in the alternative, vacate the judgment as to those counts and grant a new trial.

40

Dated: May 27, 2026

Respectfully submitted,

_/s/  Elizabeth B. Prelogar_

Elizabeth B. Prelogar (*pro hac vice*)

Stephany Reaves (Bar No. 19658)
Sarah E. Weiner (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Stephany.Reaves@mto.com
Sarah.Weiner@mto.com

**COOLEY LLP**
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com


Jonathan I. Kravis (Bar No. 31556)
**LIU SHUR KRAVIS LLP**
607 14th Street NW, Suite 625
Washington, DC 20005
(202) 240-7100
jonathan.kravis@lskllp.com

Adeel Mohammadi (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com