## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| *THOMAS C. GOLDSTEIN,* | * | |
| | * | |
| *Defendant.* | * | |
| | ******** | |

## DEFENDANT THOMAS C. GOLDSTEIN'S
## MEMORANDUM IN AID OF SENTENCING

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|

I.   LEGAL STANDARD.................................................................................................3

II.  APPLICATION OF SENTENCING FACTORS ...................................................4

A.   Mr. Goldstein has spent most of his legal career expanding access to the Supreme Court, mentoring more junior lawyers, and advocating for underrepresented parties. ........................................................................4

B.   The Guidelines range egregiously overstates the appropriate punishment for offenses with no victim, and for which Mr. Goldstein has already paid millions of dollars in taxes, penalties, and interest. ...............................................10

C.   A lengthy period of supervision is sufficient, but not greater than necessary, to punish Mr. Goldstein and deter similarly situated individuals.........12

D.   Incarceration would be disproportionately harsh in comparison to similar or more culpable defendants. ..........................................................15

III. RECOMMENDATION .........................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001)..........................................................................................................8

*Bush v. Gore*,
  531 U.S. 98 (2000)............................................................................................................1

*Clay v. United States*,
  537 U.S. 522 (2003)..........................................................................................................7

*Cone v. Bell*,
  556 U.S. 449 (2009)..........................................................................................................7

*Florence v. Board of Chosen Freeholders of County of Burlington*,
  566 U.S. 318 (2012)..........................................................................................................8

*Gall v. United States*,
  552 U.S. 38 (2007)..........................................................................................................19

*Georgia v. Randolph*,
  547 U.S. 103 (2006)..........................................................................................................8

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006)..........................................................................................................7

*IBP, Inc. v. Alvarez*,
  546 U.S. 21 (2005)............................................................................................................9

*Jimenez v. Quarterman*,
  555 U.S. 113 (2009)..........................................................................................................7

*Koon v. United States*,
  518 U.S. 81 (1996)............................................................................................................3

*Los Angeles Police Department v. United Reporting Publishing Corp.*,
  528 U.S. 32 (1999)............................................................................................................8

*Moncrieffe v. Holder*,
  569 U.S. 184 (2013)..........................................................................................................8

*Nelson v. United States*,
  555 U.S. 350 (2009)..........................................................................................................3

*Pace v. Bogalusa City School Board*,
  403 F.3d 272 (5th Cir. 2005) (en banc) ...........................................................................9

*People of Bikini v. United States*,
    554 F.3d 996 (Fed. Cir. 2009)............................................................................................9

*Rita v. United States*,
    551 U.S. 338 (2007)..........................................................................................................4

*Smith v. City of Jackson*,
    544 U.S. 228 (2005)..........................................................................................................9

*Spears v. United States*,
    555 U.S. 261 (2009).........................................................................................................19

*Spector v. Norwegian Cruise Line*,
    545 U.S. 119 (2005)..........................................................................................................9

*Tennessee v. Lane*,
    541 U.S. 509 (2004)..........................................................................................................9

*United States v. Booker*,
    543 U.S. 220 (2005)..........................................................................................................4

*United States v. Brown*,
    No. 1:12-CR-135 (D.D.C.): DC........................................................................................18

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008).............................................................................................3

*United States v. Cemini*,
    No. 2:23-CR-92 (E.D. Pa.)..............................................................................................17

*United States v. Donuk*,
    No. 2:22-CR-691 (D.N.J.)...............................................................................................18

*United States v. Schechter*,
    No. 1:23-CR-210 (D.D.C.) ..............................................................................................17

*United States v. Warner*,
    792 F.3d 847 (7th Cir. 2015) ..........................................................................................18

*United States v. Frederick Kellner*,
    No. 1:19-CR-267 (D. Md.) ..............................................................................................18

*Western Organization of Resource Councils v. Zinke*,
    892 F.3d 1234 (D.C. Cir. 2018).......................................................................................10

*Williams v. New York*,
    337 U.S. 241 (1949)..........................................................................................................3

**FEDERAL STATUTES**

18 U.S.C. § 3553 .......................................................................................................3, 4, 10, 12, 15

USSG § 2T1.1 ...........................................................................................................................11, 16

**OTHER AUTHORITIES**

David Lat, *What SCOTUSblog's Tom Goldstein Doesn't Miss About the Court*,
　　Bloomberg Law (Nov. 14, 2024) .............................................................................................1

David Thomas, *Washington lawyer Tom Goldstein leaves Supreme Court
　　practice, law firm*, Reuters (Mar. 1, 2023) ...........................................................................1

DSM-IV to DSM-5 Gambling Disorder Comparison, *National Library of
　　Medicine*, https://www.ncbi.nlm.nih.gov/books/NBK519704/table/ch3.t39/ ........................15

*Judiciary Sentencing Information*, United States Sentencing Commission,
　　https://jsin.ussc.gov/analytics/saw.dll?Dashboard....................................................................16

Noah Scheiber, *The Hustler*, The New Republic, (Apr. 10, 2006)
　　https://newrepublic.com/article/64619/the-hustler ...................................................................6

*SCOTUSblog*, Peabody, https://peabodyawards.com/award-profile/scotusblog/;.........................13

<u>**DEFENDANT THOMAS C. GOLDSTEIN'S**</u>
<u>**MEMORANDUM IN AID OF SENTENCING**</u>

Three years ago, Mr. Goldstein was one of the most highly respected advocates in the country.  Having paved his own path to arguing more than 40 cases before the Supreme Court, he made (legal news) headlines in March 2023 for retiring at age 52.[1]  The instant case has also made headlines.  But his first famous case was as part of the team that represented Al Gore in *Bush v. Gore*, 531 U.S. 98 (2000).  And for over two decades, although Mr. Goldstein had a financially successful firm, his private law practice had purpose.  Most of his legal work—and impact—involved taking up appeals for plaintiffs' lawyers, representing state and local governments, teaching and mentoring law students, and otherwise advocating for people and parties who had little access to Supreme Court practitioners.  He liked the hard work.  He respected judges and his opponents.  And he acknowledged that he stood in a position of privilege.[2]  SCOTUSBlog, which Mr. Goldstein started with Amy Howe, had its own renown in the legal world, and had a dramatic impact on the public's awareness of—and ability to digest—what was happening before the Supreme Court.

But after this extremely public (and extremely personal) investigation and prosecution, Mr. Goldstein's world has been turned upside down—his individual failings, and accusations of much more, exposed for the public and his peers to judge and dissect.  Mr. Goldstein maintains his innocence with respect to the tax offenses, and maintains his legal defense with respect to

---

[1] David Thomas, *Washington lawyer Tom Goldstein leaves Supreme Court practice, law firm*, Reuters (Mar. 1, 2023); https://www.reuters.com/legal/government/washington-lawyer-tom-goldstein-leaves-supreme-court-practice-law-firm-2023-03-01/.

[2] David Lat, *What SCOTUSblog's Tom Goldstein Doesn't Miss About the Court*, Bloomberg Law (Nov. 14, 2024); https://news.bloomberglaw.com/us-law-week/What-SCOTUSblogs-Tom-Goldstein-Doesnt-Miss-About-the-Court (quoting Mr. Goldstein explaining, "There's 'an enormous problem with diversity,' with SCOTUS arguments dominated by 'a lot of old White guys'—which he described as 'utterly messed up.'").

the mortgage counts, issues to be resolved separately from sentencing.[3]  But there should be no doubt that Mr. Goldstein has remorse for the conduct that got him to this place.  If there are victims in this case, they are the people who are most important to Mr. Goldstein.  And if the goal of criminal prosecution is to punish and deter, this case has had irreversible consequences for Mr. Goldstein, and presents a cautionary tale for similarly situated taxpayers.

Moreover, the obvious reality overshadowing this case is that Mr. Goldstein has a severe and longstanding gambling addiction.  Mr. Goldstein was at the peak of his career.  He was financially successful and well respected.  He married his college sweetheart, started a small business with her in their home, and raised two children.  He should be retiring with significant life savings or, if he wanted to, continuing to practice law at the highest levels.  Instead, he has spent many years gambling with money he didn't have, and gambling away money that he won, to the detriment of himself and his loved ones.  His addiction is at the center of the conduct that brought him before the Court—even while the defense maintains it was not criminal.

As further outlined below, incarceration is not appropriate in this case.  Instead, a lengthy period of supervision, with restitution obligations, is sufficient but no greater than necessary to achieve the goals of sentencing, for multiple reasons.  *First*, even though Mr. Goldstein was a lawyer in private practice, he spent the bulk of his career promoting public interest and access to justice.  He could do substantially more good in the community than in prison.  *Second*, the guidelines calculation, which includes $3.5 million that Mr. Goldstein already paid, egregiously overstates the tax loss.  And even the allegations underlying most of the felony convictions involve omissions of information, not elaborate fraud.  *Third*, the

---

[3] Mr. Goldstein's Motion for Judgment of Acquittal and, in the Alternative, for a New Trial is currently pending and, if granted, Mr. Goldstein will pursue an appeal. Nothing in this memorandum should be construed as an admission of legal guilt nor as a waiver of any of his objections or rights.

2

personal, professional, and financial consequences of this case are already sufficient punishment and deterrent. Addressing Mr. Goldstein's gambling addiction is the necessary intervention going forward. *Fourth*, any significant period of incarceration would create disparities between Mr. Goldstein and other defendants who were convicted of similar, or more problematic, conduct. In sum, exercising its independent judgment, the Court should vary below the guidelines range and suspend any period of incarceration.

## I.   LEGAL STANDARD

Every sentence must be tailored to the individual standing before the court and the specific facts of their case, not simply reduced to the offense of conviction. And the Supreme Court has long held that punishment must "fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). This principle demands "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). It is now "emphatically clear" that the "Guidelines are guidelines—that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).

Calculating the Guidelines range does not relieve the Court of its obligation to arrive independently at a sentence that is appropriate and serves the interests of justice. *See Nelson v. United States*, 555 U.S. 350 (2009) (reversing sentence where district court presumed guidelines were reasonable). "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." 555 U.S. at 352. Having considered the Guidelines alongside the statutory factors in 18 U.S.C. § 3553(a), the Court may conclude that the case falls outside the "heartland" contemplated by the Guidelines, that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence

3

regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007); *see also United States v. Booker*, 543 U.S. 220, 259-60 (2005).  The overriding command of § 3553(a) is that district courts impose a sentence sufficient but not greater than necessary to comply with the purposes of sentencing set forth in § 3553(a)(2).

Even setting aside the wide disagreement between the parties regarding the appropriate guidelines calculation, Mr. Goldstein's case is precisely the kind the Supreme Court recognized in *Rita*—one that simply "warrants a different sentence" than the Guidelines recommend.  551 U.S. at 351.  The average tax loss case with Mr. Goldstein's guidelines receives a significantly below-guideline sentence.  And Mr. Goldstein's personal history and characteristics, the nature of the harm caused and the absence of any risk to the community—indeed, Mr. Goldstein's capacity to do substantial good in the community—all point to the same conclusion: a term of imprisonment would exceed what is necessary to satisfy the purposes of sentencing and would be inconsistent with the § 3553(a) factors.

## II.    **APPLICATION OF SENTENCING FACTORS**

### A.    **Mr. Goldstein has spent most of his legal career expanding access to the Supreme Court, mentoring more junior lawyers, and advocating for underrepresented parties.**

Mr. Goldstein's history and characteristics, 18 U.S.C. § 3553(a)(1), favor a sentence that does not include incarceration.

There should be no dispute that he could, and would, be successful on a term of supervision.  The best evidence of this is that Mr. Goldstein has spent the past three-plus months on home confinement, complying with strict conditions that require a court order to leave his residence for anything other than medical or legal visits.  Before that, he spent over a year in close communication with pretrial services and in substantial compliance with his conditions of release—most importantly, providing regular financial statements to pretrial services, restricting

4

travel outside the area unless approved by pretrial services, refraining from contacting an (overbroad) list of over 80 people, and restricting his use of computers.  Mr. Goldstein's ability to conform to court and supervision orders comes as no surprise.  He has no prior record.  He has a broad network of family, friends, and colleagues who offer support and motivation for Mr. Goldstein to put this chapter of his life behind him.  And he has respect for the Court and the criminal legal system more broadly—trusting that the best way to challenge the allegations against him is going through the process.

Setting aside that he *would* successfully complete a term of supervision, Mr. Goldstein *should* be given that opportunity, in this Court's exercise of its discretion.  It is no overstatement to say that Mr. Goldstein transformed access to the Supreme Court—making it so that smaller parties and smaller causes, without the federal government or big business behind them, could have their cases heard in the highest court.  Multiple witnesses testified as much at trial.  Daniel Woofer explained that Mr. Goldstein "changed the profession" by seeking out clients, doing "top-notch legal work, [and] winning big Supreme Court cases for them."  1/22/26 Tr. 48:18-21. Sarah Harrington described him as "a very entrepreneurial person," and explained how Mr. Goldstein "pioneered the practice of looking for what people call circuit splits"—a practice that was innovative when Mr. Goldstein started, but now commonplace.  2/3/26 Tr. 9:20-10:9.  And while the government insinuated Mr. Goldstein had ulterior motives for hiring post-college office managers, his colleagues confirmed that there was a benefit to hiring "young people who were very bright and more enthusiastic than if we had hired somebody more senior at that time."  1/20/26 Tr. 108:25-109:4.

Moreover, as confirmed by witnesses at trial, Mr. Goldstein was invested in the next generation of lawyers.  Molly Runkle described him succinctly, in response to the *government's* question:

> **Q:** What was Mr. Goldstein like?
>
> **A:** He's brilliant.  He is quiet, kind of reserved.  He is an excellent mentor.  He is direct.  He is – he was a good boss.

1/20/26 Tr. 177:6-8. She went on to explain how Mr. Goldstein helped with her application process to law school and beyond, not just in writing recommendation letters, but being a resource.  "If I wasn't sure what I wanted to do next in my career, he was someone I could talk to, was a sounding board."  1/20/26 Tr. 171:5-12.  Mr. Goldstein provided this support to many aspiring or junior lawyers, whether they were former employees or even people he didn't know.[4]  And as the Court heard at trial, Mr. Goldstein "founded the Supreme Court litigation clinic at Stanford and Harvard Law Schools," even though he didn't attend those schools, and worked with students at both schools for many years.  1/20/26 Tr. 101:17-21.

Despite the government's allegations, Mr. Goldstein has spent the last several decades contributing to the rule of law and expanding access to justice.  His ability—and obligation—to

---

[4] For example, in an article linked on Stanford Law School's website, a profile about then-35-year-old Mr. Goldstein described how he had already argued sixteen cases before the Supreme Court, but also how Mr. Goldstein was willing to help others attain similar experience:

> Goldstein has even inspired a growing mob of solo operators. One of these, a Los Angeles-based attorney named Jean-Claude Andre, recently told me that he first learned about Goldstein from a 1998 *Washington Post* article on the eve of Goldstein's first argument. Andre was in law school at the time, but, as soon as he was eligible to be admitted to the Supreme Court bar, he called Goldstein and asked for advice. "He was extremely gracious," recalls Andre. "He had no incentive to help me, because, to some extent, I would be a competitor. But we talk every couple of months."

Noah Scheiber, *The Hustler*, The New Republic, (Apr. 10, 2006) https://newrepublic.com/article/64619/the-hustler.

do good would be wasted in prison.  He has represented hundreds of clients in the Supreme

Court and in appellate courts across the country.  He has argued dozens of cases and filed briefs

in many more.  His career is extraordinary not just because he did not attend the most elite

schools, nor secure the most elite clerkships, to get there, but because he chose to build a

practice that prioritized cases that made little—or no money—but that pursued justice.  A

sample of his cases demonstrates just a fraction of his impact.

    ***Criminal Justice.***  Mr. Goldstein repeatedly represented criminal defendants, prisoners,

and detainees in cases that sought to preserve constitutional protections and meaningful access

to judicial review.  His clients often faced the most severe consequences in the legal system,

including lengthy imprisonment, capital punishment, and military detention: *Cone v. Bell*, 556

U.S. 449 (2009), where Mr. Goldstein represented a Vietnam War veteran sentenced to death,

convincing the Supreme Court that he should have the opportunity to challenge a *Brady*

violation on collateral appeal; as well as *Clay v. United States*, 537 U.S. 522 (2003) and *Jimenez*

*v. Quarterman*, 555 U.S. 113 (2009), both unanimous decisions where Mr. Goldstein convinced

the Supreme Court to reopen the deadlines for collateral review.  Mr. Goldstein was also on the

briefs for *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), arguing that a detainee in Guantanamo

should enjoy the rights protected by the Geneva Convention.  He challenged procedural barriers

that prevented courts from considering potentially meritorious constitutional claims, helping

ensure that convictions and sentences were subject to meaningful review rather than being

insulated by technical rules.

    His advocacy also addressed the limits of government power and the protection of

individual privacy.  For example, in a case where Mr. Goldstein worked with the Stanford

Supreme Court Clinic, the Supreme Court strengthened Fourth Amendment protections within

the home by holding that police cannot conduct a warrantless search when a co-occupant is present and objects. *Georgia v. Randolph*, 547 U.S. 103 (2006). And Mr. Goldstein advocated for marginalized clients in numerous other cases, which deserve note even when he didn't win. One example is *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318 (2012), a civil rights action where Mr. Goldstein represented a man arrested on an outdated warrant who was subjected to invasive strip searches. Although the Court ruled against Mr. Goldstein's client, this is one of many instances Mr. Goldstein lent his time and energy to indigent defendants and promoted efforts to respect their rights and dignity.

*First Amendment.* Mr. Goldstein litigated cases—on both sides—involving the tension between the public's right to information and individual rights to privacy. In *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the Supreme Court agreed with Mr. Goldstein that the First Amendment protects publication of truthful information concerning issues of public importance, even when the source obtained that information unlawfully. And in *Los Angeles Police Department v. United Reporting Publishing Corp.*, 528 U.S. 32 (1999), Mr. Goldstein defended—on behalf of the Los Angeles Police Department—restrictions on access to arrestee information collected by the government, supporting a state law that restricted dissemination.

*Immigration.* In *Moncrieffe v. Holder*, 569 U.S. 184 (2013), Mr. Goldstein, again with the Stanford Supreme Court Litigation Clinic, represented a lawful permanent resident facing mandatory deportation after a minor marijuana-related conviction. The Supreme Court held that the offense did not categorically qualify as an aggravated felony under federal immigration law. The decision protected countless noncitizens from automatic deportation based on relatively minor criminal offenses and reinforced the principle that severe immigration penalties should not be imposed absent clear congressional authorization.

***Anti-Discrimination***.  Mr. Goldstein's anti-discrimination work included cases that sought to expand access and equal treatment for individuals facing barriers because of age or disability.  In *Tennessee v. Lane*, 541 U.S. 509 (2004), he helped defend the rights of individuals with disabilities who were denied meaningful access to courthouses, resulting in a landmark decision preserving Congress's authority to require reasonable accommodations.  In his Court of Appeals work, such as *Pace v. Bogalusa City School Board*, 403 F.3d 272 (5th Cir. 2005) (en banc), Mr. Goldstein advocated for students with disabilities seeking remedies when schools failed to provide legally required accommodations.

His work also addressed discrimination in employment and public accommodations.  In *Smith v. City of Jackson*, 544 U.S. 228 (2005), the Supreme Court held that disparate-impact claims can be brought under the Age Discrimination in Employment Act, expanding protections for older workers (though denying his client's claim).  And in *Spector v. Norwegian Cruise Line*, 545 U.S. 119 (2005), the Court extended Americans with Disabilities Act protections to foreign cruise ships operating in U.S. waters, broadening accessibility protections for individuals with disabilities.

***Workers' Rights.***  In *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005), Mr. Goldstein represented meat-processing workers who were required to wear specialized protective equipment for their work.  The Supreme Court held that the time they spent putting on gear, or taking off gear, was compensable work time covered by the Fair Labor Standards Act.  The decision helped ensure that workers are paid for time spent performing tasks that are necessary and indispensable to their jobs, particularly in hazardous industrial workplaces.

***Environmental Justice.***  Mr. Goldstein's environmental representations included communities affected by government actions and natural-resource policies.  In *People of Bikini*

9

*v. United States*, 554 F.3d 996 (Fed. Cir. 2009), he was on the briefs representing the people of Bikini Atoll, whose homeland was devastated by nuclear testing.  Although his clients were denied relief, it highlighted the long-term human and environmental consequences of government actions.  And in *Western Organization of Resource Councils v. Zinke*, 892 F.3d 1234 (D.C. Cir. 2018), he was on the briefs in favor of environmental and landowner interests challenging federal decisions affecting public lands and energy development, in an effort to advance transparency and accountability in natural-resource management.

In sum, from just a sample of his cases, Mr. Goldstein used his career not just for profit—but for good.  The Court should take that substantial public service into account.

**B.** **The Guidelines range egregiously overstates the appropriate punishment for offenses with no victim, and for which Mr. Goldstein has already paid millions of dollars in taxes, penalties, and interest.**

The nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1), favor a sentence that does not include incarceration.

As explained in the defense's separately-filed Notice of Objections to the Presentencing Report ("PSR"), the PSR—by copying verbatim the government's version of the facts— seriously overstates the strength of the government's case.  The government's main theory about Mr. Goldstein's alleged tax evasion shifted dramatically throughout trial: opening on the theory that Mr. Goldstein *hid* the money he won from Alec Gores; suggesting mid-trial that Mr. Goldstein reported *only* the money he won from Alec Gores; and closing on a theory that the issue was actually a (non-existent) secret bank account in Asia that Mr. Goldstein supposedly used to hide millions of dollars in gambling wins.  After years of investigation, it is unusual for the government to be oblivious to basic facts about their case—such as the fact that Mr. Goldstein disclosed his gambling wins to his accountant in writing.  Post-trial, this matters because the case the government set out to prove is not the case Mr. Goldstein was convicted of.

10

The PSR also overstates the felony tax loss.  As the mixed verdict confirmed, Mr. Goldstein was likely convicted on the theories that he (1) transferred money to his firm's IOLTA account when he still owed $40,000 in penalties and interest for 2016; (2) was willfully blind to the misclassification of payments to Napoli Shkolnik and Chuck Pacheco as business expenses; and (3) was willfully blind to the requirement to report that he engaged in cryptocurrency transactions.  These theories are completely consistent with the verdict and produce a dramatically lower tax loss estimate than the one listed in the PSR.  Mr. Goldstein should be sentenced based on the allegations that were actually proven, not every theory the government presented—particularly given the government's opposition to a special verdict form.

Separately, even under the defense calculation of the guidelines, the guidelines massively overstate tax loss because they include over $3.5 million for the misdemeanor willful failure to pay on time offenses.  Including that amount distorts the seriousness of the offense. Under the guidelines tax loss table, tax loss more than $3.5 million is already an offense level 24.  As a result, the least serious conduct in the indictment—misdemeanor charges about not *whether* Mr. Goldstein paid his taxes, but about *when* he paid them—produce a guidelines range of four to five years imprisonment, without even considering the felony conduct.  Moreover, although under the guidelines the tax loss is not reduced by payment of the tax after commission of the offenses, *see* USSG § 2T1.1, this is not a case where Mr. Goldstein only paid his taxes once indicted.  He paid all of the $3.5 million owed for Counts 10 to 13, plus penalties and interest, years before indictment.

Finally, while mortgage fraud is, by statutory maximum, the most serious offense charged, the conduct underlying the mortgage counts involved omissions of private debt from

11

loan applications—not a fraudulent scheme.  There was never any loss to the bank.  For Counts 14 and 15 Mr. Goldstein and his wife never received the loans, and for Count 16 Mr. Goldstein and his wife continue to repay the loan.  Moreover, there was never any *intended* loss, or any risk that the bank would not recover the value of the loan and more.  Mr. Goldstein and his wife also intended to pay the mortgage, and did.  The house, which secures the loan, is worth more than the amount of the loan—so if Mr. Goldstein and his wife ever default, the bank would still recover its money in full.  Once Mr. Goldstein and his wife are allowed to sell the property, the bank will recover its loan (plus the interest already paid) in full.  And the debts Mr. Goldstein omitted were private agreements where Mr. Goldstein could, and did, renegotiate the pace of repayment, such that the private debt never took priority over payment of the bank loans.

Taken together, these offenses involved no victims; the bank and the government have already been repaid much of the debt at issue; and both the bank and the government will soon be made whole.  Incarceration will only make it more difficult for Mr. Goldstein to repay his debts, both for the undisputed tax errors, and to private individuals.

C. **A lengthy period of supervision is sufficient, but not greater than necessary, to punish Mr. Goldstein and deter similarly situated individuals.**

The Court can achieve the purposes of sentencing, 18 U.S.C. § 3553(a)(2), without incarceration.  The offenses Mr. Goldstein was convicted of are undoubtedly serious offenses, and the appropriate sentence must promote respect for the law and provide just punishment, as well as adequately deter Mr. Goldstein and others.  A non-carceral sentence is sufficient to achieve those goals.

The Court has numerous tools available to it that punish Mr. Goldstein without incarceration.  Since January 2025, Mr. Goldstein has been under strict court supervision—particularly over the past three months on home confinement, but in addition to the long-

12

standing restrictions on his travel, computer use, and social network.  In addition, the government is seeking millions of dollars in restitution, and the Court could impose even more in fines.  Those tools are sufficient to disgorge any benefit Mr. Goldstein obtained as a result of the conduct in this case and to restrict Mr. Goldstein's liberty for any punitive purpose.

The real-life consequences of this case already adequately deter Mr. Goldstein, and anyone who would follow in his footsteps, from the conduct at issue in this case.  As the Court well knows, this case turned on *willfulness*—the idea that the government could get inside Mr. Goldstein's head and prove intent.  On many of the charges, the underlying facts (e.g., that a source of income was or was not reported) was not in dispute; the question was why.  Although Mr. Goldstein maintains that he did not willfully commit these offenses, the lesson learned is that following best practices with financial accounting and tax reporting could avoid even the accusation of wrongdoing.  Indeed, this case is a cautionary tale for any taxpayer or small business owner—and particularly for any who, like Mr. Goldstein, are privileged enough to be in the public eye.

Even if Mr. Goldstein prevails in his posttrial motion, or on appeal, the impact of this case on his life is irreversible.  Mr. Goldstein was once a leading appellate advocate; he has had to report his prosecution and conviction to the bar, and cannot currently practice law.  Mr. Goldstein and his wife's website, SCOTUSblog, is recognized as a bona fide news source, even winning a Peabody Award in 2012.[5]  Mr. Goldstein had to sell the blog in 2025.  Mr. Goldstein had a broad network of personal and professional connections, but he has been prohibited from contacting most of them since his indictment, and has undoubtedly lost friends along the way. And most significantly, Mr. Goldstein—and his loved ones—have had to endure a public

---

[5] *SCOTUSblog*, Peabody, https://peabodyawards.com/award-profile/scotusblog/; *see also* Attachment A.

13

dissection of intimate aspects of Mr. Goldstein's life, callous accusations about his character, and financial insecurity as Mr. Goldstein sold assets to pay debts, and as the government continues to seek forfeiture of his family home. Incarceration would be excessive in a case where Mr. Goldstein already knows viscerally the impact of his actions on his life.

Finally, the Court must take into account the need for corrective treatment—here, Mr. Goldstein's need to address his gambling addiction.  After trial, Mr. Goldstein agreed to submit to an evaluation for gambling addiction; the evaluation finds that Mr. Goldstein has a severe disorder and needs treatment to recover.  *See* Attachment B.  The results are unsurprising to an outside eye: Mr. Goldstein spent years gambling with money he didn't have.  And while Mr. Goldstein has had success in the high-stakes world, he has also had incredible failures.  He is not wealthy enough to sustain the losses of the billionaires he has played against, and he is not good enough at poker to win at the rate of professionals.  The result is that Mr. Goldstein is (and has been for a while) in millions of dollars of debt, to the detriment of his family and career.

Prison will not fix this problem.

14

████████████████████████████████████████████████

████████████████████████████████████

Particularly for someone as smart and successful as Mr. Goldstein, it is easy to dismiss problematic gambling as a choice—a mere character flaw, or poor decision.  But gambling has been recognized in the Diagnostic and Statistical Manual of Mental Disorders (DSM) since 2013.  It is characterized by "[p]ersistent and recurrent problematic gambling behavior leading to clinically significant impairment or distress."[6]  The most recent version, renaming the condition from "[p]athological [g]ambling" to simply "[g]ambling [d]isorder," moved gambling from an impulse-control disorder in its own category to the category "Substance-Related and Addictive Disorders."  *Id.*  In other words, scientific research now confirms that gambling is a substance abuse disorder, just as addictions to drugs like opioids, tobacco, or cocaine.  But with appropriate treatment, Mr. Goldstein could end his relationship with gambling, pay his debts, and redirect his energy to more productive endeavors.

> **D.** **Incarceration would be disproportionately harsh in comparison to similar or more culpable defendants.**

The sentence within the guidelines would cause unwarranted sentencing disparities compared to defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(1).

The PSR, using as a basis the inflated and unsupported tax loss and enhancements requested by the government, gives Mr. Goldstein a Total Offense Level 28, which in Criminal History Category I translates to a guideline range of 78 to 97 months.  PSR at 69.  But even the data in the PSR acknowledges that the guidelines range is out of step with reality: according to

---

[6] Table 3.38, DSM-IV to DSM-5 Gambling Disorder Comparison, *National Library of Medicine*, https://www.ncbi.nlm.nih.gov/books/NBK519704/table/ch3.t39/.

the US Sentencing Commission's database, of the five defendants between 2020 and 2024 who had the same offense level and criminal history category from the tax loss table, the median and average sentences imposed were 42 months and 48 months, respectively.  PSR at 73.  In other words, the average tax defendant in the government's calculation of the guidelines received a *significant variance below* the guidelines—and that's excluding defendants who received a departure for cooperating with the government.

Using the same Sentencing Commission data (updated through 2025), and applying the more appropriate tax loss calculations as explained in the defense's Notice of Objections to the Presentencing Report, a term of supervision is an appropriate sentence here.[7]  In exercising its independent judgment to determine a fair sentencing, the Court should take into account the conduct that is actually supported by the evidence for the tax offense Mr. Goldstein was convicted of, setting aside the misdemeanors (tax liabilities that Mr. Goldstein has already paid): Mr. Goldstein was likely convicted based on the transfers to his IOLTA account, personal payments to Napoli Shkolnik and Chuck Pacheco, and failing to disclose cryptocurrency transactions.  Using offense level 14 (tax loss more than $100,000) and criminal history category I, the guidelines range is 15 to 21 months, but the average sentence is a *below-guidelines variance of 12 months*, and *half* of defendants in that category from 2021 to 2025 received *probation or fine only*.

Even adjusting the calculation to include $3.5 million misdemeanor tax loss, the guidelines go up to 41 to 51 months, but a downward variance and a term of supervision remain appropriate.  Of the defendants in this category from 2021 to 2025, excluding defendants who

---

[7] *See Judiciary Sentencing Information*, United States Sentencing Commission, https://jsin.ussc.gov/analytics/saw.dll?Dashboard.  *See also* Attachment C (Guideline §2T1.1, Offense Level 14, Criminal History I; Offense Level 22, Criminal History I)

received a departure for cooperation with the government, the median and average sentences were 24 months and 28 months respectively, *with fifteen percent receiving probation or fines only*.

This data reveals that a guidelines sentence—whether using the government's calculation or the defense's—is disproportionately harsh. Courts regularly impose below-guidelines sentences for individuals with the same tax loss and the same clean criminal history as Mr. Goldstein, including imposing probation only or fine only sentences. And Mr. Goldstein's individual circumstances—his history of public service, the absence of any victim, the fact that Mr. Goldstein has already paid millions of dollars in taxes, penalties, and interest, and the fact that Mr. Goldstein's conduct is driven by treatable gambling addiction all favor a significantly lower sentence than the Guidelines range.

There are numerous examples of courts imposing below-guidelines sentences in similar cases where defendants were convicted of tax-related offenses, mortgage fraud, or other financial crimes:

- *United States v. Cemini*, **No. 2:23-CR-92 (E.D. Pa.):** Defendants were convicted of conspiring to defraud the United States, after stipulating that they evaded $682,446.80 in taxes by withholding but not paying employment taxes, failing to file tax returns from 2013 through 2021, paying employees in cash, and paying for personal expenditures directly from business funds without reporting any wages or compensation. ECF No. 53, 54. The Court sentenced one defendant to 36 months probation and the other defendant to six months of confinement with $934,428.80 restitution. ECF No. 78, 79.

- *United States v. Schechter,* **No. 1:23-CR-210 (D.D.C.):** The defendant, a retired multimillionaire investment banker, was a dual U.S.-U.K. citizen residing in London

17

during the relevant period. He opened an account in a Swiss bank while concealing his status as a U.S. citizen, including by falsely representing that he had renounced his citizenship 20 years earlier. He caused his firm to prepare false income tax returns that underreported $5,130,048 in adjusted gross income, causing a tax loss of $820,391. ECF No. 28.  Despite a guideline range of 24-30 months, the Court imposed a sentence of 7 days incarceration and 3 years of supervised release.  ECF No. 28.

- *United States v. Donuk*, **No. 2:22-CR-691 (D.N.J.):** The defendant was convicted of twelve counts in an indictment for tax evasion, employment tax crimes, aiding the filing of false tax returns and making false statements in bankruptcy, with a tax loss between $100,000 and $250,000 before interest.  ECF No. 25.  The Court sentenced him to five years probation with $157,552.77 in restitution.

- *United States v. Warner, 792 F.3d 847 (7th Cir. 2015):* The defendant, billionaire creator of Beanie Babies, evaded $5.6 million in U.S. taxes through use of offshore accounts and was convicted of tax evasion.  He was sentenced to two years' probation, 500 hours of community service, $100,000 fine, and costs.  Restitution and a $53.6 million civil penalty also imposed.  The Seventh Circuit upheld the sentence as substantively reasonable, despite a guideline range of 46 to 57 months.

- *United States v. Frederick Kellner*, **No. 1:19-CR-267 (D. Md.):** The defendant was convicted of embezzling $356,577 by taking his deceased parent's social security benefits for his own use.  ECF No. 1, 17.  He was sentenced to five years of probation to include six months of home detention, and restitution.  ECF No. 37.

- *United States v. Brown*, **No. 1:12-CR-135 (D.D.C.):** DC Councilman Kwame Brown was convicted of bank fraud after forging information and falsely inflating his income

18

for a home equity loan, and two years later, to purchase a boat.  ECF No. 5.  He was sentenced to one day incarceration and two years of supervised release.  ECF No. 20.  These are just a few examples of cases where the Court imposed probation despite tax loss ranging from hundreds of thousands to millions of dollars.  The specific facts and circumstances of Mr. Goldstein and his case merit the same result.

## III.    **RECOMMENDATION**

Incarceration is not appropriate in this case.  The Supreme Court has rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Gall v. United States*, 552 U.S. 38 (2007).  And here, there are multiple reasons for the Court to exercise its independent judgment and impose a sentence that is significantly below the guidelines—including that the median and average sentences in similar cases do precisely that.  Furthermore, the Court has the authority to determine that the tax loss table results in an excessive sentence, and should use as a starting point, instead, only the tax loss amount for the conduct that supports the felony convictions.  *Cf. Spears v. United States*, 555 U.S. 261 (2009) (affirming the court's authority to discount guidelines based on crack cocaine guidelines when they resulted in an excessive sentence compared to powder cocaine).

The Court should impose a lengthy period of supervision with conditions that both hold Mr. Goldstein accountable but that also allow him to repay his debts, address his gambling addiction, and contribute to society.  In the alternative, the Court should impose a period of home confinement.  Either option is sufficient, but not more than necessary, to fulfill the purposes of a sentence given the facts and circumstances of this case.

19

Dated: June 2, 2026                                      Respectfully submitted,

                                                        */s/  Jonathan I. Kravis*
Stephany Reaves (Bar No. 19658)                         Jonathan I. Kravis (Bar No. 31556)
Sarah E. Weiner (*pro hac vice*)                        **LIU SHUR KRAVIS LLP**
**MUNGER, TOLLES & OLSON LLP**                          607 14th Street NW, Suite 625
601 Massachusetts Avenue NW, Suite 500E                 Washington, DC 20005
Washington, DC 20001                                    (202) 240-7100
(202) 220-1100                                          jonathan.kravis@lskllp.com
Stephany.Reaves@mto.com
Sarah.Weiner@mto.com

Adeel Mohammadi (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*

20