**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **CRIMINAL NO. LKG-25-6** |
| **THOMAS C. GOLDSTEIN,** | |
| **Defendant.** | |

**DEFENDANT THOMAS C. GOLDSTEIN'S
RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

ARGUMENT ........................................................................................................................3

I. THE GOVERNMENT'S INFLATED GUIDELINES RANGE IS NOT
ACCURATE ...............................................................................................................3

  A. The government's calculation of tax loss includes alleged conduct that the
government did not prove by a preponderance of the evidence. ...........................4

  B. The tax loss calculation should not include $7,680,272 that is attributable
to clearly unrelated alleged conduct in tax years 2022 and 2023. ........................11

  C. The government's calculation inflates the guidelines range with
$6,635,405.97 in taxes, penalties, and interest that Mr. Goldstein has
already paid. ........................................................................................................14

    1. Including $4,545,177.84 in tax loss for misdemeanor Counts 10 to
13 distorts the intent of the statute and guidelines. ...................................14

    2. Including $2,090,228.13 in tax loss for 2016 similarly overstates
the offense, but also circumvents conflicting guidelines. ..........................15

  D. The fact that the willful failure to pay amounts were paid long before
indictment supports a downward variance. ...........................................................16

  E. The government's tax loss calculation is not a reasonable estimate. .....................17

  F. After adopting the government's statement of facts, the PSR incorrectly
increases Mr. Goldstein's offense level by four points for enhancements. ...........20

    1. The evidence does not support a sophisticated means enhancement .........20

      a. Foreign bank accounts were not used to execute or conceal
any offense. ...................................................................................21

      b. Third-party payments were not used to execute or conceal
any offense. ...................................................................................23

      c. VPN technology was not used to execute or conceal any
offense. .........................................................................................23

    2. The evidence does not support an obstruction enhancement. ....................24

      a. Mr. Goldstein's statements to IRS-CI Special Agents did
not obstruct justice. ......................................................................25

      b. Mr. Goldstein did not attempt to impede Ms. Bart's
cooperation. ..................................................................................25

      c. Mr. Goldstein did not perjure himself in his financial assets
declaration. ...................................................................................26

d.      Mr. Goldstein did not perjure himself on the witness stand. .........27

II.    EVEN IF THE GOVERNMENT'S SENTENCING GUIDELINES
       CALCULATION WERE CORRECT, ANYTHING CLOSE TO THE
       GOVERNMENT'S REQUESTED SENTENCE WOULD BE INAPPROPRIATE ........30

       A.    The government distorts the nature and circumstances of the offense. .................30

       B.    The government has tunnel vision about Mr. Goldstein's history and
             characteristics. ................................................................................................30

       C.    The sentence imposed can reflect the seriousness of the offense without
             incarceration. ...................................................................................................32

       D.    The government's requested sentence is significantly more harsh than—
             and would create disparities with—cases with similarly situated
             defendants. .......................................................................................................35

       E.    Incarcerating Mr. Goldstein is not necessary specific deterrence and is not
             effective general deterrence. ............................................................................40

       F.    Regardless of the guidelines calculation, a period of supervision is
             appropriate under the statutory sentencing factors. .........................................43

CONCLUSION ...............................................................................................................45

INDEX OF EXHIBITS ...................................................................................................46

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*United States v. Adams*,
955 F.3d 238 (2d Cir. 2020)..................................................................12

*United States v. Adepoju*,
756 F.3d 250 (4th Cir. 2014) ...............................................................21

*United States v. Banks*,
347 F.3d 1266 (11th Cir. 2003) ............................................................24

*United States v. Brennick*,
134 F.3d 10 (1st Cir. 1998)...................................................................38

*United States v. Catone*,
769 F.3d 866 (4th Cir. 2014) ..................................................................4

*United States v. Flores-Alvarado*,
779 F.3d 250 (4th Cir. 2015) ..................................................................4

*United States v. Guldi*,
141 F.4th 435 (2d Cir. 2025) ................................................................21

*United States v. Jinwright*,
683 F.3d 471 (4th Cir. 2012) ................................................................20

*United States v. Palermo*,
259 F.2d 872 (3d Cir. 1958)..................................................................38

*United States v. Perez*,
661 F.3d 189 (4th Cir. 2011) ................................................................24

*United States v. Urbanek*,
930 F.2d 1512 (10th Cir. 1991) ............................................................25

**FEDERAL STATUTES**

18 U.S.C. § 3553(a) ...........................................................................3, 35

**SENTENCING GUIDELINES**

U.S.S.G. § 1B1.3(c) ...........................................................................4, 16

U.S.S.G. § 2T1.1 ............................................................................ *passim*

U.S.S.G. § 2T4.1.............................................................................10, 14

**FEDERAL RULES**

Fed. R. Crim. P. 32(i)(3) ..................................................................................................3

**OTHER AUTHORITIES**

U.S. Sentencing Guidelines Amendment 491.................................................................36

Anna Scott Farrell, *$47M Fat Brands Tax Case Tossed After DOJ Quits Pursuing It*, Law360
    (Aug. 8, 2025) ......................................................................................................40

*Binance and CEO Plead Guilty to Federal Charges in $4B Resolution*, DOJ Press Release (Nov.
    21, 2023) ..............................................................................................................37

Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, 42 Crime &
    Just. 199 (2013)....................................................................................................42

*Early Cryptocurrency Investor Known as 'Bitcoin Jesus' Admits to Misconduct and Enters into
    Deferred Prosecution Agreement*, USAO Press Release (Oct. 14, 2025) ..............................39

Emily Widra, *States of Incarceration: The Global Context 2024*, Prison Policy Initiative (June
    2024) ...................................................................................................................32

*Former CFO sentenced to two years in prison for $35 million theft from start-up tech firm*,
    USAO Press Release (Mar. 5, 2026) .......................................................................37

National Research Council, National Academies Press, *Growth of Incarceration in the United
    States: Exploring Causes and Consequences* (2014)................................................42

*Private Equity CEO Enters into Non-prosecution Agreement on International Tax Fraud Scheme
    and Agrees to Pay $139 Million, to Abandon $182 Million in Charitable Contribution
    Deductions, and to Cooperate with Government Investigations*, DOJ Press Release (Oct. 15,
    2020) ...................................................................................................................39

Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence?*, 100 J.
    Crim. L. & Criminology 765 (2010)........................................................................42

U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things
    About Deterrence* (May 2016) ...............................................................................42

Valerie Wright, The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty
    Versus Severity of Punishment* (Nov. 2010) ............................................................41

**INTRODUCTION**

By the government's own calculations, the *actual loss* to the Department of the Treasury for Mr. Goldstein's conviction offenses is approximately $1.9 million. *See* ECF No. 521-11 at 2 (sum of tax on unreported income). That number is inflated. But even taking it at face value, the government asks the Court to sentence Mr. Goldstein based on over ***$14.3 million more***, made up of taxes, penalties, and interest that Mr. Goldstein paid years before the indictment, and purportedly relevant conduct from allegations that post-date the conviction offenses. Then using this overblown tax loss calculation, the government asserts that Mr. Goldstein's conduct is so severe that it merits a top-of-the-guidelines sentence. Along the way, the government loses sight of the factors the Court must consider for sentencing, and ultimately, the government's role to do justice.

Since his indictment, the government has pushed forward a one-dimensional caricature of Mr. Goldstein as a person fixated on tax evasion and motivated above all else by greed. This narrative has repeatedly included new, baseless accusations that the government could have resolved by consulting the defense. But as the Court will see from numerous submissions in support of Mr. Goldstein, the people who actually know Mr. Goldstein understand that, though he is flawed, he is also deeply caring. He has made mistakes but he has also paid it forward. Any sentence imposed should reflect the fact that the good in Mr. Goldstein outweighs the bad.

The government's tax loss calculations and requested enhancements are, as explained below, incorrect. But regardless of the appropriate guidelines range, according to the U.S. Sentencing Commission's data, the *average* sentence imposed on similarly situated defendants is a variance substantially below the guidelines. For Mr. Goldstein in particular, incarceration is not appropriate. Anything close to what the government requests would be a miscarriage of justice.

1

**BACKGROUND**

Mr. Goldstein and his counsel inevitably have a different view of the facts than the government. But it ignores the record for the government to assert that the evidence, even viewed under a preponderance standard, supported proof of a "flagrant and egregious," "sophisticated multi-year scheme" of tax evasion so extreme that it merits a sentence of *years* in prison. ECF No. 520 at 4. Far from offering evidence that Mr. Goldstein engaged in "yearslong planning" to commit tax crimes, ECF No. 520 at 54, the government has consistently defended its request for a willful blindness instruction on the theory that Mr. Goldstein did not *actually* know about the errors on his tax returns but "closed his eyes to what would otherwise have been obvious to him." Final Instruction No. 59. The government cannot have it both ways—convicting Mr. Goldstein on a theory that he chose not to learn whether items on his tax return were false, and sentencing Mr. Goldstein on a theory that every false statement was premeditated.

The defense's Objections to U.S. Probation's Guidelines Calculations, ECF No. 515, and the defense's Motion for Judgment of Acquittal or, in the Alternative, for a New Trial, ECF No. 487, lay out in detail why "The Government's Version of the Offense Conduct," copied into the PSR, is incomplete, inaccurate, and/or misleading. The defense addresses the additional allegations regarding purported "relevant conduct" from 2022 through 2025 below. However, it is clear that the numerous witnesses and voluminous evidence presented in this case did not all weigh in the government's favor. The mixed verdict that the jury returned confirms that the jury rejected many of the government's underlying theories—including key aspects of the false narrative the government continues to advance.[1] The Court, too, must look at each of the

---

[1] One of many examples: in acquitting Mr. Goldstein on Counts 2 and 6, the jury unambiguously (and unanimously) rejected the government's theory that the 2012 audit informed Mr. Goldstein

2

government's underlying theories and discount those that are not supported by a preponderance of the evidence. Moreover, the Court must look at other available evidence—including Mr. Goldstein's history and characteristics, to determine the appropriate sentence. *See* 18 U.S.C. § 3553(a).

**ARGUMENT**

The tax loss and enhancements promoted by the government, as adopted in the PSR, are not supported by a preponderance of the evidence. Even if they were, taking the record and Mr. Goldstein as a whole, a significant downward variance is appropriate.

I.      **THE GOVERNMENT'S INFLATED GUIDELINES RANGE IS NOT ACCURATE**

Although the Court "may accept any undisputed portion of the presentence report as a finding of fact," the Court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary." Fed. R. Crim. P. 32(i)(3). Here, the facts laid out in the PSR are not Probation's independent findings but "The Government's Version of the Offense Conduct." *See* PSR at 5-54. In response, the defense submitted detailed, factual objections. Rather than resolving the disputes, Probation simply deferred to the government, stating in the PSR that Probation "trusts the Government" and taking the position that "the Probation Office *must* consider" the government's version of "the facts . . . when applying the guidelines." PSR at 67 (emphasis added). Therefore, the PSR explicitly requests that "the Court resolve the[] matters presented by Defense Counsel" to comply with the Court's obligations under the guidelines. PSR at 68.

---

of his obligation to report gross gambling wins even in years where he was a net gambling loser. Yet the government continues to push a narrative that Mr. Goldstein knew, since 2012, how to appropriately keep records for gambling wins and losses and supposedly schemed to avoid it. ECF No. 520 at 6-7, 31.

Under these circumstances, it would be reversible error for the Court to accept the government's invitation to simply adopt the PSR. *See* ECF No. 520 at 26-28. Instead, where the defense's objections to the PSR are "specific and factually grounded," the Court is "obligated to resolve the dispute." *United States v. Flores-Alvarado*, 779 F.3d 250, 255-56 (4th Cir. 2015) (vacating sentence because "[a]dopting the PSR does not satisfy the requirements of Rule 32(i)(3)(B)" where "the factual recitations in the PSR do not support the PSR's recommendation"). Furthermore, "[w]hile a sentencing court need only make a 'reasonable estimate' of loss based on the 'available information,' . . . an estimate that is unsupported by any evidence cannot be reasonable." *United States v. Catone*, 769 F.3d 866, 877 (4th Cir. 2014) (citation omitted) (vacating fraud sentence where the court adopted the government's position but failed to independently calculate loss). *See also Flores-Alvarado*, 779 F.3d at 256 (requiring specific findings to support a drug amount calculation). Here, the PSR adopts the government's calculation of tax loss that is more than $9.5 million, but does not include sufficient factual findings to support that amount.

### A. The government's calculation of tax loss includes alleged conduct that the government did not prove by a preponderance of the evidence.[2]

The government's calculation of tax loss is inaccurate because it assumes the government proved each of the theories it alleged rather than assessing which theories the government proved by a preponderance of the evidence. Notably, the guidelines now direct courts to exclude acquitted conduct when determining relevant conduct. *See* U.S.S.G. § 1B1.3(c) ("Relevant conduct does not include conduct for which the defendant was criminally charged and acquitted

---

[2] Mr. Goldstein does not waive, and expressly maintains, all of his prior objections, including but not limited to those made in his post-trial motion. For the purpose of sentencing, however, in assuming the truth of certain allegations for the purposes of sentencing, the defense does not concede that the jury (under a beyond a reasonable doubt standard) could or should find that those allegations were sufficiently substantiated.

in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction.").  And here, because each of the felony tax convictions involved distinct underlying theories, the jury very well may have acquitted Mr. Goldstein on multiple of those theories.  If the jury had used a special verdict form, the parties and the Court would have clarity on the jury's specific acquittals.  Given the government's opposition to a special verdict form, it should not be allowed to benefit from the ambiguity.

Because the defense's Objections to U.S. Probation's Guidelines Calculation, ECF No. 515 & Attachment A, lay out in detail why the government's version of facts is wrong, this response sets out only the key points:

*Count 1 (2016):* The government claims that the facts proven at trial establish that Mr. Goldstein "evaded assessment of his 2016 income by (1) intentionally underreporting his gambling income and (2) falsely deducting more than a million dollars in personal expenses from his G&R income."  ECF No. 520 at 30.  Not so.  On the eve of trial, the government abandoned any attempt to prove the statute of limitations for alleged affirmative acts before January 1, 2018, and pivoted its instructional requests to emphasize that Mr. Goldstein was charged with evasion of *payment* in addition to evasion of assessment.[3]  As a result, and as the government argued, the government did not have to prove, and the jury did not have to find, that there was any willful error on Mr. Goldstein's 2016 tax return.  2/17/26 Tr. 189:2-5 ("Because even if Mr. Goldstein earned the—in 2016, the exact amount of money that he reported on his income taxes, then he can still evade that amount in subsequent years by evading payment of it.").

---

[3] *See, e.g.*, Exhibit A (Jan. 10, 2026 Gov't Markup of Preliminary Jury Instructions at 13) ("That is, even if the jury were to find that Goldstein's tax return was accurate in 2016, the jury nonetheless could conclude that he evaded payment.").

At trial, the government's theories of evasion of assessment in 2016 were thoroughly discredited. With respect to the allegation that Mr. Goldstein intentionally underreported his gambling income, the government's theory shifted dramatically throughout the trial. As just one example, in opening statements, the government argued that Mr. Goldstein hid his Gores winnings from his accountants. 1/15/26 Tr. 44:18-21 ("Did he give them the tax form from Gores saying, I won $26 million? The evidence will show the answer to that also is no."). By closing arguments, the government argued that Mr. Goldstein disclosed *only* his Gores winnings to his accountants. 2/18/26 Tr. 46:10-23 ("[Alec Gores] issued a Form 1099 to Mr. Goldstein . . . [and Mr. Goldstein was] forced to report and pay taxes on $27 million of gambling income earned in the United States."). This is not just the defense's perspective. During trial, the government admitted it had to revise its theory about Mr. Goldstein's 2016 gambling because it had missed critical documents during its investigation and preparation. 2/4/26 Tr. 107:7-8 ("[Y]es, that's absolutely—it is true that the government realized it had to refine its narrative.")

The government's sentencing memorandum quietly admits that the theory it pushed at trial about Mr. Goldstein's 2016 gambling is wrong. Indeed, the government finally concedes that the $50 million that Chairman, Gores, and Tango lost to Mr. Goldstein "do not represent his ultimate personal net income from those matches." ECF No. 520. Instead, the government repeats its narrative that Mr. Goldstein intentionally erred on the wires list that he created for himself—when the evidence showed instead that Mr. Goldstein made good faith mistakes. Moreover, because Mr. Goldstein's international gambling losses were so significant, even if Mr. Goldstein's errors had been intentional, the net gambling income is still zero. That record does not allow the Court to find sufficient evidence for tax loss on an evasion of assessment theory. 2/17/26 Tr. 189:2-5.

6

Instead, the jury's verdict was most likely based on the government's theory that Mr. Goldstein evaded *payment* of his 2016 taxes in 2021 by having funds moved to the firm's IOLTA account over a long weekend.  At the time, Mr. Goldstein had paid his entire 2016 tax liability and had less than $40,000 to pay in penalties and interest.  The government did not prove any other allegation by a preponderance of the evidence.  *See* ECF No. 515 at 3-5 (discussing the flawed allegation regarding Mr. Goldstein's statements to the IRS in 2018 and 2020).  The Count 1 tax loss is $0, not $1,442,805.

Nevertheless, even if the Court finds that the government's evasion of assessment theory for Count 1 was supported by a preponderance of the evidence (i.e., that Mr. Goldstein was willfully blind to the errors in his tax reporting), the government's tax loss calculation is still wrong.  It explicitly ignores the impact of Mr. Goldstein's international gambling on the tax calculations, despite the fact that all parties agree Mr. Goldstein gambled in Asia in 2016.  The ledger kept by Mr. Phua's assistant shows that Mr. Goldstein *lost* approximately $4.4 million gambling outside the United States in 2016.  And Mr. Goldstein's contemporaneous text messages show that a significant portion of the gambling income that the government attributes to Mr. Goldstein represented Mr. Phua's share of the Gores winnings, which Mr. Phua and Mr. Goldstein agreed to offset with Mr. Goldstein's share of the Tango winnings in 2017.  The government's sentencing memorandum makes no attempt to address any of this evidence.

Agent Ranahan testified at trial that her tax loss analysis—on which the government now relies for sentencing—does not even attempt to reconcile Mr. Goldstein's international wins and losses.  2/10/26 Tr. 92:21-22 (I'm only using what was in and out of the bank account, the actual cash transactions.").  And the government's entire discussion of Mr. Goldstein's 2016 gambling reporting, see ECF No. 520 at 30-34, ignores the contemporaneous messages, which both reflect

Mr. Goldstein's state of mind and corroborate his testimony.  The jury did not have the benefit of those messages, but the Court does.  Those messages show that Mr. Goldstein actually lost millions of dollars gambling in 2016, and those losses more than wipe out any tax deficiency arising out of the conduct discussed in the government's sentencing memorandum—including both the mistakes on the wire tracker and the improper business deductions.

*Count 3 (2017 Form 1120-S):* The government argued that Mr. Goldstein aided and assisted his accountants in preparing inaccurate tax returns in 2017 in two ways: (1) by directing Robbins Geller to pay a $250,000 legal fee to his personal bank account; and (2) by directing the firm office manager to pay $175,000 to Napoli Shkolnik without specifying that it was a personal payment.  The government did not prove the first theory by a preponderance of the evidence because Mr. Goldstein reasonably expected his accountants to use Form 1099 reporting of legal fee payments to prepare his taxes.  *See, e.g.*, DX 226 (2017 Form 1099 from Robbins Geller), DX 568 (Mr. Goldstein requesting, and his assistant sending, a W-9 so that Robbins Geller could report the $250,000 payment).  The jury clearly agreed—it acquitted Mr. Goldstein of a substantially similar allegation in Count 5.  Therefore, the tax loss calculation should include only the tax loss arising out of the Napoli Shkolnik payment.  The tax loss for Count 3 is $67,112.50, not $173,349.  *See* ECF No. 515 at 6-7.

*Count 7 (2019 Form 1120-S):* The government argued that Mr. Goldstein aided and assisted his accountants in preparing inaccurate tax returns in 2019 in two ways: (1) failing to include $235,000 in legal fees from Paul Phua as income; and (2) by directing the firm office manager to pay $170,000 to Chuck Pacheco without specifying that it was a personal payment.  The government did not prove the first theory by a preponderance of the evidence.  The undisputed evidence showed that: (1) Mr. Goldstein directed the office manager to transfer these

8

funds to the firm bank account in the United States; (2) the accountants were aware of these funds; (3) the accountants by default treated funds deposited in the firm's bank account as income; and (4) neither Mr. Goldstein nor the office manager told the accountants *not* to classify these funds as income.  Instead, it appears that the accountants misclassified this income because a previous wire transfer was properly treated as a loan.  *Compare* 2/9/26 Tr. 167:2 (accountant explaining that "our default was always legal fee income."); *with* 2/10/26 Tr. 228:14-21 ("Q: And if you look down below [at GX 22], . . . the February 27, 2019 entry, there is no notation explaining why GRF [treated it as a loan]; right?  A: There is not.").

The government's argument to the contrary relies on communications *with the Montenegrin bankers*, concerning the transfer of funds *between the Montenegrin bank accounts*, *see* ECF No. 520 at 16-17, but in the absence of instructions otherwise to Mr. Goldstein's *accountants*, Mr. Goldstein had every reason to believe this would be tracked as income.  The conviction on Count 7 rested, instead, on the payment to Chuck Pacheco.  The jury likely convicted on the same theory as Count 3.  The tax loss for Count 7 is $59,415.00, not $147,973.  *See* ECF No. 515 at 7.

*Count 8 (2020 Form 1040):* The parties agree that there was no tax loss where, as here, Mr. Goldstein was convicted of aiding and assisting his accountants in preparing a tax return that did not disclose cryptocurrency use.[4]

---

[4] The government notes that it omits cryptocurrency income from Mr. Goldstein's tax loss.  ECF No. 520 at 39 n.6.  It also fails to mention that: (1) there is no evidence that Mr. Goldstein's cryptocurrency inflows were income; (2) there is no evidence of any cryptocurrency payments from Titan Golden to support the unexecuted engagement letter the government references; and (3) there is no evidence that Mr. Goldstein was ever made aware of any capital gains in his cryptocurrency account.  The government simply presented after-the-fact evidence that outflows slightly exceeded inflows.

***Count 9 (2021 Form 1040):*** The government argued that Mr. Goldstein aided and assisted his accountants in preparing inaccurate tax returns in 2021 in two ways: (1) by instructing Tobey Maguire to pay a $500,000 legal fee to Bob Safai; and (2) by failing to disclose his cryptocurrency transactions. For similar reasons as Count 3, the government did not prove its theory about the legal fee from Tobey Maguire by a preponderance of the evidence— Mr. Goldstein reasonably believed his accountants would use Form 1099 tax reporting to identify his legal fee income, and the jury's acquittal on Count 5 shows that it agreed. (In other words, contrary to the government's sarcasm, *see* ECF No. 520 at 40, Mr. Goldstein never claimed to have forgotten his legal work with Mr. Maguire. He expected his accountants to review and use tax reporting documents that have the explicit purpose of identifying legal fee income.) Instead, the most logical conclusion is that the jury convicted Mr. Goldstein on Count 9 on the same theory as Count 8, while discrediting the allegations about Mr. Maguire. The tax loss for Count 9 is $0, not $185,000. *See* ECF No. 515 at 9.

In sum (and as summarized in the chart below), excluding purported tax loss for theories that were not proven by a preponderance of the evidence, the total tax loss resulting from the felony convictions is $126,527.50. That corresponds with a base offense level of 16. *See* U.S.S.G. § 2T4.1 (more than $100,000).

| Count | Allegation | Tax Loss |
|---|---|---|
| 1<br><br>2016 | Transferred money to IOLTA account in 2021 to avoid payment of $40,000 remaining penalties and interest | $0 |
| 3<br><br>2017 Form 1120-S | $175,000 Napoli Shkolnik Mischaracterized Transaction | $67,112.50<br><br>(Tax Rate: 38.35%) |
| 7<br><br>2019 Form 1120-S | $170,000 Chuck Pacheco Mischaracterized Transaction | $59,415.00<br><br>(Tax Rate: 34.95%) |
| 8<br><br>2020 Form 1040 | Answered "no" to the question whether, at any time during 2020, he had received, sold, etc. virtual currency | $0 |
| 9<br><br>2021 Form 1040 | Answered "no" to the question whether, at any time during 2021, he had received, sold, etc. virtual currency | $0 |
| TOTAL | | $126,527.50 |

For the same reasons, the government's restitution calculation is inflated and inaccurate.

**B.      The tax loss calculation should not include $7,680,272 that is attributable to clearly unrelated alleged conduct in tax years 2022 and 2023.**

While "relevant conduct" for the tax loss calculation includes tax violations that are "part of the same course of conduct or common scheme or plan," where "the evidence demonstrates that the conduct is clearly unrelated," the Court should not include allegations outside of the offense conduct. U.S.S.G. § 2T1.1 app. n.2. Using that commentary, the government asserts that the Court should include tax loss for 2022 and 2023, relying on the default guidance that all tax violations could be relevant. In support, it cites only two out-of-circuit cases which stand for the quite different proposition that it is sometimes appropriate to include penalties and interest in

11

the calculation.[5] For multiple reasons, the Court should reject the government's legally unsupported assertion that the 2022 and 2023 allegations are "a continuing pattern of violations of tax laws" that the Court may include in the tax loss calculation. ECF No. 520 at 41-42 (quoting U.S.S.G. § 2T1.1 app. n.2).

The Court has already ruled that the 2022 and 2023 allegations are not related to the offenses for which Mr. Goldstein was actually charged (and thus, are also unrelated to the counts of conviction). Before trial, the government argued that evidence regarding Mr. Goldstein's 2022 through 2023 taxes was "intrinsic to the Superseding Indictment." *See, e.g.*, ECF No. 224 at 9. The Court ruled otherwise, recognizing that these allegations were extrinsic to the charged offenses. 12/12/25 Tr. 270:24 – 271:6 ("Category number four, Mr. Goldstein did not timely file or pay his taxes in 2022 and 2023. This seems to be on the other end of our timeline and also not intrinsic to the specific tax charges in this case."). Although the Court later allowed the government to present evidence of Mr. Goldstein's spending in 2022 to prove willfulness as to charged conduct, the Court reaffirmed throughout trial that the 2022 and 2023 tax allegations were too far beyond the scope of the conduct at issue (and thus too prejudicial) to be admitted.

That exclusion, and the conclusion that 2022 and 2023 tax allegations are unrelated, makes good sense. The core charges at issue in this case were tax evasion and aiding and assisting the preparation of false tax returns. The alleged conduct in 2016—that Mr. Goldstein willfully underreported his tax liability, or willfully evaded payment—is factually and temporarily distinct from 2022 and 2023. The government (correctly) does not allege that Mr. Goldstein committed tax evasion in 2022 or 2023, and acknowledges that for both years Mr.

---

[5] For example, in *United States v. Adams*, 955 F.3d 238 (2d Cir. 2020), the defense challenged the inclusion of penalties and interest in the tax loss calculation. *See United States v. Adams*, No. 16-CR-86 (D. Conn. Feb. 14, 2018), Dkt. 155.

Goldstein has already filed the Form 1120-S corporate tax return and prepaid some of his tax liability—even if his Form 1040 personal return and additional payments lag.  Put differently, the character of the 2022 and 2023 allegations is plainly distinct and disconnected from the conviction on Count 1.  The same is true of Counts 3, 7, 8, and 9: whether Mr. Goldstein was convicted on a theory that he took incorrect deductions, failed to report all legal fee income, or failed to disclose cryptocurrency transactions, all of that conduct is clearly unrelated to belated filing or partial payment of Mr. Goldstein's 2022 or 2023 taxes.

Furthermore, although Mr. Goldstein was also convicted of misdemeanor failure to timely pay taxes, belated taxes for 2022 and 2023 are still too far beyond the offense conduct to be related and included in tax loss.  Prior to filing its sentencing memo, the government had never suggested that it considered 2022 and 2023 tax liabilities "relevant conduct" for the purpose of the tax loss calculation.[6]

Finally, the amount of tax loss the government seeks to add based on untimely 2022 and 2023 tax filing and payment generates a guidelines range with a substantively unreasonable sentence, such that it violates Mr. Goldstein's constitutional rights to due process, to be tried by a jury for felony offenses, and to be protected against excessive sentences.  The government's calculation for restitution for the actual offense conduct is approximately $3.1 million—a figure that includes the government's calculation of tax loss (using all of its underlying theories of tax liability) plus penalties and interest.  *See* ECF No. 521-11 at 2.  Yet the government seeks to add

---

[6] The draft PSR indicated that the government calculated tax loss at above $9.5 million, but without any explanation that would indicate the government included 2022 and 2023.  When the parties submitted objections and revisions to Probation, the defense did not receive the government's submission.  And while the updated, final PSR states that the government calculates tax loss at $16,264,804.97, *see* PSR at 67, the PSR still does not include any information that would indicate that the government included tax loss for 2022 or 2023.

13

$5,934,767 for 2022 and $1,745,505 for 2023.  That $7,680,272 in total is almost 2.5 times the requested restitution and significantly inflates Mr. Goldstein's guidelines: it alone brings the government's tax loss calculation above $9.5 million, bumping up the government's calculation of the base offense level from 24 to 26.  *See* U.S.S.G. § 2T4.1(J), (K).

In sum, the 2022 and 2023 allegations are, factually and temporally, clearly unrelated to the offenses for which Mr. Goldstein was convicted and not properly part of the tax loss.  Even if they were related, they overstate Mr. Goldstein's culpability so significantly that an appropriate sentence would not take them into account.

### C.    The government's calculation inflates the guidelines range with $6,635,405.97 in taxes, penalties, and interest that Mr. Goldstein has already paid.

As part of its tax loss calculations, the government includes over $6.6 million in taxes, plus penalties and interest, that Mr. Goldstein has *already paid*.  Including these amounts under these circumstances distorts the purpose of the guidelines and merits a significant downward variance.

#### 1.    Including $4,545,177.84 in tax loss for misdemeanor Counts 10 to 13 distorts the intent of the statute and guidelines.

A substantial portion of the government's tax loss calculation is the sum of what Mr. Goldstein has already paid in taxes, penalties, and interest for 2017, 2019, 2020, and 2021 ( Counts 10 through 13).  This purported tax "loss" amounts to over $4.5 million.  Similar to the purported tax loss amounts for 2022 and 2023, these figures significantly and disproportionately increases the guidelines range.  Again, using the government's tax loss figures, the *felony* tax loss (i.e., the tax loss for unreported income) is just over $1.9 million, which correlates with a base offense level of 22.  *See* U.S.S.G. § 2T4.1(I) (more than $1.5 million).  Including the *misdemeanor* tax "loss" pushes the guidelines, instead, to a base offense level of 24.  *See* U.S.S.G. § 2T4.1(J) (more than $3.5 million).

14

The government argues that the misdemeanor figures should be included in the tax loss calculation because under the guidelines, the tax loss is not reduced by subsequent payment of taxes.  ECF No. 420 at 40.  Yet the government *still* has not identified *any case* where (1) the defendant paid his tax liability with penalties and interest years prior to indictment; and (2) that tax liability was nevertheless included in the guidelines calculation based on the willful failure to pay misdemeanor.  Whether it is because the government never, or almost never, charges taxpayers with willful failure to pay after they have already paid, it is extraordinarily excessive to do so here.

Moreover, although the government is right that willful evasion and willful failure to pay cases generally include penalties and interest in the tax loss, *see* ECF No. 520 at 40, that again makes no sense here where Mr. Goldstein had already paid penalties and interest years prior to indictment.  Where the government has already been made whole, plus civil penalties and interest, it defies logic to consider that amount "loss" or even "intended loss" to the government. Even if the Court must formally count this amount to calculate the guidelines correctly, the Court should grant a variance on the ground that this calculation substantially overstates the offense.

### 2. Including $2,090,228.13 in tax loss for 2016 similarly overstates the offense, but also circumvents conflicting guidelines.

The government's inclusion of the tax "loss" for 2016 is even worse.  The government's calculation includes $2,090,228.13 in taxes, penalties, and interest for the 2016 tax year that Mr. Goldstein paid off in 2021.  In addition to all the problems set forth above, this figure is based on a charge that the government dismissed with prejudice before trial, likely because this conduct clearly falls outside the statute of limitations.  *See* ECF No. 337, 343.  Yet the government now seeks to increase Mr. Goldstein's sentence based on this allegation that it did not and could not prove at trial.

15

The guidelines now require the Court to exclude acquitted conduct from "[r]elevant conduct." U.S.S.G. § 1B1.3(c). Here, the government precluded Mr. Goldstein from securing an acquittal on the 2016 willful failure to pay charge—which would have required the government to prove significant tolling of the statute of limitations—by dismissing it just days before trial began. It cannot comport with due process, and with the right to a trial, for the government to avoid its burden through dismissal of an untimely charge, but then still be permitted to punish Mr. Goldstein for unproven conduct.

Furthermore, because Mr. Goldstein reported $2.7 million in net gambling winnings in 2016 when he actually lost money gambling that year, *see supra* p. 9-10, Mr. Goldstein's true tax liability for 2016 is significantly less than the amount he paid. Consequently, Mr. Goldstein did not fail to pay $2,090,228.13 for 2016, because his actual tax liability—and the attendant penalties and interest—should have been far smaller.

**D.     The fact that the willful failure to pay amounts were paid long before indictment supports a downward variance.**

Even if the Court were to accept the government's tax loss estimates for 2022 and 2023 and for willful failure to pay in its formal guidelines calculation, the Court must take into account the nature and circumstances of that tax loss in this particular case—i.e., that the alleged tax losses for 2022 and 2023 are uncharged willful failure to pay allegations, and that Mr. Goldstein already paid the charged willful failure to pay amounts, with penalties and interest, years before he was indicted. When considering disparities with other cases and similarly situated defendants, the Court should keep in mind that these amounts increase the tax loss calculation from under $1,949,127 (the government's calculation of tax on unreported income for the conviction offenses), *see* ECF No. 521-11 at 2, by ***$14,315,677.97***, *see id.* at 1-2 (the government's calculation of what Mr. Goldstein already paid on Counts 1, 10-13, plus the

16

government's totals for 2022 and 2023).  The impact on the guidelines, using the government's theories of the felony offense conduct, is to increase the base offense level from 22 (more than $1.5 million) to level 26 (more than $9.5 million).  Under the defense's calculations, which exclude theories of liability that were not proven by a preponderance of the evidence, the already-paid or unrelated tax loss increased the base offense level by 10—from 16 (more than $100,000) to 26.

The government has not presented a comparable case where the bulk of the tax loss driving its years-long sentencing request matches these facts.  And even if it finds one, such a case would certainly be an outlier.  Belated payment of taxes, even in large amounts, would be capped at the statutory maximum of one year for the underlying misdemeanor offense, and as a practical matter would typically be sentenced with shorter, concurrent sentences or probation.  The fact that these $14.3 million of late payments, penalties, and interest make up the vast majority of the government's tax loss—not the felony conduct that actually motivated this prosecution—should be a significant factor for the Court in determining an appropriate sentence.

### E.    The government's tax loss calculation is not a reasonable estimate.

Finally, the actual calculations underlying the government's tax calculations are not reasonable, for multiple reasons.

First, and as explained *supra*, the estimates assume all theories of liability for the conviction offenses, rather than excluding the theories not proven by a preponderance of the evidence.

Second, the calculations for Mr. Goldstein's 2016 gambling income do not include his international gambling.  If correctly calculated, his gambling income in that year was net zero.  As a result, when Mr. Goldstein reported approximately $2.7 million on his taxes—even

17

accounting for improper business deductions—he overstated his 2016 tax liability by over two million dollars.[7]

The government's tax liability calculations inexplicably exclude all international gambling, despite the fact that the government actively pushed a narrative about it at trial. The government avoids recalculating this liability because it has no reasonable challenge to the accuracy of Mr. Goldstein's testimony about his international wins and losses. Mr. Goldstein's understanding is corroborated, specifically, by contemporaneous messages containing the ledger kept by Paul Phua. Moreover, other witnesses confirmed that Mr. Phua was likely to have a large share of Mr. Goldstein's international games, and to be the one to initially receive payment for those games. *See, e.g.*, 1/15/26 Tr. 111:15-17 (Andrew Gipson testifying that he "[w]ould [] have expected Chairman to pay the losses . . . [t]o Mr. Phua."); 121:1-7 (explaining that Mr. Goldstein would have needed Mr. Phua's financial support to play Tango). Multiple witnesses also confirmed that Mr. Goldstein had a reckless style of gambling that often led to huge losses. *See, e.g.*, 1/15/26 Tr. 147:1-7 (Mr. Goldstein "lost most of the time" in ring games). Given the undisputed fact that Mr. Goldstein gambled in Asia, the lack of any evidence contradicting Mr. Goldstein's testimony and the contemporaneous records, the 2016 liability calculations are not accurate without taking the extensive gambling losses into account. Tax loss must be based on

---

[7] Had Mr. Goldstein recognized at the time of filing that he still lost more than he won gambling in 2016, he would have owed approximately $700,000 in taxes for 2016, instead of approximately $1.689 million. As a result, he would have paid subsequent taxes sooner and fewer penalties and interest. Correcting for this mistake, at the end of 2022 Mr. Goldstein had paid approximately $1.698 million more than he owed for tax years 2021 and before. The attached exhibit corrects the government's calculations in ECF 521-11, using $0 net gambling income for 2016. This exhibit also corrects the government's trial exhibit, GX 410, to remove net gambling income for 2016, and calculates how the timing, penalties, and interest for tax years 2016 through 2021 would have been different without the incorrect 2016 net gambling income. *See* Exhibit B, Revised Tax Calculation.

the actual loss to the government, but the government's estimate does not even attempt to assess the actual loss for 2016.

Third, the government's willful failure to pay calculations must be discounted by the amount Mr. Goldstein overpaid.  As IRS witnesses explained at trial, the IRS by default applied Mr. Goldstein's payments to 2016 because it was the earliest year outstanding.  Had he correctly calculated his liability in 2017, the 2016 debt would have been satisfied earlier, and subsequent payments would have been applied to later tax years.

Fourth, the government should not have included penalties and interest for the conviction counts.  The government acknowledges that the total tax loss should be the "total amount of loss that was the object of the offense."  ECF No. 520 at 40 (citing U.S.S.G. § 2T1.1(c)(1)).  Where a defendant has not yet paid the amount evaded or the amount of the willful failure to pay, penalties and interest are part of the amount necessary to make the government whole.  But where, as here, the defendant has already paid the liability, penalties, and interest, including penalties and interest double counts the amount necessary to make the government whole.

Fifth, if the government's theory is evasion of payment for Count 1 rather than the dismissed willful failure to pay charge, assessing over $2 million in tax loss (because that's what Mr. Goldstein eventually paid with penalties and interest) is still inaccurate.  The Court would have to make factual findings about the affirmative acts of evasion of payment that the government proved at trial.  And here, given that the Count 1 conviction likely rested on the IOLTA account allegations, *see supra* p. 7, 9, the amount of payment evaded would be less than $40,000—the amount outstanding for tax year 2016 at the time of the IOLTA transfer.

Finally, the government's calculations for 2022 are too uncertain to be reasonable estimates of tax loss.  With respect to 2022, the stipulation presented at trial was a compromise

19

to streamline the evidence—it did not reflect an assessment of Mr. Goldstein's net gambling wins.[8]  The Court allowed the government to introduce evidence of 2022 gambling because the government insisted it needed to show that Mr. Goldstein gambled in *mid*-2022 before paying off his 2020 and 2021 taxes in *late*-2022.  There was no reason for Mr. Goldstein to ensure the stipulation included all of the offsetting losses and other deductions, because evidence about Mr. Goldstein's 2022 tax liability was excluded.[9]

For all these reasons, the government's calculation of tax loss is not a reasonable estimate.

**F.     After adopting the government's statement of facts, the PSR incorrectly increases Mr. Goldstein's offense level by four points for enhancements.**

The Defense Objections to U.S. Probation's Calculation explain why the enhancements applied in calculating Mr. Goldstein's guidelines range are unsupported.  *See* ECF No. 515 at 17-24.  Below, the defense responds specifically to the government's arguments for these enhancements.

**1.     The evidence does not support a sophisticated means enhancement.**

The sophisticated means enhancement is appropriate only for "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2T1.1 app. n.5.  Because "the average criminal tax fraud . . . involves some concealment," the enhancement requires "some means of execution that separates the offense before us from the ordinary or generic."  *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012) (citation and internal quotation marks omitted).  Imposing this enhancement without

---

[8] This understanding was clear because the prior stipulation about Mr. Goldstein 2016 through 2021 gambling included nothing about the 2016 games in Asia, not because they didn't happen, but because the parties were not going to agree on what the numbers were.

[9] Mr. Goldstein's Form 1040 filings have been underway for some time.  They will be completed prior to sentencing with an update for the Court as soon as they are available.

specific factual findings on this requirement is error.  *See, e.g.*, *United States v. Guldi*, 141 F.4th 435, 452-54 (2d Cir. 2025) (holding that not every "multi-step effort to conceal an offense" qualifies as sophisticated means); *United States v. Adepoju*, 756 F.3d 250, 256-59 (4th Cir. 2014) (reversing sophisticated-means enhancement where government points to the "use of forged checks and a stolen identity").  Here, the acts the government relies on are not sophisticated, did not further or conceal the conviction conduct, or both.

> a.    *Foreign bank accounts were not used to execute or conceal any offense.*

Contrary to the government's bald assertion, Mr. Goldstein did not use the Montenegrin bank accounts to "hide [or] obscure assets and transactions."  ECF No. 520 at 44-45.  The government points to the fact that Mr. Goldstein held foreign bank accounts—but fails to demonstrate that he used the accounts in some way that either allowed him to willfully evade taxes or otherwise hide a tax offense.  The government notes that Mr. Goldstein did not tell his assistant "the purpose of his personal account," ECF No. 520 at 44, but it is undisputed that Mr. Goldstein disclosed both his business and personal accounts to his accountants, through Ms. Runkle, on multiple occasions.  *See, e.g.*, GX 582, 576, 574.

Next, and illogically, the government argues that receiving money through the Montenegrin account "ensured Deyhle would not inquire about Goldstein's massive poker games in Asia."  ECF No. 520 at 45.  That makes no sense.  Mr. Goldstein not only told his accountants about the Montenegrin bank account, he also transferred money from the Montenegrin bank account to the law firm bank account in the United States.  If Mr. Goldstein has been using the Montenegrin bank account to hide income, he would not have disclosed it to his accountants at all, nor transferred money from the foreign account into the United States.  Indeed, the evidence at trial showed that the $750,000 transferred from the Montenegrin bank account to the law firm's U.S. bank account in 2016 was erroneously reported as income *twice*—it was counted as

21

legal fee income by the accountants and it was included in the gambling figures that Mr. Goldstein provided to Mr. Deyhle by email in 2017.  This evidence thoroughly undermines any suggestion that the Montenegrin bank account was used in furtherance of tax evasion.

The government is also wrong in its contention that Mr. Goldstein used the Montenegrin bank account to hide income in 2018.  *See* ECF No. 520 at 45.  First, the government again makes no attempt to show that Mr. Goldstein *used* the Montenegrin bank accounts to commit tax evasion.  The $1 million loan from Paul Phua was transferred to the firm's U.S. bank account in 2018 and recorded by his accountants; even if the money originated from a foreign bank account it was never hidden.

Second, the government simply refuses to accept the jury's conclusion that contemporaneous messages corroborated Mr. Goldstein's consistent testimony that the $1 million from Mr. Phua was a loan.  The government resorts to a suspicious invoice the bank produced after trial without any explanation, but fails to even defend the indicia of unreliability in that document.  That invoice looks nothing like Goldstein & Russell's other invoices.  It was not in any of Goldstein & Russell's files, nor in any transmission emails.  And there is no testimony corroborating it.  The most likely explanation is that Mr. Phua, or his bank, wanted some sort of documentation of this transfer—but that does not mean that the hearsay within the document (i.e., that it was a legal fee) was ever accurate.  The existing record outweighs the minimal probative value of this invoice.

Finally, the government resorts to its discredited refrain about a "virtual account" in Asia. *See* ECF No. 520 at 46.  There is absolutely no evidence from any witness to support the idea that Mr. Goldstein held some other, undisclosed, foreign bank account.  As the defense has repeatedly established, and has affirmatively presented through contemporaneous messages,

when Mr. Goldstein referred to a "virtual" account, all he meant was that Mr. Phua's assistant tracked Mr. Goldstein's shares of wins and losses on a spreadsheet. The government cites no legal authority to support the dubious proposition that a spreadsheet constitutes sophisticated means.

> b.    *Third-party payments were not used to execute or conceal any offense.*

There was nothing sophisticated about the payments Mr. Goldstein made through third parties, despite the government's claim that Mr. Goldstein "effectively made his income disappear." ECF No. 520 at 46. There are only two third party payments at issue: Mr. Goldstein asking Robbins Geller to pay him in his personal account, and Mr. Goldstein asking Tobey Maguire to pay Bob Safai. In each case, as explained *supra* at p. 10-12, Mr. Goldstein had every reason to believe that this income would be tracked and recorded through a Form 1099. That is an extremely common method of keeping track of income, and the explicit reason these tax forms are sent. In fact, Robbins Geller *did* prepare and send a Form 1099 reporting the redirected income—Mr. Goldstein's accountants ignored it based on their incorrect belief that parties were not required to send Forms 1099 to the firm. The evidence does not support the conclusion that Mr. Goldstein's reliance on tax forms was an act of willful tax evasion, and as explained above, the jury very likely rejected this theory even while convicting on other theories.[10]

> c.    *VPN technology was not used to execute or conceal any offense.*

Mr. Goldstein's use of a VPN to access Binance.com likewise did nothing to further or conceal the tax offenses. The government's theory of liability with respect to cryptocurrency

---

[10] This is yet another example where, had the government not objected to a special verdict form with respect to the assisting a false return counts, the Court would have clarity on the findings that the jury made—and thus the acquittals that under the guidelines should not be considered in relevant conduct.

was that Mr. Goldstein failed to check the box on his tax returns reporting his use of cryptocurrency.  Much of the government's evidence on this point concerned Mr. Goldstein's use of U.S.-based cryptocurrency exchanges, including evidence that Mr. Goldstein transferred money from Binance.com to the U.S.-based exchanges, and that Mr. Goldstein used his true name to register for Binance.com.  It makes no sense that Mr. Goldstein would attempt to conceal his use of Binance.com through a VPN while also transacting on U.S.-based cryptocurrency exchanges.  Moreover, the only authority the government cites is *its own* conclusory sentencing memo, written by one of the government lawyers here for another case. See ECF No. 520 at 47.  The court there apparently adopted the enhancement in large part because it was part of the plea agreement.  *United States v. Saris*, No. 5:22-CR-00502 (N.D. Ohio July 14, 2025), Dkt. 73 at 25.  The transcript the government cites shows no analysis of how VPN use furthered or concealed the offense.

### 2.  The evidence does not support an obstruction enhancement.

As an initial matter, to apply the enhancement the Court must find both that "the defendant willfully obstructed or impeded" the administration of justice and that "the obstructive conduct related" to the offense of conviction and any relevant conduct.  For obstruction of justice based on alleged perjury, the Court must make specific findings on each element of perjury—or findings that otherwise establish falsity, materiality, and willful intent.  *See United States v. Perez*, 661 F.3d 189 (4th Cir. 2011).  Providing false information is not in and of itself obstruction.  *See, e.g.*, *United States v. Banks*, 347 F.3d 1266, 1269-71 (11th Cir. 2003) (reversing obstruction enhancement where defendant gave a false name and identification document and concealed his criminal history to law enforcement because the conduct did not significantly obstruct or impede the investigation).  Likewise, it is error to apply the

24

enhancement when a defendant's statement "amounted to nothing more than a denial of guilt." *United States v. Urbanek*, 930 F.2d 1512, 1513-15 (10th Cir. 1991).

      *a.*     *Mr. Goldstein's statements to IRS-CI Special Agents did not obstruct justice.*

Factually, Mr. Goldstein did not lie about "his [] gambling income" when interviewed in 2020, "claiming that income was only from Gores and he only had investors against Gores." ECF No. 520 at 47-48. Agent MacDonald agreed, when confronted with his own contemporaneous notes, that Mr. Goldstein said he "*doesn't* play poker with investors," as in, he doesn't play with investors anymore. 2/5/26 Tr. 50:9-13. An agent's recollection of what Mr. Goldstein said in an unrecorded interview six years ago—when the precise words matter—is insufficient to find that Mr. Goldstein made materially and willfully false statements that impeded the investigation of this case. And logically, even if Mr. Goldstein had misstated whether he had investors in games other than the ones with Gores, that would have done nothing to impede or obstruct the investigation. After all, Mr. Phua was one of the investors in the Gores game. The government admits that it learned about Mr. Goldstein's international gambling, regardless, using evidence it collected from another witness. ECF No. 520 at 48. And Mr. Goldstein had no power or influence over the government's decision not to review that evidence until 2024. *See id*. Disclosing that some of the same people invested in another game would have made no difference; it does not support the obstruction enhancement.

      *b.*     *Mr. Goldstein did not attempt to impede Ms. Bart's cooperation.*

The government's allegations about Mr. Goldstein's interactions with Katie Bart are not supported by the evidence. *See* ECF No. 520 at 48-49. Ms. Bart had no reason to shade her trial testimony—she did not enjoy working for Mr. Goldstein and she has no relationship with him now. Yet she repeatedly testified that Mr. Goldstein did not attempt to influence her cooperation in the IRS investigation. On multiple occasions, the government asked Ms. Bart questions with

the hope that she would accuse Mr. Goldstein of obstruction. She did not. The government had to ask an *extremely leading* question to elicit the testimony the government would have the Court rely on for an obstruction enhancement:

> **Government Counsel**: *At the time*, in [the] end of 2020 or beginning of 2021, *you thought* that one of the reasons that Mr. Goldstein was offering you these things of value, including Bitcoin, was so that you would be less likely to talk to or cooperate with the IRS investigation; is that right?
>
> **Ms. Bart**: Yes. That crossed my mind.

2/2/26 Tr. 93:20-25. The Court cannot base an obstruction enhancement off a *thought* that *crossed a witness's mind*, but that she did not assert at trial. The fact is that Mr. Goldstein requested Ms. Bart's assistance to *cooperate* with the investigation, not impede it. *See, e.g.*, 2/2/26 Tr. 62:11-12 ("I just helped Tom compile documents responsive to the subpoena."). Moreover, Ms. Bart did in fact speak with the government multiple times about this case, and confirmed unambiguously that "Mr. Goldstein didn't do anything to interfere with [her] talking to the government." 2/2/26 Tr. 38:8-9.

          c.      *Mr. Goldstein did not perjure himself in his financial assets declaration.*

The government devotes four paragraphs to a time that Mr. Goldstein wore an expensive watch to dinner, which the government knows because it was tracking and photographing him during pretrial release. ECF No. 520 at 49-50. This is significant, according to the government, because Mr. Goldstein did so "[b]arely one month after claiming he did not have 'any other significant assets'" to pay his legal fees. This cannot possibly support an obstruction enhancement—which requires showing that Mr. Goldstein willfully made a material false statement. First, this declaration was not willfully false. The government again relies on an omission, *faulting* Mr. Goldstein for readily disclosing the watch to pretrial services once the

26

government raised its concern. But the government has no evidentiary support for the claim that Mr. Goldstein willfully omitted this watch from his asset disclosures, let alone that he thought about (or was ever asked to tally) the value of items in his wardrobe. Second, it was not materially false. Mr. Goldstein's declaration explained that he had outstanding legal fees and needed to sell his house to pay them. All of that is (and remains) true.

> d.    *Mr. Goldstein did not perjure himself on the witness stand.*

Finally, as also explained *supra* at p. 24, Mr. Goldstein did not lie to the jury when he stated that the money he received from Paul Phua in 2018 was a loan. The jury rightly acquitted on this charge after seeing a redacted version of this text message, DX 738.1, which shows Mr. Goldstein asking: "Do you happen to know whether the remainder of the loan will be ok with Richard?" At trial, the Court excluded the surrounding context on hearsay grounds. However, the full text of the conversation makes abundantly clear that in October 2018 Mr. Goldstein had already received a $1 million loan (the September 2018 transfer through Universal Capital Bank) and asked for $1 million more (the October 2018 cash Mr. Goldstein brought back from Hong Kong:

| TG | Tom Goldstein ▮▮▮▮▮ | 10/11/2018, 7:45 PM |
| --- | --- | --- |
| | Do you happen to know whether the remainder of the loan will be ok with Richard? Apologies for the bother. Just got another communication from the IRS. | |
| U | user89308144 | 10/11/2018, 7:47 PM |
| | We are all losing a lot . I will see what can be done on Monday , | |
| U | user89308144 | 10/11/2018, 7:47 PM |
| | Will another million be enough ? | |
| U | user89308144 | 10/11/2018, 7:47 PM |
| | TD lost huge past week | |
| TG | Tom Goldstein ▮▮▮▮▮ | 10/11/2018, 8:14 PM |
| | I'm so sorry. The $1m you already lent to me is of course very kind. Doing another $1m is extremely generous too. If it's possible, I'm obviously incredibly grateful. My situation will be the same in terms of what I owe. So I likely would come back towards the end of the year just in case the circumstances are better for you. But of course, I'm grateful for whatever is possible for you and ask for nothing else. Many thanks. | |

That corroborates the truth of Mr. Goldstein's testimony. And the government's post-trial, unexplained invoice does not change the fact that both sets of money Mr. Goldstein

27

received from Mr. Phua in 2018 were loans. The invoice attached to the government's filing, ECF No. 521-14, was not sent from Mr. Goldstein or Goldstein & Russell and is not on Goldstein & Russell letterhead:



On its face, it appears to be a form template one would expect from a vendor or seller, not something prepared by a law office. In contrast, the invoices that were directed by Mr. Goldstein and sent by the firm office managers are all on Goldstein & Russell letterhead. For example, as the government knows, Exhibit C (DX-376) shows an invoice actually prepared by the firm office manager and sent on his behalf to the Universal Capital Bank:



28

And we know that the above invoice was actually prepared on Mr. Goldstein's behalf because it is attached to an email between Mr. Goldstein's assistant and representatives of the Universal Capital Bank, as shown in Exhibit C (DX-375):



**To:** Ana Rajković <███████@ucbank.me>
**Cc:** Milos Pavlovic <███████@ucbank.me>; Akif Raza <███████@ucbank.me>
**Subject:** RE: Transfer

Dear Ms. Rajkovic,

The invoice is attached. Thank you for your help.

Jon

**From:** Ana Rajković <███████@ucbank.me>
**Sent:** Monday, February 25, 2019 9:05 AM
**To:** Jon Levitan ███████@goldsteinrussell.com>
**Cc:** Milos Pavlovic <███████@ucbank.me>; Akif Raza ███████@ucbank.me>
**Subject:** RE: Transfer

Dear Mr Levitan,

Please send us an invoice issued by Mr. Thomas Goldstein to Mr. Phua, in EUR amount equivalent to USD 235,000.

Thank you.

Best regards,

Ana Rajković
Head of Customer Relations

Universal Capital Bank

In contrast, the government's belated and unverified invoice comes out of nowhere—without any transmission email in Mr. Goldstein's records, or the bank's.[11] Whatever misunderstanding led to this document's inclusion in the bank's records, that incorrect invoice is not sufficient to overcome the contemporaneous messages that led to the jury's acquittal—and certainly is not sufficient for the government to meet the elements of perjury necessary for the obstruction enhancement.

---

[11] Exhibit C is also relevant to the government's calculation of tax loss for Count 7 because it shows that even in communications with the Montenegrin bank Mr. Goldstein disclosed that the $235K he received from Mr. Phua in February 2019 was legal fee income. As noted above, however, because the accountants never received a copy of the communications with the Montenegrin bank, any such communications were irrelevant because the accountants should have treated this as income by default.

II.     **EVEN IF THE GOVERNMENT'S SENTENCING GUIDELINES CALCULATION WERE CORRECT, ANYTHING CLOSE TO THE GOVERNMENT'S REQUESTED SENTENCE WOULD BE INAPPROPRIATE**

At every step, the government misses the forest for the trees—wedded to its narrative about Mr. Goldstein in spite of the abundant evidence to the contrary.  As a result of the government's chosen charging structure and its opposition to a special verdict form, it is entirely unclear which theories of liability actually support the jury's verdict, and therefore the Court cannot simply accept those theories as established.  The government's 97-month sentencing request is not supported by the record as a whole and does not faithfully apply the required sentencing factors.

A.     **The government distorts the nature and circumstances of the offense.**

The government spends ten pages on the nature and circumstances of the offense, repeating misleading or disproven allegations about Mr. Goldstein, and concluding that Mr. Goldstein was premeditated, calculated and consumed with greed.  ECF No. 520 at 53-62.  The defense has explained at length how the evidence shows the government's framing is wrong.  But the bigger picture is this: by the government's own calculation, the entire offense conduct adds up to approximately $1.9 million in taxes on unreported income.  The vast majority of the government's tax loss calculation (*more than $14.3 million*) consists of taxes, penalties, and interest that Mr. Goldstein already paid or allegedly needs to pay—not charged willful acts of evasion.  The Court must make findings about the facts as they were actually presented at trial.

B.     **The government has tunnel vision about Mr. Goldstein's history and characteristics.**

This case is not about greed. █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

30

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

Unfortunately, after over a year of vigorous litigation, the government is primed to see only the worst in Mr. Goldstein and assumes misconduct in everything he does. The government does so again in its sentencing memo, accusing Mr. Goldstein of "falsely stating that he had fully paid his more than $1 million in 2025 taxes when, in fact, he had paid barely one percent of that." ECF No. 520 at 65. In reality, as the DOJ Tax Division should well know, the more than $3 million that Mr. Goldstein paid toward taxes in 2022 remains on his account with the IRS. Moreover, the IRS has been sending Mr. Goldstein notices that he must credit the money to a tax return or lose it. *See, e.g.*, Exhibit D. Consequently, Mr. Goldstein's statement that he already paid more than $1 million in 2025 taxes is part of Mr. Goldstein's effort to comply with his obligations—an option *directed by the IRS*. And the government could have easily reached out to the defense to clarify prior to lodging new accusations without understanding the facts.

This underscores why the Court must make factual findings supported by the record and cannot adopt the government's rush to judgment at sentencing. The government has repeatedly accused Mr. Goldstein of misconduct, separate and apart from the charges in this case, only to be refuted with basic facts that could have been discovered with more investigation and effort. Shortly after the indictment was returned, the government secured a warrant for Mr. Goldstein's arrest based on cryptocurrency transactions in *someone else's* account. Rather than consult with

31

the defense, the government had Mr. Goldstein arrested. The transactions continued while Mr. Goldstein was in jail—confirming he was not the one conducting them. Put succinctly by the magistrate court at the time, "the fact of the matter is now, is that given Mr. Goldstein's evidence that he's presented, you can't say that Mr. Goldstein owns those two crypto wallets," to which the government responded, "[t]hat's correct." 2/13/25 Tr. 23:13-16. Mr. Goldstein was, thankfully, released—but the government persisted in its accusations of post-indictment misconduct. In a more recent example, the government *faulted* Mr. Goldstein for filing a tax return that reported gambling winnings, because he "was barred from gambling" in 2025. *See* ECF No. 500 at 2. But the last time Mr. Goldstein gambled was *before* his indictment, and he disclosed that fact to probation in the initial intake interview. *See* ECF No. 501 at 1-2. Given this history, the Court should look at the government's more recent accusations with skepticism.

**C.    The sentence imposed can reflect the seriousness of the offense without incarceration.**

Tax evasion is a serious offense, and no one disputes that. *See* ECF No. 520 at 67-70. It is *also true* that Mr. Goldstein's convictions had no victims. He has not amassed significant wealth as a result of the offense conduct. He has paid *millions* of dollars in taxes between 2016 and 2022—including over $1 million in penalties and interest. And he has lost his life as he knew it as a result of this case. The defense agrees that there should be no distinction or disparity between white-collar crime and so-called blue-collar crime. There should be *more* grace and humanity extended to all people accused of and convicted of crimes, not less.[12]

---

[12] The United States maintains its status as the democracy with the highest incarceration rate on earth. Emily Widra, *States of Incarceration: The Global Context 2024*, Prison Policy Initiative (June 2024), https://www.prisonpolicy.org/global/2024.html. The government should seek to reduce that average to promote fairness; not increase it.

Despite his faults, Mr. Goldstein's friends, family, and acquaintances have taken the time to share with the Court their experience of him as a person.  The defense will submit these letters to the Court in full, but excerpts a few below.  They make emphatically clear that, whatever his flaws, Mr. Goldstein has spent decades doing good.

People who have worked with Mr. Goldstein explain his efforts to assist civil and criminal litigants:

> *From a federal defender: As I see it, Tom's devotion to the defense of our clients was founded on his fundamental belief that our clients, facing troubling circumstances, required not only great legal representation, but counsel who treated them with respect, kindness, and humanity.*

> *From a public interest lawyer: Tom has been generous with his time and expertise in assisting other advocates before the Supreme Court. My organization typically offers moot courts to advocates in about a third of the cases heard by the Court. The "Justices" in our moots include both our own staff attorneys and volunteers from law firms, law schools, and other nonprofits, who receive nothing for the substantial time they spend preparing and participating in the moot courts. Tom was a frequent participant in those moots. He invariably asked probing questions; more importantly, though, his post-moot comments went straight to the heart of the most troubling aspects of the case, leaving the advocate with no doubt about the perils of their position but also offering concrete, constructive suggestions for improvement.*

> *From a capital defender: Mr. Goldstein was always available to offer his advice and services, often on short notice.  Mr. Goldstein steadfastly dedicated himself to rectifying the injustices in [our client's] case, and he demonstrated a deep and caring regard for our mutual client. . . Mr. Goldstein selflessly went well beyond the call of duty; and, . . . in doing so, he saved our client's life.*

Others who worked for Mr. Goldstein also treated the people who worked for him with kindness and respect:

> *From a former associate: Tom could be a difficult boss.  He was demanding and, at times, impatient.  But he was also capable of real generosity, and it showed in the firm's work.  We were often fighting the good fight on Tom's dime, whether he was leading the charge or not.  For the better part of our last full year working together, for example, he paid for my travel to and from Minneapolis so I could help the Minnesota Department of Human Rights negotiate a consent decree with the city over its police department after George Floyd's murder and the investigation that followed.  That pro bono matter accounted for about half the*

*hours I otherwise would have billed to fee-paying clients that year. Tom paid me for all my labor just the same.*

*From a former assistant: Tom wasn't often present in the office, but we interacted nearly every day through messages. A good part of my role was figuring out and executing the details of tasks that Tom did not have time for (therefore creating the need for an assistant/manager), but Tom always welcomed questions, and never once made me feel small for asking them.*

*From a former associate, later partner: I also remember how Tom reacted to my inevitable errors. As a new attorney, I was terrified of making a mistake. But, of course, mistakes happen when young lawyers are given real responsibility. When they did, Tom recognized instantly that I would beat myself up—and rather than pile on, he helped me improve. He understood that mistakes are a path to growth, and so rather than fear my errors, he taught me to admit them, learn from them, and move forward wiser and more vigilant.*

Mr. Goldstein has also been an enthusiastic mentor, formally and informally:

*From a clinic co-professor: Here is what I learned from working closely with Tom and the students. First, he was imaginative, able to see potential arguments that drew from other areas of law. Second, he was great at enabling students to feel ownership over their work. . . . Tom gave the students confidence that they could produce work that was every bit as good as the work being turned out by Supreme Court specialists. Tom was exceptionally generous to our students in myriad ways, ranging from treating them to dinners to hosting them in Washington to strategizing with them about professional choices.*

*From a former assistant, later associate: Tom was among my earliest—and fiercest—mentors in this profession. He did all the things great mentors do: wrote a law school recommendation letter, called judges on my behalf when I applied for clerkships, and offered invaluable guidance at pivotal moments in my career. But what I want to reflect on here is something deeper: the way he cultivated what became my lifelong love of the law and gave me the confidence to believe I could help improve it.*

Mr. Goldstein has made an impact on friends and acquaintances beyond any formal work relationship:

*From a journalist: I routinely turned to Tom for help in understanding complex legal issues. And I wasn't the only one. He was a frequent source of guidance and expertise for dozens of other reporters on the beat. We turned to him because of his intellect and knowledge about the intricacies of court procedures, and he was unfailingly generous with his time.*

> *From a business owner: Tom contributed to our business personally - not as a formal investor seeking a return, but on a simple handshake understanding that we'd figure the rest out when we were back on our feet. He asked for no stake, no contract, no timeline. He simply believed in us.*

> *From a mentor: For all the years I have known him, he has been a loyal friend and a genuinely decent and caring person, always willing to jump to the aid of people in need of help.*

And of course, Mr. Goldstein is a person who loves, and is loved by, his family:

> *From his sibling: What stands out most to me about Tom is not his accomplishments, but the way he treats people when there is nothing for him to gain from it. I have seen him quietly help family members, friends, and people around him over and over again, often before they even had to ask.*

> *From his stepmother: Though he hasn't lived in this state since high school and has had a fully packed schedule of work commitments elsewhere, Tommy has been for all of us, someone who shows up, reads a tribute, finds a resource, listens attentively, helps as needed ... and provides invaluable emotional and other support.*

> *From his grandmother: I am proud of Tommy's Supreme Court accomplishments, and his devotion and loyalty and kindness and generosity to me and his family. I hope that Tommy continues to draw on his knowledge, experience, and lessons learned to serve as a positive influence professionally, and that he will commit to continuing to use his charismatic gifts and experiences to take actions that matter in positive ways.*

These excerpts provide just a sample of who Mr. Goldstein is, as told by people who actually know him. It is true that in the past decade he has gambled and enjoyed luxuries. He also neglected his tax responsibilities—and is forced to accept that at least for some allegations, the jury found he did so willfully. The Court's duty is to "impose a sentence sufficient, but not greater than necessary," to meet the purposes outlined by statute. 18 U.S.C. § 3553(a). The Court does not need to impose incarceration to convey the seriousness of this case.

> **D.    The government's requested sentence is significantly more harsh than—and would create disparities with—cases with similarly situated defendants.**

It is telling that the government spends little time on the need to avoid unwarranted sentencing disparities. *See* ECF No. 520 at 70. And it very well may be that the government can

present the Court with examples, even from its own prosecutions, of courts imposing harsh sentences in tax cases with high tax loss. Those examples should not sway the Court from imposing lengthy supervision here.

While the U.S. Sentencing Commission adjusted its guidelines recommendations for financial crimes, including tax crimes, to "somewhat increase average sentence length" and "reduce" (not eliminate) "the number of purely probationary sentences," § 2T1.1, comm., that language has been part of the guidelines for *almost forty years*.[13] It is not referencing any current sentencing trend that the guidelines seek to correct. On the contrary, a guidelines sentence (or anything close) in this case would constitute an enormous sentencing disparity. As discussed in the defense sentencing memorandum, data from the U.S. Sentencing Commission shows that, even under the government's tax loss calculation, sentences in comparable cases fell substantially below the guidelines. Under the defense calculation, defendants in comparable cases often receive probation. *See* ECF No. 518-3. Part of the question for the Court, then, is how Mr. Goldstein's case and character compare to those of other defendants. Were there victims harmed by a fraudulent scheme? For Mr. Goldstein, no. Was the tax loss *actual* loss? For Mr. Goldstein it includes millions of dollars in taxes, penalties, and interest he paid before indictment. Was the theory of liability clear cut? For Mr. Goldstein, without a special verdict, the government cannot show that the conviction rested on the narrative it promotes. And even comparing the facts here with other financial crimes cases, where individual people were harmed

---

[13] The current language of this comment references 1987—the year the guidelines were implemented and this language was inserted. *See also* U.S. Sentencing Guidelines Amendment 491, *available at* https://www.ussc.gov/guidelines/amendment/491 (outlining 1993 amendment where this language as already present).

and with larger amounts of money at issue, courts frequently determine that sentences years below the government's request are appropriate.

One recent example: In March of this year, the U.S. Attorney's Office in Washington asked a court to impose a nine-year sentence—almost the same as what the government asks for here—for a former CFO's *$35 million fraud*, which almost put his former company out of business and resulted in *60 people losing their jobs* in layoffs.  For that financial crime, double the amount of loss that the government cites here and putting dozens of people "into complete turmoil," the court imposed a two-year sentence.[14]

Another example: The government faults Mr. Goldstein for using Binance.com through a VPN, even though he did so using his real name, and transferred the funds in it to US-based accounts that follow all of the government's know-your-customer requirements.  In 2023, Binance.com and its CEO, Changpeng Zhao, former Binance CEO, both pled guilty to a violation of the Bank Secrecy Act—requiring the company to forfeit $2.5 billion and pay an additional $1.8 billion dollar fine.[15]  For Mr. Zhao, personally, the government asked for a 36 month sentence and $50 million fine.  *United States v. Zhao*, No. 23-CR-179 (W.D. Wash. April 23, 2024), Dkt. 78.  The court determined that the appropriate sentence was four months.  *Id*. at Dkt. 89.

Imposing the government's requested sentence would especially create disparities here because more than $14.3 million of the government's $16.2 million tax loss calculation is for

---

[14] *See Former CFO sentenced to two years in prison for $35 million theft from start-up tech firm*, USAO Press Release (Mar. 5, 2026), https://www.justice.gov/usao-wdwa/pr/former-cfo-sentenced-two-years-prison-35-million-theft-start-tech-firm.

[15]  *See Binance and CEO Plead Guilty to Federal Charges in $4B Resolution*, DOJ Press Release (Nov. 21, 2023), https://www.justice.gov/archives/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution.

belated tax payments (including penalties and interest) that either are or would be charged as misdemeanors. Indeed, for this aspect of the case that drives the majority of the government's tax loss calculation, it is hard to find many comparisons. Throughout this litigation, the parties had to go back to the 1950s to find analysis on the willful failure to pay misdemeanors. Indeed, *United States v. Palermo* dealt with an issue "of first impression in an appellate court" where "[t]he conviction is the first . . . for failure to make timely payment of federal income tax where the taxpayer had filed his return at the time fixed by the revenue laws." 259 F.2d 872, 874 (3d Cir. 1958). Mr. Goldstein paid his tax liabilities for all years prior to 2021, with penalties and interest, years before indictment—and yet was convicted of four misdemeanors because he did not pay on the date the government says payment was due. The government's calculation adds to those figures taxes, penalties, and interest that Mr. Goldstein already paid for 2016. These circumstances must weigh heavily in the Court's consideration of comparable sentences. Decades ago, when still constrained by mandatory guidelines, the First Circuit explained that even where a defendant had the *intent* to pay his taxes on a later date, a departure could be warranted:

> [W]e are inclined on the basis of the information we have and our common sense to think that such a temporary delay in payment—where the defendant expected to pay—is not a "typical" or "heartland" case of tax evasion. Thus, even if the evasion statute and guideline might "linguistically" be extended to embrace such temporary delay cases, the intent to delay payment only briefly could take the case out of the heartland.

*United States v. Brennick*, 134 F.3d 10, 14 (1st Cir. 1998). Even more so, here, where Mr. Goldstein paid his liabilities for 2016, 2017, 2018, 2019, and 2021—over seven million dollars in taxes, penalties, and interest—the conduct is not the "heartland" that tax laws aim to punish. Whether the Court agrees with the government's calculation of the guidelines range, or the

defenses, the comparison the Court makes should be against conduct that is actually comparable to Mr. Goldstein's—not guidelines driven by misdemeanors.

The reality is that the same DOJ Tax Division that has vigorously prosecuted Mr. Goldstein—emphasizing his privilege and prominence—has dropped cases altogether for individuals much wealthier and better connected than Mr. Goldstein.  The day after IRS Criminal Investigative agents interrogated Mr. Goldstein in 2020, the DOJ Tax Division entered into a non-prosecution agreement with a private equity billionaire "for his involvement from 2000 through 2015 in an illegal scheme to conceal income and evade millions"—allowing the would-be defendant to pay $139 million in outstanding taxes, penalties, and interest without prosecution (let alone incarceration).[16]

That result is not an aberration.  While the parties were litigating pretrial motions in this case, the DOJ allowed Roger Ver to enter a deferred prosecution agreement to resolve federal tax charges where the tax loss to the United States was almost the same as what the government claims here: $16,864,105—and that's without including penalties and interest.  Mr. Ver admitted that he willfully failed to report assets when he was expatriated in order to avoid paying capital gains taxes, and instead of prosecution, paid the government nearly $50 million.  The government said that resolution "'demonstrates that there are consequences for those who intentionally conceal their assets and evade their tax obligations.'"[17]  Around the same time, the

---

[16] *See Private Equity CEO Enters into Non-prosecution Agreement on International Tax Fraud Scheme and Agrees to Pay $139 Million, to Abandon $182 Million in Charitable Contribution Deductions, and to Cooperate with Government Investigations*, DOJ Press Release (Oct. 15, 2020), https://www.justice.gov/archives/opa/pr/private-equity-ceo-enters-non-prosecution-agreement-international-tax-fraud-scheme-and-agrees.

[17] *See Early Cryptocurrency Investor Known as 'Bitcoin Jesus' Admits to Misconduct and Enters into Deferred Prosecution Agreement*, USAO Press Release (Oct. 14, 2025), https://www.justice.gov/usao-cdca/pr/early-cryptocurrency-investor-known-bitcoin-jesus-admits-misconduct-and-enters.

government decided to dismiss a case accusing a company's former chief executive, former chief financial officer, and tax advisor of hiding $47 million from the IRS in a loan scheme.[18]  There, the DOJ Tax Division told the court that "the conduct alleged in the indictment does not fall within the scope of [the government's] criminal prosecution priorities." *United States v. Wiederhorn*, No. 2:24-CR-295 (C.D. Cal. Aug. 5, 2025), Dkt. 135.  Specifically, the Department of Justice's current policy in white collar enforcement is to prioritize: (1) waste, fraud, and abuse with healthcare and other federal programs; (2) trade and customs fraud; (3) fraud in investment entities; (4) fraud that victimizes individuals and markets; (5) conduct that threatens national security; (6) material support to terrorists; (7) complex money laundering; (8) violations of the Controlled Substances Act; (9) money laundering that impacts national interest; and (10) crimes that victimize digital investors.  *See* Exhibit E, DOJ Memorandum, "Focus, Fairness, and Efficiency in the Fight Against White-Collar Crime."  These examples make clear that the allegations against Mr. Goldstein are not outliers, and do not represent the most serious white collar conduct—not in the amount of money at issue, the involvement of cryptocurrency or foreign bank accounts, the government's belief that he acted willfully, nor the broader impact on his conduct.  And in cases occurring at the same time as Mr. Goldstein, the DOJ Tax Division found hefty fines more than sufficient consequence for more costly conduct, or determined more egregious cases were not a priority to pursue at all.

**E.      Incarcerating Mr. Goldstein is not necessary specific deterrence and is not effective general deterrence.**

For Mr. Goldstein, the consequences of this prosecution have been, in a word, devastating.  It has destroyed his reputation.  He can no longer practice law.  He has depleted his

---

[18] *See* Anna Scott Farrell, *$47M Fat Brands Tax Case Tossed After DOJ Quits Pursuing It*, Law360 (Aug. 8, 2025), https://www.law360.com/articles/2375184/-47m-fat-brands-tax-case-tossed-after-doj-quits-pursuing-it.

retirement savings, has millions of dollars in outstanding debt, and has had to rely on friends and family to get by.  He has had to confront the reality of his gambling addiction.  He has been prohibited from speaking with dozens of his friends and support system for over eighteen months.  For the past four months, he has been prohibited from leaving his residence except for legal visits, court, and medical appointments—even going out into his yard for fresh air would trigger a GPS violation.  And all this is without getting into the financial and emotional strain this case, Mr. Goldstein's actions, and the public nature of it all has had on his family.  Incarceration is not necessary to deter Mr. Goldstein going forward.  Moreover, probation currently monitors his bank accounts and monitors his computer use.  In a period of supervision, probation could continue to ensure it knows exactly what underlies Mr. Goldstein's finances.

As to general deterrence, the prosecution of Mr. Goldstein itself provides deterrence to others who may be similarly situated—if any such people actually exist.  There is no evidence that incarceration would meaningfully increase the deterrent effect.  Empirical research has consistently found that the certainty of punishment—not its severity—is the more effective deterrent.  As one literature review explains, "[c]riminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment." [19]  Likewise, leading deterrence scholar Daniel Nagin has concluded that "[t]he evidence in support of the deterrent effect of the certainty of punishment is far more consistent than that for the severity of punishment" and that the "effect of certainty rather than severity of punishment reflect[s] a

---

[19] Valerie Wright, The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment* 4 (Nov. 2010).

response to the certainty of apprehension."[20]  Other research consistently confirms the conclusion that severe punishments for individuals makes little difference to general deterrence.[21]  Even the Department of Justice's National Institute of Justice has found that "[i]ncreasing the severity of punishment does little to deter crime" and that "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment."[22]

Common sense makes plain that the government's arguments to the contrary, *see* ECF No. 520 at 71-80, are wrong.  Mr. Goldstein is a unique defendant—an extremely accomplished Supreme Court lawyer who had a private habit of playing high-stakes poker with billionaires and professional poker players, and who had a flashy lifestyle that the government condemns.  No other lawyers see themselves in his shoes.  Neither do actual professional poker players, who typically have gambling-specific accountants; nor the billionaires Mr. Goldstein played with, who have teams of accountants who prepare their taxes, and who can afford to lose millions.  If anything, this case puts the public on notice that the DOJ picks and chooses to prosecute just a few, while pursuing civil penalties (or no remedy at all) for most others.  But there is no evidence that incarcerating Mr. Goldstein would have any impact on the actions of others.

---

[20] Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, 42 Crime & Just. 199, 201, 233-34 (2013).

[21] *See* National Research Council, National Academies Press, *Growth of Incarceration in the United States: Exploring Causes and Consequences* 90 (2014) ("Three National Research Council studies have examined the literature on deterrence and concluded that insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects. Nearly every leading survey of the deterrence literature in the past three decades has reached the same conclusion." (citations omitted)); Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence?*, 100 J. Crim. L. & Criminology 765, 810 (2010) ("[C]ontrary to deterrence doctrine, subjective probabilities of punishment held by individuals do not appear to vary systematically with the actual or objective probabilities.").

[22] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, *Five Things About Deterrence* 1–2 (May 2016) (emphasis added).

**F.      Regardless of the guidelines calculation, a period of supervision is appropriate under the statutory sentencing factors.**

Using the guidelines and past practice as a proxy, comparing the nature and circumstances of the offense convictions and Mr. Goldstein's history and characteristics, even a guidelines-range sentence would dramatically over-punish Mr. Goldstein as compared to other defendants. This is because, even using the government's calculations, a within-guideline sentence is actually an above-average sentence. Indeed, as explained in the PSR, the average recent sentence for a defendant with offense level 28 and criminal history category I, despite the range of 78 to 97 months, was 48 months (mean) or 42 months (median)—meaning that the sentence the government seeks *is more than twice* the average. *See* PSR at 73. That is not appropriate here.

Breaking down the sentence by count makes even more clear that a within-guidelines sentence would be disproportionately harsh. To reach its calculation of the guidelines range, the government asks the Court to impose the statutory maximum for each of the tax counts. But as explained above, because of the government's own objection to a special verdict, the government cannot demonstrate that Mr. Goldstein was even convicted on all of the theories underlying the convictions—let alone the most culpable theories. Moreover, the willful failure to pay counts (despite generating the vast majority of the tax loss) and the mortgage fraud counts (despite having the high statutory maximum) indisputably deserve more lenient punishment than other defendants contemplated by the statute. For the willful failure to pay counts, because the government's calculation includes millions of dollars in taxes, penalties, and interest that Mr. Goldstein paid by 2022, the Department of Treasury has already been made whole. For the mortgage fraud counts, the parties agree that there was never any actual or intended loss to the bank; indeed, the reason there is still a house with equity for the government to attempt to forfeit

43

is that Mr. Goldstein and his wife have been repaying their mortgage as required. This case exemplifies why judges are not just empowered, but required, to make an independent assessment of the appropriate sentence—to avoid a miscarriage of justice when the guidelines, using tax loss as a proxy, do not make sense.

All of the above assumes the Court agrees with the government that Mr. Goldstein "caused a tax loss over $16 million dollars." ECF No. 520 at 83. If the Court agrees with the defense's calculations—excluding theories that were not proven by a preponderance of the evidence and excluding non-offense conduct that is clearly unrelated—probation and home confinement are frequently imposed sentences. *See* ECF No. 518 at 16-17. And in either calculation, the nature of the $16 million dollars the government calculates—that over $14.3 million of it is for failure to pay—further supports the conclusion that Mr. Goldstein's sentence should be significantly below average. Adding to that analysis the fact that Mr. Goldstein has spent decades expanding access to the Supreme Court and devoting countless hours to worthy causes, supervision is the right outcome here.[23]

Mr. Goldstein is also willing to pay restitution for the taxes, interest, and penalties on any properly calculated underreported income so long as he is allowed to repay it at a reasonable pace, given the restrictions that will apply going forward on his ability to practice law. Likewise, Mr. Goldstein would accept a reasonable penalty if given the time to repay it—although forfeiture of his home is unlawful for the reasons argued in the defense's separate filing, *see* ECF

---

[23] Even though Counts 14 through 16, the mortgage fraud counts, resulted in no loss to the bank and little attention at trial or through this prosecution, they are class B felonies that statutorily do not allow a sentence of probation. Regardless, the Court can lawfully impose a time served sentence with supervised release on those counts.

44

No. 529, and would be inappropriate given the circumstances, and that the equity in the home is his (and his wife's) only significant remaining asset.

## CONCLUSION

The Court should impose a period of supervision, restitution, and penalties.

Anything close to the government's requested sentence would be a miscarriage of justice.

Dated: June 23, 2026

Respectfully submitted,

/s/ *Jonathan Kravis*

Stephany Reaves (Bar No. 19658)
Sarah E. Weiner (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Stephany.Reaves@mto.com
Sarah.Weiner@mto.com

Adeel Mohammadi (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

Jonathan I. Kravis (Bar No. 31556)
**LIU SHUR KRAVIS LLP**
607 14th Street NW, Suite 625
Washington, DC 20005
(202) 240-7100
jonathan.kravis@lskllp.com

**INDEX OF EXHIBITS**

| | |
|---|---|
| Exhibit A | Jan. 10, 2026 Email & Attachment, Gov't Markup of Preliminary Jury Instructions |
| Exhibit B | Revised Tax Calculation |
| Exhibit C | DX 375 & DX 376 |
| Exhibit D | IRS Notice CP81 (Credit Letter) |
| Exhibit E | DOJ Memorandum, "Focus, Fairness, and Efficiency in the Fight Against White-Collar Crime." |