**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. LKG-25-0006** |
| **THOMAS C. GOLDSTEIN,** | |
| **Defendant.** | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT
### THOMAS C. GOLDSTEIN'S SENTENCING MEMORANDUM

Defendant Thomas C. Goldstein committed a nearly decade-long white-collar crime spree that caused more than $16,000,000 in harm to the public fisc. After roughly six weeks of trial, a jury convicted him of 12 federal crimes, including five tax felonies and four tax misdemeanors. Despite this, Goldstein now argues, stunningly, that the tax loss from his felonies is less than $127,000. He does so based on a tortured reading of the jury's verdict and desperately claims that—despite causing an exponentially higher actual loss—he did not actually *intend* to do so. His arguments are not only unsupported, but often directly contradicted by the facts proven at trial. Moreover, Goldstein continues to shirk responsibility even for the crimes he concedes, arguing that he should face no prison time because a gambling addiction explains all his criminal conduct. The government's initial sentencing memorandum, Dkt. 520, detailed the affirmative case for its recommended sentence. This opposition explains why the Court should reject Goldstein's arguments and instead impose a lengthy prison sentence.

### PROCEDURAL HISTORY

On June 2, 2026, the parties filed sentencing memoranda. Dkt. 518; Dkt. 520. On June 8, this Court ordered the government to file a reply brief by June 30. Dkt. 527. On June 16, this Court orally modified that order to require both parties file responses by June 23, and replies on June 30.

# ARGUMENT

## I.     Tax Loss Calculations

### A.  Generally

Goldstein theorizes that—despite being convicted of tax felonies in five of six straight years—the jury's verdict really means he was convicted only for (1) using his Firm's IOLTA account in 2021; (2) the misclassifications of the $175,000 payment to Napoli Shkolnik in 2017 and the $170,000 payment to Chuck Pacheco in 2019; and (3) failing to report his cryptocurrency transactions. Def. Mem. 16; Def. PSR Objection Mem. 6, Dkt. 515 ("Obj. Mem."). Thus, he argues the tax loss from his felony counts of convictions is only $126,527.50. Obj. Mem. 20.

This argument hinges on an outright misapplication of the Sentencing Guidelines, a strained reading of the jury's verdict, and a breathtaking blindness to the overwhelming evidence.

***First***, Goldstein's 2016 tax loss calculation errs from the start by ignoring the relevant Guideline. He claims his 2016 tax evasion caused "no tax loss because the government's only factually viable post-January 1, 2018, affirmative act" was his 2021 abuse of G&R's IOLTA account, and the jury "did not need to consider [pre-2018] allegations to convict." Obj. Mem. 6.

But the fact that the jury had to find a post-January 1, 2018, affirmative act has no bearing on the tax loss calculation at sentencing. For evasion, "the tax loss is the total amount of loss that was the object of the offense." U.S.S.G. § 2T1.1(c)(1). The requirement that the jury convict on an affirmative act within the limitations period is irrelevant. And even if the jury did not find a particular fact beyond a reasonable doubt, the sentencing court still can find it "by a preponderance of the evidence." *United States v. Jinwright*, 683 F.3d 471, 484 (4th Cir. 2012).

***Second***, Goldstein distorts the jury's verdict in a frantic effort to minimize the massive tax loss from his crimes. The jury convicted him of willfully causing G&R's 2017 and 2019 returns

to be false, and Goldstein himself acknowledges the jury must have—at a minimum—found he knew about (or was willfully blind to) the misclassified $175,000 Napoli payment and $170,000 Pacheco payment. *See* Def. Mem. 16. Yet his sentencing and PSR objections memoranda are *completely silent* about the more than $1.1 million in personal expenses he caused to be misclassified and improperly deducted from his and his firm's 2016 taxes. *See* Def. Mem. 16; Obj. Mem. 6-9; *see also* Def. Obj. Letter 30, Dkt. 515-1 (arguing only that his $2.7 million in reported gambling income "should have been $0" and would thus "wipe[] out" any loss from the misclassified 2016 expenses). The notion that the jury found him guilty of willfully misclassifying two isolated personal transactions in 2017 and 2019 but not the six he committed in 2016 is risible.

Similarly, he argues the jury's mixed verdict shows that it did not convict him based on the $250,000 he diverted from Robbins Geller in 2017 or the $500,000 he diverted from Tobey Maguire in 2021. Obj. Mem. 9, 11. He reasons that the acquittal on Count 5 (2018 Form 1120S), which included the $125,000 offset with Napoli that should have appeared on a Form 1099, must mean the jury believed Goldstein was not willful as to Robbins Geller or Maguire because, according to him, all these payments also should have been reported on Forms 1099. *See* Obj. Mem. 9, 11, 15. But this cannot be reconciled with the verdict or evidence. The government did not argue the jury should convict based on the $125,000 Napoli offset. *See generally* 2/18 Tr. 45-90, 185-206 (closing and rebuttal arguments); GX429 at 2 (listing only 2018 Form 1120S falsity as omitted $1 million Phua legal fee). Rather, the government argued the jury should convict on the diverted Robbins Geller and Maguire fees—and the jury did so on the corresponding Counts 3 (2017 Form 1120S) and 9 (2021 Form 1040). Dkt. 472 at 2. This Court should reject Goldstein's misplaced efforts to distort the jury's verdict.

***Third***, Goldstein's 2016 through 2021 tax loss calculation contravenes the overwhelming evidence. During weeks of trial, the government introduced hundreds of exhibits, called dozens of witnesses, and entered seven fact stipulations with Goldstein. The jury convicted him of 12 federal crimes, including five tax felonies. The government's sentencing memorandum details the evidence of Goldstein's crimes for tax years 2016 through 2021, and how that evidence proves the tax loss from those years. *See* Gov. Sent. Mem. 6-19, 28-41, Dkt. 520. The Pre-Sentence Investigation Report similarly summarizes the underlying evidence. *See* PSR ¶¶ 21-248. The government need not restate all that evidence here, but rather highlights one example: Goldstein's specious argument about Forms 1099 from Robbins Geller and Maguire.

Goldstein's effort to conflate the $125,000 Napoli offset with the Robbins Geller and Maguire transactions misconstrues the overwhelming evidence admitted at trial. To start, the idea that Goldstein expected his accounting firm to annually reconcile G&R's books against its Forms 1099 is absurd: Goldstein never asked the accounting firm to do so and it never did. *See* 2/9 Tr. 193:13-195:6 (Shuman). Moreover, Revenue Agent Ranahan testified that an individual paying an attorney for work outside that individual's trade or business has *no obligation* to issue a Form 1099—meaning the 1099 defense could not have applied to Maguire's payment for recovering his poker winnings. *See* 2/10 Tr. 233:6-23. Nor did Goldstein ask Maguire for a Form 1099. *See* 1/28 Tr. 19-23. Yet Goldstein clearly knew he had to report diverted legal fees, as he did with the $500,000 from Malaysia. *See* DX265. The idea that he forgot an identical amount from a famous actor—and then forgot it again when he filed an amended 2021 tax return (after discovering various errors by his accountants)—strains credulity. The evidence establishes—far beyond a preponderance—that Goldstein willfully caused the omission of his Robbins Geller and Maguire income from his taxes.

More broadly, Goldstein's arguments amount to an insistence that he is innocent, regardless of any verdict to the contrary. *See* Def. Mem. 7 ("[T]he defense maintains [his conduct] was not criminal"); *id.* at 11 ("Despite the government's allegations . . . ."); *id.* at 18 ("Goldstein maintains that he did not willfully commit these offenses."); Obj. Mem. 7 ("[T]he defense disputes that Mr. Goldstein intended to evade payment of taxes.").

As the Court held in rejecting his motion for judgment of acquittal or a new trial, "this was not a close case." Mem. Op. 27, Dkt. 537. The government proved its case beyond a reasonable doubt. It must prove the tax loss by far less onerous standard: only a preponderance of the evidence. *See United States v. Mehta*, 594 F.3d 277, 281-82 & n.2 (4th Cir. 2010). The correct calculation of the tax loss arising from Goldstein's conduct is not a close call, and this Court should not countenance Goldstein's efforts to discount the evidence or deny the jury's verdict.

### B. 2016 Gambling Income

Beyond disagreeing with the facts of his misclassified income, Goldstein also argues, as he testified at trial, that he had *zero* net gambling income in 2016 and, in fact, was a net loser "by over $2.6 million," Obj. Mem. 8, because, at the end of 2016, he owed Paul Phua roughly $9 million for Phua's share of the Alec Gores winnings, 2/11 Tr. 261:25-262:3, 269:11-18. Thus, he avers there was no tax loss from his 2016 evasion of assessment. His argument rests on unreliable evidence, a facially unbelievable story, and a legally invalid analysis. The Court should reject it.

#### 1. Unreliable Evidence

Goldstein's argument is predicated entirely on his own testimony and series of ostensible text messages between himself and "user89308144," whom he claims is Phua, and "user7115414," whom he says is Phua's associate, identified only as "Kids." *See* Dkt. 515-3 (providing various messages with Kids). These messages are unreliable on many levels.

First, any number of these messages could be altered or fabricated. Despite repeated requests from the government, Goldstein declined to provide for inspection the original devices from which the messages were gathered, declined to provide forensic images of the data on those devices, and did not provide any forensic extraction reports detailing how the data was extracted and what, if any, steps were taken to confirm the messages were genuine, contemporaneous messages rather than post-hoc fabrications. This leaves the Court to rely entirely on Goldstein's word that the messages are real.

Second, even if the messages are not fabricated, they remain highly unreliable because they omit critical periods and discussions. For example, the photographs of a computer screen showing parts of an Excel spreadsheet that Goldstein said reflected his "virtual account" with Phua do not show the entire Excel document and show only brief snippets in time, completely omitting the central period from October 19, 2016, through June 6, 2017, when Goldstein received the second UCB Chairman payment, beat Gores, beat Tango, and (according to him) received a loan from Phua to pay Safai before working out a "swap" of the Gores and Tango amounts. *See* Dkt. 515-3 at 15, 30 (showing DX737.7, with the last transaction on October 18, 2016, and DX737.12, with the earliest transaction on June 7, 2017); 2/12 Tr. 11:14-16, 211:9-14 (claiming Phua let him pay Safai with the money).

Indeed, there appears to be *zero* discussion in the messages that Goldstein produced of any loan to pay Safai or the Gores-Tango swap—both of which are central to Goldstein's attack on the 2016 tax calculation. *See generally id.*

Third, the existing messages strongly suggests that key discussions are missing. According to a spreadsheet that defense counsel provided the government during trial, the vast majority of the messages appear to be downloaded directly from Goldstein's Telegram account (hosted on

Telegram's servers), while a small number came from his "iPhone 15 Pro." *See* Ex. A, 2/9/16 Epiq Authentication List 1, 4-18. Telegram provides a "secret chats" function that uses encrypted chats stored on only the users' devices (not Telegram's servers), can be set to self-destruct, and can only be accessed on "their device of origin." Telegram FAQ ("How are Secret Chats Different?"), https://telegram.org/faq#q-how-are-secret-chats-different. When discussing Goldstein's winnings from Tango over Telegram on December 17, 2016, Kids wrote, "secret . . . secret chat!" Dkt. 515-3 at 17. In a 2017 Telegram chat, Phua similarly told Goldstein, "Use secret chat." Ex. B, 11/18/2017 Chat at 6. *See* Ex. A at 9, 11 (listing these messages as coming from Telegram). However, Goldstein did not produce any Telegram chats contemporaneous to these two instructions to use a secret chat. This strongly suggests that Goldstein either deleted or failed to keep his secret chats with Phua and Kids, depriving the Court of the very messages that they deemed so important as to keep secret. Worse, it means any number of other secret chats may have occurred but were not produced.

Moreover, the fact that the other messages were extracted from Goldstein's iPhone 15 Pro, which was not released by Apple until 2023, suggests Goldstein did not collect any of this data until years into the investigation—and roughly *six years* after the ostensible chats occurred. *See* Apple, iPhone 15 Pro Tech Specs, https://support.apple.com/en-us/111829. For example, he previously used an older iPhone but either did not keep or did not extract messages from that device. *See* GX464 Binance Report ("Approved Devices" tab listing "iPhone 13,2").

While the rules of evidence are loosened at sentencing, any proponent of evidence must still demonstrate sufficient reliability to support the proposed evidence's probable accuracy. *See* U.S.S.G. § 6A1.3(a); *accord United States v. Roy*, 88 F.4th 525, 531 (4th Cir. 2023). Goldstein

cannot establish any individual message is reliable, let alone that the messages as a whole provide a reliable record of his 2016-2017 dealings with Phua and Kids.

## 2. Unbelievable Story

Insufficient evidence aside, Goldstein's story strains credulity. First, he testified at trial, "I truly figured this out, you know, within the last—like, the current—like, really locking it down in the last few weeks." 2/11 Tr. 269:1-3. In other words, despite having emailed Walter Deyhle that his 2016 net gambling income was "$2,748,350," PSR ¶ 74, having faced years of IRS collections efforts, including roughly $1 million in levies and a tax lien on his house, having received many questions about his 2016 gambling from IRS–Criminal Investigation special agents, discovering various past errors by Deyhle, being indicted for tax crimes in 2016, hiring multiple tax and accounting experts, and then heading to trial, Goldstein *never*, in almost a decade, realized he in fact owed no money on his 2016 taxes. Instead, he realized this only in the middle of trial, ostensibly "figure[ing it] out" *himself* while staring down potential conviction on more than a dozen criminal charges.

This timeline reveals the true nature of Goldstein's Phua-share defense: a desperate, eleventh-hour ploy to confuse the jury and muddle the 2016 tax deficiency calculation.

Goldstein's story defies common sense and fares even worse under scrutiny. First and foremost, he claimed to be holding $9 million in his bank account for Phua at the end of 2016— but Goldstein *had barely $5.68 million* in his Wells Fargo account x3796 (where he received and kept the Gores winnings) account at the end of that year. *See* 2/11 Tr. 261:3-9; GX4.1 at 30 (bank account balance). The purported money for Phua's "share" *did not exist*.

Second, he claimed that the Gores-Tango swap happened only *"[a]fter . . . Tango ha[d] paid"* but still while "[m]ost" the $9 million Gores money was "in my bank account." *See* 2/11 Tr.

260:23-261:20 (emphasis added). This, too, makes no sense because Goldstein had just $5.68 million in his bank account at the end of 2016 and Tango (according to him) did not pay until well into 2017. *See* 2/11 Tr. 258:19-21 (saying Tango had not paid "in the spring of 2017"). Goldstein's claimed timing of the swap cannot be reconciled with the actual chronology of events,

Even assuming Goldstein's cherry-picked messages are accurate, the truth is far simpler: he and Phua did the Gores-Tango swap in 2016, Goldstein kept the money from Gores, and he owed Phua less than $1.2 million, which he eventually repaid in 2017. *See* 2/11 Tr. 261:25-263:20 (stating Phua had $9 million Gores share, Goldstein had $7.8 million Tango share, they agreed to swap, and Goldstein then owed Phua only $1.2 million, which he paid off in part by paying Thomas Dwan on Phua's behalf).

The jury rejected Goldstein's fabricated 2017 swap story; so should this Court.

### 3. Legal Invalidity

Even if the purported messages were genuine, accurate and complete, and showed that he owed Phua a $9 million share of the Gores winnings, tax law dictates that $9 million share cannot be deducted from his 2016 gross gambling winnings—and therefore cannot lower his unreported income.

Under the "constructive receipt" doctrine money (or assets) not in a person's possession is "constructively received" by him—and therefore represents taxable income to him—in a particular tax year when the money has been set aside such that a person can "draw upon it at any time" or "could have withdrawn upon it" within that year if that person had asked to do so. 26 C.F.R. § 1.451-2(a). "However, income is *not* constructively received if the [person's] control of its receipt is subject to substantial limitations or restrictions." *Id.* (providing corporate stock credited

to employees company's books but "not available" until a future date as an example when constructive receipt has not occurred).

Money is constructively received and represents income to the recipient when that person "has an unqualified, vested right to receive *immediate* payment." *Ames v. Comm'r*, 112 T.C. 304, 312 (1999) (emphasis added). For example, "[a] check in the hands of a taxpayer ordinarily means that funds are immediately available," and thus constructively received. *Walter v. United States*, 148 F.3d 1027, 1029 (8th Cir. 1998). However, if "the payor [is] insolvent" or other conditions prevent the payee from receiving funds, the payee does not have constructive receipt. *Id.*

Under this doctrine, Phua did not have constructive receipt of a $9 million Gores share and Goldstein cannot deduct that amount from his 2016 income for two simple reasons.

First, the money literally did not exist. By December 31, 2016, there was only $5.68 million in Goldstein's bank account. GX4.1 at 30. Then he paid Safai $1,664,000 by check dated December 31, 2017. GX415; GX718 at 3. As a result, Goldstein was functionally holding little over $4 million at the end of 2016. Thus, it was "impossible" for Phua to constructively receive $9 million because that amount did not exist. *See United States v. Burks*, 746 F. App'x 191, 199 n.4 (4th Cir. 2018) (unpublished) (rejecting argument that affiliates could have constructively received funds where revenues "were only $37 million" so "it would have been impossible to conclude that more than $108 million was 'made available [to affiliates] so that [they] may draw upon it at any time,'" (quoting 26 C.F.R. § 1.451-2(a))).

The absence of the money represents a glaring, insurmountable "substantial limitation[]" on Phua's constructive receipt of it. 26 C.F.R. § 1.451-2(a). Goldstein cannot now deduct a $9 million share where that $9 million did not even *exist* in his own accounts. *See id.*; *Walter*, 148 F.3d at 1029 (stating constructive receipt cannot occur if the payor is insolvent).

Second, Phua could not even readily access the roughly $4 million that Goldstein did possess. "There is no constructive receipt of income where delivery of the cash is not dependent solely upon the volition of the taxpayer." *Ames v. Comm'r*, 112 T.C. at 312. This is because "[t]he essence of constructive receipt is the *unfettered control* over *the date* of actual receipt." *Id.* (emphasis added); *see id.* at 308, 313 (concluding infamous spy, Aldrich Ames, did not have constructive receipt of espionage payments in a Soviet bank account because he could withdraw funds only through slow, convoluted tradecraft). Goldstein repeatedly failed to wire $1 million back to UCB (his waypoint for Phua) when trying to "distribute" it at the end of 2016 "for tax purposes," GX636 at 1; *see* Gov. Sent. Mem. 32-33, Dkt. 520 (detailing UCB attempts).

He could not easily transmit a million dollars to Phua, let alone four million. This led him to instead write a check for $750,000 to Daniel Cates on December 31, 2016. GX718 at 4. Although the government gave Goldstein credit for that payment in 2016 at trial, Cates did not deposit the check until January 5, 2017. GX420 at 2. These transactions show that even if Phua could direct Goldstein to make individual payments in late 2016, Phua could not draw the full amount immediately, did not have "unfettered control over the date of actual receipt," and therefore did not have constructive receipt of the money that was in Goldstein's account on December 31, 2016. *See Ames v. Comm'r*, 112 T.C. at 312; *see also Paul v. Comm'r*, 64 T.C.M. 955 (T.C. 1992), 1992 WL 238774 at *2-3 (Tax Court Memo) (ruling taxpayer did *not* constructively receive income in 1987 when he got a winning lottery ticket on December 29, 1987, because redeeming it that year would have required "travelling 68 miles" within the last two days of the year).

Goldstein's arguments to disappear his 2016 gambling income with Phua's ostensible $9 million share cannot be squared with the facts, his own actions, or the applicable law. The Court should reject them.

## II.     Section 3553(a) Analysis

### A.  Gambling Addiction

Goldstein now offers a report from Harry Levant, a licensed therapist and gambling recovery counselor, which concludes that ███████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████. *See* Levant Report 15, 17, Dkt. 518-2; *id.* at 20 (CV). From this, Goldstein argues that ████████████████████████████████ ████████████████████████████████████████████. Def. Mem. 19-20.

At no point prior to Mr. Levant's report did Goldstein ever raise this alleged gambling addiction. In fact, to the contrary, Goldstein told the *New York Times* that he had not "played in quite a while," "fe[lt] no desire to," and did not suffer from an addiction. Dkt. 327-1 at 17-18. Goldstein also did not notify Probation that he had a gambling addiction, did not provide Probation any additional information from his treating psychiatrist, and did not raise his gambling addiction as an objection to the PSR. *See* PSR ¶ 310; *see generally* Def. Obj. Letter, Dkt. 515-1.

The government does not discount the sincerity of Mr. Levant's report; however, Goldstein's invocation of that report amounts to a sweeping effort to minimize his culpability for his decade-long crime spree.

To start, gambling addiction may provide a motive to commit financial crimes because money can help feed the addiction. *See* Levant Report 15. But plenty of people suffering from addictions—gambling and otherwise—do not commit financial crimes, let alone years of tax fraud. *Cf. United States v. Carucci*, 33 F. Supp. 2d 302, 303 (S.D.N.Y.1999) ("[A] compulsive gambler is not, *a fortiori*, a compulsive illegal trader.").

This is why the prior version of the Sentencing Guidelines recognized that a "reduced mental capacity" could constitute a mitigating circumstance and warrant a downward departure *if* it "contributed to the commission of the offense" because it "significantly impaired ability to (A) understand the wrongfulness of the [criminal conduct]; or (B) control behavior the defendant kn[ew wa]s wrongful." U.S.S.G. § 5K2.13 & app. n.1 (2024). Although the 2025 amendments eliminated this Guideline,[1] its logic remains instructive: an addiction warrants meaningfully different treatment *only* to the extent it impaired the defendant's ability to tell right from wrong, or ability to do the right thing. But where an addiction merely supplied a *motive* for the crime, it does not warrant different treatment because virtually every crime has a motive, and many defendants' motives stem from an addiction or a desire for money. *See United States v. Grillo*, No. 03-CR-0249, 2003 WL 22999219, at *2 (S.D.N.Y. Dec. 22, 2003) (identifying defendant's gambling addiction as creating "the motive for the criminal behavior," not the "conduct constituting the criminal behavior," and declining to depart downward because many defendants commit crimes "only after spending all their assets," and "many [crimes] are committed out of motives created by behavior that might be described as addictive or compulsive").

The instant facts reinforce that—even if Goldstein suffered from a gambling addiction as early as 2016—he remained in control, wildly successful as a litigator, fully able to distinguish right from wrong, and fully able to choose how to spend his money.

First, Goldstein argued and won a case in the Supreme Court every year from 2017 through 2020—in the dead center of the charged period—with opinions issued the following year. *See*

---

[1] The 2025 amendments eliminated the § 5H1.4 addiction policy statement and § 5K2 departure guidelines to better align with courts' post-*Booker* pattern of relying on variances under § 3553(a), but these changes "do[] not limit the information courts may consider" and do not "reflect a view from the Commission that such facts should no longer inform a court for purposes of determining the appropriate sentence." U.S.S.G. Ch.1, Pt. A intro. Comment; *see United States v. Gonzalez*, No. 23-CR-179 (WFK) (RML), 2026 WL 1215775, at *9 (E.D.N.Y. May 1, 2026) (recognizing repealed § 5H1.4 and "consider[ing] its underlying rationale and policy"); U.S.S.G. Appx. C at 421 (Reason for Amendment 836).

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 419 (2018); *Air & Liquid Sys. Corp. v. DeVries*, 586 U.S. 446 (2019); *CITGO Asphalt Ref. Co. v. Frescati Shipping Co., Ltd.*, 589 U.S. 348 (2020); *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021). The last of these was a leading technology case in which Google effectively bet $9 billion on Goldstein's legal acumen. *See NYT Article*, Dkt. 327-1 at 1 (describing *Google v. Oracle* as an "immensely complicated, but highly significant, copyright dispute" that represented the "high point" of Goldstein's career). He owned a highly regarded law firm and operated at levels few lawyers ever could. As his glittering appellate record reflects, Goldstein remained fully in control of his work and mental faculties.

Even if a gambling addiction motivated his tax crimes, it did not diminish his legal prowess—or his ability to understand the wrongfulness of his crimes. Indeed, in 2016 he recognized that his conscious choice to not pay 2016 taxes was a "problem" that would result in "penalties." GX12.

Second, Goldstein retained control over his financial decisions and routinely chose to spend money on things other than more poker games. A few examples: In 2017 and 2021, Goldstein chose to divert $250,000 from Robbins Geller and $500,000 from Maguire to pay down his existing debt to Safai, not play more poker. In 2022, when he had won tens of millions from Andy Beal, Goldstein chose to "invest" $1,000,000 in Michael McGuiness's matches against other poker players—not play poker himself (let alone pay his overdue 2020 and 2021 taxes). *See* 2/2 Tr. 247-48 (McGuiness stipulation). In March 2023, he lent $77,000 to one of his paramours to help her pay off a tax lien on her house (which she sold a few months later), rather than play poker or pay his own taxes. *See* Ex. C, Woman-4 MOI Excerpt ¶ 8, 29 (PROD-USA-0351028). Goldstein could and did routinely choose not to spend money on poker action; he just did not care to spend it on his taxes.

Third, although Mr. Levant attributes Goldstein's profligate personal spending on ███ ████ "█████████████████████████████████ ███████████████████████," Levant Report 14, this claim cannot be squared with the facts. Goldstein only had investors against Chairman, Gores, Tango, and Beal. Many of them testified at trial that they invested in him in those games because they thought he could outperform his opponents. *See, e.g.*, 1/15 Tr. 139:10-16 (Gipson) (agreeing he invested in poker players he thought were going to win); 1/29 Tr. 52:9-22 (Salomon) (testifying he invested in Goldstein because "[h]e ha[d] a very good style against Al[ec] Gores"); 2/5 Tr. 89:2-13 (Robl) ("I thought I could train him to beat Alec Gores and invest in it and make some money from it."). Material spending had no bearing on their calculus.

If anything, Goldstein's ostentatious lifestyle and myriad romantic relationships were *unwelcome* in the community. *See, e.g.*, Ex. D, Alfred Decarolis MOI Excerpt ¶ 19-20 (stating Goldstein's decision to bring four or five "girls with him to Decarolis's house" "caused problems" and "Decarolis had to not allow them in the house"); Ex. E, Kevin Hart MOI Excerpt ¶ 17 (stating, "Tom is a little weird at times," and Hart had no interest in learning about Goldstein's relationships or the women with whom he travelled). Indeed, it is unclear how spending nearly a million dollars on PayPal and Venmo for non-gambling activities would have furthered Goldstein's poker. *See* GX417 (summary chart). This record makes clear that, whatever role a gambling addiction may have played in Goldstein's poker, it did not dictate his exorbitant luxury spending and did not preclude him from timely and accurately filing his taxes or paying them.

Instead, Goldstein remained fully in control of his actions, and fully aware that he had a duty to timely file and pay his taxes. He simply chose to prioritize repaying other debts, investing in others, or spending on himself. This Court should reject his attempts to minimize his culpability.

*Cf. United States v. Tahzib*, 513 F.3d 692, 694 (7th Cir. 2008) (affirming within-Guidelines sentence where district court rejected defendant's attempts to blame his tax evasion on a gambling addiction, stating, "[T]he fact that he does have control at other times in his life is certainly an indication to me that he is not out of control on a permanent basis").

The court's approach in *United States v. Rosie Quinn*, is instructive. 566 F. App'x 659 (10th Cir. 2014). There, the defendant was an attorney who was charged with willfully failing to pay over employment taxes, in violation of 26 U.S.C. § 7202, and failing to pay her income taxes, in violation of § 7203. *Id.* at 662. She argued that "she had never *willfully* refused to pay," "claimed not to know the failure to pay was a crime," that she "always intended to pay at some future time when she had the money." *Id.* Despite her claims that she was unable to pay her taxes, the defendant "purchased a lake-view home" and paid her sister $9,000 per month to manage her law office. *Id.* Nonetheless, Quinn claimed that "her gambling addiction prevented her from making a rational decision" and argued she was entitled to a downward departure because "her pathological gambling . . . prevented her from controlling her behavior to conform to the law." *Id.* at 662, 670.

The district court rejected her argument, noting, "she didn't pay the taxes because she preferred to use that money for something else[, which] may have been to feed a gambling addiction" but "I come back to the fact that she was perfectly able to cope with her other responsibilities" so "I [conclude] it was willful on her part." *Id.* at 671. Thus, the court imposed a within-Guidelines sentence. *Id.* at 669. The Tenth Circuit affirmed, recognizing Quinn "managed to maintain herself and her family in a comfortable lifestyle, run a profitable legal practice, . . . and pay her sister. . . to manage [her] law office." *Id.* The Tenth Circuit concluded, "the judge was right: Quinn willfully refused to meet her legal duty 'because she preferred to use that money for something else than paying taxes.'"

Goldstein operated a successful law office. In 2016, 2022, and 2024, he won tens of millions of dollars playing poker. He provided an imminently comfortable life for himself, his family, and his other romantic partners. He hid his true 2016 income, filed false tax returns, and willfully failed to pay his taxes—not because of a gambling addiction but because he preferred to spend the money on things other than his taxes. This Court should reject his attempts to minimize his willfulness, just as the court did in *Quinn*.

It also should reject his bid to use the need for treatment to avoid prison. First, Goldstein implies, without evidence, that his addiction cannot be treated in prison. In fact, the Bureau of Prisons ("BOP") routinely provides psychiatric services and medications. *See, e.g.*, BOP Psychology Servs. Manual (2016), https://www.bop.gov/policy/progstat/5310_017.pdf; BOP National Formulary (2025), https://www.bop.gov/resources/pdfs/summer_2025_bop_formulary_part_1.pdf. It even operates a cognitive behavioral therapy program for prison gambling with group sessions. *See* First Step Act Approved Programs Guide 24 (May 2026), https://www.bop.gov/inmates/fsa/docs/fsa-approved-program-guide.pdf.

Second, Goldstein's own expert recognizes that a gambling addiction is just like a heroin, opioid, or alcohol addiction. Levant Report 13, 17; Def. Mem. 20. Even if the BOP's treatment programs for *gambling* addictions specifically are limited, its broader treatment programs promise benefit. *See United States v. Mady*, No. 04-80408, 2006 WL 3147740, at *10 (E.D. Mich. Nov. 1, 2006) ("While the treatment programs within the BOP for someone with gambling addiction may be limited, it appears from Defendant's own expert that elements of the treatment programs in the BOP for other addictions could be of benefit to Defendant.").

Third, Goldstein's sentencing memorandum is framed entirely in the future tense: he "*could* end his relationship with gambling [and] pay his debts," he could "*begin* intensive therapy,"

17

he "*could* do substantially more good in the community than prison." Def. Mem. 7, 20 (emphasis added). In essence, he asks the Court to just trust him. Many other creditors—from the Resnicks and Paul Napoli to Parabellum, NFM, and the IRS—already made that mistake. This Court need not. Goldstein has barely begun anything resembling a journey toward recovery but suggests this Court should trust that he will, eventually, if left to his own devices, do the right thing. The past decade shows otherwise. Goldstein's own sentencing memorandum, filled with the constant refrain that he is not actually guilty, shows he is nowhere near taking responsibility for his actions, let alone meaningful recovery.

Ultimately, "the nation's prisons and criminal justice system contain many who have some addiction, mostly drugs and alcohol. Even gambling addiction is just a reason for a need for money, and almost everyone in the criminal justice system needs money." *United States v. Gonzales*, 163 F. Supp. 3d 1078, 1124 (D.N.M.) (declining to depart downward based on gambling addiction), *aff'd*, 844 F.3d 929 (10th Cir. 2016). Goldstein's purported addiction is just like any other. His crimes—roughly a decade long and more than $16 million in harm—are not. This Court should treat him as such, and impose a substantial term of incarceration in light of all the § 3553(a) factors, not weigh one part of one factor to the detriment of all others. Particularly where Goldstein offers only a belated diagnosis and the mere possibility that he could eventually recover.

### B. Specific and General Deterrence

Goldstein's post-2021 conduct and his own sentencing memorandum underscore the need to achieve deterrence through a substantial term of imprisonment.

He concedes that, for sentencing guidelines calculations, the tax loss must include the loss from his willful failure to pay taxes in 2017, 2019, 2020, and 2021. *See* Def. Mem. 16; Obj. Mem. 19-20; *see* U.S.S.G. § 2T1.1(c)(5) (providing that the tax loss "is not reduced by any payment of

18

the tax subsequent to the commission of the offense"). Nonetheless, he argues that because he eventually paid those taxes (years after they were due), the Court should ignore the resulting tax loss when it considers the appropriate sentence. *See* Def. Mem. 16; Obj. Mem. 19.

However, Goldstein's own conduct demonstrates the need for a meaningful term of imprisonment to deter his and others' tax crimes. Goldstein did not pay his reported 2016, 2017, or 2019 taxes until years of IRS collections activity had resulted in tax liens that prevented him from selling his old house. Then he did not pay his 2020 or 2021 taxes until he had spent millions on poker and his personal life. He did all this while under a criminal tax investigation. Then he continued, not filing his 2022 and 2023 tax returns and not paying millions that he owed. Even after being convicted of tax crimes and receiving psychological treatment, he filed a false 2025 tax return and failed to timely pay the more than $1 million in taxes due. Taken as a whole, his conduct represents a paradigmatic display of the need for substantial punishment to ensure meaningful specific and general deterrence.

Despite his effort to downplay his § 7203 convictions as "the least serious conduct in the indictment" that "overstate the tax loss" and produce a disproportionate four-to-five-year Guidelines range, Def. Mem. 16, these are serious offenses, and Congress made failure to timely pay income taxes a misdemeanor "to insure prompt collection," *United States v. Palermo*, 259 F.2d 872, 875 (3d Cir. 1958). The actor Welsey Snipes's case is emblematic. After being charged with myriad tax crimes, a jury convicted him on only three misdemeanor § 7203 willful failure to file counts. *United States v. Snipes*, 611 F.3d 855, 860-61, 863 (11th Cir. 2010). Despite this, the district court recognized that "Congress had deemed [his crimes] to be serious," and sentenced him to the statutory maximum: 36 months' imprisonment, based on consecutive 12-month terms for each count. *Id.* at 863. The Eleventh Circuit affirmed, recognizing that a higher tax loss

corresponds to a more serious crime that is more "'harmful to the treasury,'" and finding Snipes's sentence substantively reasonable. *Id.* at 870, 872 (quoting U.S.S.G. § 2T1.1 cmt. (background)).

Goldstein's recurring insistence that the tax loss from his willful failure to pay convictions should be discounted because he already paid it before indictment, Def. Mem. 16, cannot be reconciled with *Snipes* or Guideline § 2T1.1. Moreover, the argument that he should get credit for having repaid the charged years—while *still* having failed to pay millions for 2022, 2023, and 2025, after investigation, indictment, and now conviction—betrays breathtaking hypocrisy. In this context, his argument (yet again) that "millions of taxpayers each year pay penalties and interest," so his conduct "should not drive a years-long sentence," Obj. Mem. 20, reads as a flat disagreement with Congress's decision to make § 7203 a crime.[2] A meaningful term of incarceration is necessary to deter him—and any would-be followers—from continuing to not file or pay his taxes.

Indeed, Goldstein contends that "the lesson learned is that following best practices with financial accounting tax reporting could avoid even the accusation of wrongdoing," so "this case is a cautionary tale for any taxpayer or small business owner." Def. Mem. 18. But his own conduct for tax years 2022 to 2025 suggests that he has learned a very different lesson: do not file, do not pay, and certainly do not enlist a professional to prepare the return. He avers that the "real-life consequences of this case already adequately deter" him, *id.*, yet he remains an inveterate tax cheat.

Anything less than a significant term of incarceration at the high end of the Guidelines range would fail to afford adequate general and specific deterrence. A sentence of *no* incarceration,

---

[2] So too does his claim that his offenses had "no victims." Def. Mem. 17. The IRS was and is a victim, currently owed more than $3 million in unreported 2016, 2017, 2019, and 2021 taxes, as well as more than $7 million for Goldstein's unpaid 2022 and 2023 taxes. The mortgage lenders also were victims, and NFM would have suffered a substantial loss if (1) the real estate market had declined, and (2) Goldstein had defaulted, forcing NFM to sell the Hawthorne property at a loss. It has not suffered financial harm merely by happenstance. Moreover, Goldstein's role as a prominent attorney has inflicted a broader harm to the public and respect for the law. *See U.S. v. Mosby*, No. 22-cr-0007-LKG, Dkt. 544 at 41:22-24 (Sent. Tr.) (recognizing the "significant harm to the public because of Ms. Mosby's role at the time [of the offenses] as both an elected official and an officer of the Court").

as he proposes, would send the message that someone can shirk their tax duties for nearly a decade, even after indictment and conviction, and walk away with little more than a stern warning.

### C. Other Arguments

Goldstein also raises various other arguments, including his past good deeds, the harm to his reputation and finances, and the need to avoid sentencing disparities. Each requires only a brief response.

First, he cites his past legal work to argue he "should be given" an opportunity at a term of pure supervision because he "used his career not just for profit but for good." Def. Mem. 11, 15. To this end, he cites various legal cases from 1999 through 2013 (and one in 2018), *see id.* at 11-15, arguing "his ability . . . to do good would be wasted in prison," *id.* at 11-12. At the outset, this argument is hard to reconcile with Goldstein's acknowledgment that he "cannot currently practice law." Def. Mem. 18. More deeply, Goldstein asks this Court to treat his good deeds from long ago as a basis for present leniency toward his recent and ongoing crimes. While this represents charity in the form of labor and time, rather than monetary donations, it nonetheless suggests "society can always be bought off, even by those whose criminal misconduct has shown contempt for its well-being," *United States v. McHan*, 920 F.2d 244, 248 (4th Cir. 1990).

Second, Goldstein argues that "[i]ncarceration would be excessive" where he has already endured financial insecurity and "a public dissection" of his life. Def. Mem. 18-19. But his appeal to reputation overlooks that sentencing white-collar offenders differently than blue-collar ones merely because the former suffer greater reputational harm would create widespread sentencing disparities. *See United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012). And Goldstein's appeal to financial insecurity is little more than the white-collar equivalent of a defendant convicted of parricide arguing that his status as an orphan warrants mercy. Goldstein has no one other than

himself to blame for his present financial predicament. Goldstein chose to prioritize personal spending over his taxes and chose to commit three separate mortgage frauds for a new house. After learning about the criminal investigation, Goldstein chose to try to hide his crimes and then to commit more. There can be little dispute that he, and he alone, is responsible for his financial situation and any collateral impact from the government's investigation.

Third and finally, Goldstein invokes six cases to argue that this Court must impose a sentence far below the Guidelines range to avoid sentencing disparities. *See* Def. Mem. 22-24. But he buries the critical fact that binds these cases: *every* defendant in those cases pleaded guilty and accepted responsibility. *See United States v. Cemini*, No. 2:23-CR-92 (E.D. Pa.), Dkts. 46 & 49 (minute entries for defendants' guilty pleas); *United States v. Schechter*, No. 1:23-CR-210 (D.D.C.), Dkt. 31 at 5 (def. sentencing mem.); *United States v. Donuk*, No. 2:22-CR-691 (D.N.J.), Dkt. 25 (plea agreement); *United States v. Kellner*, No. 1:19-CR-267 (D. Md.), Dkt. 31 (plea agreement); *United States v. Brown*, No. 1:12-CR-135 (D.D.C.), Dkt. 4 (plea agreement); *United States v. Warner*, 792 F.3d 847, 853 (7th Cir. 2015) (recounting guilty plea and acceptance of responsibility).

Even a cursory review of one case underscores how different Goldstein is. In *Warner*, the billionaire defendant hid money in a Swiss bank account, causing a tax loss of $5.6 million—far below the present loss. *See Warner*, 782 F.3d at 851-52. But then he regretted the account and undertook *to voluntarily disclose* his misdeed to the IRS before learning of any investigation. *Id.* He later pleaded guilty, promising to pay full restitution and a $53,000,000 penalty, equal to 50% of the account's maximum balance and 30% higher than a penalty he would have otherwise owed. *Id.* at 852. At sentencing, the district court noted that he had concealed only a "small fraction" of

his income, tried to come clean, paid far more than the taxes he would have owed if he had reported the income, promptly paid his civil liabilities, and complied with the plea agreement. *Id.* at 854.

By contrast, Goldstein has done *none of this*. Instead, he hid a large portion of his income, fought to conceal his crimes after learning of IRS collections efforts and then a criminal investigation, has only committed more crimes since indictment and conviction, lied under oath, and even now insists that he is innocent. There may be rare cases that warrant a significantly below-Guidelines sentence. This is the opposite.

The government's sentencing memorandum listed examples of within and above Guidelines sentences for tax offenders, including those imposed on first-time offenders. *See* Gov. Sent. Mem. 73-74. The government respectfully submits that Goldstein's conduct is egregious and a sentence at the high end of the Guidelines range is sufficient, but not greater than necessary, to reflect the seriousness of his offenses, and afford general and specific deterrence.

*　　*　　*

**CONCLUSION**

The government respectfully submits that this Court should reject Goldstein's arguments

and instead impose a substantial term of imprisonment at the high end of the Guidelines range.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

A. Tysen Duva
Assistant Attorney General
Criminal Division

Dated: June 23, 2026

    /s/
Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice—Criminal Division

Sean Beaty
Senior Litigation Counsel
Department of Justice—Criminal Division

Adeyemi Adenrele
Assistant United States Attorney
District of Maryland