**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **CRIMINAL NO. LKG-25-6** |
| **THOMAS C. GOLDSTEIN,** | |
| **Defendant.** | |

**DEFENDANT THOMAS C. GOLDSTEIN'S MOTION AND MEMORANDUM IN
SUPPORT OF MOTION FOR RELEASE PENDING APPEAL**

The Court is scheduled to sentence Defendant Thomas C. Goldstein on July 24, 2026.

Pursuant to 18 U.S.C. § 3143(b), Mr. Goldstein respectfully moves for release pending appeal and

submits the accompanying memorandum of law in support of his motion.  Mr. Goldstein has asked

the Court to exercise its discretion to impose a non-custodial sentence and, if this Court does so,

this motion will be moot.  In the event the Court decides to impose a period of incarceration,

however, he submits this motion and memorandum in advance of sentencing for the Court's

convenience.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 3

I.     Mr. Goldstein Does Not Pose A Danger To The Community Or A Flight Risk. ............... 4

II.    Mr. Goldstein's Appeal Raises Substantial Questions Likely To Result In A New Trial. .............................................................................................................. 8

       A.     The Court's Instructional Errors Regarding Accessory Liability Raise Substantial Questions On Appeal. .......................................................... 9

             1.     Whether the Court erroneously permitted conviction under Section 2 without instructing on its elements is, at minimum, a "close" question. ...................................................................... 9

             2.     Whether the Court violated Rule 30(b) by expanding Section 2 liability after closing is at least a "close" question. ................................. 16

       B.     The Court's Improper Exclusion Of Messages Including The Ledger Raises A Substantial Question On Appeal ............................................. 18

             1.     Whether the Court erroneously excluded the messages under the rule against hearsay is at least a "close" question. .................................... 20

             2.     Whether the exclusion of the messages was harmless is at least a "close" question. ..................................................................... 22

CONCLUSION ......................................................................................................... 26

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyde v. California*,
  494 U.S. 370 (1990)........................................................................................ 11-13

*Cheek v. United States*,
  498 U.S. 192 (1991)..............................................................................................18

*McDougall v. Dixon*,
  921 F.2d 518 (4th Cir. 1990) ...............................................................................11

*United States v. Ali*,
  793 F. Supp. 2d 386 (D.D.C. 2011) .......................................................................4

*United States v. Amador Lopez*,
  No. 26-cr-0031, 2026 WL 820380 (D. Md. Mar. 25, 2026).................................. 4-5

*United States v. Baum*,
  785 F. Supp. 570 (E.D. Va. 1992) ..........................................................................7

*United States v. Brizuela*,
  962 F.3d 784 (4th Cir. 2020) ................................................................................25

*United States v. Edelman*,
  No. 24-cr-239, 2024 WL 5093496 (D.D.C. Dec. 12, 2024) ....................................6

*United States v. Edelman*,
  No. 24-cr-239, 2025 WL 1725957 (D.D.C. June 20, 2025) ................................. 6-7

*United States v. Gallagher*,
  90 F.4th 182 (4th Cir. 2024) ........................................................................... 20-25

*United States v. Gumbs*,
  283 F.3d 128 (3d Cir. 2002)..................................................................................10

*United States v. Harris*,
  346 F.2d 182 (4th Cir. 1965) ................................................................................10

*United States v. Horton*,
  921 F.2d 540 (4th Cir. 1990) ...........................................................................10, 16

*United States v. Ibisevic*,
  675 F.3d 342 (4th Cir. 2012) ....................................................................... 22-23, 25

*United States v. Ince*,
  21 F.3d 576 (4th Cir. 1994) ............................................................................ 24-25

**TABLE OF AUTHORITIES – continued**

**Page(s)**

*United States v. Javice,*
No. 23-cr-251 (S.D.N.Y. Oct. 30, 2025)......................................................................7

*United States v. Lighty,*
616 F.3d 321 (4th Cir. 2010) ...................................................................................11

*United States v. Maher,*
10 F. Supp. 2d 594 (W.D. Va. 1998) ..........................................................................8

*United States v. McComber,*
No. 21-cr-036, 2024 WL 4664630 (D. Md. Nov. 4, 2024).........................................7

*United States v. Odum,*
65 F.4th 714 (4th Cir. 2023) .............................................................................10, 16

*United States v. Polowichak,*
783 F.2d 410 (4th Cir. 1986) ...................................................................................10

*United States v. Sanchez,*
995 F.2d 468 (3d Cir. 1993)........................................................................................5

*United States v. Squillacote,*
221 F.3d 542 (4th Cir. 2000) ...................................................................................17

*United States v. Steinhorn,*
927 F.2d 195 (4th Cir. 1991) ................................................................ 8-9, 13, 15, 25

*United States v. Winstead,*
708 F.2d 925 (4th Cir. 1983) .............................................................................10, 16

**Statutes and Regulations**

18 U.S.C.
§ 3143(b)(1) ...........................................................................................................3, 8
§ 3143(b)(1)(B).......................................................................................................1, 8

Fed. R. Evid. 803(3)...................................................................................................20

Fed. R. Crim. P. 30(b).................................................................................................17

**INTRODUCTION**

Mr. Goldstein respectfully requests release pending appeal. Although Mr. Goldstein respects the Court's decision to deny his motion under Rule 33, he intends to appeal that decision on an expedited basis to the Fourth Circuit. Importantly, the standard for release pending appeal does not require the Court to find likely success on the merits. Rather, the question is whether Mr. Goldstein's appeal will present a "substantial question" that, if resolved in his favor, would result in an acquittal or new trial. 18 U.S.C. § 3143(b)(1)(B). There are at least two such questions here.

The first relates to the Court's accessory liability instruction, and the Court's decision to change that instruction after closing arguments. There is no longer any dispute that the government misrepresented the governing legal rules to this Court at trial. Nor is it disputed that a new trial is required if there is a reasonable likelihood the jury read the instructions to permit conviction under Section 2 because the instructions omitted the elements of accessory liability.

After trial, this Court did not read the instructions that way. But for purposes of this motion, there is no fair way to say that the issue raises no "substantial" question. The reason is straightforward: At trial, *even the government* read the instructions that way, and the Court seemingly did as well. That was the entire basis for the government's last-minute request to change the jury instructions after closing argument—which the Court granted. To now contend there is no substantial question whether the jury reasonably could read the instructions to allow for conviction under Section 2—when the government previously repeatedly maintained that quoting the text of Section 2 sufficed to submit the issue of accessory liability to the jury—strains credulity.

On the exclusion of messages between Mr. Goldstein and Mr. Phua's assistant, the Court recognized during the June 16, 2026 hearing that the defense has "strong arguments" that the messages should have been admitted. 6/16/26 Tr. 99:16-18. That is an understatement, as Fourth Circuit precedent is clear that such statements are not hearsay, and this Court did not suggest

1

otherwise.  The Court instead deemed this error—once again induced by the government's misstatement of the law—harmless.  Yet there is no dispute that the messages were key to Mr. Goldstein's defense on the central disputed issue of willfulness.  For this Court to conclude there is no substantial question on appeal would require dismissing Fourth Circuit precedent specifically holding that the defendant's testimony on the content of wrongly excluded evidence does not make the error harmless.  The Court's harmlessness ruling therefore creates a substantial question for appeal.

The remaining considerations likewise favor granting release pending appeal.  Mr. Goldstein is neither a danger to the community nor a flight risk.  The Court necessarily already made those determinations in Mr. Goldstein's favor in allowing his release post-conviction, and as the government conceded at the intervening hearing on Mr. Goldstein's post-trial motions, nothing has changed. He is not before the Court for any violent crime, and the government has never suggested that he poses any kind of danger under the terms of his release.  Over the course of these proceedings, Mr. Goldstein has appeared for every court date, and he has every incentive to remain in the United States to litigate his appeal.  Although the Court will now impose a sentence, he has known of that prospect since conviction, and the critical point for present purposes is that he strongly believes in the merits of his appeal.  Fleeing the country would not only forfeit his opportunity to appeal, but also sever his relationships with his family.  It is implausible that Mr. Goldstein would seek to give all that up, permanently exile himself from the United States, and expose himself to additional criminal liability—all to avoid a sentence that he believes will be eliminated by his appeal and retrial.  At any rate, Mr. Goldstein's conditions of release prevent any possible flight risk, as this Court has previously held.  He has surrendered his passport, has submitted to location monitoring, and is subject to a strict home detention policy.  Mr. Goldstein

2

has been subject to those conditions for almost five months, and there is no suggestion that he has attempted to leave his home without permission or violated any other condition. Nor is there any plausible argument that Mr. Goldstein is appealing for the purpose of delay, given that he plans to seek expedited review in the Fourth Circuit to resolve his appeal by the end of the year. Accordingly, the Court should grant release pending appeal.

## ARGUMENT

Under 18 U.S.C. § 3143(b)(1), a district court "shall order the release" of a defendant pending appeal if the defendant demonstrates: (1) "by clear and convincing evidence that [he] is not likely to flee or pose a danger to the safety of any other person or the community if released"; (2) that the appeal is not taken "for the purpose of delay"; and (3) that the appeal raises a "substantial question of law or fact." 18 U.S.C. § 3143(b)(1).

All three factors are satisfied here. As an initial matter, Mr. Goldstein has no desire to unduly delay the resolution of the case. On the contrary, Mr. Goldstein plans to take all necessary steps to vindicate his rights on appeal as quickly as possible. Mr. Goldstein will file a notice of appeal as soon as this Court enters judgment and will move for a highly expedited briefing and oral argument schedule that would enable the Fourth Circuit to rule before the end of the year. These steps will ensure that the appeal does not cause undue delay, and proceeding at this expedited pace will be significantly easier if Mr. Goldstein is able to communicate regularly with his attorneys.

The remaining two factors likewise warrant release pending appeal. No party has suggested that Mr. Goldstein poses a danger to his community, and the conditions the Court has imposed on Mr. Goldstein's release ensure there is no flight risk. And Mr. Goldstein will raise at least two substantial questions for appeal. This Court should therefore order that Mr. Goldstein remain on home detention for the duration of the appeal.

3

**I.      MR. GOLDSTEIN DOES NOT POSE A DANGER TO THE COMMUNITY OR A FLIGHT RISK.**

Mr. Goldstein is not a danger to the community.  He is not before the Court for violent offenses, he has no prior criminal history, and he has extensive ties to the community.  Against that backdrop, when the Court reevaluated the terms of Mr. Goldstein's release at the end of trial, neither the government nor Probation took the position that Mr. Goldstein is a danger to the community.  *See* 2/26/26 Tr. 10:13-11:3.  Nothing has changed since then.  Mr. Goldstein's mental health needs and prior entirely incidental substance use never posed a threat to others.  And as Probation explained in its recent status report, Mr. Goldstein has "maintained negative urinalysis drug test results and continues to participate in mental health treatment."  7/20/26 Release Status Report (RSR) 4.  Nor has he been cited or arrested for another crime.  As a result, he poses no danger to himself or the community—as reflected in Probation's recent recommendation that Mr. Goldstein remain released pending self-surrender.  6/12/26 RSR 3.  Indeed, Probation's view was that even home confinement was not required post-conviction.  *See* 1/7/26 RSR 1-4.[1]

Mr. Goldstein is not a flight risk either.  Throughout these proceedings, he has appeared for every court date, and he has every incentive to remain in full compliance as his appeal moves forward.  Mr. Goldstein is confident in the strength of his arguments on appeal for all the reasons set forth below, and he has strong ties to the United States, including his extended family of parents, grandmother, and other family relations.  He would forfeit those relationships, and his ability to pursue his legal claims on appeal if he attempted to flee.  There is no rational reason for

---

[1] The most recent Release Status Report filed by Probation Services noted that the government has alleged Mr. Goldstein violated his conditions of release by committing a new offense related to his 2025 tax return.  *See* 7/20/26 RSR 3.  Mr. Goldstein contests the government's allegations, *see* Response to Gov't Sentencing Mem., Dkt. No. 541, at 31, and Probation Services has not taken a position on them—instead recommending that this Court address the allegations during sentencing, *see* 7/20/26 RSR 4.  In any event, those allegations do not bear on whether Mr. Goldstein poses a flight risk or danger to the community during the pendency of his appeal.

him to do so, particularly in light of the sentence that he faces.  This is not a case where the defendant will be subject to a "life sentence" or decades-long incarceration—creating "strong incentives" to flee notwithstanding the downsides of flight.  *United States v. Ali*, 793 F. Supp. 2d 386, 390 (D.D.C. 2011); *see also United States v. Amador Lopez*, No. 26-cr-0031, 2026 WL 820380, at *5 (D. Md. Mar. 25, 2026) (recognizing that the length of a defendant's sentence impacts his "incentive to flee"); *United States v. Sanchez*, 995 F.2d 468, 469-70 (3d Cir. 1993) (same).  To the contrary, even assuming the Court accepts the government's excessive sentencing request (it should not), Mr. Goldstein would be sentenced to a term of incarceration for approximately eight years.  While such a sentence would be substantial—and wholly unwarranted—it is implausible that Mr. Goldstein would seek to consign himself to permanent exile from the United States, become an international fugitive, expose himself to additional federal criminal liability, and destroy his ability to pursue his legal claims on appeal to avoid that time in custody.

What is more, Mr. Goldstein has strong incentives to comply with his conditions of release during the appeal: He intends to be fully engaged in the appeal, and he is well-positioned to do so given his experience as an appellate advocate.  Any action that could result in detention and so jeopardize his ability to assist with his appeal would be directly contrary to his interests.  The Court should thus reaffirm its conclusion that Mr. Goldstein is not a flight risk under his current conditions of release.

In any event, Mr. Goldstein's current conditions of release further ensure there is no risk of flight.  Those conditions include: (1) home confinement with a "24-hour-a-day lock down" except for "medical necessities, attorney visits, court appearances, or other activities specifically approved by the court"; (2) electronic location monitoring; (3) passport surrender; (4) daily

telephone contact and weekly in-person contact with a third-party custodian; (5) computer and internet monitoring; and (6) submission of monthly bank statements and a prohibition on any transfers without approval.[2]  6/12/26 RSR 1-3.  At the close of trial, this Court concluded that those conditions mitigated any flight risk.  *See* 2/26/26 Tr. 23:12-14.  And just weeks ago, the Court denied Mr. Goldstein's motions for a judgment of acquittal or a new trial but concluded that Mr. Goldstein should remain released subject to those conditions pending sentencing.  *See* 6/16/26 Tr. 115:19-22.  Again, nothing has changed in the interim, so the same conclusion holds.

Courts have regularly found that defendants convicted of far more serious financial crimes do not pose a danger to the community or a flight risk—even when they have extensive foreign ties.  For example, a district court in the District of Columbia recently ordered the temporary release of Douglas Edelman, an individual "charged with orchestrating one of the largest tax-evasion schemes in American history."  *United States v. Edelman*, No. 24-cr-239, 2025 WL 1725957, at *1 (D.D.C. June 20, 2025).  In that case, the government alleged that Edelman—a U.S. citizen living in Kyrgyzstan—"leverag[ed] connections in Kyrgyzstan and Russia" to start a business selling jet fuel to the U.S. Department of Defense and then "evaded taxes on more than $350 million of income."  *United States v. Edelman*, No. 24-cr-239, 2024 WL 5093496, at *1 (D.D.C. Dec. 12, 2024).  Edelman was arrested in Spain, where he was detained and then extradited.  *Id.* at *2.

Although the court ordered Edelman to be detained after he repeatedly violated his pretrial release conditions, it ordered his release pending sentencing after he "appeared before th[e] Court repeatedly and without issue."  *Edelman*, 2025 WL 1725957, at *5.  The court noted that, despite

---

[2] Mr. Goldstein does not have access to any cryptocurrency wallets, and his current conditions of release prohibit cryptocurrency transactions and require monitoring of any cryptocurrency wallets. *See* 6/12/26 RSR 2-3.

Edelman's extensive "financial crimes," there "ha[d] never been any suggestion" that he posed a danger to the community. *Id.* at \*4. As to flight risk, the court emphasized that Edelman "was required to surrender his passport, submit to GPS monitoring, and restrict his movements to within one mile of his residence." *Id.* at \*1. There were no "issues regarding Edelman's compliance with his location-monitoring conditions," the court explained, and it had "never determined that Edelman was a flight risk while subject to those conditions." *Id.* at \*3. The court also rejected the government's argument that "Edelman 'now has greater reason to flee' than he did while awaiting trial" because there was "no reason to suspect that his *ability* to flee from justice has changed materially." *Id.*

Courts around the country, moreover, have found defendants pose no danger or flight risk on grounds similar to those present here—especially where the court has previously granted release pre-sentencing and the defendant complied with conditions of release. *See, e.g.*, *United States v. McComber*, No. 21-cr-036, 2024 WL 4664630, at \*4-5 (D. Md. Nov. 4, 2024) (concluding defendant posed no flight risk or danger to the community notwithstanding her conviction for multiple fraud offenses and the government's opposition to release pending appeal based on her consistent appearance at court proceedings, "strong ties to family in Maryland and to the community," and her prior compliance with pretrial release); Sent'g Tr. 75-81, *United States v. Javice*, No. 23-cr-251 (S.D.N.Y. Oct. 30, 2025), Dkt. 450 (granting bail pending appeal where defendant had complied with all bail conditions and had strong ties to the United States, notwithstanding the government's opposition and her dual French citizenship, connections abroad, and conviction for fraud that caused $174 million in loss); *United States v. Baum*, 785 F. Supp. 570, 571 (E.D. Va. 1992) (concluding defendant who had pleaded guilty to procuring home loans by fraud posed no flight risk or danger to the community because he had "promptly and properly

7

appeared at all scheduled meetings of the court, at all appointments with Pretrial Services, Probation and Parole, and with his defense counsel" and had "surrendered himself for service of his sentence").

The Court should follow that same course here. There has never been any suggestion that Mr. Goldstein is a danger to the community. And although the Court initially deemed Mr. Goldstein a flight risk, it subsequently found that the combination of surrendering his passport, location monitoring, and home detention eliminated that risk. That has not changed. Mr. Goldstein has consistently appeared before the Court without issue, and there is no basis to conclude that he poses a flight risk under his current conditions of release.

## II.   MR. GOLDSTEIN'S APPEAL RAISES SUBSTANTIAL QUESTIONS LIKELY TO RESULT IN A NEW TRIAL.

Mr. Goldstein also satisfies the final requirement of 18 U.S.C. § 3143(b)(1): His appeal presents "substantial question[s] of law or fact" that, if accepted by the Fourth Circuit, are "likely to result in" an order for a new trial. 18 U.S.C. § 3143(b)(1)(B).

A "substantial question of law or fact" is "a 'close' question or one that very well could be decided the other way." *United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991) (per curiam) (quoting *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)). "[T]here are no blanket categories for what questions do or do not constitute 'substantial' ones." *Id*. (citation omitted). Rather, "[w]hether a question is 'substantial' must be determined on a case-by-case basis." *Id*. (citation omitted).

Determining whether a "substantial question" is "likely to result" in reversal or a new trial, 18 U.S.C. § 3143(b)(1)(B), does not require a district court to "find[] that its own judgment is likely to be reversed on appeal," *United States v. Maher*, 10 F. Supp. 2d 594, 596 (W.D. Va. 1998). The "correct approach, universally adopted by the circuit courts of appeal, is to ask whether a

8

reduction [in sentence or a new trial] would likely result, assuming the appellate court rules in defendant's favor." *Id*. (collecting cases). The question, therefore, is whether "if [the court were to] reverse the district court's ruling on the [contested] issue, [it] would likely order a new trial." *Steinhorn*, 927 F.2d at 196.

Mr. Goldstein's appeal will raise at least two substantial questions that require a new trial—and at minimum qualify as "close" questions. First, the jury instructions on accessory liability contradict binding Fourth Circuit precedent, and the Court violated Rule 30(b) by changing the accessory liability instructions after closing argument. Both errors require a new trial on every count. Second, the Court improperly excluded messages between Mr. Goldstein and third parties that were critical to demonstrating his lack of willfulness as to each count. Because these issues "very well could be decided the other way," the third criterion for release under Section 3143(b)(1) is satisfied. *Steinhorn*, 927 F.2d at 196 (citation omitted).

### A.    The Court's Instructional Errors Regarding Accessory Liability Raise Substantial Questions On Appeal.

The government's legal positions led this Court into two errors in its accessory liability instructions, each of which gives rise to a substantial question on appeal. And because both of those errors affected every count, retrial is not only likely but required across the board if the Fourth Circuit agrees.

#### 1.    Whether the Court erroneously permitted conviction under Section 2 without instructing on its elements is, at minimum, a "close" question.

At the charge conference, the Court adopted a standalone Accessory Instruction that set forth the elements the jury must find to convict under Section 2. *See* 2/17/26 Tr. 223:6-224:3. Following closing arguments, however, the government persuaded the Court to delete that standalone instruction on the ground that "the statute is sufficiently clear" to instruct the jury on Section 2 liability. 2/19/26 Tr. 10:19-20; *see also* Dkt. 430 at 2 (arguing "[t]he substantive

9

instructions already" provide sufficient guidance on Section 2 liability because the "relevant statutory language is straightforward").

That position contravenes binding Fourth Circuit precedent. Courts must instruct the jury "as to the elements of [each] offense charged." *United States v. Polowichak*, 783 F.2d 410, 415 (4th Cir. 1986) (citation omitted). Simply "reading . . . the statute to the jury" does not suffice; "an exposition of the constituents of the offense is mandatory and indispensable." *United States v. Harris*, 346 F.2d 182, 184 (4th Cir. 1965). And the Fourth Circuit has applied that rule to Section 2 instructions, specifically. In *United States v. Odum*, 65 F.4th 714 (4th Cir. 2023), the Fourth Circuit held that the district court plainly erred by "'read[ing] directly from' 18 U.S.C. § 2" without instructing the jury as to its elements, *id*. at 720 (citation omitted), including the requirement that the defendant "must have 'chosen, with full knowledge, to participate in the illegal scheme.'" *Id*. at 721 (quoting *Rosemond v. United States*, 572 U.S. 65, 79 (2014)).

That is precisely the error at issue here. At the government's urging, the Court removed the standalone Accessory Instruction that set forth the required elements of Section 2 liability and instead opted to simply "'read directly from' 18 U.S.C. § 2." *Id.* at 720 (citation omitted). As a result, the jury did not know that Section 2(a) aiding and abetting liability requires finding (1) that there was another guilty principal, *United States v. Horton*, 921 F.2d 540, 543-44 (4th Cir. 1990); (2) that "the defendant shared in the principals' criminal intent"—in this case, the *willful* intent to commit the tax offenses, *United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983); and (3) that the defendant "took an affirmative act in furtherance of the underlying offense," *Odum*, 65 F.4th at 721. As for Section 2(b) cause liability, the jury did not know that it was required to find "the defendant had the *mens rea* required by the underlying statute," which here is the willful intent to commit the tax offenses. *United States v. Gumbs*, 283 F.3d 128, 135 (3d Cir. 2002). Permitting

10

the jury to convict Mr. Goldstein under Section 2 without knowing those essential elements—which are not set forth in the statutory text—violates due process.

When Mr. Goldstein's motion for a new trial identified this legal error, the government reversed course. It did not, and could not, dispute that simply reading the statutory text is insufficient to instruct on Section 2 liability. *See* Dkt. 505 ("Opp.") at 9-29; *contra* 2/19/26 Tr. 10:19-20. Nor did the government attempt to satisfy the harmless-error standard. *See* Opp. 29-34. Instead, the government claimed that the instructions "did not permit the jury to convict under any § 2 theory"—obviating the need for the Court to instruct on the elements of Section 2 liability. Opp. 4 (emphases omitted).

The government's revised theory is incorrect. To determine if the instructions permitted conviction under Section 2, the Court must ask whether there is a "reasonable likelihood" that a "reasonable juror" would have understood the instructions in that manner. *Boyde v. California*, 494 U.S. 370, 380, 386 (1990); *see McDougall v. Dixon*, 921 F.2d 518, 532 (4th Cir. 1990) (test is "what a reasonable juror would have understood the entire charge to mean"). In so doing, the Court must read the instructions "as a whole and in the context of the entire charge." *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010) (citation omitted).

Here, there is at least a "reasonable likelihood" that the jury would have understood the instructions as a whole to allow for conviction under Section 2. *Boyde*, 494 U.S. at 380. Indeed, the government itself consistently read the instructions that way—up until the moment the defense pointed out the error in post-trial motions. When urging the Court to delete the standalone Accessory Instruction, which was limited to Section 2(a) liability, the government made clear that it understood the remaining instructions to submit *both* Section 2(a) and Section 2(b) liability to the jury. The government stated that it had charged Mr. Goldstein with both theories of Section 2

11

liability and emphasized that "[t]he substantive instructions already make that clear by quoting both subsections." Dkt. 430 at 2; *see also* Dkt. 513-1 (Ex. A) ("[T]his is a § 2(b) case (*in addition to (a)*)." (emphasis added)). The government stressed that "in the substantive instructions for tax evasion[,] for false returns[,] and for mortgage fraud, there is language specifically quoting Section 2(a) and (b). So that is already in the instructions." 2/19/26 Tr. 21:20-23. And when the defense objected that the government "wants to . . . tell the jury they can convict Mr. Goldstein of aiding and abetting and then remove the instruction explaining to them what they would have to find to do that," 2/19/26 Tr. 8:3-6, the government did not respond that it was disavowing seeking a conviction under Section 2; instead, the government argued that the standalone Accessory Instruction "should come out, and the other aiding and abetting language should stay in," reiterating that "the statute is sufficiently clear" and "[i]t's already cited in the instructions, and so there is no reason to have a separate standalone." 2/19/26 Tr. 8:17-10:22. The government's prior position that the jury instructions quoting Section 2 sufficed to submit the issue of accessory liability to the jury confirms that there is at least a close question whether a "reasonable likelihood" exists that lay jurors would have understood the jury charge in the same manner. *Boyde*, 494 U.S. at 380.

The government had it right then: The instructions, read as a whole, invite the jury to convict under Section 2. Recall that the Court instructed the jury that its role was to "find Mr. Goldstein guilty or not guilty" as to the "*offenses charged*." 2/19/26 Tr. 42:5-7 (emphasis added). And the instructions for all four categories of charges provided that Mr. Goldstein was "charged" with the substantive offense "and aiding and abetting, counseling, commanding, inducing or procuring such an offense." 2/19/26 Tr. 55:17-19; 60:24-61:2; 71:1-4, 75:21-76:1. Additionally, the instructions regarding tax evasion, false returns, and mortgage fraud each described Section 2

12

as "pertinent" and quoted the statutory text in full. *See* 2/19/26 Tr. 56:6-14, 64:24-65:6, 78:23-79:6. Thus, it is at least reasonably likely that a juror would have understood those components of the instructions to invite the jury to convict under Section 2. Indeed, the jury's verdict on Count 15 confirms that the jury understood the instructions to permit a conviction based on Section 2: the only basis for venue in Maryland for Count 15 was a theory of accessory liability because the government affirmatively acknowledged in closing that Mr. Goldstein "was in the Virgin Islands," not Maryland, when the application relevant for Count 15 was submitted. *See* 2/18/26 Tr. 87:19.

Thus, there is at minimum a "substantial question" as to whether the instructions permitted the jury to convict under Section 2. *Steinhorn*, 927 F.2d at 196.

This Court's denial of Mr. Goldstein's motion for a new trial does not suggest otherwise. The Court did not dispute that, if the instructions permitted a conviction under Section 2, then the instructions were inadequate and prejudicial—requiring a new trial as to every count. *See* Dkt. 537 ("Mem. Op.") at 17-21. The Court's ruling thus hinges on its conclusion that the instructions did not allow the jury to convict under Section 2 in the first place. But there is a strong argument that the Court's justification for that conclusion is flawed.

To begin, the Court incorrectly concluded that the "references to Section 2" in the instructions are best read as "simply summariz[ing] the charges alleged in the case," not as "evidence for the Jury to consider." Mem. Op. 21. In support of that view, the Court cited the provision of the instructions stating that "an indictment is merely a statement of charges and not itself evidence," and "[e]ven if I read a portion of the indictment to you, it is not evidence; it is only a statement of charges." *Id.* at 20 (quoting 2/19/26 Tr. at 41:9-14). But telling the jury that the indictment is not "evidence" says nothing about the legal theories available to the jury for conviction. And instructing the jury that the indictment set forth the relevant "charges" only

13

reinforces the problem.  Recall that the Court had instructed the jury to "find Mr. Goldstein guilty or not guilty" as to the "offenses charged."  2/19/26 Tr. 42:5-7.  So if those "charges" included Section 2 liability—as the Court told the jurors—then the jury would have reasonably understood its role as determining guilt or innocence on Section 2 liability.

The Court also observed that "the Jury was properly instructed on what the essential elements are for each of the tax and mortgage fraud offenses charged in this case."  Mem. Op. 21.  But proper instructions on the elements for the substantive offenses cannot cure the lack of adequate instructions on Section 2 liability.  And the fact that "none of the Jury Instructions regarding the elements of these tax and mortgage fraud offenses refer to Section 2," *id*., similarly fails to move the needle.  As noted, the instructions tasked the jury with finding Mr. Goldstein "guilty or not guilty" of the "charge[s]," 2/19/26 Tr. 42:5-7, which set forth *two separate paths* for conviction: (1) conviction based on finding the essential elements of the substantive offense and (2) conviction based on accessory liability for that substantive offense—defined only by the statutory text of Section 2.  Accordingly, the lack of any reference to Section 2 in the Court's description of the elements of the substantive offenses would not have changed the jury's understanding that Section 2 remained a separate basis for conviction.

In denying the post-trial motions, this Court observed that the "evidence presented at trial was not sufficient to sustain a conviction under Section 2(a)" based on that provision's elements. Mem. Op. 19.  But the constitutional problem is that the jury was not instructed on Section 2(a)'s elements.  Thus, whether a properly instructed jury could have convicted under Section 2(a) based on the evidence presented at trial is irrelevant.

Finally, the Court invoked the principle that jurors are presumed to "attend closely the particular language of [the] instructions" and "strive to understand, make sense of, and follow

14

[them]." Mem. Op. 18 (quoting *Samia v. United States*, 599 U.S. 635, 646 (2023)).  But under the Court's view, the jury must have ignored three components of the instructions: (1) the directive to "find Mr. Goldstein guilty or not guilty" as to the "offenses charged," 2/19/26 Tr. 42:5-7; (2) the instruction that Mr. Goldstein was charged with each substantive offense "*and* aiding and abetting, counseling, commanding, inducing or procuring such an offense," 2/19/26 Tr. 55:17-19, 60:24-61:2, 71:1-4, 75:21-76:1 (emphasis added); and (3) the repeated recitation of Section 2's statutory text, which the Court itself described as "pertinent," 2/19/26 Tr. 56:6-8.  A juror who attended closely to the instructions would have followed the Court's instructions to determine guilt or innocence on the Section 2 charges, looking to the statutory text of Section 2 for guidance. Under *Boyde*, that establishes a "reasonable likelihood" that the instructions permitted conviction under Section 2, 494 U.S. at 380—and is more than enough to present a "substantial question" for the Fourth Circuit, *Steinhorn*, 927 F.2d at 196.

### 2. Whether the Court violated Rule 30(b) by expanding Section 2 liability after closing is at least a "close" question.

The Rule 30(b) issue likewise presents a substantial question on appeal.  The Court did not dispute that Rule 30(b) was violated when the government persuaded the Court to substantively amend the jury instructions following closing argument.  *See* Mem. Op. 21-22.  And it is at least a close question whether this last-minute amendment prejudiced Mr. Goldstein.

To establish prejudice for purposes of Rule 30(b), the defendant must simply show that the violation affected the defense's closing—for instance, by impacting counsel's ability to address a "new line of argument."  *Horton*, 921 F.2d at 547-48.  Prejudice is not measured by the effect on the outcome of the case.  *Id.*  That is because Rule 30(b) is designed to ensure the defendant has "an adequate opportunity to argue his innocence under the district court's instructions in order to be assured a fair trial."  *Id*. at 546-47.

15

Here, if defense counsel had known that the jury would not be instructed on the elements of Section 2 liability, he would have approached closing argument very differently. Specifically, he would have affirmatively argued that to convict under aiding and abetting liability the jury must find a guilty principal; that the defendant had willful intent to commit the tax offenses; and that the defendant took an affirmative act in furtherance of the underlying offense. *See Horton*, 921 F.2d at 543-44; *Winstead*, 708 F.2d at 927; *Odum*, 65 F.4th at 721. It was "essential" to Mr. Goldstein's defense that the jury know of those limits on Section 2 liability to avert an erroneous accessory liability conviction. *Horton*, 921 F.2d at 547. And had defense counsel known that the instructions would not clearly explain those limits, he would have altered his closing to address that "new line of argument"—demonstrating actual prejudice. *Id*.

The Court's contrary conclusion rested on three principal points—each of which at minimum presents a close question. First, the Court observed that "the trial record makes clear that Section 2(a) liability was not an issue that the Defense addressed during the trial," and in fact "the Defense maintained throughout the trial that the evidence introduced by the Government was not sufficient to support a conviction under Section 2(a)." Mem. Op. 22. But the defense took that position based on a *correct* understanding of the elements required to show Section 2(a) liability, detailed above. The Court, however, never instructed the jury on those elements. Had defense counsel known that the jury would be left without adequate guidance on Section 2 liability, he would have vigorously argued to the jury that the elements of Section 2 liability were not satisfied.

Second, it is not correct that the defense's closing argument "would have been the same regardless of the Court's" removal of the standalone Accessory Instruction because "Defense Counsel did not address Section 2(a) liability during his closing argument to the Jury." Mem. Op.

16

22.  Again, defense counsel chose not to devote time in closing argument to Section 2(a) liability because he believed that the jury would be properly instructed on the elements of aiding and abetting liability—which plainly foreclose liability based on the evidence at trial.  If defense counsel had known that the Court was planning to merely read the text of 18 U.S.C. § 2, he would have argued to the jury that the government had failed to satisfy the elements of Section 2(a) liability.

Finally, the fact that the defense "did not seek to make an additional closing argument to the Jury after learning that the Court would not instruct the Jury on Section 2(a) liability," Mem. Op. 22, does not erase the Rule 30(b) violation.  The Fourth Circuit has never held that a defendant is required to request additional time for closing to establish a Rule 30(b) violation.  For good reason: Rule 30(b) places the burden squarely on the Court to "inform the parties before closing arguments how it intends to rule on the requested instructions."  Fed. R. Crim. P. 30(b); *see United States v. Squillacote*, 221 F.3d 542, 572 (4th Cir. 2000) (recognizing that "Rule 30 requires that the district court" take these actions).  The Rule 30(b) violation here thus raises a substantial question for appeal.

      **B.**      **The Court's Improper Exclusion Of Messages Including The Ledger Raises A Substantial Question On Appeal.**

The government convinced the Court to exclude text messages between Mr. Goldstein and Kids—an assistant to Paul Phua—under the hearsay rule.  That erroneous decision raises a substantial question on appeal.

The excluded text messages were key to Mr. Goldstein's state-of-mind defense for every tax charge and would have bolstered Mr. Goldstein's credibility across the board.  For each charge, the government had to establish a willful violation, *i.e.*, "the 'voluntary, intentional violation of a known legal duty.'"  *Cheek v. United States*, 498 U.S. 192, 201 (1991) (citation omitted).  But the

government did not offer count-by-count evidence of willfulness. Instead, it pressed an overarching theory based entirely on Mr. Goldstein's alleged beliefs regarding his 2016 gambling income. In its closing argument, the government emphasized that Mr. Goldstein knew he had almost $50 million in gambling income in 2016 and that his desire to avoid paying taxes on that income "motivated everything that Mr. Goldstein did from March 2016 through December 2022." 2/18/26 Tr. 46:20-24; *see* 2/18/26 Tr. 62:7-11 ("[E]verything that happens is motivated by Mr. Goldstein's decision to cheat on his taxes in 2016."). Thus, after informing the jury that it would spend "the bulk of [its] time" in closing "talking about Count One," 2/18/26 Tr. 49:24-25, the government stated that it would address the other tax charges only briefly "[f]or expediency" because "all of this is motivated by his tax evasion in 2016," 2/18/26 Tr. 73:21-23.

The government and Mr. Goldstein both sought to introduce contemporaneous documentary evidence that was probative of Mr. Goldstein's beliefs regarding his 2016 gambling income. Indeed, both parties largely relied on the same kind of evidence: late-2016 text messages in which Mr. Goldstein and his investors discussed what he won and lost in the games he had just played (and what he owed the investors). For instance, the government relied heavily on messages between Mr. Goldstein and Keith Gipson—a poker player who invested in Mr. Goldstein's games against Chairman, Tango, and Mr. Gores—to establish Mr. Goldstein's belief about the amount of money he won in those games. *See* 1/15/26 Tr. 110:6-15, 124:10-126:8, 131:1-11; 2/18/26 Tr. 52:12-25. In turn, Mr. Goldstein sought to introduce messages he exchanged with an assistant to Paul Phua—Mr. Goldstein's primary investor—to establish his beliefs about the money he won in those games, the money he lost in other games, the money he owed Mr. Phua and other investors, and the timing of payments for winnings. *See* DX-737.5; DX-737.6.

Although the Court admitted the government's evidence of willfulness, it misapplied the rule against hearsay and erroneously excluded Mr. Goldstein's similar evidence. Specifically, the Court failed to recognize that out-of-court statements that are probative of the speaker's state of mind cannot be excluded as hearsay. Because of that error, the government was able to support its argument regarding Mr. Goldstein's state of mind with contemporaneous evidence, whereas Mr. Goldstein was forced to support his arguments on the same issue with his testimony alone. The government seized on that discrepancy, emphasizing throughout its closing arguments that Mr. Goldstein lacked credibility and that he was lying to the jury. *See, e.g.*, 2/18/26 Tr. 49:11-12 ("If this case comes down to credibility, there is no reason to believe Tom Goldstein.").

The Court's exclusion of Mr. Goldstein's text messages presents a substantial question for appeal. That exclusion was inconsistent with settled principles of hearsay and evidence law. And the Fourth Circuit has repeatedly held that similar errors are not harmless. Thus, whether the Court's error here was harmless is at least a "close" question. If the Fourth Circuit agrees with Mr. Goldstein that the error was not harmless, a new trial will be required for every count.

> **1.    Whether the Court erroneously excluded the messages under the rule against hearsay is at least a "close" question.**

As with the accessory liability error, the government's aggressive legal positions caused this Court to erroneously exclude the text messages between Mr. Goldstein and Mr. Phua's assistant. At trial, the government repeatedly incanted that the text messages and the embedded ledger were "self-serving hearsay" because Mr. Goldstein wanted to use them to prove the amount of money he won gambling in 2016. *See, e.g.*, 2/11/26 Tr. 74:18-21; 77:11-14; 92:12-95:11; 229:17-230:3. The Court agreed and "globally" excluded the messages on that basis. 2/11/26 Tr. 95:14-18.

19

That ruling was inconsistent with an important principle of evidence: an out-of-court statement cannot be excluded as hearsay when the defendant offers it to prove his state of mind. As the Fourth Circuit has explained, "[h]earsay is an out-of-court statement offered '*to prove the truth of the matter asserted in the statement.*'" *United States v. Gallagher*, 90 F.4th 182, 195 (4th Cir. 2024) (quoting Fed. R. Evid. 801(c)(2)).  Thus, "[i]f a statement is offered for any other reason, it is not hearsay and may not be excluded on that basis."  *Id.*  And the paradigmatic example of a statement that may not be excluded as hearsay is a statement to the defendant or by the defendant "offered to 'establish the state of mind thereby induced'" or "the reasonableness [or] good faith . . . of subsequent conduct."  *Id.* (alterations in original) (quoting 2 McCormick on Evid. § 249 (8th ed.)); *see also* Fed. R. Evid. 803(3) ("A statement of the declarant's then-existing state of mind" is admissible).  Accordingly, statements that are offered to prove a defendant's state of mind cannot be excluded as hearsay.

At every stage, the defense offered the messages between Mr. Goldstein and Mr. Phua's assistant as proof of Mr. Goldstein's state of mind and beliefs regarding his 2016 gambling income. In a motion *in limine* filed the day before Mr. Goldstein's testimony, the defense argued that the messages "speak directly to Mr. Goldstein's state of mind—they demonstrate that Mr. Goldstein believed that Mr. Phua had significant shares in his poker matches."  Dkt. 411 at 8-9 (emphasis omitted).  At trial the next day, the defense explained to the Court that the messages were admissible because they "show what Mr. Goldstein's state of mind was with respect to his wins and losses in Asia."  2/11/26 Tr. 90:1-4.  In essence, the messages to and from Mr. Phua's assistant were powerful evidence that Mr. Goldstein believed much of the money he won in 2016 was offset by losses, owed to investors, or was not received until 2017.  And given those beliefs, the

20

government's willfulness theory—that Mr. Goldstein knew he had almost $50 million in gambling income in 2016 and was motivated to avoid paying taxes on that income—necessarily failed.

Because the defense offered the messages to prove Mr. Goldstein's state of mind, it did not matter that the facts asserted in the messages *also* tended to disprove that Mr. Goldstein had a tax debt. The Fourth Circuit has stated that an out-of-court statement "may not be excluded" as hearsay if it "is offered for any . . . reason" besides proving the truth of the matter asserted. *Gallagher*, 90 F.4th at 195. For instance, the Fourth Circuit in *Gallagher* reversed the exclusion of "seemingly loving Facebook messages" the defendants had exchanged after a point when, according to the government, their "marriage was over" and they were "conspir[ing] to obtain immigration benefits." *Id.* Even if the messages might bear on the key factual dispute about whether the marriage was over at the relevant time, the court reasoned that the evidence was not inadmissible hearsay because "[w]hether [the defendant wife] truly loved [the defendant husband] when she wrote him saying she did, the messages were relevant to show what [the husband] could have believed about the state of the marriage based on what he was hearing from [the wife]." *Id.* (emphasis added). Likewise, here, the messages provided evidence of Mr. Goldstein's belief regarding his 2016 gambling income and thus could not be excluded under the hearsay rule even though the facts asserted therein related to disputed issues.

As the Court itself recognized at the hearing on Mr. Goldstein's motion for a new trial, "the defense has some strong arguments with regards to whether or not the Phua ledger and the text messages should ha[ve] been admitted by the Court." 6/16/26 Tr. 99:16-18. That is enough for the Court to conclude that the merits of its exclusion of the messages present a substantial question for appeal.

21

**2.    Whether the exclusion of the messages was harmless is at least a "close" question.**

Despite the importance of the messages to Mr. Goldstein's state-of-mind defense, the Court concluded that the exclusion of the messages was harmless. When a court erroneously excludes the defendant's evidence, the error is not harmless unless the government affirmatively demonstrates that it is "highly probable that the error did not affect the judgment." *United States v. Ibisevic*, 675 F.3d 342, 350 (4th Cir. 2012). The Fourth Circuit "ha[s] identified three decisive factors in making this determination: '(1) the centrality of the issue affected by the error; (2) the steps taken to mitigate the effects of the error; and (3) the closeness of the case.'" *Id.* (citation omitted). In denying Mr. Goldstein's motion for a new trial, the Court concluded that "all three factors weigh in favor of a finding of harmless error." Mem. Op. 26.

That conclusion is in serious tension with Fourth Circuit precedent. Specifically, in two recent cases, the Fourth Circuit has held that the erroneous exclusion of out-of-court statements that bear on the defendant's state of mind was not harmless where intent was a central issue in dispute. In *Ibisevic*, the court vacated the defendant's conviction based on the district court's exclusion of an out-of-court statement that tended to show the defendant lacked the intent to lie to customs officers. 675 F.3d at 355. The court explained that (1) the excluded statement "clearly did go to the central issue in the case, *i.e.*, [the defendant's] intent," *id.* at 350; (2) the defendant's in-court testimony on the same issue did not mitigate the "effects of the error" because the absence of corroborating evidence may have caused the jury to think that the defendant was lying, *id.* at 351-52; and (3) the case was close because even though the Government "put on a good deal of evidence," it "presented no direct evidence of [the defendant's] intent to commit the alleged acts" and the "jury deliberated for four hours," *id.* at 352-54. The court added that the excluded corroborating evidence could have made the difference in the case because it might have had the

22

"effect of 'lend[ing] plausibility to an otherwise incredible yarn.'" *Id.* at 353 (alteration in original) (citation omitted).

Similarly, in *Gallagher*, the Fourth Circuit vacated the defendant's conviction based on the district court's exclusion of out-of-court statements that tended to show the defendants lacked the intent to defraud the United States. 90 F.4th at 198. The court's reasoning on harmlessness mirrored *Ibisevic*: (1) the "defendants' intent was a 'central issue'"; (2) the defendants' "in-court testimony" could not "mitigate the effects of the error"; and (3) the case was close because the excluded evidence could have "countered the government's somewhat weak evidence about [one defendant's] state of mind." *Gallagher*, 90 F.4th at 197-98. The court emphasized that "excluding 'the sole evidence that directly corroborated [a defendant's] own testimony' about what that defendant 'believed' is particularly problematic given the risk that jurors may disregard self-serving testimony by criminal defendants." *Id.* at 197 (alteration in original) (quoting *Ibisevic*, 675 F.3d at 350).

Those cases demonstrate that the harmlessness analysis here is at least a close question. The Court found that the first factor weighed against Mr. Goldstein because "the issue of whether Mr. Goldstein had poker gambling winnings or losses in 2016" was "relevant only to the tax evasion charge in Count 1 of the Indictment." Mem. Op. 27. And "even with regards to the charges in Count 1," the Court noted, "the question of whether Mr. Goldstein had gambling winnings and losses in 2016 is not central to that count, because the Government introduced other evidence" that Mr. Goldstein had a "tax deficiency" and committed "affirmative acts of tax evasion." *Id.* But the primary purpose of introducing the messages was to rebut the government's theory of intent and willfulness, *not* to prove there was no tax deficiency or were no affirmative acts of tax evasion. Thus, like in *Ibisevic* and *Gallagher*, the messages "clearly did go to the central

23

issue in the case, *i.e.*, [Mr. Goldstein's] intent." *Ibisevic*, 675 F.3d at 350; *Gallagher*, 90 F.4th at 197. As the government put it, the "main question . . . on the tax charges is whether [Mr. Goldstein] acted willfully." 2/18/26 Tr. 48:12-16. And as explained, the government relied on Mr. Goldstein's 2016 gambling income to prove willfulness for every tax charge. *See supra* at 18. There is therefore a strong argument that the exclusion of the messages "affected" a "central[] . . . issue" in the case. *Gallagher*, 90 F.4th at 197 (citation omitted).

The Court found that the second factor—mitigation of the error—weighed against Mr. Goldstein because "Mr. Goldstein testified extensively about the excluded evidence during the trial" and "the Court gave a curative instruction to the Jury that directed the Jury not to speculate about why the Phua Ledger was not admitted into evidence." Mem. Op. 27. Under Fourth Circuit precedent, however, Mr. Goldstein's "in-court testimony about" his 2016 gambling income could not "mitigate the effects of" excluding the messages and ledger. *Gallagher*, 90 F.4th at 197. Because the messages and ledger were the "'sole evidence that directly corroborated [Mr. Goldstein's] own testimony' about what [he] 'believed'" regarding his 2016 gambling income, excluding them was "particularly problematic given the risk that jurors may disregard self-serving testimony by criminal defendants." *Id.* (quoting *Ibisevic*, 675 F.3d at 350). Indeed, the government repeatedly told the jury that Mr. Goldstein was lying and that his self-serving testimony was not credible. *See supra* at 19.

Nor was there a reliable way to mitigate the error with a curative instruction. The Court's curative instruction only addressed the additional prejudice that resulted from the government's repeated intimations that Mr. Goldstein was lying about the existence of the ledger. *See* 2/18/26 Tr. 91:15-92:17. But it did not mitigate the prejudice from the complete exclusion of the messages and the ledger. On the contrary, the Fourth Circuit's cases involving curative instructions have all

24

dealt with the improper *inclusion* of evidence. *See United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994). That makes sense—a Court can instruct the jury to ignore evidence it should not have seen, but it cannot instruct the jury about the importance of evidence that it has not seen. Accordingly, there is a strong argument that nothing "mitigate[d] the effects of" excluding Mr. Goldstein's key evidence of intent. *Gallagher*, 90 F.4th at 197.

The Court found that the third factor weighed against Mr. Goldstein because "the Government presented the testimony of 39 witnesses, extensive documentary evidence and six factual stipulations that were agreed to by the parties" and the "Jury never indicated during its two-day deliberations that it was struggling to reach a verdict." Mem. Op. 27-28. That analysis is also in tension with Fourth Circuit precedent. As in *Ibisevic*, the central issue at trial was Mr. Goldstein's intent but "the Government presented no direct evidence of his intent." 675 F.3d at 353. Accordingly, even though "the Government put on a good deal of . . . . circumstantial evidence," it "would have had a harder case to make" if the messages and ledger had been admitted. *Id.* at 353-54. Moreover, the Fourth Circuit has expressly cautioned that "the strength of the Government's case does not, in itself, resolve the 'closeness' question." *Id.* at 354. And the court of appeals has stated that a "split verdict indicates the case was close, perhaps so much so that the erroneously admitted evidence was the deciding factor." *United States v. Brizuela*, 962 F.3d 784, 799 (4th Cir. 2020). Given the split verdict in this case, the "closeness of the case" weighs in Mr. Goldstein's favor. *Gallagher*, 90 F.4th at 197.

Because there is a strong argument that each of the harmlessness factors favors Mr. Goldstein, whether the government has carried its burden to demonstrate harmlessness is at least "a 'close' question." *Steinhorn*, 927 F.2d at 196. And if the Fourth Circuit were to conclude that

25

the error was not harmless, it "would likely order a new trial" on every count. *Id*. Thus, the Court's exclusion of the messages presents a substantial question for appeal.

## CONCLUSION

For the foregoing reasons, if the Court chooses to impose a period of incarceration, the Court should order that Mr. Goldstein shall remain released during the pendency of the appeal, subject to his current conditions of release. Alternatively, Mr. Goldstein moves for a stay of his surrender date pending resolution of the instant motion. Should the district court deny this motion, Mr. Goldstein requests that the Court set his surrender date 30 days after the Fourth Circuit rules on the motion for release pending appeal that Mr. Goldstein would file following this Court's denial.

Dated: July 22, 2026

Respectfully submitted,

/s/ Elizabeth B. Prelogar

Stephany Reaves (Bar No. 19658)
Sarah E. Weiner (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Stephany.Reaves@mto.com
Sarah.Weiner@mto.com

Adeel Mohammadi (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

Elizabeth B. Prelogar (*pro hac vice*)
**COOLEY LLP**
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

Jonathan I. Kravis (Bar No. 31556)
**LIU SHUR KRAVIS LLP**
607 14th Street NW, Suite 625
Washington, DC 20005
(202) 240-7100
jonathan.kravis@lskllp.com