**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**THOMAS C. GOLDSTEIN,**<br><br>**Defendant.** | **CRIMINAL NO. LKG-25-0006** |

**UNITED STATES' SUPPLEMENTAL REPLY BRIEF REGARDING FORFEITURE**

Defendant Thomas Goldstein, true to form, has gone all in: this time on his argument that the proposed forfeiture of $1,987,500 must be measured against U.S. Sentencing Guideline § 5E1.2(c)(3) Fine Table and $9,500. *See* Opp. 16, 19, Dkt. 591. And, true to form, he is wrong. His arguments yet again hinge on ignoring the Guidelines and distorting the law in a last-ditch effort to evade the consequences of his crimes. This Court should reject them and order forfeiture in the amount of his criminal proceeds: $1,987,500. The statutory and Guidelines advisory maximum authorized fines are the same—$1 million—and all four *Bajakajian* factors show that forfeiture of less than twice that amount is wholly proportionate to the gravity of his offense.

**ARGUMENT**

At the outset, "[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only *extreme sentences* that are grossly disproportionate to the crime." *Ewing v. California*, 538 U.S. 11, 23 (2003) (emphasis added) (cleaned up); *United States v. Bajakajian*, 524 U.S. 321, 336 (1998) (concluding "strict proportionality" is not required); *United States v. $79,650*, 650 F.3d 381, 388 (4th Cir. 2011), *as corrected* (June 2, 2011) ("[Forfeiture] will violate the Excessive Fines Clause only if it is 'grossly disproportional' to the gravity of the offense."). And it is Goldstein's burden to prove that amount would be *grossly*

disproportionate to his offense. *E.g.*, *United States v. Ahmad*, 213 F.3d 805, 816 (4th Cir. 2000).

Moreover, it is far from clear that forfeiture of a single defendant's criminal proceeds can *ever* violate the Excessive Fines Clause. *See, e.g.*, *United States v. Sanjar*, 853 F.3d 190, 214 (5th Cir.) ("Forfeiture orders tied to the proceeds of a crime generally are not considered a fine subject to the Eighth Amendment."), *cert. denied*, 583 U.S. 893, 583 U.S. 900 (2017), *superseded on other grounds*, 876 F.3d 725 (5th Cir. 2017); *United States v. Funds on Deposit at Bank One Chicago Account 1110010428312*, 393 F. App'x 391, 392 (7th Cir. 2010) (unpublished) ("[F]orfeiting the proceeds of crime never violates the Eighth Amendment.").

This is precisely why the Fourth Circuit recognized in *United States v. Jalaram, Inc.* that, although the *Bajakajian* test may technically apply to forfeiture of criminal proceeds:

> [I]n most cases, courts ultimately will find a forfeiture of proceeds not grossly disproportional to the offense. In a case involving a single offender, it would be very difficult, and perhaps impossible, for the defendant to show that the forfeiture of proceeds was grossly disproportional to the gravity of his offense.

599 F.3d 347, 354-55 (4th Cir. 2010) (emphasis added) (distinguishing forfeitures involving "a single offender" from those involving "the proceeds of a criminal conspiracy" where "joint and several liability" could force defendants who played "a truly minor role" to "forfeit property that they obtained lawfully" and thus risk gross disproportionality).

Goldstein, "a single offender," defrauded NFM to steal $1,987,500. Forfeiture of those criminal proceeds is perfectly proportionate to his offense, not disproportionate—let alone so *grossly* disproportionate as to violate the Eighth Amendment. *See id.*; *see, e.g.*, *United States v. Johnson*, 956 F.3d 510, 519 (8th Cir. 2020) (affirming $2.1 million forfeiture where it was "directly proportional to the $2.1 million" the defendant took from his victims); *United States v. Bonventre*, 646 F. App'x 73, 92 (2d Cir. 2016) ("Where the forfeiture ordered is in an amount equivalent to the undisputed, actual proceeds of the fraud . . . , we cannot conclude that the order was grossly

disproportional."). The four *Bajakajian* factors only reinforce this common-sense conclusion.

## I. The Sentencing Guidelines and Maximum Authorized Penalty Confirm the Forfeiture Sought is Wholly Appropriate

The first factor looks at the relationship between the amount of the forfeiture and the maximum authorized penalty. *Jalaram*, 599 F.3d at 355-56. The parties agree on at least one thing: under this factor, "the relevant metric is the top of the Guidelines for the fine and for imprisonment." *United States v. Castello*, 611 F.3d 116, 123 (2d Cir. 2010); Opp. 15 (quoting *Castello*). The only question is what forms "the top of the Guidelines" in this case.

### A. The § 1014 Statutory Maximum Fine of $1,000,000 is also the Guidelines Maximum Here

When the maximum fine authorized by the statute of conviction exceeds $500,000, Guideline § 5E1.2(c)(4) applies, the "maximum of the fine guideline range" set by subsection (c)(2) and the subsection (c)(3) Fine Table do *not* apply, and the Guidelines advisory maximum penalty *becomes* the same amount as the statutory maximum. *See* U.S.S.G. § 5E1.2(c)(4) ("Subsection (c)(2), limiting the maximum fine, does not apply if the defendant is convicted under a statute authorizing . . . a maximum fine greater than $500,000."). In such a case, "the court may impose a fine up to the maximum authorized by statute." *Id.*

In other words, in subsection (c)(4) cases, the maximum fine guideline column of the Fine Table ceases to apply, and "the maximum of the fine guideline range" is the maximum fine authorized by statute. *E.g.*, *$79,650*, 650 F.3d at 388.[1] Thus, the statutory maximum fine becomes the yardstick for measuring forfeiture.

[1] Goldstein attempts to distinguish *$79,650* as inapplicable on the grounds that it "did not hold that the advisory Guidelines fine was irrelevant." Opp. 19. However, the Fourth Circuit could not have been clearer: "The fine table in section 5E1.2 of the Guidelines is inapplicable. [A] legal error was made when the court predicated its proportionality analysis on an incorrect understanding that the authorized penalty was the Guidelines advisory fine. [T]he correct authorized penalty is the statutory maximum fine [so] the magistrate judge's proportionality analysis was erroneously conducted." *$79,650*, 650 F.3d at 388.

This is the norm across circuits. *E.g.*, *United States v. Waked Hatum*, 969 F.3d 1156, 1168 & n.7 (11th Cir. 2020) (concluding subsection (c)(4) applied so maximum authorized penalty would exceed $20 million); *United States v. Ortiz-Cintron*, 461 F.3d 78, 81 (1st Cir. 2006) ("The statute and the sentencing guidelines authorize a maximum fine of $1 million." (citing subsection (c)(4)); *United States v. Bikundi*, 926 F.3d 761, 796 (D.C. Cir. 2019) (noting 18 U.S.C. § 1956 authorized "a fine of twice the value of the property involved"); *United States v. Guerrier*, No. 20-3469, 2022 WL 610338, at *4 (2d Cir. Mar. 2, 2022) (unpublished) (citing subsection (c)(4) and concluding $10 million maximum fine "could have been imposed"); *United States v. Sepulveda-Hernandez*, 752 F.3d 22, 37 (1st Cir. 2014) (concluding maximum fine was $5 million under Title 21 and subsection (c)(4), so "a forfeiture judgment of $1,000,000 raises no eyebrows").

Under § 1014 here, the maximum fine is $1,000,000, so Guideline § 5E1.2(c)(4) applies and the Guidelines advisory maximum fine also becomes $1,000,000. *See* 18 U.S.C. § 1014. Forfeiture in the amount of $1,987,500 is less than twice the authorized penalty, and far, far below the ratio of "ten to twenty times" that Goldstein himself says is constitutional, *see* Opp. 20. The first factor demonstrates the instant forfeiture is entirely valid.

**B. Goldstein's Contrary Theory Cannot Be Reconciled with Consistent Precedent Across Circuits**

Goldstein insists that the § 5E1.2(c)(3) Fine Table, not the statutory maximum, is the best and necessary metric for proportionality. *See* Opp. 16. He further asserts that, "the upper limit imposed by the Fines Clause on any forfeiture here would be an amount roughly ten to twenty times the advisory Guidelines fine" from the Fine Table. *Id.* 20. Routine forfeitures in the ones, tens, and *hundreds* of millions reveal these positions for what they are: a woefully wrongheaded attempt to ignore the fact that subsection (c)(4) applies and the Fine Table does not.

Here are a few: *United States v. Guo*, No. 23-cr-118-1, 2026 WL 1862602, at *8 (S.D.N.Y. June 29, 2026) (imposing **$889 million forfeiture** money judgment); *United States v. Sterlingov*, 755 F. Supp. 3d 17, 31 (D.D.C. 2024) (imposing **$395 million forfeiture** after concluding it was not grossly disproportionate), *aff'd on other grounds*, No. 24-3161, 2026 WL 2881230, at *1 (D.C. Cir. Sept. 25, 2026); *Bikundi*, 926 F.3d at 795 (affirming **$80 million forfeiture** as proportionate); *United States v. Esformes*, 60 F.4th 621, 640 (11th Cir. 2023) (affirming **$38.7 million forfeiture** and describing Excessive Fines Clause challenge to it as "even weaker" than other arguments); *United States v. Segal*, 495 F.3d 826, 840 (7th Cir. 2007) (affirming **$30 million forfeiture**); *Bonventre*, 646 F. App'x at 91-92 (affirming **$19 million forfeiture**); *United States v. Ponzo*, 171 F.4th 507, 521 (1st Cir. 2026) (affirming **$13.2 million forfeiture**).

By Goldstein's logic, none of these cases can exist because the maximum Guideline advisory fine under the § 5E1.2(c)(3) Fine Table is $500,000 and the upper end of the constitutional forfeiture ratio is 20, so no court could order forfeiture exceeding $10 million. Yet these cases imposed or affirmed forfeitures well above his supposed $500,000 maximum and as high as *1,778 times greater* than it. These cases—all good law—exist in droves; Goldstein is just flatly wrong.

Take one more example: *United States v. Samuel Bankman-Fried*, the now-disgraced cryptocurrency mogul. The district court ordered forfeiture of **$11.02 billion** as the "amount of [criminal] proceeds . . . that the Defendant received." Prelim. Forfeiture Order, No. S6 22-cr-673, 2024 WL 1506561, at *2 (S.D.N.Y. Mar. 29, 2024). The Second Circuit affirmed, concluding the multibillion-dollar forfeiture "satisfie[d] the *Bajakajian* factors." 179 F.4th 104, 124 (2d Cir. 2026). Moreover, it expressed no concern about the fact that the forfeiture was **22,040 times greater** than the Fine Table $500,000 maximum that Goldstein invokes. *See id.*

Indeed, Bankman-Fried did not even "meaningfully contest the district court's application

of the four *Bajakajian* factors." *Id.* Even now, in his certiorari petition, Bankman-Fried *still* does not dispute those factors; instead, he argues only that the Eighth Amendment prohibits a fine that destroys his livelihood. *See* Cert. Pet., *Bankman-Fried v. United States* (Sept. 10, 2026), https://www.supremecourt.gov/DocketPDF/26/26-349/423863/20260910190205555_Petition%20for%20a%20Writ%20of%20Certiorari.pdf. His appeals and his decision not to challenge the four factors reinforces that the statutory maximum fine controls in subsection (c)(4) cases and that the forfeiture ratio can run far, far above 20 for criminal proceeds.[2]

As the Fourth Circuit recognized in *Jalaram*, it is exceedingly difficult—"and perhaps impossible"—for forfeiture of criminal proceeds to be grossly disproportionate, 599 F.3d at 355.

### C. Goldstein Misunderstands *Bajakajian* and Many Other Cases He Invokes

#### 1. Bajakajian

Goldstein emphasizes that *Bajakajian* focused primarily on the maximum six-month sentence and $5,000 fine set by the Guidelines, rather than the statutory maximum five years' imprisonment and $250,000 fine and notes its footnote that the low Guidelines maximums there suggested low culpability by the defendant. Opp. 14. But this overlooks critical facts of that case.

First, Bajakajian pleaded guilty to one count of failing to report transporting more than $10,000 in currency, which subjected him to a maximum fine of $250,000 and therefore meant the Fine Table controlled, not subsection (c)(4). At the time, the Guidelines were mandatory, *see* Opp.

---

[2] In fact, even when the Fine Table applies (it does not here), courts still rightfully impose forfeitures far more than twenty times the Guideline recommended maximum fine. For example, in *United States v. Castello*, the defendant was convicted on only one count of willfully failing to file Currency Transaction Reports ("CTRs"), for which 31 U.S.C. § 5322(a) provided a $250,000 statutory maximum fine, leading the Fine Table to apply. *See* 611 F.3d 116, 123 (2d Cir. 2010). Nonetheless, the Second Circuit emphasized that the "relevant metric is the top of the Guidelines" and noted that the "Guidelines range of imprisonment" for Castello's failure file CTRs on nearly $200 million in cashed checks "was far greater" than the statutory maximum five years' imprisonment for his single conviction. *Id.* at 123. Thus, the court held that the relationship between the maximum penalty and the forfeiture sought weighed in favor of forfeiture of Castello's full proceeds from his crimes, $12,012,924, and ordered the district court to impose forfeiture in that amount—even though it was 40 times greater than the maximums. *Id.* at 123-24.

14, so the maximum fine was truly capped at $5,000. The Supreme Court used the imprecise phrase "the maximum fine" simply because the Fine Table was *mandatory*, not because that table represented the appropriate yardstick measuring for forfeiture in all cases. *See Castello*, 611 F.3d at 123 & n.7 (2d Cir. 2010) (noting the "ambiguity in *Bajakajian*" "refer[ring] to the 'maximum fine' without clearly differentiating the statutory maximum from the Guidelines maximum").

Second and relatedly, where subsection (c)(4) applies and the statutory maximum exceeds $500,000, "the statutory scheme is a better guide to whether the forfeiture order is excessive." *United States v. Carpenter*, 941 F.3d 1, 11 & n.8 (1st Cir. 2019). This is because the appropriate fine (or forfeiture) can easily outstrip the Fine Table, which is confined by total offense levels. *See id.* (noting that Sentencing Commission envisioned such scenarios may warrant upward departures); 2018 U.S.S.G. § 5E1.2 app. n.4 (recognizing, in since-revised commentary, that "an upward departure from the fine guideline may be warranted" if "a sentence within the applicable fine guideline range would not be sufficient to ensure" disgorgement and adequate punishment).

The cases listed above display an extraordinary range of criminal proceeds from millions to billions of dollars; such variability exceeding the Fine Table is precisely why the statutory maximum is the better guide in subsection (c)(4) cases like this one. *See United States v. Ponzo*, 171 F.4th 507, 521 & n.22 (1st Cir. 2026) (citing *Carpenter* to reject defendant's argument that Guidelines range should receive greater weight because it "take[s] into consideration the culpability of the individual defendant" and instead relying on maximum statutory fine to affirm $13.2 million forfeiture (internal quotations omitted)). For example, even though the Guidelines "authorize[d] a maximum fine of $100,00 for [his] offense," *Carpenter* affirmed a forfeiture of $14,053,715 because the statutory maximum was roughly $18 million. *See* 941 F.3d at 11 & n.8.

**2. Goldstein's Other Cases are Unavailing**

Goldstein continues to bark up the wrong tree by invoking two more subsection (c)(3) Fine Table cases. *See* Opp. 15-16, 19. He claims *United States v. Fifty Nine Thousand Dollars*, 282 F. App'x 785 (11th Cir. 2008) (unpublished) shows "federal courts have reiterated . . . that the advisory Guidelines fine is a better indicator of a particular defendant's offense," Opp. 14, and the Eleventh Circuit held the court there "committed legal error by relying exclusively on the statutory maximum," Opp. 15. This is misleading, to put it mildly. In *Fifty Nine Thousand*, the maximum statutory fine was $250,000 so the subsection (c)(3) Fine Table applied but the district court "mistakenly concluded that" Fine Table did *not* apply because it misread § 5E1.2(c)(4) to exempt statutes with maximums over "25,000." 282 F. App'x at 788-90. The district court committed error because it misread the Guidelines in a Fine Table case, not because it used the statutory maximum in a subsection (c)(4) case (as applies here). Thus, the case has little bearing on this latter scenario.

He similarly invokes *United States v. Rafael*, 282 F. Supp. 3d 407 (D. Mass. 2017), but it too is a subsection (c)(3) Fine Table case. *See id.* at 408, 412-13 (citing Fine Table and noting defendant pleaded guilty to, *inter alia*, §§ 3372(d) and 3373(d)); 18 U.S.C. § 3373(d)(3)(A) (authorizing fine "under Title 18" and 5 years' imprisonment); 18 U.S.C. § 3571(b)(3) (providing $250,000 fine). The defendant's total adjusted offense level reflected the aggregate value of his criminal proceeds (mislabeled fish) across the 23 relevant counts and set the maximum applicable Guidelines fine at $200,000. *Id.* at 412-13. Nonetheless, the government sought to forfeit roughly $30 million of fishing vessels under 16 U.S.C. § 3374(a). *Id.* at 409. This far exceeded the criminal proceeds so the government instead "erroneously sought to multiply the maximum fine by each of the [23] counts" to improve the fine-to-forfeiture ratio for *Bajakajian*. *See id.* at 413. The court correctly refused to do so because the $200,000 fine already reflected all 23 counts. *See id.*

*Rafael* does not apply to the instant case because subsection (c)(4) controls here. In any

event, that case still confirms the instant forfeiture is appropriate. *Rafael* used the proceeds to calculate the proportionate fine ($200,000) from which to measure forfeiture. Here, the proceeds are $1,987,500; forfeiture of that amount is wholly proportionate and far less than the roughly ten-times ratio *Rafael* used. *See id.*

*United States v. 3814 NW Thurman Street*, 164 F.3d 1191 (9th Cir. 1999) ("*Thurman*"), which Goldstein invokes to buttress his focus on Fine Table's $9,500, Opp. 16-17, fares even worse. A divided panel issued *Thurman* shortly after *Bajakajian*, over a vocal dissenter on only the Excessive Fines Clause, who noted, "The parties have not had the opportunity to brief the effect, if any, of *Bajakajian* since it came down." *Id.* at 1199 (Rymer, J., dissenting). Unable to garner insight from the parties, the district court, or any other courts applying *Bajakajian*, the panel botched the forfeiture-to-fine-ratio factor, focusing on the fact that "a fine could be *as low as* $500 to $5,000" under the Fine Table—even though the relevant metric is the top of the Guidelines range and the maximum statutory fine exceeded the subsection (c)(4) threshold so the Fine Table did not apply. *See id.* at 1197-98 & n.3 & 4 (maj. op.) (emphasis added) (recognizing Fine Table did not apply and that "The district court did not have the benefit of *Bajakajian* . . . ."); Opp. 15 (noting the "relevant metric is the top" of the Guidelines").

*Thurman*'s focus on the low end of the Guidelines, rather than the statutory maximum fine, was flatly wrong. Not only is it contradicted by the myriad subsequent precedent focused on the statutory maximum fine (discussed above), but it is an outlier even within the Ninth Circuit, where later cases have recognized that the proper metric for the top of the Guidelines range in § 5E1.2(c)(4) cases is the statutory maximum. *See, e.g.*, *United States v. Beecroft*, 825 F.3d 991, 1001 (9th Cir. 2016) ("Each [forfeiture] amount is substantially less than the $1 million maximum fine authorized both by statute and by Beecroft's Guidelines range."); *United States v. Grossi*, 359

F. App'x 830, 832 (9th Cir. 2009) ("[T]he relevant criminal statute and Sentencing Guidelines permit fines in excess of $345,347.28 for Grossi's crime. *See* . . . U.S.S.G. § 5E1.2(c)(4)."). *Thurman* does not change the fact that the proper metric for forfeiture is the maximum statutory fine of $1 million, and a forfeiture of less than $2 million is well within the permissible bounds.[3]

Section 1014 provides a $1,000,000 fine for crimes like Goldstein's. *See* 18 U.S.C. § 1014. That severe penalty demonstrates that Congress "has found the offense to be serious," *United States v. Bollin*, 264 F.3d 391, 418 (4th Cir. 2001), and thus shows "a substantial level of culpability," *United States v. Blackman*, 746 F.3d 137, 144 (4th Cir. 2014). "Because questions of proportionality are reserved primarily to the legislature, the *Bajakajian* test is highly deferential." *Id.* at 144. Congress decreed a $1 million fine appropriate for violations of § 1014. Forfeiture of less than $2 million here is warranted considering § 1014 and the amount of Goldstein's fraud proceeds. *See Bollin*, 264 F.3d at 418-19 (affirming forfeiture more than double the statutory maximum); *United States v. Bennett*, 986 F.3d 389, 399 (4th Cir. 2021) (summarizing *Bollin*).

## II. Goldstein's Fraud on NFM was Calculated and Egregious

The "nature and extent of the criminal activity" weigh heavily toward full forfeiture here. *See Ahmad*, 213 F.3d at 816. First, Goldstein falls squarely within "the class of persons for whom the statute was principally designed." *Bajakajian*, 524 U.S. at 338. After the 2008 Financial Crisis, Congress expanded § 1014 specifically to include false statements to mortgage lenders to deter

---

[3] Goldstein's reliance on *United States v. Tobias*, 101 F.4th 473 (6th Cir. 2024), and *United States v. Torres*, 209 F.3d 308 (3d Cir. 2000), is even more misplaced. Neither involved forfeiture or even mentioned the Excessive Fines Clause. *See id.* Rather, both entailed plain error review of fines imposed. *See Tobias*, F.4th at 483; *Torres*, 209 F.3d at 313. Moreover, Goldstein misunderstands the implication of what these cases do say: they are about calculating a *proportionate* fine, not about whether a fine (let alone forfeiture) would be *grossly disproportionate*, and thus they provide no insight into the proportionality of forfeiting his criminal proceeds. *See Bajakajian*, 524 U.S. at 350 (Kennedy, J., dissenting) ("The purpose of the Guidelines, however, is to select punishments with precise proportion, not to opine on what is a gross disproportion."). But even *Tobias* correctly recognized the relationship between the Fine Table and its exception that Goldstein refuses to accept: "[T]he statutory maximum (here, $8 million) becomes the Guidelines maximum when it exceeds the maximum amounts listed in § 5E1.2(c)(3)." *Tobias*, 101 F.4th at 483 (citing § 5E1.2(c)(4)).

mortgage fraud by borrowers unable to afford their loans. *See* Gov. Suppl. Br. 7-8, Dkt. 588; 18 U.S.C. § 20(10) (defining "financial institution" to include a "mortgage lending business"). That underscores the seriousness of Goldstein's crime, as do the statutory maximum $1 million fine and 30 years' imprisonment. *See Bollin*, 264 F.3d at 418; *see also United States v. Muho*, 978 F.3d 1212, 1225 n.8 (11th Cir. 2020) ("Taking [$1 million or more in gross receipts] from a financial institution impacts the financial system because, *e.g.*, it could trigger an FDIC audit or payout, it could endanger the deposits or investments of many innocent people, and it could prompt layoffs or stock selloffs."). "By stealing or fraudulently borrowing from a financial institution, the criminal is putting that institution's financial safety and soundness at risk." *United States v. Huggins*, 844 F.3d 118, 123 (2d Cir. 2016).

Second, no-loss mortgage fraud is profoundly difficult to detect. As a result, particularly steep penalties are necessary to afford adequate deterrence. *Cf. United States v. Ross*, 132 F.4th 952, 962 (6th Cir. 2025) (affirming application of offense characteristic based on defendant's gross receipts in no-loss mortgage fraud scheme and stating, "It makes perfect sense that Congress and the Commission would seek to punish adequately criminal conduct from which a defendant benefitted, even where no loss resulted, especially when, in the absence of loss, such crimes can be difficult to detect and deter."); *see United States v. Facteau*, 89 F.4th 1, 45 (1st Cir. 2023) (affirming fine "more than twice the maximum" where the district court determined his crime was "about the money" and financial punishment was the "best way" to "accomplish general deterrence"); *United States v. Schwarzbaum*, 127 F.4th 259, 281 (11th Cir. 2025) (concluding Congress sought to deter FBAR violations through hefty penalties, and its decision to authorize "severe penalties" for such violations showed fines were not grossly disproportionate).

Third, unlike in *Bajakajian*, this was not a lone reporting offense committed out of "fear stemming from 'cultural differences.'" *Ahmad*, 213 F.3d at 816 (quoting *Bajakajian*, 524 U.S. at 326, 337 n.12). It was a shrewdly calculated effort to deceive a lender to get nearly $2 million so Goldstein could repay another lender (whom he deceived) and keep his new, multimillion-dollar home. Goldstein's intentional omission of $15-million-plus in debt is completely different from the civil forfeiture in *Thurman*, where the defendant omitted a mere $108,356 in liabilities—less than 1% of the debt Goldstein hid—and did so long before Congress sought to curtail mortgage fraud in response to the 2008 Financial Crisis. *See* 164 F.3d at 194. The calculated nature and massive size of Goldstein's NFM fraud weighs heavily in favor of forfeiting his entire proceeds.

## III. Goldstein's Attempt to Minimize His Culpability Reinforces the Need for Full Forfeiture Here

First, the fact that Goldstein's mortgager may, hopefully, be made whole is not dispositive. *See Jalaram*, 599 F.3d at 356-57 (holding forfeiture was warranted even though government "ha[d] not identified any victims who suffered harm").

Second, Goldstein fundamentally misunderstands the purpose of forfeiture. Whether a victim has been made whole is irrelevant. "Forfeiture is mandatory even when restitution is also imposed. These two aspects of a defendant's sentence serve distinct purposes: restitution functions to compensate the victim, whereas forfeiture acts to punish the wrongdoer." *Blackman*, 746 F.3d 143. It is entirely appropriate for a court to order both for the same criminal conduct. *Id.*

Third, following these precepts, courts routinely impose forfeiture of gross proceeds. *E.g.*, *United States v. Porcelli*, 440 F. App'x 870, 879 (11th Cir. 2011) (affirming forfeiture of gross proceeds as not grossly disproportionate even though almost $800,000 "was used to pay off the first mortgages and, thus, benefitted the victims"); *United States v. Miller*, No. 06-40151, 2009 WL 2949784, at *4-5, 8 (D. Kan. Sept. 10, 2009) (holding § 982(a)(2) provides forfeiture for

"gross receipts" and forfeiture did not violate Excessive Fines Clause even if it exceeded "the loss suffered"); *United States v. Lindell*, No. 3-00512 DKW, 2016 WL 4707976, at *12 (D. Haw. Sept. 8, 2016) (holding $8.6 million forfeiture based on gross proceeds was not grossly disproportionate, and noting, "Victim loss is not material to this determination"), *aff'd*, 766 F. App'x 525 (9th Cir. 2019); *United States v. Milton*, No. 21-CR-00478 (ER), 2024 WL 779210, at *6, 8 (S.D.N.Y. Feb. 26, 2024) (finding forfeiture of ranch—"the proceeds" of his fraudulent transaction—was not grossly disproportionate even though defendant argued he had paid victim more than the ranch was worth as part of that transaction); *cf. Bikundi*, 926 F.3d 792-93, 795-96 (concluding healthcare fraud forfeiture properly sought traceable gross proceeds and affirming $80 million forfeiture as not grossly disproportionate); *United States v. Bradley*, 969 F.3d 585, 589, 592 (6th Cir. 2020) (holding forfeiture of gross receipts under 21 U.S.C. § 853(a) was not grossly disproportionate).

Thus, courts have imposed forfeiture on proceeds in cases like Goldstein's, even where the lender had been partially repaid or forfeiture exceeded their losses. *See United States v. Peters*, 257 F.R.D. 377, 387-89 (W.D.N.Y. 2009) (imposing $23 million forfeiture even though defendant had repaid lender $10 million), *aff'd*, 732 F.3d 93 (2d Cir. 2013); *United States v. Wiese*, No. 10-cv-51297, 2012 WL 43369, at *3 (E.D. Mich. Jan. 9, 2012) (recognizing "the amount subject to forfeiture is not limited . . . to the amount of loss," and concluding forfeiture of gross proceeds was not grossly disproportionate even though it exceeded "the loss allegedly suffered by the lenders").

Finally, even if Goldstein could establish that he caused zero harm to any victims, the three other factors suffice to warrant full forfeiture of his criminal proceeds. *See Jalaram*, 599 F.3d at 356-57 (holding forfeiture appropriate where "all the other factors" favored it). Indeed, even though many of Bankman-Fried's "victims may be made whole," the Second Circuit nonetheless upheld an $11 billion forfeiture order against him. *Bankman*-Fried, 179 F.4th at 123. Even where

the economic harm threatened by Goldstein's fraud on NFM has not come to fruition, that threat nonetheless underscores the grave nature of his offense and its connection to his broader crimes.

## IV. The Relationship with Goldstein's Other Crimes Reinforces the Need for Full Forfeiture

This factor also weighs strongly toward full forfeiture. Goldstein's fraud on NFM was inextricably intertwined with his other crimes. His habitual violation of federal tax laws led to the massive tax liens on his house, which in turn fueled his decision to defraud FSM, then lie to Parabellum, and then defraud NFM to repay Parabellum. One common thread in this convoluted series of financial frauds was Goldstein's greed, as evidenced by his enduring desire to spend lavishly on himself, his poker, and his multimillion-dollar home rather than pay his taxes or tell his lenders the truth about his finances. His fraud on NFM was directly enabled and emboldened by his previous fraud on FSM and deception of Parabellum. Goldstein's failed effort to dupe FSM taught him lenders would detect his tax liens but not his private debts—so he promptly lied to Parabellum about the latter to pay off the tax liens and then lied to NFM about his gambling debts and Parabellum loan-guarantor status to defraud NFM. This complex, long-running web of financial crime warrants forfeiture of his criminal proceeds. *See Ahmad*, 213 F.3d at 816-17 (finding factor weighed for forfeiture where crime was part of "larger scheme" and contrasted starkly from the one-off effort to repay a lawful debt in *Bajakajian*).

Moreover, Goldstein's crimes and deceptions shared a unifying arrogance: his conviction that he always knew better than his unwitting victims and could always put their money to better use for himself, whether the IRS, FSM, NFM, the Resnicks, Paul Napoli, or Parabellum. Goldstein now reiterates that belief, effectively arguing that this Court should *endorse* his crime because he made a good bet on the housing market. *See* Opp. 11-13 (emphasizing house's value has increased and would have retained enough value to cover any losses even in another Great Recession).

This is as if Bankman-Fried argued that, because he and his coconspirators made a lucky bet on Anthropic that later helped cover their victims' losses, they should not face punishment. *See, e.g.*, Godwin Oluponmile, Yahoo Finance, "FTX could've had $75B if it kept its Anthropic Stake," (Oct. 1, 2026) (noting "every major group of creditors has now collected more than 100% of its claims," and Anthropic was "one of the most valuable things FTX had left" when it imploded, even though no one predicted Anthropic would become worth "anywhere near a trillion dollars"), https://finance.yahoo.com/markets/crypto/articles/ftx-couldve-had-75b-kept-110000051.html. This argument flies in the face of Congress's effort to deter mortgage fraud by subprime borrowers whose inability to predict their financial circumstances helped endanger the global economy. It is particularly astounding given the fact that Goldstein himself failed to predict his larger circumstances, has struggled to pay many of his creditors, and still owes millions to the IRS—in part because he has consistently chosen to spend his money on his mortgage rather than his taxes. *See* Opp. 11 (noting he has "never defaulted" and "is still paying on time").

Given that his house is now worth more than $3 million, his argument that forfeiture should be limited to $190,000 or less, Opp. 20, amounts to a request that the Court ensure his crime pays. "When a defendant commits a multimillion-dollar crime, he can be required to forfeit assets also running into the millions." *Segal*, 495 F.3d at 840. Goldstein committed a $1,987,500 fraud on NFM. Forfeiture is mandatory, and he should be made to forfeit those criminal proceeds—not profit on them.

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court enter an amended forfeiture money judgment in the amount of $1,987,500—the exact amount of Goldstein's § 1014 fraud proceeds.

Respectfully submitted,

COLIN M. MCDONALD
Assistant Attorney General
National Fraud Enforcement Division

Dated: October 1, 2026

*/s/*
Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys, Tax Section
National Fraud Enforcement Division
Department of Justice

Sean Beaty
Senior Litigation Counsel, Tax Section
National Fraud Enforcement Division
Department of Justice